# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., ET AL.,

*Plaintiffs-Appellees*,

*v.*

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts in Case No. 1:25-cv-11913

## OPPOSITION TO MOTION FOR STAY PENDING APPEAL

Emily Nestler
PLANNED PARENTHOOD
 FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW
Washington, D.C. 20005
Tel.: (202) 973-4800
emily.nestler@ppfa.org

Alan Schoenfeld
Cassandra A. Mitchell
Alex W. Miller
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com

August 14, 2025

*Attorneys for Plaintiffs-Appellees*

ADDITIONAL COUNSEL ON INSIDE COVER

Sharon K. Hogue
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
sharon.hogue@wilmerhale.com

# TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................1

STATEMENT ....................................................................................2

    A.    Planned Parenthood's Mission and Message ........................2

    B.    The Defund Provision ..........................................................4

    C.    This Lawsuit ........................................................................6

ARGUMENT ....................................................................................7

I.    THE MOTION IS PROCEDURALLY IMPROPER .....................8

II.    THE GOVERNMENT IS UNLIKELY TO SUCCEED ON THE
MERITS OF ITS PRELIMINARY INJUNCTION APPEAL ........9

    A.    The Defund Provision Is An Unconstitutional Bill Of
Attainder ..............................................................................9

        1.    Specification...............................................................10

        2.    Punishment.................................................................11

        3.    No Judicial Trial........................................................13

    B.    The Defund Provision Violates Equal Protection ...............13

    C.    The Defund Provision Violates The First Amendment .......16

        1.    The Defund Provision violates Planned
Parenthood's First Amendment associational rights ...............16

        2.    The Defund Provision unconstitutionally retaliates
against Planned Parenthood's exercise of First
Amendment rights.....................................................19

III.    THE REMAINING FACTORS WEIGH HEAVILY AGAINST
A STAY ......................................................................................21

A. The Government Has Not Shown Irreparable Injury ...........................21

B. A Stay Would Substantially Harm Planned Parenthood .....................21

C. A Stay Would Disserve The Public interest ........................................22

CONCLUSION .........................................................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l,*
570 U.S. 205 (2013)........................................................................17

*Alexander v. Choate,*
469 U.S. 287 (1985).........................................................................4

*Barton v. Clancy,*
632 F.3d 9 (1st Cir. 2011)..........................................................19, 20

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985).......................................................................13

*District 4 Lodge of the IAM v. Raimondo,*
18 F.4th 38 (1st Cir. 2021) ..............................................................9

*Eisenstadt v. Baird,*
405 U.S. 438 (1972).......................................................................15

*Florida Youth Conservation Corps. v. Stutler,*
2006 WL 1835967 (N.D. Fla. June 30, 2006).................................12

*Gattineri v. Town of Lynnfield,*
58 F.4th 512 (1st Cir. 2023) ...........................................................19

*Hanson v. D.C.,*
120 F.4th 223 (D.C. Cir. 2024).......................................................21

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016)............................................................22

*Lozman v. City of Riviera Beach,*
585 U.S. 87 (2018).........................................................................19

*Mahmoud v. Taylor,*
145 S.Ct. 2332 (2025).....................................................................22

*McCue v. Bradstreet,*
807 F.3d 334 (1st Cir. 2015)...........................................................20

*N.H. Indonesian Cmty. Support v. Trump*,
    765 F.Supp.3d 102 (D.N.H. 2025) ................................................................21

*NAACP v. Alabama*,
    357 U.S. 449 (1958)...................................................................................18

*National Rifle Ass'n v. Vullo*,
    602 U.S. 175 (2024)...................................................................................19

*New Jersey v. Trump*,
    131 F.4th 27 (1st Cir. 2025) .......................................................................7

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ................................................................7, 21

*Nixon v. Administrator of Gen. Servs.*,
    433 U.S. 425 (1977)...................................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................7, 21

*Planned Parenthood of Cent. N.C. v. Cansler*,
    877 F.Supp.2d 310 (M.D.N.C. 2012) ........................................................12

*Plyler v. Doe*,
    457 U.S. 202 (1982)...................................................................................14

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)...................................................................................18

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005)........................................................................23

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)............................................................................14, 20

*Rocket Learning, Inc. v. Rivera-Sanchez*,
    715 F.3d 1 (1st Cir. 2013)..........................................................................14

*Romer v. Evans*,
    517 U.S. 620 (1996)...................................................................................16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000)...............................................................22

*Rust v. Sullivan*,
    500 U.S. 173 (1991)....................................................................17

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*,
    309 F.3d 662 (9th Cir. 2002) .......................................................11

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*,
    468 U.S. 841 (1984).............................................................10, 11

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012)........................................................9, 22

*Somerville Pub. Schs. v. McMahon*,
    139 F.4th 63 (1st Cir. 2025) ..................................................21, 24

*United States v. Brown*,
    381 U.S. 437 (1965).............................................................10, 11

*United States v. Lovett*,
    328 U.S. 303 (1946)....................................................................10

**Docketed Cases**

*Beckwith v. Frey*,
    No. 25-1160, Dkt.00118270772 (1st Cir. Apr. 10, 2025) ..............................21

**Statutes**

42 U.S.C. §1396a .............................................................................4

One Big Beautiful Bill Act,
    Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025)..............................................4

**Rules**

Fed. R. App. P. 8(a)(2)........................................................................8

**Other Authorities**

Benner, *Most Planned Parenthood Clinics Are Ineligible for Medicaid Money After Court Ruling*, N.Y. Times (July 22, 2025) .................................1

"Control," *Black's Law Dictionary* (12th ed. 2024) .................................................18

# INTRODUCTION

The government seeks extraordinary relief to enforce an unconstitutional law concededly crafted to punish Planned Parenthood for its political advocacy. Section 71113 of the "One Big Beautiful Bill"—the Defund Provision—categorically prohibits certain Planned Parenthood Members from being reimbursed with federal funds under the Medicaid program for health care services they provide to their patients. This prohibition has nothing to do with funding abortions—the Hyde Amendment already generally bars that; the Defund Provision spares nearly every other abortion provider; and the law defunds Planned Parenthood Members that do not, in fact, provide abortions. Instead, with no reason other than admitted animus toward Planned Parenthood's "political advocacy," the law seeks to prevent Planned Parenthood Members from providing vital—indeed, lifesaving—care to more than one million patients.[1] Because singling out Planned Parenthood for punishment in this manner violates the Constitution, the district court properly enjoined the Defund Provision.

Three constitutional provisions independently support the preliminary relief entered below. First, the Constitution prohibits bills of attainder—laws, like this

---

[1] Benner, *Most Planned Parenthood Clinics Are Ineligible for Medicaid Money After Court Ruling*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/us/politics/trump-planned-parenthood.html (HHS spokesperson reacting to district court decision with "States should not be forced to fund organizations that have chosen *political advocacy* over patient care" (emphasis added)).

one, that specify and punish particular entities without a trial.  Second, the Fifth Amendment's equal protection guarantee precludes the government from treating Planned Parenthood Members worse than other abortion providers without sufficient justification.  Moreover, heightened scrutiny applies where, as here, the fundamental rights to association and political advocacy are directly implicated by that discriminatory treatment.  Finally, the Constitution forbids punishing Planned Parenthood Members for exercising their First Amendment right to freely associate.

Three weeks after the district court first enjoined the Defund Provision, the government conjures an emergency and demands that this Court immediately prevent Planned Parenthood from continuing to provide lifesaving health care to the millions of Americans on Medicaid.  The government's delayed request fails to meet any of the prerequisites for the extraordinary and devastating relief it seeks.  Even temporary enforcement of the Defund Provision will cause irreparable harm, and the evidence of the law's unconstitutionality has only grown stronger since the district court's initial order.  This Court should deny the stay request.

## STATEMENT

### A.    Planned Parenthood's Mission and Message

PPFA is a national membership organization whose mission is to support the provision of comprehensive, high-quality sexual and reproductive health care regardless of ability to pay, educate the public about sexual and reproductive health,

and advocate for access to sexual and reproductive health care.  *See* Dkt.5-1 ¶¶7, 12.  PPFA has 47 independently incorporated and operated Members including Plaintiff-Members Planned Parenthood League of Massachusetts ("PPLM") and Planned Parenthood Association of Utah ("PPAU").  Dkt.1 ("Compl.") ¶¶19, 25, 35.  PPFA and its Members have long been at the forefront of the reproductive rights movement, and the Planned Parenthood name "sends a powerful message to the community that the Member stands for certain values and provides health care and educational services of high quality."  Dkt.5-1 ¶¶9, 15.

Planned Parenthood Members' health centers provide sexual and reproductive health care to millions of people.  Dkt.5-1 ¶21.  An estimated one out of every three women and one in ten men nationally have received care from a Member health center.  *Id.*  In 2023, Members served more than two million patients and provided approximately 9.4 million services, including cancer examinations, contraceptives, testing and treatment for STIs, gender-affirming hormone therapy, and legal abortion.  *Id.* ¶23.  Especially in low-income and historically underserved communities, a Planned Parenthood Member health center is often the most accessible—if not the only—place to obtain sexual and reproductive health care.  *Id.* ¶¶24, 33.

**B.    The Defund Provision**

Medicaid is a joint federal-state program wherein the federal government provides financial assistance to States, through reimbursements, to help finance health care for eligible low-income individuals. *See Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985); 42 U.S.C. §1396a. Over half of Planned Parenthood Member patients rely on Medicaid, and half of visits to Member health centers are covered by Medicaid. Dkt.5-1 ¶¶5, 43.

The Defund Provision culminates a decades-long effort to punish Planned Parenthood for its advocacy, as statements by Speaker Johnson, President Trump, and their allies have made clear. Compl. ¶¶86-88, 91. To give just one example, Speaker Johnson stated that "defunding" Planned Parenthood was at the top of the Republican agenda and "the House is going to be working on the one, big, beautiful bill … . And we're absolutely making it clear to everybody that this bill is going to redirect funds away from Big Abortion," a long-used pejorative for Planned Parenthood. *Id.* ¶93.

The Defund Provision makes good on this promise. It prohibits federal Medicaid funds from going to a "prohibited entity"—a definition gerrymandered to capture Planned Parenthood Members—for "services furnished during the 1-year period beginning on the date of the enactment of this Act." Pub. L. No. 119-21, 139 Stat. 72, 300-01 (July 4, 2025). The legislative history makes clear that Congress

described Planned Parenthood by its traits, rather than by name, to overcome a parliamentary rule known as the "Byrd Rule." *See* Dkt.5 at 10, 20 n.15. Thus, the statute defines a "prohibited entity" as "an entity" "including its affiliates, subsidiaries, successors, and clinics," that:

> (1) "provides for abortions," other than abortions in the case of rape or incest or where the pregnant patient's life is in danger;
>
> (2) is a 501(c)(3) nonprofit;
>
> (3) "is an essential community provider described in" 45 C.F.R. §156.235 "primarily engaged in family planning services, reproductive health, and related medical care"; and
>
> (4) "for which the total amount of Federal and State expenditures under the Medicaid program … in fiscal year 2023 made directly … to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000."

The overwhelming majority of entities that satisfy these criteria are Planned Parenthood Members. Some Members, including PPLM, independently satisfy the law's requirements, and therefore independently qualify as "prohibited entit[ies]." *See* Dkt.5-1 ¶47; Dkt.5-2 ¶29. Others, including PPAU, either do not provide abortion services or did not receive over $800,000 in Medicaid funds during FY2023 and therefore do not independently meet this definition (the "Non-Qualifying Members"). *See* Dkt.5-3 ¶20; Dkt.5-1 ¶63. But to the extent the Non-Qualifying Members are deemed "affiliates" of the qualifying Planned Parenthood Members—

a characterization the government has refused to dispel, Dkt.69 ("Op.") at 14—they are likewise unable to receive Medicaid payments under the Defund Provision.

Virtually all other abortion providers are excluded, and the government has identified only two other providers that are captured as collateral damage. Mot.12.

If enforced, the Defund Provision will devastate Planned Parenthood Members, patients, and PPFA. It will force Members to terminate employees, curtail services, and potentially close health centers, as over one-third of Members' total revenue is from Medicaid and some Members receive the majority of their health services revenue from Medicaid. Dkt.5-1 ¶¶44, 47, 54-55, 60-64. This will have lasting effects even if funding is restored, as it is often prohibitively difficult to reopen closed health centers. Dkt.5-4 ¶46. This in turn will jeopardize essential care for patients, many of whom lack alternative providers. Dkt.5-1 ¶¶4-5, 52-56. Other providers cannot fill the gaps. *Id.* ¶¶49-56; Dkt.5-5 ¶¶35-59.

## C.    This Lawsuit

On July 7, Plaintiffs sued to enjoin the Defund Provision's enforcement. The same day, the district court entered a temporary restraining order, followed by an amended order on July 11, 2025. Dkt.46. On July 21, the court granted Plaintiffs' Motion for a Preliminary Injunction in part, Dkt.62, and the government appealed the next day, Dkt.63. On July 28, the district court granted the Preliminary Injunction in full. Op. On August 5—more than a week later—the government

appealed the July 28 Order.  Dkt.75.  On August 7, the government filed a Motion to Stay Preliminary Injunctions Pending Appeal in the district court.  Dkt.84.  On August 11, the district court issued an order noting it had already denied the government's previous requests for stays, but ordered Plaintiffs to respond to the government's motion no later than August 21 and said it would consider that motion "promptly" thereafter.  Dkt.87.  Notwithstanding the district court's order, the government filed this stay motion later that day.

## ARGUMENT

A stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review."  *New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025).  "[T]he party seeking a stay—here, the Government—bears the burden of proving that the circumstances justify one."  *New Jersey v. Trump*, 131 F.4th 27, 34 (1st Cir. 2025).  The government must "(1) make a 'strong showing that [it is] likely to succeed on the merits' in [its] appeal; (2) show that [it] 'will be irreparably injured absent a stay'; (3) show that 'issuance of the stay will [not] substantially injure the other parties interested in the proceeding'; and (4) show that the stay would serve 'the public interest.'"  *New York*, 133 F.4th at 65 (quotations omitted and alterations in original).  Here, no factor favors a stay.

## I.    THE MOTION IS PROCEDURALLY IMPROPER

The government's motion is procedurally improper because its motion for a stay pending appeal remains pending before the district court. *See* Dkt.84. The government filed that motion on August 7 and asked the district court to rule by August 11. Dkt.85 at 3. On August 11, the district court issued an order noting that it had already twice denied the government's request "that any injunctive relief be stayed pending appeal," and that even so, the government had yet to seek a stay in the First Circuit. Dkt.87. In light of those previous orders, the court said the government had not presented argument to "justify an expedited ruling on Defendants' request for reconsideration," and directed Plaintiffs to file a response by August 21, after which it would "promptly" decide the government's motion. *Id*. The government filed this motion even though the district court stated its intent to issue a decision on the stay motion pending before it.

To be entitled to a stay pending appeal, the government is required to "state that, a motion having been made, the district court denied the motion or failed to afford the relief requested." Fed. R. App. P. 8(a)(2). The government cannot make the necessary showing that "the district court denied the motion or failed to afford the relief requested" because a renewed stay motion is currently pending before the district court. That alone justifies denying the government's motion, or at least deferring a decision until the district court issues its order.

## II. THE GOVERNMENT IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS PRELIMINARY INJUNCTION APPEAL

"Determining the likelihood of the [defendants'] success in this appeal requires [the court] to determine the likelihood that the district court itself erred in issuing a preliminary injunction." *District 4 Lodge of the IAM v. Raimondo*, 18 F.4th 38, 42-43 (1st Cir. 2021). "To the extent the district court's ruling rested on findings of fact," this Court must "defer to those findings absent clear error." *Id.* at 43. "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).

The district court correctly held that the Defund Provision is likely unconstitutional. Specifically, the court found that the law violates both the Bill of Attainder Clause and the Fifth Amendment's equal protection guarantee as to all Members, and that it violates the First Amendment rights of the Non-Qualifying Members. The government fails to show that it is likely to persuade this Court on appeal that the district court erred on any of those constitutional claims. Further, a stay is also improper because the Defund Provision constitutes unlawful retaliation against all Members' protected speech and association.

### A. The Defund Provision Is An Unconstitutional Bill Of Attainder

The Defund Provision punishes Planned Parenthood for having long been the Nation's foremost advocate for sexual and reproductive rights and, if its Members

are treated collectively, the only nationwide abortion provider.  That makes the law

a bill of attainder, violating U.S. Const. art. I, §9, cl. 3.  The Bill of Attainder Clause

prohibits "trial by legislature" and requires legislatures to accomplish their

objectives "by rules of general applicability," not by "specify[ing] [those] upon

whom the sanction it prescribes is to be levied." *United States v. Brown*, 381 U.S.

437, 442, 461 (1965).  The district court correctly held that the Defund Provision

likely satisfies all three elements of a bill of attainder: "[1] specification of the

affected persons, [2] punishment, and [3] lack of a judicial trial." *Selective Serv.

Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 847 (1984).

### 1.    Specification

Specification exists if the challenged legislation applies "to easily

ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315

(1946).  Here, the definition of "prohibited entity" was designed for Planned

Parenthood alone—deploying, per the district court, a set of "conjunctive criteria

[that] create a narrow class of entities consisting almost entirely of Planned

Parenthood Members." Op.32.  The legislative history and context confirm that

intent. *Supra* pp.4-5.

None of the Defund Provision's peculiarities change this.  It is immaterial that

the law incidentally captures two entities other than Planned Parenthood Members.

The government has not disputed that these entities were afterthoughts swept into

the bill during the reconciliation process. Dkt.5 at 10, 20 n.15. Nor does it matter that the specified class may escape punishment by ceasing to provide abortions or affiliate with entities that do. Mot.10-12. Leaving "the designated parties a way of escaping the penalty" does not excuse a bill of attainder. *Brown*, 381 U.S. at 442. As the district court explained, the "law establishes a class of entities and requires only those entities to stop providing abortion—and to disaffiliate with entities that do—to continue receiving Medicaid reimbursements." Op.34. Because the Defund Provision specifies Planned Parenthood in all but name, the specification element is satisfied. *See SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 669-670 (9th Cir. 2002) ("A statute need not identify an individual or group by name to incur suspicion.").

## 2.    Punishment

The Defund Provision imposes "punishment" on Planned Parenthood. Three factors determine whether legislation punishes: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852. The district court rightly held that those factors show the Defund Provision imposes punishment. Op.36-41.

*First*, "'barring designated … groups from participation in specified employments or vocations' is a historical form of punishment characteristic of bills of attainder." Op.37 (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 474 (1977)). The Defund Provision prevents Planned Parenthood Members from continuing to serve Medicaid patients, the consequence of which is "to put plaintiff[s] out of business, or at least … out of the business in which [they have] been engaged to date." *Florida Youth Conservation Corps. v. Stutler*, 2006 WL 1835967, at *1 (N.D. Fla. June 30, 2006). Exclusion is therefore "analogous to legislation that prohibits a person or entity from engaging in certain employment, which courts have historically found to be associated with punishment." *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F.Supp.2d 310, 324 (M.D.N.C. 2012).

*Second*, the Defund Provision does not advance any nonpunitive legislative purpose. *See Nixon*, 433 U.S. at 475-476. The government's sole *post hoc* justification—not subsidizing abortion providers, *see* Mot.9-10—is nonsensical. The Defund Provision does not prevent taxpayer dollars from paying for abortions, nor does it prevent the majority of abortion providers from receiving Medicaid funding. The Hyde Amendment, moreover, has long prohibited federal Medicaid money from funding most abortions. The Defund Provision thus has nothing to do with funding for abortion. *See* Benner, *supra* n.1 (HHS spokesperson justifying

Defund Provision on ground that "[s]tates should not be forced to fund organizations that have chosen political advocacy over patient care").

*Third*, the legislative record confirms the government's intent to punish Planned Parenthood. The statute's supporters have expressly reaffirmed that their point was to target and punish Planned Parenthood. *See supra* pp.4-5.

### 3. No Judicial Trial

The Defund Provision undisputedly operates without a trial.

### B. The Defund Provision Violates Equal Protection

Equal protection directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). By design, the Defund Provision prohibits Planned Parenthood Members from receiving Medicaid reimbursements while leaving untouched almost all others who provide the same care—even abortions. For-profit abortion providers may still participate in Medicaid. So too may non-profit providers of abortions who do not predominantly serve low-income individuals or engage primarily in family planning services. As the district court held, this selective disfavoring straightforwardly fails heightened scrutiny, but it would also fail any level of review.

Heightened scrutiny applies because the Defund Provision infringes Planned Parenthood's fundamental First Amendment right of association. Because the Defund Provision "applies to affiliates of an entity that provide[s] abortion, no

Member can escape the law's burden simply by ending its own abortion services. Instead, a member must also disaffiliate from any Member that continues to provide abortion, which requires disassociating from Planned Parenthood Federation." Op.45. That compulsion curtails Members' associational expression, as "[m]embership in Planned Parenthood Federation—and corresponding affiliation with other Members—is … part and parcel with Planned Parenthood Members' associational expression." Op.27. As the district court found, "Planned Parenthood Federation advocates before Congress, provides education and information about sexual and reproductive health, … communicates with the public regarding lawmakers' voting records, supports campaigns for ballot initiatives, and supports candidates for federal, state, and local officials who will support reproductive freedom in furtherance of its mission." Op.26-27. And "Members engage in those activities with Planned Parenthood Federation and each other," rendering their association highly expressive. Op.27. Coercing Members to abandon these expressive associations is a quintessential burden on core First Amendment activity. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984).

"Classifications that impinge on 'fundamental rights,' including free speech rights, are subject to strict scrutiny and will only be upheld if 'precisely tailored to serve a compelling governmental interest.'" *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 9 n.6 (1st Cir. 2013) (quoting *Plyler v. Doe*, 457 U.S. 202, 217

(1982)); *see also Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7 (1972). The Defund Provision comes nowhere near this and fails even rational basis review.

The statute does not serve the government's sole asserted purpose: "a federal policy against subsidizing abortion." Mot.1. Federal law already prohibits funding most abortions. But even if it did not, the Defund Provision punishes *non*-abortion providers if they "affiliate" with an independently qualifying "prohibited entity," despite the lack of any evident link between such affiliation and "subsidizing abortion." The statute then deploys several conditions that (again) have nothing to do with the abortions an entity provides. As the district court observed, "it is unclear how including only entities that are non-profits and provide medical services in underserved communities is in any way related to reducing abortion." Op.48. And even if the government could somehow connect the provision's individual requirements to its asserted interest in disfavoring abortion—though it cannot—the conditions taken together conspire to prohibit just Planned Parenthood Members and isolated, collateral casualties, leaving uncovered *every other abortion provider in the country*. The Defund Provision thus does not halt Medicaid funds for "one category of abortion providers," Mot.19, but rather deploys layered criteria with no relation to the asserted purpose to target one provider network: Planned Parenthood.

Pretexts aside, the provision's true design is to punish Planned Parenthood for its advocacy for abortion rights and access. If that were not already clear from the

Defund Provision's layered scheme and legislative history, the government has since removed any doubt, saying it should be able to defund what it deems to be "organizations that have chosen political advocacy over patient care." *See* Benner, *supra* n.1. Such a "'bare … desire to harm'" Planned Parenthood is not a legitimate, much less compelling, government interest. *Romer v. Evans*, 517 U.S. 620, 632-635 (1996).

## C. The Defund Provision Violates The First Amendment

### 1. The Defund Provision violates Planned Parenthood's First Amendment associational rights

As the district court held, the Defund Provision also directly violates the Planned Parenthood Members' First Amendment rights by imposing an unconstitutional condition that coerces them to no longer associate with other Members. The district court's analysis focused on Members that do not provide abortions, who can avoid the Defund Provision only by forgoing their First Amendment "right to associate with Planned Parenthood Federation and other Members" that do. Op.26. This reasoning is correct, and it supports the injunction as to all Planned Parenthood Members—none of whom, according to the government, can escape sanction merely by altering their own behavior and instead must renounce their relationships with one another.

The unconstitutional conditions doctrine protects against such coercion. The doctrine bars the government from "'leverag[ing] funding to regulate speech outside

the contours of the [funded] program itself,'" while permitting the government to "specify the activities Congress wants to subsidize." Op.25 (second alteration in original) (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214-215 (2013)). As the district court held, the Defund Provision falls on the prohibited side of that divide, as it "does not merely 'withhold[] funding based on whether entities provide abortion services,' but also based on whether 'an entity, *including its affiliates*,' provides abortion services." Op.25. Given that statutory text, the government cannot contend that "Congress was not regulating the act of affiliation or the acts of the non-abortion-providing affiliates." Mot.18. Instead, the law clearly burdens First-Amendment-protected free association. *See supra* pp.13-14.

Because this associational restraint occurs "'outside the contours' of the Medicaid program," it is unconstitutional. Op.27 (quoting *AOSI*, 570 U.S. at 214-215). The Defund Provision imposes no "limit on the services that Medicaid funds may reimburse," but instead restricts who "a Medicaid provider may … affiliate with." Op.27. It thus unconstitutionally "place[s] a condition on the *recipient* of the subsidy rather than on the program or service" being provided. Op.28 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

The government mistakenly claims that First Amendment rights are not implicated by the affiliation restriction because that restriction merely aims to stop

prohibited entities from shuffling funds between corporate sub-entities. Mot.14. To be clear, Congress's intent was not so benign—the Defund Provision is laser-focused on punishing Planned Parenthood, as government spokespeople have reaffirmed. *See supra* Part II.A. But even if the government were right, "[i]nnocent motives do not eliminate the danger" of a law (like the Defund Provision) that directly restrains First Amendment freedoms. *Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015); *see also NAACP v. Alabama,* 357 U.S. 449, 461-462 (1958).

If anything, the government's argument provides another reason why a stay is inappropriate. The government apparently concedes that any Non-Qualifying Member can become a "prohibited entity" through its relationship to other entities only if that relationship involves corporate "control." Mot.14. "Control" typically requires an entity to own or manage another. *See, e.g.*, "Control," *Black's Law Dictionary* (12th ed. 2024). But no Planned Parenthood Member owns or manages any other. Members are separately incorporated, have separate leadership and boards, separate staff on separate payrolls, and file their taxes as individual organizations. Dkt.5-1 ¶¶9, 16. No Member has an ownership interest in another, nor is there such a relationship between PPFA and Members. *Id.* ¶¶10, 13, 15-17. Yet despite its own characterization of "affiliate" in its brief before this Court, the government has insisted that it is entitled to "construe the statute to cover 'non-qualifying members'" based on their association with other Members, and a stay

would permit the government to act on that claimed entitlement. Dkt.53 at 27. This Court should not grant a stay that would enable the government to act on its contradictory interpretation of the provision's scope.

### 2. The Defund Provision unconstitutionally retaliates against Planned Parenthood's exercise of First Amendment rights

Plaintiffs are also likely to show the Defund Provision is unconstitutional with respect to all Planned Parenthood Members because it unlawfully retaliates against their First Amendment activity. Congress cannot "punish or suppress disfavored expression," *National Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024), or retaliate against such expression, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Accordingly, "the government may not deprive an individual of a 'valuable government benefit[]' in retaliation for [the] exercise of First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 23 (1st Cir. 2011). Yet that is precisely what the Defund Provision seeks to do. And because PPFA and its Members (1) "'engaged in constitutionally protected conduct,'" (2) were "'subjected to adverse [government] action,'" and (3) "'the protected conduct was a substantial or motivating factor in the adverse action,'" they have demonstrated all elements necessary to prevail on a retaliation claim. *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514-515 (1st Cir. 2023).

First, PPFA and its Members engage in First Amendment-protected activity. They advocate for access to sexual and reproductive health care, including abortion.

And to speak and act together, Members associate with PPFA and one another, exercising the associational right "implicit in the right to engage in activities protected by the First Amendment." *Roberts*, 468 U.S. at 622.

Second, terminating Medicaid eligibility is an adverse action. The Defund Provision punishes Members for associating with each other and PPFA by stopping the flow of hundreds of millions of dollars in Medicaid reimbursements—denying a "'valuable government benefit.'" *Clancy*, 632 F.3d at 23. With that much at stake, disqualification would "'deter a reasonably hardy individual'" from associating with Planned Parenthood or advocating for sexual and reproductive health care, including abortion. *McCue v. Bradstreet*, 807 F.3d 334, 339 (1st Cir. 2015).

Finally, intentional animus against Planned Parenthood's message is at the center of the Defund Provision, and Planned Parenthood Members' association with each other and PPFA is why they have been targeted for differential treatment. *See supra* pp.15-16. Taken together, the Defund Provision's text and context demonstrate unconstitutional retaliatory animus, a desire to pressure caregivers who associate with Planned Parenthood and its mission of promoting reproductive health for those in need.

## III. THE REMAINING FACTORS WEIGH HEAVILY AGAINST A STAY

### A. The Government Has Not Shown Irreparable Injury

The government has not carried its burden of showing it "will be irreparably injured absent a stay." *New York*, 133 F.4th at 65. The government invokes its interest in implementing a duly enacted statute, Mot.20, but it has "no interest in enforcing an unconstitutional law." *N.H. Indonesian Cmty. Support v. Trump*, 765 F.Supp.3d 102, 112 (D.N.H. 2025); *see also Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025).

Additionally, the government's "failure to seek expedited review of the stay motion" before this Court or the district court indicates that immediate relief is unnecessary. The district court issued its first order enjoining the statute on July 21, but the government did not file this Motion until about three weeks later, and even then did not seek expedited review. *See* Order, *Beckwith v. Frey*, No. 25-1160, Dkt.00118270772 (1st Cir. Apr. 10, 2025) (government's "failure to seek expedited review of the stay motion or the appeal undercuts any claim that immediate relief from the injunction is required to prevent irreparable harm")*; Hanson v. D.C.*, 120 F.4th 223, 246 (D.C. Cir. 2024).

### B. A Stay Would Substantially Harm Planned Parenthood

By contrast, Planned Parenthood will suffer substantial harm if the preliminary injunction is even temporarily lifted. The "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 145 S.Ct. 2332, 2364 (2025). Given the likely First Amendment violations, "[t]here is no need for an extensive analysis" to identify an injury to Planned Parenthood. *Fortuño*, 699 F.3d at 15.

In any event, further harms to Planned Parenthood are apparent. Disqualifying Planned Parenthood from Medicaid would force its health centers to cancel appointments with Medicaid patients, cut back on services, lay off staff, and perhaps close. *See* Dkt.5-1 ¶¶4, 44, 54-57, 78; Dkt.5-2 ¶¶40-42; Dkt.5-3 ¶¶6, 24; Dkt.5-4 ¶¶45-48. These cancellations and cuts would stymie Planned Parenthood Members' and PPFA's shared mission of providing medical care to individuals of modest means. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (irreparable harm where "new obstacles unquestionably make it more difficult for the [plaintiffs] to accomplish their primary mission"). They would also impair the provider-patient relationship and undermine Planned Parenthood health centers' goodwill and reputation. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Because injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable.").

## C.     A Stay Would Disserve The Public interest

As the district court held, the preliminary injunction serves the public interest,

so staying it would not. *See* Op.53-55. If enforceable, the Defund Provision would compel Members to curtail care for Medicaid patients, cut services, and close health centers, jeopardizing the health of all Planned Parenthood patients. *See* Dkt.5-5 ¶¶35, 57, 60-63, 82; Dkt.5-1 ¶¶65-73. The resulting public health crisis would harm the public interest. *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 77 (1st Cir. 2005) (affirming preliminary injunction where "any shut down" of a particular health center "would adversely affect hundreds of Medicaid patients").

By comparison, there is no substantial public interest in enforcing the Defund Provision. The government leans almost entirely on a supposed interest in ensuring "that taxpayer dollars should not be allocated to certain organizations that perform elective abortions." Mot.20. But the key word is "certain"—the Defund Provision plainly does not bar taxpayer dollars from going to organizations that perform elective abortions. *See* Mot.11 (stating that Members could avoid Section 71113 yet continue to provide abortions if they "relinquish Section 501(c)(3) or essential-community-provider status"). It bars taxpayer dollars specifically from going to Planned Parenthood Members, which is what it was designed to do—and the government has never explained what legitimate public interest that serves. While the government also fleetingly invokes the public's interest in the implementation of duly enacted statutes, Mot.19, there is no public interest in perpetuating unconstitutional action. *See Somerville*, 139 F.4th at 76.

# CONCLUSION

Since every factor disfavors a stay, this Court should deny the Motion. However, in the event the Court grants the Motion, it should clarify that Planned Members are entitled to retain reimbursements for covered healthcare already provided and for which, in reliance on the injunction, they submitted claims while the injunction was in place.

Respectfully submitted,

Emily Nestler
PLANNED PARENTHOOD
 FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW
Washington, D.C. 20005
Tel.: (202) 973-4800
emily.nestler@ppfa.org

*/s/ Alan Schoenfeld*
Alan Schoenfeld
Cassandra A. Mitchell
Alex W. Miller
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com

Sharon K. Hogue
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
sharon.hogue@wilmerhale.com

*Attorneys for Plaintiffs-Appellees*

August 14, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 5,184 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Alan Schoenfeld*
Alan Schoenfeld
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com

August 14, 2025

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Opposition to Motion for Stay on Appeal with the Clerk of the United States Court of Appeals for the First Circuit via the CM/ECF system this 14th day of August, 2025 to be served on the following counsel of record via ECF:

ABRAHAM R. GEORGE
  abraham.george@usdoj.gov
DONALD CAMPBELL LOCKHART
  donald.lockhart2@usdoj.gov
U.S. ATTORNEY'S OFFICE
1 Courthouse Way
Boston, MA 02210
(617) 748-9152

BRETT A. SHUMATE
  brett.a.shumate@usdoj.gov
LEAH B. FOLEY
  leah.b.foley@usdoj.gov
ERIC D. MCARTHUR
  eric.d.mcarthur@usdoj.gov
EMILY HALL
  emily.hall@usdoj.gov
STEVEN H. HAZEL
  steven.h.hazel@usdoj.gov
BRADLEY HUMPHREYS
  bradley.humphreys@usdoj.gov
JACOB SILER
  jacob.s.siler@usdoj.gov
DANIEL TENNY
  daniel.tenny@usdoj.gov
ELIZABETH THEMINS HEDGES
  elizabeth.t.hedges@usdoj.gov
U.S. DEP'T OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530-0001

(202) 514-2498

Elisabeth Neylan
  elisabeth.j.neylan@usdoj.gov
U.S. Dep't of Justice
1100 L St NW
Washington, DC 20530
(717) 217-8180

*Attorneys for Defendants-Appellants*

Thomas Michael Harvey
  thomasharvey2232@embarqmail.com
Law Office of Thomas M. Harvey
22 Mill St
Arlington, MA 02476
(252) 539-2111

Nathan Jeremiah Moelker
  nmoelker@aclj.org
Jordan A. Sekulow
  jordansekulow@aclj.org
American Center for Law & Justice
201 Maryland Ave NE
Washington, DC 20002-5703
(202) 546-8890

Olivia F. Summers
  osummers@aclj.org
American Center for Law & Justice
1000 Regent University Dr
Virginia Beach, VA 23464
(757) 955-8176

*Attorneys for American Center for Law and Justice*

/s/ Alan Schoenfeld
Alan Schoenfeld
Wilmer Cutler Pickering
  Hale and Dorr llp

7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com

August 14, 2025