# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

―――――――――――

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.;
PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; PLANNED
PARENTHOOD ASSOCIATION OF UTAH,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the U.S.
Department of Health and Human Services; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; MEHMET OZ, in the official capacity as
Administrator of the Centers for Medicare & Medicaid Services; CENTERS FOR
MEDICARE & MEDICAID SERVICES,

*Defendants-Appellants.*

―――――――――――

On Appeal from the United States District Court
for the District of Massachusetts

―――――――――――

## APPENDIX

―――――――――――

BRETT A. SHUMATE
  *Assistant Attorney General*
LEAH B. FOLEY
  *United States Attorney*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
DANIEL TENNY
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.H.Hazel@usdoj.gov*

# TABLE OF CONTENTS

Docket Sheet ................................................................................................ A98

Complaint (Dkt. No. 1) ............................................................................ A112

Exhibits to Motion for Preliminary Injunction (Dkt. No. 5) .................... A167

Exhibits to Opposition to Motion for Preliminary Injunction (Dkt. No. 53) ........ A458

Exhibit to Reply in Support of Motion for Preliminary Injunction (Dkt. No. 60) ............................................................................................. A469

Transcript of July 18, 2025 Motion Hearing (Dkt. No. 70) ...................... A472

Notices of Appeal (Dkt. Nos. 63, 75) ....................................................... A563

August 29, 2025 Order Denying Stay Motion (Dkt. No. 93) .................... A567

CERTIFICATE OF SERVICE

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25−cv−11913−IT

Planned Parenthood Federation of America, Inc. et al v. Kennedy et al
Assigned to: Judge Indira Talwani
related Case:  1:25−cv−12118−IT
Case in other court:  USCA − First Circuit, 25−01698
USCA − First Circuit, 25−01755
Cause: 28:2201 Injunction

Date Filed: 07/07/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **Planned Parenthood Federation of America, Inc.** | represented by | **Alan E. Schoenfeld**<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>212−937−7294<br>Fax: 212−937−8888<br>Email: alan.schoenfeld@wilmerhale.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Albinas Prizgintas**<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>2100 Pennsylvania Avenue, NW<br>Washington, DC 20037<br>202−663−6719<br>Fax: 202−663−6363<br>Email: albinas.prizgintas@wilmerhale.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Alexander Miller**<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>212−295−6272<br>Email: alex.miller@wilmerhale.com<br>*ATTORNEY TO BE NOTICED* |
| | | **C. Peyton Humphreville**<br>Planned Parenthood Federation of America<br>123 William Street<br>New York, NY 10038<br>212−965−7000<br>Email: catherine.humphreville@ppfa.org<br>*ATTORNEY TO BE NOTICED* |
| | | **Cassandra Mitchell**<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York City, NY 10007<br>212−937−7273<br>Email: cassie.mitchell@wilmerhale.com<br>*ATTORNEY TO BE NOTICED* |

**Emily Nestler**
Planned Parenthood Federation of America
Planned Parenthood Federation of America
1110 Vermont Avenue NW
Washington, DC 20005
202–973–4800
Email: emily.nestler@ppfa.org
*ATTORNEY TO BE NOTICED*

**Jennifer Sandman**
Planned Parenthood Federation of America
Public Policy Litigation & Law
123 William Street
Floor 9
New York, NY 10038
212–261–4584
Email: jennifer.sandman@ppfa.org
*ATTORNEY TO BE NOTICED*

**Kyla Eastling**
Planned Parenthood Federation of America
123 William St.
Floor 9
New York, NY 10038
858–692–5797
Email: kyla.eastling@ppfa.org
*ATTORNEY TO BE NOTICED*

**Sharon Hogue**
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617–526–6702
Email: sharon.hogue@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Planned Parenthood League of Massachusetts**    represented by    **Alan E. Schoenfeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Albinas Prizgintas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**C. Peyton Humphreville**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cassandra Mitchell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Sandman**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Kyla Eastling**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sharon Hogue**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Planned Parenthood Association of Utah** | represented by | **Alan E. Schoenfeld**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Albinas Prizgintas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**C. Peyton Humphreville**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cassandra Mitchell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Sandman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyla Eastling**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sharon Hogue**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Robert F. Kennedy, Jr.**<br>*in his official capacity as Secretary of the U.S. Department of Health and Human Services* | represented by | **Emily Margaret Hall**<br>DOJ–Civ<br>Civil Division, Office of the Assistant Attorney General<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530<br>202–307–6482<br>Email: emily.hall@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Elisabeth Neylan**
DOJ–Civ

1100 L St. NW
Washington, DC 20005
771–217–8180
Email: elisabeth.j.neylan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Elizabeth Themins Hedges**
DOJ–Civ
950 Pennsylvania Ave NW
Washington, DC 20530
771–209–1978
Email: elizabeth.t.hedges@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. Department of Health and Human Services**      represented by    **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth Neylan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Themins Hedges**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Mehmet Oz**
*in his official capacity as Administrator of the Centers for Medicare & Medicaid Services*     represented by    **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth Neylan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Themins Hedges**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Centers for Medicare & Medicaid Services**      represented by    **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth Neylan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Themins Hedges**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**American Center for Law & Justice**
201 Maryland Ave., NE, DC 20002      represented by    **Olivia F. Summers**
ACLJ
1000 Regent University Dr.
Ste 422
Virginia Beach, VA 23464

757–955–8176
Email: osummers@aclj.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan A. Sekulow**
American Center for Law and Justice
201 Maryland Ave., NE
Washington, DC 20002
202–546–8890
Email: jordansekulow@aclj.org
*ATTORNEY TO BE NOTICED*

**Nathan Jeremiah Moelker**
The American Center for Law and Justice
201 Maryland Ave NE
Washington, DC 20002
724–987–8477
Email: nmoelker@aclj.org
*ATTORNEY TO BE NOTICED*

**Thomas M. Harvey**
Law Office of Thomas M. Harvey
22 Mill Street
Suite 408
Arlington, MA 02476–4744
617–710–3616
Fax: 781–643–1126
Email: tharveyesq@aol.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/07/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants Filing fee: $ 405, receipt number AMADC–11104085 (Fee Status: Filing Fee paid), filed by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 2 | CORPORATE DISCLOSURE STATEMENT by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 3 | MOTION for Leave to File Excess Pages by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts.(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 4 | Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Text of Proposed Order)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 5 | MEMORANDUM in Support re 4 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Exhibit 1 – Declaration of Kimberly Custer, # 2 Exhibit 2 – Declaration of Dominique Lee, # 3 Exhibit 3 – Declaration of Shireen Ghorbani, # 4 Exhibit 4 – Declaration of Jenna Tosh, # 5 Exhibit 5 – Declaration of Claire D. Brindis)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 6 | NOTICE of Appearance by Sharon Hogue on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Hogue, Sharon) (Entered: 07/07/2025) |

| 07/07/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Alan Schoenfeld Filing fee: $ 125, receipt number AMADC–11104437 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Alan Schoenfeld)(Hogue, Sharon) (Entered: 07/07/2025) |
|---|---|---|
| 07/07/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice for admission of Albinas Prizgintas Filing fee: $ 125, receipt number AMADC–11104462 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Albinas Prizgintas)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Cassandra Mitchell Filing fee: $ 125, receipt number AMADC–11104475 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Cassandra Mitchell)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Alex W. Miller Filing fee: $ 125, receipt number AMADC–11104496 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Alex W. Miller)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Jennifer Sandman Filing fee: $ 125, receipt number AMADC–11104533 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Jennifer Sandman)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Emily Nestler Filing fee: $ 125, receipt number AMADC–11104556 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Emily Nestler)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of C. Peyton Humphreville Filing fee: $ 125, receipt number AMADC–11104566 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of C. Peyton Humphreville)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Kyla Eastling Filing fee: $ 125, receipt number AMADC–11104577 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Declaration of Kyla Eastling)(Hogue, Sharon) (Entered: 07/07/2025) |
| 07/07/2025 | 15 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (NMC) (Entered: 07/07/2025) |
| 07/07/2025 | 16 | Summons Issued as to Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (SEC) (Entered: 07/07/2025) |
| 07/07/2025 | 17 | Judge Indira Talwani: ELECTRONIC ORDER granting *nunc pro tunc* Motion for Leave to File Excess Pages 3 . (SEC) (Entered: 07/07/2025) |
| 07/07/2025 | 18 | Judge Indira Talwani: TEMPORARY RESTRAINING ORDER. See attached. (SEC) (Entered: 07/07/2025) |
| 07/07/2025 | 19 | Judge Indira Talwani: ELECTRONIC ORDER: Defendants shall file any opposition to the Plaintiffs' request for a preliminary injunction, *see* Motion 4 , no later than July 14, |

| | | 2025. The clerk shall set a hearing on the motion for the morning of July 21, 2025. (SEC) (Entered: 07/07/2025) |
|---|---|---|
| 07/07/2025 | 20 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 7 Motion for Leave to Appear Pro Hac Vice; granting 8 Motion for Leave to Appear Pro Hac Vice; granting 9 Motion for Leave to Appear Pro Hac Vice; granting 10 Motion for Leave to Appear Pro Hac Vice; granting 11 Motion for Leave to Appear Pro Hac Vice; granting 12 Motion for Leave to Appear Pro Hac Vice; granting 13 Motion for Leave to Appear Pro Hac Vice; granting 14 Motion for Leave to Appear Pro Hac Vice. Added Alan Schoenfeld, Albinas Prizgintas, Cassandra Mitchell, Alex W. Miller, Jennifer Sandman, Emily Nestler, C. Peyton Humphreville, and Kyla Eastling.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by each of the newly admitted attorneys.<br><br>(SEC) (Entered: 07/07/2025) |
| 07/08/2025 | 21 | ELECTRONIC NOTICE Setting Hearing on Motion 4 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction:* Motion Hearing set for 7/21/2025 11:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (GAM) (Entered: 07/08/2025) |
| 07/08/2025 | 22 | NOTICE of Appearance by Alan E. Schoenfeld on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Schoenfeld, Alan) (Entered: 07/08/2025) |
| 07/08/2025 | 23 | MOTION to Continue Hearing on Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction to July 24, 2025 by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts.(Schoenfeld, Alan) (Entered: 07/08/2025) |
| 07/09/2025 | 24 | Opposition re 23 MOTION to Continue Hearing on Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction to July 24, 2025 filed by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. (Neylan, Elisabeth) (Entered: 07/09/2025) |
| 07/09/2025 | 25 | Judge Indira Talwani: ELECTRONIC ORDER: Plaintiffs' Motion to Continue Hearing 23 seeks to continue the July 21, 2025 hearing on Plaintiffs' Motion for a Preliminary Injunction 4 , or in the alternative, to reschedule the hearing for July 18, 2025, based on Plaintiffs' counsel's schedule. Defendants request that the court deny Plaintiffs' Motion for lack of good cause to delay the hearing where Plaintiffs are represented by multiple counsel and where Defendants do not oppose Plaintiffs' remote attendance at the hearing. Defendants' Opp. 1–2 24 . Defendants note further that where a TRO has been entered, the hearing should be scheduled "at the earliest possible time," and that if the hearing is rescheduled, it should be set for July 17 or July 18, 2025, while maintaining existing briefing schedules. Id. (citing Fed. R. Civ. P. 65(b)(3)).<br><br>Where both sides are available for an earlier hearing on July 18, 2025, the clerk shall reset the hearing on Plaintiffs' Motion for Preliminary Injunction 4 for the morning of July 18, 2025. Defendants' time to file an opposition to Plaintiffs' Motion for Preliminary Injunction 4 remains set for July 14, 2025. Plaintiffs' Motion to Continue Hearing 23 is denied as moot.(SEC)<br><br>(Entered: 07/09/2025) |

| 07/09/2025 | 26 | ELECTRONIC NOTICE Resetting Hearing on Motion 4 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* : Motion Hearing RESET for 7/18/2025 09:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (SEC) (Entered: 07/09/2025) |
|---|---|---|
| 07/09/2025 | 27 | NOTICE of Appearance by Elisabeth Neylan on behalf of Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services (Neylan, Elisabeth) (Entered: 07/09/2025) |
| 07/10/2025 | 28 | NOTICE of Appearance by Elizabeth Themins Hedges on behalf of Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services (Hedges, Elizabeth) (Entered: 07/10/2025) |
| 07/11/2025 | 29 | MOTION to Vacate 18 Temporary Restraining Order *Motion to Dissolve* by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. ~~(Attachments: # 1 Memorandum)~~(Hedges, Elizabeth) Memorandum in Support filed as own entry. See 30 (SEC). (Entered: 07/11/2025) |
| 07/11/2025 | 30 | MEMORANDUM in Support re 29 MOTION to Vacate 18 Temporary Restraining Order *Motion to Dissolve* filed by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. (SEC) (Entered: 07/11/2025) |
| 07/11/2025 | 31 | NOTICE of Appearance by Thomas M. Harvey on behalf of American Center for Law & Justice (Harvey, Thomas) (Entered: 07/11/2025) |
| 07/11/2025 | 32 | MOTION for Leave to Appear Pro Hac Vice for admission of Nathan J. Moelker Filing fee: $ 125, receipt number AMADC−11117447 by American Center for Law & Justice.(Harvey, Thomas) (Entered: 07/11/2025) |
| 07/11/2025 | 33 | MOTION for Leave to Appear Pro Hac Vice for admission of Jordan A. Sekulow Filing fee: $ 125, receipt number AMADC−11117514 by American Center for Law & Justice. (Attachments: # 1 Exhibit amicus declaration)(Harvey, Thomas) (Entered: 07/11/2025) |
| 07/11/2025 | 34 | MOTION for Leave to Appear Pro Hac Vice for admission of Olivia F. Summers Filing fee: $ 125, receipt number AMADC−11117543 by American Center for Law & Justice. (Attachments: # 1 Exhibit amicus declaration)(Harvey, Thomas) (Entered: 07/11/2025) |
| 07/11/2025 | 35 | STATUS REPORT by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. (Neylan, Elisabeth) (Entered: 07/11/2025) |
| 07/11/2025 | 36 | Assented to MOTION for Leave to File *Amicus Curiae Brief* by American Center for Law & Justice. (Attachments: # 1 Certificate of Compliance)(Harvey, Thomas) (Additional attachment(s) added on 7/11/2025: # 2 Proposed Amicus Brief) (SEC). (Entered: 07/11/2025) |
| 07/11/2025 | 37 | ~~AMICUS BRIEF filed by American Center for Law & Justice . (Harvey, Thomas)~~ Proposed Amicus Brief filed as attachment to motion. See 36 −2 (SEC). (Entered: 07/11/2025) |
| 07/11/2025 | 38 | NOTICE of Appearance by Alexander Miller on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Miller, Alexander) (Entered: 07/11/2025) |
| 07/11/2025 | 39 | NOTICE of Appearance by Albinas Prizgintas on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Prizgintas, Albinas) (Entered: 07/11/2025) |
| 07/11/2025 | 40 | NOTICE of Appearance by Cassandra Mitchell on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Mitchell, Cassandra) (Entered: 07/11/2025) |
| 07/11/2025 | 41 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 36 Assented to MOTION for Leave to File *Amicus Curiae Brief*. |

| | | |
|---|---|---|
| | | Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (SEC)<br><br>(Entered: 07/11/2025) |
| 07/11/2025 | 42 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 32 Motion for Leave to Appear Pro Hac Vice; granting 33 Motion for Leave to Appear Pro Hac Vice; granting 34 Motion for Leave to Appear Pro Hac Vice. Added Nathan J. Moelker, Jordan A. Sekulow, and Olivia F. Summers.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a Pacer account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by each of the newly admitted attorneys.<br><br>(SEC) (Entered: 07/11/2025) |
| 07/11/2025 | 43 | NOTICE of Appearance by Olivia F. Summers on behalf of American Center for Law & Justice (Summers, Olivia) (Entered: 07/11/2025) |
| 07/11/2025 | 44 | AMICUS BRIEF filed by American Center for Law & Justice . (Summers, Olivia) (Entered: 07/11/2025) |
| 07/11/2025 | 45 | NOTICE of Appearance by Nathan Jeremiah Moelker on behalf of American Center for Law & Justice (Moelker, Nathan) (Entered: 07/11/2025) |
| 07/11/2025 | 46 | Judge Indira Talwani: ORDER entered on Defendants' Motion to Vacate 29 . The court dissolves the Temporary Restraining Order 18 issued on July 7, 2025, and enters this AmendedTemporary Restraining Order for the reasons set forth therein. See attached Amended Temporary Restraining Order. (Talwani, Indira) (Entered: 07/11/2025) |
| 07/13/2025 | 47 | NOTICE of Appearance by Emily Margaret Hall on behalf of Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services (Hall, Emily) (Entered: 07/13/2025) |
| 07/14/2025 | 48 | NOTICE of Appearance by C. Peyton Humphreville on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Humphreville, C. Peyton) (Entered: 07/14/2025) |
| 07/14/2025 | 49 | MOTION for Leave to File Excess Pages by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services.(Neylan, Elisabeth) (Entered: 07/14/2025) |
| 07/14/2025 | 50 | NOTICE of Appearance by C. Peyton Humphreville on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Humphreville, C. Peyton) (Entered: 07/14/2025) |
| 07/14/2025 | 51 | Judge Indira Talwani: ELECTRONIC ORDER allowing 49 MOTION for Leave to File Excess Pages; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (SEC) (Entered: 07/14/2025) |
| 07/14/2025 | 52 | NOTICE of Appearance by Jennifer Sandman on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Sandman, Jennifer) (Entered: 07/14/2025) |

| 07/14/2025 | 53 | MEMORANDUM in Opposition re 4 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. (Attachments: # 1 Affidavit Costello Declaration, # 2 Affidavit Snyder Declaration)(Neylan, Elisabeth) Modified on 7/15/2025 to correct heading error (SEC). (Entered: 07/14/2025) |
|---|---|---|
| 07/15/2025 | 54 | NOTICE of Appearance by Jordan A. Sekulow on behalf of American Center for Law & Justice (Sekulow, Jordan) (Entered: 07/15/2025) |
| 07/15/2025 | 55 | NOTICE by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts *of Undertaking on Temporary Restraining Order* (Schoenfeld, Alan) (Entered: 07/15/2025) |
| 07/15/2025 | 56 | NOTICE of Appearance by Emily Nestler on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Nestler, Emily) (Entered: 07/15/2025) |
| 07/16/2025 | 57 | NOTICE of Appearance by Kyla Eastling on behalf of Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts (Eastling, Kyla) (Entered: 07/16/2025) |
| 07/17/2025 | 58 | MOTION for Leave to File *a Reply in Support of Motion for Preliminary Injunction* by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Exhibit A – Plaintiffs' Proposed Reply, # 2 Exhibit 1)(Schoenfeld, Alan) (Entered: 07/17/2025) |
| 07/17/2025 | 59 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 58 MOTION for Leave to File a Reply in Support of Motion for Preliminary Injunction.

Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (SEC)

(Entered: 07/17/2025) |
| 07/17/2025 | 60 | REPLY to Response to 4 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Attachments: # 1 Exhibit 1)(Schoenfeld, Alan) (Entered: 07/17/2025) |
| 07/18/2025 | 61 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Motion Hearing held on 7/18/2025 re 4 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Planned Parenthood League of Massachusetts, Planned Parenthood Federation of America, Inc., Planned Parenthood Association of Utah. Case called. Court heard argument from counsel. Order to issue by 7/21/2025.

(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Kyla Eastling, Sharon Hogue, C. Peyton Humphreville, Alexander Miller, Emily Nestler, Albinas Prizgintas, Alan E. Schoenfeld, Emily Margaret Hall, Elizabeth Themins Hedges) (GAM) (Entered: 07/18/2025) |
| 07/21/2025 | 62 | Judge Indira Talwani: Plaintiffs' Emergency Motion for a Preliminary Injunction [Doc. No. 4] is GRANTED in part and otherwise remains under advisement. See attached Memorandum and Order. (Talwani, Indira) (Entered: 07/21/2025) |
| 07/22/2025 | 63 | NOTICE OF APPEAL as to 62 Order on Motion for TRO by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. Fee Status: US Government.

NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit** |

| | | |
|---|---|---|
| | | **requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 8/11/2025. (Hall, Emily) (Entered: 07/22/2025)** |
| 07/22/2025 | 64 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 63 Notice of Appeal. (MAP) (Entered: 07/22/2025) |
| 07/23/2025 | 65 | USCA Case Number 25−1698 for 63 Notice of Appeal, filed by Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services, Mehmet Oz, U.S. Department of Health and Human Services. (MAP) (Entered: 07/23/2025) |
| 07/23/2025 | 66 | Emergency MOTION for Clarification *of the Court's July 21, 2025 Order or, in the Alternative, to Extend Amended Temporary Restraining Order* by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts.(Schoenfeld, Alan) (Entered: 07/23/2025) |
| 07/23/2025 | 67 | MEMORANDUM in Support re 66 Emergency MOTION for Clarification *of the Court's July 21, 2025 Order or, in the Alternative, to Extend Amended Temporary Restraining Order* filed by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Schoenfeld, Alan) (Entered: 07/23/2025) |
| 07/24/2025 | 68 | NOTICE by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services *of Intent to Oppose Pls.' Motion for Clarification, ECF Nos. 66, 67.* (Neylan, Elisabeth) (Entered: 07/24/2025) |
| 07/28/2025 | 69 | Judge Indira Talwani: ELECTRONIC ORDER granting Plaintiffs' Motion for a Preliminary Injunction 4 . See attached Memorandum and Order. (SEC) (Entered: 07/28/2025) |
| 07/28/2025 | 70 | Transcript of Motion Hearing held on July 18, 2025, before Judge Indira Talwani. COA Case No. 25−1698. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 8/18/2025. Redacted Transcript Deadline set for 8/28/2025. Release of Transcript Restriction set for 10/27/2025. (DRK) (Entered: 07/29/2025) |
| 07/29/2025 | 71 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 07/29/2025) |
| 07/29/2025 | 72 | Judge Indira Talwani: ELECTRONIC ORDER denying without prejudice Plaintiffs' Emergency Motion for Clarification of the Court's July 21, 2025 Order or, in the Alternative, to Extend Amended Temporary Restraining Order 66 . Any renewed Motion for Clarification should be directed at this court's July 28, 2025 Memorandum & Order 69 , rather than the July 21, 2025 Memorandum & Order 62 . (SEC) (Entered: 07/29/2025) |
| 08/04/2025 | 73 | Joint MOTION for Clarification *, or in the Alternative*, MOTION for Extension of Time to August 11, 2025 to Submit a Proposed Case Schedule, or Move to Extend Such Deadline ( Responses due by 8/18/2025) by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts.(Schoenfeld, Alan) (Entered: 08/04/2025) |
| 08/05/2025 | 74 | Judge Indira Talwani: ELECTRONIC ORDER granting Joint Motion to Clarify, or in the Alternative to Extend, Deadline to Submit Case Schedule 73 . The parties shall submit a proposed case schedule by August 11, 2025. (SEC) (Entered: 08/05/2025) |
| 08/05/2025 | 75 | NOTICE OF APPEAL as to 69 Memorandum & ORDER by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at** |

| | | |
|---|---|---|
| | | **http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 8/25/2025. (Neylan, Elisabeth) (Entered: 08/05/2025) |
| 08/05/2025 | 76 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 75 Notice of Appeal. (MAP) (Entered: 08/05/2025) |
| 08/05/2025 | 77 | SUMMONS Returned Executed Mehmet Oz served on 7/10/2025, answer due 7/31/2025. (Schoenfeld, Alan) (Entered: 08/05/2025) |
| 08/05/2025 | 78 | SUMMONS Returned Executed Centers for Medicare & Medicaid Services served on 7/10/2025, answer due 7/31/2025. (Schoenfeld, Alan) (Entered: 08/05/2025) |
| 08/05/2025 | 79 | SUMMONS Returned Executed U.S. Department of Health and Human Services served on 7/10/2025, answer due 7/31/2025. (Schoenfeld, Alan) (Entered: 08/05/2025) |
| 08/05/2025 | 80 | SUMMONS Returned Executed Robert F. Kennedy, Jr served on 7/10/2025, answer due 7/31/2025. (Schoenfeld, Alan) (Entered: 08/05/2025) |
| 08/05/2025 | 81 | SUMMONS Returned Executed by Planned Parenthood Association of Utah, Planned Parenthood League of Massachusetts, Planned Parenthood Federation of America, Inc.. (Schoenfeld, Alan) (Entered: 08/05/2025) |
| 08/05/2025 | 82 | SUMMONS Returned Executed as to US Attorney by Planned Parenthood Association of Utah, Planned Parenthood League of Massachusetts, Planned Parenthood Federation of America, Inc.. (Schoenfeld, Alan) (Entered: 08/05/2025) |
| 08/07/2025 | 83 | USCA Case Number 25–1755 for 75 Notice of Appeal, filed by Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services, Mehmet Oz, U.S. Department of Health and Human Services. (MAP) (Entered: 08/07/2025) |
| 08/07/2025 | 84 | MOTION to Stay re 62 Order on Motion for TRO, 69 Memorandum & ORDER by Centers for Medicare and Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services.(Neylan, Elisabeth) (Entered: 08/07/2025) |
| 08/07/2025 | 85 | MEMORANDUM in Support re 84 MOTION to Stay re 62 Order on Motion for TRO, 69 Memorandum & ORDER filed by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services. (Neylan, Elisabeth) (Entered: 08/07/2025) |
| 08/11/2025 | 86 | Joint MOTION to Stay *Further District Court Proceedings Pending Resolution of the Government's Motion to Stay Preliminary Injunctions Pending Appeal* by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts.(Schoenfeld, Alan) (Entered: 08/11/2025) |
| 08/11/2025 | 87 | Judge Indira Talwani: ELECTRONIC ORDER entered. On July 21, 2025, the court granted in part Plaintiffs' Emergency Motion for a Preliminary Injunction [Doc. No. 4], enjoining Defendants from enforcing the provisions of Section 71113 of "An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14" against Planned Parenthood Association of Utah and other Planned Parenthood Federation of America Members who will not provide abortion services as of October 1, 2025, or for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly to them did not exceed $800,000. Mem. & Order 35 [Doc. No. 62]. At the same time, the court considered and denied Defendants' request, see Defs.' Mem. 44 [Doc. No. 53], that any injunctive relief be stayed pending appeal, Mem. & Order 33–35 [Doc. No. 62]. Defendants filed an appeal the following day, see Notice of Appeal [Doc. No. 63], but did not seek a stay from the First Circuit.<br><br>On July 28, 2025, the court granted Plaintiffs' Emergency Motion for a Preliminary Injunction [Doc. No. 4] in full, enjoining Defendants from enforcing the provisions of Section 71113 of "An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14" against Planned Parenthood Association of Utah, Planned Parenthood League of Massachusetts, and all other Planned Parenthood Federation of America Members. Mem. & Order 57–58 [Doc. No. 69]. The court again considered and denied |

| | | Defendants' request, see Defs.' Mem. 44 [Doc. No. 53], that any injunctive relief be stayed pending appeal. Mem. & Order 56–57 [Doc. No. 69]. Defendants filed an appeal eight days later, on August 5, 2025, see Notice of Appeal [Doc. No. 75], but have not sought a stay from the First Circuit to date.

On August 7, 2025, after filing their second Notice of Appeal [Doc. No. 75], Defendants filed a stand–alone Motion to Stay Preliminary Injunctions Pending Appeal [Doc. No. 84] in this court. Defendants acknowledge that they had previously requested a stay and that the court had denied the request, see Mem. in Support 2 [Doc. No. 85] (citing Defs.' Mem. at 44 [Doc. No. 53] (requesting stay pending appeal); Mem. & Order 33–35 [Doc. No. 62] (denying stay request); Mem. & Order 56–57 [Doc. No. 69] (denying stay request)). Defendants explain their further filing by citing Am. Pub. Health Assn v. Nat'l Institutes of Health, –– F.4th––, 2025 WL 2017106, at *8 (1st Cir. July 18, 2025) (requiring the government to raise all arguments in support of stay pending appeal in its stay motion).

Defendants also "request[] a ruling on this motion by this Monday, August 11, 2025, so that [Defendants] may promptly request relief from the First Circuit, if necessary." Mem. in Support 2–3 [Doc. No. 85]. But the court has already ensured that Defendants could immediately seek relief from the First Circuit by acting on their previous request for a stay at the same time that the court addressed Plaintiffs' Emergency Motion for a Preliminary Injunction [Doc. No. 4]. In light of that, Defendants' belated concern about presenting all arguments to this court does not justify an expedited ruling on Defendants' request for reconsideration.

Plaintiffs shall file their response to Defendants' Motion to Stay [Doc. No. 84] no later than August 21, 2025. The court anticipates considering Defendants' Motion [Doc. No. 84] promptly once Plaintiffs have filed their response.(Talwani, Indira) (Entered: 08/11/2025) |
|---|---|---|
| 08/13/2025 | 88 | Judge Indira Talwani: ELECTRONIC ORDER granting Joint Motion to Stay Further District Court Proceedings 86 . Good cause shown, the court stays further proceedings in this court, except as to Defendants' Motion to Stay Preliminary Injunctions Pending Appeal 84 , pending resolution of that motion and any similar motion made on appeal. Plaintiffs' deadline to submit any response to Defendants' Motion 84 remains August 21, 2025, in accordance with the court's previous Electronic Order 87 . (SEC) (Entered: 08/13/2025) |
| 08/19/2025 | 89 | ORDER of USCA as to 63 Notice of Appeal filed by Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services, Mehmet Oz, U.S. Department of Health and Human Services and 75 Notice of Appeal filed by Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services, Mehmet Oz, U.S. Department of Health and Human Services. (JAM) Modified on 9/1/2025 to Correct Filing Date. (MAP). (Entered: 08/20/2025) |
| 08/20/2025 | 90 | NOTICE by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services re 85 Memorandum in Support of Motion, 84 MOTION to Stay re 62 Order on Motion for TRO, 69 Memorandum & ORDER (Neylan, Elisabeth) (Entered: 08/20/2025) |
| 08/20/2025 | 91 | NOTICE by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services re 85 Memorandum in Support of Motion, 84 MOTION to Stay re 62 Order on Motion for TRO, 69 Memorandum & ORDER (Neylan, Elisabeth) (Entered: 08/20/2025) |
| 08/21/2025 | 92 | Opposition re 84 MOTION to Stay re 62 Order on Motion for TRO, 69 Memorandum & ORDER filed by Planned Parenthood Association of Utah, Planned Parenthood Federation of America, Inc., Planned Parenthood League of Massachusetts. (Schoenfeld, Alan) (Entered: 08/21/2025) |
| 08/29/2025 | 93 | Judge Indira Talwani MEMORANDUM AND ORDER: For the reasons set forth in the attached document, Defendants' Motion [Doc. No. 84] is DENIED. (GAM) (Entered: 08/29/2025) |
| 09/11/2025 | 94 | ORDER of USCA as to 75 Notice of Appeal, filed by Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services, Mehmet Oz, U.S. Department of Health and |

| | | |
|---|---|---|
| | | Human Services, <u>63</u> Notice of Appeal, filed by Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services, Mehmet Oz, U.S. Department of Health and Human Services (MAP)<br><br>**ORDER entered by Gustavo A. Gelp, Jr., Appellate Judge; Lara E. Montecalvo, Appellate Judge; and Seth Robert Aframe, Appellate Judge: On July 21, 2025, the district court preliminarily enjoined the defendants in this action –– the Department of Health and Human Services and its Secretary, along with the Centers for Medicare and Medicaid Services and the Administrator –– from "enforcing, retroactively enforcing, or otherwise applying" section 71113 of the Act of July 4, 2025, Pub. L. No. 119–21, § 71113, 139 Stat. 72, 300–01 (2025), against plaintiff Planned Parenthood Association of Utah and other members of plaintiff Planned Parenthood Federation of America, Inc., who met certain conditions specified in the court's order. The preliminary injunction also ordered the defendants to "take all steps necessary to ensure that Medicaid funding continues to be disbursed in the customary manner and timeframes to Planned Parenthood Association of Utah and other Planned Parenthood Federation of America [m]embers" who satisfied the specified conditions. The defendants have appealed both injunctions. We denied without prejudice as premature the defendants' motion to stay the injunctions pending the disposition of those appeals, while a motion for similar relief was pending in the district court. Notwithstanding the contrary conclusion reached by the district court after its careful consideration of the matter, we conclude that defendants have met their burden to show their entitlement to a stay of the preliminary injunctions pending the disposition of their appeals of the same. The motion is GRANTED. The July 21, 2025 preliminary injunction and the July 28, 2025 preliminary injunction are hereby stayed pending disposition of the respective appeals. The separate motions by the State of Louisiana and the American Center for Law & Justice for leave to file an amicus brief also are GRANTED and the briefs are accepted for filing as of this date. So ordered.**<br><br>(Entered: 09/11/2025) |
| 09/12/2025 | 95 | Judge Indira Talwani: ELECTRONIC ORDER: On August 13, 2025, at the parties' joint request, the court stayed proceedings in this court pending resolution of Defendants' Motion to Stay Preliminary Injunctions Pending Appeal <u>84</u> "and any similar motion made on appeal." Elec. Order 88 . Where the First Circuit has now resolved Defendants' Motion to Stay Preliminary Injunctions, see Order <u>94</u> , the stay of the proceedings in this court is lifted. The parties shall submit a proposed case schedule no later than September 26, 2025. (SEC) (Entered: 09/12/2025) |
| 09/23/2025 | <u>96</u> | Joint MOTION to Stay *Further District Court Proceedings Pending Resolution of Expedited Appeal of This Court's Preliminary Injunctions* by Centers for Medicare & Medicaid Services, Robert F. Kennedy, Jr, Mehmet Oz, U.S. Department of Health and Human Services.(Neylan, Elisabeth) (Entered: 09/23/2025) |
| 09/24/2025 | 97 | Judge Indira Talwani: ELECTRONIC ORDER granting Joint Motion to Stay Further District Court Proceedings Pending Resolution of Expedited Appeal <u>96</u> . Good cause shown, the court stays further proceedings in this court pending resolution of Defendants' appeal of this court's July 21, 2025 Memorandum and Order <u>62</u> , and this court's July 28, 2025 Memorandum and Order <u>69</u> , to the First Circuit. (SEC) (Entered: 09/24/2025) |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC.; PLANNED
PARENTHOOD LEAGUE OF
MASSACHUSETTS; and PLANNED
PARENTHOOD ASSOCIATION OF UTAH,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
MEHMET OZ, in his official capacity as
ADMINISTRATOR OF THE CENTERS
FOR MEDICARE & MEDICAID
SERVICES; and CENTERS FOR
MEDICARE & MEDICAID SERVICES,

Defendants.

Case No. 1:25-cv-11913

# COMPLAINT FOR
# DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Planned Parenthood Federation of America, Inc., on behalf of itself and all 47 of its members, as well as two of those members, Planned Parenthood League of Massachusetts and Planned Parenthood Association of Utah, allege in support of their Complaint for Declaratory and Injunctive Relief as follows:

## NATURE OF THE ACTION

1.      This is a challenge to Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 (the "Defund Provision"),[1] to vindicate rights secured by the Constitution's Bill of Attainder Clause and by the First and Fifth Amendments to the United States Constitution.

2.      The clear purpose of the Defund Provision is to categorically prohibit health centers associated with Planned Parenthood from receiving Medicaid reimbursements.  The prohibition specifically targets Planned Parenthood Federation of America ("PPFA") and its member health care providers (collectively, the "Members" and each individually, a "Member") in order to punish them for lawful activity, namely advocating for and providing legal abortion access wholly outside the Medicaid program and without using any federal funds.

3.      Anti-abortion politicians have targeted PPFA and its Members (collectively, "Planned Parenthood") for decades, and the history and context of the Defund Provision underscores that the purpose of this law is to punish Planned Parenthood by blocking its Members from providing and being reimbursed for care through the Medicaid program.  The Defund Provision targets Planned Parenthood Member providers by expressly limiting its application to abortion providers that are non-profits that primarily provide family planning services, and

---

[1]      *Available at* https://www.congress.gov/bill/119th-congress/house-bill/1/text.

COMPLAINT
A113

received more than $800,000 in Medicaid reimbursements in fiscal year 2023—a set made up almost entirely of Planned Parenthood Members.  And if there were any doubt, President Trump, Speaker Johnson, and their allies have been promising to "defund Planned Parenthood" for years now.  That is what the Defund Provision does.

4.      If allowed to take effect and prevent Planned Parenthood Members from providing care to the almost 80 million Americans who rely on Medicaid for their essential health care needs, the Defund Provision will have devastating consequences nationwide.

5.      With a history going back over 100 years, PPFA and its 47 independent Members play an essential role in the delivery of health care to millions of people in the United States. Planned Parenthood envisions a world of equity: where sexual and reproductive rights are basic human rights, where access to health care does not depend on who you are, where you live, or your ability to pay, and where every person has the opportunity to choose their own path to a healthy and meaningful life.  All Planned Parenthood organizations are driven by this mission to ensure access to sexual and reproductive health care and rights, including abortion care.

6.      As detailed below, Planned Parenthood Members are at the forefront of providing high-quality reproductive health care to individuals and communities facing serious barriers to obtaining such care—especially individuals with low incomes, individuals in rural and other medically underserved areas, and individuals of color.  Planned Parenthood Members operate nearly 600 health centers across the Nation and serve over 2,000,000 patients each year, providing vital health care services such as contraception, cancer screenings, testing and treatment for sexually transmitted infections ("STIs"), gender-affirming hormone therapy, and abortion services.

7.      Planned Parenthood Members have been a critical part of the Medicaid program for decades, providing preventive and life-saving health care to eligible low-income patients across the nation.  More than 1,000,000 patients each year receive health care services at Planned Parenthood Member health centers through Medicaid.  Consistent with their mission-driven commitment to provide high-quality sexual and reproductive health care to all people, regardless of their ability to pay, no Planned Parenthood Member limits the number of Medicaid patients it will treat.[2]  At a time when low reimbursement rates lead many health care providers to either effectively limit the number of Medicaid patients they serve or not participate in Medicaid at all, in many communities, a Planned Parenthood Member health center is the only place where individuals can receive sexual and reproductive health care services through the Medicaid program.  For this reason, losing the ability to choose a Planned Parenthood Member health center as their Medicaid provider will be devastating for Medicaid patients across the country.

8.      If the Defund Provision is not enjoined, the consequences will be catastrophic for Planned Parenthood Members, each of which is a non-profit health care provider with a mission of ensuring that every person has access to sexual and reproductive health care and education, and as a result will harm health care access among non-Medicaid patients too.  More than 50% of Planned Parenthood Member patients rely on Medicaid to access essential health services.  In federal fiscal year 2023, more than one-third of Members' total aggregate revenue was from Medicaid reimbursement for health care services the Members provided.  Because of the great unmet need for high-quality Medicaid providers of sexual and reproductive health care, some of

---

[2]      Planned Parenthood Members participate in Medicaid programs in every state where they are able, a total of forty-six of forty-seven Members across forty-three states.

COMPLAINT

those Members received the vast majority (over three quarters) of their health services revenue from Medicaid reimbursements that year. Stripping away this patient volume and reimbursements for care provided will result in the elimination of services, laying off staff, and health center closures. The public health consequences for Medicaid patients and non-Medicaid patients alike will be dire and compounding.

9.     The Defund Provision emphatically does *not* address federal funding for abortion. For more than four decades, federal law has prohibited health care providers from using federal funds for abortions (subject to extremely narrow exceptions) and that has been true for the entirety of Planned Parenthood Members' participation in Medicaid. Thus, this statute must be doing something more—and it is. The Defund Provision is a naked attempt to leverage the government's spending power to attack and penalize Planned Parenthood and impermissibly single it out for unfavorable treatment. It does so not only because of Planned Parenthood Members' long history of providing legal abortions to patients across the country, but also because of Planned Parenthood's unique role in advocating for policies to protect and expand access to sexual and reproductive health care, including abortion.

10.     There is no legitimate justification for the statute; rather, the true design of the Defund Provision is simply to express disapproval of, attack, and punish Planned Parenthood, which plays a particularly prominent role in the public debate over abortion and (if Planned Parenthood's Members are treated collectively) is the only nationwide abortion provider. Supporters of the Defund Provision, including President Trump and members of Congress, have made this point unmistakably clear.

11.    For these reasons, the Defund Provision's exclusion of Planned Parenthood Members from a program designed to provide high-quality medical care to the Nation's neediest patients—care that Planned Parenthood Members have delivered for decades—is unconstitutional as to all Planned Parenthood Members as a Bill of Attainder and it also violates Plaintiffs' Equal Protection and First Amendment rights.

12.    In the alternative, if the Defund Provision is allowed to remain in effect as to any Planned Parenthood Member, it should be held not to apply to those Members who do not independently meet each of the required statutory triggers for defunding.  It is clear that Congress intended to punish Planned Parenthood Members for their unique role in providing abortions and to defund *all* entities associated with Planned Parenthood for their participation in a visible and unique membership association with a shared mission of abortion advocacy.  However, the enacted language is actually more narrow, likely because Congress misunderstood Planned Parenthood's structure.  By its terms, the Defund Provision applies only to entities that meet the statutory requirements for being a "prohibited entity" and entities that have a relationship of ownership or control with those "prohibited entit[ies]."  No such relationship exists between PPFA and any of its Members.  Indeed, if not construed this way, the Defund Provision is an unconstitutional attack on the associational rights of those Planned Parenthood Members who do not independently meet the trigger, by forbidding them from being reimbursed for Medicaid care based solely on their association with other Planned Parenthood Members providers despite a lack of any relationship of ownership or control.  At best, the Defund Provision is unconstitutionally vague as applied to those Members on this point, and they will have no choice but to stop seeking Medicaid

COMPLAINT
A117

reimbursement absent direction from the Court, lest they otherwise face the untenable risk of arbitrary enforcement.

13.     If not enjoined, the Defund Provision will devastate Planned Parenthood Members, their patients, and the broader public health of the Nation.  If allowed to take effect and construed to apply to all Members, the Defund Provision will jeopardize care for the more than 1,000,000 patients per year who receive care from Planned Parenthood Members through the Medicaid program—with many of those patients losing access to health care altogether.  Many Planned Parenthood Members will be required to lay off staff and curtail services, with serious adverse consequences for the many patients served at those centers even if they do not use Medicaid to access services.  Worse still, Members may be forced to shutter a substantial number of their health centers nationwide, many of which are in rural or underserved areas without alternative providers.  And even where alternative providers are theoretically available, those providers, who are already stretched to capacity, often do not offer the same comprehensive sexual and reproductive health service options, have long wait times for patients, and cannot accommodate the huge influx of patients who would need to find a new provider of care.

14.     The adverse public health consequences of the Defund Provision will be grave.  The elimination or reduction in access to sexual and reproductive health care across the Nation is likely to lead to increased rates of undiagnosed and untreated STIs and cancer, as well as increased rates of unplanned pregnancies and abortions.  Moreover, individuals with low incomes, who live in medically underserved or rural areas, and who are Black, Latinx, or members of other communities of color will disproportionately feel those consequences.

COMPLAINT

15.     Thus, to remedy the multiple violations of their constitutional rights and to prevent irreparable harm to themselves and to the millions of individuals whose health care would be jeopardized, Plaintiffs seek declaratory and injunctive relief to prevent the Defund Provision from remaining in effect.  In the alternative, Plaintiffs seek declaratory and injunctive relief to ensure that Planned Parenthood Members that do not independently qualify as "prohibited entit[ies]" under the statute are able to continue submitting and receiving Medicaid reimbursements.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. § 702.  *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006).

17.     The Court is authorized to issue the relief sought here under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the inherent equitable powers of this Court.  This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (noting that federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials").

18.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e).  Plaintiff Planned Parenthood League of Massachusetts ("PPLM") resides in this district, and a substantial part of the events or omissions giving rise to this action occurred in this district.  PPLM is headquartered in Boston, Massachusetts; it operates four health centers—in Boston, Worcester, Marlborough,

and Springfield—that participate in the Medicaid program but which are barred from receiving federal Medicaid reimbursements under the Defund Provision.

## PARTIES TO THE ACTION

19.    **Plaintiff Planned Parenthood Federation of America** is a 501(c)(3) not-for-profit corporation organized under the laws of New York.  PPFA is a membership organization with 47 Members that have health centers in 47 states and the District of Columbia, as well as a telehealth presence in all 50 States.  PPFA and its Members share a mission of ensuring that regardless of income, insurance, gender identity, sexual orientation, or race, people can receive high-quality, inclusive, and comprehensive sexual and reproductive health care.  PPFA does not itself provide any health care but provides support to 47 Members that do, as explained below.

20.    Planned Parenthood Members provide medical services through nearly 600 health centers across the nation and serve millions of people each year by providing a wide range of sexual and reproductive health care, as well as other care.  An estimated one out of every three women and one in ten men nationally has received care from a Planned Parenthood Member at least once in their life.

21.    PPFA and its Members, along with national, state, and local Planned Parenthood 501(c)(4) social welfare organizations, have long been at the forefront of the movement for sexual and reproductive rights, advocating at the federal, state, and local levels to expand abortion access. As the nation's leading advocates for sexual and reproductive health care and education, Planned Parenthood organizations advocate at the federal, state, and local levels to protect and expand access to services and information.  This includes pushing to codify the rights to abortion and contraception, block abortion bans, repeal the Hyde Amendment, and ensure access to emergency

contraception and medication abortion.  Planned Parenthood Action Fund, a related 501(c)(4) organization, seeks to hold members of Congress politically accountable through its congressional scorecard, communicating with and activating constituents to educate their lawmakers about the importance of sexual and reproductive health care.  Planned Parenthood Members and their related 501(c)(4) organizations play a similar role in state legislatures across the nation.  Since the Supreme Court's ruling in *Dobbs*, Planned Parenthood Action Fund and Members' related 501(c)(4) organizations have actively supported successful campaigns for reproductive freedom ballot initiatives.  Separately, Planned Parenthood Action Fund and other national and local Planned Parenthood advocacy and political organizations work to elect federal, state, and local officials who will support reproductive freedom and abortion access.  Planned Parenthood Members, and when appropriate PPFA, are active litigants fighting to secure abortion access and rights for their patients in federal and state courts across the country.

22.    PPFA and its Members provide education and information to Members' patients and the general public about sexual and reproductive health, risks, and preventive measures, reaching approximately 1.3 million individuals in person with education and information in their communities—and even more people online.  Planned Parenthood Member educators also train teachers, school staff, and other youth-serving professionals within their communities on critical topics such as age-appropriate youth pregnancy prevention and STI prevention.

23.    PPFA sues on behalf of itself and all of its Members.  By excluding Planned Parenthood Members from Medicaid reimbursements, the Defund Provision injures PPFA. Patients have come to know and trust the Planned Parenthood name, and understand that they can count on Planned Parenthood Members for some of their most sensitive health care needs.  The

exclusion will force its Members to abruptly withdraw care from patients who depend on Medicaid—that is, more than half of all Planned Parenthood Member patients—and compel the closure of health centers on which patients depend.  Not only will this harm the Planned Parenthood name and reputation, but ultimately, the exclusion strikes at PPFA's and its Members' shared mission of ensuring the provision of sexual and reproductive care, including abortion care, providing related educational services, promoting research on sexual and reproductive health, and advocating for public policies that guarantee access to such services.  All of these injuries stem from the enforcement of the Defund Provision, and all are redressable by a judicial declaration and injunction.  PPFA therefore has standing in its own right to challenge the exclusion, which drains the organization's resources and impairs its ability to carry out its mission.  *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395-98 (4th Cir. 2024).

24.     PPFA also has standing on behalf of its Members who participate in the Medicaid program because (1) its Members would otherwise have standing to sue in their own right; (2) the interests PPFA seeks to protect are germane to its purposes; and (3) neither the claims asserted, nor the relief requested, requires the participation in this lawsuit of each individual Planned Parenthood Member.

25.     **Plaintiff Planned Parenthood League of Massachusetts** is a 501(c)(3) not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts.  Its principal office is in Boston, Massachusetts.  PPLM operates four health centers in Massachusetts in Boston, Worcester, Marlborough, and Springfield; and a virtual health center that offers telehealth services via phone and video.

26.     PPLM is a separately incorporated, independently operated organization and a Planned Parenthood Member.

27.     PPLM delivers health care to more than 30,000 patients each year.  In 2024, PPLM provided patients with more than 20,500 birth control methods, including nearly 5,000 long-acting reversible contraceptives ("LARCs"), which are the most effective forms of birth control.  In that same year, PPLM performed more than 65,000 STI tests, which represents a substantial portion of the STI tests performed in Massachusetts.

28.     PPLM also provides its patients critical health education, especially about breast and cervical cancer screening, diagnosis, follow-up, and referral to medical specialists in the community.  PPLM provides health education services to the general public as well, offering age-appropriate and medically accurate sexual education programs in public schools and in the broader communities in which PPLM operates.

29.     Massachusetts is in great need of the services that PPLM provides.  Two of PPLM's health centers are in communities classified by the federal government as Medically Underserved Areas ("MUAs"), and three of PPLM's health centers are in communities classified by the federal government as Medical Care Health Professional Shortage Areas ("HPSAs").[3]  A substantial part of PPLM's education services are provided to individuals in communities experiencing significant health disparities. PPLM's health centers offer early morning, limited evening, and weekend hours along with walk-in appointments and same-day contraception, including highly effective LARCs.

---

[3]     HPSAs are designated by the Health Resources and Services Administration ("HRSA"), an agency of the U.S. Department of Health and Human Services ("HHS"), as having shortages of primary medical care, dental or mental health providers.  MUAs have a shortage of primary care health services for residents within a geographic area.

COMPLAINT
A123

30.    A core part of PPLM's mission is to provide sexual and reproductive health care, including abortion, to individuals with low incomes.  In 2024, PPLM provided services to approximately 10,822 patients—nearly 35% of PPLM's patient base—who were enrolled in Medicaid.  In 2024 alone, PPLM provided through Medicaid more than 5,237 units of contraception (including 1,255 LARCs), 242 cervical screenings, 257 breast cancer exams, and 21,463 STI tests (yielding over 500 positive results that would have otherwise gone undiagnosed). In 2024, PPLM received a significant portion of its patient revenue (approximately 39%) from Medicaid reimbursements.

31.    PPLM clinics in recent years have served a significant portion of patients who seek reproductive health care from publicly funded clinics in Massachusetts, including 54% of Massachusetts patients that received family planning services through Medicaid.

32.     In 2024, PPLM referred more than 2,100 patients to other providers for a variety of types of care, including diagnosis and management of chronic diseases including cancer, diabetes, cardiovascular disease, mental health, obstetric and breast specialist care, human immunodeficiency virus ("HIV") care, infertility, and dermatology.  Many of those patients initially came to PPLM health care centers for other needs in addition to family planning services, and would likely not have received treatment for their illnesses if not for the PPLM staff, who were able to accurately diagnose their conditions and connect them with appropriate medical professionals.  PPLM also engages in advocacy activities to protect and expand access to sexual and reproductive health care, including abortion, and education.

33.    PPLM brings this action on behalf of itself and its patients.

COMPLAINT
A124

34.    **Plaintiff Planned Parenthood Association of Utah ("PPAU")** is a 501(c)(3) not-for-profit corporation organized under the laws of Utah.  Its principal office is in Salt Lake City, Utah.  PPAU operates six health centers across the State of Utah, located in Ogden, Orem, Salt Lake City (which has two health centers), South Jordan, and West Valley City.  PPAU also offers some types of care through telehealth.

35.    PPAU is a separately incorporated, independently operated organization and a Planned Parenthood Member.

36.    PPAU provides a full range of sexual and reproductive health services, including well-person preventative care visits; breast exams; pap tests; STI testing; a wide range of U.S. FDA-approved contraception methods, including highly effective, long-acting reversible contraceptives; pregnancy testing; risk assessments for pregnant patients to screen for high-risk issues; referral services for pregnant patients; urinary tract infection treatment; cervical cancer and testicular cancer screening; fertility awareness services; vasectomies; and abortions.  All of PPAU's health centers generally offer same-day appointments and walk-in availability, and two of PPAU's health centers generally offer weekend, early morning, and evening hours.

37.    In 2024, PPAU provided health care to nearly 30,000 patients through more than 44,000 total visits to its health centers, including 19,341 birth control pills, 2,278 implantations of intrauterine devices, 12,303 pregnancy tests, 89 vasectomies, 1,592 pap tests, and 2,676 abortions.

38.    PPAU also provides comprehensive education about sexual and reproductive health. Through its research-based education programs, PPAU works to provide all Utahns with the accurate, reliable information they need to make responsible decisions and stay healthy. In 2024, PPAU's educators reached 5,106 individuals throughout Salt Lake County, Utah County,

and Summit County.  Four of PPAU's health centers are in communities classified by the federal government as HPSAs.

39.     Like all other eligible Planned Parenthood Members throughout the country, PPAU is a Medicaid-enrolled provider.  PPAU provides health care to patients who rely on Medicaid for health insurance and seeks reimbursement from Medicaid funds for the provision of eligible health care services.

40.     PPAU does not limit the number of Medicaid patients it serves.  Of the nearly 30,000 patients PPAU served in 2024, 2,096 were Medicaid-enrolled patients.  In federal fiscal year 2023, PPAU received $706,251 in Medicaid reimbursements.

41.     PPAU brings this action on behalf of itself and its patients.

42.     **Defendant Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services and is that agency's highest ranking official.  He is charged with overseeing the federal agency responsible for the Medicaid program and the Defund Provision.  He is sued in his official capacity.

43.     **Defendant U.S. Department of Health and Human Services** (including all subagencies over which HHS exercises legal control) is an executive department of the United States.

44.     **Defendant Mehmet Oz** is the Administrator for the Centers for Medicare & Medicaid Services.  He is charged with administering the Medicaid program and the Defund Provision.  *See* Section 71113(c) (appropriating funds "to the Administrator of the Centers for Medicare & Medicaid Services" "[f]or the purposes of carrying out this section").  He is sued in his official capacity.

45.    **Defendant Centers for Medicare & Medicaid Services** is an agency within the U.S. Department of Health and Human Services.

## THE RELATIONSHIP BETWEEN PPFA AND ITS MEMBERS

46.    PPFA is a mission-driven membership organization whose membership includes the 47 accredited Members.   Each Member is a separately incorporated 501(c)(3) organization with its own CEO, board of directors, staff, books, and operations.

47.    Under PPFA's governance structure, the PPFA Membership elects PPFA's Board of Directors; approves changes to PPFA's bylaws and membership standards; approves PPFA's long-range goals; and determines the amount each Member pays in annual dues.

48.    PPFA supports its Members in a variety of ways.  For example, PPFA administers the accreditation standards for the Membership, promulgates certain shared medical standards and guidelines, and provides leadership around certain shared policy and program initiatives.  PPFA also provides practical support such as technical assistance and consultant services, programmatic grants, and fundraising support.  While Members receive some grant and other funding through PPFA, overall, the vast majority of each Member's revenue comes from sources other than PPFA.

49.    In addition to maintaining separate corporate structures, PPFA and its Members maintain separate finances and day-to-day operations.  For example, PPFA and each member maintain separate general ledgers and file taxes separately from one another.  Each has separate payrolls and employee rosters, and PPFA has no role in its Members' respective staffing or employment decisions.

50.    PPFA membership is important to Members' ability to fulfill their missions.  PPFA licenses the use of the Planned Parenthood name and well-known trademark to each Member—a

name that sends a powerful message to the community that the Member stands for certain values and provides high-quality health care and educational services in furtherance of the shared Planned Parenthood mission.  Planned Parenthood Members are viewed in communities throughout the country as providing nonjudgmental, welcoming, and compassionate care to patients seeking health care, including sexual and reproductive health care.

51.    Planned Parenthood Members' structural independence means that no Member has control over the operations or decision-making processes of another.  The actions or policies of one Planned Parenthood Member do not legally or operationally bind the others.

52.    PPFA does not exercise control over any Member, or vice versa.

## PLANNED PARENTHOOD MEMBERS' ROLE IN PROVIDING CRITICAL SEXUAL AND REPRODUCTIVE HEALTH CARE SERVICES IN THE UNITED STATES

53.    Collectively, the 47 Planned Parenthood Members provide care to more than 2 million patients each year.  An estimated one in three women and one in ten men have received care from a Planned Parenthood Member.  This number is even higher among individuals with Medicaid, 43% of whom have received services from a Member health center.

54.    All Planned Parenthood Members offer a wide range of sexual and reproductive health care, including contraception (including LARCs), contraceptive counseling, preventive care visits, physical exams, clinical breast exams, screening for cervical and breast cancer, STI screening, testing and treatment, pregnancy testing and counseling, pre-exposure prophylaxis for HIV prevention, the HPV vaccine, and health education services.  Most Planned Parenthood Members offer gender-affirming hormone therapy.  Planned Parenthood Members also provide abortion in every jurisdiction where it is lawful to do so.

55.    For fiscal year 2023 to 2024, Planned Parenthood Members provided approximately 9,400,000 services to 2,080,000 patients who visited Planned Parenthood Member health centers.  Planned Parenthood Members' health centers provided more than 350,000 pap tests and breast exams, 5,100,000 STI tests and treatments, and 400,000 abortions.  Planned Parenthood Member health centers also provided 2,200,000 birth control services.

56.    Planned Parenthood Members' expertise and specialization in family planning, evidence-based practices, and technology often make their health centers the top choice for individuals seeking high-quality sexual and reproductive health care.

57.    Planned Parenthood Members are providers of compassionate, non-judgmental, and culturally sensitive care related to reproductive health and sexuality.  Topics of this sort can be highly sensitive for patients, some of whom may find it difficult to discuss issues of sexuality or to seek treatment for reproductive- or sex-related conditions, such as STIs.  Indeed, because of their concerns about privacy and being judged, many individuals use Planned Parenthood Members as their provider for sexual and reproductive health care services even when they use other providers for their other health care needs.

58.    Patients often find Planned Parenthood Member health centers to be much more accessible than alternative providers—to the extent alternatives are even available in their communities, which is often not the case.  Most Planned Parenthood Member health centers offer extended (early morning, evening, or weekend) hours.  The availability of extended hours and same-day appointments is particularly important for many patients with low incomes who often work long or extended hours and have childcare responsibilities, and do not have the flexibility to attend appointments during the traditional 9-to-5 workday.

59.    Planned Parenthood Member health centers are significantly more likely than other publicly funded family-planning clinics to use a variety of protocols that enhance contraceptive method initiation and continuation.  For example, a recent survey conducted by the Guttmacher Institute reported that 99% of Planned Parenthood Member health centers provided at least ten reversible contraceptive methods on-site, compared with 63 to 90% of other provider types surveyed.  Planned Parenthood Member health centers were also more likely than all other types of clinics to provide a LARC method of contraception.

60.    PPFA Members also play a critical role in responding to public health crises.  For example, Members expanded their use of telehealth, including for medication abortion, in response to the COVID-19 pandemic.

61.    And after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization* led to the implementation of abortion bans in many states and thus an abortion access crisis, Planned Parenthood Members opened health centers in states where abortion remained legal close to the borders of states with abortion bans and expanded staffing and hours in access states.

62.    In connection with its mission to ensure access to sexual and reproductive health care, including abortion care, PPFA is committed to supporting the advancement of research and technology in sexual and reproductive health.  For example, PPFA and its Members have led and participated in research concerning contraceptive methods as well as human papillomavirus ("HPV") vaccine completion, sharing this research in journal articles and presentations at medical and public health conferences.

## PLANNED PARENTHOOD MEMBERS' SERVICE TO UNDERSERVED AREAS AND COMMUNITIES

63.    PPFA and its Members share a critical mission to ensure access to sexual and reproductive and complementary health care, including abortion, to individuals and communities that historically have faced barriers to access.  Many of PPFA and its Members' educational outreach efforts make a special effort to reach individuals who live in underserved areas and/or have low incomes.

64.    In many communities throughout the country, a Planned Parenthood Member health center is the only place that a patient can turn to for high-quality, compassionate, and affordable sexual and reproductive health care.  74% of Planned Parenthood Member health centers are located in rural areas, HPSAs, or MUAs.

65.    Planned Parenthood Member health centers also play an increasingly critical role in serving communities of color and in many cases are the only health centers located in such communities.  In the 2023-2024 reporting period, approximately 34% of Planned Parenthood Members' patients were white, 27% were Latino/a, 17% were Black, 12% did not disclose their race or their race was unknown, 4% were Asian American/Pacific Islander, 0.5% were American Indian/Alaskan Native, 4% were another race, and 2% were multiracial.  As this data shows, Planned Parenthood Members serve a disproportionate number of patients of color as compared to the U.S. population.

66.    Planned Parenthood's role in serving communities of color is especially important given the barriers to care that such communities often face.  In particular, Planned Parenthood Member health centers are a critical source of care for Black and Latina women, who disproportionately face barriers to preventive health screening.  Nearly half of Black women in the

COMPLAINT
A131

United States have been to a Planned Parenthood Member health center.  And in 2023, a greater percentage of Latina women (approximately 15%) were uninsured compared to women of any other racial or ethnic group, and more than 16% lived in poverty.  Along those same lines, 6.9% of Black women were uninsured, and 16.8% lived in poverty during the same span.

67.    Many Planned Parenthood Member health centers have bilingual or multilingual staff; many also have access to interpretation and translation services.  PPFA and its Members often provide educational materials in English, Spanish, and other languages spoken by the patients in the communities they serve.

**PLANNED PARENTHOOD MEMBERS' SERVICE TO MEDICAID PATIENTS**

68.    Since 1965, Medicaid has provided health coverage for eligible families and individuals with low incomes.  Medicaid is a joint federal-state program under which the federal government provides financial assistance to participating States to help them furnish care to persons in need.  No State is required to participate, but if it does, it must comply with a range of federal statutes and regulations and must administer the program in accordance with federal law.  Currently, all 50 States and the District of Columbia participate in Medicaid.

69.    Eligible individuals who receive Medicaid may choose to obtain care at participating health care providers.  Health care providers are not required to accept Medicaid, and many non-Planned Parenthood Member providers do not accept Medicaid patients at all, or effectively limit the number of Medicaid patients whom they will serve.  This is primarily because Medicaid reimbursement rates have historically been well below those of Medicare or private insurance rates.

70.    For participating health care providers, Medicaid typically works by reimbursement.  Specifically, the health care provider cares for the Medicaid-enrolled patient and submits to the Medicaid program a claim for a reimbursement for the specific covered health care services provided, and the Medicaid program then reimburses the provider.  The majority of the funding for Medicaid is provided by the federal government, but the program is administered at the state level, with the amount of state funding and the exact way in which the program is administered varying from state to state.  States have the option to require cost-sharing (including deductibles and copays) from beneficiaries, but those cost-sharing requirements are generally nominal and cannot be imposed for family planning services.

71.    Each year, Planned Parenthood Members collectively serve approximately two million people, more than half of whom receive care through Medicaid. Planned Parenthood Members provide their Medicaid patients with comprehensive sexual and reproductive health care services, such as STI/HIV screenings and treatments, pelvic exams, and contraception, including LARCs.

72.    As a result of their commitment to serving Medicaid patients whom many other providers would not serve, Planned Parenthood Members received more than one third of their total revenue from Medicaid reimbursements in federal fiscal year 2023.  Some Members received the vast majority (over three quarters) of their total revenue from Medicaid reimbursements that year.  By participating in the Medicaid program, Planned Parenthood Members can serve low-income patients at no cost to those patients and are thus able to ensure access to sexual and reproductive health care for communities in need.

### PLANNED PARENTHOOD'S ADVOCACY FOR, AND PROVISION OF, ABORTION SERVICES

73.     Consistent with—and indeed critical to—their core missions of ensuring access to comprehensive sexual and reproductive health care for all, PPFA and its Members advocate for access to safe and legal abortion for individuals who wish to terminate a pregnancy, and Members in states where it is legal provide abortions.  Abortion services represent a small fraction (4%) of the total services offered by Members collectively and are offered only at some health centers. The vast majority of the services provided by Members are preventive sexual and reproductive health care services, such as STI testing and treatment and contraceptive services.

74.     When a patient comes to a Planned Parenthood Member health center because they may be interested in seeking an abortion, consistent with sound medical practice, Planned Parenthood Members provide educational information to the patient about all the options available to them, including the option of a safe and legal abortion.

75.     In many communities, a Planned Parenthood Member is the only abortion provider, or is the only place where an individual can obtain an abortion without traveling long distances.  The difficulty of obtaining an abortion is made worse by the fact that nineteen states have an abortion ban in effect.  As a result, health centers across these states have shuttered, making it more difficult for patients to access a variety of other health care, including preventative health services.  In 2024, 155,000 people traveled out of their home state for abortion care.

76.     For decades, federal law has prohibited the use of federal funds for abortions except in narrow circumstances (*i.e.*, where the pregnant person's life would be endangered by carrying to term, or where the pregnancy is the result of rape or incest).  No federal funds, including

COMPLAINT

Medicaid funds, are used to reimburse Planned Parenthood Members for abortion services except under the extremely limited circumstances authorized by federal law.

## LEGISLATIVE HISTORY REAFFIRMS THAT THE DEFUND PROVISION SPECIFICALLY TARGETS PLANNED PARENTHOOD

77.     For over a decade, President Trump and his political allies in Washington have tried to coerce Planned Parenthood Members into abandoning the provision of abortion care, and to penalize Members and PPFA for advocating for abortion access.

78.     While these efforts are commonly referred to as efforts to "defund" Planned Parenthood, it bears emphasis that there is no line item in the federal budget for Planned Parenthood.  Rather, Planned Parenthood Members, like any other health care providers in the Medicaid program, provide services to their patients and then typically submit a claim for reimbursements to Medicaid to cover those services.  What the Defund Provision does is bar certain Planned Parenthood Members from receiving federal Medicaid funds and thus, in effect, from providing health care through the Medicaid program.

79.     The Trump Administration and its political allies have tried to pass this bill before. In 2017, Congress considered—and narrowly rejected—a bill that included language nearly identical to the Defund Provision.  It was clear then that that language was intended to target Planned Parenthood, and it remains clear now.

80.     In fact, the failed attempt to pass the same law dates back a decade, to August 2015, when then-candidate Trump was asked whether he would support shutting down the federal government to "get rid of Planned Parenthood money."  President Trump replied, "I would … I think you have to in this case."

COMPLAINT
A135

81.    One month later, Trump stated emphatically that he was "not supporting Planned Parenthood." He added that he would be "totally opposed to funding" Planned Parenthood as long as they provided abortions.

82.    In February 2016, Trump stated in a debate that he would end federal funding for Planned Parenthood, asserting that he would "defund it because [he's] pro-life."

83.    In September 2016, Trump wrote a letter to "Pro-Life Leader[s]," indicating that he was "committed to … [d]efunding Planned Parenthood as long as they continue to perform abortions." Fast forward four years and Trump again wrote to "Pro-Life Leaders and Activists," promising to "[f]ully defund the big abortion industry such as Planned Parenthood of our tax dollars."

84.    In May 2017, President Trump became the first sitting president to single out Planned Parenthood and call for its "defunding."

85.    During President Trump's first term in office, there were also frequent congressional efforts to "defund" Planned Parenthood. The Republican-led House sought to repeal a rule barring state and local governments from withholding Title X—a federal grant program that covers the provision of family planning services—funds from family planning providers that, like Planned Parenthood Member health centers, offered full sexual and reproductive health care services, including abortions. H.R.J. Res. 43, 115th Cong. (2017); Compliance with Title X Requirements by Project Recipients in Selecting Subrecipients, 81 Fed. Reg. 91852 (Dec. 19, 2016) (codified at 42 C.F.R. pt. 59). That rule was a response to more than a dozen attempts by states to "defund" Planned Parenthood by way of excluding its Members from receiving public funds.

86.     Both the House and Senate tried to "defund" Planned Parenthood as part of their efforts to overhaul the Affordable Care Act ("ACA").  42 U.S.C. § 18001 *et seq.*  The "American Health Care Act of 2017" and its Senate analog, the "Better Care Reconciliation Act of 2017," proposed restricting access to Medicaid reimbursements from family planning providers that offer abortion services, using substantially the same language as the Defund Provision.  American Health Care Act of 2017, H.R. 1628, 115th Cong. (2017); S. Amend. 267, 115th Cong. (2017).  Although H.R. 1628 did not expressly mention Planned Parenthood then, just as the Defund Provision does not now, the bill's supporters acknowledged that the legislation was designed to target Planned Parenthood.  For example, during the March 24, 2017, floor debate on H.R. 1628, Representative Matt Gaetz "implore[d] [his] conservative colleagues to vote for this bill" because it would result in "$1.15 trillion in spending cuts" and would "defund[] Planned Parenthood."  163 Cong. Rec. H2373, H2409 (daily ed. Mar. 24, 2017) (statement of Rep. Gaetz).  He then asked, "How long have we been fighting to defund Planned Parenthood?" underscoring that "defunding" Planned Parenthood was one of the bill's key objectives.  *Id.*  Later that day, Representative Kevin Brady likewise stated, "I am proud to defund Planned Parenthood once and for all."  *Id.* at H2433.  H.R. 1628 passed the House but stalled in the Senate.

87.     As drafted, H.R. 1628's definition of "prohibited entity" largely tracked that in the Defund Provision.  H.R. 1628 applied only to family planning providers that provide abortions and received more than $350 million in Medicaid funds in fiscal year 2014.  That number was no accident, but rather yet more proof of the intended target of the bill:  Planned Parenthood Members collectively received over $350 million in Medicaid funds that year.  No other organization or association came close.

COMPLAINT
A137

88.     Because the Senate parliamentarian determined that "prohibit[ing]" only "Planned Parenthood from receiving Medicaid funds for one year" violated a Senate rule (the Byrd Rule),[4] the bill was then revised so as to purportedly bring one other unidentified entity within its scope. In the Senate version of the bill, the threshold for qualification was reduced from $350 million to $1 million for the sole purpose of evading the restrictions of the reconciliation process.  While the Parliamentarian inexplicably allowed the bill to move forward with that change, there is no question that the true purpose of that bill was to express disapproval of and to punish Planned Parenthood.

89.     Although these congressional efforts to ban Planned Parenthood from receiving federal funding ultimately failed in 2017, President Trump then sought to permit states to accomplish what he and Congress could not.  In 2018, for example, President Trump's HHS Secretary revoked guidance that had prohibited states from excluding providers from eligibility for Medicaid reimbursement because they also provided abortions.  Letter from Brian Neale, Director, Ctr. for Medicare & CHIP Servs., and Alec Alexander, Director, Ctr. for Program Integrity, to State Medicaid Dirs. (Jan. 19, 2018).

90.     During the Biden Administration, congressional efforts to "defund" Planned Parenthood continued.  House members introduced bills that openly sought to "defund" Planned Parenthood unless it certified that it would not provide abortions.  For example, H.R. 128, 118th Cong. (2023), the "Defund Planned Parenthood Act of 2023," introduced by Representative Lauren Boebert (Colorado), and H.R. 371, 118th Cong. (2023), "Defund Planned Parenthood Act

---

[4]     S. Comm. on the Budget, 115th Cong., Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff (July 21, 2017), https://www.budget.senate.gov/imo/media/doc/Background%20on%20Byrd%20Rule%20decisions_7.21[1].pdf.

of 2023," proposed by Representative Michelle Fischbach (Minnesota), sought to restrict any federal funding for Planned Parenthood, or any of its affiliates or clinics, for one year unless it certified that its affiliates and clinics would not perform, and would not provide funds to entities that perform, abortions during that year.  In a press release announcing H.R. 128, Representative Boebert stated, "[t]he nation's largest abortion provider has no business receiving taxpayer dollars."[5]  Similarly, Representative Fischbach stated of her bill, "[o]rganizations like Planned Parenthood receive millions of hard-earned taxpayer dollars every year to provide abortions on demand."[6]  Other bills, like H.R. 6176, 118th Cong. (2023), introduced by Representative Robert B. Aderholt (Alabama), simply aimed "to prohibit Federal funding of Planned Parenthood Federation of America."  Similar bills were introduced in the Senate.[7]

91.    And saying the quiet part out loud, entities politically opposed to abortion released ads and other materials seeking to defund Planned Parenthood's Members in part because of the work of its related electoral organizations.  For example, Susan B. Anthony Pro-Life America announced the launch of a six-figure TV and digital ad campaign that followed sensational accusations about Planned Parenthood's abortion services with the conclusion, "all while they spend hundreds of millions supporting Democrats.  Stop forced taxpayer funding of the Big

---

[5]    Press Release, Rep. Lauren Boebert Introduces the Defund Planned Parenthood Act (Jan. 20, 2023), https://boebert.house.gov/media/press-releases/rep-lauren-boebert-introduces-defund-planned-parenthood-act.

[6]    Press Release, Rep. Fischbach Introduces the Defund Planned Parenthood Act and Protecting Life and Taxpayers Act (Jan. 19, 2023), https://fischbach.house.gov/press-releases?ID=67C83E37-B8FF-4E7C-AC0B-4EB21AAE68F9.

[7]    *See, e.g.*, Defund Planned Parenthood Act, S. 203, 119th Cong. (2025) (introduced by Sen. Paul (Kentucky)); H.R. 271, 119th Cong. (2025) (introduced by Rep. Fischbach (Minnesota)); Protecting Funding for Women's Health Care Act, S. 177, 119th Cong. (2025) (introduced by Sen. Ernst (Iowa)); H.R. 599, 119th Cong. (2025) (introduced by Rep. Aderholt (Alabama)).

Abortion industry.  Defund Planned Parenthood."[8]  Students for Life Actions "National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion" included, as its "Week Five Theme" a suggestion that its members contact their Senators to tell them that "Planned Parenthood is funding their political enemies," and specifically that"[a]head of last November's elections, they spent $69.5 million bolstering pro-abortion President Joe Biden & leading congressional Democrats."[9]

92.    The second Trump Administration picked up its efforts to "defund" Planned Parenthood right where the first left off.  Project 2025, a proposed "governing agenda" for the Trump administration organized by the Heritage Foundation, encouraged Congress to pass the "Protecting Life and Taxpayers Act," which "would accomplish the goal of defunding abortion providers such as Planned Parenthood."  Although President Trump distanced himself from Project 2025 during his 2024 campaign, its proposed policies track President Trump's actions targeting Planned Parenthood during his first term in office, are in line with his stated intention to "defund" Planned Parenthood because it provides abortion services, and have now been implemented through the Defund Provision.

93.    These efforts to "defund" Planned Parenthood culminate now with the enactment of the Defund Provision, which comes as no surprise.  Speaker Johnson confirmed in 2024, before the current congressional term began, that "defunding" Planned Parenthood continued to be at the

---

[8]    Press Release, Six-Figure Ad Campaign Exposes How Big Abortion's Substandard 'Care' Harms Women & Girls (July 1, 2025), https://sbaprolife.org/newsroom/press-releases/six-figure-ad-campaign-exposes-how-big-abortions-substandard-care-harms-women-girls.

[9]    Join Students for Life's National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion,' Students for LifeAction, https://www.studentsforlifeaction.org/defund/.

top of the Republican agenda in the House.  In an interview with Fox News at the end of 2024, Speaker Johnson confirmed while discussing budget cuts, that he was planning to "axe" funding for Planned Parenthood.[10]  On April 29, 2025, during a keynote address at a fundraising event, Speaker Johnson reiterated, "In the weeks ahead, the House is going to be working on the one big, beautiful bill . . . .  And we're absolutely making it clear to everybody that this bill is going to redirect funds away from Big Abortion."[11]  "Big Abortion" has long been used by anti-abortion groups as a derogatory synonym for Planned Parenthood.

94.    Other Members of Congress have made similar statements.  For example, Representative Christopher Smith called for the "defunding of Planned Parenthood" to penalize it for performing abortions.  171 Cong. Rec. E255 (2025) (statement of Rep. Smith).  And despite acknowledging that defunding Planned Parenthood "doesn't save money," Representative Andy Harris called on Congress to include reconciliation language to defund Planned Parenthood because "[w]e shouldn't be paying for institutions whose primary purpose is to do abortions."[12]

95.    Congress has now chosen to defund Planned Parenthood in the same way that failed in 2017.  The Defund Provision initially started with the $1 million eligibility threshold where the 2017 bill left off, but was again scaled down—this time to $800,000—again to overcome the Byrd Rule.  To the best of Plaintiffs' knowledge, this lower eligibility threshold may mean that a small

---

[10]    Speaker Mike Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*, YOUTUBE (Dec. 4, 2024), https://www.youtube.com/watch?v=VOM5wRs1WFc.

[11]    SBA Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*, YOUTUBE (Apr. 29, 2025), https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794.

[12]    Alice Ollstein, *Knives Are Out for Planned Parenthood. In All 3 Branches of Government*, POLITICO (Feb. 13, 2025), https://www.politico.com/newsletters/politico-nightly/2025/02/13/knives-are-out-for-planned-parenthood-in-all-3-branches-of-government-00204234.

COMPLAINT

number of additional entities have been swept into the statute's coverage as collateral damage.  But the intent remains the same: to defund Planned Parenthood.

## THE SWEEPING EFFECTS OF THE DEFUND PROVISION

### Section 71113: Text and Purpose

96.    Section 71113, enacted through the reconciliation process, is the latest attempt to single out and penalize Planned Parenthood.

97.    The Defund Provision bars federal Medicaid funds from being "used to make payments" to a "prohibited entity" "for items and services furnished during the 1-year period beginning on the date of the enactment of this Act."

98.    The Defund Provision applies only to entities that meet the statutory definition of a "prohibited entity" "as of the first day of the first quarter beginning after the date of enactment of this Act."  But it prohibits federal funds from being disbursed "for items and services furnished during the 1-year period beginning *on the date of the enactment of this Act*."  Accordingly, even if one cannot know if an entity will qualify as a "prohibited entity" until next quarter, such a "prohibited entity" would be prohibited from receiving Medicaid reimbursements for any services provided as of July 4, 2025.

99.    By design, the Defund Provision defines "prohibited entity" in such a way as to specifically target Planned Parenthood.  In particular, the statute defines "prohibited entity" to mean an entity, "including its affiliates, subsidiaries, successors, and clinics," that meets four criteria:

(1) it "provides for abortions," other than abortions in the case of rape or incest or where the woman's life is in danger;

(2) it "is an organization described in section 501(c)(3) of the Internal Revenue Code … and exempt from tax under section 501(a) of such Code";

(3) it "is an essential community provider described in" 45 C.F.R. § 156.235 "that is primarily engaged in family planning services, reproductive health, and related medical care"; and

(4) "for which the total amount of Federal and State expenditures under the Medicaid program … in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000."

100.    PPFA itself does not provide health care, including abortion care, and has never received Medicaid funds.  Nor is it "an essential community provider."  PPFA is therefore not a "prohibited entity" under the statute.

101.    But the statute's criteria are specifically drafted to target Planned Parenthood Members.  When taken together, to the best of Plaintiffs' knowledge, all but a small number of the entities that satisfy these criteria—that provide abortions, are 501(c)(3) organizations, are essential community providers, and received more than $800,000 in Medicaid funds in fiscal year 2023—are Planned Parenthood Members.  And there is no indication that Members of Congress were even aware that any other entity could qualify under this statute that was clearly designed to target Planned Parenthood alone.

102.    Underscoring that Congress targeted Planned Parenthood—and Planned Parenthood alone—is the fact that nearly all other *abortion* providers fall *outside* the scope of a "prohibited entity" under the statute by design.  That includes providers that are not non-profit

organizations, that are not essential community providers that primarily provide family planning and reproductive health services, and/or that did not receive more than $800,000 in Medicaid funds in fiscal year 2023.  All those providers remain eligible to receive Medicaid funds, while Planned Parenthood Members are prohibited from doing so.

103.    Some Planned Parenthood Members, including PPLM, independently satisfy the requirements of the Defund Provision, and therefore qualify as "prohibited entit[ies]" under the statute.

104.    Other Planned Parenthood Members, including Plaintiff PPAU, fall outside the scope of this definition because they do not provide abortion services or did not receive over $800,000 in Medicaid funds during fiscal year 2023.

105.    These ten Members (the "Non-Qualifying Members") are also not "affiliates, subsidiaries, successors, or clinics" of any prohibited entity.  Each Planned Parenthood Member is a separately incorporated and independently governed non-profit organization, with its own finances, board of directors, and operational structure.  As such, one Planned Parenthood Member does not exercise control over any other Planned Parenthood Member such that they could be considered affiliates of one another under the statute.  Nor are Planned Parenthood Members controlled by PPFA.

106.    But these Non-Qualifying Members can take no comfort in the plain text of the statute.  Given the decade-plus focus on "defunding" set out above, there can be no question that they face a serious risk that the Defendants will willfully misinterpret the statute to disqualify them from receiving federal Medicaid funding, based solely on their association with PPFA and other Planned Parenthood Members.

**The Devastating and Irreparable Impact of the Defund Provision on Plaintiffs and the Patients and Communities Members Serve**

107.     If not enjoined, the Defund Provision will have devastating effects on PPFA, its Members, and the patients and communities that Members serve.

108.     The Defund Provision will jeopardize care for the more than 1,000,000 Planned Parenthood Member patients who rely on Medicaid—approximately 50% of Planned Parenthood Member patients.  As a direct result of the law, patients are no longer able to use Medicaid to receive services at Planned Parenthood Member health centers.  Many will not be able to find alternative providers—and thus will lose access to care altogether.  Even those who may be able to obtain care from an alternative provider will face delays and disruptions in care, which can be particularly devastating to their health.

109.     The Defund Provision will irreparably harm Plaintiff PPLM and the patients it serves.  Because PPLM currently meets the requirements to be a "prohibited entity" under the Defund Provision, and that status will not change between now and the "first day of the first quarter beginning after the date of enactment of this Act," PPLM has been forced to stop seeking Medicaid reimbursement upon the Defund Provision's enactment.  *See* Section 71113 (barring federal Medicaid funds from being "used to make payments" to a "prohibited entity" "for items and services furnished during the 1-year period beginning on the date of the enactment of this Act").

110.     If the Defund Provision is not enjoined, Plaintiff PPLM will be forced to cease providing services to its Medicaid patients.  PPLM has nearly 150 scheduled appointments for Medicaid patients across its health centers on July 7 and July 8 alone, and has been reaching out to inform these patients they cannot use their Medicaid coverage for services at PPLM.  PPLM is discussing options with patients to try to ensure their access to care, but many of those patients

34

will likely be unable to find another provider or will face such lengthy wait times that they will be forced to forgo services. Early estimates indicate that the Defund Provision will cause PPLM to lose approximately 35-40% of its annual health care revenue. As a result, PPLM will be forced to make substantial reductions to services, programs, and staffing, potentially up to 20-25%, and ultimately may have no choice but to close some of its health centers altogether. This will deny care not only to its Medicaid patients, but *all* of its patients at those health centers.

111.    The Defund Provision will also irreparably harm Plaintiff PPAU and the patients it serves. Because PPAU's health centers cannot afford to provide health care services free of charge, if the Defund Provision is not prevented from going into effect, patients will no longer be able to receive health care services through the Medicaid program at PPAU's health centers. PPAU has already had to turn away Medicaid patients who had appointments in its health centers on Saturday, July 5. And many of PPAU's Medicaid-enrolled patients may be unable to find another provider of affordable, high-quality sexual and reproductive health care in their area, much less one that sees Medicaid patients.

112.    In addition to the harms to PPAU's patients, PPAU will also be immediately and irreparably harmed by the Defund Provision. In federal fiscal year 2023, PPAU received $706,251 in Medicaid reimbursements. Even though this means that PPAU does not independently qualify as a "prohibited entity" under the Defund Provision, due to the threat that the government could determine PPAU is a "prohibited entity" based on its association with other Planned Parenthood Members, PPAU has had no choice but to stop seeking Medicaid reimbursement.

113.    Losing this revenue will force PPAU to lay off full-time staff, limit the health care services it provides, and potentially close health centers as a result. When the federal government

recently withheld $2.8 million in Title X funds from PPAU—approximately 20% of its overall revenue—PPAU was forced to lay off eighteen full-time staff members (approximately 20% of PPAU's staff) and close two health centers (approximately 20% of its health centers).  PPAU will likely similarly have to make proportionate cuts to its health centers and staff if it cannot seek Medicaid reimbursements.  Being unable to serve Medicaid patients also makes it more difficult for PPAU to accomplish its mission of ensuring access for Utahns to sexual and reproductive health care.

114.    Other Planned Parenthood Members and their patients will also suffer.  Where eligible, Planned Parenthood Members provide care to patients enrolled in Medicaid, and care for all of their Medicaid patients will be jeopardized for the same reasons.  Most of those patients face serious barriers to health care, and many will be unable to find alternative providers.

115.    For example, patients in California face especially devastating impacts.  There are seven Planned Parenthood Members located in California,[13] operating 114 health centers throughout the State.  Each of the seven California Planned Parenthood Members independently meets the requirements of being a "prohibited entity" under the Defund Provision.

116.    The California Members collectively provide care to roughly 700,000 patients, across 1.3 million patient visits, each year.  The California Planned Parenthood Members offer a range of sexual and reproductive health care services, including the provision of birth control, including emergency contraception; testing and treatment of sexually transmitted infections;

---

[13]    The seven members are: Planned Parenthood Northern California ("PPNorCal"); Planned Parenthood Mar Monte ("PPMM"); Planned Parenthood California Central Coast ("PPCCC"); Planned Parenthood Los Angeles ("PPLA"); Planned Parenthood Pasadena and San Gabriel Valley ("PPSGV"); Planned Parenthood Orange and San Bernardino Counties ("PPOSBC"); and Planned Parenthood Pacific Southwest ("PPPSW").

pregnancy testing and services; breast and cervical cancer screenings; gender-affirming care, and abortion. In addition, all seven California Planned Parenthood Members offer education and counseling on sexual and reproductive health, reaching over 100,000 Californians every year.

117.     Over 80% of Planned Parenthood Member patients in California rely on California's Medicaid program ("Medi-Cal") and its related programs for their health care coverage. Current budget estimates show that federal funds cover around 60% of the total Medi-Cal program expenditures.

118.     As a result of the Defund Provision, Medicaid payments will be prohibited for the vast majority of services that the California Members provide to the more than 25,000 patients their health centers serve every week. Medicaid payments constitute approximately two thirds of the California Members' collective revenue.

119.     Without immediate relief, the seven California Planned Parenthood Members will be forced to close health centers and reduce hours, staff, and services, and Californians—whether enrolled in Medi-Cal or not—will lose important points of access for their sexual and reproductive health care needs.

120.     Closures of California Planned Parenthood Members' health centers would mean that there will be fewer family planning providers in the Medi-Cal program, leading to longer wait times and more barriers to care as Californians may need to travel significant distances to receive in-person care.

121.     Such closures will likely leave many patients with no other options from which to receive the health care they need. In California, Planned Parenthood Member health centers see approximately half of all patients in California served at a publicly funded clinic. Federally

COMPLAINT
A148

qualified health centers are already struggling to meet a rapidly increasing demand for services and will be unable to absorb Planned Parenthood Members' patients. The California Primary Care Association ("CPCA"), which represents the community clinics in California, has stated that these clinics do not have the capacity to take on Planned Parenthood Members' patients.

122.    Across the country, Planned Parenthood Members' patients with low incomes, patients in rural areas, patients who are not proficient in English, and patients of color will disproportionately suffer the consequences of the Defund Provision. Those patients and communities already face serious barriers to health care that would only worsen if they cannot use Medicaid to receive services at Planned Parenthood Members' health centers, including because health centers are forced to close and others are forced to limit their hours or curtail their services.

123.    Indeed, Planned Parenthood Members provide an extraordinary proportion of the Nation's publicly funded sexual and reproductive health services. Moreover, Planned Parenthood Member health centers focus on sexual and reproductive health services; other publicly funded health centers may offer a broad range of primary and acute medical services, but lack the strong focus on sexual and reproductive health and experience providing that care that Planned Parenthood Members have. Put simply, other publicly funded health centers, already stretched to capacity, will not be able to make up the drastic shortfall in coverage that will result from the Defund Provision. The statute will thus create an immediate health care crisis for hundreds of thousands of patients, if not more.

124.    The adverse public health consequences of the gap in services that will result from the Defund Provision will be grave, leading to significant adverse public health outcomes, including, among other things, higher rates of STIs and more unintended pregnancies.

125.    If not enjoined, the Defund Provision will frustrate PPFA's and its Members' mission to ensure access to sexual and reproductive health care services to individuals regardless of their ability to pay.  PPLM, PPAU, and other Planned Parenthood Members face the immediate prospect of having to turn away patients, curtail services, terminate employees, and close health centers.  Even if the Defund Provision is held unconstitutional at the end of this lawsuit, absent a temporary restraining order and preliminary injunctive relief, Planned Parenthood Members would not be able to resume relationships with the patients that they lost, reconstitute the programs and services that were terminated, or recall the employees that were essential to serving those patients. Planned Parenthood Members' patients will also be harmed by the loss of their health care provider of choice, and even if they are able ultimately to find an alternative provider, will suffer from a loss of continuity of care with their established provider.

126.    If Member health centers are forced to curtail services or close as a result of the Defund Provision they could not be reopened without extensive additional investment in infrastructure.  Thus, even if in future years Members are permitted to obtain federal Medicaid reimbursement, such funds would not be sufficient to provide Planned Parenthood Members the capital needed to renew services and reopen clinics for the patients that they would have lost as a result of the Defund Provision.

127.    Planned Parenthood Members have a reputation among the patients and the communities they serve for offering reliable and comprehensive health care.  The disruption in services and care offered by PPLM, PPAU, and other Members as a result of the Defund Provision will diminish their reputations as providers of reliable and comprehensive health care.  It has taken years for Planned Parenthood Members to build such reputational capital.  Indeed, many Planned

Parenthood Members have been in their communities for decades. Once disrupted, such reputational capital cannot be readily rebuilt.

128.    These harms to PPLM, PPAU, and other Planned Parenthood Members across the Nation will also harm PPFA. By preventing Planned Parenthood Member health centers from serving Medicaid patients and other vulnerable patients with low incomes across the Nation, the Defund Provision strikes at the heart of PPFA's core mission of ensuring access for all to sexual and reproductive health care, including abortion, regardless of patients' ability to pay. Although PPFA does not directly operate health care centers, it will face substantial reputational, operational, and mission-related injury if the Defund Provision is not enjoined.

129.    PPFA, its Members, and their patients have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT ONE
### ARTICLE ONE: BILL OF ATTAINDER

130.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

131.    The Constitution instructs Congress that "[n]o Bill of Attainder … shall be passed." U.S. Const. art. I, § 9, cl. 3.

132.    The Act constitutes an unconstitutional bill of attainder because the Defund Provision specifies and punishes PPFA and its Members without a judicial trial.

133.    While the Defund Provision does not identify Planned Parenthood by name, it defines "prohibited entity" specifically to target Planned Parenthood.

134.    The Defund Provision also uses language nearly identical to that proposed, but not enacted, in 2017. The history and context surrounding that version of the bill, which is functionally

the same as the Defund Provision now enacted with respect to who is a "prohibited entity," clearly indicates that it was intended to exclude Planned Parenthood, and Planned Parenthood alone, from the Medicaid program.  Events since 2017, as well as the history and context of the Defund Provision itself, also demonstrate that the challenged law was intended to target Planned Parenthood.

135.    The Defund Provision specifically punishes Planned Parenthood Members by making them ineligible for Medicaid reimbursement.

136.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## COUNT TWO
## FIFTH AMENDMENT: EQUAL PROTECTION

137.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

138.    The equal protection component of the Due Process Clause of the Fifth Amendment requires that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

139.    By its terms, the Defund Provision reaches only "prohibited entit[ies]," which is defined to encompass Planned Parenthood.  As the statute's supporters have confirmed in public statements, that definition is designed to single out Planned Parenthood.

140.    The Defund Provision purposefully treats Planned Parenthood Members unlike other organizations that provide the same medical care.  Others who provide abortion and also

receive Medicaid payments for Medicaid-covered care are not similarly targeted by the Defund Provision and are not prohibited from receiving Medicaid funds as a result.

141.    The Defund Provision targets Planned Parenthood Members for unequal treatment because of their association with PPFA and each other.  Such unequal treatment burdens Planned Parenthood Members' fundamental right to free association under the First Amendment.  In particular, the Defund Provision singles Planned Parenthood Members out for unequal treatment based on their association with other providers of lawful abortion and PPFA, and based on their advocacy for access to sexual and reproductive health care, including abortion.  The Defund Provision does not similarly restrict other abortion providers' associational rights.

142.    The Defund Provision does not further a compelling government interest.  And even if it did, it does not use the least restrictive available means.

143.    The Defund Provision also does not further an important government interest.  And even if it did, it is not substantially related to achievement of an important governmental objective.

144.    Moreover, the Defund Provision does not even bear a rational relationship to any legitimate government interest.  The Defund Provision's ban on reimbursing Planned Parenthood Members for their non-abortion-related care does not rationally relate to a possible government interest.  Far from a legitimate interest, the Defund Provision is animated solely by animus—a moral disapproval of the political views and lawful activities of Planned Parenthood.  *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

145.    The Defund Provision violates the equal protection component of the Due Process Clause of the Fifth Amendment by irrationally singling out Planned Parenthood for unfavorable

treatment.  *See Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 325-28 (M.D.N.C. 2012).

146.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**COUNT THREE**
**FIRST AMENDMENT: RETALIATION**

147.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

148.    "Congress shall make no law … abridging the freedom of speech."  U.S. Const. amend. I.  Congress cannot "punish or suppress disfavored expression."  *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024).  Nor can it retaliate against such expression.  *See Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see also Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014) ("It is well established that political discrimination … , including retaliation for a contrary political opinion, violates the freedom of belief and association protected by the First Amendment.").

149.    To state a First Amendment retaliation claim, a plaintiff must allege that it "'engaged in constitutionally protected conduct,'" was "'subjected to an adverse [government] action,'" and that "'the protected conduct was a substantial or motivating factor in the adverse action'" such that retaliatory animus was the but-for cause of the injury.  *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514-15 (1st Cir. 2023).

150.    PPFA and its Members engage in First Amendment protected activity.  They do so by advocating for access to sexual and reproductive health care, including the right to safe and

43

legal abortion.  Members associate with PPFA and one another to speak and act collectively where appropriate, and in furtherance of their common goals, exercising the associative right "implicit in the right to engage in activities protected by the First Amendment."  *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).

151.    The Defund Provision qualifies as an action adverse to PPFA and its Members. Quite simply, the Defund Provision punishes Planned Parenthood Members for their association with each other and with PPFA by excluding them from Medicaid reimbursements that they would otherwise be qualified to receive.  Stopping the flow of millions of dollars in reimbursements for provided medical services would "'deter a reasonably hardy individual'" from associating with Planned Parenthood or from advocating for the sexual and reproductive rights and other causes that Planned Parenthood champions.  *McCue v. Bradstreet*, 807 F.3d 334, 339 (1st Cir. 2015).

152.    That is by design.  The Defund Provision is obviously motivated by more than the provision of abortion, otherwise it would cover all abortion providers and not just target Planned Parenthood.  The history and context of the Defund Provision make clear that it treats Planned Parenthood Members—each of which is an independent corporation with its own leadership, board, finances, and autonomous operations— differently from other health care providers.  The statute plainly defunds Planned Parenthood Members because of their participation in the nation's most high-profile membership association of abortion providers, known for its advocacy for abortion rights and access across the country.  Context confirms the retaliatory animus underlying the Defund Provision.  Over a decade worth of failed attempts and public statements demonstrate that Congress passed the Defund Provision to target Planned Parenthood.

153.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

### COUNT FOUR
### REQUEST FOR DECLARATORY JUDGMENT
### (on behalf of PPAU and the Non-Qualifying Members)

154.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

155.    The Defund Provision excludes "prohibited entities" from receiving federal Medicaid funds.  The statute defines "prohibited entities" to include entities that, among other things, provide abortion services and received more than $800,000 in Medicaid reimbursements in fiscal year 2023.

156.    Planned Parenthood Members that do not provide abortions or did not receive over $800,000 in Medicaid funds in fiscal year 2023 are not themselves "prohibited entities" under the Defund Provision.

157.    Under the plain meaning of the statute, Planned Parenthood Members that do not provide abortions or did not receive over $800,000 in Medicaid funds in fiscal year 2023 are not "affiliates, subsidiaries, successors, or clinics" of "prohibited entities" under Section 71113.

158.    Planned Parenthood Members are not owned or controlled by PPFA or by each other.

159.    Therefore, the Defund Provision does not apply to Planned Parenthood Members that do not provide abortions or did not receive over $800,000 in Medicaid funds in fiscal year 2023.

COMPLAINT
A156

160.    Despite this, there is a substantial risk that Defendants will interpret the Defund Provision to prohibit these Non-Qualifying Members from receiving Medicaid funding solely based on their association with PPFA and other Members, even though they do not meet the statutory criteria for exclusion.  Interpreting the Defund Provision to cover the Non-Qualifying Members is aligned with President Trump's stated goal to "defund" Planned Parenthood, and so is a predictable interpretation for the Defendants to adopt.

161.    Because of this risk, the Non-Qualifying Members that do not independently satisfy the requirements of "prohibited entities" under the Defund Provision will nonetheless be forced to cease seeking Medicaid reimbursement or else risk being subject to enforcement based on allegations that they filed unlawful claims for reimbursement.

162.    The Non-Qualifying Members seek a declaration that the Defund Provision does not apply to Planned Parenthood Members that do not provide abortion services or did not receive more than $800,000 in Medicaid reimbursements during fiscal year 2023, and that such Non-Qualifying Members are not considered "prohibited entities" or "affiliates, subsidiaries, successors, or clinics" thereof under the Act.

163.    Accordingly, the Non-Qualifying Members are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**COUNT FIVE**
**UNCONSTITUTIONAL PENALTY ON CONSTITUTIONALLY PROTECTED**
**ACTIVITY UNDER THE FIRST AMENDMENT**
**(PLED IN THE ALTERNATIVE TO COUNT FOUR)**
**(on behalf of PPAU and the Non-Qualifying Members)**

164.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

165.    The Defund Provision violates the First Amendment to the United States Constitution by imposing an unconstitutional condition on the Non-Qualifying Members that do not provide abortion services or did not receive over $800,000 in Medicaid funds in fiscal year 2023, including but not limited to Plaintiff PPAU.

166.    To the extent the Defund Provision purports to deny those Non-Qualifying Members a benefit—eligibility for federal Medicaid funding—based on their association with PPFA and other Members, it impermissibly infringes upon the Non-Qualifying Members' First Amendment right of association.  If interpreted to apply to the Non-Qualifying Members, the Defund Provision would require the Non-Qualifying Members to surrender their right to associate with PPFA and other Members in order to maintain their eligibility for Medicaid reimbursements. Absent disassociation from PPFA and the Members, the Non-Qualifying Members would be barred from receiving federal funds if any of their purported "affiliates" provide abortions and received more than $800,000 in Medicaid funds in fiscal year 2023—even though they themselves do not meet that definition.

167.    There is "implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *United States Jaycees*, 468 U.S. at 622.  The Defund Provision purports to deny Plaintiff PPAU and other Non-Qualifying Members the ability to associate with PPFA and other Members in their work in advocating for, and providing, sexual and reproductive health care for all, including abortion.

168.    Accordingly, the Non-Qualifying Members are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## COUNT SIX
## FIFTH AMENDMENT: VAGUENESS
## (PLED IN THE ALTERNATIVE TO COUNT FOUR)
## (on behalf of PPAU and the Non-Qualifying Members)

169.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

170.    Since "clarity in regulation is essential," the Due Process Clause of the Fifth Amendment "requires the invalidation of laws that are impermissibly vague." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  First, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And second, laws must not invite "arbitrary and discriminatory enforcement." *Id.*

171.    Laws that "abut[] upon sensitive areas of basic First Amendment freedoms" must rigorously adhere to these requirements to ensure ambiguity does not chill protected speech or association.  *Grayned*, 408 U.S. at 109; *see also Fox*, 567 U.S. at 253-54 ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.").

172.    The Defund Provision is impermissibly vague as applied to certain Planned Parenthood Members.  While the statute leaves no doubt that it targets Planned Parenthood, the statute does not clarify whether it reaches each and every Planned Parenthood Member.  The statute defines "prohibited entity" to include "affiliates, subsidiaries, successors, and clinics," yet the

48

statute leaves those terms undefined. It is ambiguous whether the statute reaches Planned Parenthood Members who do not provide abortions. It is also ambiguous whether the statute reaches Members who did not receive more than $800,000 from Medicaid in the 2023 fiscal year. In short, the Defund Provision leaves certain Planned Parenthood Members guessing—at great risk to themselves and their patients—whether their association with PPFA and other Planned Parenthood Members will jeopardize their participation in Medicaid.

173.    To the extent the Defund Provision's prohibition may encompass the Non-Qualifying Members, the Defund Provision implicates their associational freedoms that the First Amendment protects. Where a statute implicates First Amendment rights, it must rigorously adhere to the vagueness doctrine's notice requirement and its prohibition on enabling arbitrary or discriminatory enforcement.

174.    The Defund Provision does not reasonably specify whom it regulates. As such, it does not provide reasonable notice, and it delegates to enforcement officials the discretion to determine who is eligible to receive millions in Medicaid reimbursements. Therefore, the Defund Provision is void for vagueness as applied to the Non-Qualifying Members who do not provide abortions and/or who did not receive more than $800,000 from Medicaid in the 2023 fiscal year.

175.    Accordingly, the Non-Qualifying Members are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court

a)    Issue a declaratory judgment that the Defund Provision violates the Bill of Attainder Clause of the United States Constitution;

b)    Issue a declaratory judgment that the Defund Provision violates the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution;

c)    Issue a declaratory judgment that the Defund Provision violates the First Amendment to the United States Constitution;

d)    Issue a declaratory judgment that the Defund Provision does not apply to Planned Parenthood Members that do not provide abortions or did not receive more than $800,000 in Medicaid funds in fiscal year 2023, and/or else that the Defund Provision is unconstitutional as applied to the Non-Qualifying Members because it violates their freedom of association and is unconstitutionally vague;

e)    Issue a declaratory judgment that the Defund Provision is not a lawful or proper basis for terminating Planned Parenthood Members from Medicaid programs.

f)    Issue a declaratory judgment that all Planned Parenthood Members may continue to seek and obtain reimbursements for eligible care provided to Medicaid recipients, and that requests for such reimbursements shall constitute lawful claims under Planned Parenthood Members' respective Medicaid Provider Agreements;

g)    Issue a declaratory judgment that Planned Parenthood Members are entitled to retain Medicaid reimbursements for eligible care provided to Medicaid recipients while an injunction is in place, even if such injunction is later reversed;

50

h)    Issue temporary, preliminary, and permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the Defund Provision, by enjoining Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants from enforcing, threatening to enforce, or otherwise applying the provisions of the Defund Provision against any Planned Parenthood Members, even if the injunction is later reversed, or for seeking and retaining Medicaid reimbursement for such services;

i)    Order Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants to take all steps necessary to ensure that Medicaid reimbursements continue to be disbursed to Planned Parenthood Members in the customary manner and timeframes, including reimbursements for services provided while an injunction is in place;

j)    Retain jurisdiction after judgment for the purpose of resolving any future disputes over the effect of any injunctive relief this Court may issue, including if injunctive relief is granted and later reversed;

k)    Award Plaintiffs their costs, attorney's fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

l)    Grant such further relief as this Court deems just and proper.

COMPLAINT

Dated:  July 7, 2025

Respectfully submitted,

/s/ Sharon K. Hogue

Emily Nestler*
PLANNED PARENTHOOD
  FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW
Washington, D.C.  20005
Tel.: (202) 973-4800
emily.nestler@ppfa.org

Sharon K. Hogue, BBO# 705510
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
sharon.hogue@wilmerhale.com

Jennifer Sandman*
C. Peyton Humphreville*
Kyla Eastling*
PLANNED PARENTHOOD
  FEDERATION OF AMERICA, INC.
123 William Street
New York, NY 10038
Tel.: (212) 441-4363
jennifer.sandman@ppfa.org
peyton.humphreville@ppfa.org
kyla.eastling@ppfa.org

Alan Schoenfeld*
Cassandra A. Mitchell*
Alex W. Miller*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com

Albinas J. Prizgintas*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
albinas.prizgintas@wilmerhale.com

*Application for pro hac vice forthcoming

Counsel for Plaintiffs

52

COMPLAINT
A163

**<u>CERTIFICATE OF SERVICE</u>**

Counsel for Plaintiffs certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated:  July 7, 2025

/s/ Sharon K. Hogue
Sharon K. Hogue, BBO# 705510

53

JS 44 (Rev. 10/20)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

Planned Parenthood Federation of America, Inc.; Planned Parenthood League of Massachusetts; Planned Parenthood Association of Utah

### DEFENDANTS

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES

**(b)** County of Residence of First Listed Plaintiff    New York County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    District of Columbia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Sharon K. Hogue, Wilmer Cutler Pickering Hale and Dorr LLP, 60 State St., Boston, MA 02109, (617) 526-6000

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☒ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S. Const. art. 1, section 9, cl. 3, amends. I and V

Brief description of cause:
Constitutional claims arising from exclusion of Planned Parenthood Members from Medicaid

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE    07/07/2025

SIGNATURE OF ATTORNEY OF RECORD    /s/ Sharon K. Hogue

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____ A165    JUDGE _____    MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Planned Parenthood Federation of America, Inc., et al. v.
   Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   [ ]  I.    160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   [ ]  II.   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   [✓] III.   120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362,
              365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560,
              625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
              *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                    YES [ ]      NO [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
                                                    YES [✓]      NO [ ]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                    YES [✓]      NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                    YES [ ]      NO [✓]

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                    YES [✓]      NO [ ]

   A.  If yes, in which division do all of the non-governmental parties reside?
       Eastern Division [✓]        Central Division [ ]        Western Division [ ]

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
       Eastern Division [ ]        Central Division [ ]        Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                    YES [ ]      NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Sharon K. Hogue
ADDRESS  60 State St., Boston, MA 02109
TELEPHONE NO.  (617) 526-6000

(CategoryForm11-2020.wpd )

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; and PLANNED PARENTHOOD ASSOCIATION OF UTAH,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES; and CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>Defendants. | Case No. _____ |

## DECLARATION OF KIMBERLY CUSTER
## IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Kimberly Custer, declare and state as follows:

1.     I am employed by Planned Parenthood Federation of America, Inc. ("PPFA") as Executive Vice President and Senior Advisor to the President of PPFA. In this role, I am responsible for, among other things, advising the President on a variety of strategic and operational objectives, leading digital health strategy development and planning, and engaging with the independent members of Planned Parenthood Federation of America (each, a "Member" and collectively, the "Members" or "Membership"). I am involved in developing strategies to address the short- and long-term needs of PPFA's Members nationwide, and support them in their core mission of ensuring access to sexual and reproductive health care services, including abortion, regardless of income, insurance, gender identity, sexual orientation, or race.

2.     I previously served as Executive Vice President and Chief Federation Engagement & Impact Officer from 2021 to 2025. In this role, I developed, led, and implemented PPFA's strategic framework for coordinating with Members and oversaw teams responsible for having a federation-wide impact. From 2015 to 2021, I served as Executive Vice President, Health Care Division overseeing PPFA's health care-related programs and strategies in support of Members, including those related to medical services, health education, research, contraceptive equity, health care operations, business analytics, accreditation, and evaluation for PPFA's Members, as well as support for Member governance and leadership. Before taking on these roles at PPFA, I worked at two different Planned Parenthood Member organizations. I served as Chief Executive Officer of Planned Parenthood Keystone from 2004 to 2015, and as Vice President of Community Affairs at Planned Parenthood of Orange and San Bernardino Counties from 1997 to 2004.

3.     I am over the age of eighteen, and this declaration is based on my personal knowledge, a review of PPFA's business records, and the knowledge I have acquired in the course

of my service and duties with PPFA and Planned Parenthood Members. If called and sworn as a witness, I could and would testify competently thereto.

4.     As discussed more fully below, Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 (the "Defund Provision"), if allowed to remain in effect, will be devastating to the patients who rely on Planned Parenthood Member health centers for their sexual and reproductive health care. Indeed, the Defund Provision is already forcing Members to turn away patients enrolled in Medicaid. Nationwide, 51% of Planned Parenthood Member patients rely on Medicaid for their health care. And more than one-third of Members' total revenue is from Medicaid reimbursement for services the Members provide. Because the Defund Provision bars Planned Parenthood Members from receiving federal reimbursement under the Medicaid program for the care provided to these patients, if the Defund Provision is allowed to remain in effect, Planned Parenthood Members will have to severely curtail the services they provide to many of their low-income patients. Those patients will face great difficulty in finding, and in many cases will be unable to find, alternative providers of evidence-based sexual and reproductive health care in their communities. Because many Planned Parenthood Members will also have to close health centers and/or reduce the hours they serve patients, the care of many other Planned Parenthood Member patients will be jeopardized.

5.     The Defund Provision will have a severe and disproportionate impact on Members' most vulnerable patient groups—low-income patients, individuals who live in rural and/or medically underserved areas, and communities of color. Other providers will not be able to fill the gap in services that will result, and many individuals who rely on Planned Parenthood Members will be deprived of the ability to obtain high-quality and often life-saving health care. At a minimum, over a million patients will lose their preferred health care provider and will face serious disruptions and discontinuities in their health care.

6.    The Defund Provision presents an existential threat to PPFA and its Members and their patients. PPFA estimates that a substantial number of Planned Parenthood Member health centers could eventually close if the Defund Provision remains in effect and if Members continue to be unable to provide care through the Medicaid program.

I.    **PPFA'S MISSION AND STRUCTURE**

7.    PPFA is a 501(c)(3) not-for-profit corporation organized under the laws of New York. PPFA is a membership organization whose forty-seven Members are non-profit health care providers with health centers in forty-seven states and the District of Columbia, as well as a telehealth presence in all fifty states. PPFA does not itself provide health care services but supports its health care-providing Members in a variety of ways.

8.    Because PPFA is not a health care provider, it does not participate in Medicaid.

9.    Planned Parenthood Members are separately incorporated and independently governed 501(c)(3) non-profit corporations, each with its own CEO; governance structure, including a board of directors; staff; books; and operations. Each Planned Parenthood Member provides health care and educational services directly to the public in a distinct geographic area.

10.    As part of their membership rights, PPFA Members elect PPFA's board of directors; approve changes to PPFA's bylaws and membership standards; approve PPFA's long-range goals; and determine the amount each Member pays in annual dues to PPFA.

11.    As a condition of membership, PPFA requires each Member to agree to meet its membership standards (outlined in PPFA's bylaws and set by the Membership) and provides them with support and services to ensure that they are able to provide high-quality care consistent with evidence-based standards.

12.    PPFA and its Members share a mission of ensuring that regardless of income, insurance, gender identity, sexual orientation, or race, people can receive high-quality, inclusive,

4

and comprehensive sexual and reproductive health care; providing related educational services; promoting research on sexual and reproductive health; and advocating for public policies that guarantee access to such services. For more than a century, millions of patients have turned to Planned Parenthood Members for vital health care services, sex education, and sexual health information.

13.    PPFA provides support, leadership, and guidance to its Members to ensure that Members are able to provide high-quality health care and educational services directly to the public. For example, PPFA administers accreditation standards for the Membership, promulgates certain shared medical standards and guidelines, and provides leadership around certain shared policy and program initiatives. PPFA also provides practical support such as technical assistance and consultant service, programmatic grants, and fundraising support. While Members receive some grant and other funding through PPFA—an average of less than 7% annually for each Member—overall, the vast majority of each Member's revenue comes from sources other than PPFA.

14.    PPFA licenses the use of the Planned Parenthood name and well-known trademark to each Member.

15.    PPFA membership is important to Members' ability to fulfill their missions. The Planned Parenthood name sends a powerful message to the community that the Member stands for certain values and provides high-quality health care and educational services in furtherance of the shared Planned Parenthood mission. Planned Parenthood Members are viewed in communities throughout the country as providing nonjudgmental, welcoming, and compassionate care to patients seeking health care, including sexual and reproductive health care.

16.    In addition to maintaining separate corporate structures, PPFA and its Members maintain separate finances and day-to-day operations. For example, PPFA and each Member

maintain separate general ledgers and file taxes separately from one another. Each has separate payrolls and employee rosters, and PPFA has no role in its Members' respective staffing or employment decisions.

17.    Their structural independence means that no Member has control over the operations or decision-making processes of another. The actions or policies of one Planned Parenthood Member do not legally or operationally bind the others.

18.    Similarly, PPFA does not exercise control over any Member, or vice versa.

19.    Working in furtherance of the shared Planned Parenthood mission, PPFA and its Members also advocate to shape the national, state, and local landscape to create the most favorable conditions for people everywhere to have equitable access to the vital sexual and reproductive health care, including abortion, provided by Planned Parenthood Members and other non-profit sexual and reproductive health care providers. Hearing directly from Planned Parenthood Member patients and with the backing of 19 million supporters, PPFA and its Members are uniquely situated and bear a special responsibility to lead the defense against attacks on sexual and reproductive health care and to shape a national narrative that shifts public opinion while advancing the policies and systems that will preserve and improve access to care—for Planned Parenthood Member patients and all people seeking sexual and reproductive health care. Separately, each Member may have a related 501(c)(4) tax-exempt entity with its own board that works in furtherance of the Planned Parenthood mission, and PPFA has a related 501(c)(4) organization called Planned Parenthood Action Fund. These independent, separately incorporated non-profit social welfare organizations each engage in education, advocacy, and limited electoral activities that work to further the Planned Parenthood mission.

## II.    HEALTH CARE SERVICES PROVIDED BY PLANNED PARENTHOOD MEMBERS

20.    Collectively, Planned Parenthood Members have health centers in forty-seven states and the District of Columbia and a telehealth presence in all fifty states.

21.    Taken together, PPFA's forty-seven Members provide sexual and reproductive health care to more people in the United States than any other provider. Planned Parenthood Members provide medical services through nearly 600 health centers throughout the nation, serving more than two million patients each year. One out of every three women and one in ten men nationally has received care from a PPFA Member at least once in their lifetime; this number is even higher among individuals with Medicaid, 43% of whom have received services from a Member health center.[1] In 2021 alone, one in ten reproductive-aged Medicaid beneficiaries who received family planning services went to a Planned Parenthood Member health center for that care.[2] And in 2020, Planned Parenthood Member health centers served 33% of the total contraceptive clients served by safety-net providers—roughly 1.6 million people.[3] PPFA Members play a particularly important role in providing sexual and reproductive and other health care to low-income people.

22.    All PPFA Members offer a wide range of family planning services and reproductive health care, although the specific services that PPFA Members offer vary depending on the needs of the communities in which they operate and the resources available. Members typically provide

[1] Brittni Frederiksen et al., *Major Federal and State Funding Cuts Facing Planned Parenthood*, KFF (May 15, 2025), https://www.kff.org/womens-health-policy/issue-brief/major-federal-and-state-funding-cuts-facing-planned-parenthood/.

[2] Brittni Frederiksen et al., *The Impact of Medicaid and Title X on Planned Parenthood*, KFF (Apr. 16, 2025), https://www.kff.org/medicaid/issue-brief/the-impact-of-medicaid-and-title-x-on-planned-parenthood/.

[3] Guttmacher Inst., *Federally Qualified Health Centers Could Not Readily Replace Planned Parenthood* (June 4, 2025), https://www.guttmacher.org/news-release/2025/federally-qualified-health-centers-could-not-readily-replace-planned-parenthood.

contraception (including long-acting reversible contraceptives ("LARCs")), contraceptive counseling, physical exams, cancer screenings, gender-affirming hormone therapy, testing and treatment for sexually transmitted infections ("STIs"), pregnancy testing and counseling, vasectomies, colposcopies, abortion where legal, and health education services.

23.    During the federal fiscal year 2023, Planned Parenthood Members served approximately 2.08 million patients and provided more than 9.4 million total services.[4] The care Planned Parenthood Members that year included over 2.2 million birth control services, more than 5.1 million STI tests, over 400,000 abortions, and over 426,000 cancer screenings and prevention services.[5] Abortions comprise a small fraction—approximately 4%—of Members' services nationwide.[6] Members also reached approximately 1.3 million people through education programming, outreach, and trainings.[7]

24.    PPFA Members have a special mission to provide sexual and reproductive health care, including abortion, to historically underserved patients and communities. In many communities, a Planned Parenthood Member health center is the only place that a patient can turn to for high-quality, compassionate, and low-cost (or free) reproductive health care. Sixty-four percent of Planned Parenthood Member health centers are located in rural areas, Health Professional Shortage Areas, or Medically Underserved Areas.[8]

---

[4] Planned Parenthood Fed'n of Am., *2023-2024 Annual Report*, at 6, 23 (2024), https://www.plannedparenthood.org/uploads/filer_public/ec/6d/ec6da0d6-98e5-4278-8d11-99a5cba8e615/2024-ppfa-annualreport-c3-digital.pdf [hereinafter PPFA Annual Report].

[5] *Id.* at 6, 23.

[6] *Id.* at 22.

[7] *Id.* at 14.

[8] Health Professional Shortage Areas—as designated by the Health Resources and Services Administration, an agency of the U.S. Department of Health and Human Services—are designated as having shortages of primary medical care, dental, or mental health providers. Medically Underserved Areas have a shortage of primary care health services for residents

25.     Of the Planned Parenthood Member patients who report their income, 65% have incomes at or below 150% of the federal poverty level.[9]

26.     Planned Parenthood Member health centers play a critical role in serving communities of color, and in many cases are the only health centers providing sexual and reproductive health care in the communities they serve. In the 2023 to 2024 reporting period, approximately 34% of Planned Parenthood Members' patients were white, 27% were Latino/a, 17% were Black, 12% did not disclose their race or their race was unknown, 4% were Asian American/Pacific Islander, 0.5% were American Indian/Alaskan Native, 4% were another race, and 2% were multiracial. As this data shows, Planned Parenthood Members serve a disproportionate number of patients of color as compared to the U.S. population.[10]

27.     Patients choose to receive care from Planned Parenthood Members for numerous reasons.

28.     Planned Parenthood Member health centers offer a range of comprehensive services that many other providers do not, such as LARCs. LARCs are the most effective methods of preventing pregnancy—they are more than 99% effective,[11] leading to a dramatic reduction in unintended pregnancies. Once in place, they can prevent pregnancy for up to twelve years. Member

---

within a geographic area. Health Res. & Servs. Admin., *What Is Shortage Designation?* (June 2023), https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation.

[9] *See generally* U.S. Dep't of Health & Hum. Servs., Office of the Assistant Sec'y for Plan. & Evaluation, *2025 Poverty Guidelines: 48 Contiguous States (all states except Alaska and Hawaii),* https://aspe.hhs.gov/sites/default/files/documents/dd73d4f00d8a819d10b2fdb70d254f7b/detailed -guidelines-2025.pdf (last visited July 5, 2025) (the 2025 poverty level for a single individual is $15,650 and is $32,150 for a family of four).

[10] *See generally* U.S. Census Bureau, *Quick Facts*, https://www.census.gov/ quickfacts/fact/table/US/PST045223 (last visited July 5, 2025).

[11] Am. Coll. of Obstetricians & Gynecologists, *FAQs: Long-Acting Reversible Contraception (LARC): Intrauterine Device (IUD) and Implant*, https://www.acog.org/womens-health/faqs/long-acting-reversible-contraception-iud-and-implant (last visited July 5, 2025).

9

health centers typically offer three categories of LARCs: birth control implants, hormonal intrauterine devices ("IUDs"), and non-hormonal IUDs. They also typically provide LARCs in a single visit to reduce barriers to access, whereas many providers require patients to return for a second visit.

29.    Many Planned Parenthood Member health centers have language services for patients who are not proficient in English, a service that other health clinics are often not able to provide. Many Member health centers also have bilingual or multilingual staff, as well as access to interpretation and translation services. PPFA and its Members often provide educational materials in English, Spanish, and other languages commonly spoken by the patients served in particular areas.

30.    Planned Parenthood Member health centers have staff trained to help patients experiencing intimate partner violence ("IPV"), and clinicians are trained to screen patients for IPV. The training includes ways to identify if a patient is experiencing reproductive or sexual coercion, such as attempts to impregnate a partner against their will, control outcomes of a pregnancy, coerce a partner to have unprotected sex, and interfere with contraceptive methods.[12] Clinicians are also specifically trained to screen for signs of abuse or coercion during telehealth visits. PPFA and its Members also provide educational resources related to healthy relationships, consent, and sexual assault.

31.    Planned Parenthood Members are viewed in communities throughout the country as providing nonjudgmental, welcoming, culturally-sensitive, and compassionate care to patients seeking health care, including sexual and reproductive health care. Topics of this sort can be highly

---

[12] Am. Coll. Obstetricians & Gynecologists, *ACOG Committee Opinion Number 554: Reproductive and Sexual Coercion*, 121 Obstetrics & Gynecology 411 (2013).

sensitive for patients, some of whom may find it difficult to discuss issues of sexuality or to seek treatment for reproductive- or sex-related conditions, such as STIs.

32.    Indeed, because of their concerns about privacy and being judged, many individuals use Planned Parenthood Members as their provider for sexual and reproductive health care services even when they use other providers for their other health care needs. Moreover, Planned Parenthood Members' expertise and specialization in family planning, evidence-based practices, and technology often make them the top choice for individuals seeking high-quality medical care.

33.    Planned Parenthood Member health centers are also often much more convenient for and accessible to their patients than other providers of sexual and reproductive health care—even when such alternative providers are available, which is often not the case. Planned Parenthood Members are usually able to see patients quickly and in many cases on a walk-in basis. In contrast, patients seeking sexual and reproductive health care services often face long wait times for appointments at other providers. Wait times can be a serious barrier to care, especially for low-income patients, many of whom have inflexible schedules due to work and/or child care responsibilities.

34.    Most Planned Parenthood Member health centers offer extended (early morning, evening, or weekend) hours. The majority offer evening appointments at least one day per week, as well as weekend appointments. Again, these extended hours are very important to patients who have inflexible schedules and have difficulty in attending medical appointments during the traditional 9-to-5 workday.

35.    In addition, all Planned Parenthood Members offer online scheduling for appointments and provide health services (including appointments for contraceptives) via telehealth, which makes such services more accessible to patients with disabilities, in remote areas, who lack access to reliable transportation, and/or who have inflexible schedules. In the 2023

federal fiscal year, Planned Parenthood Member health centers provided over 296,000 telehealth appointments to patients.

36.    In recent years, many Planned Parenthood Members have served an increased and critically important role with respect to the provision of care to LGBTQ+ individuals. LGBTQ+ people face lower rates of health insurance coverage, higher rates of HIV/AIDS and cancer, and higher rates of discrimination from medical providers.[13] All Planned Parenthood Members offer HIV prevention tools like pre- or post-exposure prophylaxis ("PrEP" and "PEP," respectively), a daily drug regimen to help prevent HIV. As of the 2024 federal fiscal year, 90% of Member health centers offer PrEP, and 77% offer PEP. Many Planned Parenthood Member health centers have programs for LGBTQ+ youth and allies, providing safe and supportive environments that allow youth to get the information and support they need to make healthy decisions and feel comfortable in their identities.

37.    Planned Parenthood Member health centers are a critical source of care for transgender people nationwide. They are often the only place that transgender individuals can receive care without facing discrimination or judgment. Members provide gender-affirming hormone therapy to treat gender dysphoria as well as other services in a trans-affirming manner.

38.    PPFA and its Members provide education and information to Members' patients and the general public about sexual and reproductive health, risks, and preventive measures, reaching approximately 1.3 million individuals[14] in person with education and information in their communities—and even more people online. Planned Parenthood Member educators also train

---

[13] Planned Parenthood Fed'n of Am., *This is Who Planned Parenthood Is* (Sept. 2017), https://www.plannedparenthood.org/uploads/filer_public/16/3f/163fe02e-2c2d-4bcf-92f5-63386b4c4065/who_we_are_lgbtq_community_september_2017.pdf.

[14] PPFA Annual Report, *supra* note 4, at 14.

teachers, school staff, and other youth-serving professionals within their communities on critical topics such as age-appropriate youth pregnancy prevention and STI prevention.

39.     Planned Parenthood Members have been at the forefront of responding to recent public health crises. For example, in response to the COVID-19 pandemic, Members expanded their use of telehealth, including for medication abortion. They made changes to workflows and operations to minimize or eliminate physical contact with patients and time in the health center, including the adoption of telehealth for various components of the medication abortion care process, such as pre-abortion counseling and follow up appointments. And after the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* led to the implementation of abortion bans in many states, Planned Parenthood Members responded to the abortion access crisis by opening health centers in states where abortion remained legal close to the borders of states with abortion bans, as well as by expanding staffing and hours in access states.

40.     PPFA and its Members are committed to supporting the advancement of research and technology in sexual and reproductive health, and are well situated to do so because of the millions of patients Members serve and the range of care they provide. In the 2024 PPFA fiscal year, 69% of Members participated in at least one research study for a total of 73 unique studies between PPFA and its Members. For example, PPFA and its Members have led and participated in research concerning contraceptive methods, such as contraceptive patches, IUDs, and emergency contraception, as well as human papillomavirus ("HPV") vaccine, sharing this research in journal articles and presentations at conferences ranging from the American Public Health Association to the American Congress of Obstetricians and Gynecologists.

## III.    PLANNED PARENTHOOD MEMBERS' SERVICE TO MEDICAID PATIENTS

41.     The Medicaid program provides health coverage for eligible low-income families and individuals. The majority of the funding for Medicaid is provided by the federal government,

but the program is administered at the state level; the amount of state funding and the exact way in which the program is administered varies from state to state. In general, the program operates by reimbursing health care providers for health care services that they have provided to enrolled Medicaid patients.

42.    Medicaid reimbursement rates vary by state but are generally well below Medicare and commercial insurance rates, so many providers do not accept Medicaid patients or effectively limit the number of Medicaid patients they see.[15] In many states, Medicaid reimbursement rates are significantly lower than the actual cost of delivering care.

43.    Despite this, Planned Parenthood Members see Medicaid patients as part of their longstanding commitment to providing quality health care to underserved patients. As part of that commitment, Planned Parenthood Members participate in Medicaid programs in every state where they are able, a total of forty-six of forty-seven Members across forty-three states.[16] No Member limits the number of Medicaid patients that it will see. Approximately 51% of Planned Parenthood Members' patients rely on Medicaid for their health care, and half of visits to Planned Parenthood Member health centers are covered by Medicaid.

44.    Medicaid reimbursements for reproductive health care services, preventive care screenings, and treatment make up a large portion of Planned Parenthood Members' revenue. In

---

[15] Cindy Mann & Adam Striar, *How Differences in Medicaid, Medicare, and Commercial Health Insurance Payment Rates Impact Access, Health Equity, and Cost*, Commonwealth Fund (Aug. 17, 2022), https://www.commonwealthfund.org/blog/2022/how-differences-medicaid-medicare-and-commercial-health-insurance-payment-rates-impact.

[16] The Member who participated only in the Texas Medicaid program is not able to provide care through Medicaid. Texas terminated Planned Parenthood Members from its Medicaid program; the termination was enjoined for several years based on the district court's determination that there was not "even a scintilla of evidence" supporting the terminations, but that injunction was subsequently reversed on procedural grounds. *See Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 998 (W.D. Tex. 2017), *vacated sub nom. Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020).

federal fiscal year 2023, in the aggregate, more than one-third of Members' total revenue was from Medicaid reimbursements for health care services the Members provided. That year, more than half of PPFA's Members received 25% or more of their health care revenue in the form of Medicaid reimbursements. Because of the great unmet need for high-quality Medicaid providers of sexual and reproductive health care, some of those Members received the vast majority (over three quarters) of their health services revenue from Medicaid reimbursements that year.[17]

45.    Federal law has long prohibited federal funds, including Medicaid funds, being used for abortion (except in narrow circumstances of rape, incest, and when the life of the pregnant person is in danger). This provision of federal law—commonly known as the Hyde Amendment—means that Medicaid does not cover abortion, except within these narrow exceptions. Accordingly, Planned Parenthood Members do not receive Medicaid reimbursements or any other federal funds for abortion services (other than in those very narrow circumstances).

46.    For many Planned Parenthood Member patients enrolled in Medicaid, a Planned Parenthood Member is their only health care provider. In a survey of patients of publicly-funded clinics, like Planned Parenthood Member health centers, for the years 2015 to 2019, two-thirds of patients reported that the clinics were their primary source of medical care.[18] And based on a survey of 725 patients of two Planned Parenthood Member health centers in Kentucky and

---

[17] While the federal government regulates the services for which federal Medicaid funds can be used, states can, and in many cases do, cover additional services through their Medicaid programs with state-only funds. While the vast majority of Members' Medicaid reimbursements are for services reimbursed using federal funds—i.e., the federal funding that will be lost under the Defund Provision—the percentages above also include reimbursements that Members receive for services reimbursed using state-only funds.

[18] Jennifer J. Frost et al., *Trends and Differentials in Receipt of Sexual and Reproductive Health Services in the United States: Services Received and Sources of Care, 2006–2019*, Guttmacher Inst. (June 2021), https://www.guttmacher.org/sites/default/files/report_pdf/sexual-reproductive-health-services-in-us-sources-care-2006-2019.pdf.

Louisiana, 60% did not have a regular source of health care besides a Planned Parenthood Member, and nearly 40% reported "instability" with their health insurance.[19]

## IV. THE DEVASTATING IMPACT OF THE DEFUND PROVISION ON PPFA, ITS MEMBERS, AND MEMBERS' PATIENTS

47. I have reviewed the Defund Provision and understand that it bars certain Planned Parenthood Members from receiving federal Medicaid reimbursements for the care provided to Medicaid patients. If it is not enjoined, the Defund Provision will have a devastating impact on PPFA, its Members, and the patients and communities that Members serve.

48. This is not the first time the federal government has attempted to "defund Planned Parenthood." In 2017, the House introduced a bill initially targeting entities that provided abortions and received more than $350 million in Medicaid funds in fiscal year 2014 for exclusion from Medicaid. Collectively, Members received over $350 million in Medicaid funds that year. My understanding is that the 2017 House bill would not have defunded any abortion providers other than Planned Parenthood Members.[20]

49. The Defund Provision is already affecting patients at Planned Parenthood Member health centers. It is forcing some Members to turn away patients enrolled in Medicaid; to attempt to refer them to other providers; or to offer Medicaid patients (who, by criteria of the program, have low incomes) the option to pay out-of-pocket for services where state law allows. Paying for care may be impossible for some Medicaid patients and may force some to forego other necessities such as paying for food or rent.

---

[19] Anna Newton-Levinson et al., *Influences on Women's Care Seeking at Planned Parenthood Health Centers in Two Southern States*, 31 Women's Health Issues 485 (2021).

[20] *See* Paige Winfield Cunningham, *Planned Parenthood Defunded for One Year Under GOP Health Bill*, Wash. Post (May 4, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/05/04/planned-parenthood-defunded-for-one-year-under-gop-health-bill/.

50.    If the Defund Provision is not enjoined, many Medicaid patients will no longer be able to receive care at their chosen provider. In many cases, they will not be able to access equivalent care elsewhere, and in some cases, they may not be able to access health care at all. This is especially true for those who already face systemic barriers to getting care and who have worse health outcomes as a result. This particularly includes groups who face systemic discrimination and barriers to economic advancement—e.g., people of color, LGBTQ+ people, and women—all of whom Members disproportionately serve and who are more likely than others to have low incomes and qualify for Medicaid coverage.

51.    Even those patients who are still able to access care at a Member health center could experience longer wait times and increased costs of health care.

52.    I understand that proponents of the Defund Provision have argued that there will not be a reduction in access to reproductive health care because services will be available through community health centers or other publicly funded health care providers, such as federally qualified health centers. But it is clear that other health centers will not fill the gaps left by the closure and reduced capacity of Planned Parenthood Member health centers.[21]

53.    Many existing publicly funded health care providers, such as public health departments, do not provide the services that Planned Parenthood Members provide, and certainly do not provide the full range of high-quality services for lower-income patients with minimal wait times, convenient hours, and access for people with limited English proficiency. Moreover, these providers are stretched to their capacity now, and cannot serve the more than one million people who will no longer be able to obtain care at Planned Parenthood Member health centers as a result of the Defund Provision. Nor do such providers offer the nonjudgmental, welcoming, culturally-sensitive, and compassionate care that Planned Parenthood Members provide their patients.

---

[21] Guttmacher Inst., *supra* note 3.

17

54.     The Defund Provision will have a dramatic and devastating impact on PPFA Members' ability to provide necessary and often life-saving health care to their patients throughout the country, especially their most vulnerable patients who are in need of affordable, high-quality health care. Moreover, in many cases the Defund Provision will also require Members to reduce hours at their health centers or close some health centers altogether—with serious adverse consequences for the many patients served there, Medicaid and non-Medicaid alike.

55.     Of the nearly 600 Planned Parenthood Member health centers, a substantial number could be at risk of closing if the Defund Provision is allowed to remain in effect, many of which are located in Medically Underserved Areas, primary care Health Professional Shortage Areas, or rural areas. At minimum it creates grave instability at a time when as many as 17 million people could lose access to Medicaid or other health insurance.[22]

56.     The Defund Provision would be particularly devastating to patients in Medically Underserved Areas, many of whom would likely not be able to obtain health care from alternative providers in their communities. Even those who are fortunate enough to be able to obtain care from an alternative provider will likely face delays in care, as other providers scramble to serve the more than one million Planned Parenthood Members' patients who may have to go elsewhere for health care. Delays and gaps in the care that Planned Parenthood Members provide are particularly devastating, as they can lead to undetected STIs, undetected cancers, complications in pregnancies, missed use of contraception, and other serious health conditions.

57.     Due to the demographics of Planned Parenthood Members' patient populations, barring Members from receiving federal Medicaid reimbursements would have a disproportionate

---

[22] Cynthia Cox, *About 17 Million More People Could be Uninsured due to the Big Beautiful Bill and Other Policy Changes*, KFF (July 1, 2025), https://www.kff.org/quick-take/about-17-million-more-people-could-be-uninsured-due-to-the-big-beautiful-bill-and-other-policy-changes/.

adverse impact on communities of color. Such communities already face barriers to quality health care that would only increase if Planned Parenthood Member health centers—many of which are one of the only providers in communities where they are located—were forced to close or reduce services.

58.    The Defund Provision comes on the heels of the Trump administration's ending of Title X funding for many Planned Parenthood Members. Title X is a federally funded family-planning grant program that enables grantees to provide certain family planning services to low-income patients based on a sliding fee scale. Title X services include some, but not all, of the reproductive health care services that are available under Medicaid, and the criteria for eligibility to receive services under Title X are different from those under Medicaid. Several Planned Parenthood Members received more than 15% of their health services revenue from Title X until recently. Without Title X funds to fill some of the coverage gaps for patients with low incomes caused by the Defund Provision, the impacts will be even greater than if just one revenue stream had been cut.

59.    The Defund Provision will harm PPFA's mission of ensuring access to comprehensive sexual and reproductive health care for all individuals, regardless of their ability to pay. Although PPFA does not directly operate health centers, all of its Members do, and—at minimum—they will be forced to reduce services to their patients as a result of being excluded from receiving federal funds under Medicaid. That injury to PPFA's Members also harms PPFA's mission, and PPFA will suffer substantial reputational and operational injury if the Defund Provision is not enjoined.

   **A.    Harm to Certain Planned Parenthood Members**

60.    In addition to the harms to Planned Parenthood League of Massachusetts, Planned Parenthood Association of Utah, and the Planned Parenthood Members in California, all Planned

Parenthood Members enrolled in Medicaid will suffer revenue losses as a result of the Defund Provision, and their Medicaid patients may not be able to access services at a Member health center.

61.    Eight Members will lose between 25 and 49% of their revenue as a result of the Defund Provision. For example, in the federal fiscal year 2023, Planned Parenthood of Wisconsin ("PPWI") received 49% of its total revenue—$17.6 million—from Medicaid. In the 2024 federal fiscal year, Medicaid patients made more than 35,000 visits to PPWI, representing more than half of the total visits at PPWI that year. The Guttmacher Institute estimates that publicly-supported clinics in Wisconsin would have to more than double their caseloads to meet the needs of patients currently served by PPWI.[23] Furthermore, 21% of Medicaid beneficiaries who received family planning services in Wisconsin went to PPWI.[24]

62.    An additional ten Members will lose between 15 and 24% of their total revenue, and eleven Members will lose less than 15% of their total revenue because of the Defunding Provision.

63.    Based on my understanding of the definition of in the Defund Provision, ten Members who are enrolled in Medicaid do not independently meet the definition of "prohibited entity" because they do not provide abortions, did not receive more than $800,000 in Medicaid reimbursements for federal fiscal year 2023, or both. Three of these Members (Planned Parenthood Gulf Coast, Planned Parenthood Greater Texas, and Planned Parenthood of Tennessee and North Mississippi) do not provide abortions because it is not legal in any state where their health centers are located. Other Members, including Plaintiff Planned Parenthood Association of Utah, received less than $800,000 in Medicaid reimbursements in federal fiscal year 2023.

---

[23] Guttmacher Inst., *supra* note 3.

[24] Frederiksen et al., *supra* note 2.

64.    For example, in federal fiscal year 2023, Planned Parenthood of Delaware ("PPDE") received approximately $273,000 in Medicaid funding, or 6% of its total revenue. In 2024, roughly 20% of PPDE patients were enrolled in Medicaid or Medicare.[25]

**B.    The Experiences in States That Have Excluded Planned Parenthood Members from Medicaid or Other Government Health Care Programs Preview the Dire Harms to Come.**

65.    Multiple states have weaponized their animus towards Planned Parenthood and excluded Members from their Medicaid programs or from other publicly-funded health care programs—to the detriment of their own citizens. This state-level defunding has shown how harmful the exclusion of Planned Parenthood Members from Medicaid actually is—painting a dangerous picture of what will happen if the Defund Provision is not enjoined.

66.    For example, beginning in 2011, Texas lawmakers took steps to remove Planned Parenthood Members in the state from receiving state and federal funds to provide health care. In 2011, Texas cut $73 million from a joint federal-state family planning program, through which Planned Parenthood Member health centers served more than 40% of participants.[26]

67.    In 2012, Texas tried to block patients from getting care at Planned Parenthood Member health centers and other abortion providers in its federally-funded Medicaid family planning program—Women's Health Program ("WHP")—while still retaining federal funding for that program. After this attempt was blocked by the Obama administration in 2013, Texas

---

[25] Planned Parenthood of Del., *2024 Annual Report* (May 12, 2025), https://www.plannedparenthood.org/uploads/filer_public/b8/99/b8997f4e-0f93-4be5-aff7-26657e808b2f/2024_annual_report_final.pdf.

[26] Planned Parenthood Fed'n of Am., *The Harm of Defunding Planned Parenthood Health Centers* (Apr. 2025), https://www.plannedparenthood.org/uploads/filer_public/60/22/6022aa2f-caed-4946-966f-7186b9751e3c/defunding_state_cases_20_pdf.pdf?. Texas targeted Planned Parenthood by targeting "providers 'affiliated' with clinics that perform abortions. (By this logic, because some Planned Parenthood clinics provide abortions, none of them can receive state money.)." Emily Ramshaw, *Lawmakers Could Restore Family Planning Funds*, Tex. Trib. (Dec. 7, 2012, 6:00 AM), https://www.texastribune.org/2012/12/07/lawmakers-could-restore-family-planning-funds/.

lawmakers instead opted to forego federal funding altogether for the state's family planning program and were thus able to block WHP enrollees from getting care at Planned Parenthood Member health centers and from other abortion providers in the state.[27]

68.    In 2020, the Trump administration approved federal funding for a new version of WHP called Healthy Texas Women ("HTW") and allowed Texas to continue excluding Planned Parenthood Members from the program. And in 2021, Texas blocked Medicaid enrollees from getting care at Planned Parenthood Member health centers by terminating all three Members in Texas from the state Medicaid program.[28]

69.    All of these actions led to worse health outcomes for Texans, including less access to contraceptive care, STI testing, and cancer screening, as well as the closure of Member health centers.[29] Whereas 90% of HTW enrollees were able to access care in 2011 when Planned Parenthood Members were still in the program, that number dropped to 59% in 2023.[30] Birth control use also declined by 56% during that same period.[31]

70.    Politicized attacks on Planned Parenthood Members in other states have also harmed patients. In 2017, Iowa, like Texas, ended its federally-funded Medicaid family planning waiver program, replacing it with a state-funded program that prevented Medicaid enrollees from

---

[27] Planned Parenthood Fed'n of Am., *supra* note 26. Like the 2011 action, the 2012 action targeted clinics "affiliated with abortion providers." Alana Rocha, *Judge's Order Allows Planned Parenthood to Remain in Women's Health Program*, Tex. Trib. (Oct. 26, 2012, 2 PM), https://www.texastribune.org/2012/10/26/planned-parenthood-suing-over-affiliate-ban-rule/.

[28] Planned Parenthood Fed'n of Am., *supra* note 26.

[29] *Id.*

[30] *See, e.g.,* Every Texan, *Limited Access: How Provider Exclusion Has Reshaped Care for Texas Women* 1 (May 2025), https://everytexan.org/wp-content/uploads/2025/06/ProviderExclusion_Report_EveryTexan_May2025.pdf.

[31] *Id.*

accessing family planning providers who perform abortions, including Planned Parenthood Members. Four Planned Parenthood Member health centers closed as a result of the defunding.[32]

71.    After Indiana enacted a 2011 law that barred Planned Parenthood Member health centers from receiving federal STI prevention funding, five Member health centers were forced to close, including one in Scott County. By 2015, Scott County had an unprecedented HIV outbreak, leading then-Governor Mike Pence to declare a public health emergency.[33]

72.    When Kansas blocked non-profit family planning centers, including Planned Parenthood Member health centers, from receiving Title X funds in 2011, more than 14,000 people lost access to birth control, cancer screenings, STI tests, annual pelvic exams, and other care. As a result of the cuts, one Member health center in Hays, Kansas was forced to close, leaving the area without a dedicated family planning provider.[34]

73.    In 2011, Tennessee diverted Title X funds from a Planned Parenthood Member in Shelby County—an area that ranks especially high in unintended teen pregnancies—to a faith-based entity that did not have the same capacity to see patients. By 2012, family planning services provided to women in Shelby County had dropped by 93%.[35]

---

[32] Planned Parenthood Fed'n of Am., *supra* note 26; *see also, e.g.,* Michaela Ramm, *Iowa's Family Planning Service Use Plummets 85 Percent After Switch to New Program*, Gazette (Dec. 10, 2019, 5:31 PM), https://www.thegazette.com/health-care-medicine/iowas-family-planning-service-use-plummets-85-percent-after-switch-to-new-program/.

[33] Planned Parenthood Fed'n of Am., *supra* note 26; *see also, e.g., Indiana Governor Declares Public Health Emergency to Battle Worst HIV Outbreak in State History*, ABC News (Mar. 26, 2015, 10:28 AM), https://abcnews.go.com/Health/indiana-hit-worst-hiv-outbreak-state-history/story?id=29921662.

[34] Planned Parenthood Fed'n of Am., *supra* note 26; *see, e.g.,* Roxana Hegeman, *Feds Push Back on States Targeting Planned Parenthood Funds*, Associated Press (Sept. 24, 2016), https://apnews.com/domestic-news-domestic-news-general-news-03c09aa8420a4bce98a4134491 29d2f8 ("The number of Kansans who received Title X services fell from 38,461 in 2011 to 24,047 in 2015 — a decrease of more than 37 percent, according to HHS.").

[35] Planned Parenthood Fed'n of Am., *supra* note 26; *see also, e.g.,* Tara Culp-Ressler, *Defunding Planned Parenthood Caused Women's Services to Drop by 93 Percent in Tennessee County*,

## VI.    THE DEFUND PROVISION WILL ALSO HAVE DIRE IMPACTS ON ABORTION ACCESS OUTSIDE THE MEDICAID PROGRAM.

74.    As providers of a comprehensive range of sexual and reproductive health care, Planned Parenthood Members offer safe and legal abortion services in states where abortion is legal. Planned Parenthood Members collectively provide approximately 40% of all of the abortions performed in the United States. Providing abortion is critical to PPFA's and its Members' mission of ensuring access to sexual and reproductive health care, including abortion.

75.    PPFA and its Members, along with national, state, and local Planned Parenthood 501(c)(4) social welfare organizations, have long been at the forefront of the movement for sexual and reproductive rights, including access to abortion. As the nation's leading advocates for sexual and reproductive health care and education, Planned Parenthood organizations advocate at the federal, state, and local levels to protect and expand access to services and information. Before Congress, PPFA has pushed to codify the rights to abortion and contraception, block abortion bans, and repeal the Hyde Amendment.[36] PPFA has also advocated for access to emergency contraception and medication abortion.[37] Planned Parenthood Members, and when appropriate

_____

Think Progress (Sept. 6, 2012, 6:46 PM), https://archive.thinkprogress.org/defunding-planned-parenthood-caused-womens-services-to-drop-by-93-percent-in-tennessee-county-bc0562be7a7f/.

[36] Planned Parenthood Fed'n of Am., *Tell the Senate: Vote YES on the Women's Health Protection Act*, https://www.plannedparenthood.org/get-involved/campaigns/congress-protect-safe-legal-abortion (last visited July 5, 2025); Planned Parenthood Fed'n of Am., *House Passes Right to Contraception Bill, Critical Step in Protecting Essential Right* (July 21, 2022), https://www.plannedparenthood.org/about-us/newsroom/press-releases/house-passes-right-to-contraception-bill-critical-step-in-protecting-essential-right; Planned Parenthood Fed'n of Am., *Planned Parenthood President on 45th Anniversary of the Hyde Amendment* (Sept. 30, 2021), https://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-president-on-45th-anniversary-of-the-hyde-amendment; Planned Parenthood Fed'n of Am., *Planned Parenthood Denounces House Committee Passage of National 20-Week Abortion Ban* (Jan. 30, 2014), https://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-denounces-house-committee-passage-national-20-week-abortion-ban.

[37] Planned Parenthood Fed'n of Am., *Planned Parenthood Applauds FDA Expansion of Access to Over-The-Counter Emergency Contraception* (Nov. 6, 2014), https://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-applauds-fda-expansion-of-access-to-over-the-counter-emergency-contraception; Planned Parenthood Fed'n of Am., *FDA Reaffirms*

PPFA, are active litigants fighting to secure abortion access and rights for their patients in federal and state courts across the country. Planned Parenthood Action Fund, a related 501(c)(4) organization, advocates for policies that protect care for Planned Parenthood Member patients and seeks to hold members of Congress accountable to their constituents through its congressional scorecard, communicating with and activating constituents to educate their lawmakers about the importance of sexual and reproductive health care.[38] Planned Parenthood Members and their related 501(c)(4) organizations play similar roles, respectively, in advocating for sexual and reproductive rights in states across the nation. Additionally, together with Members' related 501(c)(4) organizations, Planned Parenthood Action Fund has actively supported successful campaigns for reproductive freedom ballot initiatives since the Supreme Court's ruling in *Dobbs*. Separately, Planned Parenthood Action Fund and other national and local Planned Parenthood advocacy and political organizations, work to elect federal, state, and local elected officials who will support reproductive freedom and access to abortion.

76.    As explained above, Medicaid does not cover abortion (except under narrow circumstances authorized by federal law) and accordingly, Members do not receive any federal funds for providing these abortions.

77.    Many Planned Parenthood Member health centers primarily provide contraception, physical exams, STI testing and treatment, gender-affirming hormone therapy, and cancer screenings but also provide abortions. Although Planned Parenthood Member health clinics provide abortion through separate funding streams and entirely outside the federally-subsidized

---

*Safety of Mifepristone, Approves New Label for Medication Abortion* (Mar. 30, 2016), https://www.plannedparenthood.org/about-us/newsroom/press-releases/fda-reaffirms-safety-of-mifepristone-approves-new-label-for-medication-abortion.

[38] Planned Parenthood Action Fund, *Congressional Scorecard*, https://www.plannedparenthoodaction.org/congressional-scorecard (last visited July 5, 2025).

Medicaid program, the closure of clinics because of the Defund Provision will also impact the various non-Medicaid services Planned Parenthood Members offer, including abortion—since a clinic that no longer exists obviously cannot provide any services at all. Thus, the Defund Provision will force Planned Parenthood Members to provide fewer abortion services in states where abortion is legal because they will have to close health centers and reduce staff.

78.     If Planned Parenthood Members were to stop performing abortions, people across the Nation would face drastic hardship in obtaining safe and high-quality abortion care. There is no way that the remaining abortion providers in this country could find the capacity to meet the need for abortion services no longer met by Planned Parenthood Members. Moreover, discontinuing of abortion services would be inconsistent with the core mission of Members and PPFA to ensure access to sexual and reproductive health care, including abortion, for all.

79.     Cutting off access to abortion puts pregnant people at risk and strips people of their rights to build their families and futures as they see fit. When abortion is not accessible, women and children suffer the most. States with more abortion restrictions tend to have poorer health outcomes for women and children than other states, including higher rates of maternal and infant mortality.[39] According to a recent study, after *Dobbs*, mothers living in a state that banned abortion were three times more likely to die during pregnancy, childbirth, or soon after giving birth.[40] Patients who are unable to access a wanted abortion are more likely to receive public assistance

---

[39] *See* Ibis Reprod. Health & Ctr. for Reprod. Rights, *Evaluating Priorities: Measuring Women's and Children's Health and Well-being Against Abortion Restrictions in the States* 23 (2017), https://ibisreproductivehealth.org/sites/default/files/files/publications/Evaluating%20Priorities%20August%202017.pdf.

[40] Gender Equity Pol'y Inst., *The State of Reproductive Health in the United States* (Jan. 19, 2023), https://thegepi.org/wp-content/uploads/2024/05/GEPI-State-of-Repro-Health-Report-US.pdf.

and lack full-time employment six months after being unable to obtain an abortion.[41] These economic consequences impact individuals, their families, and their communities for years to come. Furthermore, in states with laws impeding access to abortion or limiting the number of abortion clinics, both women and men have a decreased likelihood of transitioning from unemployment to employment.[42] In contrast, when given access to abortion, women's health outcomes and economic security improve. Women living in states with policies that support women's access to health care have higher earnings and are more integrated into the workforce than women in other states.[43]

80.    This abortion care crisis is made worse by the fact that nineteen states have an abortion ban in effect.[44] As a result, health centers across these states have shuttered, making it more difficult for patients to access a variety of other health care, including preventative health services. In 2024, 155,000 people traveled out of their home state for abortion care.[45] The closure of additional Planned Parenthood Member health centers as a result of the Defund Provision will

---

[41] Diane Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who are Denied Wanted Abortions in the United States*, 108 Am. J. Pub. Health 407 (2018).

[42] Kate Bahn et al., *Linking Reproductive Health Care Access to Labor Market Opportunities for Women*, Ctr. for Am. Progress (Nov. 21, 2017), https://www.americanprogress.org/issues/women/ reports/2017/11/21/442653/linking-reproductive-health-care-access-labor-market-opportunities- women/.

[43] *Id. See also* Asha Banerjee, The Economics of Abortion Bans, Econ. Pol'y Inst. (Jan. 18, 2023), https://www.epi.org/publication/economics-of-abortion-bans/ ("While the effect of abortion denial is overwhelmingly negative economically, mentally, and physically, there is also strong evidence for the flip side of this argument: that access to abortion is associated with positive economic outcomes, including lower rates of teen births and teen marriages").

[44] KFF, *Abortion in the United States Dashboard* (June 2, 2025), https://www.kff.org/womens- health-policy/dashboard/abortion-in-the-u-s-dashboard.

[45] Guttmacher Inst., *Guttmacher Institute Releases Data on State of Residence of US Abortion Patients Traveling for Care in 2024* (June 24, 2025), https://www.guttmacher.org/news-release/ 2025/guttmacher-institute-releases-data-state-residence-us-abortion-patients-traveling.

only make it harder for patients to access abortion in states where it is legal, as well as other health services.

81.     As discussed above, defunding Planned Parenthood Members from Medicaid puts a substantial number of Planned Parenthood Member health centers at risk of closure. The vast majority of the health centers at risk of closure are in states where abortion is legal. An overwhelming majority of the Planned Parenthood Member health centers at risk of closure provide abortion care, meaning it will be much harder to get an abortion, in addition to other sexual and reproductive health care.

**VII.    INJUNCTION BOND**

82.     PPFA, a not-for-profit organization, is not capable of posting a bond in the amount of the federal funds that its Members receive in Medicaid reimbursements. If PPFA were required to post an injunction bond in such an amount, it would be foreclosed from pursuing judicial relief on behalf of its Members.

l declare under penalty of perjury that the foregoing is true and correct. Executed on July 6, 2025.

Kimberly Custer

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; and PLANNED PARENTHOOD ASSOCIATION OF UTAH,<br><br>        Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES; and CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>        Defendants. |

Case No. _____

**DECLARATION OF DOMINIQUE LEE**
**IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1.  I am currently employed by Planned Parenthood League of Massachusetts ("PPLM") as President and Chief Executive Officer. PPLM is a not-for-profit corporation registered to do business in Massachusetts. I have served in this role since September of 2023. I have also served at other Planned Parenthood affiliates, including as Chief Operating Officer of Planned Parenthood Mar Monte, which operates thirty-five health centers in California and Nevada and is the largest affiliate in the nation. In that role, I led enterprise-wide implementation of telehealth services across thirty-five health centers, serving more than 250,000 patients annually.

This system-wide rollout ensured the continuation of care during the COVID-19 pandemic and required rapidly adapting clinical operations to shifting public health guidance, patient needs, and regulatory requirements to preserve access to essential reproductive and primary health services. I have nearly twenty years of experience in sexual and reproductive health care, including direct oversight of clinical operations, regulatory compliance, and access to abortion and contraceptive services. I have led responses to rapidly changing landscapes, including state restrictions, funding threats, and operational challenges across multiple states. My work has included ensuring continuity of care under emergency conditions, navigating Medicaid and commercial payer systems, and advising on operational implications of federal and state policy changes. I hold a Master of Business Administration from Northwestern, Kellogg School of Management, as well as a Master of Public Health from Dartmouth College, where I currently serve as an Adjunct Lecturer in the Institute for Health Policy and Clinical Practice.

2.      In my role as PPLM's President and Chief Executive Officer, I am responsible for PPLM's management. As such, I am familiar with the types of care we provide, patient demographics, operations, and staff needs and concerns. I lead PPLM's executive team, interface with its Board of Directors, and am responsible for a wide array of operational and strategic decisions.

3.      I am over the age of eighteen and have personal knowledge of the matters herein or have acquired such knowledge by personally examining the business records kept in the normal course of business by PPLM. If called upon to testify, I could and would testify to the facts in this declaration.

4.      As I explain below, Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 (the "Defund Provision") will cause immediate and irreparable harm

to PPLM and the patients it serves—including and especially people with low incomes who lack alternative access to expert, reliable reproductive health care.  If PPLM remains prohibited from receiving federal Medicaid reimbursements, its health centers' operations will be immediately and potentially irrevocably upended and our patient relationships threatened as we face losing 40% of our gross operating revenue. PPLM and its patients are already experiencing harm in the few days since the Defund Provision has gone into effect.  When Section 71113 went into effect on July 4, we immediately began preparing for the impact this would have when our health centers opened on Monday.  We have nearly 150 scheduled appointments for Medicaid patients across our health centers on July 7 and July 8 alone, and have been reaching out to inform these patients they cannot use their Medicaid coverage for services at PPLM.  We are discussing options with patients to try to ensure their access to care, but we know that many patients cannot afford to self-pay for their care and will not be able to get timely, high-quality care at another provider that accepts Medicaid. PPLM has already had to disrupt and reorganize dozens of workflows that direct, among other things, patient intake, general patient communication, and billing.  We have translated new communications materials and worked with community partners to shore up referral systems–all while trying to reassure our staff that they will still have jobs next week.

5.    PPLM clinics in recent years have served a significant portion of patients who seek reproductive healthcare from publicly funded clinics in Massachusetts, including 54% of Massachusetts patients that received family planning services through Medicaid.  Because alternative providers in the State are already significantly overstretched, PPLM's ejection from the Medicaid program will have seriously adverse public health consequences for the State as a whole,

including a precipitous rise in unwanted pregnancies, sexually transmitted infections ("STIs"), and abortions.[1]

6.      Furthermore, unless an injunction is quickly granted, the Defund Provision will likely have a significant effect on PPLM's financial viability. While the exact financial impact is still being assessed, early estimates indicate that the Defund Provision will jeopardize 35–40% of our annual health care revenue. This could force PPLM to make substantial reductions to services, programs, and staffing, potentially up to 20–25%, and may ultimately put our health centers at risk of closure.  We have determined that these reductions will need to start within three months absent injunctive relief.

## I.    ORGANIZATION

7.      PPLM is a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts, with its principal office located in Boston, Massachusetts.

8.      PPLM is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  Each of its clinics is an essential community provider, 45 C.F.R. § 156.235, that is primarily engaged in family planning services, reproductive health, and related medical care.

9.      PPLM's mission is to ensure that every person in the State has access to sexual and reproductive health care and education no matter who they are, where they live, or who they love. Our work is informed by research, powered by advocacy, and conducted with compassion and respect.   For ninety-four years, PPLM has been the leading provider of high-quality, comprehensive, compassionate, safe, and confidential family planning, reproductive health care,

---

[1] Usha Ranji et al., *5 Key Facts About Medicaid and Family Planning*, KFF (May 29, 2025), https://www.kff.org/medicaid/issue-brief/5-key-facts-about-medicaid-and-family-planning/#:~:text=The%20Medicaid%20program%20has%20a,for%20other%20health%20care%20services.

and education for all people in Massachusetts.  PPLM's staff and network of clinics work to ensure that families and communities have the resources they need to achieve positive reproductive health outcomes, regardless of their ability to pay for services.

10.     PPLM is an independently incorporated entity with its own CEO, Board of Directors, and management.  PPLM has its own infrastructure and approximately 200 staff members manage the day-to-day operations of our health centers and educational services.  As the premier provider of sexual and reproductive health care in Massachusetts, PPLM implements operational and advocacy strategies to meet the reproductive health needs in the state.  This includes PPLM's ASPIRE Center for Sexual And Reproductive Health which engages in clinical and social science research, professional education, and clinical training independently and in partnership with academic institutions in Massachusetts, and teaching hospitals, especially in the greater Boston area.

11.     In order to better serve its mission, PPLM also is a member of Planned Parenthood Federation of America, Inc. ("PPFA").  PPLM pays annual dues to PPFA to maintain its membership status.  As a member of PPFA, PPLM receives the right to use the Planned Parenthood name and service mark and to participate in programs organized by PPFA. PPLM's membership in PPFA helps to serve PPLM's core mission.  PPFA lends valuable advice and technical support in areas including clinical research, compliance with the medical standards and guidelines, revenue management, development, public affairs, communications, and advocacy.  In addition, because only providers who meet PPFA's stringent accreditation standards are permitted to use the Planned Parenthood name, patients know that they can trust Planned Parenthood members for expert, nonjudgmental care.

## II.    PPLM'S ROLE IN PROMOTING PUBLIC HEALTH

12.    PPLM provides a range of sexual, reproductive, and wellness care at its four physical health centers in Boston (the Greater Boston Health Center), Marlborough (The Metro West Health Center), Springfield (the Western Massachusetts Health Center), and Worcester (the Central Massachusetts Health Center), and through its virtual health center that offers telehealth services via phone and video.

13.    PPLM's health centers offer birth control, pregnancy testing and prenatal referrals, testing and treatment for STIs, Pre-Exposure Prophylaxis ("PrEP"), Post-Exposure Prophylaxis ("PEP"), clinical breast exams, breast and cervical cancer screenings, colposcopy and biopsy, condyloma treatment, and gender affirming care.

14.    PPLM also provides critical health education to its patients, including education about breast and cervical cancer screening, diagnosis, follow-up, and referral to medical specialists in the community.  PPLM develops health educational services for the general public as well, offering age-appropriate and medically accurate sexual education programs in public schools and in partnership with community-based organizations that provide guidance and support. Furthermore, by offering peer education and lay health advisor programs, PPLM trains youth and adults to respond to cultural and linguistic barriers that often keep members of their communities from seeking and receiving the health care they need.

15.    PPLM delivers health care to more than 30,000 unique patients each year.  In 2024 alone, PPLM provided patients with more than 20,500 birth control methods, including nearly 5,000 long-acting reversible contraceptives ("LARCs"), which are the most effective forms of birth control.  In that same year, PPLM performed more than 65,000 STI tests, which comprises a substantial portion of the STI tests performed in PPLM's service areas.

16.    Three of PPLM's health centers are in communities classified by the federal government as Medical Care Health Professional Shortage Areas ("HPSAs") for individuals with low incomes, and a substantial part of its education services are provided to individuals in communities experiencing significant health disparities.[2]  Unlike most family planning providers in its service areas, PPLM's health centers offer early morning, limited evening, and weekend hours.  Additionally, we offer walk-in appointments and same-day contraception, including highly effective LARCs—services that are often not offered by other providers in the area—and without the burdensome wait times or multiple visits that are often encountered elsewhere.

17.    Because PPLM's health care centers offer same-day and walk-in visits for most services and for urgent care needs, they serve as an alternative to the emergency room for many of their patients.  For example, patients come to PPLM's health centers for treatment following miscarriages and for treatment of urinary tract infections.  By offering those services, PPLM alleviates the burden on emergency rooms and primary care providers.

18.    In addition, PPLM manages an active clinical training program through partnerships with local academic institutions, hospitals, and other organizations.  This program includes both clinical observations and hands-on rotations for medical students, residents, fellows, and advanced practice clinicians to train in all of the services PPLM provides.  We are also in year three of our ASPIRE Center's sexual and reproductive health residency program for nurse practitioners, physician assistants, and certified nurse midwives.  The residency program is based at our Central Massachusetts health center in Worcester and is supported by funding from the Massachusetts Department of Public Health.

---

[2] HPSAs are designated by the Health Resources and Services Administration ("HRSA"), an agency of the U.S. Department of Health and Human Services ("HHS"), as having shortages of primary medical care, dental, or mental health providers.

19.     PPLM also partners with Brigham and Women's Hospital to co-host the MassGeneralBrigham-Harvard Medical School Complex Family Planning Fellowship (MGB-HMS CFP).  The MGB-HMS CFP program is a nationwide training program for obstetrician-gynecologists to receive subspecialty clinical training in abortion and contraception care, training in clinical research methods and public health, and exposure to policy and advocacy work.  This Fellowship program works to create the next generation of leaders in the research and provision of sexual and reproductive health care, with specific expertise in serving patients with complex issues.  Our professional education programs are vital to the provision of sexual and reproductive health care in the state, serving as a pipeline of trained providers to areas in Massachusetts where there is a shortage of sexual and reproductive health care providers, including Springfield and Worcester.

20.     In 2024, PPLM referred more than 2,100 patients to other providers for a variety of types of care, including diagnosis and management of chronic diseases including cancer, diabetes, cardiovascular disease, mental health, obstetric and breast specialist care, human immunodeficiency virus ("HIV") care, infertility, and dermatology.  Many of those patients initially came to PPLM health care centers for other medical needs, including family planning services, and would likely not have received treatment for their illnesses if not for the PPLM staff, who were able to accurately diagnose their conditions and connect them with appropriate medical professionals.

21.     A core part of PPLM's mission is to deliver reproductive health care to individuals with low incomes, including individuals who rely on Medicaid.  The vast majority of PPLM's patients are economically disadvantaged and come from at-risk communities.  Two of PPLM's four clinics—the Greater Boston and Central Massachusetts Health Centers—are in communities

classified as Medically Underserved Areas, which are areas designated by HHS as having major shortages in primary health service providers relative to the health care needs of the community. As noted above, Worcester, where the Central Massachusetts Health Center is located, and Springfield, where the Western Massachusetts Health Center is located, are both designated by HHS as primary care HPSAs.

22.     In patient surveys, PPLM is consistently highly ranked as a leading provider of sexual and reproductive health care.  Specifically, our Medicaid patients have scored PPLM an average of 93/100 in overall patient experience, overall access, and convenience of our hours. They have also scored our care providers an average of 95/100 and 96/100 when asked if the services they were offered met their needs.  In particular, patients often report that they choose PPLM because of the confidential and nonjudgmental care we provide.  Many patients come to PPLM out of concern that their local or family provider may judge them or fail to respect their privacy.

23.     The Commonwealth of Massachusetts is in great need of the services PPLM provides.  According to the last comprehensive study published in 2020 by the Guttmacher Institute, the nation's leading research organization regarding reproductive health care, there are 1,498,680 women of reproductive age (13–44) in Massachusetts, of which 947,850 are in need of contraceptive services and supplies.[3]  Of those, 332,670 women need publicly supported contraceptive services, because they either have an income below 250% of the Federal Poverty Level (68%) or are younger than 20 years of age (32%).  In Massachusetts, 34% of all pregnancies

---

[3] Blades N et al., *Publicly Supported Family Planning Services in the United States, 2020—Tables and Appendix Tables*, Guttmacher Inst. (May 2025), https://www.guttmacher.org /sites/default/files/report_downloads/publicly-supported-fp-services-us-2020tables-and-appendix-tables.pdf.

are unintended, indicating an ongoing and urgent need for accessible family planning and reproductive health services.[4]

24.    Based on 2022 data from Massachusetts Department of Public Health, the birth rate for female youth aged 15–19 is 5.7 per 1,000.[5]  The need for PPLM's services is particularly acute in Worcester, Springfield, and Marlborough, where the birth rates (per 1000) of female youth aged 15–19 are 9.5, 19.8, and 16.3 respectively.[6]  Further, for youth under the age of 18 in Worcester and Springfield 27.8% and 23.5% (respectively) received inadequate prenatal care, based on the Adequacy of Prenatal Care Utilization Index.[7]

25.    Between 2021 to 2023, the state rates of chlamydia, gonorrhea, and HIV increased, and there was only a slight decrease in confirmed and probable infectious syphilis cases.[8]  In areas such as Hampden County, the rates for chlamydia, gonorrhea, and early syphilis (per 100,000 people) all surpassed the state rates.[9]  County data collected from 2012 to 2022 demonstrated that in the counties of Hampden, Worcester, and Middlesex there was an overall increase in chlamydia,

---

[4] Kathryn Kost et al., *Pregnancies and Pregnancy Desires at the State Level: Estimates for 2017 and Trends Since 2012*, Guttmacher Inst. (Sept. 2021), https://data.guttmacher.org/states/table?topics=191&dataset=data&state=MA.

[5] Registry of Vital Recs. & Stats., Mass. Dep't of Pub. Health, *Massachusetts Births 2022*, at 17 (Nov. 2024), https://www.mass.gov/doc/2022-birth-report/download.

[6] *Id.* at 16, 29.

[7] *Id.* at 24, 30.

[8] Bureau of Infectious Disease & Lab'y Scis., Mass. Dep't of Pub. Health, *2023 Massachusetts Integrated HIV, STI, and Viral Hepatitis Surveillance Report* (Dec. 2024), https://www.mass.gov/doc/2020-integrated-hivaids-std-and-viralhepatitis-report/download; Bureau of Infectious Disease & Lab'y Scis., Mass. Dep't of Pub. Health, *Surveillance Data Overview of Sexually Transmitted Infections, Massachusetts, 2000-2023* (Mar. 2024), https://www.mass.gov/doc/surveillance-data-overview-of-sexually-transmitted-infections-massachusetts-2000-2023-slide-set/download.

[9] Bureau of Infectious Disease & Lab'y Scis., Mass. Dep't of Pub. Health, *Summary for Hampden County, Massachusetts, 2022* (2022), https://www.mass.gov/doc/summary- for-hampden-county-2022/download.

gonorrhea, and early syphilis.[10]  Yet, while the need for reproductive health services in Western Massachusetts and the Worcester area is significant, the availability of those services there is sparse.

26.     As part of its commitment to ensuring that all people have access to comprehensive reproductive health care, three of PPLM's clinics—the Greater Boston Health Center, the Central Massachusetts Health Center, and the Western Massachusetts Health Center—provide abortion services to patients who choose to terminate a pregnancy.  PPLM's Western Massachusetts Health Center in Springfield and the Central Massachusetts Health Center in Worcester provide over 90% of abortion care in their regions. Without those clinics, many patients in Massachusetts would have no access to an abortion provider.  As federal law requires, no federal funds under the Medicaid program are used to reimburse PPLM for the cost of providing those abortion services (except under the very limited circumstances permitted by federal law).

27.     PPLM is dedicated to ensuring that every person should have equitable access to abortion—without shame, stigma, or delay—because sexual and reproductive health is essential to every person's overall health, well-being, and happiness.  PPLM was one of the first health care organizations in Massachusetts to offer medication abortion through telehealth.  And while abortion remains legal and protected in Massachusetts, PPLM continues to advocate for improved access to abortion, especially in regions with limited abortion providers, such as southeastern Massachusetts.  In 2024, PPLM established referral partnerships with eleven public colleges to ensure students have accurate information and access to abortion services.

---

[10] *Id.*; Bureau of Infectious Disease & Lab'y Scis., Mass. Dep't of Pub. Health, *Summary for Worcester County, Massachusetts, 2022* (2022), https://www.mass.gov/doc/summary-for-worcester-county-2022/download; Bureau of Infectious Disease & Lab'y Scis., Mass. Dep't of Pub. Health, *Summary for Middlesex County, Massachusetts, 2022* (2022), https://www.mass.gov/doc/summary-for-middlesex-county- 2022/download.

28.     Further, PPLM contributes to expanding abortion access through our groundbreaking social science and clinical research.  Added in 2016, our social science research program employs rigorous methodologies to identify and disrupt barriers to and inequities in care. For the past two decades, our clinical research arm has been steadfast in its commitment to actively pushing patient care forward and expanding access to abortion and contraception through the conduct of high-quality, award-winning clinical research that directly addresses the needs of our patients.  By approaching research questions from these different perspectives and using a variety of methodologies, we have been able to broaden the impact of our research program on the field of sexual and reproductive health.

## III.    SERIOUS ADVERSE CONSEQUENCES OF THE DEFUND PROVISION

29.     It is my understanding that PPLM is a "prohibited entity" under the Defund Provision because, among other things, PPLM received $4,744,699.47 in Medicaid payments during fiscal year 2023.  Prohibiting PPLM from receiving Medicaid reimbursement will have dire consequences for PPLM and its patients.

30.     In 2024, PPLM provided services to approximately 10,822 patients who were enrolled in Medicaid—nearly 35% of PPLM's patient base.  In 2024, PPLM received a significant portion of its patient revenue (approximately 39%) from Medicaid reimbursements.

31.     In 2024 alone, PPLM provided, through Medicaid, more than 5,237 units of contraception (including 1,255 LARCs), 242 cervical screenings, 257 breast cancer exams, and 21,463 STI tests (yielding over 500 positive results that would have otherwise gone undiagnosed).

32.     It is my understanding that, as a direct result of the Defund Provision, PPLM will be prohibited from receiving federal Medicaid reimbursement for any of the health care services it provides.

33.     Medicaid provides free or very low-cost health coverage for eligible families and individuals with low incomes.  It is a joint federal-State program under which the federal government provides financial assistance to participating States to help them furnish care to needy persons.  A State is not required to participate, but once it does, it must comply with a range of federal statutes and regulations.

34.     Health care providers are not required to accept Medicaid, and many providers do not participate in the Medicaid program or strictly limit the number of Medicaid patients they will treat.   For those participating health care providers, like PPLM, Medicaid works by reimbursement: specifically, the program reimburses PPLM for providing covered services to enrolled Medicaid patients.  So, for example, a patient with Medicaid coverage will come to a PPLM clinic for preventive care.  That patient receives birth control, an STI test, a Pap smear, or other Medicaid-covered care—likely at no cost.  The PPLM clinic then submits to Medicaid a reimbursement claim for the services it provided.

35.     With the Defund Provision in effect, patients are no longer able to receive health care services through the Medicaid program at PPLM clinics.  On July 7 and 8 alone, 148 of PPLM's booked appointments across our health centers are for Medicaid patients.  These Medicaid patients, who are close to or below the federal poverty level, are unlikely to be able to afford fees for the services they require, and PPLM clinics cannot afford to provide those services free of charge.

36.     Some of PPLM's Medicaid patients who will no longer be able to obtain health care at PPLM clinics may try to find some services at Federally Qualified Health Centers ("FQHCs") or community health centers.  Those safety net providers, however, generally do not specialize in reproductive health, and thus do not offer the full range of high-quality services provided by PPLM.  Additionally, many FQHCs cannot offer the same immediate availability that PPLM offers.

37.     Given the volume of Medicaid patients PPLM's health centers serve, even if alternative providers were theoretically available, they could not take on the dramatic influx of patients who would lose service at PPLM.  In addition, as discussed above, many health care centers cap the number of Medicaid patients they see, and many private physicians see few, if any, Medicaid patients.

38.     Many of PPLM's patients will therefore be unable to find another provider or will face such lengthy wait times that they will be forced to forgo services.  In the greater Boston area, in particular, patients face some of the highest wait times to see a family medicine provider (an average wait time of sixty-nine days) or gynecologist (an average wait time of eighty-four days).[11] For patients waiting to see a provider, this will increase their risk of unintended pregnancy, STIs (both to themselves and their sexual partners), and undetected cancer.

39.     Even those patients who can find another provider will suffer significant harm from losing access to their provider of choice, with whom they already have an established relationship. Patients covered through Medicaid choose PPLM health centers as their health care provider over other providers for numerous reasons—including PPLM's accessibility, commitment to evidence-

---

[11] AMN Healthcare, *2025 Survey of Physician Appointment Wait Times and Medicare and Healthcare Technology Medicaid Acceptance Rates*, http://online.flippingbook.com /view/83050962/ (last visited July 5, 2025).

based practices, use of leading-edge technology, wide range of reproductive health services and contraception options, and compassionate care. Moreover, as noted above, many patients who receive some health services elsewhere nonetheless choose PPLM for their reproductive health care because they are concerned about their privacy and fear of being judged by other providers. These essential aspects of treatment will be lost, even if a Medicaid patient can find a new provider.

40.    With the Defund Provision in effect, there will be serious consequences for PPLM's ability to continue operating its health centers and provide the care our patients rely on. While we are still evaluating the full scope of the impact, early projections suggest we may need to reduce overall costs by 20–25%, which could include scaling back both health care services and staff. We may also be forced to make significant reductions to PPLM's educational and advocacy programs. These are difficult possibilities that we are expending resources to actively plan for as we assess all available options to preserve access to care.

41.    While PPLM would try to preserve as many of its services and health care centers for as long as possible by reducing hours and staff, that is unlikely to provide a long-term solution. Without any access to federal Medicaid funding, within one year, we likely would have to close at least one health center. Based on current projections, PPLM currently anticipates that the Marlborough Health Center would have to close within about twelve months after losing Medicaid funds. Even then, that closure may still be insufficient to cover the revenue shortfall caused by the loss of Medicaid funds. Ultimately, even PPLM's remaining clinics would be forced to lay off additional staff and reduce operational hours, including the reduction or elimination of weekend clinic hours.

42.    Closing the Marlborough Health Center would lead to almost 3,500 patients losing their reproductive health care provider of choice. Alternative providers in these areas are already

overstretched, with some having wait times of more than a week for even basic but essential services like oral birth control. The closure of PPLM clinics in these areas would overwhelm the capacity of these alternative providers, which are too small to provide services to thousands of new patients.

## IV.    INJUNCTION BOND

43.    PPLM, a nonprofit organization, would be incapable of posting a bond in the amount of the federal funds it receives without severely curtailing its services and compromising its organizational mission. If PPLM were required to post an injunction bond, it would be foreclosed from pursuing judicial relief.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 7, 2025.


_____              July 7, 2025_____
Dominique Lee                                Date

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

<table>
<tr><td>

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC.; PLANNED
PARENTHOOD LEAGUE OF
MASSACHUSETTS; and PLANNED
PARENTHOOD ASSOCIATION OF UTAH,

                    Plaintiffs,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
MEHMET OZ, in his official capacity as
ADMINISTRATOR OF THE CENTERS
FOR MEDICARE & MEDICAID
SERVICES; and CENTERS FOR
MEDICARE & MEDICAID SERVICES,

                    Defendants.

</td><td>

Case No. _____

</td></tr>
</table>

**DECLARATION OF SHIREEN GHORBANI IN SUPPORT OF PLAINTIFFS'**
**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
<u>**PRELIMINARY INJUNCTION**</u>

I, Shireen Ghorbani, declare as follows:

      1.      I am the Interim President of Planned Parenthood Association of Utah (PPAU), a

role in which I have served since April 2025.  PPAU is an independently incorporated nonprofit

organization that has provided health care services in Utah for more than fifty years. PPAU

provides comprehensive sexual and reproductive health care at six health centers in the State of

Utah.

2.      As the Interim President of PPAU, I oversee health care operations, education and advocacy and am responsible for our organizational budget and ensuring that Utahns have access to high quality affordable health care.  Through this role, I am familiar with PPAU's operations and health care services, including PPAU's patient demographics and revenue.

3.      Prior to serving as the Interim President of PPAU, I served as the Chief Corporate Affairs Officer at PPAU from 2023 to 2025.  Before joining PPAU, I worked as a director of community health for the largest regional health care provider in the intermountain west with a focus on reducing Utah's uninsured population.  I am a former Salt Lake County Councilmember and served in the United States Peace Corps.  I have a Master of Arts degree in Communication Studies from the University of Nebraska-Lincoln, and a Master of Philosophy in Organizational Communication and Policy from the University of Utah.

4.      I am familiar with Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 (the "Defund Provision").  I understand that this provision prevents Planned Parenthood members around the country from receiving reimbursements for any health care services they provide to patients through the Medicaid program.

5.      PPAU's patient population includes patients with low incomes who otherwise may lack access to affordable, high-quality sexual and reproductive health care, including patients who rely on Medicaid for health insurance.  In 2024, PPAU provided health care services to 2,096 patients through the Medicaid program.

6.      The Defund Provision will cause immediate and irreparable harm to PPAU and its patients. As discussed below, the Defund Provision forces PPAU to stop seeking Medicaid reimbursements.  As a result of losing the ability to seek Medicaid reimbursement, PPAU has already started turning away patients who cannot pay for care without reimbursement from

Medicaid.  Most of those patients will be unable to privately pay PPAU for our services or find affordable, high-quality sexual and reproductive health care at other providers in their area.  The loss of hundreds of thousands of dollars in Medicaid revenue each year will likely force PPAU to lay off full-time staff, limit the health care services it provides, and potentially close health centers as a result.

7.    I am over the age of eighteen and have personal knowledge of the matters herein or have acquired such knowledge by personally examining business records kept in the normal course of business by PPAU.  If called upon to testify, I could and would testify competently to the facts in this declaration.

## I.    PPAU's Organization & Services

8.    PPAU is a 501(c)(3) nonprofit organization organized under the laws of the State of Utah, with its principal office located in Salt Lake City, Utah.  All six of PPAU's health centers are essential community providers under 45 C.F.R. § 156.235 and are primarily engaged in family planning services, reproductive health care, and related medical care.

9.    PPAU is an independently organized corporation with its own chief executive officer, board of directors, bylaws, management, and staff.  PPAU employs 106 staff members who handle the day-to-day operations of PPAU's health centers and educational services.

10.    Founded in 1970, PPAU's mission is to empower Utahns of all ages to make informed choices about their sexual health and to ensure access for Utahns to affordable, quality sexual and reproductive health care and education.  As part of that mission, PPAU established the Planned Parenthood Action Council of Utah, a separately incorporated nonprofit organization tax-exempt under section 501(c)(4) to engage in education, advocacy, and limited electoral activities, in furtherance of PPAU's mission.

11.     PPAU operates six health centers located in Ogden, Orem, Salt Lake City (which has two health centers), South Jordan, and West Valley City.  PPAU also offers some types of care through telehealth.  PPAU provides a full range of sexual and reproductive health services, including well-person preventative care visits; breast exams; pap tests; sexually transmitted infection ("STI") testing and treatment; a wide range of U.S. Food and Drug Administration ("FDA")-approved contraception methods, including highly effective, long-acting reversible contraceptives; pregnancy testing; vaccines; risk assessments for pregnant patients to screen for high-risk issues; referral services for pregnant patients; urinary tract infection treatment; cervical cancer and testicular cancer screening; colposcopy; fertility awareness services; vasectomies; and abortions.  All of PPAU's health centers generally offer same-day appointments and walk-in availability, and two of PPAU's health centers generally offer weekend and evening hours.

12.     PPAU currently provides abortions at its two health centers in Salt Lake City—the Metro Health Center and Salt Lake Health Center.

13.     In 2024, PPAU provided health care to nearly 30,000 patients through more than 44,000 total visits to its health centers, including 19,341 birth control pills, 2,278 implantations of intrauterine devices (IUDs), 12,303 pregnancy tests, 89 vasectomies, 1,592 pap smears, and 2,676 abortions.

14.     PPAU also provides comprehensive education about sexual and reproductive health. Through its research-based educational programs, PPAU works to provide all Utahns with the accurate, reliable information they need to make responsible decisions and to stay healthy.  In 2024, PPAU's educators reached 5,106 individuals throughout Salt Lake County, Utah County, and Summit County.

15.    To better serve its mission, PPAU is a member of Planned Parenthood Federation of America ("PPFA"), a 501(c)(3) organization that provides support to Planned Parenthood members nationwide.  PPAU pays annual dues to PPFA to maintain its membership.  As a member of PPFA, PPAU receives the right to use the Planned Parenthood name and service mark and participate in programs organized by PPFA.  PPAU's membership in PPFA helps PPAU serve its core mission.  PPFA lends valuable advice and technical support in areas including clinical research, compliance with the medical standards and guidelines, revenue management, development, public affairs, communications, and expanding access to sexual and reproductive health care.  In addition, because only providers who meet PPFA's stringent accreditation standards are permitted to use the Planned Parenthood name, patients know that they can trust Planned Parenthood members such as PPAU for expert, nonjudgmental care.

## II.    PPAU's Role as a Medicaid-Enrolled Provider

16.    Like all other eligible Planned Parenthood members throughout the country, PPAU is a Medicaid-enrolled provider.  PPAU provides health care to patients who rely on Medicaid for health insurance and seeks reimbursement from Medicaid funds for the provision of eligible health care services.

17.    PPAU's patient population includes patients with low incomes who otherwise may lack access to affordable, high-quality sexual and reproductive health care, including patients who rely on Medicaid for health insurance.  In 2024, 61% of the patients served by PPAU had no insurance, 6% relied on public insurance, and 32% relied on private insurance.  Approximately half of PPAU's patients live at or below the federal poverty line.  Four of PPAU's health centers are in communities classified by the federal government as Primary Care Health Professional

Shortage Areas ("HPSAs").  Our Utah Valley Health Center is also in a community classified as a Medically Underserved Area/Population.

18.    PPAU does not limit the number of Medicaid patients it serves.  Of the nearly 30,000 patients PPAU served in 2024, 2,096 were Medicaid-enrolled patients.  In federal fiscal year 2023, PPAU received $706,251.02 in Medicaid reimbursements.

## III.    The Defund Provision Will Irreparably Harm PPAU and Its Patients

19.    It is critical that PPAU be allowed to continue to seek reimbursement for health care it provides to patients through the Medicaid program.  Core to PPAU's mission is its ability to serve patients with low incomes and from marginalized communities, who may otherwise lack access to affordable, high-quality sexual and reproductive health care.   Providing health care to patients through the Medicaid program—which primarily serves low-income individuals and families—is a key part of PPAU's fulfillment of that mission.

20.    Even though PPAU did not receive more than $800,000 in Medicaid payments in federal fiscal year 2023, which is one of the criteria listed for being a "prohibited entity" under the Defund Provision, I understand that the Defund Provision could be construed to prohibit PPAU from receiving Medicaid reimbursements due to PPAU's association with PPFA and other Planned Parenthood members.  Because of this possibility, and the potential risk of liability arising therefrom, PPAU has had no choice but to stop seeking Medicaid reimbursement upon the law's enactment.

21.    Because PPAU's health centers cannot afford to provide health care services free of charge, patients will no longer be able to receive health care services through the Medicaid program at PPAU's health centers if the Defund Provision is not prevented from going into effect.

PPAU has already had to turn away Medicaid patients who had appointments in its health centers on Saturday, July 5.

22.     Many of PPAU's Medicaid-enrolled patients will likely be unable to find another provider of affordable, high-quality sexual and reproductive health care in their area, much less one that sees Medicaid patients.  For instance, patients in Orem and Ogden have few options in their area other than PPAU's health centers for affordable, high-quality sexual and reproductive health care.  Even those of PPAU's patients who can find another provider of affordable, high-quality sexual and reproductive health care may nonetheless be subject to significant wait times before receiving that care.

23.     PPAU's Medicaid-enrolled patients will also be harmed by losing access to their chosen provider.  Patients come to PPAU because they know they will receive affordable, high-quality sexual and reproductive health care in a safe, affirming environment without facing stigma, shame, or unnecessary barriers to care.  PPAU's patients have trusting relationships with their providers, who they rely on for critical and often life-saving health care.  PPAU's Medicaid-enrolled patients will be harmed if they are forced to immediately stop seeking care at their chosen health care provider and to instead search for a new provider elsewhere, or not be able to obtain care at all.

24.     In addition to the harm to PPAU's patients, PPAU will also be immediately and irreparably harmed by the Defund Provision.  In federal fiscal year 2023, PPAU received $706,251.02 in Medicaid reimbursements. If PPAU can no longer receive reimbursements for the health care it provides to patients through the Medicaid program, PPAU will lose hundreds of thousands of dollars of revenue on average each year.  This loss in revenue will force PPAU to lay off full-time staff, limit the health care services it provides, and potentially close health centers as

a result.  When the federal government  began to withhold Title X disbursements from PPAU on March 31, 2025, this withholding constituted approximately $2.8 million annually (twenty percent of PPAU's overall annual revenue).  As a result of this withholding, PPAU was forced to lay off eighteen full-time staff members (approximately twenty percent of PPAU's staff) and to close two health centers (approximately twenty percent of its health centers).  I anticipate that PPAU will similarly have to make proportionate cuts to its health centers and staff if it cannot seek Medicaid reimbursements.

25.    PPAU also recently implemented a workflow to connect uninsured patients to health insurance navigators to assist eligible patients through the process of enrolling in the Medicaid program in an attempt to serve more patients through that program.  Through the implementation of this workflow, PPAU had expected to see the number of patients it serves through the Medicaid program grow, and consequently had also expected to receive more Medicaid reimbursements on average.  The Defund Provision will prevent PPAU and the patients it serves from seeing the expected benefits of this workflow.

## IV.    Injunction Bond

26.    PPAU, a nonprofit organization, would be incapable of posting a bond in the amount of the federal funds it receives without severely curtailing its services and compromising its organizational mission.  If PPAU were required to post an injunction bond, it would be foreclosed from pursuing judicial relief.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 7, 2025.


_____                    July 7, 2025_____
Shireen Ghorbani                                    Date

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; and PLANNED PARENTHOOD ASSOCIATION OF UTAH, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES; and CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendants. | Case No. |

### DECLARATION OF JENNA TOSH
### IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Jenna Tosh, PhD, declare and state as follows:

1.      I am the President and CEO for Planned Parenthood California Central Coast ("PPCCC"), a Planned Parenthood Federation of America ("PPFA") member with health care centers in Santa Barbara, Ventura, and San Luis Obispo counties in California. I am also the Chair of the Board of California Planned Parenthood Education Fund ("CPPEF"), the statewide entity

1

that represents the seven separately incorporated, independent Planned Parenthood members providing comprehensive sexual and reproductive health care services in the State of California (collectively, the "Planned Parenthood Members").

2.    This declaration is based on my personal knowledge, a review of data and studies compiled by CPPEF, a review of CPPEF's business records, and the knowledge obtained in the course of my twenty years of service at Planned Parenthood entities. Statements about the other California Planned Parenthood Members I make are based on information I have received from them in connection with my role at CPPEF. If called and sworn as a witness, I could and would testify competently to the information in this declaration.

3.    I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, which seeks to prevent the implementation of Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 ("PP Defund" or "Section 71113"), which prohibits federal Medicaid funding from being used for payments for services provided by Planned Parenthood Members' health care in California's Medicaid program ("Medi-Cal"). I am familiar with the PP Defund provision.

4.    As explained more fully below, the PP Defund will have devastating consequences for Planned Parenthood Members in California and their health centers, as well as Californians who rely on them for comprehensive sexual and reproductive health and family planning care. Over 80% of patients who visit Planned Parenthood Members' health centers in California rely on Medi-Cal for access to health care. Planned Parenthood Members' health centers serve over 25,000 patients every week in California, including one in four California women of reproductive age who need publicly funded family planning services.[1]

---

[1] Nakeisha Blades et al., *Publicly Supported Family Planning Services in the United States, 2020:*

5.      The PP Defund abruptly cuts off payments for all services Planned Parenthood Members' health centers provide to patients in Medi-Cal programs, including the State's family planning services program, the Family Planning, Access, Care, and Treatment ("Family PACT") Program, for a period of one year. This sudden loss of revenue has led to uncertainty around the continued ability of Planned Parenthood Members' health centers to serve the 25,000 patients a week that rely on them for care.

6.      As a result of the PP Defund, the seven California Planned Parenthood Members anticipate they will need to close health centers, drastically cut their health centers' hours and days of operation, reduce their workforces, and scale back the services they provide. Unless a temporary restraining order is granted, the California Members will need to scale their health care services back immediately. This means every patient who relies on Planned Parenthood Members' health centers in California will have more difficulty accessing services including family planning, screening and treatment for sexually transmitted infections ("STIs"), and cancer screenings. In the Medi-Cal provider network, Californians will find it especially difficult to access sexual and reproductive health care services and education throughout the State, and patients from California and those who come from out of state will have fewer options to receive care. Every day that this continues, CPPEF's seven Planned Parenthood Members and their patients are irreparably harmed.

## I.    EMPLOYMENT AND EDUCATION BACKGROUND

7.      I received my Bachelor of Arts in Political Science from the University of Florida, magna cum laude, in 2004. I then earned my Master's in Political Science from the University of

---

*Tables and Appendix Tables*, Guttmacher Inst. (2025), https://www.guttmacher.org/sites/default/files/report_downloads/publicly-supported-fp-services-us-2020-tables-and-appendix-tables.pdf; Cal. Dep't of Health Care Servs., *Family Pact Program Report*, https://familypact.org/wp-content/uploads/2023/05/FPACT-Program-Report-FY19-20.pdf (last visited July 5, 2025).

3

Central Florida in 2008. I did my thesis on "Sex Education Policy in Florida: Strategies for Change," which earned an award for Outstanding Political Science Master's Thesis. In 2015, I earned my PhD in Public Affairs, on the Governance and Policy Research Track, from the University of Central Florida. My dissertation was titled: "State Adolescent Health Policies and their Impact on Teen Pregnancy Outcomes."

8.      I began my career as a Family Case Manager for Kids Hope United then moved to Planned Parenthood of Greater Orlando, where I served as the Director of Education and Advocacy from 2006 to 2009. In 2012, I was appointed President and CEO of Planned Parenthood of Greater Orlando. I served in that capacity until becoming President and CEO of PPCCC in February 2015.

9.      PPCCC is the Planned Parenthood member with health centers in Santa Barbara, Ventura, and San Luis Obispo counties. It provides approximately 64,000 patient visits annually over three counties with six health center locations.

10.     As the President and CEO of PPCCC, I serve on the board of directors of CPPEF along with the CEOs of the other California members. As of July 1, 2025, I am the chair of the CPPEF Board of Directors, a position I served previously in 2017 to 2019. In my role as CPPEF's Board Chair, I work closely with the CPPEF President and CEO to help shape policy advocacy and provide support at the statewide level on behalf of the seven separately incorporated Planned Parenthood Members operating health centers in California.

## II.    ORGANIZATION MISSION AND STRUCTURE

11.     CPPEF is a California not-for-profit organization that provides statewide policy analysis, advocacy, and legal support to its members and works alongside government agencies, coalition partners, and stakeholders on issues related to access to comprehensive sexual and reproductive health, health care operations, and equitable access to quality health care for all

Californians, especially for people who have low incomes or who are from underserved communities.

12.    CPPEF's mission is to ensure that all individuals have the freedom to make reproductive decisions and, for people to make healthy decisions, they should have access to comprehensive information and services related to sexuality, reproduction, methods of contraception, fertility control, and parenthood.

13.    CPPEF is a membership organization consisting of the seven California Planned Parenthood Members. Each CPPEF member is a separately incorporated, independent non-profit organization, with its own Chief Executive Officer, Board of Directors, management, and staff. Each member provides health care and educational services in a distinct geographic region throughout California. The seven members are: PPCCC, Planned Parenthood Northern California ("PPNorCal"); Planned Parenthood Mar Monte ("PPMM"); Planned Parenthood Los Angeles ("PPLA"); Planned Parenthood Pasadena and San Gabriel Valley ("PPPSGV"); Planned Parenthood Orange and San Bernardino Counties ("PPOSBC"); and Planned Parenthood Pacific Southwest ("PPPSW").

14.    While CPPEF is dedicated to ensuring access to comprehensive sexual and reproductive health care services in California, CPPEF itself does not provide medical services. Medical services are provided by CPPEF's seven California members through the 114 health centers they independently operate throughout the State, collectively providing over 1.3 million patient visits each year to patients from all 58 counties in California as well as from other states.

15.    CPPEF and its member Planned Parenthood organizations are also members of Planned Parenthood Federation of America, Inc. ("PPFA").

III.    **PLANNED PARENTHOOD IN CALIFORNIA**

16.     The seven California Planned Parenthood Members independently operate 114 health centers across the State, providing over 1.3 million patient visits annually. Collectively, they are among California's largest providers of sexual and reproductive health care and sexual education.

17.     The seven California Planned Parenthood Members' health center locations span from the northwest corner of the State in Eureka to the southeast corner in El Centro near the U.S.-Mexico border almost 900 miles away. These health centers are intentionally located in underserved areas, near public transportation to facilitate access for patients who rely on public transit, and in other locations where there are shortages of adequate health care resources to meet patient needs. Health centers can be found in the major metropolitan areas of Los Angeles, San Diego, San Jose, San Francisco, Oakland, and Sacramento, along California's more rural Central Coast, and throughout the State's Central Valley. There are also a number of health centers in other, more rural parts of the State, such as Antelope Valley, Victorville, Ukiah, and Redding. A true and correct copy of a map showing the location of the health centers throughout the State of California is attached as Exhibit A.

18.     California Planned Parenthood Members' health centers offer a range of sexual and reproductive health care services, including the provision of birth control, including emergency contraception; testing and treatment of STIs; pregnancy testing and services; breast and cervical cancer screenings; gender-affirming care; and abortion. Some also provide primary care services. Others provide behavioral health and prenatal care services. All seven California Planned Parenthood Members provide health care services in person and via telehealth.

19.     Last year, California's Planned Parenthood Members' health centers provided care to roughly 700,000 individual patients, including almost 100,000 telehealth visits. The primary

services provided during those visits included: 2.6 million tests for STIs; over 500,000 visits for contraception, including emergency contraception; almost 500,000 pregnancy tests; nearly 100,000 cancer screenings; and pre-exposure prophylaxis ("PrEP") and post-exposure prophylaxis ("PEP"), two HIV-related medications, to more than 6,000 patients.

20.    The services we provide are critical to the health and well-being of our patients. Our work to screen and immunize against human papillomavirus ("HPV"), and treat pre-cancerous cervical lesions undoubtedly reduces the incidence of cervical cancer for our patients, but nonetheless, we do sometimes need to make the diagnosis. For example, last month, a PPPSGV physician diagnosed two patients with cervical cancer. The first patient presented for intrauterine device ("IUD") removal had been seen in a local emergency room due to abdominal pain, where they said they could not remove the IUD because strings were not seen and treated for a presumed pelvic infection. The patient had a large cervical mass pushing into her abdomen causing significant pain. She had sought care through multiple health providers without receiving the diagnosis. The second patient had been seen regularly by PPPSGV for cervical cell abnormalities. Monitoring closely, the PPPSGV provider was able to diagnose cancerous cells at an early stage, increasing the patient's likelihood of survival greatly. Both patients had Medi-Cal, and PPPSGV was able to connect them directly to cancer doctors once the diagnoses were made.

21.    Planned Parenthood Members often diagnose patients with ectopic pregnancy, a life-threatening condition, and are often able to get them the emergency treatment they need. For example, recently, one member's health center identified an ectopic pregnancy on an ultrasound at the visit and immediately referred the patient, who was seven weeks pregnant, to Los Angeles General. She had a salpingostomy (fallopian tube-sparing surgery) before the tube ruptured.

22.    As another example, two months ago, a member's health center saw a patient who

was six weeks pregnant. No pregnancy was seen in the uterus on the ultrasound. The Planned

Parenthood provider drew human chorionic gonadotropin ("hCG") (a pregnancy hormone) levels,

and the patient was referred the next day for evaluation at the emergency department. She was able

to get Methotrexate treatment (an injection to treat ectopic pregnancy) rather than surgery due to

the early diagnosis.

23.    In addition, all seven California Planned Parenthood Members offer education and

counseling on sexual and reproductive health, reaching nearly 100,000 Californians every year.

24.    Planned Parenthood Members' health centers primarily serve patients who have

low incomes and rely on Medi-Cal programs to access health care services. Approximately 90%

of patients who come to Planned Parenthood Members' health centers in California have incomes

that are below 200% of the federal poverty line ("FPL") ($31,300 for one person in 2025)[2] and

over 80% are under the age of 35. Three out of four patients identify as people of color.

25.    Patients come to Planned Parenthood Members' health centers because they know

they can receive high-quality, patient-centered, confidential, compassionate, and nonjudgemental

care regardless of their ability to pay. California's Planned Parenthood Members have

longstanding, deeply rooted relationships in the communities they serve, and work to provide

culturally-appropriate care to meet the needs of California's diverse population. For example,

PPNorCal came into existence in 1929, and PPPSGV in 1933. PPCCC, PPPSW, PPLA, and

PPOSBC have served their communities since the 1960's.

26.    Many patients also choose to receive care at Planned Parenthood Members' health

---

[2] U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Plan. & Evaluation, *2025 Poverty Guidelines: 48 Contiguous States (all states except Alaska and Hawaii)*, https://aspe.hhs.gov/sites/default/files/documents/dd73d4f00d8a819d10b2fdb70d254f7b/detailed -guidelines-2025.pdf (last visited July 5, 2025).

centers because they are often able to see a clinician, receive care and counseling (including relevant labs and other testing), and obtain medications or supplies at one location, without having to travel to a separate lab testing facility or pharmacy. This allows patients to receive sensitive medical services confidentially and efficiently, saving time, money, and resources that would be required to arrange for childcare or to take additional time off from work or school. At Planned Parenthood Members' health centers, patients can receive help with State coverage program enrollment, be tested for STIs and then receive results and treatment if necessary, receive birth control counseling, and obtain any needed services, referrals, and medications in one visit at one location. California's Planned Parenthood Members also operate several health centers that have extended hours, including weekend hours, and provide services to accommodate patients who have inflexible work schedules, childcare, or other unique scheduling challenges.

27.    The seven California Planned Parenthood Members implement programs and policies to address the unique and diverse needs of the communities they serve, including survivors of trauma and assault, people with disabilities, people with physical, mental, or social challenges, migrant workers, and people who are unhoused.

28.    For example, a patient with a history of significant trauma sought an IUD as a birth control method. The patient desired sedation for the insertion because of their past trauma and came to a PPOSBC health center after their regular primary care doctor refused any type of sedation. PPOSBC was able to see the patient the next day and make sure that the patient could receive the birth control method of their choice in a manner that addressed their circumstances— ensuring that the patient felt safe and supported during the medical procedure.

29.    Planned Parenthood Members' health centers in the State serve many patients who speak languages other than English. Access to care with a trusted provider is crucial for these

patients, who are more likely to have lower incomes, poorer health, and experience discrimination in the health care system. All Planned Parenthood Members' health centers in California offer language access services to address the needs of California's diverse population, including multilingual staff in many of their locations to meet the specific needs of the patient population in their communities, and telephone or video access to translators in over 200 languages.

30.    For example, at PPCCC, the member where I serve as the President and CEO, we have a health center that serves a large indigenous farmworker population from Mexico. Many in that community speak the indigenous language of their region. They face many challenges related to poverty and lack of access to health care. Recently, a patient came in for a pregnancy test who did not speak English or Spanish. Our interpreter working in that health center was able to speak to her in her indigenous language. During the visit, the patient reported that she had been sexually assaulted and was pregnant as a result. She was extremely scared and was not sure she would be able to come back for another visit. We were able to do rapid testing to determine whether she had acquired an STI, provided an abortion, and inserted an IUD. The patient told our clinicians that they had helped her more than anybody else, particularly since they were able to provide all these services during one visit.

## IV.    PLANNED PARENTHOOD'S PARTICIPATION IN THE CALIFORNIA MEDICAID PROGRAM

31.    Medi-Cal covers almost 15 million Californians—over a third of the State's population. Most Medi-Cal enrollees are covered through a state contract with a managed care plan. For beneficiaries who access care through a managed care plan, sexual and reproductive health care services, including for family planning and abortion, are available both in- and out-of-network as sensitive services.[3]

---

[3] Medi-Cal Providers, *Client Eligibility* 19, https://mcweb.apps.prd.cammis.medi-cal.ca.gov/

32.     Of those covered by Medi-Cal, 36.6% are 20 years of age and younger.[4] 34.3% of Medi-Cal enrollees are a part of the ACA expansion adult population with incomes up to 138% of the FPL between the ages of 19–64.[5] The California Department of Health Care Services ("DHCS") manages the State's Medicaid Programs and is responsible for provider enrollment, claims processing, program design, and responding to the public.

33.     The Medi-Cal program provides coverage for comprehensive sexual and reproductive health services, covering all health care services required by federal law as well as many federal optional benefits that are eligible for federal matching funds. The State also provides coverage using state-only funds for certain health care services that are not eligible for federal funds, which includes abortion, and for certain populations whose care is not eligible for federal matching funds.

34.     The State administers Medi-Cal, subject to federal and state regulations, and cost of care under the program is shared between California and the federal government. The federal medical assistance percentage ("FMAP") is the percentage of costs paid by the federal government to state Medicaid programs, which varies by service type and the enrollee receiving the service. California's FMAP is 50% for most services and enrollees,[6] while certain services and enrollees, including family planning services, are eligible for an FMAP of up to 90%.[7] Current budget

---

assets/907504BF-B611-4569-AA2F-
AD19852DC99A/clientelig.pdf?access_token=6UyVkRRfByXTZEWIh8j8QaYylPyP5ULO
(last visited July 5, 2025).
[4] Cal. Dep't of Health Care Servs., *Medi-Cal Monthly Eligible Fast Facts* 9 (May 2025), https://www.dhcs.ca.gov/dataandstats/reports/Documents/Fast-Facts.pdf.
[5] *Id.* at 13.
[6] KFF, *Federal Medical Assistance Percentage (FMAP) for Medicaid and Multiplier*, https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/ (last visited July 5, 2025); Social Security Amendments of 1965, Pub. L. No. 89-97 (1965).
[7]    Social    Security    Amendments    of    1972,    Pub.    L.    No.    92-603    (1972), https://www.govinfo.gov/content/pkg/STATUTE-86/pdf/STATUTE-86-Pg1329.pdf.

estimates show that federal funds cover around 60% of the total Medi-Cal program expenditures.[8]

35.    The Family PACT, or FPACT, Program is a comprehensive family planning services program, part of Medi-Cal, which is funded 77.5% by the federal government. FPACT provides contraceptive and family planning-related services, along with client-centered health education and counseling, at no cost to California's residents of reproductive age with low incomes. Operating since 1997, it is administered by the DHCS, Office of Family Planning (OFP), which is responsible for program policy, program monitoring, quality improvement, and program evaluation. The Family PACT Program is designed to assist individuals who have a medical necessity for family planning services, so that they can establish the timing, number, and spacing of their children, and maintain optimal reproductive health. Family PACT serves over 600,000 income-eligible people of childbearing age.[9]

36.    Family PACT patients are California residents of reproductive age who have a family income at or below 200% of the FPL.[10] FPACT patients must have a medical necessity for family planning services and either have no other source of health care coverage for family planning or meet certain criteria for eligibility. Planned Parenthood Members' health centers provide approximately 70% of the health care services that are reimbursed by Family PACT in California.[11]

---

[8] Cal. Dep't of Health Care Servs., *Medi-Cal May 2025 Local Assistance Estimate for Fiscal Years 2024-25 and 2025-26* (May 2025), https://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Documents/2025_May_Estimate/MAY-2025-Medi-Cal-Local-Assistance-Estimate.pdf.

[9] Cal. Dep't of Health Care Servs., *supra* note 1, at 11.

[10] Cal. Dep't of Health Care Servs., *Family Pact: An Overview*, https://familypact.org/wp-content/uploads/2024/04/Family-PACT-Program-Fact-Sheet.pdf (last visited July 5, 2025).

[11] Cal. Dep't of Health Care Servs., *Medi-Cal May 2023 Local Assistance Estimate for Fiscal Years 2022-23 and 2023-24* (May 2023), https://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Documents/2023_May_Estimate/MAY-2023-Medi-Cal-Local-Assistance-Estimate.pdf; Dep't of Health Care Access & Info., *2023 Primary Care Clinic Annual Utilization*

37.    All seven of the Planned Parenthood Members offering health care services currently participate in the Medi-Cal program and are enrolled as Family PACT providers. Approximately 54% of the patients seen at Planned Parenthood Members' health centers in California are enrolled in Medi-Cal with an additional 26% enrolled in the Family PACT program. Combined, Medi-Cal and its related programs including Family PACT make up approximately 80% of Planned Parenthood's patient visits.

38.    Planned Parenthood Members' health centers are reimbursed by the State of California for eligible patient care through a combination of state and federal funding. Planned Parenthood Members' health centers in California are the backbone of the Medi-Cal program's network of sexual and reproductive health care providers and collectively provide approximately $425 million of services to patients that are covered by Medi-Cal and its related programs annually.[12] Of that, around 77%, or $328 million, is paid using federal funds.[13]

39.    Planned Parenthood Members' health centers also assist and support patients who are uninsured and/or need assistance navigating publicly-funded coverage options. Many people turn to Planned Parenthood Members' health centers for care because they do not have health care coverage and have few options to obtain care. Health center staff will often assist patients who may be between jobs, recently lost their job, or simply cannot afford health care, in order to help them navigate what coverage they may be eligible for and help them enroll in coverage.

40.    For example, one recent PPPSGV patient discovered that their health care coverage had expired and they were due for their birth control shot the next day. PPPSGV was able to assist

---

*Data (November 2024)*, CA.gov (July 5, 2025), https://sandbox.data.ca.gov/dataset/primary-care-clinic
-annual-utilization-data/82f4dc4e-b1fb-4961-b362-6d05534f3781.
[12] Dep't of Health Care Access & Info., *supra* note 11.
[13] Cal. Dep't of Health Care Servs., *supra* note 8.

13

the patient by helping them enroll in Family PACT.

41.     Another patient recently visited a PPNorCal's health center after losing their insurance. The patient needed help accessing prescription medication for their chronic medical conditions. A community health worker at PPNorCal was able to assist the patient with obtaining Medi-Cal coverage, and connect them with clinicians and specialists that accepted Medi-Cal. PPNorCal was able to help their patient navigate a complex health care system and gain access to critical care and services.

42.     In another example, PPMM assisted a patient who was working as an agricultural worker, and who was uninsured, to enroll in the Family PACT program, and performed a preventive care visit where the clinician identified concerning findings. PPMM was able to order imaging and diagnostic testing that resulted in a cancer diagnosis. PPMM then facilitated a referral to an oncology provider and supported the patient in enrolling in additional public coverage programs to cover the costs of the treatment.

43.     At PPCCC, a patient came to one of our health centers who was uninsured. She had a breast mass that she was worried about. We helped her get funding for the visit and ordered screening, which showed that she had Stage 1 breast cancer. We then helped her make an appointment with a local oncologist and did a warm hand-off, which is known to improve the chances of survival. The patient indicated she had tried to see another Ob-Gyn, but could not afford the visit.

## V.    EFFECT OF THE PP DEFUND ON PLANNED PARENTHOOD MEMBERS IN CALIFORNIA

44.     It is my understanding that the seven separately incorporated Planned Parenthood Members in California that operate the 114 health centers throughout the State are "prohibited entit[ies]" under the PP Defund because they are all 501(c)(3) not-for-profit organizations and

essential community providers, which operate community clinics that primarily engage in family planning and reproductive health, provide abortion, and because each received more than $800,000 in total state and federal Medicaid funding in fiscal year 2023. The PP Defund is in effect. Because Planned Parenthood members in California are now prohibited from receiving federal Medicaid payments, they are unable to submit the vast majority of claims to Medi-Cal as of the time of President Trump's signature on July 4, 2025.

45.    If California Planned Parenthood Members remain unable to seek reimbursement for the vast majority of services provided to the more than 25,000 patients their health centers serve every week, they will be forced to close health centers and reduce hours, staff, and services, and Californians will lose vital access to sexual and reproductive health care. Absent a temporary restraining order and preliminary injunction, the California Planned Parenthood Members will have to scale back the health services they offer almost immediately. The PP Defund will not only impact abortion access, but will be devastating for access to family planning and other sexual and reproductive health care, not just for Medi-Cal beneficiaries but for all patients who seek care at Planned Parenthood Members' health centers in California. The PP Defund also threatens access to Planned Parenthood Members' community-based educational services that reach almost 100,000 Californians a year.

46.    Even short disruptions in revenue will have drastic impacts to funding because over 80% of Planned Parenthood Members' services in California are provided to Medi-Cal and Family PACT patients. Without reimbursement for those services, California's Planned Parenthood Members will lose approximately two-thirds of their revenue, and health centers will need to close, which is a time-consuming, administratively burdensome, and expensive process. Additionally, this process will likely include termination of leases or selling health center buildings that

Members own. Once a location is closed, it sometimes never reopens. Even if funding resumes and re-opening is possible, it is very difficult, time-consuming and expensive to reopen. New staff would have to be hired and trained, new locations would have to be found to lease, new systems for medical records and billing would have to be installed and implemented, and a multitude of new licenses would have to be obtained. Plus, each Member would need to extensively expand philanthropic fundraising to raise the costs of opening health centers: expenses for insurance, billing and medical record systems, leases and staff will be incurred long before any revenues exist from services provided that could be used to cover those costs. It also takes 6 months, and perhaps longer, to get the licenses and regulatory approvals from the various State agencies to open a health center, and all of that would have to occur before a clinic could open and begin to see patients.

47.    Closures of Planned Parenthood health centers will reduce the number of family planning and abortion providers in the Medi-Cal program, leading to longer wait times and more barriers to care. Californians may need to travel significant distances to receive in-person care, which is especially problematic for rural and remote areas of the state where transportation is already a significant barrier to care. For many people who live in California's vast state, patients would have to drive multiple hours for over 200 miles to access the next closest reproductive health clinic. Forcing people to travel long distances to access care results in delays in time-sensitive care, or in care becoming inaccessible.

48.    In addition to the impacts on the provision of health care, the PP Defund will have huge economic consequences on the employees who work for the California Planned Parenthood Members and the communities in which their health centers are located. The seven California Planned Parenthood Members employ over 3,000 Californians, including experienced clinicians, support staff, educators, and administrative staff. Planned Parenthood's California Members will

be forced to do large lay-offs, and would need to provide severance, health care coverage for the severance period, and career transition and outplacement services for any staff laid off. The extreme and sudden nature of the PP Defund will make it difficult to adequately prepare for staff transitions and cover the costs of these transition services.

## VI.    PROVISION OF FAMILY PLANNING AND FAMILY PLANNING-RELATED CARE IN CALIFORNIA

49.    Publicly funded family planning clinics, including Planned Parenthood Member health centers, provide essential health care to patients with low incomes, including access to contraception and other family planning services.[14] In 2020, over 2.2 million California women aged 13–44 were in need of publicly funded family planning services.[15] It is critical that providers like Planned Parenthood Members' health centers be able to continue operating; people that have trouble accessing family planning services are more likely to experience an unplanned pregnancy, contract an STI, or suffer other health complications.[16]

50.    In California, Planned Parenthood Members' health centers see approximately half of all patients served at a publicly funded clinic for family planning services. Planned Parenthood Members' health centers saw half of the 1.2 million contraceptive clients served by all safety-net family planning centers in 2020 across California.[17]

51.    Screening and treatment of STIs is the most cost-effective strategy for reducing adverse reproductive health outcomes, such as pelvic inflammatory disease and infertility, and

---

[14] Usha Ranji et al., *Financing Family Planning Services for Low-income Women: The Role of Public Programs*, KFF (Oct. 25, 2019), https://www.kff.org/womens-health-policy/issue-brief/financing-family-planning-services-for-low-income-women-the-role-of-public-programs/.
[15] Blades et al., *supra* note 1.
[16] Inst. of Med. of the Nat'l Acads., *Overview of Family Planning in the United States*, *in* A Review of the HHS Family Planning Program: Mission, Management, and Measurement of Results (2009).
[17] Guttmacher Inst., *Federally Qualified Health Centers Could Not Readily Replace Planned Parenthood* (June 4, 2025), https://www.guttmacher.org/news-release/2025/federally-qualified-health-centers-could-not-readily-replace-planned-parenthood.

their associated costs.[18] For many patients, Planned Parenthood Members' health centers are the only health care provider and trusted source for information and services related to STI testing and treatment. Over the past five years, the California Planned Parenthood Members have partnered with state and local public health officials to address the STI epidemic by increasing testing and treatment rates within their communities. In the past year, Planned Parenthood Members' health centers in California have performed over 2.6 million STI tests. Many have implemented rapid testing, which expands testing capacity and enables STI testing and treatment on the same day.

52.     In 2020, only 56% of federally qualified health center (FQHC) sites nationwide reported offering contraceptive care to at least 10 women per year.[19] If Planned Parenthood Members are forced to reduce services and hours and close health center locations as a result of the PP Defund, patients will need to identify other publicly funded providers, such as FQHCs, to provide their care. FQHCs, however, are already struggling to meet a rapidly increasing demand for services and will be unable to absorb the patients of Planned Parenthood's Members in California. The California Primary Care Association ("CPCA"), which represents the community clinics in California, has stated that these clinics do not have the capacity to take on the patient volume served by Planned Parenthood Members. CPCA states: "[e]liminating Planned Parenthood from our state's comprehensive network of care would put untenable stress on remaining health centers. We do not have the capacity for such an increase in care and building such capacity would require significant capital investment." A true and correct copy of the CPCA letter dated June 3, 2025, is attached as Exhibit B.

53.     For example, PPPSGV has referral relationships with local clinics that have very

---

[18] *See, e.g.,* Andrea K. Kennedy et al., *Direct and Indirect Cost Savings from STI Testing, Treatment, and Counseling among Foster Youth*, 49 Sexually Transmitted Diseases 86 (2022).
[19] Guttmacher Inst., *supra* note 17.

limited capacity to provide family planning services. In fulfilling this role, PPPSGV's health centers play a critical part in the safety net infrastructure. In addition to providing health care services, PPPSGV has served as a pillar within its community by providing information, education, and outreach to combat disinformation and acted as a hub for vaccine distribution to the most vulnerable.

54.     In another example, PPCCC is the only safety-net, comprehensive reproductive health care provider in the State's Santa Barbara, San Luis Obispo, and Ventura counties located in the central coast region of California. Local hospitals and clinics routinely refer patients to PPCCC, especially for abortion, gynecological cancer prevention, and gender-affirming hormone therapy. Currently, the FQHCs refer their patients to PPCCC because the clinics either do not offer the range of services PPCCC provides or because they have a much longer wait time.

55.     In fact, Planned Parenthood Members' health centers are much more likely than other clinic types to provide patient-centered options for care, including offering the full range of reversible contraceptive methods, providing same-day care for IUD and implant insertions, on-site dispensing of oral contraceptives, and the provision of contraceptives using telehealth.[20] Compared to other clinic types, Planned Parenthood Members' health centers offer a wider range of contraceptive methods that help patients identify and obtain methods that work best for them.

56.     For example, one patient sought care at PPLA after being told by a gynecologist that it would be 5 months before they could schedule an appointment for a contraceptive implant. PPLA was able to offer the patient a same-day appointment.

57.     As another example, another patient described how PPPSW staff took the time to

---

[20] Alicia VandeVusse et al., *Publicly Supported Family Planning Clinics in 2022–2023: Trends in Service Delivery Practices and Protocols*, Guttmacher Inst. (Nov. 2024), https://www.guttmacher.org/report/publicly-supported-family-planning-clinics-2022-2023.

talk to them about all the birth control options so they could consider what would be the best for them. They were able to make a choice about their preferred birth control method feeling equipped with the information they needed to make that decision. As the patient stated, "I'm so grateful that I was able to access care at Planned Parenthood through Medi-Cal—to get tested, get my annual exams, access birth control, and the information I needed to decide what's best for my body."

\*\*\*

58.    In sum, it is my belief that the PP Defund will have a large and devastating impact on Planned Parenthood Members' health centers in California, widen disparities in health care, and threaten access to family planning and abortion services for Californians.

I declare under penalty of perjury that the foregoing is correct and that this declaration is executed on 6th day of July, 2025, in Santa Barbara, California.

*Jenna Tosh*
_____          7/6/2025
Jenna Tosh                                              _____
                                                                        Date

20

# Exhibit A



# Exhibit B



June 3, 2025

The Honorable Alex Padilla
The Honorable Adam Schiff
United States Senate
331 Hart Senate Office Building
Washington, D.C. 20510

Dear Senator Padilla and Senator Schiff,

The California Primary Care Association is aware of provisions in the House-passed Budget Reconciliation Bill that is currently before the Senate that would prohibit federal funding from being used for services provided by Planned Parenthood. In California, this would mean that Medi-Cal patients would lose an important point of access for family planning services, shifting care to federally qualified health centers that will be unable to meet patient needs. This provision has no purpose other than putting a moratorium on Planned Parenthood as a health care provider for ten years and in fact, according to the Congressional Budget Office, will increase the deficit by $300 million.

As the state-wide representatives of community clinics and health centers in California, who annually serve over 7.7 million Medi-Cal patients, we believe this action would negatively impact the health of our community.

Planned Parenthood currently operates 115 health centers in California and serves almost a million patients through 1.3 million total visits annually. Eliminating Planned Parenthood from our state's comprehensive network of care would put untenable stress on remaining health centers. We do not have the capacity for such an increase in care and building such capacity would require significant capital investment.

Moreover, the effort to defund Planned Parenthood would eliminate a patient's ability to choose the provider with which they feel most comfortable. Many patients rely on Planned Parenthood because they know that it is a place where they can get high quality care that is confidential and without judgment. Their reputation as a leading provider of sexual and reproductive health care means that they are the provider of choice to almost a million Californians who seek out a variety of services that include wellness exams, birth control, sexually transmitted infection (STI) testing and treatment, cancer screenings, and other preventive care. In 2024 alone, the Planned Parenthood affiliate health centers in CA conducted over 2.5 million STI tests.

Planned Parenthood is a vital component of the health care system in California and for that reason, we are opposed to any provisions in the budget reconciliation bill that will diminish their capacity to provide care in our state.

Sincerely,

Francisco J. Silva, Esq.
President and CEO
California Primary Care Association

A250

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC.; PLANNED
PARENTHOOD LEAGUE OF
MASSACHUSETTS; and PLANNED
PARENTHOOD ASSOCIATION OF UTAH,

       Plaintiffs,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
MEHMET OZ, in his official capacity as
ADMINISTRATOR OF THE CENTERS FOR
MEDICARE & MEDICAID SERVICES; and
CENTERS FOR MEDICARE & MEDICAID
SERVICES,

       Defendants.

Case No. _____

## EXPERT DECLARATION OF CLAIRE D. BRINDIS
## IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

I, Claire D. Brindis, declare that if called as a witness, I would testify competently to the following:

1.      I am a Distinguished Professor Emerita (on recall) in the Department of Pediatrics and the Department of Obstetrics, Gynecology and Reproductive Health Sciences at the University of California, San Francisco ("UCSF"), where I have held positions as a researcher and faculty member since 1982.

2.      I am Emerita Director of the Philip R. Lee Institute for Health Policy Studies.  This Institute is an interdisciplinary health policy research unit that collaborates with universities, the private sector, government, and community-based organizations to address issues concerning health care delivery, access and quality of care, and health services outcomes.  I have been associated with this Institute since 1983 and was its Director from 2008 to 2020.

3.      I am a Founding Director and currently Senior Advisor of the UCSF Bixby Center for Global Reproductive Health.  This Center leads research and training programs around the world to improve reproductive health policies, treatment, and care guidelines around the world.  I have been associated with this Center since its founding in 2004.

4.      I received a Master's Degree in Public Health in Maternal and Child Health, International Health, and Family Planning from the University of California at Los Angeles and a Doctoral Degree in Public Health (with a specialty in Behavioral Sciences) from the University of California at Berkeley.

5.      A copy of my curriculum vitae is attached as Exhibit A.

6.      My area of academic expertise is child, adolescent, and women's health policy.  I have conducted research regarding reproductive health services for men and women, pregnancy and pregnancy prevention, and health care reform, among other topics.  Of particular relevance, I

served on the 2011 Institute of Medicine Women's Committee on Preventive Services for Women, which produced a report of recommendations for women's health, including an annual preventive health visit, counseling on sexually transmitted infections ("STIs"), and access to all Food and Drug Administration ("FDA")-approved contraceptive services without copayment. I also served for nearly 20 years as the co-Principal Investigator for California's Family Planning, Access, Care, and Treatment ("PACT") Program, the state's Medicaid waiver program for providing family planning services to low-income men and women and one of the largest publicly funded family planning programs in the country. I have served as the Principal Investigator for a National Institutes of Health-funded program, Building Interdisciplinary Research Careers in Women's Heath, which supports junior faculty conducting research aimed at improving women's health.

      7.     I have served as a research grantee, advisor, and/or consultant to a variety of federal government projects and agencies since 1983, including: member of the advisory panel for the U.S. Congress Office of Technology Assessment on Adolescent Health (1991); advisor to the Centers for Disease Control and Prevention ("CDC") regarding adolescent pregnancy prevention efforts (1995-2000); member of the Adolescent Health Work Group, Maternal and Child Health Bureau, U.S. Department of Health and Human Services ("DHHS") (1995-1996); member of the Steering Committee, Women's Health Panel, Bright Futures for Women's Health and Well-Being: National Guidelines Project, Maternal and Child Health Bureau, DHHS (2001-2002); member of the Technical Experts Advisory Committee for the Office of Population Affairs, Office of Family Planning, and CDC in connection with revision of the Title X Family Planning Program Guidelines, Adolescent Panel (2011); member for the DHHS and Health Resources and Services Administration ("HRSA") Office of Women's Health Expert Panel on Curriculum Development in Women's Health (2012); expert panel member for the DHHS and the Office of Adolescent

Health (OAH) "Think Adolescent Health" agenda (2013); member of DHHS and OAH's Technical Workgroup on the Cost Study of Evidence-Based Teen Pregnancy Prevention Programs (2013); technical expert panel member for CDC panel on The National Survey of Children's Health (2015); member of the CDC's Adolescent Reproductive Health Clinical Program Improvements Workgroup (2018-2019); and special emphasis panel member of the CDC's Developing and Evaluating Adolescent, Parent, and Provider Resources to Improve Adolescent Use of Sexual Health Services panel (2020).

8.      I have not been paid a fee for my work in connection with this case.  I will be reimbursed for all reasonable and necessary out-of-pocket expenses incurred in connection with this engagement, such as travel expenses.  This reimbursement is not contingent on the nature of my findings or conclusions, or on the outcome of this litigation.

9.      I have been asked to provide my opinion on the effect on public health outcomes of Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 ("Section 71113"), which I understand is intended to prohibit Planned Parenthood Federation of America ("PPFA") Member organizations from receiving federal funds through Medicaid.

10.      In this declaration, I use shorthand to discuss PPFA Members' health centers, using the terms "Planned Parenthood," "Planned Parenthood health centers," and "Planned Parenthood clinics."  For purposes of this declaration, unless otherwise indicated, those terms refer to the health centers owned and operated by PPFA Members, all of which include the words "Planned Parenthood" in their names.

11.      As further explained below, restricting Planned Parenthood's ability to provide essential health care services jeopardizes the health of patients and risks serious adverse public health outcomes—in particular, an increase in unintended pregnancies and attendant

complications, and an increase in undiagnosed and therefore untreated sexually transmitted infections. Because many patients rely on publicly funded healthcare services, the resulting increase in covered births, complications, and STIs will mean Section 71113 will lead to a net *increase* in public spending.

12.    I begin by providing an overview of Planned Parenthood's role in the system of providing reproductive health care to safety-net patients, *i.e.*, patients who receive such services through publicly funded health care programs. I then explain that if Planned Parenthood Members are excluded from receiving federal funds in the form of Medicaid reimbursement for the health care services they provide, alternative providers will not be able to fill the gaps in services that would result. I further explain below that serious public health consequences will result from Section 71113's exclusion of Planned Parenthood from the safety-net of health care providers that provide federally funded health care services under Medicaid and the lack of alternative providers who can offer similar services.

## I.    PLANNED PARENTHOOD MEMBERS' CENTRAL ROLE IN PROVIDING REPRODUCTIVE HEALTH CARE

### A.    Background Information on Medicaid

13.    Below, I provide a brief description of Medicaid and explain Planned Parenthood's important role in providing health care to patients under those programs.

14.    Millions of Americans rely on publicly funded programs, such as Medicaid, for all or a portion of their health care needs. Medicaid is a joint federal and state program that, together with the Children's Health Insurance Program ("CHIP"), provides health coverage to over 78

million Americans, including children, pregnant women, parents, seniors, and individuals with disabilities.[1]  Medicaid is the single largest source of health coverage in the United States.[2]

15.     States are not required to participate in the Medicaid program, but all states and the District of Columbia currently participate.[3]  The federal share of Medicaid funding varies from state to state, but in every state, the majority of funding for the program is provided by the federal government.

16.     Medicaid was initially enacted as a safety-net health coverage program for individuals with low incomes, with a particular emphasis on dependent children and their mothers, individuals with disabilities, and the elderly.[4]  When a state chooses to participate in the Medicaid program, federal law requires states to cover certain groups of individuals.  Low-income families, qualified children and pregnant women, and individuals receiving Supplemental Security Income are examples of mandatory eligibility groups.[5]

17.     The Affordable Care Act of 2010 created the opportunity for states to expand Medicaid to cover nearly all low-income Americans under age 65.  In particular, states have the

---

[1]     *Eligibility Policy*, https://www.medicaid.gov/medicaid/eligibility-policy (last visited July 1, 2025).

[2]     *Id.*

[3]     Alison Mitchell et al., Cong. Rsch. Serv., R43357, Medicaid: An Overview (2025), https://www.congress.gov/crs-product/R43357.

[4]     *Program History and Prior Initiatives*, Medicaid, https://www.medicaid.gov/about-us/program-history (last visited July 3, 2025); *Why did they do it that way? Eligibility policy*, National Association of Medicaid Directors, (Nov. 13, 2023), https://medicaiddirectors.org/resource/why-did-they-do-it-that-way-eligibility-policy (last visited July 3, 2025).

[5]     *See List of Medicaid Eligibility Groups, Mandatory Categorically Needy*, Medicaid, https://www.medicaid.gov/medicaid/eligibility/downloads/list-of-eligibility-groups.pdf (last visited July 1, 2025).

DECLARATION OF CLAIRE D. BRINDIS

option to extend eligibility to adults with incomes at or below 133% of the federal poverty level.[6]

Forty-one states, including Massachusetts, Ohio, and Maryland, as well as the District of

Columbia, chose to expand coverage to adults.[7]  Ten states have not done so.[8]  Nearly 40% of

adult women of reproductive age who are enrolled in Medicaid are covered through the expansion

pathway.[9]

18.    Medicaid is an entitlement program; if a patient is entitled to receive benefits under

the program's criteria, then the patient may enroll and receive health care services from Medicaid

providers.

19.    As relevant to this case, Medicaid reimburses health care providers for covered

services that they have delivered to eligible patients.  Many health care providers do not participate

in Medicaid because reimbursement rates are often considered low and thus less financially

viable.[10]  States have the option to require cost-sharing (such as deductibles and copays) from

beneficiaries, but those cost-sharing requirements are generally nominal, and under federal law

they cannot be imposed for family planning services.[11]

---

[6]    Eligibility Policy, *supra* note 1.

[7]    *Status of State Action on the Medicaid Expansion Decisions*, Kaiser Family Foundation
(May 9, 2025), https://www.kff.org/status-of-state-medicaid-expansion-decisions/.

[8]    *Id.*

[9]    *5 Key Facts About Medicaid and Family Planning*, Kaiser Family Foundation (May 29,
2025), https://www.kff.org/medicaid/issue-brief/5-key-facts-about-medicaid-and-family-
planning/.

[10]    *See, e.g.*, *Evaluating the Effects of Medicaid Payment Changes on Access to Physician
Services*, Medicaid and CHIP Payment and Access Commission, 1 (Jan. 2025),
https://www.macpac.gov/wp-content/uploads/2025/01/Evaluating-the-Effects-of-Medicaid-
Payment-Changes-on-Access-to-Physician-Services.pdf.

[11]    *See* 42 CFR 447.56(a)(2)(ii) ("The agency may not impose cost sharing for … family
planning services and supplies.").

DECLARATION OF CLAIRE D. BRINDIS

20.     There are several types of providers, including Planned Parenthood Members, that use Medicaid and other sources of federal funding to provide health care services to safety-net patients.[12]   For example, community health centers ("CHCs") and federally qualified health centers ("FQHCs") provide health care services to low-income individuals in medically underserved or areas where there is a health professional shortage.[13]   Unlike Planned Parenthood, those providers usually do not specialize in family planning; rather, they may provide, among others, primary care, dental care, and/or mental health services.

**B.      Planned Parenthood Members' Crucial Public Health Role in Providing Publicly Funded Health Care**

21.     Planned Parenthood plays a central role in the national fabric of federally-funded health care providers.   In 2023, Planned Parenthood health centers served over two million patients, collectively delivering around 9.5 million services.[14]   In 2022, 53% of Planned

---

[12]     Title X is a federally-funded health care program dedicated to providing primarily low-income individuals with comprehensive family planning and related preventive health services. Unlike Medicaid reimbursement, Title X grantees receive finite grant awards.

[13]     For the purposes of this report, the majority of my opinions are focused on FQHCs, rather than public health clinics, hospital outpatient clinics, or other facilities where patients may seek health care services.   Though all these facilities are integral to the health care provider network, this report compares the services and impact of Planned Parenthood health centers with those of FQHCs based on available data and because these providers primarily serve similar populations of patients.

[14]     Planned Parenthood Federation of America, *A Force for Hope*, *Planned Parenthood Annual Report 2023-2024*, at 23 (2023-2024), https://www.plannedparenthood.org/uploads/filer_public/ec/6d/ec6da0d6-98e5-4278-8d11-99a5cba8e615/2024-ppfa-annualreport-c3-digital.pdf.

8

DECLARATION OF CLAIRE D. BRINDIS

Parenthood patients relied on Medicaid and other government-funded health care programs to pay for their care.[15]

1.    **Planned Parenthood Health Clinics Serve a Critical Mass of Patients Seeking Family Planning Services**

22.    Planned Parenthood health centers are critical both in terms of the types of services they provide and the population they serve.  The volume and breadth of Planned Parenthood health centers' provision of contraceptive services sets them apart from other safety-net providers. Among health care providers who accept Medicaid, Planned Parenthood Members serve contraceptive-seeking patients in numbers that are disproportionate to their collective size.[16]  The Guttmacher Institute, a sexual and reproductive health-focused research and policy organization, estimated that in 2020, Planned Parenthood health centers comprised just 6% of publicly funded clinics providing contraceptive services, but 33% (1.6 million) of all female contraceptive clients

---

[15]    It is my understanding that the other 47% of Planned Parenthood patients pay for care out of pocket or through private insurance based on Planned Parenthood's sliding fee scale.  *See Planned Parenthood patients rely on the Title X family planning program for health care*, Planned Parenthood Federation of America (Mar. 12, 2025), https://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-patients-rely-on-the-title-x-family-planning-program-for-health-care (last visited July 3, 2025); *see also Rightfully Ours*, Planned Parenthood Federation of America, https://www.plannedparenthoodaction.org/rightfully-ours/for-planned-parenthood#:~:text=In%202023%2C%20there%20were%20more,to%20pay%20for%20their%20care (last visited July 1, 2025).

[16]    The majority of Medicaid beneficiaries ages 15-49 who receive family planning services at a Planned Parenthood clinic received contraceptive and STI services.  *The Impact of Medicaid and Title X on Planned Parenthood*, Kaiser Family Foundation (updated April 30, 2025), https://www.kff.org/medicaid/issue-brief/the-impact-of-medicaid-and-title-x-on-planned-parenthood/.

DECLARATION OF CLAIRE D. BRINDIS

(4.7 million) who visited a publicly funded clinic visited a Planned Parenthood health center.[17] Moreover, according to a newly released health tracking poll, one in three women state that they have gone to a Planned Parenthood clinic for care, as well as one in ten men, and nearly half of Black women.[18]   In 2020, each Planned Parenthood clinic served on average 2,640 female contraceptive patients, compared with 330 female contraceptive patients served on average at an FQHC, 320 served at a health department, and 410 served at a hospital.[19]   In 2021, 11% of all female Medicaid beneficiaries ages 15-49 who received family planning services went to a Planned Parenthood health center.[20]   A study of publicly funded clinics providing family planning services found that in 2022-2023, 47% of Planned Parenthood health centers cared for at least 50 contraceptive patients each week, compared with only 6% of health department sites and 25% of FQHCs that serve the same volume of clients.[21]

---

[17]     In comparison, public health departments accounted for 20% of publicly funded clinics and served 13% of all contraceptive clients in 2020.  FQHCs administered 58% of clinics and served 38% of clients.  Hospital outpatient sites accounted for 7% of clinics and served 9% of clients.  Other independent clinics represented 9% of total clinics and served 7% of clients. Jennifer J. Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Use, 2020,* Guttmacher Inst., 8, App. Table 7 (May 2025), https: //www.guttmacher.org/report/publicly-supported-FP-services-US-2020; *see also Federally Qualified Health Centers Could Not Readily Replace Planned Parenthood*, Guttmacher Inst. (May 13, 2025) https://www.guttmacher.org/news-release/2025/federally-qualified-health-centers-could-not-readily-replace-planned-parenthood.

[18]     Brittni Frederiksen et al., *Major Federal and State Funding Cuts Facing Planned Parenthood*, Kaiser Family Foundation (May 15, 2025), https://www.kff.org/womens-health-policy/issue-brief/major-federal-and-state-funding-cuts-facing-planned-parenthood/.

[19]     *Federally Qualified Health Centers Could Not Readily Replace Planned Parenthood*, Guttmacher Inst. (May 13, 2025) https://www.guttmacher.org/news-release/2025/federally-qualified-health-centers-could-not-readily-replace-planned-parenthood.

[20]     *The Impact of Medicaid and Title X on Planned Parenthood*, *supra* note 16.

[21]     Alicia VandeVusse et al., *Publicly Supported Family Planning Clinics in 2022-2023: Trends in Service Delivery Practices and Protocols*, Guttmacher Inst., 13, App. Table 1 (2024), https://www.guttmacher.org/sites/default/files/report_pdf/publicly-supported-family-planning-clinics-2022-2023.pdf.

23.     Planned Parenthood Members are well regarded for providing high quality, culturally competent care, and patients often choose to seek care at Planned Parenthood health centers over other health care providers.[22]  Studies confirm that "Planned Parenthood clinics have shown a higher quality of care for family planning services compared with other provider types."[23] Planned Parenthood health centers are also more likely than all other types of publicly funded clinics to institute written counseling protocols for health screenings like intimate partner violence and substance abuse.[24]

24.     For example, a 2021 study of women seeking services at Planned Parenthood health centers found that nearly 60% of surveyed participants chose Planned Parenthood over other health care centers  because they "want[ed] to support [Planned Parenthood] health centers."[25]  Patients reported that Planned Parenthood clinics had increased appointment availability compared to other clinics, were easy to get to, and that staff understood their needs.  Notably, patients also frequently identified that they could get services at Planned Parenthood clinics in a confidential manner that they could not receive at other clinics.[26]

---

[22]     *See* Anna Newton-Levinson et al., *Influences on Women's Care Seeking at Planned Parenthood Health Centers in Two Southern States*, 31-5 Women's Health Issues 485 (2021), [doi: 10.1016/j.whi.2021.03.003].

[23]     Marion W. Carter et al., *Referral Practices Among U.S. Publicly Funded Health Centers that Offer Family Planning Services*, 27 Jour. Women's Health 994 (Aug. 2018), [doi: 10.1089/jwh.2017.6487].

[24]     Marion W. Carter et al., *Four Aspects of the Scope and Quality of Family Planning Services in US Publicly Funded Health Centers: Results from a Survey of Health Center Administrators*, 94 Contraception 340, 342-343, Table 4 (2016), [doi: 10.1016/j.contraception.2016.04.009].

[25]     Newton-Levinson et al., *supra* note 22, at 489.

[26]     *Id.* at 490.

DECLARATION OF CLAIRE D. BRINDIS

25.     Relative to FQHCs, Planned Parenthood health centers are also likely to have staff trained to address the special needs of certain groups of clients.[27]  Specifically, Planned Parenthood health centers had training to work with adolescents (91% of Planned Parenthood facilities to 72% of FQHCs); lesbian or gay individuals (83% to 46%); individuals experiencing intimate partner violence (81% to 68%); non-English-speaking individuals (82% to 65%); and men (77% to 59%).[28]  A provider's cultural competence is particularly important for underrepresented groups. For example, in a study of Latino adolescents, the authors expressed that optimal pregnancy-prevention programs caring for Latino youth should include the following: having culturally sensitive and nonjudgmental staff, being responsive to Latino subgroup differences, emphasizing education, and recognizing cultural values regarding gender roles.[29]

### 2.    Planned Parenthood Members Readily Provide A Full Range of Accepted Contraceptive Services

26.     Planned Parenthood health centers are often the only reproductive health care provider available to patients seeking publicly funded services.  Moreover, in 238 of the 415 counties where Planned Parenthood health centers were located in 2015, Planned Parenthood health centers served at least half of the women obtaining publicly supported contraceptive

---

[27]     Jennifer J. Frost et al., *Variation in Service Delivery Practices Among Clinics Providing Publicly Funded Family Planning Services in 2010*, Guttmacher Inst., 12 (2012), https://www.guttmacher.org/sites/default/files/report_pdf/clinic-survey-2010.pdf.  Although this study is from 2012, it is my opinion that the findings from this study, as well as others cited in this report, reflect current program information about family planning clinics and the services they provide.

[28]     *Id.* at 22, 38, Table 9.

[29]     Anne K. Driscoll et al., *In Their Own Words: Pregnancy Prevention Needs of Latino Teen Mothers*, 1 Cal. Journal of Health Promotion 118, 120 (2003).

services from a safety-net health center.[30]  In 38 of the 415 counties where Planned Parenthood health centers were located in 2015, Planned Parenthood was the only safety-net family planning center in that county.[31]  As of 2017, almost two-thirds (64%) of the 20 million women in need of publicly funded contraceptive care lived in counties with a Planned Parenthood health center.[32] Moreover, 24% of those women lived in counties where a Planned Parenthood Member serves the majority of those obtaining publicly supported contraceptive care from safety-net providers.[33]

27.    In addition to providing contraceptive care to a large number of patients, Planned Parenthood Members provide a broader range of contraceptive methods relative to other providers.[34]  Planned Parenthood clinics are much more likely than other publicly funded clinics providing family planning services to have met the CDC's objective to provide the full range of U.S. Food and Drug Administration ("FDA")-approved methods of contraception (94% of Planned

---

[30]    Kinsey Hasstedt, *Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net*, 20 Guttmacher Pol'y Rev. 12, 14 (2017), https://www.guttmacher.org/sites/default/files/article_files/gpr2001216.pdf.

[31]    *Id.*

[32]    Memorandum from Jennifer J. Frost & Mia R. Zolna, Guttmacher Institute, to Senator Patty Murray, Ranking Member, Senate Health, Education, Labor and Pensions Committee, May 3, 2017, at 3, https://www.guttmacher.org/sites/default/files/article_files/guttmacher-murray-memo-2017.pdf.  "Women in need of publicly funded contraceptive care" are defined as "[t]hose women who a) are younger than 20 or are poor or low-income (i.e., have a family income less than 250% of the federal poverty level) and b) are sexually active and able to become pregnant but do not want to become pregnant."  *Id.* at 8.

[33]    *Id.* at 3.

[34]    *See, e.g.*, Carter et al., *supra* note 24, at 342; VandeVusse et al., *supra* note 21, at 10 ("Planned Parenthood facilities continue to exhibit the widest selection of contraceptive methods.").

DECLARATION OF CLAIRE D. BRINDIS

Parenthood clinics vs. 52-77% of other types of clinics),[35] which is important so that people can have greater alternatives in choosing their preferred methods, avoid unintended pregnancies, and more effectively plan the timing of their pregnancies to maximize birth outcomes.  Providing the full range of contraceptive options is also recommended by the American College of Obstetricians and Gynecologists ("ACOG"), the nation's leading organization of obstetricians and gynecologists.[36]  In 2022-2023, 90% of Planned Parenthood centers provided at least 10 reversible contraceptive methods on-site, compared with 64-84% of other publicly funded clinics providing family planning services.[37]

28.    Notably, Planned Parenthood health centers lead the way in providing intrauterine devices ("IUD"s) and contraceptive implants, both referred to as long-acting reversible contraception ("LARC") methods, to patients.  LARCs are widely recognized as the most medically effective and cost-effective forms of contraception,[38] and ACOG has accordingly

---

[35]    VandeVusse et al., *supra* note 21, at 14, App. Table 2; *see also* Healthy People 2030, *Family Planning*, *Overview and Objectives*, Office of Disease Prevention and Health Promotion, https://odphp.health.gov/healthypeople/objectives-and-data/browse-objectives/family-planning (last visited June 2, 2025).

[36]    ACOG, Committee Opinion No. 615, *Access to Contraception*, 3 (Jan. 2015, reaffirmed 2022), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2015/01/access-to-contraception ("All FDA-approved contraceptive methods should be available to all insured women without cost sharing….").

[37]    VandeVusse et al., *supra* note 21, at 14, App. Table 2.

[38]    ACOG, Committee Opinion No. 186, *Long-Acting Reversible Contraception Implants and Intrauterine Devices* (Nov. 2017, reaffirmed 2024), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2017/11/long-acting-reversible-contraception-implants-and-intrauterine-devices (characterizing implants and IUDs as among the most effective methods of contraception); James Trussell et al., *Cost Effectiveness of Contraceptives in the United States*, 79 Contraception 5, 13 (2009); Paul D. Blumenthal et al., *Strategies to Prevent Unintended Pregnancy: Increasing Use of Long-Acting Reversible Contraception*, 17 Human Reproduction Update 121, 131 (2011).

DECLARATION OF CLAIRE D. BRINDIS

recommended that clinicians encourage appropriate candidates to consider LARCs.[39]  As of 2022-2023, Planned Parenthood health centers are more likely than other publicly funded health centers providing family planning services, including FQHCs, to offer a patient a LARC method (99% of Planned Parenthood clinics versus 64-84% of other types of clinics).[40]

29.     Planned Parenthood health centers are also more likely than other publicly funded clinics providing family planning services to offer same-day LARC insertion,[41] a practice also recommended by ACOG.[42]  Same-day LARC insertion is widely viewed as an essential component of effective family planning, because it eliminates the time and cost associated with follow-up visits and the risk that patients will be unable to return at a later time or will become pregnant in the interim.[43]  Planned Parenthood's role in providing such effective methods of contraception is essential in helping to reduce the number of unintended and mistimed pregnancies.

30.     Planned Parenthood health centers also stand out for their emergency contraception offerings.  They are more likely than other types of publicly funded family planning providers to

---

[39]     *Id.*

[40]     VandeVusse et al., *supra* note 21, at 14.

[41]     *Id.* at 7, 15, App. Table 3.

[42]     ACOG, Committee Opinion No. 615, *supra* note 36, at 4 ("Another common practice is requiring one medical appointment to discuss initiation of a LARC method and a second for placement of the device … Clinicians are encouraged to initiate and place LARC in a single visit as long as pregnancy may be reasonably excluded").

[43]     M. Antonia Biggs et al., *California Family Planning Health Care Providers' Challenges to Same-Day Long-Acting Reversible Contraception Provision*, 126 Obstetrics & Gynecology 338, 338 (2015) ("Same-day insertion protocols lessen patient burden, costs associated with additional visits, and the risk of experiencing an unintended pregnancy between the initial and subsequent visit."); *Bridging the Divide: Current Research and Policy on Long-Acting Reversible Contraception (LARC): Key Points for Policymakers*, Jacobs Institute of Women's Health, 8 (2016), https://jiwh.publichealth.gwu.edu/sites/g/files/zaxdzs6301/files/2023-09/larc_key_points.pdf (some women who would like to use a LARC method may not be able to return for a return visit for insertion).

offer emergency contraceptive pills (100% compared to 68-93% among other publicly funded clinics).[44] They are also more likely to dispense or prescribe oral emergency contraceptives ahead of time, so they are readily available to patients when needed without travel or wait times.[45] Planned Parenthood facilities are also more likely than others to offer copper IUDs as a method of emergency contraception.[46]

31.     In addition to providing a broader range of contraceptive methods, according to a 2015 study, Planned Parenthood health centers were more likely than all other types of publicly funded clinics to implement contraceptive counseling protocols, which help patients maximize their ability to use their method of contraception effectively.[47] In 2022-2023, Planned Parenthood health centers were also more likely than all other provider types to offer at least a twelve-month pill supply when providing oral contraceptives, which prevents patients from having inadequate

---

[44]     VandeVusse et al., *supra* note 21, at 14, Table 2.

[45]     *Id.* at 7 ("Planned Parenthood facilities were most likely to carry out this advanced provision of emergency contraception (81%), while FQHCs were the least likely (28%)"); *see also* ACOG, Frequently Asked Questions No. 114, Emergency Contraception (last updated April 2025), https://www.acog.org/womens-health/faqs/emergency-contraception (individuals can get emergency contraceptive pills ahead of time so they are available if needed).

[46]     VandeVusse et al., *supra* note 21, at 14, App. Table 2; ACOG, Frequently Asked Questions No. 114, *supra* note 45 (copper IUD is most effective form of emergency contraception).

[47]     *See, e.g.*, Carter et al., *supra* note 24, at 342-43, Table 2.

DECLARATION OF CLAIRE D. BRINDIS

protection if they are unable to return for additional supplies.[48]   Nearly all (98%) Planned

Parenthood health centers used the quick-start protocol for oral contraceptives,[49] compared with

50-76% for all other clinic types.[50]   Nearly all (98%) Planned Parenthood health centers dispense

oral contraceptives without a pelvic exam,[51] which historically was a precondition for potential

contraceptive patients, but are now considered by broad medical consensus to be unnecessary in

most cases.[52]   That figure compares favorably with 54-79% for all other clinic types.[53]   This is

important because the requirement of a pelvic exam, which involves instruments being placed in

---

[48]    VandeVusse et al., *supra* note 21, at 15, Table 3; ACOG, Committee Opinion No. 788, *Over-the-Counter Access to Hormonal Contraception* (2012, reaffirmed 2025), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2019/10/over-the-counter-access-to-hormonal-contraception ("Access to multiple OCP packs at one time … results in higher rates of continuation."); Diana Greene Foster et al., *Number of Oral Contraceptive Pill Packages Dispensed and Subsequent Unintended Pregnancies*, 117 Obstetrics & Gynecology 566, 569 (2011) ("Dispensing a 1-year supply [of oral contraceptives, as opposed to a 1-month or 3-month supply] is associated with a 30% reduction in the odds of conceiving a pregnancy in the subsequent year and a 46% reduction in the odds of an abortion….").

[49]    The quick-start protocol, *i.e.*, starting contraceptive use on the day of an office visit, improves initial continuation rates for use of oral contraceptives. *U.S. Selected Practice Recommendations for Contraceptive Use, 2013*, CDC, 62 Morbidity & Mortality Wkly. Rep., 23 (2013), https://www.cdc.gov/mmwr/pdf/rr/rr62e0614.pdf.

[50]    VandeVusse et al., *supra* note 21, at 15, App. Table 3.

[51]    *Id.*

[52]    Loretta Gavin et al., *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 63 Morbidity & Mortality Wkly. Rep., No. 4, 11 (2014), https://www.cdc.gov/mmwr/pdf/rr/rr6304.pdf. Pelvic exams can cause fear and discomfort and are "not needed routinely to provide contraception safely to a healthy client."; *see also* ACOG, Committee Opinion No. 615, *supra* note 36, at 4 ("There is no medical or safety benefit to requiring routine pelvic examination or cervical cytology before initiating hormonal contraception. The prospect of such an examination may deter a woman, especially an adolescent, from having a clinical visit that could facilitate her use of a more effective contraceptive method than those available over the counter.").

[53]    VandeVusse et al., *supra* note 21, at 15, App. Table 3. In general, family planning-focused providers, like Planned Parenthood, are more likely than primary care/multi-specialty providers, like most FQHCs, to not misinform clients that pelvic exams or STI tests were necessary prior to contraceptive initiation.

DECLARATION OF CLAIRE D. BRINDIS

the vagina, can be a significant deterrent for some patients to seek care, especially those who are victims of sexual assault.

32.    Planned Parenthood health clinic's broad range of available contraceptive methods, coupled with its client-centered counseling and advising, provide patients with the flexibility to determine the preferred, client-centered family planning care treatment for their lifestyles.

### 3.    Planned Parenthood Health Centers Readily Provide STI Testing and Treatment

33.    In addition to the provision of contraceptives, Planned Parenthood health centers play an important public health role in screening for human immunodeficiency virus ("HIV") and other STIs.   In 2023, Planned Parenthood health centers provided 5,132,330 STI tests and treatments, among which included 769,851 HIV tests.[54]   Planned Parenthood health centers are more likely to provide pre-exposure prophylaxis ("PrEP"), a medication taken by HIV-negative individuals to significantly reduce the risk of acquiring HIV.[55]  97% of Planned Parenthood health centers offer PrEP for patients, compared to only 33% of health departments and 69% of FQHCs.[56] In providing these tests and treatments, according to a 2012 study, Planned Parenthood health centers were more likely to use rapid-result testing for HIV (tests that provide results more quickly than other forms of testing) than other publicly funded family planning clinics, such as FQHCs, public health departments, and hospital outpatient clinics, enabling patients to begin treatment more quickly.[57]   And, the experience by Planned Parenthood health clinics in promoting and

---

[54]    Planned Parenthood Federation of America, *A Force for Hope: Planned Parenthood Annual Report 2023-2024*, *supra* note 14, at 23.

[55]    VandeVusse et al., *supra* note 21, at 8, 16, Table 4.

[56]    *Id.*

[57]    Frost et al., *Variation in Service Delivery Practices Among Clinics Providing Publicly Funded Family Planning Services in 2010*, *supra* note 27, at 12.

DECLARATION OF CLAIRE D. BRINDIS

delivering PrEP has provided valuable insight to increasing access to and culturally competent communications about PrEP.[58]

### 4. Planned Parenthood Members Provide Accessible Services for Adolescents

34. Adolescents and young adults are populations that often have difficulty obtaining family planning services, and Planned Parenthood health centers offer high quality care to the substantial number of adolescents and young adults they serve.[59] For example, in 2015, 97% of Planned Parenthood health centers provided LARCs to adolescent patients, compared to 57-76% of other types of publicly funded family planning providers.[60] One study found that certain facility practices that are targeted to teens and young adults, such as more flexible hours, teen-friendly decor, online scheduling, and social media usage, were more prevalent at Planned Parenthood health centers than other providers.[61] In addition, researchers suggest that Planned Parenthood's name recognition may avoid some of the lack-of-knowledge barriers that prevent adolescents from

---

[58] Brittany Wilbourn et al., *Preexposure Prophylaxis Implementation in a Reproductive Health Setting: Perspectives From Planned Parenthood Providers and Leaders*, 24 Health Promotion Practice 764 (2022) [doi:10.1177/15248399221086616].

[59] Katherine H. Mead et al., *The Role of Federally Qualified Health Centers in Delivering Family Planning Services to Adolescents*, 57 J. Adolescent Health 87, 87-88 (2015) (summarizing reasons why adolescents have difficulty obtaining adequate family planning care); Megan L. Kavanaugh et al., *Meeting the Contraceptive Needs of Teens and Young Adults: Youth-Friendly and Long-Acting Reversible Contraceptive Services in U.S. Family Planning Facilities*, 52 J. Adolescent Health 284, 286 (2013).

[60] Mia R. Zolna & Jennifer Frost, *Publicly Funded Family Planning Clinics in 2015: Patterns and Trends in Service Delivery Practices and Protocol*, Guttmacher Inst., 22, fn. 19 (Nov. 2016), https://www.guttmacher.org/sites/default/files/report_pdf/publicly-funded-family-planning-clinic-survey-2015_1.pdf (last visited July 3, 2025).

[61] Kavanaugh et al., *supra* note 59, at 286. In 2022-2023, Planned Parenthood health centers were more likely than other publicly funded family planning clinics to offer extended (evening and/or weekend) clinic hours (70% compared to 3-53%). VandeVusse et al., *supra* note 21, at 13, App. Table 1.

DECLARATION OF CLAIRE D. BRINDIS

obtaining care at other publicly funded providers.[62]  One study found that a young woman's likelihood of becoming a mother and dropping out of high school decreased with a local presence of a Planned Parenthood health center.[63]

## II.    OTHER PUBLICLY FUNDED HEALTH CLINICS WILL NOT FILL THE GAP LEFT BY PLANNED PARENTHOOD MEMBERS' EXCLUSION FROM MEDICAID

35.    By excluding Planned Parenthood Members from federal Medicaid funding upon enactment, Section 71113 creates an immediate health care crisis for over a million patients, and will place enormous strain on other publicly funded health care providers.[64]  The loss of Medicaid funding could force over a million family planning patients who previously received care at Planned Parenthood health centers to seek care at alternative sites such as FQHCs.  But, although FQHCs are a large and important part of the nation's primary health care safety-net, they will not be able to meet the need of providing care to Planned Parenthood Members' Medicaid patients

---

[62]    Mead et al., *supra* note 59, at 87, 92.

[63]    Katherine Hicks-Courant & Aaron Schwartz, *Local Access to Family Planning Services and Female High School Dropout Rates*, 127 Obstetrics & Gynecology 699, 703 (2016), [doi: 10.1097/AOG.0000000000001344].  This study found that the abortion services provided at some Planned Parenthood clinics "did not drive the association between the clinics and reduced high school dropout rates."

[64]    Press Release, Guttmacher Institute, Federally Qualified Health Centers Could Not Readily Replace Planned Parenthood (updated June 4, 2025), https://www.guttmacher.org/news-release/2025/federally-qualified-health-centers-could-not-readily-replace-planned-parenthood; Sara Rosenbaum, *Planned Parenthood, Community Health Centers, And Women's Health: Getting the Facts Right*, Health Affairs (Sept. 2, 2015), http://healthaffairs.org/blog/2015/09/02/planned-parenthood-community-health-centers-and-womens-health-getting-the-facts-right.

DECLARATION OF CLAIRE D. BRINDIS

because Section 71113 does not provide a reasonable accommodation time for patients and clinics to make adjustments.[65]

36.    In my opinion, it is unrealistic to suggest that FQHCs (or any other alternative sites, such as public health clinics, hospitals, etc.) could possibly ramp up services quickly enough to fill the sudden gap left by disqualifying Planned Parenthood Members from federal Medicaid reimbursement.

37.    There are at least four critical flaws with the assumption that family planning services can be transferred from Planned Parenthood health centers to FQHCs or other publicly funded health care providers without any significant loss of care.

38.    The four critical flaws are:  (1) it would take substantial additional time for FQHCs to hire staff and make other changes needed to meet the needs of over a million new family planning patients; (2) FQHCs may not be located near Planned Parenthood health centers, so they may not be accessible to large numbers of patients displaced from Planned Parenthood; (3) FQHCs do not offer the same range of reproductive services that Planned Parenthood health centers offer, so transferring patients may not be able to obtain the type of care they need, or else receive care from a provider with less expertise in the services sought; and (4) any additional funding (if any) would not help to compensate for the loss of Planned Parenthood services because it would take the federal administering agency months to even allocate new funds to FQHCs.

39.    The net result is that FQHCs could not realistically respond in a timely fashion to fill the gap left by the barring of Medicaid reimbursement to Planned Parenthood health centers.

---

[65]    Press Release, Guttmacher Institute, *supra* note 64; Sara Rosenbaum, *Can Community Health Centers Fill the Health Care Void Left by Defunding Planned Parenthood?*, Health Affairs (Jan. 27, 2017), http://healthaffairs.org/blog/2017/01/27/can-community-health-centers-fill-the-health-care-void-left-by-defunding-planned-parenthood.

DECLARATION OF CLAIRE D. BRINDIS

Over a million patients would likely experience a serious gap in access to family planning services, which could result in increases in unplanned pregnancies and births as well as other health problems, such as untreated STIs or cancers detected too late due to missed cancer screenings. For those patients who use Planned Parenthood Members as their primary health care providers, the denial of Medicaid reimbursement to Planned Parenthood Members may also lead to other health impacts.

### A.  FQHCs Would Require Substantial Time to Meet the Needs of Over a Million New Family Planning Patients

40.    *First*, to serve Planned Parenthood Members' existing Medicaid patients, FQHCs would have to immediately recruit and hire medical staff, as well as expand their space (e.g., exam rooms) and stock of supplies, such as intrauterine devices or oral contraceptives. As explained before, given that an average Planned Parenthood center serves 2,640 contraceptive patients per year while an average FQHC site serves 320,[66] an FQHC near a Planned Parenthood center that closed down would need to increase the number of contraceptive patients served by almost ten times in order to absorb those who can no longer go to Planned Parenthood because of Section 71113.

41.    Planned Parenthood Members' exclusion from Medicaid will likely result in patients who are motivated to protect against unintended pregnancies to seek contraceptive care from other providers. For example, FQHC sites offering contraceptive care would have to, virtually overnight, increase their capacity to provide these services by 56%—an additional one million contraceptive clients.[67] Public health department sites offering contraceptive care would

---

[66]    Press Release, Guttmacher Institute, *supra* note 64.

[67]    *Id.*

DECLARATION OF CLAIRE D. BRINDIS

have to increase their capacity to provide these services by 28%—an additional 168,000 contraceptive patients.[68]  Hospital sites offering contraceptive care would have to increase their capacity to provide these services by 53%—an additional 344,000 contraceptive patients.[69]  And other sites offering contraceptive care would have to increase their capacity to provide these services by 55%—an additional 189,000 contraceptive patients.[70]  Not included in these numbers are the likely increase in wait times, decreased access nearby clinics, and gaps in the services provided as a result of Planned Parenthood Members' absence.[71]

42.    But FQHCs already struggle to fill existing vacancies and frequently suffer staffing shortages owing to their locations in medically underserved areas.  By statute, FQHCs only operate in areas that are designated as medically underserved areas, even before Section 71113 went into effect, or as health professional shortage areas, so they typically struggle to hire trained health staff.  Almost all FQHCs (95%) have at least one clinical vacancy at any given time.[72]  More than two thirds (69%) have a vacancy for a family physician, half (50%) have a vacancy for a nurse practitioner, and have a 41% vacancy for a registered nurse.

43.    Furthermore, it can be particularly difficult and time-consuming for FQHCs to fill staff vacancies for reproductive health providers.  For example, the average time to fill an

---

[68]    *Id.*

[69]    *Id.*

[70]    *Id.*

[71]    *See infra* Section I.B.

[72]    *Staffing the Safety Net: Building the Primary Care Workforce at America's Health Centers*, National Association of Community Health Centers (March 2016), https://hcpsocal.org/wp-content/uploads/2014/05/NACHC_Workforce_Report_2016.pdf.

DECLARATION OF CLAIRE D. BRINDIS

obstetrician/gynecologist position at an FQHC is about 11 months.[73]  When FQHCs have challenges meeting their current staffing needs, it is inherently impracticable for them to rapidly meet new and sudden unanticipated needs to serve over a million patients who would be displaced from Planned Parenthood health centers (as well as other patients who might be affected if Planned Parenthood health centers must close or curtail services).

44.     This point is illustrated by a study in which researchers interviewed alternative providers, such as FQHCs, in the vicinity of five Texas Planned Parenthood clinics to learn if they had the capacity to take in patients that might lose Medicaid funding at Planned Parenthood clinics.[74]  The alternative sites generally reported they were already at or close to capacity and would not be able to serve large numbers of additional family planning patients.  For example, survey respondents noted that their nurse practitioners or physicians already had full caseloads, and a new patient might need to wait for months for an appointment.

45.     Similar findings were reported from a 2021 qualitative interview study that evaluated access to care after Planned Parenthood Members were excluded from the Texas

---

[73]     *Id*.  Rural family planning clinics are more likely to be understaffed and under resourced, compounding the crisis for rural FQHCs.  In 2016, 13% of community health centers reported a vacancy for an obstetrician-gynecologist, and between 2006-2008, only 0.6% to 1.4% of all recent US residency graduates went on to practice in rural health centers or FQHCs.  Anita Y. Cheng, *Community Health Center Engagement and Training During Obstetrics and Gynecology Residency*, 11 Jour. Graduate Medical Educ., 513 (Oct. 2019) [doi: 10.4300/JGME-D-19-00039.1]; *see also* Emma Pliskin et al., *Rural and Urban Women Have Differing Sexual and Reproductive Health Experiences*, Child Trends, (Sept. 15, 2022) https://www.childtrends.org/publications/rural-and-urban-women-have-differing-sexual-and-reproductive-health-experiences (last visited July 3, 2025).

[74]     Leighton C. Ku et al, *Deteriorating Access to Women's Health Services in Texas: Potential Effects of the Women's Health Program Affiliate Rule*, Geiger Gibson/RCHN Community Health Foundation Research Collaborative: Policy Research Brief No. 31 (2012), https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?article=1000&context=sphhs_policy_ggrchn.

DECLARATION OF CLAIRE D. BRINDIS

Medicaid program, discussed in more detail below.   The study found Planned Parenthood Medicaid patients experienced challenges accessing care elsewhere, finding other providers, and getting evidence-based care, leading to delayed or forgone care, and emotional distress.[75]

### B.    FQHCs May Not Be Practically Accessible To Large Numbers Of Patients Displaced From Planned Parenthood

46.    *Second*, even if FQHCs did have sufficient capacity, many current Planned Parenthood patients would still be unable to obtain care at those health centers.

47.    While FQHCs are an important part of this country's health care safety net, in 2020, only 56% of FQHC sites nationwide reported offering contraceptive care to at least 10 women per year—the threshold at which clinics are considered part of the network of safety-net contraceptive providers. FQHC sites each serve an average of 330 female contraceptive patients annually; health department sites serve 320 annually; centers operated by hospitals serve 640 annually; and centers operated by other types of agencies serve 410 annually.  By contrast, Planned Parenthood Member health centers each serve an average of 2,640 female contraceptive clients annually.[76]

48.    FQHCs and Planned Parenthood health centers are not always located in the same areas, and in many counties the patient population is heavily or even exclusively reliant on Planned Parenthood health centers for reproductive health care.  According to 2015 data, in 238 (57%) of the 415 counties with a Planned Parenthood health center, Planned Parenthood served at least half of all safety-net contraceptive patients.[77]  Approximately 4.8 million women—24% of all women

---

[75]    Anna Chatillon et al., *Access to care following Planned Parenthood's termination from Texas' Medicaid Network: A qualitative study*, 128 Contraception 110, 141 (2023), https://www.contraceptionjournal.org/article/S0010-7824(23)00235-4/fulltext.

[76]    Press Release, Guttmacher Institute, *supra* note 64.

[77]    Zolna & Frost, *supra* note 60, at 2.

DECLARATION OF CLAIRE D. BRINDIS

in need of publicly funded contraceptive care—live in those counties.[78]  In 203 counties, FQHCs would have to triple their contraceptive patient workloads in order to provide services for the patients currently being treated at Planned Parenthood health centers.[79]  As of 2017, in 54 counties with Planned Parenthood health centers, there were no FQHCs at all.[80]  And in 38 of these counties, Planned Parenthood health centers are the sole publicly funded source of reproductive health care services.[81]  Analysis by the Congressional Research Service from 2017 reached a similar conclusion: despite the large number of FQHC sites, there are a number of areas in which a Planned Parenthood health center exists, but there is no FQHC in the same county.[82]

49.    Thus, even Planned Parenthood Members' very large share of the aggregate provision of reproductive health services does not fully reflect how important Planned Parenthood health centers are to the communities that depend on them as Medicaid providers.  In many parts of the country, Planned Parenthood is not just the predominant or preferred provider of reproductive health services—it is the *only* publicly funded option available.  Patients in those and surrounding counties may have to travel more than 100 miles to obtain care at an alternative provider, and many of those patients will be unable or unwilling to do so, especially lower-income

---

[78]    *Id.* at 3.

[79]    *Id.* at 5.

[80]    *Id.*

[81]    *Id.*

[82]    Elayne J. Heisler and Victoria L. Elliott, Cong. Rsch. Serv., R44295, Factors Related to the Use of Planned Parenthood Affiliated Health Centers (PPAHCs) and Federally Qualified Health Centers (FQHCs), 25, Table 6 (May 18, 2017).

DECLARATION OF CLAIRE D. BRINDIS

patients who are likely to have difficulty in finding transportation and meeting child-care and work responsibilities.[83]

### C.    FQHCs Do Not Offer The Same Range Of Reproductive Services That Planned Parenthood Centers Offer

50.    *Third*, Planned Parenthood health centers and FQHCs are not substitutes for one another in terms of the services they offer.  Under Section 330 of the Public Health Service Act, FQHCs must provide comprehensive primary care services to all patients.  Thus, their limited resources must be directed not just to reproductive care, but to all other primary care and preventive needs, including pediatric and geriatric services, mental health, and other services.  In 2022-2023, 100% of Planned Parenthood health centers had a primary focus on reproductive health, compared with 8% of FQHCs.[84]  Unsurprisingly, then, women of reproductive age are only about a quarter (26%) of all FQHC patients, whereas they represent more than 85% of all Planned Parenthood patients.

51.    Research has shown that patients prefer to receive care at specialized clinics, like Planned Parenthood health centers, because such clinics can offer better or faster services such as having oral contraceptives available on site or have same day IUD insertion available.[85]  Shifting

---

[83]    For example, a 2021 study found that increased driving time required for treatment led to an increased likelihood of cost-related healthcare avoidance, reduced likelihood of ever having had a clinical breast examination, and past-year mammogram receipt among female Ohio residents following restrictions on public funding led to clinical closures.  Jacqueline Ellison et al., *The Impact of Driving Time to Family Planning Facilities on Preventive Service Use in Ohio*, 60 Am J. Prev. Med. 4 (2021).

[84]    VandeVusse et al., *supra* note 21, at 13, App. Table 1.

[85]    Jennifer J. Frost et al., *Specialized Family Planning Clinics in the United States: Why Women Choose Them and Their Role in Meeting Women's Health Care Needs*, 22 Women's Health Issues 519 (2012).

DECLARATION OF CLAIRE D. BRINDIS

to other facilities means that patients may not receive the full range and quality of family planning services that they have come to expect at Planned Parenthood health centers.

52.    Research by Guttmacher Institute shows the limitations of FQHCs in this area.[86] As of 2023, only 52% of FQHCs offered the full range of reversible contraceptive services, compared with 94% of Planned Parenthood clinics.[87]  In addition, while almost every Planned Parenthood health center offers same day IUD insertion and oral contraceptive pills, only 38% of FQHCs offer same day IUD insertion, and about 50% of FQHCs offer same day oral contraceptive pills.[88]

### D.    It Would Take The Federal Administering Agency Months To Allocate New Funds To FQHCs

53.    *Fourth*, Section 71113 does not explain how any additional FQHC funding is to be allocated, and there are significant logistical difficulties in ensuring that the funding is correctly allocated to clinics where there is additional need stemming from the disruption of services at Planned Parenthood health centers.  It would not make sense for HRSA, the federal funding agency, to simply increase funding to all FQHCs—most are not in the service areas of Planned Parenthood health centers.  Moreover, as discussed above, they are unlikely to be operationally equipped to handle a rapid expansion even if they had additional funding.

54.    It is my understanding that the additional funds for FQHCs must be allocated through a grant funding system.  In practical terms, this means that HRSA would need to draft and issue a funding notice, receive grant applications from FQHCs, evaluate the applications to decide

---

[86]    *See* VandeVusse et al., *supra* note 21.

[87]    *Id.* at 14, App. Table 2.

[88]    *Id.* at 15, App. Table 3.

DECLARATION OF CLAIRE D. BRINDIS

which applications to fund, and then release the funds.  Here, there is an additional challenge: If the reallocated funds are targeted to provide care to displaced Planned Parenthood patients to buttress the public health impact, then funds ought to be allocated to FQHCs that are close in location to Planned Parenthood health centers, which would require more specialized and time-consuming funding notices and applications.

55.    To illustrate the time needed, on May 30, 2024, HRSA released a funding opportunity notice (HRSA-25-085) soliciting applications to support new FQHC service sites for the following fiscal year, beginning on June 1, 2025.[89]  There is a significant gap between the announcement of funding availability and the date when funds became available.

56.    Following passage of the 2025 Act, FQHCs will likely receive no further federal funds to help them provide service to the over a million patients who would no longer be able to receive those services at Planned Parenthood health centers.

57.    In light of these four factors, the overall effect of Section 71113 will likely leave many patients with significantly reduced access to reproductive health care.[90]

58.    Moreover, although I have thus far focused on the patients receiving services at Planned Parenthood health centers, Section 71113 will also have devastating effects on the low-income patients that currently receive their care at FQHCs.  FQHCs are already stretched to capacity.  As noted above, an average FQHC patient typically waits nine days for a general medical

---

[89]    U.S. Dep't of Health and Human Services, HRSA, *Notice of Funding Opportunity: New Access Points*, No. HRSA-25-085 (May 30, 2024), https://apply07.grants.gov/apply/opportunities/instructions/PKG00286780-instructions.pdf.

[90]    Even if these patients were to identify viable alternatives to seeking care in FQHCs, they would likely encounter many of the same challenges as described above.  It would be important to conduct studies to better document the full impact of Section 71113.

29

DECLARATION OF CLAIRE D. BRINDIS

appointment at FQHCs.[91]  Because of the difficulty in expanding capacity rapidly, I expect that the typical appointment delay at FQHCs for a family planning patient in areas affected by the loss of Planned Parenthood health centers could exceed one month.  Many patients would be discouraged by such a long delay and go without contraception, increasing the risk of an unplanned pregnancy or untreated sexually transmitted infection.[92]

59.    The delays would affect not only new family planning patients—those previously served by Planned Parenthood—but also those already receiving a range of care provided at FQHCs.  If there is a sudden surge in the number of appointments at an FQHC, the FQHC will typically attempt to serve all patients in an equivalent fashion.  If FQHCs are to serve new patients with the same level of staff and resources they had before, then all patients, whether new or established, will have to wait longer for appointments.  This can create delays not only in people getting family planning services, but also in delays for other medical care too, such as care for diabetes or heart disease, further burdening health care infrastructure for patients with low incomes.

---

[91]    Brendan Saloner et al., *The Availability of New Patient Appointments for Primary Care at Federally Qualified Health Centers: Findings From an Audit Study*, The Urban Institute Health Policy Center (April 7, 2014), https://www.urban.org/sites/default/files/publication/22496/413088-The-Availability-of-New-Patient-Appointments-for-Primary-Care-at-Federally-Qualified-Health-Centers-Findings-From-an-Audit-Study.PDF.

[92]    Brooke Whitfield et al., *Timely Access to Contraception at Medicaid Providers Following the Exclusion of Planned Parenthood from Texas' Medicaid Program*, Univ. of Tex. at Austin, Tex. Policy Eval. Proj., at 3 (Jan. 2022) https://sites.utexas.edu/txpep/files/2022/01/TxPEP-research-brief-Planned-Parenthood-Medicaid.pdf.

III.    **BARRING PLANNED PARENTHOOD FROM FEDERAL MEDICAID REIMBURSEMENTS WILL LEAD TO ADVERSE PUBLIC HEALTH OUTCOMES**

60.    In my opinion, the overall effect of Section 71113 will thus be to reduce access to high quality health care, particularly for low-income Americans, and to increase the strain on publicly funded providers at the precise moment they are expected to serve an influx of new patients who can no longer receive services from Planned Parenthood Members.

61.    Already, publicly funded providers struggle to meet the demand for contraceptive services and supplies.  A study conducted in 2020 found that publicly supported family health care providers served only 39% of all women who likely needed support for contraceptive services.[93] In other words, only 7 million out of 19 million women who likely needed public support received these vital health care services.[94]

62.    If patients lose access to the health care services or are delayed in accessing care that they currently obtain at Planned Parenthood facilities, the public health consequences will be numerous and severe.  These adverse consequences are likely to include, among others, more unintended and therefore riskier pregnancies, potentially resulting in health problems for the women, as well as their infants and children.  STIs will also go undetected or be detected later, leading to higher rates of STIs and more severe consequences for patients experiencing these diseases, such as pelvic inflammatory diseases ("PID") and future infertility.  Those adverse consequences are likely to be felt most intensely by historically underserved populations; as studies have shown, people of color in the United States are disproportionately unable to gain access to

---

[93]    Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Use, 2020*, *supra* note 17, at Figure 5.

[94]    *Id.*

DECLARATION OF CLAIRE D. BRINDIS

and benefit from high-quality health care.[95]  This crisis will be further compounded by other steps the federal government is taking to deprive Planned Parenthood Members of other funding streams, such as withholding Title X funds and restrictions on funds for sex education programs that Planned Parenthood Members provide in community settings.

### A.    The Number of Unintended Pregnancies and the Rate of Related Adverse Health Outcomes and Costs Will Likely Increase

63.    Reduced access to Planned Parenthood health centers will lead to reduced access to contraceptives and, in particular, to the most effective forms of contraceptives, which will in turn lead to an increased number of unintended or mistimed pregnancies.  Unintended pregnancies are themselves an undesirable health outcome, and unintended or mistimed pregnancies also may lead to other adverse health outcomes for both mother and child.  When the number of unintended pregnancies rises, the number of abortions also rises.  Finally, when the costs of unintended pregnancies are borne by taxpayer-funded systems, those costs far outstrip the costs of providing contraceptive services.

### 1.    The Number of Unintended Pregnancies Will Likely Increase

64.    Patients who lose access to contraceptive services at Planned Parenthood health centers are likely to use less effective forms of birth control.  In a study encompassing a variety of clinic types, including Planned Parenthood clinics, participating in California's publicly funded family planning program (Family PACT), individuals were asked what they would do if they had

---

[95]    *See generally Healthy People 2020: An Opportunity to Address Societal Determinants of Health in the U.S.*, Secretary's Advisory Committee on National Health Promotion and Disease Prevention Objectives for 2020 (July 26, 2010), https://health.gov/sites/default/files/2021-11/Committee%27s%20Report%20on%20Healthy%20People%202020-%20An%20Opportunity%20to%20Address%20Societal%20Determinants%20of%20Health.pdf.

DECLARATION OF CLAIRE D. BRINDIS

to pay for their family planning services.[96]   Responses indicated that patients would use less effective means of contraception.   Specifically, patients reported that their use of low-efficacy methods, such as condoms, would nearly double (from 25% to 46%).[97]  Patients' projected use of medium-efficacy methods, such as contraceptive injections, oral contraceptives (OCs), patch, and ring, would decrease from 63% to 44%.[98]  Patients' use of high-efficacy methods, such as IUDs, contraceptive implants, and sterilization, would decrease from 11% to 7%.[99]  Use of no method would increase from 2% to 3%.[100]

65.    The decrease in the use of high-efficacy contraception methods and the increase in use of low-efficacy methods will result in more unintended and mistimed pregnancies.   High-efficacy methods have failure rates of less than 1%, meaning that fewer than 1% of women using these methods will experience an unintended pregnancy within the first year of use.[101]   Medium-efficacy methods have failure rates of 4-7%, because some patients miss or delay injection or

---

[96]     M. Antonia Biggs et al., *Findings from the 2012 Family PACT Client Exit Interviews*, Bixby Center for Global Reproductive Health, 54 (June 2014).

[97]     *Id.* at 53.  Low-efficacy methods include condoms, diaphragms, and other barrier methods; natural family planning; abstention; and emergency contraception.  *Id.* at 34.

[98]     *Id.* at 34, 53.

[99]     *Id.*

[100]     *Id.* at 34, 54.

[101]     *Contraception and Birth Control Methods*, CDC (Aug. 6, 2024), https://www.cdc.gov/contraception/about/index.html.

DECLARATION OF CLAIRE D. BRINDIS

ingestion of the pill.[102]  Failure rates for low-efficacy methods, including male condoms, are 13%

and higher.[103]  Using no method of contraception has a failure rate of 85%.[104]

66.    In 2015, Planned Parenthood Members' provision of contraceptive services averted

430,000 unintended pregnancies.[105]  Section 71113, by decreasing access to Planned Parenthood

Members' extensive family planning services, which include offering highly effective LARCs at

higher rates than other providers, will likely increase the number of unintended and mistimed

pregnancies.

### 2.    Unintended Pregnancies Will Have Adverse Health Impacts on Mothers and Children

67.    There are several risks to infants and mothers that occur more frequently with

unintended pregnancies than with planned pregnancies.  In some instances, preexisting health

conditions, such as having recently given birth or diabetes, make it important for a person to be

---

[102]    *Id.*

[103]    *Id.*; *see also* ACOG, Committee Opinion No. 642, *Increasing Access to Contraceptive Implants and Intrauterine Devices to Reduce Unintended Pregnancy*, at 2 (October 2015), https://journals.lww.com/greenjournal/abstract/2015/10000/committee_opinion_no__642__incre asing_access_to.52.aspx.

[104]    James Trussell, *Contraceptive Failure in the United States*, 83 Contraception 397, 398 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3638209/pdf/nihms458000.pdf.

[105]    *Unintended Pregnancies and Abortions Averted by Planned Parenthood*, Guttmacher Inst. (June 13, 2017), https://www.guttmacher.org/infographic/2017/unintended-pregnancies-and-abortions-averted-planned-parenthood-2015; *see also* M. Antonia Biggs et al., *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, Bixby Center for Global Reproductive Health, 16, 17, Fig. 1 (2010), https://www.ansirh.org/sites/default/files/ publications/files/familypactcost-benefitanalysis2007_2010apr_featured.pdf (in California, across all publicly funded contraceptive providers—including Planned Parenthood—it was estimated that, for every seven women who received publicly funded contraceptive services, two pregnancies were averted.  There, in one year, it was estimated that provision of contraceptive services to 998,084 clients averted 286,700unintended pregnancies.).

able to delay becoming pregnant.[106]  If a person with these conditions fails to delay becoming

pregnant until the conditions are properly managed, there is a risk of a range of adverse health

impacts, including pregnancy loss, still-births, pre-term births, infant size that is either too small

or too large relative to gestational age, birth defects, and increased risk of hypoglycemia (low

blood sugar) or respiratory distress for the baby.[107]

68.    The effects of unintended pregnancies on infants have been shown to persist into

childhood and even adulthood.  For example, children from unintended pregnancies are more

likely to experience poor mental and physical health during childhood and have lower educational

attainment and more behavioral issues in their teen years.[108]

69.    In addition, because a person experiencing an unintended pregnancy may not

immediately be aware that they are pregnant, a person with an unintended pregnancy is more likely

to receive no prenatal care or to receive care later in their pregnancies.[109]  They are also more

---

[106]    ACOG, Committee Opinion No. 654, *Reproductive Life Planning to Reduce Unintended Pregnancy* (2016), https://journals.lww.com/greenjournal/abstract/2016/02000/committee_opinion_no__654__reproductive_life.53.aspx#:~:text=In%20order%20to%20reduce%20the,use%20of%20all%20contraceptive%20methods; ACOG Practice Bulletin No. 230 (2021), *Obesity in Pregnancy*, https://journals.lww.com/greenjournal/abstract/2021/06000/obesity_in_pregnancy__acog_practice_bulletin,.38.aspx;  ACOG, Frequently Asked Questions No. 142, Diabetes and Women (2016), https://sa1s3.patientpop.com/assets/docs/87560.pdf.  Planned Parenthood providers discuss such conditions with patients to help inform physicians' and patients' discussions regarding timing and planning for a safe pregnancy.  *Pre-Pregnancy Health and Planning*, https://www.plannedparenthood.org/learn/pregnancy/pre-pregnancy-health; *see also* Healthy People 2030, *supra* note 35.

[107]    *See* ACOG sources cited *supra* note 106.

[108]    *Family Planning, Reduce the proportion of unintended pregnancies — FP-01*, Office of Disease Prevention and Health Promotion, https://odphp.health.gov/healthypeople/objectives-and-data/browse-objectives/family-planning/reduce-proportion-unintended-pregnancies-fp-01 (last visited July 2, 2025); *see also* ACOG, Committee Opinion No. 654, *supra* note 106.

[109]    Diana Cheng et al., *Unintended Pregnancy and Associated Maternal Preconception, Prenatal and Postpartum Behaviors*, 79 Contraception 194, 196 (2009).

DECLARATION OF CLAIRE D. BRINDIS

likely to smoke and consume alcohol during pregnancy, to be depressed during pregnancy, and to experience domestic violence during pregnancy—all issues that contribute to worse health outcomes.[110]

70.    Unintended pregnancies occur across all income levels, races, and ages, but research shows that the rates of unintended pregnancies are higher among certain groups.[111]  For example, 71% of pregnancies to mothers ages 15 to 19 are unintended.[112]  Women whose income is below the federal poverty level and black women and Latinas also have higher rates of unintended pregnancies than other demographic groups.[113]  Many of the reasons these populations suffer disparate effects from unintended pregnancies are underlying factors that Planned Parenthood works hard to counteract, such as cost of services combined with limited insurance coverage, family planning clinic locations and hours that are not convenient, and lack of youth-friendly and client-centered reproductive health services.[114]  Removing Planned Parenthood

---

[110]    *Id.*; *see also* ACOG, Committee Opinion No. 654, *supra* note 106; Mary K. Ethen et al., *Alcohol Consumption by Women Before and During Pregnancy*, 13 Maternal Child Health J., 274, 277 (2009); Christie A. Lancaster et al., *Risk Factors for Depressive Symptoms During Pregnancy: A Systematic Review*, 202 Am. J. Obstetrics & Gynecology 5, 7, 11 (2010); Lois James et al., *Risk Factors for Domestic Violence During Pregnancy: A Meta-Analytic Review*, 28 Violence & Victims 359, 368-69 (2013).

[111]    *See, e.g.*, Blumenthal et al., *supra* note 38, at 123.

[112]    Lauren M. Rossen et al., *Updated Methodology to Estimate Overall and Unintended Pregnancy Rates in the United States, National Center for Health Statistics*, CDC, 19 (Apr. 2023), https://www.cdc.gov/nchs/data/series/sr_02/sr02-201.pdf.

[113]    *Id.*; Lawrence B. Finer & Mia R. Zolna, *Declines in Unintended Pregnancy in the United States, 2008-2011*, 374 N. Engl. J. Med. 843, 846-47 (2016); Jennifer J. Frost et al., Guttmacher Institute, *Return on Investment: A Fuller Assessment of the Benefits and Cost Savings of the US Publicly Funded Family Planning Program*, 92 Milbank Q. 667, 668 (2014).

[114]    *See, e.g.*, Susan A. Cohen, *Abortion and Women of Color: The Bigger Picture*, 11 Guttmacher Pol'y Rev. 2, 4-5 (2008), https://www.guttmacher.org/sites/default/files/article_files/gpr110302.pdf; Mead et al., *supra* note 59, at 87-88.

DECLARATION OF CLAIRE D. BRINDIS

Members from the already limited network of providers available to these patients and families will likely disproportionately harm already medically underserved populations.

71.    Decreased access to contraceptives and the corresponding increase in the number of unintended pregnancies caused by excluding Planned Parenthood Members' care will likely result in an increased number of abortions.[115]  Studies show that, as the rate of contraceptive use by unmarried women increased in the U.S. between 1982-2001, rates of unintended pregnancy and abortion for unmarried women also declined.[116]  In addition, increased access to affordable contraceptives through the Affordable Care Act reduced the number of unintended pregnancies and the rate of abortions.[117]  A study regarding California's Family PACT program estimated that provision of contraception to approximately 1,000,000 women and 100,000 men through that program in 2007 prevented approximately 122,200 abortions.[118]  Similarly, when Iowa increased access to contraceptive services over the course of 2006-2008, studies found lower abortion rates.[119]  It is likely that a decrease in contraceptive use will not only raise the rate of unintended

---

[115]    Over 30% of unintended pregnancies end in abortion in the United States.  Jonathan M. Bearak et al., *Country-specific Estimates of Unintended Pregnancy and Abortion Incidence: A Global Comparative Analysis of Levels in 2015–2019*, 7 BMJ Global Health 3 (2022) (Supplementary PDF, App. D).

[116]    Heather D. Boonstra et al., *Abortion in Women's Lives*, Guttmacher Inst., 18 (2006), https://www.guttmacher.org/sites/default/files/pdfs/pubs/2006/05/04/AiWL.pdf.

[117]    Matthew D. Solomon et al., *Effects of the Affordable Care Act on Contraception, Pregnancy, and Pregnancy Termination Rates*, 145(2) Obstetrics & Gynecology 196 (Feb. 2025), [doi: 10.1097/AOG.0000000000005796].

[118]    Biggs et al., *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, *supra* note 105, at 6, 16.

[119]    M. Antonia Biggs et al., *Did Increasing Use of Highly Effective Contraception Contribute to Declining Abortions in Iowa?*, 91 Contraception 167, 169 (2015).

37

DECLARATION OF CLAIRE D. BRINDIS

pregnancy, but will also raise the rate of abortion, where it is legal after *Dobbs v. Jackson Women's Health Organization*.

### 3.    Unintended Pregnancies Also Impose a Serious Fiscal Cost on Society

72.    When considering the adverse public health consequences of intended and mistimed pregnancies, fiscal costs are a significant factor that are measurable and substantial for society as a whole.  In 2016, more than $3 billion in public costs was spent on family planning and related sexual and reproductive health services (such as STI testing).[120]  Those services were estimated to have averted approximately 2 million pregnancies, among other adverse health outcomes.[121]  The estimated public costs associated with those pregnancies and outcomes—*i.e.*, maternity care, birth, infant care, miscarriages or abortions, and treating the effects of undetected STIs—would have been $15 billion, $14.3 billion of which is attributable to publicly covered maternity and infant care.[122]  Accordingly, publicly funded family planning and related care saved nearly $12 billion in public costs.[123]  In other words, for every $1 spent on family planning services, the public saved nearly five times that amount ($4.83) in costs associated with unintended pregnancies and other reproductive health issues.[124]

73.    Eliminating Planned Parenthood health centers as a source of contraceptive care would have an outsized impact on cost-savings because they serve a large proportion of clients in

---

[120]    Jennifer J. Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Impact, 2016*, Guttmacher Inst., 20 (2019), https://www.guttmacher.org/sites/default/files/report_pdf/publicly-supported-fp-services-us-2016.pdf.

[121]    *Id.* at 18.

[122]    *Id.* at 20.

[123]    *Id.*

[124]    *Id.*

need of publicly funded family planning services, and because it provides clients with highly effective methods of contraception.

### B.    The Number of Sexually Transmitted Infections Will Likely Increase

74.    In addition to contraceptive care, it is important to remember that hundreds of thousands of patients receive other important services, such as STIs and treatment, cervical and breast cancer screening, pregnancy testing and counseling, other primary-care related services, such as blood pressure screening, and mental health screening, from Planned Parenthood Members.  Adults and adolescents are likely to have reduced access to these services as well, with the result that there are likely to be more undetected and untreated STIs and cancers, with other attendant serious consequences.

75.    The preventive care provided by Planned Parenthood health centers in the STI testing and treatment field is highly cost effective and avoids financial burdens that would be borne by the public in Planned Parenthood's absence.  For example, the 2016 analysis of publicly funded clinics described above found that the role of publicly funded clinics—including Planned Parenthood health clinics—in screening, testing, and preventing STIs during family planning visits saved an estimated $273 million taxpayer dollars that year, in the form of costs to treat PID or other results of untreated chlamydia or gonorrhea, HIV infections, and HPV sequelae for low-income populations.[125]

---

[125]    Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Impact, 2016*, *supra* note 120, at 20, Table 18.

DECLARATION OF CLAIRE D. BRINDIS

76.    Reduced access to Planned Parenthood health centers will lead to reduced access to testing, counseling, and treatment for STIs.  This means that STIs will go undiagnosed or be diagnosed much later, which will both put those patients at greater health risk themselves and allow them to transmit the infection to more people.

77.    In its most recent annual report, PPFA reported that its Members provided 769,851 HIV tests, 4,330,310 STI tests, 173,397 Pap tests; 16,824 HPV treatments, and 40,247 HPV vaccinations, 15,345 other STI prevention treatments, among other services.[126]

78.    The Guttmacher Institute has developed a tool to estimate the health benefits and cost savings associated with publicly funded family planning.[127]  Using that tool and the list of services from PPFA's most recent annual report, the STI services offered by Planned Parenthood avert, in a year, approximately[128] 70-510 cases of HIV[129] and 56,560-99,770 other STIs, and, in

Even a relatively few number of HIV/AIDS cases averted results in substantial savings.  In 2021, the average Medicaid spending per enrollee was $7,085.  *Medicaid Spending per Enrollee (Full or Partial Benefit) by Enrollment Group*, Kaiser Family Foundation (2021), https://www.kff.org/medicaid/state-indicator/medicaid-spending-per-enrollee/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.  In 2022, the federal government spent an estimated $13 billion on Medicaid services for people with HIV.  *Medicaid and People with HIV*, Kaiser Family Foundation (Mar. 27, 2023), https://www.kff.org/hivaids/issue-brief/medicaid-and-people-with-hiv/.

[126]    Planned Parenthood Federation of America, *A Force for Hope: Planned Parenthood Annual Report 2023-2024*, *supra* note 14, at 23.

[127]    *Health Benefits and Cost Savings of Publicly Funded Family Planning*, Guttmacher Data Center, https://data.guttmacher.org/calculator (last visited July 2, 2025).

[128]    The tool provided by Guttmacher requires inputting a state where the service is provided. California data was used as a case study (as it represents one of the largest states by population and numbers of Planned Parenthood health centers) for calculating the potential outcomes among all of the following examples.

[129]    A range is provided because the estimated health outcomes depend on whether HIV tests were provided to male or female clients, which was not specified in PPFA's report.  The result of 70 cases of HIV assumes all tests were administered to women; the result of 510 cases assumes all tests were administered to men.

DECLARATION OF CLAIRE D. BRINDIS

turn, many PID cases, ectopic pregnancies, and infertility cases.[130]  In Massachusetts, testing

services provided by Planned Parenthood prevented 920-1,930 cases of chlamydia and other STIs,

and resulted in a gross cost savings of $530,540-$545,090 to the Commonwealth.

79.    Were Planned Parenthood Members' ability to provide STI-related services

eliminated or reduced, the effect on public health would be significant and adverse.[131]  In general,

patients who contract STIs suffer adverse reproductive health outcomes.[132]  STIs are often

asymptomatic[133] but can result in PID, a major cause of infertility, ectopic pregnancy, and chronic

pelvic pain.[134]  Syphilis and gonococcal infections also facilitate the transmission of HIV

infections.[135]

---

[130]    The tool provided by Guttmacher is limited in the type of STI tests that can be entered and the type of STIs it indicates were averted.  This range assumes that all STI tests provided by Planned Parenthood health centers were for chlamydia and reflects the number of chlamydia cases likely averted were that assumption true.  The low end of the range assumes all tests were provided to only women; the high end assumes all tests were provided to only men.

[131]    For example, a 2022 study on the effect of closures of publicly funded family planning health centers on gonorrhea and chlamydia diagnoses in Iowa found that counties with closures had significantly larger increases in gonorrhea rates, and smaller, non-statistically significant increase in chlamydia rates, compared to counties without closures.  Megan Srinivas et al., *Sexually Transmitted Infection Rates and Closure of Family Planning Clinics Because of Abortion Restrictions in Iowa*, 5 JAMA Network Open 10 (2022).

[132]    *See* David Friedel & Suzanne Lavoie, *Epidemiology and Trends in Sexually Transmitted Infections*, *in* Public Health & Preventive Medicine 155, 159 (Wallace et al., eds., 2008).

[133]    Jerusha Barton et al., *Sexually Transmitted Disease Surveillance 2015*, CDC, 6, 43, 54, 55 (Oct. 2016), https://stacks.cdc.gov/view/cdc/41806.

[134]    *About Pelvic Inflammatory Disease (PID)*, CDC (Dec. 13, 2023) https://www.cdc.gov/pid/about/; Kristen Kreisel et al., *Prevalence of Pelvic Inflammatory Disease in Sexually Experienced Women of Reproductive Age—United States 2013-2014*, 66 Morbidity & Mortality Wkly Rpt. 80, 80 (2017).  Approximately 10-20% of women with chlamydia or gonorrhea may develop PID without adequate treatment.  Barton et al., *supra* note 133, at 54.

[135]    Barton et al., *supra* note 133, at 6, 17, 31.

DECLARATION OF CLAIRE D. BRINDIS

80.     In rare, but serious, cases, pregnant people infected with chlamydia can pass the infection to their infants during delivery, potentially resulting in ophthalmia neonatorum, which can lead to blindness and pneumonia.[136]  Untreated syphilis infections in pregnant people, though rare, can cause significant complications, including fetal death in up to 40% of pregnant people or preterm birth.[137]  It can lead to infection of the fetus in 80% of cases, which can result in both physical and mental developmental disabilities.[138]

81.     The increased incidence of STIs is likely to disproportionately affect patients with low incomes and patients of color.  For example, prevalence of gonorrhea, syphilis, and chlamydia is highly dependent on the geographic area and sociodemographic factors, with increased rates occurring among Hispanic and African American populations, and individuals with lower incomes.[139]

## C.    Other Negative Health Outcomes Will Likely Result from Decreased Access to Planned Parenthood

82.     Restricting or eliminating access to Planned Parenthood health care clinics and services will negatively affect more than just the reproductive health issues described above (the increase in unintended pregnancies and the increased rate of STIs).  Family planning providers, like Planned Parenthood Members, often serve as a source of primary care services for patients.[140] For many people, reproductive health services are the only health services that they seek during

---

[136]    *Id.* at 6.

[137]    *Id.* at 31.

[138]    *Id.* at 31, 54.

[139]    *Id.* at 1, 2, 18, 54, 69, 70-75.

[140]    VandeVusse et al., *supra* note 21, at 2.

DECLARATION OF CLAIRE D. BRINDIS

their reproductive health years.[141]  Accordingly, many young people and people with low incomes consider family planning centers to be their usual sources of medical care and their entry points into the health care system.[142]

83.    A typical wellness visit at a Planned Parenthood health center may include a regular physical exam (e.g., height, weight, and blood pressure), vaccinations including for HPV, reproductive health services (e.g., birth control, STD screening), pelvic exams, Pap tests, and breast examinations.[143]

84.    Such visits can detect important health concerns, like cancer.  In its most recent annual report, PPFA reported that its Members provided 426,268 cancer screenings and other diagnostic procedures, resulting in early detection of cancer or abnormalities.  These screenings included 191,197 breast exams and 173,397 Pap tests.[144]

85.    Services related to family planning, like provision of contraceptives, can have broader health benefits for patients.  For example, a decrease in access to contraception may cause patients to lose access to the other health benefits of hormonal contraception, such as treatment of

---

[141]    Frost et al., *Specialized Family Planning Clinics in the United States*, *supra* note 85, at 522.

[142]    Rachel Benson Gold et al., *Next Steps for America's Family Planning Program: Leveraging the Potential of Medicaid and Title X in an Evolving Health Care System*, Guttmacher Inst., 16 (Feb. 2009), https://www.guttmacher.org/report/next-steps-americas-family-planning-program-leveraging-potential-medicaid-and-title-x.

[143]    *Wellness Visit*, https://www.plannedparenthood.org/learn/health-and-wellness/wellness-visit (last visited July 2, 2025).

[144]    *A Force for Hope, Planned Parenthood Annual Report 2023-2024*, *supra* note 14, at 23.

DECLARATION OF CLAIRE D. BRINDIS

menstrual disorders, acne, hirsutism, or pelvic pain; reduced risk of various cancers; and protection against PID and some benign breast diseases.[145]

86.     A study of publicly funded family planning providers in California—approximately half of which were Planned Parenthood Members—found that most new clients received an initial health assessment; 83% received a blood pressure test; more than 70% were screened for alcohol, tobacco and drug use; more than 60% were asked whether they had high blood pressure or diabetes; about half were asked whether they had gained, lost, or been maintaining their weight; and more than half were asked about interpersonal violence in the past 12 months.[146]

### D.     State-Level Defunding Experiences Demonstrate the Negative Effect Restricting Access to Planned Parenthood Members Has on Health Outcomes

87.     The public health risks described above are far from theoretical.  In recent years, several states have enacted laws that restrict funding for Planned Parenthood health centers specifically, and for family planning efforts generally.  The health outcomes following those restrictions have demonstrated both that Planned Parenthood health centers play an essential role in reproductive and preventive health care and that the presence of other providers is insufficient to curb the public health risks of eliminating Planned Parenthood.

88.     When States have excluded Planned Parenthood Members from public health funding they saw overall declines in patient access, and corresponding increases in the negative impacts caused by decreased access.

---

[145]     ACOG Practice Bulletin No. 110, *Noncontraceptive Uses of Hormonal Contraceptives*, 115 Obstetrics & Gynecology 206 (listing non-contraceptive benefits); Adolf E. Schindler, *Non-Contraceptive Benefits of Oral Hormonal Contraceptives*, 11 Int'l J. Endocrinology & Metabolism 41, 45-46 (2013).

[146]     M. Antonia Biggs et al., *Findings from the 2012 Family PACT Client Exit Interviews*, Bixby Center for Global Reproductive Health, University of California, San Francisco (2014).

DECLARATION OF CLAIRE D. BRINDIS

### 1.    Kansas & Tennessee

89.    When Kansas excluded the Planned Parenthood Member from Title X funding, the number of people accessing Title X services decreased by more than 14,000 between 2011 and 2015, and some areas were left without a single family planning provider.[147] After Tennessee excluded the local Planned Parenthood Member from Title X funding in 2011, Shelby County reported declines in family planning services patients by 93%.[148]

### 2.    Iowa

90.    And after Iowa defunded the local Planned Parenthood Member in 2017, four Planned Parenthood health centers were forced to close and there was an 86% reported decline in the provision of services.[149]  Between 2016 and 2018, the number of people being served under the state's Family Planning Program decreased from 10,817 to 1,502.[150]  Further, 74 of the 695 listed providers in the state-funded family planning program did not offer contraception.[151]

---

[147]    Roxanne Hegeman, *Feds push back on states targeting Planned Parenthood funds*, Associated Press (Sep. 24, 2016), https://apnews.com/domestic-news-domestic-news-general-news-03c09aa8420a4bce98a413449129d2f8.

[148]    Tara Culp-Ressler, *Defunding Planned Parenthood Caused Women's Services To Drop By 93% in Tennessee County*, ThinkProgress (Sep. 6, 2012), https://thinkprogress.org/defunding-planned-parenthood-caused-womens-services-to-drop-by-93-percent-in-tennessee-county-bc0562be7a7f/.

[149]    Michaela Ramm, *Iowa's family planning service use plummets 85% after switch to new program*, The Gazette (Dec. 10, 2019), https://www.thegazette.com/health-care-medicine/iowas-family-planning-service-use-plummets-85-percent-after-switch-to-new-program/.

[150]    *Id.*

[151]    Tony Leys and Barbara Rodriguez, *State family planning services decline 73% in fiscal year as $2.5M goes unspent*, Des Moines Register (Oct. 18, 2018), https://www.desmoinesregister.com/story/news/health/2018/10/18/iowa-health-care-family-planning-contraception-services-planned-parenthood-abortion-medicaid/1660873002/.

DECLARATION OF CLAIRE D. BRINDIS

91.     Patients in Iowa experienced significant disruptions to care as a result of the Iowa defunding.[152]  The share of patients who had not recently received contraceptive care nearly doubled, from 32% to 62%.[153]  Further, the share of patients not using any contraceptive method increased from 9% to 15%.[154]  Patients also reported reduced hours and provider availability as barriers to accessing care.[155]  Up to 176,550 women in Iowa now live in counties that lack reasonable access to contraceptive care; almost 50,000 women live in counties without a single health care provider that offers a full range of contraceptive methods.[156]  Rates of gonorrhea, chlamydia, and syphilis spiked in the year after the defunding.[157]

92.     A 2022 longitudinal study found Iowa patients paid more for care and experienced longer wait times or reduced clinical hours, as a result.[158]

### 3.    Indiana

93.     As an example of the likely increase in incidences of STIs, a Planned Parenthood facility close to Scott County, a small, rural community in Indiana, closed in 2013 due to cuts to

---

[152]   *The Harm of Defunding Planned Parenthood Health Centers*, Planned Parenthood Federation of America, at 5 (Apr. 2025) https://www.plannedparenthood.org/uploads/filer_public/60/22/6022aa2f-caed-4946-966f-7186b9751e3c/defunding_state_cases_20_pdf.pdf?_gl=1*1acswxo*_gcl_au*OTIzNTI5MjYzLjE3NTA4NjE0ODk.*_ga*MjIyMjU2NjExLjE3NTA4NjE0OTA.*_ga_ENXC8KHJL8*czE3NTA4NjM5MTkkbzIkZzAkdDE3NTA4NjM5MjMkajU2JGwwJGgxMDAzMjgzMTAx.

[153]   *Id.* at 6.

[154]   *Id.*

[155]   *Id.*

[156]   *Id.*

[157]   *Id.*

[158]   Lori Frohwirth et al., *Access to Preferred Contraceptive Strategies in Iowa: A Longitudinal Qualitative Study of Effects of Shifts in Policy and Healthcare Contexts*, 33 J. Health Care for the Poor & Underserved 3 (2022).

46

public health funding.[159]  There was no free HIV testing available in the community after that closure.[160]  From 2014 to 2015, syringe-sharing in connection with injections of opioids led to an outbreak of 181 cases of HIV in the area.[161]  Nearly 90% of these cases occurred in Scott County, where only five infections had been identified between 2004-2013.[162]  The outbreak has been described as "one of the largest and most rapid HIV outbreaks the country has ever seen."[163]  Researchers observed that "[r]esources related to the prevention and treatment of HIV did not exist in this community before the outbreak, and, as in many rural communities, access to basic health care, substance-abuse treatment, and HIV prevention services was limited."[164]

### 4.  Texas

94.  The devastating effects of excluding Planned Parenthood health centers from family planning services has been well documented in Texas.  Since 2011, Texas state lawmakers have continuously revoked funding from Planned Parenthood health centers and other providers

---

[159]  Hal C. Lawrence & Debra L. Ness, *Planned Parenthood Provides Essential Services that Improve Women's Health*, 166 Annals of Internal Medicine 443, 443 (2017); Philip J. Peters et al., *HIV Infection Linked to Injection Use of Oxymorphone in Indiana, 2014-2015*, 375 N. Eng. J. Med. 229, 230 (2016).

[160]  Peters et al., *supra* note 159, at 230.

[161]  *Id.* at 231, 233.

[162]  *Id.*

[163]  Lawrence & Ness, *supra* note 159, at 443; *See also,* Laura Bassett, *Indiana Shut Down Its Rural Planned Parenthood Clinics And Got An HIV Outbreak*, HuffPost (Mar. 31, 2015), https://www.huffpost.com/entry/indiana-planned-parenthood_n_6977232 (noting HIV outbreak followed Indiana's exclusion of Planned Parenthood health centers from CDC funding).

[164]  Peters et al., *supra* note 159, at 237.

DECLARATION OF CLAIRE D. BRINDIS

who offered abortions.[165]   These efforts have decimated access to reproductive care in rural communities like the El Paso and Hidalgo service areas,[166] increased unintended pregnancies,[167] and led to lower quality of care for family planning for Texans with low incomes.[168]

95.    This conclusion is supported by analyses that the George Washington University, Milken Institute School of Public Health conducted in 2012 regarding the potential effects of a Texas policy that prohibited Planned Parenthood centers from participating in the Texas Women's Health Program ("WHP").  This program is particularly relevant to this declaration as it helped fund family planning services for patients with low incomes using a combination of federal and state funds (like Medicaid).[169]  Planned Parenthood Members' exclusion from the WHP was thus a "controlled experiment" of sorts regarding the effect of excluding Planned Parenthood Members from the federal Medicaid program.  As a result of the defunding, these organizations, including Planned Parenthood Members, were forced to reduce their hours and charge uninsured women fees

---

[165]    *See, e.g.*, Emily Ramshaw, *Lawmakers Could Restore Family Planning Funds*, The Texas Tribune (Dec. 7, 2012), https://www.texastribune.org/2012/12/07/lawmakers-could-restore-family-planning-funds/#:~:text=When%20state%20lawmakers%20passed%20a,%2C%20in%20some%20cases%2C%20; Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, 374 N. Eng. J. Med. 853, 858 (2016); Shannon Najmabadi, *Judge rejects bid by Planned Parenthood to stay in Medicaid, affecting health care for thousands of low-income Texans*, The Texas Tribune (Mar. 10, 2012), https://www.texastribune.org/2021/03/10/planned-parenthood-medicaid-texas/.

[166]    *Healthy Texas Women Section 1115 Demonstration Waiver Evaluation: Interim Report*, UT Health Houston School of Public Health Center for Health Care Data, 43 (Dec. 2023), https://www.hhs.texas.gov/sites/default/files/documents/htw-1115-demonstration-interim-evaluation-report.pdf.

[167]    Stevenson et al., *supra* note 165, at 858.

[168]    Shetal Vohra-Gupta et al., *Evidence-based family planning services among publicly funded providers in Texas*, 22 BMC Health Services 1498, 1499 (Nov. 2022), [doi: 10.1186/s12913-022-08889-0].

[169]    Ku et al., *supra* note 74.

48

Declaration Of Claire D. Brindis

A299

for health services that had previously been free or lower cost, making it more difficult or impossible for those patients to get care.[170]

96.    The consequences of this WHP defunding were dire: within two years, nearly 45,000 fewer women received care through the program and nearly 30,000 fewer patients received birth control, cancer screenings, and other preventative care.[171]    Within five years, 41% fewer women received contraceptive care through the program.[172]    And only 6% of patients were told they could receive their chosen contraceptive method in a single visit, which is considered best practice.[173]

97.    Before the exclusion, Planned Parenthood health centers served nearly 52,000 (49%) WHP patients, while FQHCs served just over 10,000 WHP patients (10%), indicating that other publicly funded health centers would have to increase their capacity five-fold to serve Planned Parenthood's WHP patients.[174]    In 2013, after the state began running an entirely state-

---

[170]    Joseph E. Potter & Karri White, *Defunding Planned Parenthood was a disaster in Texas. Congress shouldn't do it nationally*, Wash. Post (Feb. 7, 2017), https://www.washingtonpost.com/posteverything/wp/2017/02/07/defunding-planned-parenthood-was-a-disaster-in-texas-congress-shouldnt-do-it-nationally/.

[171]    Molly Redden, *Texas seeks unprecedented federal money to defund Planned Parenthood*, The Guardian (May 11, 2017), https://www.theguardian.com/us-news/2017/may/11/texas-federal-financing-defund-planned-parenthood-healthcare#:~:text=A%20report%20commissioned%20by%20the%20state%20of%20Texas%20found%20that%20its%20state%2Dfunded%20women%E2%80%99s%20health%20program%20served%2030%2C000%20fewer%20women%20than%20the%20old%20program.

[172]    *Excluding Planned Parenthood has been Terrible for Texas Women*, Every Texan, at 7 (Aug. 2017) https://everytexan.org/images/HW_2017_08_PlannedParenthoodExclusion.pdf.

[173]    Whitfield et al., *supra* note 92, at 2.

[174]    Peter Shin et al., *An Early Assessment of the Potential Impact of Texas' "Affiliation" Regulation on Access to Care for Low-income Women*. Geiger Gibson/RCHN Community Health Foundation Research Collaborative: Policy Research Brief No. 29 (revised May 4, 2012), https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?article=1047&context=sphhs_policy_ggrc hn.

DECLARATION OF CLAIRE D. BRINDIS

funded women's health program that excluded Planned Parenthood Members, enrollment in WHP dropped precipitously. A 2015 Texas Health and Human Services report found that enrollment in WHP fell by 9% from FY2011 to FY2013, with enrollment drops particularly severe in the High Plains (38%) and West Texas (41%)—regions where alternative providers were already scarce.[175] Service utilization decreased by 26% state-wide in this time period; the largest drops were seen in the West Texas (64%), the High Plains (53%), and Central Texas (42%) regions.[176]

98. Unintended pregnancies also increased due to defunding Planned Parenthood Members in Texas. A study in the New England Journal of Medicine compared rates of contraceptive use and Medicaid-covered births using data from medical, pharmacy, and childbirth claims from counties with Planned Parenthood clinics to counties without them from 2011-2014.[177] The exclusion of Planned Parenthood from the WHP was significantly associated with a 35% decline in women using the most effective methods of family planning and a 27% increase in births among women who had been using an injectable prior to Texas's restrictions.[178]

---

[175] *Texas Women's Health Program: Savings and Performance Reporting* (2015), Texas Health and Human Services Commission, https://docs.house.gov/meetings/IF/IF14/20150917/103957/HHRG-114-IF14-20150917-SD107.pdf.

[176] *Id.* at 3.

[177] Stevenson et al., *supra* note 165, at 853-60.

[178] *Id.* at 858. *See also* Kari White et al., *The Impact of Reproductive Health Legislation on Family Planning Clinic Services in Texas*, 105 Am. J. Pub. Health 851, 851 (2015). White and colleagues describe how, in 2011, prior to Planned Parenthood's outright exclusion from Texas's publicly funded family planning program, Texas substantially cut public funding for family planning providers and imposed a priority system of reimbursement for services that placed certain providers, including Planned Parenthood, at the bottom of the hierarchy. In the year following those cuts, 54% fewer clients received publicly funded family planning services. *Id.* at 855. Providers suspected that clients stopped seeking reproductive health care. *Id.* at 856.

DECLARATION OF CLAIRE D. BRINDIS

99.    The same study showed that the number of claims submitted for LARC contraceptives in counties where Planned Parenthood Members were previously located decreased sharply.[179]    Researchers concluded that their analyses indicated that Planned Parenthood Members' exclusion adversely affected low-income women in Texas "by reducing the provision of highly effective methods of contraception, interrupting contraceptive continuation, and increasing the rate of childbirth covered by Medicaid."[180]    Some observers attributed the decrease in LARCs to providers with limited funds offering patients oral contraceptives rather than their preferred LARC option, impinging upon patients' ability to select the method of contraception that is most tailored to their needs.[181]    Providers were placed in a position of trying to provide care to more patients with limited resources, and thus selected to offer lower cost oral contraception to meet these needs.[182]

100.    However, rates of continuation of non-LARC contraception methods, such as oral contraceptives, also decreased in counties where Planned Parenthood Members were previously located.[183]    Patients who used oral contraceptives received fewer refills up front, "a practice that has been shown to result in lower rates of continuation with the method and that may increase the likelihood of unintended pregnancy—and therefore that of abortion."[184]    In a separate study, patients were contacted who had obtained injectable birth control from a Planned Parenthood

---

[179]    Stevenson et al., *supra* note 165, at 856-58.

[180]    *Id.* at 858-59.

[181]    Kari White et al., *Cutting Family Planning in Texas*, 367 N. Eng. J. Med. 1179, 1180 (Sept. 2012) [doi: 10.1056/NEJMp1207920].

[182]    *Id.*

[183]    Stevenson et al., *supra* note 165, at 856-58.

[184]    White et al., *Cutting Family Planning*, *supra* note 181, at 1180.

DECLARATION OF CLAIRE D. BRINDIS

health center prior to its exclusion.[185]    As a result of Planned Parenthood's exclusion, approximately one in five women interviewed missed a dose of their injectable birth control.[186] The most commonly cited reasons for missing a dose were difficulty finding a provider, cost, and trouble getting an appointment.[187]

101.    Because fewer women were receiving birth control counseling and services, this contributed to a significant 27% increase in Medicaid-covered births within 18 months for patients that had been previously using injectable contraceptives.[188]    Analysis by researchers from the Centers for Disease Control and Prevention found that the maternal mortality rate in Texas doubled from 2011 to 2012.[189]    While the analysis could not identify the cause of the sudden increase, the authors speculated that one possible reason was the change made under Texas' WHP policies.[190]

102.    In 2020, President Trump's first administration approved federal funding for a new version of WHP called Health Texas Women ("HTW"), allowing the continued exclusion of Planned Parenthood Members from the program.[191]    Despite having more funding, the federally funded HTW program has still been unable to meet the needs of Texans.    This defunding continues

---

[185]    C. Junda Woo et al., *Women's Experiences After Planned Parenthood's Exclusion from a Family Planning Program in Texas*, 93 Contraception 298 (2016).

[186]    *Id.* at 300.

[187]    *Id*.

[188]    Stevenson et al., *supra* note 165, at 853.

[189]    Marian F. MacDorman et al., *Trends in Texas Maternal Mortality by Maternal Age, Race/Ethnicity, and Cause of Death, 2006-2015*, 45(2) Birth 169, Fig 1, (Jan. 4, 2018) [doi: 10.1111/birt.12330].

[190]    *Id.*; *see also* Marian F. MacDorman et al., *Recent Increases in the U.S. Maternal Mortality Rate: Disentangling Trends from Measurement Issues*, 128(3) Obstetrics and Gynecology, 1-10 (Sept. 2016), [doi: 10.1097/AOG.0000000000001556].

[191]    *The Harm of Defunding Planned Parenthood Health Centers*, *supra* note 152, at 3-4.

DECLARATION OF CLAIRE D. BRINDIS

to lead to drastic results, particularly for Latinas in the state. In the four counties encompassing the Rio Grande Valley—where 92% of residents are Latino—one in four clinics were forced to close after the 2011 cuts.[192] The Rio Grande Valley has one of the highest cervical cancer rates in the country, despite the fact that cervical cancer is highly preventable and treatable when patients can get access to HPV vaccines, timely screenings, and care for cervical abnormalities.[193] More broadly, Latinas in Texas have among the highest rates of cervical cancer in the United States.[194]

103.    The December 2023 HTW Evaluation Interim Report indicates that only half of Texas Medicaid family planning providers participated in HTW.[195] It also shows that the new federal funding did not help to increase the number of family planning providers in the program, and that primary care providers have not been able to make up for the lack of access to family planning providers.[196] The primary care providers in the program see fewer patients and are less likely to follow evidence-based practices than Planned Parenthood Members.[197] Rural regions in Texas suffer most from lack of access to providers.[198]

104.    In 2021, Texas blocked Medicaid enrollees from getting care at Planned Parenthood Member centers altogether by removing them as providers in the entire state Medicaid program, further eroding access to sexual and reproductive health care in the state. Researchers conducting

---

[192]    *Id.* at 4.

[193]    *Id.*

[194]    *Id.*

[195]    *Healthy Texas Women Section 1115 Demonstration Waiver Evaluation*, *supra* note 166, at 82-83, Table 26.

[196]    *Id.* at 78, Table 24.

[197]    *Id.* at 33-40, Fig. 9.

[198]    *Id.* at 42.

DECLARATION OF CLAIRE D. BRINDIS

a secret shopper study found that only 6% of callers were informed that they could get contraception with just one visit to a provider, despite the fact that this is the medically-accepted standard of care and that it reduces the barriers patients must overcome to obtain birth control.[199] The study also found other barriers to obtaining contraception for Medicaid patients, including lack of availability for requested methods and long wait times for the next available appointment.[200] Another study found that patients of Planned Parenthood Members in Texas found it difficult to connect with other providers and to get evidence-based care, leading to lower quality care, delayed or foregone care, and emotional distress.[201]

105.    A 2023 report by the University of Texas Health Science Center at Houston's (UTHealth) School of Public Health Center for Health Care Data (CHCD), which evaluated the developing impact of the Section 1115 Medicaid Waiver, found that access to care dropped significantly between 2020 and 2023.[202] Network adequacy rates for micro counties in the Hidalgo service area remained low and percentage of Medicaid enrollees decreased precipitously from 49% to 27%.[203] Rural counties in the El Paso service area had a network adequacy rate of 0, and the enrollee count also dropped from 35 to 3.[204] Moreover, of the 5,400 remaining providers for family planning, nearly half saw no patients in 2017 and another 700 saw only one patient.[205]

---

[199]    Whitfield et al., *supra* note 92, at 2, 3.

[200]    *Id.* at 3.

[201]    Anna Chatillon et al., *supra* note 75.

[202]    *Healthy Texas Women Section 1115 Demonstration Waiver Evaluation*, *supra* note 166, at 43.

[203]    *Id.*

[204]    *Id.*

[205]    *Id.*

Declaration Of Claire D. Brindis

106.    An analysis conducted by March of Dimes, a nonprofit organization committed to ending preventable maternal health risks and death, found that "women in Texas have a very high vulnerability to adverse outcomes due to [lack of] the availability of reproductive healthcare services."[206]  In 2023, 47% of counties in Texas were maternity care deserts and had no maternity care centers or obstetricians.[207]  Patients in these counties who seek maternity care traveled an average of 30 miles to find a doctor, with some required to travel up to 70.5 miles to find the nearest birthing hospitals.[208]

107.    There is no reason to believe that the effect of removing Planned Parenthood Members from the federal Medicaid program would be any less pronounced than the observed effects of excluding local Planned Parenthood Members from WHP in Texas, or from other states, such as Kansas, Tennessee, Indiana, and Iowa.  Instead, it is reasonable to believe that the dramatic decline in use of effective contraception—and resulting increase in Medicaid-covered childbirth— will be replicated on a national scale.

## IV.    CONCLUSION

108.    For the foregoing reasons, Planned Parenthood health centers provide a unique contribution to the health and wellbeing of individuals and families across the United States, and it is my opinion that Section 71113 will have serious and adverse consequences for patients, their families, and the public's health, as well as the societal burden.

---

[206]    Lucas J. Fontenot et al., *Where You Live Matters: Maternity Care in Texas*, March of Dimes, 2 (2023), https://www.marchofdimes.org/peristats/reports/texas/maternity-care-deserts.

[207]    *Id.*

[208]    *Id.*

DECLARATION OF CLAIRE D. BRINDIS

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 7 , 2025.

_____          July 7, 2025
                                           _____
Claire D. Brindis                          Date

DECLARATION OF CLAIRE D. BRINDIS

EXHIBIT A

Prepared: July 2, 2025

**University of California, San Francisco**
**CURRICULUM VITAE**

**Name:**      Claire D Brindis, DrPH, MPH

**Position:**   Emerita Director,Philip R. Lee Institute for Health Policy Studies
Distinguished Professor Emerita of Pediatrics and Health Policy (on recall),
UCSF Edward A. Dickson Emeritus Professorship Award (2022-2024)
Department of Pediatrics and
Department of Obstetrics, Gynecology and Reproductive Health Sciences
School of Medicine, University of California, San Francisco
https://profiles.ucsf.edu/claire.brindis

**Address**    Box 0936
490 Illinois St, 7th Floor
University of California, San Francisco
San Francisco, CA 94158-2510

Primary correspondence:
Home:
1410 Monterey Blvd.
San Francisco, Ca. 94127
Voice: (415) 517-4521 (cell)
Email: claire.brindis@ucsf.edu

## EDUCATION

| 1968 - 1972 | University of California, Los Angeles | B.A. | Sociology, Cum Laude |
|---|---|---|---|
| 1972 - 1973 | University of California, Los Angeles | M.P.H. | Public Health |
| 1977 - 1982 | University of California, Berkeley | Dr. PH | Public Health/Behavioral Sciences |

## PRINCIPAL POSITIONS HELD

| 1974 - 1977 | Emory University | Assistant Professor | School of Allied Health |
|---|---|---|---|
| 1982 - 1983 | San Francisco State University | Assistant Professor | San Francisco State Health Education |
| 1982 - 1987 | University of California, San Francisco | Senior Research Associate | Institute for Health Policy Studies |
| 1987 - 1992 | University of California, San Francisco | Assistant Adjunct Professor | Institute for Health Policy Studies |
| 1992 - 1998 | University of California, San Francisco | Associate Adjunct Professor | Institute for Health Policy Studies |

Prepared: July 2, 2025

| 1998 - 1998 | University of California, San Diego | Visiting Professorship | Iris F. Litt Society for Adolescent Medicine/Organon Adolescent Health Research, Sponsored by Society for Adolescent Medicine |
| 1998 - 2000 | University of California, San Francisco | Adjunct Professor | Pediatrics and Institute for Health Policy Studies |
| 2000 - 2009 | University of California, San Francisco | Professor, In-Residence | Philip R. Lee Institute for Health Policy Studies/Joint Appointment with Dept of Pediatrics & Obstetrics, Gynecology and Reproductive Health Sciences |
| 2002 - 2002 | Children's National Medical Center | Visiting Professorship | Robert S. Rixse Memorial Lecture, Washington, DC |
| 2005 - 2005 | University of Texas, Houston | Visiting Professorship | Morris Blum Memorial Lecture, Pediatric Grand Rounds University of Minnesota Adolescent Health Leadership |
| 2006 - 2006 | Howard University, and Johns Hopkins University | Visiting Professorship | The DC-Baltimore Research Center on Child Health Disparities: a consortium of the Department of Health, the Children's National Medical Center |
| 2007 - 2007 | University of New Mexico | Visiting Professorship | Center for Latinos and Health Disparity |

Prepared: July 2, 2025

| 2009 – present | University of California, San Francisco | Distinguished Professor | Philip R. Lee Institute for Health Policy Studies/Joint Appointment with Dept of Pediatrics & Obstetrics, Gynecology and Reproductive Health Sciences |
| --- | --- | --- | --- |
| 2022-2024 | University of California, San Francisco | | UCSF Edward A. Dickson Emeritus Professorship Award |
| 2014 - 2020 | University of California, Hastings | Adjunct Professor of Law | UC Hastings College of the Law |
| 2014 - present | University of California, San Francisco | Affiliated Faculty | Institute of Global Health Sciences |
| 2016 – present | University of California, San Francisco | Affiliated Faculty | Bakar Institute for Computational Health Sciences |
| 2016 - 2016 | Pennsylvania State University | Visiting Professorship | Division of Health Services and Behavioral Research |
| 2017 - present | University of California, Los Angeles | Affiliated Faculty | UCLA School of Public Health, Center for Health Policy |
| 2021 – present | University of California, San Francisco | Affiliated Faculty and SeniorAdvisor | University of California Center for Climate, Health, and Equity |
| 2022 – present | University of California, San Francisco | Faculty Advisor; Evaluator | UCSF ARCHES (Advancing the Research Careers for Historically Excluded Scholars) Program |

Prepared: July 2, 2025

**OTHER POSITIONS HELD CONCURRENTLY**

| | | | |
|---|---|---|---|
| 1983 - 1999 | University of California, San Francisco | Co-Director | Center for Reproductive Health Policy Research, Institute for Health Policy Studies, |
| 1983 - 2005 | University of California, San Francisco | Director | Hewlett Fellowship in Reproductive Health Policy, Institute for Health Policy Studies |
| 1993 - 2014 | University of California, San Francisco | Executive Director/Co-Principal Investigator | National Adolescent Health Information and Innovation Center; Department of Pediatrics and Institute for Health Policy Studies |
| 1997 - 2014 | University of California, San Francisco | Associate Director/Co-Principal Investigator, Public Policy Analysis Center | Department of Pediatrics and Institute for Health Policy Studies |
| 1998 - present | University of California, San Francisco | Co-Director | Adolescent and Young Adult Health National Resource Center, Division of Adolescent Medicine, Department of Pediatrics |
| 1999 - present | University of California, San Francisco | Associate Director/Co-Principal Investigator | Division of Adolescent Medicine, Department of Pediatrics |

Prepared: July 2, 2025

| | | | |
|---|---|---|---|
| 1999 - present | University of California, San Francisco | Director and Founding Director and Senior Scholar, 2018-current | Bixby Center for Global Reproductive Health, Obstetrics, Gynecology and Reproductive Sciences and Institute for Health Policy Studies |
| 2002 - 2020 | University of California, San Francisco | Core Faculty | Center for Social Disparities in Health; Dept. Family and Community Medicine |
| 2005 - 2007 | University of California, San Francisco | Associate Director | Institute for Health Policy Studies |
| 2006 - 2007 | University of California, San Francisco | Acting Director | Philip R. Lee Institute for Health Policy Studies |
| 2007 - 2008 | University of California, San Francisco | Interim Director | Philip R. Lee Institute for Health Policy Studies |
| 2008 - 2020 | University of California, San Francisco | Director | Philip R. Lee Institute for Health Policy Studies |
| 2016 – present | University of California, Berkeley | Affiliated Faculty | Berkeley Ph.D. Program in Health Policy |

**HONORS AND AWARDS**

| | | |
|---|---|---|
| 1988 | Special Recognition Award | California Alliance Concerned with School Age Parents |
| 1991 | Community Leadership Award | National Family Planning and Reproductive Health Association, Washington, D.C. |
| 1994 | Integrity Award | Office of Inspector General, Office of Evaluation and Inspections, U.S. Department of Health, Human Services |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2000 | Mark Pearlman Outstanding Service Award | California Child, Youth and Family Coalition |
| 2000 | Beverlee A. Meyer Award in Excellence | California Department of Health Services |
| 2000 | Distinguished Service to the Public and the State of California | California State Senate Resolution, State of California |
| 2001 | Collaborative Award Winner, Special Recognition Award | Maternal and Child Health Branch, California Department of Health Services |
| 2001 | John C. MacQueen Lecture Award | Association of Maternal and Child Health Programs |
| 2001 | Women Faculty Recognition Award | University of California, San Francisco |
| 2003 | Champions of Diversity | University of California, San Francisco |
| 2004 | Executive Leadership in Academic Medicine (ELAM) Program for Women | Fellow-Hedwig van Ameringen |
| 2005 | Morris Blum Memorial Lecture, Pediatric Grand Rounds | University of Minnesota |
| 2005 | Commendation by Lieutenant Governor Cruz M. Bustamante Honoring Outstanding Research on Adolescent and Women's Health, Education, and Dissemination on These Important Issues, Fresno County Babies First Seminar. | State of California |
| 2005 | Directors Award: In Recognition of Contributions Made to the Health of Infants, Mothers, Children, Adolescents & Children with Special Needs | Federal Maternal & Child Health Bureau |
| 2005 | Special Election Award | Campaign for Teen Safety |
| 2006 | Hilary E.C. Millar Award for Innovative Approaches to Adolescent Health Care | Society for Adolescent Medicine |
| 2006 | Champion Award for vision and commitment in creating and sustaining the California Office of Family Planning and the Family PACT Program. | California Family Health Council, Inc |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2006 | Outstanding Researcher Award in honor of the dedication and leadership in the field of adolescent pregnancy, parenting and prevention. | Healthy Teen Network |
| 2006 | Award for service on No on 85 Campaign 'Above and Beyond' | Campaign for Teen Safety |
| 2009 | Chancellors Award for the Advancement of Women, 'In Recognition of Outstanding Contributions to the Advancement of Women' | University of California, San Francisco |
| 2009 | Telly Award, Bronze Award | Telly Award for Film, 'A Question of Hope', Social Issues Category |
| 2011 | Institute of Medicine of the National Academies (IOM) member | Elected Member |
| 2012 | Alumni Hall of Fame: Outstanding Contributions to the Field of Public Health | UCLA Fielding School of Public Health |
| 2014 | Carl S. Shultz Award for Lifetime Achievement | American Public Health Association: Population, Reproductive, and Sexual Health Section |
| 2016 | Lifetime Achievement in Mentoring Award | UCSF Faculty Mentoring Program |
| 2018 | 75th Anniversary Honoree "In Recognition of 75 Most Influential Public Health Alumni" | UC Berkeley School of Public Health |
| 2018 | In Recognition for Outstanding Contribution to the Advancement of Women's Reproductive Health | Bixby Center for Global Reproductive Health, UCSF |
| 2019 | Holly Smith Award for Exceptional Service to the UCSF School of Medicine | University of California, San Francisco |
| 2020 | Pioneer Award | School-Based Health Assembly |
| 2020 | Martha May Eliot Award in Maternal and Child Health | American Public Health Association |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2021 | 2020 Title V Lifetime Achievement Award | Maternal and Child Health Bureau (MCHB) |
| 2024 | Excellence in Maternal, Child, and Adolescent Health Leadership Award | UC Berkeley School of Public Health Department of Maternal, Child, and Adolescence Health |

**Note:** In 2023, the Claire D. Brindis Award for Community Engagement and Service in Health Policy Research was established by the Philip R. Lee Institute for Health Policy Studies at UCSF. This award recognizes UCSF faculty who are engaged in policy-focused research and advocacy which address social, health, and, ethnic, and racial disparities; this research and advocacy serve to improve community wellbeing. Community engagement and service spans a range of fields and topics, including – but not limited to – collaboration with federal, state, or local government agencies, local and community clinics, school systems, and community-based organizations. Additionally, such service may include other community and institutional efforts to advance the health and well-being of historically underserved and excluded populations.The Award recognizes a UCSF faculty member who embodies a commitment to giving voice, representation, and service to historically underserved communities; this advocacy and research in healthcare design inform policymaking in ways which achieve tangible gains in health and well-being.

## KEYWORDS/AREAS OF INTEREST

United States healthcare reform, adolescent and child health policy, health disparities, and social determinants of health, adolescent pregnancy and pregnancy prevention, adolescent and young adult health and risk-taking behaviors, reproductive health services for men and women, program evaluation, Latino health, global reproductive health, migration and health, knowledge-transfer.

## PROFESSIONAL ACTIVITIES

### MEMBERSHIPS

1972 - present   American Public Health Association

1984 - present   Society for Public Health Education

1985 - present   Society for Adolescent Medicine and Health

1985 - present   Society for Health Education

1988 - present   American School-Health Association

1995 - present   National Assembly for School-Based Health Care

2000 - present   AcademyHealth

2005 - present   National Alliance for Hispanic Health

2015 - present   Society of Family Planning

## SERVICE TO PROFESSIONAL ORGANIZATIONS

National Academies of Sciences, Engineering, and Medicine/National Research Council

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2005-2006 | Contributions from the Behavioral & Social Sciences in Reducing and Preventing Teen Motor Crashes Institute of Medicine and the Division of Behavioral and Social Sciences and Education. The National Academies of Sciences, Washington DC. | Member |
| 2020-2025 | NRC, Advisory Board, Division of Behavioral and Social Sciences and Education Studies | Member |
| 2012 – 2016 | National Academy of Medicine (formerly IOM), Section 1 Health Policy and Health Care Systems Working Groups | Elected Member (Two Terms 3 years each) |
| 2021-2024 | Executive Committee of the NAM Council | Vice-Chair (DuringTerm 2) |
| 2018-2024 | Council of the National Academy of Medicine | Member |
| 2021-2024 | Council of the National Academy of Medicine (NAM) | Member |
| 2021-2023 | NASEM (National Academies of Science, Engineering and Medicine), National Research Council (NRC) National | Member |
| 2021-2024 | Research Council (NRC), Executive Committee | Member |
| 2023-2024 | National Research Council (NRC) Governing Board Budget and Finance Committee | Member |
| 2021-2024 | National Research Council (NRC) Governing Board Project Approval Committee | Workshop Planning Committee and Workshop Moderator |
| 2021-2024 | National Research Council (NRC) Governing Board NAM Council Nominating Committee | |
| 2018-2023 | Committee on Science, Engineering, and Medicine and Public Policy (COSEMPUP), NASEM | Member, Policy, Financing, and Metrics |
| 2021-2022 | National Academy of Medicine Advancing Maternal Health Equity and Reducing Maternal Morbidity and Mortality. (https://www.nap.edu/download/26307 | Member, Health Systems Member |
| 2022 - Present | National Academy of Medicine, (NAM) Action Collaborative on Decarbonizing the U.S. Health Sector | Planning Committee |
| 2023-2024 | National Academy of Medicine (formerly IOM), Section 1 Health Policy and Health Services Working Group | Report Monitor |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2023-204 | National Academy of Sciences, Cultural Programs of the National Academy of Sciences and the CDC Foundation, Boosting Vaccine Confidence with the Arts | Chair |
| 2023 | NASEM: Identification and Prognosis of Low Birth Weight Babies and Disability Determinations | Member |
| 2022-2025 | NASEM, Standing Committee on Reproductive Health, Equity and Society | Chair |
| 2024-2025 | NASEM and National Research Council (NRC) Governing Board Project Approval Committee | Chair |
| 2025 – Present | Advisory Committee, Division of Social and Behavioral Studies and Education Studies (DBASSE), NRC | Chair |
| 2024- Present | National Academy of Medicine, President Search Committee | Chair |

**Other Professional Associations and Organizations**

| | | |
|---|---|---|
| 1996 - 2022 | AcademyHealth | Member, Advocacy Committee |
| 1993 - 1993 | American Public Health Association | Annual Program Committee, Section on Family Planning and Reproductive Health |
| 1996 - 2000 | National Assembly for School-Based Health Care | Technical Advisory Committee, Survey of School-Based Health Centers |
| 1996 - 2006 | National Assembly for School-Based Health Care | Member, Advisory Panel, Center for Evaluation and Quality |
| 1997 - 1997 | Society for Adolescent Medicine | Managed Care Ad Hoc Committee |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2000 - 2022 | AcademyHealth | National Planning Committee for Annual Meeting, Chair, Session at Annual Conference. Elected Member, Board of Directors Secretary, Board of Directors, Chair, Governance Committee, Membership Committee Member |
| 2001 - 2001 | Society for Adolescent Medicine | Member, Advocacy Committee |
| 2003 - 2003 | American Public Health Association | Program Chair |
| 2004 - 2005 | American Public Health Association | Section President |
| 2005 - 2007 | American Public Health Association | Chair, Awards Committee, Member, Awards Committee |
| 2005 - 2005 | Society for Adolescent Medicine | Research (Standing) Committee |
| 2009 - 2009 | Society for Adolescent Medicine | Consultant, Diversity Task Force |
| 2014 - 2019 | Public Health Institute | Board Member |
| 2015 - 2020 | WestEd Justice & Prevention Research Center | Member, Advisory Board, Virtual Student Health Center Project |
| 2015 - present | Health Resources and Services Administration (HRSA), Maternal and Child Health Bureau (MCHB) | Member, National Survey of Children's Health (NSCH) Technical Expert Panel (TEP) |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2017 - present | Public Health Institute | Advisory Council, Initiative for Multipurpose Prevention Technologies (IMPT) |
| 2018 - 2019 | AcademyHealth, Adolescents and Children Together for Health (ACT for Health) | Member, National Advisory Panel |
| 2019 – present | Vanderbilt University Medical Center (VUMC) | Biomedical Science Advisory Board |
| 2022- present | Health Affairs Scholar *Emerging & Global Health Policy Journal* | External Advisory Board |
| 2023- present | Social Policies for Health Equity Research (SPHERE) Center, Harvard School of Public Health | National Advisory Board Member |
| 2023-present | AcademyHealth Assessing the Full Impact of the Dobbs'Decision – Working Group | Member |

**SERVICE TO PROFESSIONAL PUBLICATIONS**

| | |
|---|---|
| 1999 - present | Editorial Board, Journal of Adolescent Health |
| 1991 - 2018 | Hispanic Health Care International; Editorial Review Board, Health Promotion Practice |
| 1999 - 2018 | Health Promotion Practice, Editorial Board |
| 1999 - present | Journal of the American Public Health Association |
| 1999 - present | Journal of the American Medical Association |
| 1999 - present | Archives of Pediatrics and Adolescent Medicine |
| 1999 - 2020 | Family Planning Perspectives |
| 1999 - 2020 | Perspectives on Sexual and Reproductive Health |
| 1999 - 2020 | American Journal of Preventive Medicine, Guest Editor (Long-Acting Reversible Contraceptive Methods in the Developing Word) |
| 1999 - present | Maternal and Child Health Journal, Editorial Board |

Prepared: July 2, 2025

| 2017 - 2017 | Maternal and Child Health Journal, Guest Editor (Long-Acting Reversible Contraceptive Methods in the Developing World, September, 2017) |
| 2017 - 2017 | Journal of Adolescent Health, Guest Editor (Special Supplement on Teenage Pregnancy Prevention) |
| 2019 – present | Health Services Research Journal - Reviewer |
| 2022 - present | Health Affairs Scholar, External Advisory Board |

## INVITED PRESENTATIONS - INTERNATIONAL

| 2005 | Canadian Evaluation Society and American Evaluation Association, Toronto, Canada, | Keynote address |
| 2008 | Binational Conference Defining a Research Agenda on Migration and Health: The Voice of the Community. University of California | Invited Talk |
| 2009 | Binational Conference: IX Semana Binacional de Salud / Ninth Annual Binational Policy Forum on Migration and Health Santa Fe, NM | Plenary Talk |
| 2010 | The 21st Scientific Conference of the Saudi Heart Association. Riyadh, Saudi Arabia | Two invited talks |
| 2010 | Institut Jantung Negara (National Heart Institute), Kuala Lampur, Malaysia | Two invited talks |
| 2011 | Egyptian Society of Cardiology: Adolescent obesity, Systems Change, Pediatric Congenital Health Disease. Alexandria, Eygpt | Three invited talks |
| 2011 | Mexican Society of Cardiology Annual Meeting: Adolescent obesity. Puerta Vallerta, Mexico | Invited talk in Spanish |
| 2012 | Societatea Romana De Cardiologie. National Congress of Cardiology Annual Meeting. Bucharest, Romania. 2012. (Childhood and Adolescent Obesity and the Role of Comprehensive Prevention Approaches) | Invited Talk |
| 2012 | Pan American Health Organization (PAHO) What Works in Pregnancy Prevention: Current Scientific Evidence and Lessons Learned. San Salvador, Salvador. August 24, 2012 (Spanish and English). | Invited Talk (English and Spanish) |
| 2014 | World Bank: International Interagency Conference: Current Evidence, Lessons Learned and Best Practices in Adolescent Pregnancy Prevention in Latin America and the Caribbean, Managua, Nicaragua 2014. | Invited talk in Spanish |
| 2014 | Robert Wood Johnson Foundation, Social Determinants of Migrant's Health Conference: The Burden of the Invisibles: The Experiences of the Deferred Action for Childhood Arrivals Within a Socio-Economic Context. Bellagio, Italy, October 10, 2014 | Invited Talk |

| 2016 | University of Ottawa, Building Health Systems and Health Equity for Populations Affected by Migration. Health Equity Impact Assessment. Ottawa, Canada. May 16-17, 2016. | Invited Talk |
|------|------|------|
| 2017 | Instituto Nacional de Perinatologia, Mexico City, Mexico. Reunion Anual INPer 2017: Salud Sexual y Reproductiva del Adolescente: Impacto Perinatal: Presentation: El Embarazo de Adolescentes en Mexico y en California: Politicas Publicas y Consecuencias Programaticas, April 4, 2017. | Invited Talk |
| 2020 | Adolescent Health and Well Being Issues: A Global Perspective. Indian Institute of Public Health. Gandhinagar, India. January 3, 2020. | Invited presentation |
| 2020 | Living in Time of Uncertainty: Advancing Women's Health in India. Joint International Conference 16th Annual Scientific Symposium. Ahmedabad, India. January 4, 2020. | Invited presentation & panel discussion |

**INVITED PRESENTATIONS - NATIONAL   (2006-Present)**

| 2006 | A Profile of Adolescent Health and Healthcare Needs". National Institute for Health Care Management Foundation; Washington, DC | Keynote address |
|------|------|------|
| 2006 | Future Directions in Adolescent Healthcare Delivery". Society for Research in Adolescent Health, Boston, MA | Keynote address |
| 2006 | Teenage Pregnancy Prevention—Trends and Lessons Learned". Society for Adolescent Medicine, Boston, MA | Keynote address |
| 2006 | Developing a Career in Health Policy and Advocacy". American Public Health Association Student Assembly, Boston, MA | Invited talk |
| 2006 | "Preventing Teenage Pregnancy: Recent Trends and Directions". Contraceptive Technology Annual Meeting, San Francisco, CA | Keynote address |
| 2006 | "The Health and Mental Health Needs of Adolescents". Association of Maternal and Child Health Epidemiology, 12th Annual Conference, OMNI Hotel CNN Center, Atlanta, GA | Keynote address |
| 2007 | "A Profile of Adolescent Health and Healthcare Utilization". The National Academies. Research Workshop on Adolescent Health Care Services and Systems, Washington, DC | Platform presentation |

Prepared: July 2, 2025

| 2007 | "Using State Data to Respond to the Health Needs of Adolescents". Association of Maternal & Child Health Programs Annual Conference, Arlington, VA | Plenary talk |
| 2007 | "Health Care Coverage for Adolescents: Where are the Gaps?". AcademyHealth Meeting, Orlando, FL | Invited talk |
| 2007 | "Meeting the Needs of Adolescents: Promising State Directions". National Conference of State Legislators, Boston, MA | Invited talk |
| 2007 | "Responding to the Health Needs of Adolescent Males: Opportunities and Challenges". The National Campaign to Prevent Teen and Unplanned Pregnancy, Santa Monica, CA | Platform presentation |
| 2007 | "Preconception Health and Health Care". Second National Summit, in collaboration with the Department of Health and Human Services, Centers for Disease Control and Prevention, and the Health Resources and Services Administration, Oakland, CA | Invited talk |
| 2009 | "A Health Profile of America's College Age Students". American College Health Association. Building Bridges by the Bay: 2009 Annual Meeting, San Francisco, CA | Keynote address |
| 2009 | "The Role of Community-Based Organizations in Meeting the Health Needs of Women". National Institutes of Health, NIH/Office of Research in Women's Health and UCSF Center of Excellence in Women's Health, New Dimensions and Strategies for Women's Health Research, National Conference, San Francisco, CA | Platform |
| 2009 | "Evaluating Community Agencies Serving Women: Promising Findings". Johnson and Johnson Foundation and UCSF Center of Excellence in Women's Health. Fostering Excellence in Women's Health Through Academic - Community Partnerships, Annual Convening, Hotel Kabuki, San Francisco, CA | Invited talk |
| 2010 | "Meeting the Health Needs of Adolescents: Future Directions". GrantMakers in Health Annual Meeting on Health Philanthropy, Charting a Healthy Life Course for Children, Orlando, FL | Invited talk |
| 2010 | Using State Profile Data to Develop New Program Strategies". Association of Maternal & Child Health Programs Annual Conference. National Harbor, MD | Invited panelist |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2010 | "The Needs of Adolescents and Young Adults – Future Directions". AcademyHealth Annual Conference, Boston, MA | Invited panel presentation |
| 2010 | "Making Healthy People 2020 Come Alive for Promoting Adolescent Health". 20th Annual CityMatCH Conference. Making Healthy People 2020 Come Alive for Promoting Adolescent Health, Chicago, IL | Invited presentation |
| 2010 | "Maternal and Child Health Reform: Looking to the Future". AMCHP Annual Meeting, Washington, DC | Invited speaker |
| 2011 | "The Environment of Girl's Health and Next Steps in the Creation of a National Initiative to Improve the Health of Young Women and Girls". Department of Health and Human Services, Office on Women's Health, Washington, DC | Invited briefing |
| 2011 | "Approaches for Supporting Pregnant and Parenting Teens". Office of Population Affairs Office of Adolescent Pregnancy Programs; Washington, DC | Invited speaker |
| 2011 | "Male Adolescent Health: Future Directions". The 2011 National Conference for Male Family Planning and Reproductive Health Services, San Francisco, CA. | Invited talk |
| 2011 | "IUD Summit: US Trends in IUD Use". Des Moines, IA. | Invited speaker |
| 2012 | "The Health Needs of Adolescents and Young Adults". AcademyHealth Annual Research Meeting, Washington, DC. | Invited speaker and panelist |
| 2012 | "Lessons Learned in Adolescent Pregnancy Prevention". National Reproductive Health Conference Title X. | Invited speaker |
| 2012 | "Evaluation of the Iowa LARC Initiative: Early Research Findings". Policy Briefings, Des Moines, IA. | Invited speaker |
| 2012 | "A Profile of Adolescent and Young Adult Health". 18th Annual Maternal and Child Health Epidemiology (MCH EPI) Conference. learning.mchb.hrsa.gov | Invited speaker and moderator |
| 2012 | "The Needs of Adolescents: How Can we Best Respond in an Era of Health Reform?" San Francisco Chapter of the National Association of Pediatric Nurse Practitioners. Stanford University, Stanford, CA. | Invited speaker |

Prepared: July 2, 2025

| 2012 | "Making Do with Less: The Impact of State Budget Cuts on California's Teen Pregnancy Prevention Programs". American Public Health Association Annual Meeting. San Francisco, CA. | Invited panel presentation. |
|------|------|------|
| 2012 | "Stayin' Alive and Thriving: Exploring Multiple Dimensions of SBHC Sustainability". American Public Health Association Annual Meeting. San Francisco, CA. | Invited panel presentation |
| 2013 | "Advancing the Maternal & Child Health Vision. The ACA, Adolescents and Young Adults". AMCHP Annual Conference. | Invited speaker |
| 2013 | "Improving the Health, Safety, and Well-being of Young Adults". Institute of Medicine, Washington DC. | Invited speaker |
| 2013 | "Taking Advantage of Natural Experiments for Child Health: Understanding How Policy Impacts Child Health Quality, Costs, and Utilization". AcademyHealth Annual Research Meeting, Washington, DC. | Invited speaker |
| 2013 | "Understanding Contraceptive Use in the United States". American Public Health Association Annual Meeting; Boston, MA. | Invited moderator |
| 2013 | "Following the Passion: Embedding the DNA of Research in a Policy Translation Career". American Public Health Association Annual Meeting. Boston, MA | Invited panel presentation |
| 2013 | "The California Hot Spots Study: Insights into Neighborhood-level Factors Associated with Teenage Pregnancy". American Public Health Association Annual Meeting. Boston, MA. | Invited Panel presentation |
| 2013 | "Exploring and Understanding Newer Reproductive Health Technologies: LARC Provider Perspectives from Colorado and Iowa". American Public Health Association Annual Meeting. Boston, MA. | Invited panel presentation |
| 2014 | "Improving Adolescent Health: State Data Resources". AMCHP Annual Conference. Washington, DC. | Invited speaker |
| 2014 | "Current Issues in Adolescent and Young Adult Health". AMCHP Annual Conference. Washington, DC. | Invited speaker |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2014 | "Accelerating Progress for Adolescent Sexual Reproductive Health: Results from a Multi-Country Needs Assessment". World Bank Group, Washington, DC. | Invited speaker (with Decker, M) |
| 2014 | "Adolescent Development, Implications, and Policy Needs". Ohio Adolescent Health Partnership. Columbus, OH. | Keynote address |
| 2014 | "Realizing the Dream for Californians Eligible for Deferred Action for Childhood Arrivals (DACA): Health Coverage and Mental Health Stressors". Robert Wood Johnson Foundation Nursing and Health Policy Collaborative/University of New Mexico: Assessing the Impact of Immigration and Health Policy. November 21, 2014. | Invited speaker |
| 2015 | "Improving Contraceptive Options Now". Project Advisory Board Meeting, MDRC (organizing foundation). New York, NY. | Invited panelist |
| 2015 | "The Health and Well-being of Young Adults: Highlights from an Institute of Medicine/National Research Council Report". Society for Research in Child Development, Philadelphia, PA. | Roundtable discussion |
| 2015 | "The Impact of the Affordable Care Act on Women." California Wellness Foundation sponsored presentation by the Commonwealth Club of San Francisco. SF, CA. (audio http://bit.ly/1xJHr7c) http://www.commonwealthclub.org/events/2015-03-16/impact-affordable-care-act-women | Invited presentation |
| 2015 | "Adolescents & Young Adults in Title V Transformation: Understanding Needs, Designing & Selecting Measures, and Achieving Outcomes." AMCHP Annual Conference. Washington, DC, January 24, 2015. | Invited speaker |
| 2015 | "The Health & Well-Being of Young Adults." AMCHP Annual Conference. Washington, DC. Washington, DC. January 26, 2015. | Invited speaker |
| 2015 | "Young Adults on Campus: Confronting the Health Challenges." Society for Public Health Education Annual Meeting, Portland, OR. April 23, 2015 | Plenary session |
| 2015 | "Partnering to Encourage Healthy Beverage Intake through Childcare: A Pilot Study." Pediatric Academic Societies (PAS), San Diego, CA. April 25-28, 2015. | Poster presentation |

Prepared: July 2, 2025

| 2015 | "Strategies and Tactics for Achieving Meaningful Consumer Engagement in Health Care." AcademyHealth Advocacy Interest Group (ARM) Interest Group, June 13, 2015. | Invited panel presentation |
|------|---|---|
| 2015 | "In Their Own Words: Improving the Care Experience of Families with Children with Special Health Care Needs." AcademyHealth Child Health Services Interest Group, June 13, 2015. | Invited talk |
| 2015 | "Assuring Access and Use of Health Services by Adolescents and Young Adults under the ACA." U.S. Centers for Disease Control and Prevention, Atlanta, GA. August 17, 2015. | Invited presentation |
| 2015 | "Adolescents in the United States: Health Care for Adolescents: How to Improve it. U.S. Centers for Disease Control and Prevention, Grand Rounds. Atlanta, GA. August 18, 2015. | Invited panel Webinar |
| 2016 | "Assessing Youth-Friendly Health Services (YFHS) for Adolescent Sexual and Reproductive Health: A Systematic Review." Consortium of Universities for Global Health Conference. San Francisco, CA. April 9-11, 2016. | Poster presentation |
| 2016 | "Transforming HealthCare for Adolescents and Young Adults: Improving Quality and Access through Innovation and Collaboration." AMCHP Annual Conference, Washington, DC. April 6, 2016. | Lead panelist |
| 2016 | "Investing in the Health and Well-Being of Young Adults: A Health Profile of Young Adults: A Window of Opportunity for Early Cancer Intervention." Opportunities for Cancer Prevention During Early Adulthood, April 13, 2016, CDC National Association of Chronic Disease Directors. Decatur, GA. | Invited talk |
| 2016 | "Not Lost in Translational Science: Lessons Learned in Building a Research and Policy Pipeline." Emory University. Student Research Day, Atlanta, GA, April 21, 2016. | Keynote address |
| 2016 | "Make Your Own Adventure: Leadership in a Transformative Time" Emory University. Student Research Day, Atlanta, GA. April 21, 2016. | Invited talk |
| 2016 | "Policies: Health Equity Impact Assessment." WHO Collaborating Centre on Technology Assessment and Health Equity- Evidence, Process and Migrant Health, University of Ottawa, May 16, 2016. | Invited panelist |

Prepared: July 2, 2025

| 2016 | "Evidence-Based Innovations to Support Women in Biomedical Research Careers." NIH Office of Research on Women's Health, Bethesda, MD. June 6, 2016. | Invited presentation |
| 2016 | "Policy Translation: A Multi-Method Approach to Evaluating California's Family Planning Policy and Program." Penn State College of Medicine: Division of Health Service and Behavioral Research: Seminar Series (Sponsored by BIRCWH Program). November 14, 2016. | Invited speaker |
| 2016 | "Mental Health Providers in School-Based Health Centers: A Potential Solution to Address Chronic Childhood Trauma." Forum on Promoting Children's Cognitive, Affective and Behavioral Health. The National Academies, Washington, DC. November 29, 2016. | Poster presentation |
| 2017 | "Advocacy for Global Family Planning/Reproductive Health Scale". IBP Consortium Meeting, Chaired by Public Health Institute, Oakland, CA. January 17, 2017. | Keynote address |
| 2017 | "Achieving relevance and visibility in an academic research career - opportunities and potential pitfalls." BIRCWH Leadership Webinar Series (Sponsored by BIRCWH Program). Webinar, June 15, 2017. https://youtu.be/4zaV92w1LuQ | Webinar |
| 2017 | "The Role of Long Acting Reversal Contraceptive: Taking the Pulse." American Public Health Association Annual Meeting, Atlanta, GA. November 6, 2017. | Invited presentation |
| 2017 | "Demonstrating School Health Center Impacts through a Results-Based Accountability Framework." American Public Health Association Annual Meeting, Atlanta, GA. November 6, 2017. | Poster presentation |
| 2017 | "Folks Do Fall Through the Cracks: Barriers to Care for Young Adults Churning Between Health Insurance Plans." American Public Health Association Annual Meeting, Atlanta, GA. November 6, 2017. | Invited presentation |
| 2017 | "Future Policy Directions for Opportunity Youth: Where Do We Go From Here?": Making Connections Matter for Adolescents. John Hopkins University, Baltimore, MA. December 6, 2017. | Invited presentation |

Prepared: July 2, 2025

| 2018 | "Overview and Accomplishments of the AYAH-NRC National Strategies." Society of Adolescent Health and Medicine, Seattle, WA. March 15, 2018. | Invited presentation |
|------|------|------|
| 2018 | "What's New in Clinical Preventive Services? New Evidence, Guidelines, Policies – Challenges and Opportunities". Society of Adolescent Health and Medicine, Seattle, WA. March 14-17, 2018. | Invited presentation |
| 2018 | "Healthcare at a Crossroads: Where Do We Go From Here?" Initiative for Regulation and Applied Economic Analysis Conference, Montana State University, Bozeman, MT. April 5-6, 2018. | Invited 2 presentations |
| 2018 | "Through The Looking Glass: The Role of Clinical Preventive Visits in Improving Adolescent Health". Oregon Pediatric Society Conference, Portland, OR, April 28, 2018. | Invited presentation |
| 2018 | "Creating Access to Care for Adolescent and Young Adult Males". 2018 National Adolescent and Young Adult Male Summit, Washington, DC. June 7, 2018. | Invited Keynote |
| 2018 | "Advancing Health Equity and Justice in California: A Landscape Analysis". Grantmakers in Health Conference. Chicago, IL, June 19, 2018. | Invited presentation |
| 2019 | "Use of Youth-Centered Mobile Health Application, Health-E You/Salud iTu, to Reduce Disparities in Contraceptive Knowledge, Access and Unintended Pregnancy Among Sexually Active Latina Adolescents". Society for Adolescent Health and Medicine Annual Meeting, Washington, DC. March 6-8, 2019. | Poster presentation |
| 2019 | "The Promise of Adolescence". Society of Preventions Research Annual Meeting. San Francisco, CA. May 30, 2019. | Roundtable discussion |
| 2019 | "Joining Forces: Advancing an Agenda for Adolescent Mental Health Services" AcademyHealth Summit on Teen Mental Health Crises. Washington, DC. June 5, 2019. | Invited presentation |
| 2019 | "Race, Gender, and Immigration Status: New Frontiers in Health Funding for Latinx". GIH Annual Conference on Health Philanthropy. Seattle, WA. June 13, 2019. | Invited presentation |

Prepared: July 2, 2025

| 2019 | "Walking the Walk: Applying Positive Youth Development Approaches to Adolescent Health". American Public Health Association, Office of Adolescent Health and Office of Population Affairs, Office of the Assistant Secretary for Health, U.S. Department of Health and Human Services. June 18, 2019. | Invited webinar presentation |
|------|------|------|
| 2019 | "Migration roles in the Lives of Latina Youth: A Binational Comparison". APHA Annual Meeting, Philadelphia, PA. November 4, 2019. | Invited presentation |
| 2020 | "The Promise of Adolescence" Health System Webinar. Board of Children, Youth, and Families. The National Academies of Science, Engineering, and Medicine. March 26, 2020. | Invited webinar presentation |
| 2020 | "Flourishing in Adolescence: Forum for Children's Well-Being Spring Virtual Workshop". The Promise of Adolescence: Realizing Opportunity for All Youth. The National Academies of Science, Engineering, and Medicine. May 5, 2020. | Invited presentation |
| 2023 | Improving the Health and Well-Being of Adolescent and Young Adult Health through System Transformation, Committee on Improving the Health and Wellbeing of Children and Youth through Health Care System Transformation, National Academy of Science, Engineering, and Medicine, February 28, 2023 | Invited Presenter |
| 2023 | National Academy of Sciences, Engineering, and Medicine, "After Roe: Physician Perspectives & Workforce Implications," on May 25, 2023, you can view a recording of that event via the link below. https://nam.edu/event/after-dobbs-physician-perspectives-workforce-implications/ | Session planner and moderator |
| 2024 | National Academy of Medicine, Council Meeting: Panel on the Standing Committee on Reproductive Health. Equity and Society | Session planner, speaker, and moderator |
| 2024 | National Academy of Sciences, Engineering and Health, Standing Committee on Reproductive Health, Equity and Society, Promising Strategies to Address Health Disparities Across the Reproductive Life Cycle. A Webinar | Session planner and moderator |

Prepared: July 2, 2025

| 2025 | Implications For Primary Care of New Directions for Women's Health: Expanding Understanding, Improving Research, and Addressing Workforce Limitations, National Academy of Sciences, Engineering, and Medicine, Standing Committee on Primary Care|. | Speaker |

## INVITED PRESENTATIONS - REGIONAL AND OTHER INVITED PRESENTATIONS

| 2004 | "Adolescent Pregnancy: A Current Profile and Dilemma for Clinicians and Other Decision makers," Clinical Conference of Child and Adolescent Psychiatry, Langley Porter, Psychiatric Institute, UCSF, San Francisco, CA | Invited lecture |
| 2006 | "The Use of Focus Group Research Methodology in Health Services Research," Health Policy Post-Doctoral Program, UCSF | Invited lecture |
| 2006 | "Conducting Effective Community Needs Assessments for Adolescent Health," Program in Maternal and Child Health, School of Public Health, UC Berkeley, CA | Invited lecture |
| 2006 | "A Profile of Adolescent Health – Miles to Go Before We Go to Sleep". Howard University Lecture Series, Washington DC | Invited lecture |
| 2006 | "Past, Present, and Future of Teenage Pregnancy Prevention", State of California, Maternal, Child, and Adolescent Branch, Teen Pregnancy Prevention Annual Meeting, Burlingame, CA | Keynote address |
| 2006 | "Adolescent Pregnancy and its Role in Health Disparities". Department of Health, DC-Baltimore Research Center on Child Health Disparities, Washington DC | Plenary talk |
| 2006 | "Creating a California Strategic Plan for Adolescents". California Adolescent Health Conference, Adolescent Health Collaborative, Oakland, CA | Plenary talk |
| 2006 | "Meeting the Needs of Adolescents in California". The California Wellness Foundation's Conference on Teenage Pregnancy Prevention, Oakland, CA | Keynote address |
| 2006 | "A Profile of Adolescent Health and Healthcare Coverage". Children's National Medical Center, Grand Rounds, Washington DC | Invited lecture |
| 2006 | "Teenage Pregnancy Prevention". Pediatric Grand Rounds, Department of Pediatrics, UCSF | Invited lecture |
| 2007 | "Future Directions in Teenage Pregnancy Prevention". The California Wellness Foundation Conference on Teenage Pregnancy Prevention, San Francisco, CA | Keynote address |

Prepared: July 2, 2025

| 2008 | "Teenage Pregnancy Prevention --- Lessons Learned". 5th Annual Conference: The Adolescent Working Group, San Francisco, CA | Plenary talk |
|------|------|------|
| 2008 | "The Family PACT Program: Evaluation Findings". Family PACT Conference for California Counties: Optimizing Family PACT in a County Health System, Sacramento, CA | Invited talk |
| 2008 | "Parental Notification: What Can Be Learned from the Experience of Other States?" Grand Rounds, Department of Obstetrics, Gynecology, and Reproductive Health Sciences, UCSF, San Francisco, CA | Invited lecture |
| 2008 | "Translating Research in Policy: Lessons Learned". Institute for Health Policy Studies, Post-Doctoral Fellowship, UCSF, San Francisco, CA | Invited lecture |
| 2008 | " Meeting the Needs of Immigrant Youth: Promising Directions". The Center for Comparative Immigration Studies, (CCIS) Weaver Center, University of California, San Diego | Invited talk |
| 2008 | "Cross-Border Health: Creating an Agenda for Future Directions". Global Health Forum, UCSF, San Francisco, CA | Invited talk |
| 2009 | "Adolescent Pregnancy Prevention: Making Progress and Not Losing Ground". The California Wellness Foundation Conference on Teenage Pregnancy Prevention, Los Angeles, CA | Keynote address |
| 2009 | "A Profile of Adolescent Health – Beyond Teenage Pregnancy Prevention". Adolescent Sexual Health Symposium, ACT for Youth Center of Excellence, New York, NY | Invited talk |
| 2009 | "Women's Health in California – Making Inroads". The California Wellness Foundation Conference on Women's Health, San Francisco, CA | Invited plenary talk |
| 2009 | Testimony on the Role of School Based Health Centers. State of California Assembly Legislature, Committee on Schools and Community, Informational Hearing | Invited talk |
| 2009 | "The Role of Teenage Pregnancy Prevention in Improving Economic Outcomes". Berkeley Center on Health Economics and Family Security, University of California, Berkeley, CA | Invited panel moderator |
| 2009 | "Prevention of Adolescent Cancer". UCSF Helen Diller Comprehensive Cancer Center Annual Symposium: The Prevention of Cancer, San Francisco, CA | Invited speaker |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2009 | Expert Testimony on School Based Health Centers. State of California, Assembly Select Committee on Schools and Community | Invited speaker |
| 2009 | Health Care Reform (Part of a Mini-Medical School series), UCSF Medical School of Medicine, UCSF, San Francisco, CA | Invited lecture |
| 2010 | "Meeting the Needs of Pregnant and Parenting Adolescents – Evaluation Findings". Adolescent Family Life Annual Conference, Oakland, CA | Invited speaker |
| 2010 | "Comparative Effectiveness Research: Opportunities and Challenges". Clinical and Translational Science Institute and the San Francisco Coordinating Center, San Francisco, CA | Invited panelist |
| 2010 | "Qualitative Research Methods in Immigrant Health". University of California Global Health Institute Center of Expertise on Migration and Health. First Annual Research Training Workshop. UC San Diego | Invited panelist |
| 2010 | "Health Care Reform in California: A UC View of Prospects and Challenges". In cooperation with the California Senate Health Committee; California Program on Access to Care. UC Berkeley School of Public Health. | Invited presentation |
| 2010 | "Migration and Health in California". University of California, Irvine Global Health Day. | Invited speaker |
| 2010 | "The Evaluation of the Family PACT Program". School of Public Health, University of California, Berkeley. | Invited speaker |
| 2010 | "Teenage Pregnancy Prevention - What Lies Ahead?" The California Wellness Foundation Conference, San Francisco, CA | Invited speaker |
| 2011 | "Organizational Learning and Evaluation: Implications for Future Investments". The California Wellness Foundation Conference, Los Angeles, CA | Invited speaker |
| 2011 | "Disparities in Health". Young Scholars Group, Department of Epidemiology and Biostatistics and CTSI, UCSF | Invited talk |
| 2011 | "Conducting Multi-Disciplinary Research in Family Planning Care". Bridging Interdisciplinary Research Careers in Women's Health (BIRCWH) health seminar series, UCSF | Invited talk |
| 2011 | "Promising Strategies: Improving Adolescent Health". San Mateo County Teen Pregnancy Prevention Summit. San Mateo, CA. | Invited plenary speaker |
| 2011 | "Conducting Program Evaluation in Family Planning". Bixby Center for Global Reproductive Sciences Research Seminar. San Francisco, CA | Invited speaker |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2012 | "Reflections and Lessons Learned in Establishing the Women's Preventive Health Services". 40th Annual Psychosocial Workshop. San Francisco, CA. | Invited keynote speaker |
| 2012 | "Lessons Learned in Developing a Research and Advocacy Career". Clinic, Advocacy, Research and Training (CART) Group, Office of Developmental Primary Care, UCSF | Invited talk |
| 2012 | "Health Policy in Community Engagement". Fellowship of Fellows, UCSF | Invited talk |
| 2012 | Young Adult Health and Well-Being: Trends and Promises". Promoting Positive Development in the Third Decade of Life: A Multidisciplinary and International Conference. Center for Advanced Study in the Behavioral Sciences, Stanford University, CA. | Invited panel presentation |
| 2012 | "Adolescent Health Insurance Coverage – How can the ACA Improve the Health of Adolescents". Adolescent Health Care Conference. San Francisco, CA. | Invited Keynote |
| 2012 | "Migrant Health – Creating a Bi-National Agenda for Research". 7th Annual Summer Institute on Migration and Global Health. | Invited talk |
| 2012 | School of Medicine Pathways Explorers in Health and Society on Shaping a policy Translation Career. | Invited talk/panel |
| 2012 | "A Profile of Native American Adolescents in California". State Indian Health Program. Sacramento, CA. | Invited talk |
| 2013 | "Health Care Reform". Robert Wood Johnson Health and Society Policy Scholars Program. San Francisco, CA. | Invited lecture |
| 2013 | "Health Care Reform". (Part of a Mini-Medical School series), UCSF Medical School of Medicine, UCSF, San Francisco, CA | Invited lecture |
| 2013 | "Taking the Pulse and Moving Forward-Reducing Teenage Pregnancy in Santa Clara County". Santa Clara County Adolescent Pregnancy Prevention Network (APPN) Retreat. | Invited talk |
| 2013 | "Aligning Assets to Improve Community Health and Health Equity: SFHIP Lessons and Strategic Directions". San Francisco Health Improvement Partnerships. San Francisco, CA | Invited talk |
| 2013 | "Taking the Pulse: Improving the Health, Safety and Well-Being of Young Adults". UCSF Center for Vulnerable Populations Seminar Series, San Francisco, CA | Invited lecture |
| 2013 | "The Role of Program Evaluation and Advocacy". Changing the World through Life Science Innovation Symposium. University of San Francisco, CA | Invited speaker |

Prepared: July 2, 2025

| 2013 | "Adolescent and Young Adult Health: Implications for Public Health, Mental Health Policy, and Clinical Services". Department of Psychiatry, Child and Adolescent Psychiatry (CAP) Grand Rounds, UCSF, San Francisco, CA | Invited lecture |
| 2013 | "The Effect of Public Family Planning Services on Fertility". Implementation Science and the Global Response to HIV/AIDS. UCSF CFAR 2013 Symposium. | Invited speaker |
| 2013 | "Report Back from the Institute of Medicine Meeting: Improving the Health, Safety and Wellbeing of Young Adults". UCSF Center for Vulnerable Populations Seminar Series (also available as video at CHARM Website), San Francisco, CA | Invited lecture |
| 2014 | "Adolescent and Young Adult Health in San Francisco: Opportunities for Change". Health Working Group (AHWG), 11th Annual Provider Training: Patient-Centered Care for Young Women, San Francisco, CA | Keynote speaker |
| 2014 | "Funding Your Research Beyond the NIH". UCSF Faculty Development Day. UCSF Campus Council on Faculty Life. September, 2014 | Invited panelist |
| 2014 | "How Will We Know it is Working: Monitoring the Impact of the ACA in Years to Come". PRL-IHPS-Osher Mini Medical School on Health Reform, UCSF, San Francisco, CA | Invited panelist |
| 2014 | "Assessing the Impact of Health Care Reform". Health Policy Colloquium, UC Berkeley, Berkeley, CA | Invited panelist |
| 2015 | "Findings From the Family PACT Providers and Health Care Reform Implementation Study". California State Department of Health Care Services. January 2015. | Invited presentation |
| 2015 | "No Federal Immigration Reform? What States Can Do to Improve the Health of Undocumented Workers". 2015 UC Global Health Day. UC Global Health Institute and UCLA. April 18 2015. | Plenary panel |
| 2015 | "Aligning Health Care and Social Determinants of Health". Spring Research Symposium: Healthy Communities Research at UC Berkeley. UC Berkeley School of Public Health. May 7, 2015 | Invited talk |
| 2016 | "Alumni Health Care Roundtable on Health Care Reform". Moderator Janet Napolitano; Claire Brindis panelist. The (UCSF) Chancellor's Breakfast/Alumni Weekend, San Francisco, April 9, 2016. | Invited panelist |

Prepared: July 2, 2025

| 2017 | "Living in a Time of Uncertainty: Advancing Women's Health in 2017 and Beyond". UCSF Monthly Collaboratory Series. San Francisco, CA. January 12, 2017. | Moderator/panelist |
| 2017 | "Making an Impact in Science through Positive Influence". Leadership Panel: "Understanding, Bridging, Inspiring." UCSF Zuckerberg SFGH. Symposium, February 2, 2017. | Lead panelist |
| 2017 | "The Threat of the Trump Administration for Women's Access to Reproductive and other Preventive Health Services for Women". UCSF Community Dialogue for Women's Health, January 20, 2017. | Invited panelist |
| 2017 | "Lessons Learned in Translating Research into Policy." Research That Gets Results: A Symposium on Science-Driven Policy Change. Bixby Center for Global Reproductive Health. March 2, 2017. | Invited panel presentation |
| 2017 | "Science Advocacy 101". Forum with Vice Chancellor for Science Policy and Strategy. In the series of "Advocating for Science and Scientists in 2017 and Beyond." Graduate Division and the Science Policy Group at UCSF March 27, 2017. https://graduate.ucsf.edu/be-an-advocate | Invited panelist |
| 2017 | "Federal Policy in 2017: What Faculty Should Know and What They Can Do." University of California, San Francisco Academic Senate Division Meeting, May 11, 2017. https://senate.ucsf.edu/division-meeting. | Invited presentation |
| 2017 | "At the Policy Forefront: Evaluating California's Efforts in Assuring Access to Quality Reproductive Health." University of California, Sacramento Speakers Series: August 2, 2017. http://uccs.ucdavis.edu/events/2017-August-2-Brindis | Invited presentation |
| 2017 | "Trumpcare: Is It the Right Treatment for What Ails the American Health Care System?" Commonwealth Club, San Francisco. August 3, 2017. | Invited presentation |
| 2017 | "Lessons Learned in a Policy Translation Research Career". Dean's Forum on Public Service. Herbst Hall Auditorium, UCSF Mt Zion Campus. August 28, 2017. | Invited presentation |
| 2017 | "At Risk – Protecting Women's Health During a Time of Uncertainly." The Yale Alumni NonProfit Alliance, San Francisco. November 14, 2017. | Invited presentation |
| 2017 | UCSF Preterm Birth Initiative World Prematurity Day: The CA Policy Roundtable Working Toward a Policy Action Agenda. San Francisco, CA. November 15, 2017. | Invited session chair |
| 2018 | "Personal Leadership Development". Johnson & Johnson Foundation: GenH Challenge: Personal Leadership Development. San Francisco, CA. January 18, 2018. | Invited presentation |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2018 | "Mentorship and Sponsorship are Crucial to Career Development for Women Faculty". UCSF Faculty Mentoring Program. Mentorship and Sponsorship are Crucial to Career Development for Women Faculty. San Francisco, CA. January 31, 2018. | Invited panelist |
| 2018 | "Discussion on Childhood Mortality". Clinical and Translational Research Fellowship Journal Club, Discussion on Childhood Mortality. University of California, San Francisco, CA. February 15, 2018. | Expert discussant |
| 2018 | "The Role of Policy Research within Precision Medicine". Marcus Mixer2: Marcus Program in Precision Medicine Innovation (MPPMI), UCSF Research Development Office's Team Science Program. University of California, San Francisco, CA. February 21, 2018. | Invited speaker |
| 2018 | "The Role of Academic Centers within the Field". First Annual Colloquium on Population Health and Health Equity. University of California, San Francisco, CA. May 28, 2018. | Invited panelist |
| 2018 | "Theories, Design, Strategies, and Instruments for Evaluating Advocacy and Policy Change Initiatives". San Francisco Bay Area Evaluator's Workshop. San Francisco, CA, June 20, 2018 | Invited presentation |
| 2018 | "Policy Translation: Lessons Learned". RISE Speaker Series, Center for Vulnerable Population. University of California, San Francisco, CA. July 11, 2018 | Invited presentation |
| 2018 | "Lessons Learned in Developing a Policy Translational Career in Reproductive Health". Brown Bag Luncheon Series, Philip R. Lee Institute for Health Policy Studies. University of California, San Francisco, CA. August 21, 2018. | Invited presentation |
| 2018 | "Advancing Health Equity and Justice in California: A Landscape Analysis". Hispanics in Philanthropy Advancing Latino Health Equity Convening. Oakland, CA. November 7, 2018. | Invited presentation |
| 2018 | "Through the California Crystal Ball: A Health Landscape and Future Direction". National Advisory Council and Faculty Task Force, California Health Benefits Review Program Annual Meeting. Berkeley, CA. November 15, 2018. | Keynote speaker |
| 2018 | "Organizer of Within Your Reach: Using Implementation Science to Advance Your Team Science". UCSF Research Development Office's Team Science Program. University of California, San Francisco, CA. December 11, 2018. | Moderator |

Prepared: July 2, 2025

| 2019 | "What comes next: How the midterm election results impact reproductive rights and health". California Preterm Birth Initiative Collaboratory Discussion Series. University of California, San Francisco, CA. December 13, 2018. | Moderator |
|---|---|---|
| 2019 | Writing for Policy Makers Workshop Series, 3 Part Series. Science Policy Group, University of California, San Francisco, CA. February 21 and March 4, 2019. | Moderator/panelist |
| 2019 | Translating Research into Policy Action, UCSF California Preterm Birth Initiative Grantee Workshop, University of California, CA. April 4, 2019. | Invited session chair |
| 2019 | Summer School: UC Network on Child Health, Poverty and Public Policy, UC Berkeley, CA. September 4, 2019. | Invited panelist |
| 2019 | "Surviving on Soft Money Environment". Building Interdisciplinary Research Careers in Women's Health (BIRCWH) Meeting, UC Davis, CA. October 7, 2019. | Moderator/panelist |
| 2019 | "Not Lost in Translational Science: Lessons Learned in Building a Research and Policy Pipeline". Global Health Science Seminar, UCSF, San Francisco, CA. October 31, 2019. | Invited presentation |
| 2020 | "The Promise and Challenges of the ACA for Women, Young Adults, and Adolescents ". Rossmoor Healthcare Forum. Myths, Realities and Options. Walnut Creek, CA. January 25, 2020. | Invited presentation |
| 2021 | "Recommendations on Diversity, Equity, and Inclusion in Health Services Research", AcademyHealth Annual Meeting, Washington, DC. | Invited Commentator |
| 2023 | Screening adolescents for Adverse Childhood Experiences (ACEs): Incorporating resilience and youth development | Invited Presentation |
| 2024 | Screening adolescents for Adverse Childhood Experiences (ACEs): Addressing the unique needs of immigrant youth ACES Aware Meeting, February 24,2023 | Invited Presentation |
| 2024 | Lessons Learned in Career Advancement of Historically Excluded Faculty, UCSF Mid-Career Faculty Development Program | Invited Presentation |
| 2025 | NASEM Webinar : Promising Strategies to Address Health Disparities Across the Reproductive Health Lifecycle (https://www.nationalacademies.org/event/43065_07-2024_promising-strategies-to-address-health-disparities-across-the-reproductive-life-cycle-a-webinar) A Policy Framework for Advancing Environment and Health Outcomes, UC Center for Climate, Health and Equity | Panel Presentation |

Prepared: July 2, 2025

**GOVERNMENT AND OTHER PROFESSIONAL SERVICE**

| | | |
|---|---|---|
| 1988 - 1991 | Office of Technology Assessment Adolescent Health, U.S. Congress | Advisory Panel |
| 1994 - 2000 | Community Partnerships for Healthy Children Initiative, Sierra Health Foundation, Sacramento, California. | Evaluation |
| 1995 - 2015 | National Campaign to Prevent Teenage Pregnancy | Program Effectiveness Task Force, State and Local Leadership Task Force, Science into Policy National Advisory Latino Initiative |
| 1995 - 2000 | Community Coalition Partnership Programs for the Prevention of Adolescent Pregnancy, Centers for Disease Control and Prevention, Atlanta, Georgia | Consultant |
| 1995 - 1997 | Adolescent Pregnancy Prevention Initiative, The California Wellness Foundation. | Advisor |
| 1995 - 2002 | Adolescent Pregnancy Prevention Initiative, Johnson & Johnson Corporation and the National Organization for Adolescent Pregnancy and Parenting (NOAPP), Washington, DC | National Advisory Committee |
| 1995 - 1995 | Adolescent Health Work Group, Maternal and Child Health Bureau, U.S. Department of Health and Human Services. | Member |
| 1996 - 1998 | Steering Committee on Welfare Redesign, California Department of Social Services | Member |
| 1996 - 2000 | Adolescent Managed Care Advisory Committee Children Now, Oakland, California | Member |
| 1996 - 2000 | Georgia Campaign to Prevent Adolescent Pregnancy, Jane Fonda, Turner Foundation, Atlanta, Georgia | Consultant |
| 1997 - 1997 | Kaiser Kids Health Insurance Initiative, Kaiser Permanente Health Plan | Consultant |
| 1997 - 1997 | Year 2000 Community Initiative, David and Lucile Packard Foundation | Consultant |
| 1998 - 1998 | Community Partnerships to Reduce Teenage Pregnancies, The Flinn Foundation, Phoenix, Arizona | Consultant |
| 1999 - 1999 | Messengers and Methods for the New Millennium; A Round Table for Adolescents and Contraception. National Campaign to Prevent Teenage Pregnancy, and Advocates for Youth, Washington, DC | Member |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 1999 - present | National Teenage Pregnancy Prevention Research Center, University of Minnesota and Centers for Disease Control and Prevention | National Advisory Board |
| 1999 - present | California Adolescent Health Collaborative | Co-Director and Executive Steering Committee Member |
| 1996 - 1997 | Advocates for Youth, Washington, DC | Program/Policy Committee Chair, Executive Committee, and Chair, Board of Directors |
| 1996 - 1999 | Frontiers of Research on Children, Youth, and Families Committee, Institute of Medicine National Research Council, Washington, DC | Member |
| 1997 - 1997 | Open Society Foundation, New York, NY | Advisor |
| 1997 - 2000 | Development of Community Guidelines for Preventive Services, Centers for Disease Control and Prevention, Atlanta, GA | Advisory Committee |
| 1997 - 2000 | Preventing Teen Pregnancy: Sharing Lessons Learned" Project. Centers for Disease Control and Prevention, and University of South Carolina, School of Public Health | Expert Panel |
| 1997 - 2001 | Board on Children, Youth, and Families, National Research Council, Institute of Medicine, Washington, DC | Forum on Adolescence |
| 1997 - 2002 | Adolescent Pregnancy Prevention Replication Project, Kansas Health Foundation | Technical Review Advisory Committee |
| 1997 - 1997 | Partnership for Information and Communication. Maternal and Child Health Bureau, Washington, DC | Inter-Organizational Workgroup |
| 1997 - 1999 | National Health Promotion and Disease Prevention Objectives for the Year 2010, Centers for Disease Control and Prevention | Core Work Group for Developing and Implementing Adolescent Health Objectives |
| 1998 - 1998 | Pan American Health Organization (PAHO), Division of Health Promotion and Protection, Family Health and Population Program, Washington, DC. Policies for Adolescents and Young Adults of the Americas | Advisory Group |
| 1998 - 1998 | Development of a Family Health Initiative, Maternal and Child Health Bureau, Washington, DC | Advisory Committee |
| 1998 - 2000 | Health Initiatives for Youth, San Francisco | Member, Adolescent Health Working Group |
| 1998 - 2004 | Centro Mujeres, La Paz, Baja California Sur, Mexico | Advisory Board |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 1998 - 2010 | Addressing Barriers to Student Learning: Closing Gaps in School/Community Policy and Practice, Center for Mental Health in Schools, Department of Psychology, UCLA | Steering Group |
| 1998 - 2001 | Girl Neighborhood Power! Building Bright Futures for Success Initiative, Healthy Mothers, Healthy Babies Coalition, Washington, DC | Steering Committee |
| 1999 - 1999 | CDC Teen Pregnancy Prevention Consensus Panel on Replication, Atlanta, GA | Panel Member |
| 1999 - 2002 | Association of Maternal and Child Health Programs, Adolescent Data and Systems project (cooperative agreement with Centers for Disease Control and Prevention, Division of Adolescent and School Health) | Advisory Panel |
| 1999 - 2002 | Women's Health Report Card Project, National Women's Law Center, the Focus on the Health of Women Project of the University of Pennsylvania Medical Center, and the Lewin Group, Inc | National Advisory Board |
| 2000 - 2001 | Adolescent Report Card Project, Children Now, Oakland, California. | Member |
| 2000 - 2002 | Sexuality and Reproductive Health Expert Panel of the Health, Mental Health and Safety in Schools Guideline Project, American Academy of Pediatrics, funded by Maternal and Child Health Bureau, U.S. DHHS | Chair |
| 2000 - 2002 | Workgroup on Standardizing Adolescent Performance Measures, Association of Maternal and Child Health Programs, Washington, DC | Member |
| 2001 - 2001 | State Team, Joint Work Group on School-Based Teen Pregnancy Prevention, California Department of Education, California Department of Health Services, National School Boards Association, Washington, DC. | Team Member |
| 2001 - 2001 | Workgroup on Teen Pregnancy Prevention Programs, California Department of Health Services, Sacramento, California. | Member |
| 2001 - 2001 | Workgroup, Implementation of California's School Health Blueprint, California Department of Education and Department of Health, Sacramento, California. | Member |

Prepared: July 2, 2025

| 2001 - 2002 | Women's Health Panel, Bright Futures for Women's Health and Well-Being: National Guidelines Project, Maternal & Child Health Bureau, DHHS, Washington, DC | Steering Committee; Chair, Adolescent Health Committee |
|---|---|---|
| 2001 - 2004 | Policy Committee, California Chlamydia Action Coalition, sponsored by the California Department of Health Services, California HealthCare Foundation, and the University of California, San Francisco. | Member |
| 2001 - present | National Expert Panel, 2003 Children's National Health Survey, National Center for Health Statistics, funded by Bureau of Maternal and Child Health | Member |
| 2002 - 2002 | National Advisory Board, Georgia Campaign to Prevent Teenage Pregnancy, Jane Fonda, Executive Director | Member |
| 2003 - 2005 | Delivery Improvement, Technical Expert Panel Meeting, U.S. Public Health Title X, Washington, DC | Member |
| 2003 - 2005 | International Planned Parenthood Federation- Latin America Development of Peer Provider Manual Project | Consultant |
| 2005 - 2005 | Johns Hopkins School of Public Health Maternal and Child Health Training Program | Advisory Committee |
| 2005 - 2005 | Grantmakers for Children, Youth & Families Maternal and Child Health Issues | Advisory Committee |
| 2005 - 2005 | Public Policy Institute, California | Advisory Committee |
| 2005 - 2007 | Contributions from the Behavioral & Social Sciences in Reducing and Preventing Teen Motor Crashes Institute of Medicine and the Division of Behavioral and Social Sciences and Education. The National Academies of Sciences, Washington DC. | Committee Member |
| 2006 - 2006 | CDC Adolescent Sexual and Reproductive Health Portfolio (ASRH | Member, Expert Panel Review |
| 2006 - 2006 | Centers for Disease Control Health Promotion and Disease Prevention Research Centers: Reproductive Health and Review Panel, Atlanta, GA | Child & Adolescent Health Review Panel |
| 2006 - 2010 | NARAL, Pro-Choice America Foundation | Board of Directors, Chair, Program Committee |
| 2007 - 2007 | Federal Office of Population Affairs, Washington, DC | Technical Experts Advisory Committee |

Prepared: July 2, 2025

| 2007 - 2009 | Institute of Medicine (IOM) Committee: A Comprehensive Review of the DHHS Office of Family Planning Title X Program | Member |
|---|---|---|
| 2008 - 2008 | CARTA Study on Adolescent Sexual Health Disparities | Consultant |
| 2008 - 2008 | Advisory Council, San Francisco County Adolescent Health Working Group, San Francisco, CA. | Member |
| 2009 - 2020 | National Adolescent Health Objectives 2020, Centers for Disease Control and Bureau of Maternal and Child Health | Consultant |
| 2009 - 2022 | National Institute of Health (NIH) | Ad Hoc Challenge Grant Reviewer, |
| 2009 - 2010 | California Breast Cancer Research Program Priority Setting Process, Oakland, CA | Policy Evaluation Advisor |
| 2009 - 2011 | Institute of Medicine (IOM) Committee on Pediatric Health and Health Care Quality Measures | Member |
| 2009 - 2020 | National Institute of Child Health and Human Development (NICHD) | Scientific Reviewer |
| 2009 - 2010 | Tipping Point Community, San Francisco, CA | Evaluation Consultant |
| 2010 - 2015 | Reproductive Life Plan, Education, Access to Health care in College High Risk (REACH) Teens California Leadership Advisory Group | Advisory Group Member |
| 2010 - 2010 | AcademyHealth Abstract Review Committee | Member |
| 2010 - 2011 | Institute of Medicine (IOM) Committee on Preventive Services for Women | Member |
| 2010 - 2010 | Centers for Disease Control and Prevention (CDC) Division of Adolescent School Health (DASH), Expert Panel | Consultant |
| 2011 - 2012 | Guttmacher Institute | Board of Directors |
| 2011 - 2011 | Office of Population Affairs (OPA), Office of Family Planning (OFP), and the Centers for Disease Control and Prevention. Revision of the Title X Family Planning Program Guidelines, Adolescent Panel | Member |
| 2011 - 2018 | Public Health Institute | Board Member |
| 2011 - 2012 | Guttmacher Institute | Board Member |
| 2012 - 2012 | Department of Health and Human Services (HHS) and Health Research Services Administration (HRSA) Office of Women's Health Expert Panel on Curriculum Development in Women's Health | Expert Panel Member |

Prepared: July 2, 2025

| 2012 - 2012 | AcademyHealth Aetna-National Assembly on School-Based Health (NASBHC) Care Coordination | Advisory Committee Member |
| --- | --- | --- |
| 2012 - 2014 | California Health Interview Survey (CHIS) Adolescent Technical Advisory Committee. | Chair |
| 2013 - 2013 | Department of Health and Human Services (HHS) and the Office of Adolescent Health (OAH) "Think Adolescent Health" agenda | Expert Panel Member |
| 2013 - 2013 | Department of Health and Human Services (HHS) and the Office of Adolescent Health (OAH) Technical Workgroup: Cost Study of Evidence-Based Teen Pregnancy Prevention (TPP) Programs. | Technical Working Group Member |
| 2013 - 2013 | National Academy of Medicine (NAM, formerly IOM) Workshop Panel | Member |
| 2013 - 2014 | Drexel University DrPH/Health Policy and Social Justice Advisory Committee | Committee Member |
| 2013 - 2015 | Patient Centered Outcomes Research Institute/PCORI Evaluation Group. | External Advisor |
| 2013 - 2014 | National Academies of Science (formerly IOM): Improving the Health, Safety and Well-being of Young Adults | Committee Member |
| 2014 - present | National Academies of Science (formerly IOM) Interest Group: Health Policy and Health Care Systems | Committee Member |
| 2015 - 2018 | California Health Interview Survey (CHIS) Adolescent Technical Advisory Committee. | Chair |
| 2015 - 2020 | Centers for Disease Control and Prevention. Division of the National Health Interview Survey: The National Survey of Children's Health | Technical Expert Panel Member |
| 2016 - 2018 | Public Health Institute (PHI) Audit Committee | Chair |
| 2016 - 2018 | California Health Interview Survey (CHIS) Teen Technical Advisory Committee (TAC) | Chair |
| 2016 - 2020 | Urban Institute: Beyond Birth Control Project: Family Planning and Women's Lives Advisory Group | Consultant |
| 2016 - 2018 | National Academies of Sciences, Engineering, and Medicine's (the Academies) Committee on Improving Health Outcomes in Children with Disabilities | Member |
| 2017 - 2022 | AcademyHealth | Board Secretary; Chair, Governance Committee, Membership Committee |

Prepared: July 2, 2025

| 2017 - 2018 | John Hopkins Bloomberg School of Public Health: The Bloomberg American Health Initiative | National Advisory Board |
| 2017 - 2018 | California Health Interview Survey (CHIS) Adolescent Technical Advisory Committee. | Technical Advisory Committee |
| 2018 - present | National Academy of Medicine, Committee on Science, Engineering and Medicine and Public Policy (COSEMPUP) | Committee Member |
| 2018 - 2019 | Urban Institute: Reproductive Health Care Access Group | Advisory Committee Member |
| 2018 - 2019 | National Academies of Sciences, Committee on Neurobiological and Socio-Behavioral Science of Adolescent Development and Its Applications | Committee Member |
| 2018 - 2019 | Campaign for Male Youth, The Partnership for Male Youth | Advisory Panel Committee |
| 2018 - 2019 | Adolescent Reproductive Health: Clinical Program Improvements Workgroup. Division of Reproductive Health, US Center for Disease Control and Prevention | Member |
| 2019 - 2024 | National Academy of Medicine, Diversity Committee | Member |
| 2019 - present | Vanderbilt University Medical Center (VUMC) | Biomedical Science Advisory Board |
| 2020 - 2021 | CDC Developing and Evaluating Adolescent, Parent, and Provider Resources to Improve Adolescent Use of Sexual Health Services | Special Emphasis Panel Member |

| 2021 – 2024 | California Health Interview Survey (CHIS) Teen Technical Advisory Committee | Chair, Member |
| 2022 | Office of the Assistant Secretary for Preparedness and Response (ASPR), At-Risk Individuals (ARI) Program, Health Resources and Services Administration (HRSA), Maternal and Child Health Bureau (MCHB), HHS Child and Adolescent Health Emergency Planning Toolkit:Guidance for Addressing the Needs of Children and Youth with Special Health Care Needs and their Peers | Subject Matter Expert |
| 2022 | Technical Expert Panel (TEP) to advise investigators conducting a systematic review on Respectful Maternity Care (RMC): Dissemination and Implementation of Perinatal Safety Culture to Improve Equitable Maternal Healthcare Delivery and Outcomes. University of Oregon. | Participant and Group Facilitator |
| 2022 | Planning committee for a research and data workshop: *Understanding the Full Impact of the Dobbs Decision,* AcademyHealth and The Commonwealth Fund. | Member |
| 2022 | NASEM: Identification and Prognosis of Low Birth Weight Babies and Disability Determinations | Report Review Monitor |

## UNIVERSITY AND PUBLIC SERVICE

**SERVICE ACTIVITIES SUMMARY**
In my interface between research and public policy, I am often called upon to help a variety of community groups, city, and county governments, as well as the federal government in helping to translate research findings for purposes of planning and development of new projects. For example, I have been called as an expert in program development for a number of states including California, Washington, Hawaii, South Carolina, New Mexico, Ohio, and Georgia in the areas of adolescent health policy, pregnancy prevention, and pregnancy treatment programs. With my methodological expertise in program evaluation, I have also provided brief consultation on how to best capture data and document both the short, as well as longer term outcomes, of their program efforts. A fulfilling experience was being invited by the State of California Governor's Office and Department of Health, beginning in the 1990s, to help develop a Teenage Pregnancy Prevention Initiative, based upon evidence and best practices. It was through these efforts that California implemented a wide portfolio of different community, media, and policy interventions that has contributed to our state's lead in decreasing the incidence of adolescent pregnancy throughout our country and across diverse ethnic and racial groups. Many of the programs that I recommended, based upon the existing evidence, continued to operate in communities throughout the state, funded by both federal and state funds, until the first decade of the 21st century. However, when the political climate turned, many of these programs were eliminated and I researched the impact of these closures on adolescents' access to reproductive

Prepared: July 2, 2025

health information and services. This data was important for stakleholders concerned with programmatic closures and have been used to seek additional funding to re-start those programs. In another area, we also provided expertise to the state as they developed programs throughout the state aimed at helping women who are pregnant or parenting and who are chemically dependent.

On the national level, I served on the Patient Centered Outcomes Research Institute's (PCORI) Evaluation Group (PEG) Task Force, as part of PCORI's Research Integration and Evaluation team. The PEG is reviewing the impacts and effectiveness of PCORI.  On a personal note, I was gratified to serve on several NAM (previously name the IOM) Report Committees; the most influential was the Committee on Preventive Health Services for Women, which developed recommendations for preventive services for women without co-payments as part of health care reform. All eight of our recommendations were accepted by the Obama Administration and were embedded in the Accountable Care Act. This resulted in over 150 million women receiving contraceptive coverage without co-payments since the recommendations were implemented.

I have also sought opportunities to more widely disseminate research information in formats that assist communities in being able to use research and program evaluation to help shape programs and policy. For example, in co-leading a research project pertaining to Latina childbearing, we were commissioned to develop a film aimed at state policy makers. Recognizing that the film would be useful for other groups, I sought to focus on its wide dissemination, not only in California, but nationally where the issue has become a pressing one for many communities that have not had the same history of programmatic efforts in this arena. I also sought to assure that the film would be available in Spanish, thus creating a resource for communities both in the US and in the Spanish speaking world. The film and a variety of educational materials are now available on our website for downloading, along with community guides providing suggestions for how to use the film in community settings.

In other arenas, I have been called upon to provide expert testimony both in Congress and in Sacramento as policy makers seek to identify viable models for improving the health of children and adolescents. I have also provided congressional staff briefings on topics that range from health care reform and the federal and state Children's Health Insurance Program, to violence prevention to adolescent pregnancy prevention. Long after the briefing is over, I continue to work with the policy staff to provide support as they attempt to incorporate evidence-based research into their policy decision-making. For example, I served on the Advisory Council for efforts sponsored by City and County of San Francisco Health Department focused on Increasing Patient-Centered Care for Young Women. I also served on the Steering Committee on a joint SF City and County Health Department and UCSF partnership (led at UCSF by Dr. Anda Kuo) to improve the coordination of health and well-being services for children and adolescents living in our county.

On our own campus, I balanced my responsibilities as the Philip R. Lee Institute for Health Policy Studies' (IHPS) previous Director, along with concurrent efforts to integrate the message of the importance of health services, population health, and health policy in a variety of campus initiatives, including Precision Medicine, the Bakar Computational Health Sciences Institute, (serving on the Executive Committee), the Health/Clinical Informatics Committee, and the Mid-Career Recruitment Committee. In addition, I represented IHPS on the Long-Range Development Planning Committee (LRDP), serving as a Liaison to its Community Advisory Group, as well as on the Bridge Funding Committee for 8 years. I also served on the School of Medicine (SOM) Campus Space Planning Committee and on the campus' Diversity Council, as well as the Limited Submission Review Committee. I have previously chaired or served on

Prepared: July 2, 2025

several Chair/Dean recruitment committees, including Epidemiology and Biostatistics and the Dean of the School of Nursing, the School of Pharmacy, Department of Clinical Pharmacy and also, the Center for Pharmocoepidemiology, the Director of the Center for as well as Chairing or serving as a member of several university Stewardship Review Committees.

Even more "up- stream" has been my effort to serve (for the past 15 years) as a year-long mentor to individuals in under-represented groups as part of the Office of Outreach & Academic Advancement Post Baccalaureate program.  In addition, I have been actively involved in mentoring and engaging a number of junior faculty on our campus, as well as being actively engaged in recruiting faculty "of color" to our campus. In these and other cases, I look beyond our campuses' walls to consider how I can support these diverse faculty members as they transition to UCSF.

On a national level and post the 2022 Supreme Court decision to eliminate Roe v.Wade, I was asked by the Presidents of the National Academies of Science, Engineering, and Medicine (NASEM) to serve as Chair a Standing Committee entitled, Reproductive Health, Equity and Society (https://www.nationalacademies.org/our-work/standing-committee-on-reproductive-health-equity-and-society). This multi-disciplinary committee (2022-2024) evaluated the health, social, and economic implications of access to reproductive health care in the United States and globally in order to inform related program and activity development at NASEM. Our committee worked to implement a variety of papers, webinars, and Webpage that has served as a national resource to professionals, policy makers, and communities. Since 2023, I have also served as a member of the National Academy of Medicine Action Collaborative on Achieving a Climate Resilient and Sustainable Health Sector, a program of the NAM Climate Grand Challenge, focusing on improving metrics to document improvements and changes within health care systems.

## UNIVERSITY SERVICE
## UC SYSTEM AND MULTI-CAMPUS SERVICE

| 1996 - 2025 | Maternal and Child Health Training Program, School of Public Health, UCB | Advisory Board |
| 2007 - 2009 | UC Santa Cruz-Silicon Valley Management School | Advisory Board |
| 2000 - 2020 | California Program on Access to Care, California Policy Research Center, University of California, Office of the President | Board Member |
| 2005 - 2006 | Inter-Campus Research Program on Children and Adolescent Health / UC Consortium on Children, Family and Community | Steering Committee |
| 2006 - 2008 | UC Mexus for the Social Sciences, Humanities & the Arts | Faculty Grants Review Committee |
| 2007 - present | UCSF Global Health Sciences, UC Davis, UCB, UC San Diego, and UCLA | Steering Committee |
| 2007 - present | UC Santa Cruz-Silicon Valley Management School | Advisory Board |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2009 - present | UCB and UC Davis, Migration and Health Research Center (MAHRC) | Advisory Board Member |
| 2009 - 2009 | Health Services and Policy Analysis (HSPA), Division of Health Policy and Management, School of Public Health, University of California, Berkeley, | Affiliate Faculty Member |
| 2010 - 2010 | Review of Research Portfolio University of California, Office of the President | Expert Reviewer |
| 2011 - 2017 | Core Curriculum Committee for Multi-Campus University of California Global Health Initiative (UCGHI) MS in Global Health Program | Member |
| 2012 - 2012 | UC Berkeley's Center for Weight and Health California's Community Transformation Initiative (CACTI) | Advisory Board Member |
| 2012 - 2014 | California Health Interview Survey (CHIS) Adolescent Technical Advisory Committee | Chair |
| 2014 - 2017 | Maternal and Child Health, Measurement Research Network (MCH-MRN) | Co-Chair and Advisory Board Member |
| 2015 - 2017 | UC-Mexico Initiative Health Initiative of the Americas, Health Working Group (HWG) | Co-Chair and Member |
| 2016 - 2020 | The California Program on Access to Care (CPAC) | Chair and Member |
| 2018 - 2022 | UCLA Fielding School of Public Health, Research on ImmiGrant HealTh and State policy (RIGHTS) | Technical Advisory Committee Member |
| 2018 - 2025 | UC Berkeley's Center for Excellence (CoE) in Maternal and Child Health | Advisory Board Member |
| 2020 – 2020 | UC Riverside, Director of UC Mexico Programs | Search Advisory Committee |
| 2024 | UCLA Center for Health Policy – 30th Anniversary | Event Host Commitee |

**UCSF CAMPUSWIDE**

| | | |
|---|---|---|
| 1996 - 1999 | Social and Behavioral Training in AIDS/HIV Research, Predoctoral training program, funded by University wide AIDS Research Program, sponsored by Department of Social and Behavioral Sciences, Center for AIDS Prevention Studies, and School of Nursing International Center for HIV/AIDS Research and Clinical Training Program | Advisor |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 1999 - 2001 | Community-Based Research and Fellowship Program, Center for Health and Community | Advisory Board Member |
| 2004 - 2004 | Vice Chancellor's Community Partnership Task Force | Member |
| 2004 - 2009 | Chancellor's Council | Member |
| 2004 - 2004 | Stewardship Review, Institute for Health and Aging | Committee Member |
| 2004 - 2006 | Global Health Sciences, Research Subcommittee, Executive Committee, and Training Subcommittee | Member |
| 2005 - 2006 | Global Health Sciences Strategic Plan Working Group | Member |
| 2006 - 2006 | Program on Reproductive Health and the Environment (PRHE), Department of Obstetrics, Gynecology, and Reproductive Sciences | Advisory Committee |
| 2006 - 2006 | Center for Health and Community | Steering Committee |
| 2006 - present | Program on Reproductive Health and the Environment (PRHE), Department of Obstetrics, Gynecology, and Reproductive Sciences | Advisory Committee, |
| 2006 - 2009 | Chancellor's Award for the Advancement of Women | Committee Chair |
| 2007 - 2007 | California Medicaid Research Institute (CaMRI), UCSF | Associate Director, Member, Steering Committee |
| 2008 - 2008 | Clinical and Translational Research Institute | Epidemiology Review Committee |
| 2008 - 2009 | Cardiovascular Research Institute | Member, Stewardship Review |
| 2008 - 2010 | UCSF Global Health Sciences Cuba Research Program in Health Diplomacy and Medical Education | Reviewer |
| 2008 - 2011 | Chancellor's Advisory Committee on the Status of Women (CACSW) | Member |
| 2008 - present | UCSF SOM Post Baccalaureate Program | Faculty Advisor |
| 2008 - 2012 | Resource Allocation Program (RAP) Clinical and Translational Science Institute (CTSI) | Multidisciplinary Review Committee |
| 2009 - 2009 | Department of Epidemiology and Biostatistics | Faculty Search Committee |
| 2009 - 2022 | First Generation Program | Faculty Advisor |
| 2010 - 2010 | Stewardship Review, Institute on Health and Aging (Dr. Wendy Max) | Chair |
| 2010 - 2010 | Graduate Group, UCSF Global Health Sciences | Member |

Prepared: July 2, 2025

| 2010 - 2013 | Health Policy and Social Sciences Review Committee, Resource Allocation Program (RAP); Clinical and Translational Science Institute (CTSI) | Member, Health Policy and Social Sciences Review Committee |
|---|---|---|
| 2010 - 2012 | UCSF Coordination Committee-the San Francisco Bay Health Improvement Program (SF Bay HIP) | Member |
| 2010 - 2012 | Chancellor's Long Range Development Plan Oversight Committee | Member |
| 2011 - 2012 | School of Medicine Leadership Retreat Planning Committee | Member |
| 2011 - 2012 | Search Committee for the position of Vice Dean, Academic Affairs and Faculty Development | Member |
| 2011 - 2012 | Chancellor's Martin Luther King Jr. Award Committee | Member |
| 2011 - 2013 | Limited Submissions Program (LSP) | Member, Steering Committee |
| 2011 - 2014 | Faculty Oversight Committee on Operational Excellence Initiatives | Member |
| 2012 - present | Institute of Computational Health Sciences Executive Committee (ICHS) | Member |
| 2013 - 2013 | Search Committee for the position of Director of the Center for Health Professions | Member |
| 2013 - 2013 | International Research Advisory Council (IRAC) | Member |
| 2013 - 2014 | Search Committee for Executive Director, UCSF Center for Healthcare Value (CHV) | Member |
| 2013 - present | Steering Committee, Precision Medicine | Member |
| 2013 - 2018 | Council on Campus Climate, Culture, and Inclusion (4CI) | Member |
| 2014 - present | Search Committee, Dean, School of Medicine | Member |
| 2014 - present | Graduate Group for the Doctoral Program, UCSF Institute for Global Health Science | Member |
| 2014 - 2015 | Knowledge Transfer Working Group, under the Benioff/Gates Pre-Term Birth Initiative | Co-Chair |
| 2014 - 2020 | UCSF Center for Vulnerable Populations | Member, Steering Committee |
| 2015 - 2020 | Multi-campus Research Programs and Initiatives: Sugar, Stress, Environments, and Weight Center (MRPI SSEW) | Member, Scientific Advisory Committee |
| 2015 - 2020 | Programming Committee for the Mission Bay East Campus Phase 1 Building | Member |

Prepared: July 2, 2025

| 2016 - 2016 | Academic Senate's Committee on Academic Personnel (CAP) Stewardship Review Committee (SRC) (RE: Dr. Nancy E. Adler) | Review Committee Member |
| 2017 - 2017 | UCSF Faculty Mentoring Program Lifetime Achievement in Mentoring Award Selection Committee | Member |
| 2017 - 2017 | Search Committee for Chief of Cardiology, San Francisco VA Medical Center | Member |
| 2019 – 2022 | Mentorship and Sponsorship Task Force | Member |
| 2024-2025 | UCSF Latinx Center of Excellence and the California Health Care Foundation, Development of a Hispanic Health Chartbook | Advisory Board Member |

## SCHOOL OF MEDICINE

| 1996 - 2020 | Institute for Health Policy Studies | Executive Advisory Committee |
| 1998 - 1998 | Faculty Review Committee, Institute for Health Policy Studies | Member |
| 2000 - 2000 | Ad Hoc Faculty Promotion Review Committee | Member |
| 2000 - 2000 | Ad Hoc Steering Committee for Integrated Clinical Studies | Member |
| 2000 - 2000 | Ad Hoc Search Committee | Member |
| 2003 - 2005 | Strategic Planning Committee, Institute for Health Policy Studies | Chair |
| 2005 - 2007 | Admissions Committee, School of Medicine | Member |
| 2008 - 2008 | Department of Obstetrics, Gynecology, and Reproductive Health Sciences | Faculty Search Committee |
| 2008 - present | School of Medicine Post Baccalaureate Program | Faculty Advisor |
| 2009 - 2009 | Search Committee for the Division Chief, Department of Obstetrics, Gynecology and Reproductive Sciences at San Francisco General Hospital. | Member |
| 2009 - 2009 | Space Committee, School of Medicine | Member |
| 2010 - 2010 | Search Committee, Department of Epidemiology & Biostatistics | Member |
| 2010 - 2010 | Search Committee, Director of Health and Society Pathway | Member |

Prepared: July 2, 2025

| | | |
|---|---|---|
| 2010 - 2010 | Dean's Faculty Oversight Committee | Research Administration Liaison |
| 2010 - 2010 | Search Committee, Faculty joint position in Health and Breast Cancer Risk Assessment; Department of Surgery, and Philip R. Lee Institute for Health Policy Studies. | Member |
| 2011 - 2011 | Compensation Plan Project Steering Committee, School of Medicine | Member |
| 2011 - 2011 | School of Medicine Leadership Retreat Planning Committee | Member |
| 2011 - 2019 | Bridge Funding Committee, School of Medicine | Member |
| 2013 - 2019 | Internal Advisory Committee, Multidisciplinary Clinical Research Center (MCRC) | Member |
| 2013 - present | Executive Committee, Institute for Computational Health Sciences (ICHS) | Member |
| 2013 - 2020 | Internal Advisory Committee, Multidisciplinary Clinical Research Center (MCRC) | Member |
| 2015 - 2020 | Building 33 Space Planning, Steering Committee | Member |
| 2016 - 2017 | Search Committee for New Chair, Department of Epidemiology and Biostatistics | Chair and Member |
| 2018 - 2020 | SOM Population Health and Health Equity Leadership Group | Member |
| 2019 - 2020 | SOM Dean's Strategic Plan Project: Clinical, Translational and Population Health Implementation Action Group (CTPH) | Member |
| 2020 - 2020 | Holly Smith Award Selection Committee | Member |

Prepared: July 2, 2025

| 2020 – 2021 | Chairs and Directors Council on Diversity (CD2), Department Accountability Subcommittee | Member |
| 2021 – present | Dr. Martin Luther King Jr. Faculty Leadership Award Selection Committee | Member |
| 2021 – present | Center for Climate Change, Health, and Equity | Senior Advisor |
| 2023-2024 | Search Committee, Vice-Chancellor of Translational Research and Director, Clinical and Translational Science Institute (CTSI) | Chair |
| 2024- present | Search Committee, UCSF National Clinician Scholars Program (NCSP) | Committee Member |
| 2023-present | Strategic Advisory Group, Clinical and Translational Science Institute (CTSI) | Chair |

**SCHOOL OF PHARMACY**

| 2023-2024 | Search Committee for Chair, Department of Clinical Pharmacy | Chair |
| 2025 | Search Committee, Chair, Center for Pharmocoepidemiology | Chair |

**SCHOOL OF NURSING**

| 2004 - 2004 | Search Committee, Department of Family and Community Nursing | Ad Hoc Chair |
| 2007 - 2007 | Health Disparities Tenure Track Search Committee, School of Nursing | Member |
| 2009 - 2010 | Dean's Search Committee School of Nursing | Member |

**DEPARTMENTAL of PEDIATRICS**

| 1996 - 1997 | Second Year Medical School Training, Integrated Curriculum, Department of Pediatrics | Task Force |
| 1996 - 2000 | Division of Adolescent Medicine. | Executive Committee |
| 1996 - 2001 | Pediatric Clinical Research Center. | Advisory Committee |
| 2000 - 2000 | Fellowship Review, Department of Pediatrics | Committee Member |
| 2001 - 2005 | Health Services/Health Policy, Strategic Planning Group, Department of Pediatrics | Strategic Planning Group |

| | | |
|---|---|---|
| 2008 - 2010 | Faculty Search Committee, Chair of Pediatrics, Department of Pediatrics | Committee Member |
| 2015 - 2016 | Chief Nutritionist Search Committee, Clinical and Research Program, Chair of Pediatrics, Department of Obstetrics, Gynecology, and Reproductive Health Sciences | Committee Member |
| 2017 – 2018 | Director Search Committee Chair, Bixby Center for Global Reproductive Health | Committee Member |
| 2021 - 2023 | Department of Pediatrics, Junior Research Faculty Review Committee for Clinical-Translational-Population Sciences Researchers | Co-Chair |

## COMMUNITY AND PUBLIC SERVICE

| | | |
|---|---|---|
| 1995 - 1997 | Adolescent Pregnancy Prevention Initiative, The California Wellness Foundation. | Advisor |
| 1996 - 1998 | Welfare Redesign, California Department of Social Services. | Steering Committee |
| 1996 - 2000 | Adolescent Managed Care, Children Now, Oakland, California. | Advisory Committee Member |
| 1999 - 2020 | California Adolescent Health Collaborative | Co-Director and Executive Steering Committee Member |
| 2000 - 2001 | Children Now, Oakland, California | Adolescent Report Card Project |
| 2001 - 2001 | State Team, Joint Work Group on School-Based Teen Pregnancy Prevention, California Department of Education, California Department of Health Services, National School Boards Association, Washington, DC. | Team Member |
| 2001 - 2004 | California Chlamydia Action Coalition, sponsored by the California Department of Health Services, California HealthCare Foundation, and the University of California, San Francisco. | Policy Committee |
| 2001 - 2001 | Teen Pregnancy Prevention Programs, California Department of Health Services, Sacramento, California | Workgroup Member |
| 2001 - 2001 | Implementation of California's School Health Blueprint, California Department of Education and Department of Health, Sacramento, California | Workgroup Member |

Prepared: July 2, 2025

| 2002 - 2002 | Georgia Campaign to Prevent Teenage Pregnancy, Jane Fonda, Executive Director | National Advisory Board |
|---|---|---|
| 2008 - 2008 | San Francisco County Adolescent Health Working Group, San Francisco, CA. | Advisory Council |
| 2009 - 2010 | California Breast Cancer Research Program Priority Setting Process, Oakland, CA | Policy Evaluation Advisor |
| 2009 - 2012 | Tipping Point Community, San Francisco, CA | Evaluation Consultant |
| 2013 - 2020 | Healthy People 2020 Adolescent Workgroup, Washington DC | Workgroup Member |
| 2014 - 2015 | Too Small to Fail, Menlo Park, CA. Moderated by Hillary Clinton, 22 Adolescent Health experts invited to a roundtable discussion of the Clinton Foundation initiative on their efforts to improve the health and well-being of children ages zero to five. Ongoing involvement. | Panel Participant |
| 2014 - 2018 | Internal Reproductive Integrative Skin (IRIS), Increasing Patient-Centered Care for Young Women, City and County of San Francisco | Member, Advisory Council |
| 2015 - 2019 | Advisory Board, WestEd Justice & Prevention Research Center, Teen Pregnancy Prevention Program within the Oregon Youth Authority | Member |

## CONTRIBUTIONS TO DIVERSITY

## CONTRIBUTIONS TO DIVERSITY

As a Spanish-speaking immigrant to the U.S. in the late 1950s, my professional research and public service activities focused on social disparities and equity have been shaped by the bullying and marginalization that I experienced initially as a non-English speaker. My public health training (Master's and Doctoral Degree) also provided me with an opportunity to understand from a theoretical perspective how structural factors, policies, and social inequalities shape the health of the public, specifically, access to health care services, education, and other economic platforms aimed at improving health and well-being.

Much of my research has focused upon the reproductive health needs of low-income women and men, as well as adolescents. For nearly 20 years, I led a team evaluating the Family PACT program, which cares for individuals up to 200% of poverty, with over two-thirds of the clients being of Latinx heritage. Our comprehensive evaluation led to quality improvement, as well as policies related to reimbursing clinics who served undocumented individuals, in spite of the Federal position not to reimburse for such services. Other health topics in which I have conducted diversity-relevant research, include: teenage pregnancy prevention program evaluation, pre-term birth initiatives, substance abuse treatment services, immigrant health, in particular, the impact of migration on the health of immigrants, the physical and mental health needs of Dreamers (Deferred Action for Childhood Arrivals), and the effectiveness of community-based clinics, school-based health centers, and community-based organizations focused on reducing asthma and increasing health care access. I have also conducted research studies

Prepared: July 2, 2025

related to the needs of diverse adolescents and young adults' access to health insurance and health care access, with a strong emphasis on analyzing the data to further understand variations in patterns among ethnic and racially diverse young people. Most recently, my focus has turned to issues of social determinants of health and their impact upon health care access and utilization among marginalized populations.

I have also promoted diversity and equality opportunity through my service activities as a campus leader. I served as Chair of the Chancellor's Committee on the Advancement of Women from 2007 to 2009. During my tenure, I led efforts to conduct retreats for junior faculty pertaining to the "soft issues" inherent in career advancement. I have been delighted to see how many of the ideas during those events have been incorporated into the Faculty Development Day. As a result of some of these activities, I was gratified to be awarded the Chancellor's Award for the Advancement of Women in 2009. I have also served on the Irene Perstein Award Committee, aimed at supporting junior faculty, many who represent diverse backgrounds, at crucial moments in their career. Previously, I have also served on the Steering Committee of the UCSF Center for Vulnerable Populations.

I previously served as a member of the Council on Campus Climate, Culture, and Inclusion (4CI), chaired by Vice Chancellor of Diversity and Outreach, Dr. Renee Navarro (please see sections on research, teaching and service for additional examples of my commitment to diversity). Finally, I was asked to serve as the Co-Chair of a Committee on Pre-Natal Health as part of a major UC Office of the President-Mexico Binational Initiative, led by President Janet Napolitano and the Mexican Secretary of Health. The other two committee worked on topics related to Violence and Diabetes. I was honored to share my responsibilities with the Director of Mexico's NIH Perinatal Health. A number of bi-national research exchanges were established as a result of this endeavor, as well as a funded research projects that compares the birthing experiences of Mexican adolescents in Mexico and California.

Most recently, I led a team that collaborated with Hispanics in Philanthropy completing a new report entitled, *Taking A Pulse: Latinx Health Equity in California—Facing Disparities and Building for the Future for Hispanics in Philanthropy*. A special symposium highlighting the results was held as a means of engaging potential federal and state private and public funders to support new projects aimed at ameliorating racial/ethnic disparities in health among the Latinx population. This is in alignment with my engagement as one of the national advisors on Dr. Alicia Fernandez's federally-funded UCSF Latinx Center of Excellence. At UCSF and nationally, I play a role in shaping the types of experiences of future diverse leaders and scholars receive, including serving as PI of the NIH-Building Interdisciplinary Careers in Women's Health (BIRCWH) and the UCSF/Genentech Mid-Career Development Program Advisory Committee, as well as serving as the evaluator of the ARCHES Program (Advancing the Career of Historically Excluded Scholars). I serve on UCSF's National Clinician Scholars Program Leadership Council and Chair of the Strategic Advisory Group for the UCSF-CTSI Initiative, serving as the evaluator of CTSI's impact evaluation.

**TEACHING AND MENTORING**

**TEACHING SUMMARY**
My primary teaching activities at UCSF focus on formal teaching within Pediatrics 180.01D, the core seminar for adolescent medicine. The program is the longest continually funded national training program in Adolescent Medicine (since 1977) and is one of seven federally funded interdisciplinary training programs in Adolescent Medicine. I also guest lecture in other courses offered in the Schools of Medicine, Pharmacy, and Nursing at UCSF and the UC Berkeley,

Prepared: July 2, 2025

School of Public Health, as well as advising post-doctoral, doctoral, and master's degree students within the School of Medicine and School of Nursing. Most recently, I have become an affiliated member of the Institute for Global Health Sciences, where I have chaired the Doctoral Committee for 6 of their Doctoral students, as well as serving on three Thesis Defense Committees.  In addition, for 17 years, I was the Director and primary faculty member of the William and Flora Hewlett Foundation Postdoctoral fellowship in Reproductive Health policy and Program Evaluation for Latin American scholars. Under my guidance, the program successfully graduated more than 30 fellows from Mexico, Peru, Venezuela, Columbia, Nicaragua, El Salvador, Guatemala, and Brazil, many of whom are involved in senior academic and government positions with high levels of influence in their respective countries. I also conduct seminars in research methodology, program evaluation, reproductive health, and adolescent health in several training programs. As an example of other types of professional teaching, I have conducted several health policy lectures that have been taped for the UCTV website, and downloaded throughout the state, nationally, and internationally, along with webinars shown nationally through the federal Maternal and Child Health Bureau.

I have also worked across 10 UC campuses in the development of a UC system-wide Global Health Institute. We successfully competed and were awarded planning and implementation grants for two of the 3 initially selected areas: Immigrant and Transborder Health and Women's Health and Empowerment. Previously, I also served as an evaluation consultant on the UCSF-MUHAS Tanzania Twinning project funded by the Gates Foundation. This program focused on the curriculum reform of the 5 school MUHAS campus: Medicine, Pharmacy, Nursing, Dentistry and Public Health. I have also developed a number of teaching aids that are being used both at UCSF and in a number of campuses across the country, for example, a long-distance learning course on adolescent health, a Resource Curriculum on Adolescent Health for Schools of Public Health, in collaboration with the Association of Schools of Public Health, as well as power point presentations on Latino Adolescent Reproductive Health, Young Adult Health, and the impact of the Affordable Care Act (ACA). Most recently, I led and/or served as the moderator of 4 national webinars on the subject of adolescent health and disparities, and the ACA and adolescents and young adults, all of which have been widely disseminated. In addition, I either taught or moderated three sessions in a 6 part Mini-Medical School series on health policy, which is available through UCTV (http://www.uctv.tv). Along with other health policy lectures sponsored by the Institute (mentioned above), these have been downloaded by over 3 million viewers.

During my tenure as Director of the Philip R. Lee Institute for Health Policy Studies (IHPS), the emergence of a dynamic relationship between UCSF and UC Hastings (now known as UC School of Law) provided the opportunity to establish an innovative master's program that focuses squarely on health policy and law. In 2009, the UCSF-UC Hastings Consortium on Law, Science, and Health Policy was initiated to develop and support interdisciplinary collaboration on subjects at the intersections of these fields through education, research, and clinical training and service. The Consortium established programs in all three areas and has also spearheaded the development of a formal affiliation agreement between the universities, which supported the launching of the MS in Health Policy and the Law (HPL). This exciting endeavor, led by Drs. Daniel Dohan (Professor, DAHSM and IHPS Associate Director for Training and Development) and David Faigman (UC Hastings College of Law, now Dean) was launched in Fall 2016. It is a one-year or two year-part time program designed to prepare students to be effective researchers and leaders in a dynamic new landscape, whether in health policy research or in health law. The MS HPL targets individuals with backgrounds in the clinical sciences, health sciences, public heath, public policy, or law.

Prepared: July 2, 2025

To kick-start planning and implementation of this effort, we developed a proposal and were awarded the campus' second Chancellor's Education Innovation Award by the Executive Vice Chancellor and Provost's (EVCP) Office, representing a $400,000 loan to support the development of the new MS HPL. Our collaborative partner, Dr. Catherine Lucey, Vice Dean for Education in the SOM, has been instrumental in the degree's development. We were also fortunate to have the support of campus leadership (including Graduate Division Dean Elizabeth Watkins, former Librarian Karen Butter, former Vice Chancellor Joe Castro, School of Nursing Professor Mary Louise Fleming), and other expert faculty at UCSF and UC Hastings. The MS HPL represents a major commitment and is part of a larger coordinated effort by the Chancellor/EVCP and SOM, to establish a campus–wide, on-line program (vendor-supported) and WASC-approved degree. The MS HPL is being conferred by UCSF and UC Hastings, jointly taught, and originally administered by PRL-IHPS (now, under the auspices of UC School of Law). During my tenure as IHPS Director, we graduated two cohorts of students. I previously participated in the development of course material on program evaluation and was invited to become affiliated faculty member of UC Hastings School of Law. In addition, I serve as the Co-Investigator of the NIH-funded Building Interdisciplinary Research Careers in Women's Health (BIRCWH), which supports 3 fellows per year to conduct basic, translational, and policy research in women's health. The program the country's longest serving program in the U.S. and celebrated its 20th anniversary in 2020.

Most recently, I was gratified to lead efforts for a new AHRQ T-32 in collaboration with UC Berkeley, which supports doctoral degree program students in public health, and two post-doctoral fellows at IHPS. Finally, IHPS serves as one of the National Clinical Scholars sites (8 in total), bringing together the School of Medicine and School of Nursing. IHPS is the home for this new endeavor that builds upon the previously successful RWJ Clinical Scholars program and I serve on its Leadership Council.

## FORMAL TEACHING AT UCSF (2004-2020)

| Academic Yr | Course No. & Title | Teaching Contribution | School | Class Size |
|-------------|--------------------|-----------------------|--------|------------|
| 2004 - 2004 | Adolescent Pregnancy: A Current Profile and Dilemma for Clinicians and Other Decision makers," Clinical Conference of Child and Adolescent Psychiatry, Langley Porter, Psychiatric Institute | Guest Lecturer | | 150 |
| 2006 - 2006 | "The Use of Focus Group Research Methodology in Health Services Research," Health Policy Post-Doctoral Program, UCSF | Lecturer | | 30 |
| 2006 - 2006 | "Conducting Effective Community Needs Assessments for Adolescent Health," Program in Maternal and Child Health, School of Public Health, UCB | Guest Lecturer | | 25 |

Prepared: July 2, 2025

| Academic Yr | Course No. & Title | Teaching Contribution | School | Class Size |
|---|---|---|---|---|
| 2006 - 2006 | "Evaluation Methods Applied to School-Based Health Clinics," School of Nursing | Guest Lecturer | | 20 |
| 2007 - 2007 | Latino Adolescent Pregnancy Prevention. 2nd Year Medical School Elective | Guest Lecturer | | 30 |
| 2008 - 2008 | Parental Notification: What can be learned from the experience of other states? Grand Rounds, Department of Obstetrics, Gynecology, and Reproductive Health Sciences | Guest Lecturer | | 70 |
| 2008 - 2008 | Translating Research in Policy: Lessons Learned. Institute for Health Policy Studies, Post-Doctoral Fellowship. | Guest Lecturer | | 20 |
| 2008 - 2008 | Pediatrics Core Seminar 180.01D | Lectures and responsible for Health Policy Core | | 15 - 20 |
| 2008 - 2009 | Adolescent Sexual Health in the Latina population, Latina Issues Elective, UCSF School of Medicine. | Guest Lecturer | | 40 - 60 |
| 2009 - 2009 | Health Care Reform (Part of a Mini-Medical School series) | Guest Lecturer | | 60 |
| 2010 - 2017 | Pediatrics Core Seminar 180.01D | Guest Lecturer | | 25 |
| 2013 - 2013 | Taking the Pulse: Improving the Health, Safety and Well-Being of Young Adults. UCSF Center for Vulnerable Populations Seminar Series | Guest Lecturer | | 20 |
| 2013 - 2013 | Adolescent and Young Adult Health: Implications for Public Health, Mental Health Policy, and Clinical Services. UCSF Department of Psychiatry; Psychiatry, Child and Adolescent Psychiatry (CAP) Grand Rounds | Guest Lecturer | | 20 |
| 2013 - 2013 | Building Interdisciplinary Research Careers in Women's Health (BIRCWH) | Guest Lecturer | | 20 |

Prepared: July 2, 2025

| | Academic Yr | Course No. & Title | Teaching Contribution | School | Class Size |
|---|---|---|---|---|---|
| | 2013 - 2013 | Health Care Reform (Part of a Mini-Medical School series) | Guest Lecturer/Panelist | | 80 |
| | 2013 - 2013 | Report Back from Institute of Medicine Meeting: Improving the Health, Safety and Wellbeing of Young Adults. UCSF Center for Vulnerable Populations Seminar Series (also available as video at CHARM Website) Sept. 9, 2013 | Guest Lecturer | | 50 |
| | 2014 - 2014 | How Will We Know it is Working: Monitoring the Impact of the ACA in Years to Come. UCSF IHPS-Osher Mini Medical School on Health Reform | Panel Member | | 80 |

**MENTORING SUMMARY**

As a Latina faculty member, I am particularly sought by Latinx students who are interested in my serving as a content and career mentor. I am the primary mentor for four to six fellows (Pediatrics, Adolescent and Young Adult Health, and Obstetrics/Gynecology and Reproductive Health Sciences, Institute for Global Health) each year, and I often meet with other postdoctoral fellows, graduate students, junior and senior faculty to discuss research designs, program development, grant development, and career development. I have been gratified to receive uniformly glowing comments from these interactions. I have also had an outstanding record in mentoring my large staff of researchers and helping them along in their career development, as well as the junior and senior faculty of IHPS.

As one of a relatively small number of Latina women in leadership on our campus, I have defined the area of mentoring of diverse trainees to be an important priority and responsibility, not only for the Institute, but also for the campus in general.  As an immigrant, I have a particular sensitivity to the promotion of diversity and enhancing the opportunities of our faculty, trainees, and staff. I am a proud participant in our campus' First-Generation Initiative (First to go to college-FG2C), formally and informally mentoring a number of medical, nursing, pharmacy, and dentistry students.

I also recognize that at this point in my career, I am promoting other faculty and research staff to provide lectures that I have been invited to provide for decades. This is part of the teaching-mentoring and transition focus as IHPS Director and as Distinguished Professor of Pediatrics and Health Policy (Recall).

In recognition of my role as mentor across UC campuses, I was invited to also join the faculty at the UCLA School of Public Health, Center for Health Policy. I was gratified to receive the UCSF Campus Mentoring Lifetime Achievement in Mentoring Award in 2016, as well as honored in 2018 as one of the UC Berkeley School of Public Health's Most Influential Alumni (as part of their celebration of the School's 75th Anniversary) (among other honors).

Prepared: July 2, 2025

**PREDOCTORAL STUDENTS SUPERVISED OR MENTORED**

| Dates | Name | Program or School | Role | Current Position |
|-------|------|-------------------|------|------------------|
| 1990 - 1991 | Marilyn Price | MSW, UCB | Research Advisor | |
| 1990 - 1991 | Margaret Martin | MPH, UCB | Research Advisor | |
| 1990 - 1991 | Chris Betzold | Master's in Nursing, UCSF | Research Advisor | |
| 1990 - 1991 | Sean Casey | MPH, UCB | Research Advisor | Research Associate, Alameda County Health Department |
| 1990 - 1991 | Myrna Epstein | MPH, UCB | Research Advisor | |
| 1990 - 1991 | Cate Teuten | MPH, UCB | Research Advisor | |
| 1990 - 1991 | Amy Wolfe | MPH, UCB and Nurse Practitioner, UCSF School of Nursing | Research Advisor | Nurse Practitioner, San Francisco County Health Department |
| 1990 - 1991 | Lee Smith | PhD, School of Nursing, UCSF | Research Advisor | |
| 1990 - 1991 | Christina Mellin | MPH, UCB | Research Advisor | |
| 1990 - 1991 | Pec Inman | PhD, School of Educational Psychology, U San Francisco | Research Advisor, Career Mentor | Assistant Professor, San Jose State University |
| 1990 - 1991 | Patricia Blasé | PhD, School of Nursing, UCSF | Research Advisor | |
| 1990 - 1992 | Georgiana Coray | PhD, School of Nursing, UCSF | Research Advisor | Nurse Director, San Diego (Deceased, 2010) |
| 1990 - 1991 | Wendy Jameson | MPH, UCB | Research Advisor | |
| 1991 - 1992 | Faith Wolfson | MSW, UCB | Research Advisor | |
| 1991 - 1992 | Lynn Wittenberg | MPH, UCB | Research Advisor | Research Associate |
| 1991 - 1992 | Meg Royce | MPH, UCB | Research Advisor | |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 1991 - 1992 | Gina Sucato | MD, School of Medicine, U Pennsylvania | Research Advisor | Assistant Professor, Department of Pediatrics, U of Pittsburgh School of Medicine |
| 1991 - 1992 | Ila Rosen | MPH, San Francisco State University | Research Advisor | |
| 1991 - 1993 | Jesus Ramirez | MPH, UCB | Research Advisor | |
| 1991 - 1993 | Tam Nguyen | MA/Public Policy, UCB | Research Advisor | |
| 1991 - 1993 | Jaime Geaga | PA, MPH, UCB | Research Advisor | |
| 1992 - 1993 | Faith Wolfson | MSW, UCB | Research Advisor | |
| 1992 - 1993 | Zandy Kidd | MPH, UCB | Research Advisor | |
| 1992 - 1993 | Victoria Fontana | MSW, UCB | Research Advisor | |
| 1992 - 1993 | Rebecca Brook | BA/Health Law, UCLA | Research Advisor | |
| 1992 - 1993 | Michelle Pearl | MPH, UCB | Research Advisor | |
| 1993 - 1996 | Sheri Tye | MPH, UCB | Research Advisor | |
| 1993 - 1994 | Renu Karir | Joint Master's, Yale School of Management, Yale School of Public Health | Research Advisor | |
| 1993 - 1994 | Julia Cohen | MA/Public Policy, UCB | Research Advisor | |
| 1992 - 1992 | Susan Kools | PhD, School of Nursing, UCSF | Research Advisor, Career Mentor | Professor,School of Nursing, UCSF |
| 1993 - 1994 | Susan Starbuck-Morales | DrPH, School of Public Health, UCB | Research Advisor | Researcher, Humboldt State University |
| 1993 - 1996 | Susan Proctor | PhD, School of Nursing, UCSF | Research Advisor | |
| 1993 - 1994 | Diane Melendez | PhD, Division of Medical Anthropology, UCSF | Research Advisor | |
| 1995 - 1995 | Meg Wise | MPH, MSW, UCB | Research Advisor | |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 1995 - 1996 | Sarah Teagle | PhD, School of Public Health, UCB | Research Advisor | Senior Researcher, RTI |
| 1995 - 1998 | Claire Horton | MD, School of Medicine, Emory and MPH, U North Carolina, Chapel Hill | Research Advisor | Clinical Faculty, San Francisco General Hospital |
| 1995 - 1996 | Margaret Martin | DrPH, School of Public Health, UCLA | Research Advisor | |
| 1995 - 1996 | Ellen Stein | MD,MPH, UCB | Research Advisor | |
| 1995 - 1996 | Neva Phair | Joint Program in Medical Sciences, UCB | Research Advisor | |
| 1995 - 1998 | Nicole Wicox | MPH, UCB | Research Advisor | Physician, San Francisco |
| 1996 - 1998 | Parag Nene | MD, School of Medicine, U Pennsylvania | Research Advisor | |
| 1997 - 1998 | Rupal Sangvhi | MPH | Research Advisor | Independent Consultant |
| 1997 - 2000 | Xochitl Castaneda | PhD, Department of Anthropology, Amsterdam University | Research Advisor | Director, UCB Mexican-US Border Initiative (now retired) |
| 1998 - 1999 | Carolyn Bradner | MD, School of Medicine, U Chicago and Post Doctoral Fellow, UCSF | Research Advisor, Career Mentor | Professor, Department of Pediatrics and Adolescent Medicine, UCSF |
| 1998 - 2000 | Deborah Sattley | MSW, School of Social Work, U Illinois | Research Advisor | Consultant |
| 1998 - 2000 | Sherri Tye | PhD, School of Public Health, UCB | Research Advisor | Parent |
| 1999 - 2000 | Monya Day | BA, Stanford | Research Advisor | |
| 1999 - 2000 | Kate Heumann | Master's in Public Policy, UCB | Research Advisor | |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 2000 - 2001 | Sara Buckelew | MD, MPH, UCB and Post-Doctoral Fellow, UCSF | Research Advisor | Professor, Adolescent Medicine, Department of Pediatrics, UCSF |
| 2001 - 2001 | Olivia Simpson | MD, MPH, UCB | Research Advisor | |
| 2001 - 2001 | May Moo Podus | MPH, San Jose State University | Research Advisor | |
| 2002 - 2002 | Hilary Spindler | MD, Yale and PhD, UCLA | Research Advisor | UCSF, Global Health Research Associate |
| 2002 - 2004 | Signy Judd | PhD, School of Nursing, UCSF | Research Advisor | Research Coordinator, UCSF |
| 2002 - 2003 | Shrimant Mishra | MD, MPH,UCB | Research Advisor | |
| 2002 - 2003 | Gorette Amaral | MPH, UCB | Research Advisor | Ph.D., Stanford |
| 2002 - 2003 | Mona Jhuar | MPH, UCLA | Research Advisor | Program Officer, The California Endowment |
| 2002 - 2004 | Katrine Lofberg | MD, Medical School, U Washington, Seattle | Research Advisor, Career Mentor | Physician, Washington State U |
| 2002 - 2004 | Andrew Mihalek | MD, Medical School, UCD | Research Advisor, Career Mentor | Professor of Pulmonary Medicine, University of Virginia |
| 2002 - 2004 | Kristine Penner | Joint UCB/UCSF MD Program, MPH, UCB | Research Advisor | |
| 2002 - 2007 | Alexa Curtis | PhD, School of Nursing, UCSF | Research Advisor | Nurse Practitioner, Humboldt County, CA |
| 2003 - 2005 | Lisa Romero | DrPH, School of Public Health, UCB | Research Adivsor | Project Officer, CDC |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 2003 - 2005 | Sonia Jain | PhD, Harvard U | Research Advisor | Research Director, West-Ed, San Francisco |
| 2003 - 2005 | Beth Chaton | PhD, LaVerne College, Claremont, CA | Research Advisor, Career Mentor | Program Director, Department of Education, Humboldt County, CA |
| 2004 - 2005 | Sarah Shulman | MS, PhD Oxford | Research Advisor | Director, Youth Development Organization |
| 2005 - 2007 | Lauren Ralph | MPH, UCB | Research Advisor | Assistant Professor, Department of Ob/Gyn, UCSF |
| 2006 - 2007 | Wanwadee Neamsakul | PhD, School of Nursing, UCSF | Research Advisor | Faculty Member, U Indonesia |
| 2006 - 2007 | Marcia Wertz | PhD, School of Nursing, UCSF | Research Advisor, Career Mentor | Assistant Professor, School of Nursing, UCSF |
| 2007 - 2010 | Linet Oyucho | PhD, Great Lakes U Kisumu, Kenya | Research Advisor | Lecturer, Doctoral Student, U of Ottawa |
| 2007 - 2008 | Alexis Armekanis | MD, Medical School, UCSF | Research Advisor | Psychiatry Resident, UCSF |
| 2007 - 2009 | Dawn Richardson | DrPH, School of Public Health, UCB | Research Advisor | Post Doctoral Fellow, Health & Society, U Michigan |
| 2007 - 2009 | Naomi Schapiro | PhD, School of Nursing, UCSF | Research Advisor | Clinical Professor, Family Health Care Nursing, UCSF |
| 2007 - 2009 | Nan Jiang | PhD School of Public Health, Indiana U, Bloomington | Research Advisor | Post-doctorate in Tobacco Policy, UCSF |
| 2009 - 2009 | Elodia Villasenor | MPH, San Francisco State University | Research Advisor | |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|-------|------|-------------------|------|------------------|
| 2009 - 2010 | Olubosola Olewole Busola | BA, Post-Bac Program, UCSF | Research Advisor | Post Bachelor Program/UCSF |
| 2010 - 2012 | Manuelito Biag | MPH, PhD, UC Davis | Career Mentor | Social Science Research Associate, Stanford University |
| 2012 - 2012 | Heather Knauer | MPH, UCB | Career Mentor | Research Associate, PRL-IHPS, UCSF |
| 2012 - 2012 | Nora Anderson | MPA, New York University | Career Mentor | Research Associate, PRL-IHPS, UCSF |
| 2012 - 2012 | Nicole Bennett | MPH | Career Mentor | Research Associate, PRL-IHPS, UCSF |
| 2013 - 2014 | Rachel Siemons | BA Postbac- Pre-med program, Bryn Mawr College | Thesis mentor | UC Berkeley-UCSF Joint Medical Program |
| 2011 - 2013 | Paulette Cha | BA Postbac- Pre-med program, Bryn Mawr College | Thesis Mentor | UCSF-UC Berkeley (now: Public Policy Institute, San Francisco |
| 2013 - 2013 | Heidi Moseson | 2nd year doctoral student at UCSF | Career Mentor | Doctoral program in Epidemiology at UCSF |
| 2013 - 2013 | Luis A. Rodríguez | RD, CNSC | Career Mentor | UCSF Medical Center/Children's Hospital |
| 2013 - 2013 | Satu Larson | 2nd year doctoral student at UCSF | Career Mentor and Qualifying Exam member | Doctoral program in at S/N UCSF |
| 2014 - 2014 | Carlos Penilla | DrPH Student | Research and Career Mentoring | Assistant Professor, Department of Pediatrics, UCSF |
| 2014 - 2015 | Zesmayat Mekonnen | MA, first year mentor program | first year mentor program | UCSF |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 2015 - 2016 | Leena Bhalerao Singh | MA | Qualifying Exam committee | UCB |
| 2015 - 2016 | Sara Kassabian | MA | Mentee/Trainee | Independent Consultant |
| 2016 - 2017 | Sophie Godley | MPH, Clinical Assistant Professor | Mentee | Boston University School of Public Health |
| 2016 - 2017 | Grace Liu | MPH | Mentee | UCSF Global Health Sciences |
| 2016 - 2017 | Joseph Chuang | MS, MPHc | Mentee | University of Washington |
| 2016 - 2017 | Stacy Osua | BA | Mentee | UCSF, Post Baccalaureate Program |
| 2016 - 2017 | Ana Isabel Gonzalez | MA, MPH | Mentee | UCB, accepted for PhD program, University of Texas |
| 2016 - 2017 | Carmen Maria Conroy | BA | Mentee | Yale NIH PREP research fellow |
| 2017 - 2018 | Lauren Lee Caton | BA, MS (2018) | Mentee | UCB, Public Health, Maternal and Child Health |
| 2017 - 2018 | Cynthia Shen | BA in progress | Mentee | Cornell 2020 |
| 2018 - 2019 | Alex Valenzuela | BS Human Biology | Mentee | UCSF |
| 2018 - 2019 | Fiona Ng | RN, Master of Science in Nursing Student | Mentee | UCSF, Pediatric Nurse Practitioner candidate 2019 |
| 2019-2020 | Aricelle Sanchez | UCSF Post-Bachelor's Program | Mentee | UC Irvine, School of Medicine |
| 2019 – 2021 | Jamie Sawyer | PhD Student | Mentee | |
| 2020-2021 | Leonida Radford | UCSF Post-Bachelor's Program | Mentee | University of Washington, School of Medicine |

Prepared: July 2, 2025

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 2020 – present | Jane Fieldhouse | PhD Student, Global Health | Mentee | |
| 2021-2022 | Urania Argueta | UCSF Post-Bachelor's Program | Mentee | UCSF, School of Medicine |
| 2021-2022 | Monica Gutierrez | Applying to Medical School | Mentee | |
| 2021-2025 | Sarah Nathan | PhD Student, Social & Behavioral Sciences | Mentee | |
| 2022-2023 | Marie Salem | Research Assoc/Pre PhD Student | Mentee | PhD Program |
| 2022-2023 | Julia Hankin | Research Assoc/Pre PhD Student | Mentee | Apply to PhD program |
| 2023-2024 | Kyle Lakatos | Medical Student | Mentee | Internship, UCLA |
| 2022-present | Sammer Elsayed | PhD Student, Global Health | Mentee | Ph.D.Global Health |
| 2023- present | Julia Holmes Ryan | Ph.D. UC Berkeley School of Public Health | Mentee | Ph.D. Student |
| 2025-present | Sigal Maya | Ph.D. Global Health | Mentee | Ph.D. Student |
| 2024-present | Jacquelyn Roger | Ph.D. Biomedical Informatics, UCSF | Mentee and Research Supervisor | Ph.D. Student |

**POSTDOCTORAL FELLOWS AND RESIDENTS MENTORED**

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 1983 - 1985 | Barbara Staggers, MD, MPH | Fellowship in Adolescent Medicine | Research, Professional Mentoring | Chief, Teen Clinics, Children's Hospital, Oakland |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 1984 - 1986 | Martin Anderson, MD, MPH | Fellowship in Adolescent Medicine | Professional Development | Chief, Division. of Adolescent Medicine, UCLA |
| 1985 - 1988 | Sheryl Ryan, MD, MPH | Fellowship in Adolescent Medicine | Professional Development | Chief, Division of. Adolescent Medicine, Yale University |
| 1989 - 1991 | Trude Bennett, DrPH | Hewlett Fellow | Research and Career advisor | Professor, School of Public Health, University of North Carolina |
| 1990 - 1991 | Jesus Jaime Guzman, MD | Hewlett Fellow, Mexico | Research advisor | Professor, Universidad de Guadalajara, Mexico |
| 1990 - 1991 | Noe Alfaro, MD, MPH | Hewlett Fellow, Mexico | Research Advisor | Professor, Universidad de Guadalajara, Mexico |
| 1990 - 1991 | Laura Laski, MD, MPH | Hewlett Fellow, Argentina | Research Advisor | Director, UN Family Planning Program, New York |
| 1991 - 1992 | Juan Carlos Ramirez Rodriguez, MD | Hewlett Fellow, Mexico | Research Advisor | Professor, Universidad de Guadalajara, Mexico |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 1991 - 1995 | Jonathan Ellen, MD | Fellowship in Adolescent Medicine | Research and Professional Development | Professor/Vice Chair of Pediatrics, Johns Hopkins |
| 1991 - 1995 | Cynthia Kapphahn, MD, MPH | Fellowship in Adolescent Medicine. | Research and Professional Development | Associate Professor, Pediatrics Stanford |
| 1992 - 1993 | Elena Fuentes-Afflick, MD, MPH | Hewlett Fellow, US | Research Advisor | Professor, Department of Pediatrics, UCSF |
| 1992 - 1993 | Julio Garcia, MD | Hewlett Fellow, Mexico | Research Advisor | |
| 1993 - 1994 | Monica Jasis, MD | Hewlett Fellow, Mexico | Research Advisor | Director, Centro Mujeres, Baja, Mexico |
| 1993 - 1995 | Isabelle Melese-d'Hospital, PhD | Hewlett Fellow, Mexico | Research Advisor | |
| 1993 - 1996 | David Bell, MD | Fellowship in Adolescent Medicine. | Research and Professional Development | Assistant Professor, Pediatrics, Columbia University |
| 1994 - 1995 | Gabriela Rodriguez, MS | Hewlett Fellow, Mexico | Research Advisor | Research Director, Family Planning Program, Mexico City, Mexico |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 1995 - 1996 | Mariana Romero, MD | Hewlett Fellow, Argentina | Research Advisor | Medical Director, Family Planning Program, (CEDES) Buenos Aires, Argentina |
| 1996 - 1997 | Rosario Cardenas, MD | Hewlett Fellow, Mexico | Research Advisor | |
| 1996 - 1997 | Elena Zuniga, BA, PhD candidate | Hewlett Fellow, Mexico | Research Advisor | Director, UN Family Planning Program, El Salvador |
| 1997 - 2000 | Howard Pinderhughes, MD | Scholar, WT Grant | Research Advisor, Career mentor | Professor and Chair, School of Nursing, Social & Behavioral Sciences, School of Nursing, UCSF. |
| 1998 - 2002 | Mary Ott, MD | U. of Pennsylvania and Postdoctoral Fellow in Adolescent Medicine | Research Advisor, Career Mentor | Associate Professor, Indiana University, Dept. of Pediatrics |
| 1998 - 2000 | Arik Marcell, MD | Fellowship in Adolescent Medicine | Research Advisor, Career Mentor | Associate Professor, Johns Hopkins University, Adolescent Medicine |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|-------|------|--------|--------------|------------------|
| 1998 - 2000 | Martha Perry | Fellowship in Adolescent Medicine | Research Advisor | |
| 1996 - 1997 | Xochitl Castenada, BA, PhD | Hewlett Fellow, El Salvador and Mexico | Research Advisor | Director, Health Initiatives of the Americas, Berkeley, CA (now retired) |
| 1997 - 1998 | Jesus Chirinos, MD | Hewlett Fellow, Peru | Research Advisor | Professor, Catholic University, Lima, Peru |
| 1997 - 1998 | Maria Vivas-Mendoza, MD | Hewlett Fellow, Mexico | Research Advisor | |
| 1998 - 1999 | Guillermo Canton Calderon, MD | Hewlett Fellow, Guatemala | Research Advisor | Physician, Guatemala City, Guatemala |
| 1998 - 1999 | Maria Soledad Gonzales Montes, PhD | Hewlett Fellow, Mexico | Research Advisor | |
| 1999 - 2000 | Freddy Javier Cardenas, MD | Hewlett Fellow, Nicaragua | Research Advisor | Professor, University of Nicaragua |
| 1999 - 2000 | Enriqueta Valdez, MD | Hewlett Fellow, Mexico | Research Advisor | |
| 2000 - 2001 | Susana Chavez, MA | Hewlett Fellow, Peru | Research Advisor | |
| 2000 - 2001 | Simon Nadew, MD | Visiting Fellow | Research Advisor | Medical resident, Family Practice, Ethiopia |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 2000 - 2001 | Diana Martinez, MD | Hewlett Fellow, El Salvador and Mexico | Research Advisor | |
| 2000 - 2003 | Sophia Yen, MD | Fellowship in Adolescent Medicine | Research and Professional Development. | Clinical Instructor, Adolescent Medicine, Stanford University |
| 2001 - 2002 | Maria Claudia Gutierrez, MA | Hewlett Fellow, Columbia | Research Advisor | |
| 2001 - 2002 | Jane Pirkis, PhD | Harkness International Health Policy Scholar, Australia | Research Mentor | Senior Lecturer, Melbourne University Australia |
| 2001 - 2002 | Addis Abeba Salinas, MD, MA | Hewlett Fellow, Mexico | Research and Career Advisor | |
| 2002 - 2003 | David Breland, MD | Fellowship in Adolescent medicine | Research Advisor | Assistant Professor, Pediatrics, University of Washington |
| 2002 - 2003 | V. Melvin Sotelo, MA | Hewlett Fellow, Nicaragua | Research and Career Advisor | Family Planning Coordinator, Nicaragua |
| 2002 - 2003 | Lillian Wong, MD | Visiting Scholar | Program Director: Research, Clinical, Professional Dev. | Faculty, Chinese University of Hong Kong |
| 2002 - 2003 | Raquel Hurtado, MD | Hewlett Fellow, Peru | Research and Career Advisor | |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|-------|------|--------|--------------|------------------|
| 2003 - 2003 | Loris Hwang, PhD | Fellowship in Adolescent Medicine | Career Advisor | Associate Adjunct Professor, Pediatrics/ Adolescent Medicine, UCSF |
| 2003 - 2004 | Erica Troncoso, MA | Hewlett Fellow, Mexico | Research Advisor | |
| 2003 - 2004 | Carmen Elisa Alvarez, MS | Hewlett Fellow, Columbia | Research Advisor | |
| 2004 - 2005 | Roberto Casto-Perez, MD | Hewlett Fellow, Mexico | Research and Career Advisor | Professor, School of Public Health, Mexico |
| 2004 - 2005 | Cecilia de Mello e Souza, MD | Hewlett Fellow, Brazil | Research Advisor | Professor, Sao Paolo, Brazil |
| 2004 - 2006 | Jane Burns, PhD | Harkness International Health Policy Scholar, Australia | Program Director, Research Mentor | Evaluation Director, Imagine, Australia |
| 2006 - 2006 | Jennifer Yu, PhD | Postdoctoral Fellow, Agency for Health Care Quality and Research, IHPS | Research Advisor, Career Mentor | Research Associate, IHPS, UCSF |
| 2006 - 2008 | Aimee Afable-Munsuz, PhD | Postdoctoral Fellow, Agency for Health Care Quality and Research, IHPS | Research Advisor, Career Mentor | Postdoctoral Fellowship, School of Pharmacy, UCSF |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 2007 – 2008 | Kim Rhoades, MD, MS, MPH | Postdoctoral Fellow, Agency for Health Care Quality and Research, IHPS Philip R. Lee Fellow, UCSF | Research, Career Mentor | Professor of Surgery and Community Research, UCSF |
| 2008 – 2009 | Helena Hart, MD | Philip R. Lee Fellow, IHPS, UCSF | Research, Career Mentor | Medical School, UCSF |
| 2009 – 2012 | Christine Dehlendorf, MD, MAS | Department of Family and Community Medicine, UCSF | Research, Career Mentor | Clinical Professor of Medicine, Department of Family and Community Medicine, UCSF |
| 2008 – 2012 | Amy Donovan-Blondell, PhD | Department of Health and Aging, UCSF | Research, Career Mentor | Post Doc Fellowship, Institute for Health and Aging, UCSF Now: Independent Consultant |
| 2009 – 2011 | Pam Stoddard, PhD | Philip R. Lee IHPS Post-Doc | Career Mentor | Post Doc, Philip R. Lee Institute for Health Policy Studies, UCSF |
| 2009 – 2012 | Anisha Patel, MD | Philip R. Lee Fellow, IHPS, UCSF | Research, Career Mentor | Stanford University |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 2011 - 2014 | Sarah, Isquick, MD, MPH | Doris Duke Fellow, Philip R. Lee IHPS, Bixby Center | Career Mentor | Practicing Physician, Sutter Health |
| 2011 - 2013 | Elizabeth Uy-Smith, MD, MPH | Primary Care Research Fellow | Career Mentor | Family and Community Medicine |
| 2013 - 2017 | Marissa Raymond-Flesch, MD, MPH | Fellow | Career Mentor | Current: Associate Professor, Adolescent and Young Adult Medicine |
| 2013 - 2017 | Satu Larson | Fellow | Career Mentor | Associate professor for SJSU School of Nursing, a pediatric nurse practitioner |
| 2013 - 2014 | Esme Cullen | Third Year Medical Student | Career Mentor | UCSF Medical Center |
| 2013 - 2018 | Paulette Cha | PhD Candidate | Career Mentor | Public Policy Institute, San Francisco |
| 2014 - 2016 | Gina Robinson | PhD, UCSF | Career Mentor | School of Nursing, UCSF |
| 2014 - 2017 | Michelle Ko | MD, PRL-IHPS Fellow | Career Mentor | Professor, UC Davis School of Medicine |
| 2014 - 2017 | Suzane M. Martinez, MD, PhD | MD, PhD | Career Mentor | UCOP |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 2014 - present | Sarah Combellick, MA | Research Associate | Career Mentor | PhD candidate, UC Davis |
| 2014 - 2016 | Jacquelyn Torres, PhD, MD | Fellow | Career Mentor | Assistant Professor, Department of Epi/Biostatistics, UCSF |
| 2015 - present | Elizabeth Dickson, RN, MSN | Fellow, RWJF Nursing and Health Policy Collaborative | Career Mentor, Dissertation Committee | Faculty (tenure-track) University of New Mexico, College of Nursing |
| 2015 - 2017 | Ilana Garcia-Grossman | MD Candidate, class of 2018 | Career Mentor | UCSF |
| 2016 - 2018 | Emily Behar, RN, MSN, MPH | Doctoral Student, Global Health Sciences | PhD, Career Mentor | Department of Public Health, San Francisco |
| 2016 - 2018 | Jennifer Shen | Fellow | Research and career mentoring | IHPS Postdoctoral Fellow |
| 2016 - 2018 | Emily Hall, RN, MSN, MPH | Doctoral Student | PhD, Career Mentor | San Francisco Department of Public Health |
| 2018 - 2020 | Lauren Strelitz, MD, MSL | PhD Candidate, Fellowship in Adolescent Medicine | Career Mentor and Scholarly Oversight Committee | Dept. of Pediatrics, UCSF |

Prepared: July 2, 2025

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 2018 - 2020 | Marichianah Onono, MBChB, Msc | Doctoral Student, Global Health Sciences | Qualifying Exam Committee & Chair | Kenya Medical Research Institute |
| 2018 - present | Jayme Congdon | Fellow | Career Mentor | Depart. of Pediatrics, UCSF |
| 2019 - present | Angela Barney, MD | Clinical Fellow | Career Mentor and Scholarly Oversight Committee | Depart of Pediatrics, UCSF |
| 2024- present | Clemence Marty | Visiting Fellow | Career Mentor | Head of Strategy and Transformation, Assistance Publique–Hôpitaux de Paris (AP–HP) |
| 2024-present | Jennifer Yarger | Post-doctoral Fellow | Mentor | Department of Urology |
| 2024-present | Juliana Friend | Post-doctoral Fellow | Mentor | Department of Epidemiology and IHPS |
| 2024-present | Kristen Burke | Post-doctoral Fellow, BIRCWH | Mentor | Post-Doctoral Program |

Prepared: July 2, 2025

**FACULTY MENTORING**

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 1999 - 2001 | Marty Jessup | PhD, School of Nursing, UCSF | Research Advisor | Associate Professor, School of Nursing, UCSF. |
| 2005 - 2006 | Kristine Madsen | MD, MPH | Research Advisor | Assistant Adjunct Professor, Pediatrics, UCSF |
| 2005 - 2007 | Jennifer Reich, PhD | Postdoctoral Fellow, IHPS | Research and Career mentoring | Professor, U of Denver |
| 2005 - present | Daniel Dohan, PhD | Associate Professor Department of Anthropology and Health Policy | Career Advisor | Deputy Director and Professor, Director of Training/IHPS/UCSF |
| 2005 - present | Diana Greene Foster, PhD | Demographer | Research and Career Advisor | Assistant Professor, Department of Obstetrics, Gynecology, and Reproductive Health Sciences, UCSF |
| 2006 - 2011 | Mary Ott, PhD | Faculty, Indiana U Bloomington | Research supervision and career mentoring | Faculty, Indiana University, Bloomington |
| 2006 - 2020 | Tracy Weitz, PhD | Department of Sociology, UCSF | Research and career mentor | Professor, American University |

Prepared: July 2, 2025

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 2006 - 2020 | Tracey Woodruff, PhD | Post-Doc and Faculty member, UCSF | Research and career mentor | Professor, Dept. of Obstetrics, Gynecology and Reproductive Sciences, UCSF |
| 2007 - 2020 | Jeff Belkora, PhD | Assistant Professor in Research, Surgery and Health Policy | Research and career mentoring | Associate Professor in residence, Department of Surgery and IHPS, UCSF |
| 2007 - 2019 | Michael Cabana, MD, MPH | Associate Professor, Chief of General Pediatrics, UCSF | Research review and personal advisor | Chair of Pediatrics, Montefiore, New York, NY |
| 2007 - 2016 | Diane Rittenhouse, MD | Associate Professor in Residence | Career mentor | Professor in Residence, Department of Family & Community Medicine and IHPS, UCSF |
| 2008 - 2012 | David Becker, MD | Assistant Clinical Professor of Pediatrics | Research and career mentoring | Clinical Professor of Pediatrics, UCSF |
| 2008 - 2014 | Sara Buckelew, MD, MPH | Assistant Clinical Professor | Career mentoring | Clinical Professor, Department of Pediatrics, UCSF |

Prepared: July 2, 2025

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 2008 - 2012 | Adam Hersh, MD | Clinical Fellow and Assistant Professor, Dept. of Pediatrics, UCSF | Research and career mentoring | Professor, Department of Pediatrics, University of Utah |
| 2008 - 2011 | Megie Okumura, MD | Assistant Adjunct Professor, Dept. of Pediatrics, UCSF | Research and career mentoring | Associate Professor, Department of Pediatrics, UCSF |
| 2008 - 2014 | Laura Schmidt, PhD, MPH, MSW | Associate Professor in Residence | Career mentor | Professor, IHPS, and the Department of Anthropology and History, UCSF and History, UCSF |
| 2008 - 2014 | Steve Takemoto, PhD | Assistant Adjunct Professor | Career mentor | Independent Consultant |
| 2010 - 2016 | Tilly Gurman, DrPH | Assistant Professor | Career mentor | Assistant Professor, Department of Global Health, School of Public Health and Health Services, George Washington University |
| 2010 - 2016 | Ushma Upadhyay, MPH | Assistant Professor | Research and career mentoring | Associate Professor, Bixby Center for Global and Reproductive Health |

Prepared: July 2, 2025

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 2013 - present | Anisha Patel, MD | Assistant Professor | Research and career mentoring | Professor, Department of Pediatrics, UCSF |
| 2013 - present | May Sudhinaraset, PhD | Assistant Professor | Research and career mentoring | Professor, School of Public Health, UCLA |
| 2018 - 2019 | Fatima Rodriquez, MD, MPH, FACC | Assistant Professor | research and career mentoring | Assistant Professor Cardiovascular Medicine, Stanford University School of Medicine |
| 2019-present | Cristin Kearns, DDS | Assistant Professor | Career mentor | Assistant Professor, School of Dentistry, UCSF |
| 2019-present | Rita Hamad, MD | Assistant Professor | Career mentor | Professor, School of Public Health, Harvard |
| 2018-2021 | Brittany Chambers, PhD | Assistant Professor | Career and research mentor | Assistant Professor, UC Davis School of Medicine |
| 2019-present | Romina Barral, MD | Assistant Professor | Career and research mentor | Assistant Professor, Univ of Missouri-Kansas, School of Medicine |

Prepared: July 2, 2025

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 2020-present | Ifeyinwa Asiodu, RN, PhD | Assistant Professor | Career and research Mentor | Associate Professor, Department of Family Health cSchool of Nursing, UCSF |
| 2020-persent | Jayme Congdon. MD | Assistant Professor | Career and research Mentor | Assistant Professor, Department of Pediatrics, UCSF |
| 2022-present | Anita Hargrave, MD | Assistant Professor | Career and research mentor | Assistant Professor, Department of Medicine, UCSF |
| 2022-2024 | Susanna Mitro, Ph.D. | BIRCWCH Scholar | Career and research Mentor | Kaiser Division of Research |
| 2022-present | Julia Raney, M.D. | Assistant Professor, Department of Pediatrics, UCSF | Mentor and Research Collaborator | Assistant Professor |
| 2022-oresent | Kenshata Watkins, MD | Assistant Professor, Department of Emergency Medicine | Mentor | Assistant Professor, Department of Emergency Medicine |
| 2023-present | Akinyemi Oni-Orinsan. Ph.D. | Associate Professor, School of Pharmacy | Mentor | Associate Professor, School of Pharmacy |
| 2024-present | Amanda Bryson, MD | Assistant Professor, Department of Pediatrics, UCSF | Mentor and Research Collaborator | Assistant Professor |

Prepared: July 2, 2025

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 2023-present | Ayesha Appa, PhD | Assistant Professor, Department of Medicine, UCSF | Mentor | Assistant Professor |
| 2020-present | Jason Nagata, MD | Associate Professor, Department of Pediatrics, UCSF | Mentor and Research Collaborato | Associate Professor |
| 2022-present | Ribka Tessera, MD | Researcher, Kaiser Division of Research, Oakland | Mentor | Researcher |
| 2023-present | April Bell, Ph.D. | Assistant Professor, Department of Famly and Community Medicine | Mentor | Assistant Professor |
| 2024-present | Jonathan Watanabe, Ph.D. | Professor and Director, Department of Clinical Pharmacology | Mentor | Professor and Director, Department of Clinical Pharmacology |
| 2024-present | Lucy Ogbu-Nwobodo, MD | Assistant Profesor, Department of Psychiatry | Mentor | Assistant Profesor, Department of Psychiatry |
| 2025-present | April Edwill, MD | Assistant Professor, Department of Pediatrics | Mentor | Assistant Professor, Department of Pediatrics |
| 2024-present | Enihomo Obadan-Udoh, DDS. | Associate Professor, School of Dentistry | Mentor | Associate Professor, School of Dentistry |

Prepared: July 2, 2025

| Dates | Name | Position while Mentored | cbrindisMentoring Role | Current Position |
|---|---|---|---|---|
| 2024-present | Meghan Morris | Associate Professor and Vice Chair in the Department of Epidemiology and Biostatistics | Mentor | Associate Professor and Vice Chair in the Department of Epidemiology and Biostatistics |
| 2025-present | Yasaswi Kirlovskiy, MD | Assistant Professor, Department of Obstetrics, Gynecology and Reproductive Health Sciences | Mentor | Assistant Professor |

## RESEARCH AND CREATIVE ACTIVITIES

### RESEARCH AND CREATIVE ACTIVITIES SUMMARY

Methodologically, I conduct program evaluations and health policy analyses, using a variety of quantitative and qualitative techniques, assuring triangulation of data. This strength enables me to work with a variety of research collaborators, including previously valuating: 1) the nation's largest 1115 Medicaid Waiver Family Planning Waiver; 2) California's statewide, community-based teenage pregnancy prevention, as well as pregnant and parenting adolescents initiatives; 3) school-based health services; 4) the impact of the Affordable Care Act (ACA) on children, adolescents, young adults and women's health; 5) the role of patient engagement in health care system redesign, 6) UCSF-CA preterm birth initiative, 7) health care access and needs of immigrants, with a particular focus on Deferred Action for Childhood Arrivals (DACAs), 8) the interaction of Adverse Childhood Experiences (ACEs) and the needs of adolescents, and 9) monitoring the impact of COVID-19 . As a result of my work in the area of program evaluation, I collaborated with Dr. Annette Gardner in the writing of a book, *Advocacy and Policy Change Evaluation: Theory and Practice*, published by Stanford Press in 2017.

In 2018-2019, along with a small number of campus leaders (Nancy Adler, Kirsten Bibbins-Domingo, Kevin Grumbach, Bob Hiatt, and Elizabeth Watkins), we established the UCSF Population Health Sciences and Health Equity Initiative that brings together multiple ongoing efforts in this area, but which are often not recognized as a special campus strength. We held a successful UCSF Colloquium on Population Health & Health Equity (https://www.youtube.com/watch?v=MXqy_LIIExI) in May 2018 and I gave a presentation on the role of academic health centers in population health. We conducted a campus-wide study of the

Prepared: July 2, 2025

data needs of our faculty in the area of population health and large data bases, working towards creating a data repository and the systematic identification of campus experts who are able to work with faculty and trainees in conducting population-health oriented analyses.

With the selection of Dr. Bibbins-Domingo as the inaugural Vice-Dean for Population Health and Health Equity, I served on her Steering Committee until 2020, planning a variety of strategies to build upon our campus' strengths in this arena and leverage further collaborations across campus related to population health. I served as principal investigator of a $1.44 million dollar "Population Health Data Initiative ("PHDI," supported by the UC Medical Center) to further advance population and health services research at UCSF. The goals of the 3-year project were to provide support for the institutional acquisition of several key data sources, establishment of a user-friendly data portal with capacity for data analytics to make these data accessible, as well as key investments to support junior faculty and trainees to use these data effectively.

*IImmigrant and Latinx Health*

My own qualitative and quantitative research has also examined health and economic disparities among multi-ethnic/racial groups nationally (e.g., health insurance coverage; risk taking behaviors, including teenage pregnancy, suicide, and substance use; and health outcomes). I have special expertise on diverse Latinx populations, global reproductive health, migration and health, as well as the impact of migration and acculturation on Latinx immigrants. For example, I completed a study with collaborators at UCLA and UCB focused on the health conditions and health care access of young Latinos eligible for health care as a result of the Deferred Action for Childhood Arrivals (DACA) program (often referred to as "Dreamers" in social media). On this project, I worked closely with a Latina Fellow in Adolescent Medicine and Health Policy (now a junior faculty member), a medical student in the joint UCB-UCSF Medical School program and hired several "Dreamers" to conduct the research. Results from this research (two briefs, 3 published articles) have been widely disseminated nationally, as well as serving as the basis for two briefings: one with state policymakers in Sacramento and the other with health providers and advocates. This data was used to support SB 4, which requires the provision of Medi-Cal (California's Medicaid Program) insurance coverage to undocumented children living in California, beginning in March 2016. Nearly 200,000 children and adolescents have benefited from the program.

I have also worked in the area of acculturation, social disparities, and health, including: 1) developing a research and policy agenda for cross-border health between Mexico and the U.S., 2) the impact of acculturation on the incidence of obesity among three different groups of Latinos—those born in Mexico who have immigrated to the U.S., Mexican-born populations that speak English, and U.S. born Mexicans who speak English, 3) the role of family planning as a means of reducing health disparities among Latinas, 4) risk and protective factors in adolescent pregnancy among adolescent and young adult Latinas, and 5) the challenge of measuring acculturation, particularly among Latinx adolescents.

Some of my co-authored relevant reports include: "Creating a Health Research and Policy Agenda for Im/migration Between Mexico and California", "Migration and Health: Mexican Immigrant Women in the U.S.," and "A Health Profile of Immigrant Teenagers", representing a multi-campus, cross-border collaboration between the National Population Council of the Government of Mexico (CONAPO), UCB School of Public Health Initiative of the Americas (ISA), UCLA School of Public Health, UC, Davis and UC Berkeley Migration and Health Research Center (MAHRC), and UCSF's Bixby Center for Global Reproductive Health (I am one of its Founding Directors). I have also collaborated on several projects focused on Latina youth, one of

Prepared: July 2, 2025

which was converted into a 22-minute, award winning film, A Question of Hope, (http://nahic.ucsf.edu/multimedia/901/); (Spanish voice-over, Una Cuestión De Esperanza: Reduciendo los embarazos de adolescentes latinas en California (http://bixbycenter.ucsf.edu/videos/video-lo-3.html).

*Adolescent Pregnancy Prevention and Reproductive Health Care Services Research*

Over nearly 5 decades, I have conducted national and international research on teenage pregnancy prevention (as shown in my curriculum vitae). Pprojects have been funded by the State of California, Patient-Centered Outcomes Research Institute (PCORI), and the federal Office of Adolescent Health and Family and Youth Services Bureau. Specifically, I conducted evaluation research for the State that helps ascertain whether the state's investment is leading to positive outcomes, including a reduction in teenage pregnancy and fewer negative social and economic consequences. I served as Co-PI with Dr. Kathleen Tebb in a PCORI-funded grant entitled, Reducing Health Disparities in Unintended Pregnancies Among Hispanic Adolescents Using a Patient-Centered Computer-Based Clinic Intervention.

In another project, funded by the Federal Family and Youth Services Bureau (Dr. Mara Decker, Principal Investigator), we were evaluating the effectiveness of a Digital Initiative for Youth. This project represents an innovative youth-centered initiative to improve the sexual health and socio-economic well-being of youth in Fresno County, California, also using a newly developed app.(project was defunded in 2025 as a result of federal Executive Orders). Finally, I collaborated with Dr. Christine Dehlendorf,and Dr. Tebb, as we tested the use of social networks and their influence on encouraging adolescents to adopt the use of long-acting contraceptive methods (LARC). The project, entitled, SpeakOut: Empowering teen to teen communication about highly effective contraception, was also funded by the federal Office of Adolescent Health and is using app technology.

With colleagues at the National Family Planning and Reproductive Health Association and George Washington University, we conducted a 3-year study entitled, "Confidential and Covered: Protecting Patients While Preventing Revenue Loss". This study focused on developing and testing effective interventions that support the federal Title X Family Planning program's historic commitment to client confidentiality, while preventing and mitigating revenue loss at Title X service sites due to the provision of confidential services as part of health care reform efforts.

An area of related interest is the role of confidentiality, electronic health care records, and access to sensitive health services in the era of health care reform. Studies have included in-depth interviews with health professionals and stakeholders regarding options for reconciling the need for health insurance explanation of benefits requirements and the need for adolescents and young adults to access sensitive health services (Protecting Adolescent Confidentiality Under Health Care Reform: The Special Case of Explanation of Benefits (EOBs) (http://healthpolicy.ucsf.edu/Protecting-Adolescent-Confidentiality) and a policy analyses regarding the Electronic Health Care Record (Sensitive Health Care Services in the Era of Electronic Health Records: Challenges and Opportunities in Protecting Confidentiality for Adolescents and Young Adults - http://healthpolicy.ucsf.edu/sensitive-health-care-and-electronic-health-records). We also completed a California-focused study of the impact of insurance churning among young adults (https://cloudfront.escholarship.org/dist/prd/content/qt85g872v5/qt85g872v5.pdf?t=p60dow

*Adolescent and Young Adult Health and Health Policy*

Prepared: July 2, 2025

With Dr. Charles Irwin (Director), I served as the co-Director of the Adolescent and Young Adult Health National Resource Center, funded by the federal Bureau of Maternal and Child Health. In this policy-practice endeavor, which was originally conceived by Dr. Irwin and me, was successfully funded between1999-2024, The Center aimed to promote adolescent and young adult (AYA) health by strengthening the abilities of State Title V MCH Programs, as well as public health and clinical health professionals, to better serve these populations (ages 10-25). Our work focused on increasing the receipt of quality preventive visits for AYAs, including . the establishment of AYAH Collaborative Improvement and Innovation Network (CoIIN) Projects. We used the CoIIN model to help selected states to address the well visit for adolescents and young adults. The CoIIN model, used by many states to address infant mortality, combined collaborative learning and quality improvement methods to drive a national strategy. As part of the Center, we conducted analyses of the health and well-being of adolescents and young adults, the impact of the ACA on this population, as well as studied ways to improve access to health insurance coverage and preventive health services. A final focus was on improving the numbers of states that promote young adult health (ages 18-25), including increasing their access to health insurance and preventive health care services.

I also conducted policy research and analyses of The Healthy People 2010 and 2020 Adolescent and Young Adult Health Objectives, and analyses of national data sets documenting the lack of health insurance among adolescents and young adults. As a result of the Affordable Care Act (ACA) and the expansion of Medicaid, disparities in access and utilization of services were reduced and increases in the use of mental health services were documented. This body of research (between 2006-2012) was the basis for bringing national attention to the needs of adolescents and young adults, specifically, the disparities they face in accessing health care, in particular for mental health services. In order to offer policy makers with a set of potential action steps, our team identified innovative programs aimed at: increasing the delivery of preventive mental health services for adolescents: assuring that insurance companies were developing products for young adults; and maximizing health insurance enrollment for young adults who represent 30% of the nation's uninsured population. I completed one of the first studies of the ACA roll-out of health insurance coverage of young adults up to age 26 on their parent's health insurance plans from the perspective of states (published in Journal of Health and Biomedical Law in Winter, 2015). We also conducted analyses of large national data sets to ascertain the impact of the ACA on young people's access to health care and preventive health care visits. In 2006, our team received recognition for this body of work by the Society for Adolescent Health and Medicine (the Hilary E. Millar Award for Advancing the Field of Health Policy for Youth to the UCSF National Adolescent Health Information Center).

*Health Services*

With colleagues at UCSF, UC Berkeley, and UCLA, we assessed care integration (behavioral and primary care) in the California safety net within the context of the ACA, conducting a set of interrelated research projects to: 1) document the level of integration of care in the safety net system in California, including integration with specialists, ancillary services, hospitals, behavioral health, and social services; 2) evaluate efforts to support Medi Cal providers to adopt health information technology to facilitate functional integration; and 3) document the challenges encountered in outreach and enrollment for difficult to reach and enroll populations, including young men who previously were not eligible to receive subsidized health care. We have disseminated the findings to policy makers and stakeholders in California's health care safety net.

Prepared: July 2, 2025

With colleagues at the Institute, we conducted a three-year evaluation of efforts to increase patient-centered care as part of the federal Center for Medicaid and Medicare Innovation Centers' endeavors. Funded by the Atlantic Philanthropies, the project entitled, the "Campaign for Better Care" (CBC), sought to engage vulnerable populations enrolled in public health plans to ensure that health reform measures reflected their needs, interests, and preferences. Three national advocacy organizations (Community Catalyst, the National Partnership for Women and Families, and PICO) developed models of consumer engagement in institutional decision-making. As part of the evaluation, the evaluation team developed a brief video to capture the voices of patients and providers, who share their stories about barriers in obtaining and providing health care. https://www.youtube.com/watch?v=TLveVpzP9cU

*Community-Focused Early Childhood Development*

With colleagues at UCSF Benioff Children's Hospital, Oakland and later at UCSF Medical Center, and funded by NextGen and the Benioff Foundation, we conducted an evaluation of a provider intervention aimed at reducing the word-gap between middle income and low-income children. Research has documented the dramatic difference between middle- and high-income households in which children 0-4 years of age are exposed to greater degrees of language interactions with their parents, as compared to low-income households, where less verbal stimulation contributes to a significantly limited vocabulary. The intent of this project was to educate low-income parents on the significant brain development that occurs very early in childhood and the importance of language interaction (singing, talking and reading) to close this existing word-gap that hampers future educational outcomes. Evaluation results documented the value of the health care provider in educating families regarding the importance of reading to their babies, as well as children.

*Influence of the Sugar Industry on the Health of the Public*

Over a period of 7 years, I worked with a team to bring greater attention to the impact of sugar on population health, beginning with a collaboration with Drs. Robert Lustig and Laura Schmidt and reflected in the article, "The Toxic Truth about Sugar". As part of our efforts, we established Sugar Science (http://sugarscience.ucsf.edu/, under the direction of Dr. Schmidt), and with the UCSF Library as a full partner, launched the Sugar Industry Library in Fall, 2018 (https://www.industrydocuments.ucsf.edu/food/), parallel to UCSF's renown Tobacco Industry Papers. This web-based resource, funded by the Arnold Foundation, is available to world-wide scholars interested in researching the impact of the food industry upon the nation's health, including the marketing of sugar-sweetened beverages leading to childhood obesity. A major symposium was held on November 15, 2018 to launch the archive (https://www.industrydocuments.ucsf.edu/research-tools/public-lectures/#food_unveiling).

*Translating of Research into Policy*

Underlying my research portfolio is an emphasis on the translation of research into policy, including not only publishing major research results in peer-reviewed journals, but also identifying different dissemination channels. For example, we published the cost-benefit analyses of the Family PACT program, helping to leverage over a billion dollars in California to serve low-income men, women, and adolescents. We also translated this research into easy to use formats for policy makers, including briefs for Congressional, as well as state Legislators. The briefs included data on the number of unintended pregnancies averted by their constituents, and the number of federal and state dollars averted through the prevention of those pregnancies. All of these dissemination and diffusion related efforts, along with my long standing research in

Prepared: July 2, 2025

the area of maternal and child health, led to my co-chairing the Knowledge-Transfer Working group, as part of the Benioff-Gates $100 million dollar, ten-year commitment to reducing pre-term birth both in California and globally. Building on that experience, we evaluated the UCSF Preterm Birth Initiative-CA. The overall goal was to use evaluation findings to assess current programs and activities and offer insights into possible program modifications that could realign initiative strategies to ensure outcome achievement.

Reflecting upon the wide variety of research interests noted above, each has the theme of focusing on vulnerable and often marginalized populations, bringing the most comprehensive evidence to bear upon policy options, and engaging communities of stakeholders in identifying the most effective policy options available, given resources and evidence.

Separately, throughout my tenure at UCSF, I have been an advocate for health policy and highlighting the roles of our faculty in advancing health policy as they translate their research for a variety of policymakers. I led efforts to identify UCSF-wide faculty who have made a significant contribution and impact on health policy at the local, state, national and international level, as well as globally. These policy impacts reflect laws, regulations, and policies, as well as changes within clinical practices as a result of clinical guideline development. The project is entitled, Policy Champions and is available at *https://pophealth.ucsf.edu/champions/home*.

*Adverse Childhood Experiences (ACEs) and adolescents/Latino youth*

Along with colleagues Drs. Naomi Schapiro (School of Nursing) and Samira Soleimanpour, we wrote two concept papers for the Office of the California Surgeon General's (OSG) ACEs Aware Initiative. The first, *Screening adolescents for ACEs: Incorporating resilience and youth development*, addresses how to: ensure confidentiality in screenings; integrate ACEs screening into an assets-based, trauma-informed adolescent visit; and engage youth and families in active steps to mitigate impacts of ACEs and toxic stress. The second paper, entitled *Screening newcomer immigrant youth for ACEs: Adaptations to address language, literacy, stigma and caregiver support*, focuses on addressing cultural and structural barriers to disclosing trauma histories, language and literacy barriers, and challenges of maintaining confidentiality in small immigrant communities. It also addresses how to support resilience and youth development amid current legal and financial restrictions. As part of the research, we conducteda series of individual, zoom-based interviews with health professionals and conducted focus groups with adolescents. Results were used by the OSG to plan initiatives and staff capacity trainings
.

*Rapid Assessment of COVID-19 Pandemic Indirect impacts and mitigating interventions*

Given the dynamic nature of the COVID-19 pandemic and California's unfolding response, state decision makers required the capacity to anticipate which direct and indirect health impacts will prove especially costly over time and which interventions could mitigate the indirect adverse health outcomes for Californians and costs to the state. In close partnership with the Office of the California Surgeon General, senior IHPS faculty, staff and I worked to develop the "Rapid Assessment of Pandemic Indirect impacts and mitigating interventions for Decision-making" (RAPID) project. Its purpose was to provide timely economic analyses that aimed to support California state decision making on strategies to mitigate the mid- and long-term indirect health burdens of the COVID-19 pandemic, in the context of Adverse Childhood Experiences (ACEs), including [depression, homelessness and alcohol and opioid use]. "Indirect burden" refers to health harms not due to infection with the SARS-CoV-2 virus itself, but rather the biological impacts of the other stressors of the COVID-19 pandemic. This public anxiety regarding COVID-

Prepared: July 2, 2025

19, compounded by the economic distress due to lost wages, employment, and financial assets; mass school closures; and necessary physical distancing measures was shown to result in an increase in stress-related morbidity and mortality. We completied an analysis highlighting major public health issues, illustrating our analytic approach and capability, identified data gaps, and promoted dialogue and feedback on ways that could further maximize the utility of the research for California policymakers (https://pmc.ncbi.nlm.nih.gov/articles/PMC9292069/).

*Transition to Distinguished Professor (Emerita-on Recall)*

As the Director of the Philip R. Lee Institute for Health Policy Studies for fourteen years (until July, 2020), I played a major leadership role within UCSF and the Institute in building strong research, methodological, and training capacity in the area of health outcomes research, population health, equity, and social determinants of health. This included monitoring the implementation of health care reform, among many pressing health topics, and building the next generation of health services and health policy talented faculty across our campus. I also recently led efforts to honor and celebrate the life of Philip R. Lee, who died on October 27, 2020. The film was presented on February 25th, 2021 and is available at: https://www.youtube.com/watch?v=JqcUeOHW9_Y.

In transitioning to this phase, I have been engaged in a variety of activities: as a Senior Advisor to the UC Center on Climate, Health and Equity, providing guidance to its two co-Directors as they have conducted their strategic plan, co-authored an article on decarbonization (https://academic.oup.com/healthaffairsscholar/article/1/1/qxad006/7203670, and worked with a Commonwealth Visiting Scholar, with whom we have written a manuscript, under review on the subject of implementing clinical decarbonization actions. I have also continued to serve as evaluator of the NIH-funded, UCSF Clinical and Translational Research Institute, evaluator of the UCSF ARCHES program, and serve as a co-investigator with an Adolescent Medicine faculty member, Dr. Jason Nagata, analyzing the impact of social media use on a variety of adolescent risk behaviors, including eating disorders, alcohol, drug use, and mental health issues. I also serve as a mentor to a variety of doctoral students, post-doctoral fellows, and junior faculty.

I served on the National Academy of Science, Engineering and Medicine, National Research Council's Governing Board (4 years;2020-2024), as Vice-Chair of the NAM Council for 3 years (2020-2023), and as Chair of the Advisory Board for the Division of Social and Behavioral Sciences and Educational Studies (2025-present). I chaired the Search Committee for the next President of NAM (2024-2025).

**RESEARCH AWARDS – CURRENT**
**Title: UCSF-Kaiser Building Interdisciplinary Research Careers in Women's Health Program**

* Major Goals: The goal of the UCSF/Kaiser BIRCWH program is to increase the number, quality, and breadth of women's health researchers. We aim to facilitate the career development of outstanding independent investigators experienced in multidisciplinary, translational, and clinical women's health research.

  Project Number: 8 K12AR084219-26; Source of Support: NIH NIAMS

*Status of Support: Project/Proposal Start and End Date: 09/2000 - 04/2025; PD/PI: Brindis, Claire/Harper, Cynthia (MPI);(Total Award Amount (including Indirect Costs): $3,811,838 for 08/2020 – 04/2025 cycle).Active (*awaiting renewal 5/1/2025-2030*);.60 effort;

Prepared: July 2, 2025

* **Title: UCSF Clinical and Translational Science Institute (CTSI)**

* Major Goals: The UCSF Clinical and Translational Science Institute (CTSI) has built a coordinated platform for clinical and translational research, successfully improved, integrated, and extended research services and infrastructure, and created comprehensive training programs. The program has expanded services and infrastructure by collaborating with regional partners, notably the 5 University of California CTSAs (UC BRAID), and measurably improved the health of vulnerable residents in the San Francisco Bay Area. Building on this foundational work, the CTSI now proposes to leverage these strengths by developing and linking emerging technologies to improve the quality, efficiency, and cost of conducting interdisciplinary, multisite clinical and translational research.

* Status of Support: Active Project Number: UL1TR001872; PD/PI: Collard, H.; Nguyen, T. Jacoby, V.(MPI); Source of Support: NCATS; Project/Proposal Start and End Date: 07/2021 - 06/2026; Total Award Amount (including Indirect Costs): $42,460,585; Person Months (Calendar/Academic/Summer) per budget period. 1.20 calendar per year (2025;2026).

**Title: Leadership Training in Adolescent Health**

Major Goals: The goals and objectives are to: 1) Recruit and train trainees to become AYA health leaders across the 5 core MCH disciplines & Public Health who can improve the quality of care and equitable access to services; (2) Develop & implement an interdisciplinary leadership curriculum; (3) Strengthen the capacity of clinical and non-clinical systems to improve AYA health through coordination and collaboration of technical assistance (TA), continuing education (CE), using technology and expanding partnerships with systems that care for underserved AYAs; (4) Advance delivery of equitable evidence-based health care to AYAs through: building trainees' skills in delivering quality clinical care to diverse AYA populations; enhanced engagement with communities & collaboration with institutions that serve AYAs; and addressing emerging issues.

* Status of Support: Active Project Number: T71MC00003-46; PD/PI: Irwin, Charles; Source of Support: PHS Health Resources & Services Admin; Project/Proposal Start and End Date: 07/2023 - 06/2027; Total Award Amount (including Indirect Costs): $1,837,480; Person Months (Calendar/Academic/Summer) per budget period..30 (2025); .60 (2026); .60 (2027)

**Title: Investigating relationships between problematic social media use and binge-eating disorder to inform precision guidance for adolescents**

Major Goals: To identify important interrelations among problematic social media use patterns and binge-eating disorder, using novel measures, prospective data, and machine learning methods on a large national cohort to inform tailored clinical and public health interventions.

* Status of Support: Active Project Number: R01 MH135492-01 PD/PI: Nagata, Jason; Source of Support: NIMH; Project/Proposal Start and End Date: 09/2023 - 06/2028; Total Award Amount (including Indirect Costs): $2,945,079 (.60 Person Months for 2025-2028).

**PENDING**

* **Title: Longitudinal pathways between adolescent social media use and substance use: Informing evidence-based guidance**

* Major Goals: To examine how social media use during adolescence may contribute to early substance use, such as nicotine, cannabis, and alcohol use. We will also examine parenting

Prepared: July 2, 2025

rules and monitoring that may protect from substance use.

Status of Support: Pending Project Number: R01DA064134; PD/PI: Nagata, Jason; Source of Support: NIH NIDA; Project/Proposal Start and End Date: 07/2025 – 06/2030; Total Award Amount (including Indirect Costs): $3,802,799; Person Months (Calendar/Academic/Summer) per budget period. (.30 for 2026-2027).

**Title: University of California, San Francisco/Kaiser Permanente Northern California Division of Research Building Interdisciplinary Research Careers in Women's Health (BIRCWH) K12 Program**

* Major Goals: This competing renewal application is to support the University of California, San Francisco (UCSF) and Kaiser Permanente Northern California (KPNC) Division of Research's Building Interdisciplinary Research Careers in Women's Health (BIRCWH) Program. The program objectives are to: Recruit a superb group of early-career women's health researchers; provide tailored training and mentoring on sex and gender influences in health and disease; build upon our existing program by targeting topics in women's health of public health importance; strengthen and integrate models of interdisciplinary research to develop researchers who foster linkages across disciplines and institutions and excel in building team science; and to promote the prominence of women's health and the retention of investigators underrepresented in clinical research by mentoring BIRCWH scholars and alumni in academic advancement and leadership.

Name of PD/PI: Harper, Cynthia/Gandhi, Monica (MPI); Source of Support: NIH/NIAMS

Project/Proposal Start and End Date: 05/2025 – 04/2030; Total Award Amount (including Indirect Costs): $4,537,516; .60 for 2026-2030).

* **Title: Informing guidance on social media use to reduce depression and anxiety in adolescents**

* Major Goals: To explore temporal and bidirectional associations between digital media engagement and internalizing symptoms of anxiety and depression in adolescence, while identifying multilevel protective factors (individual, relational, and contextual) that buffer against negative mental health outcomes.

* Status of Support: Pending Project Number: R01MH138986; PD/PI: Nagata, Jason

* Source of Support: NIH NIMH; Project/Proposal Start and End Date: 12/2025 – 11/2030

* Total Award Amount (including Indirect Costs): $3,723,183; Person Months (Calendar/Academic/Summer) per budget period .60 for 2026-2030.

**\*Title: UCSF Clinical and Translational Science Institute**
\*Major Goals: The mission and vision of the University of California, San Francisco's Clinical and Translational Science Institute (CTSI) is to accelerate research to improve health by creating and fostering a transdisciplinary clinical and translational science environment in collaboration with, and embracing scientific and community stakeholders.
\*Status of Support: Pending
\*Project Number: UM1TR006119 PD/PI: Jacoby, Vanessa L, MD (contact)/Collard, Hal/Kanaya, Alka
\*Source of Support: NIH Natl Ctr Advancing Translational Sci(NIH-NCATS)
\*Project/Proposal Start and End Date: 07/01/2026 – 12/31/2035
\*Total Award Amount (including Indirect Costs): $74,619,040

Prepared: July 2, 2025

\* Person Months (Calendar/Academic/Summer) per budget period: 1.2 for 2026-2035

## COMPLETED PROJECTS

1. 2002-7925/99-3654          PI

   The William and Flora Hewlett Foundation          7/1/1983          6/30/2005

   William and Flora Hewlett Fellowship in Latin          $ 55,302 direct/yr $ 705,943 total
   American Reproductive Health Policy          1

2. 04-35976          PI          Brindis (PI)

   California Department of Public Health          07/01/1997          06/30/2015

   Teen Pregnancy Prevention Project Evaluation          $ 1,312,800          $ 6,918,905 total
   direct/yr 1

   Evaluation research that help characterize the funded programs and estimate how well they
   are meeting the State's objectives. Program evaluation results help public health
   professionals, educators, and policymakers to support more effective teenage pregnancy
   prevention interventions to reduce the negative social and economic consequences of this
   important public policy issue.

3.          PI

   The California Wellness Foundation          10/01/1997          06/30/2007

   Evaluation of The California Wellness Foundation's $ 190,887          $ 627,011 total
   Teen Pregnancy Prevention Initiative          direct/yr 1

4. C2004-501/4375          PI          Brindis (PI)

   Alameda County Department of Health Services          07/01/1998          06/30/2012

   Evaluation of the Alameda County School-Based          $ 62,834 direct/yr $ 716,646 total
   Health Care Network          1

   The study aims to document the SHS programs' impact on students' access to and utilization
   of health care, and improvements in their health status and behaviors

5. 35038-OS-332          PI

   Centers for Disease Control (CDC          07/01/2000          12/01/2003

   Evaluation of the CDC's Teenage Pregnancy          $ 100,000          $ 281,990 total
   Prevention Initiatives, subcontract to MACRO          direct/yr 1
   International

6.          PI

   Johnson and Johnson Foundation          06/01/2002          09/01/2004

Prepared: July 2, 2025

Evaluation of the National Center for Excellence in Women's Health University of California, Community Women Leadership Projects | $ 70,000 direct/yr 1 | $ 145,000 total

---

7. 20021734                      PI

The California Endowment | 06/01/2002 | 06/30/2005

Evaluation of the Community Clinic Consortia Policy Initiative | $ 100,000 direct/yr 1 | $ 900,000 total

---

8.                               PI

Johnson and Johnson Foundation | 06/01/2002 | 06/01/2005

Evaluation of the Bridges to Employment- Milpitas High School | $ 32,000 direct/yr 1 | $ 90,000 total

---

9.                               PI

Johnson and Johnson Foundation | 06/01/2002 | 06/30/2005

Evaluation of the San Jose Nursing Academy | $ 15,000 direct/yr 1 | $ 45,000 total

---

10. R06-CCR921786-0          PI

Center for Disease Control and Prevention, Department of Health and Human Services | 09/01/2002 | 04/01/2005

Participatory Research in School-Based Health Center Research | $ 27,296 direct/yr 1 | $ 818,896 total

---

11.                              PI

Federal Health and Human Resources Administration | 10/01/2004 | 09/30/2005

Adolescent Health Program Evaluation | $ 250,000 direct/yr 1 |

---

12. 2008-12211               PI                            Brindis (PI)

The California Endowment | 02/01/2006 | 06/30/2012

Health Journalism Fellowship Evaluation | | $ 90,037 total

Fellowship program to teach journalists to examine and report on the nuances of health care issues for multicultural populations, with a special emphasis on health disparities, its impact on health care access and the quality of services available.

---

13. 2008-2211                PI

California Endowment | 2/01/2006 | 9/30/2015

Prepared: July 2, 2025

Health Journalism Fellowship Evaluation $ 300,000 total

---

14. 1329AFK-ESP-2006          PI                                    Brindis (PI)

US Department of Public Health, Office of    09/01/2006    09/01/2012
Population Affairs (Subcontract) / CDC

Evaluation of La Clinica de la Raza, Inc.    $ 281,955     $ 750,000 total
                                             direct/yr 1

A multi-year, longitudinal, randomized evaluation of 'group prenatal care' visits for pregnant and parenting adolescents vs. traditional prenatal care services is being conducted, including quantitative and qualitative methods

---

15. 1013139                   PI                                    Brindis (PI)

Public Health Institute (subcontract) / CDC (Prime) 03/01/2007   09/29/2012

Reducing Asthma Disparities through     $ 93,985 direct/yr  $ 469,925 total
Comprehensive, Community Activities     1

This evaluation is tracking and monitoring a variety of community-based strategies aimed at reducing health disparities that result in the worsening of asthma health outcomes. Interventions being tested include evaluations of community-based coalitions, environmental strategies, and policy-focused advocacy activities.

---

16.                           Co-PI

The California Endowment and the California    07/01/2007    08/01/2008
Healthcare Foundation

Developing a Latino/a Research and Program    $ 150,000
Agenda on Translational Health, with Global   direct/yr 1
Health Sciences

---

17. MCHB T71MC0003L           Co-PI                                 Irwin (PI)

Maternal and Child Health Bureau, Health    07/01/2007    06/30/2014
Resources and Services Administration,
Department of Health and Human Services
Maternal and Child Health Bureau, U.S.
Department of Health and Human Services

Interdisciplinary Leadership Education in                   $ 1,449,231 total
Adolescent Health, Public Policy Analysis and
Education Center for Middle Childhood Adolescent
Health, and the National Adolescent Health
Information Center

Conduct policy analyses and research pertaining to adolescent health.

---

18. 2008-2092                 PI

The William and Flora Hewlett Foundation    02/01/2008    06/30/2011

Prepared: July 2, 2025

Common Ground, Common Goals: The Juncture of Schools and Health in Securing California's Future

$ 150,000 total

---

19. 20081465                    PI                                    Brindis (PI)

The California Endowment               10/01/2008        1/31/2012

Evaluation of Statewide Burden of Asthma    $ 156,521 direct/yr 1    $ 547,934 total

This evaluation assesses the impact of consortia in impacting policy in the area of environment, schools and homes. Coalition surveys, policy maker interviews, and pre and post data are being used.

---

20. 20081866                    PI                                    Brindis (PI)

The California Endowment               01/01/2009        12/31/2011

Community Action to Fight Asthma Legacy; Statewide Asthma Initiative    $ 156,521 total

This project analyzes the outcomes and lessions learned on the seven year initiative to create policies to reduce the environmental risk factors that affect asthma for school-aged youth. Policy change and policy advocacy occurred at the local, regional, and state levels and focused on policies related to housing, schools, and outdoor air.

---

21. FPR PA006051              Co-PI                                  Darney (PI)

Department of Health and Human Services Office of Population Affairs    09/01/2009        08/31/2014

Innovative Evaluation of Title X and 1115 Waiver Family Planning Program    $ 100,000 direct/yr 1    $ 476,176 total

Provide conceptual guidance to the development of project design and methodology and oversight of project planning and implementation.

---

22.                              PI                                    Brindis (PI)

The Colorado Health Foundation        03/01/2010        12/31/2013

School Based Health Care Initiative Evaluation    $ 96,699 direct/yr 1    $ 290,007 total

Quantitative and qualitative methods are used to evaluate the Colorado Health Foundation's $10.8 million School-Based Health Care Initiative's processes, assess factors that contribute to school-based health care program sustainability, and identify best practices to guide operations of current and future school-based health care programs.

---

23. 2010-066                    PI                                    Brindis (PI)

The California Wellness Foundation     07/01/2010        03/31/2015

Prepared: July 2, 2025

| | | | |
|---|---|---|---|
| Assessing the Impact of Federal and State Cuts on California's Teenage Pregnancy Prevention Programs | | | $ 400,00 total |

This study examines how state budget cuts that have resulted from the national and state recession have impacted the California programs and service providers devoted to the needs of youth at high risk of becoming pregnant for the first time and teen parents at risk for repeat pregnancy.

| 24. | 639265-10S-1525 | PI | | Brindis (PI) |
|---|---|---|---|---|
| | ICF MACRO (Atlantic Philanthropy subcontract) | | 7/01/2010 | 12/31/2015 |
| | ICF Macro | | | $ 495,123 total |

| 25. | 05-45221 | Co-PI | | Darney (PI) |
|---|---|---|---|---|
| | State of California, Office of Family Planning | | 07/01/2010 | 06/30/2015 |
| | Evaluation of the Family PACT (Planning, Access, Care and Treatment) Program | | $ 2,199,084 direct/yr 1 | $ 11,717,235 total |

This evaluation of the states' comprehensive family planning program includes billing data analyses, focus groups with providers and clients, exit interviews, cost-benefit analyses, and case studies

| 26. | P60MD006902 | Co-Investigator | | Bibbins-Domingo (PI) |
|---|---|---|---|---|
| | NIMHD | | 08/27/2012 | 02/28/2018 |
| | Comprehensive Centers of Excellence Addressing Disparities in Chronic Disease with a Teen and Young Adult Focus | | | $ 779,767 total |

| 27. | 21663 | PI | | Brindis (PI) |
|---|---|---|---|---|
| | The Atlantic Philanthropies | | 01/01/2013 | 12/31/2015 |
| | Philip R. Lee Institute for Health Policy Studies' Campaign for Better Care Evaluation | | | $ 1,200,000 total |

To conduct an evaluation of the effectiveness of consumer mobilization in affecting health care system redesign and improving health outcomes for vulnerable older adults.

| 28. | 8731749 | Co-PI | | Grumbach/Brindis (PI) |
|---|---|---|---|---|
| | Blue Shield Foundation | | 7/1/2013 | 6/30/2014 |
| | Assessing care integration in the California safety net | | | $ 41,120 total |

Prepared: July 2, 2025

conducting a set of interrelated research projects to: 1) assess the level of integration of care in the safety net system in California, including integration with specialists, ancillary services, hospitals, behavioral health, and social services; 2) assess efforts to support MediCal providers to adopt health information technology to facilitate functional integration; and 3) disseminate the findings to policy makers and stakeholders in California's health care safety net.

| 29. | Co-PI | | Brinids/Roby (PI) |
|-----|-------|--|-------------------|
| Packard Foundation | | 07/01/2013 | 1/31/2018 |
| California Children's Services Evaluation | | | $ 347,986 total |

An evaluation of California's Enhanced Primary Care Case Management (EPCCM) Program, the Provider-based Accountable Care Organization (ACO); Specialty Health Care Plan (SHCP); and utilization of existing Medi-Cal Managed Care Plans.

| 30. | PI | | Brindis (PI) |
|-----|-----|--|--------------|
| The World Bank | | 9/1/2013 | 1/31/2014 |
| Teen Pregnancy Prevention Evaluation and Technical Assistance | | | $ 95,000 total |

To provide training and technical assistance to family planning agencies, as well as monitor and evaluate the process and outcomes of the programs, as well as make recommendations regarding World Bank investments in Ethiopia and Nepal.

| 31. 07-65654 | PI | | Brindis (PI) |
|--------------|-----|--|--------------|
| California Department of Public Health, Maternal, Child and Adolescent Health | | 12/01/2013 | 11/30/2015 |
| Building Capacity to Advance the Health & Well-being of Adolescents | | | $ 1,462,687 total |

To provide information, resources and expertise to support the provision of quality health care services to adolescents, increase the capacity of local Maternal, Child and Adolescent Health (MCAH) jurisdictions and their adolescent health practitioners to promote the health of adolescents, and to influence policy with the intent of improving the health and well-being of California's adolescents.

| 32. | Co-PI | | Jacobs/Brindis (PI) |
|-----|-------|--|---------------------|
| Blue Shield Foundation-Subcontract | | 07/01/2014 | 3/30/2016 |
| Medi-Cal Eligible but not Enrolled, Remaining uninsured in California: Qualitative and Quantitative Study of Deferred Action Childhood Arrivals (DACA) | | | $ 40,999 total |

Prepared: July 2, 2025

Subcontract with UC Berkeley Labor Center. This project, bringing researchers from the UCLA Center for Health Policy, UC Berkeley, and UCSF, is analyzing California Health Interview Survey Data, as well as conducting 9 focus groups with Latino DACA-Eligible young adults. Study sites include Los Angeles and San Francisco Bay Area. Recruitment is being conducted by Dreamers and through a variety of social media channels.

| 33. | PI | | Brindis (PI) |
|---|---|---|---|
| Alameda County | | 7/01/2014 | 6/30/2015 |
| Alameda County School Health Services Evaluation | | | $ 325,000 total |

| 34. | PI | | Brindis (PI) |
|---|---|---|---|
| National School Based Alliance | | 8/01/2014 | 8/30/2015 |
| Evaluation of School Based Health Services | | | $ 110,000 total |

| 35. | Co-PI | | Brindis (PI) |
|---|---|---|---|
| Next Generation (Benioff Foundation) | | 9/01/2014 | 8/30/2017 |
| Evaluation of "Too Small to Fail" | | | $ 850,000 total |

| 36. | Co-PI | | Brindis (PI) |
|---|---|---|---|
| National Family Planning and Reproductive Health Association | 9/1/2014 | | 8/30/2017 |
| Confidential and Covered: Protecting Patients While Preventing Revenue Loss | | | |

This national, multi-site project, funded by the federal Office of Population Affairs, will develop and test interventions that support the federal Title X Family Planning program's historic commitment to client confidentiality, while preventing and mitigating revenue loss at Title X service sites due to the provision of confidential services as part of health care reform efforts

| 37. NU38PS004649 | Co-I | | Kahn (PI) |
|---|---|---|---|
| US Centers for Disease Control and Prevention, Department of Health and Human Services | | 9/30/2014 | 9/29/2019 |
| Economic Analysis for Prevention of Disease (EMPoD) | | | $ 4,855,069 total |

The overall goal is to support the prevention effectiveness of state and local public health jurisdictions by providing scientifically valid economic modeling tools populated with setting-relevant data.

| 38. | PI | | Brindis (PI) |
|---|---|---|---|
| California HealthCare Foundation | | 10/01/2014 | 12/31/2014 |

Prepared: July 2, 2025

Evaluation of Health Reporting Project                                  $ 21,000 total

---

39. 15-10047                          PI                                  Brindis (PI)

California Department of Public Health          07/01/2015      06/30/2018

Teen Pregnancy Prevention Project Evaluation                        $ 4,842,846 total

Evaluation research that help characterize the funded programs and estimate how well they are meeting the State's objectives. Program evaluation results help public health professionals, educators, and policymakers to support more effective teenage pregnancy prevention interventions to reduce the negative social and economic consequences of this important public policy issue.

---

40. SC15-1502-27481              Co-Investigator                       Tebb (PI)

Patient-Centered Outcomes Research Institute    12/01/2015      11/30/2018

Reducing Health Disparities in Unintended          $ 548,885 total
Pregnancies Among Hispanic Adolescents Using a
Patient-Centered Computer-Based Clinic
Intervention

The major goals of this project are (1) support the adolescents in making decisions about an effective method of contraception by increasing knowledge and self-efficacy; (2) improve the effectiveness and efficiency of the clinical encounter; and (3) reduce the incidence of unprotected sexual intercourse among Latina adolescents girls over time.

---

41.                                  PI                                  Brindis (PI)

Programa de Investigacion en Migracion y Salud     09/01/2016      02/28/2018
(PIMSA)

Bi-National Perspectives on Adolescent                           $ 30,000 total
Childbearing, Obesity, Diabetes and Cesarean
Sections

---

42. 20094                            PI                                  Brindis (PI)

California HealthCare Foundation                 03/01/2017      02/28/2018

UCSF/Hastings Speakers Series: ACA Potential                      $ 97,000 total
Impact of the Trump Administration on Health
Policy

---

43.                                  PI                                  Brindis (PI)

Laura and John Arnold Foundation                12/01/2017      11/30/2019

Launching the Digital Food Industry Documents                    $ 1,603,712 total
Archive

To launch a new Food Industry Document Archive in UCSF's digital Industry Documents Library (IDL) and develop a longer-term plan to continue to build the collections.

Prepared: July 2, 2025

44. TP2AH000045              Co-PI                        Dehlendorf/Brindis (PI)

Department of Health and Human Services, Office  07/01/2015    06/30/2020
of Adolescent Health

SpeakOut: Empowering teen to teen
communication about highly effective
contraception

The major goals of this project are to conduct rigorous evaluation of new or innovative
approaches to prevent teen pregnancy.

45. SC15-1502-27481         Co-Investigator              Tebb (PI)

Patient-Centered Outcomes Research Institute    12/01/2015    11/30/2020

Reducing Health Disparities in Unintended                    $ 548,885 total
Pregnancies Among Hispanic Adolescents Using a
Patient-Centered Computer-Based Clinic
Intervention

The major goals of this project are (1) support the adolescents in making decisions about an
effective method of contraception by increasing knowledge and self-efficacy; (2) improve the
effectiveness and efficiency of the clinical encounter; and (3) reduce the incidence of
unprotected sexual intercourse among Latina adolescents' girls over time.

46. 2020-21-OSG             Co-PI                        Brindis/ Malekinejad
                                                         (PI)

Office of the California Surgeon General        9/1/2020      3/31/2021

Rapid Assessment of Pandemic indirect impacts                $ 456,278 total
and mitigating interventions for Decision-making in
California (RAPID)

The goal of this project is provide analysis on high-burden short-term adverse health
conditions that are not the direct medical effects of the novel coronavirus (e.g., death or
hospitalization due to COVID-19 or worsening comorbidities). As the pandemic unfolds, we
anticipate increases in the incidence (or recurrence/exacerbation) of a wide range of
behavioral and mental health conditions (e.g., anxiety, depression, PTSD-like syndrome,
suicide, alcohol and substance abuse) and physical health problems (e.g., cardiovascular
diseases, metabolic disorders, maternity problems).

47. R01HL129288             Co-Investigator              Patel (PI)
NIH/NHLBI; Stanford University                  4/1/2016      5/31/2022
Impact of Water Access on Child Food and                     $ 3,749,891 total
Beverage Intake and Obesity

The project examines how promoting fresh water intake, both in schools that do and do not
provide access to caloric beverages impacts children's consumption of food and beverages
both during and outside of school, and obesity.

Prepared: July 2, 2025

---

48. None                          PI                              Brindis (PI)

Aurrera Health Group                          6/30/2020          12/31/2021

ACES Aware Provider Engagement Grant                             $ 100,000 total

The goal of this project is to develop and disseminate two white papers widely to adolescent health, family health, and social services providers via email distribution lists, research sites, web platforms, social media and conference presentations.

---

49. 90AP2688                      Co-PI                           Decker/Brindis  (PI)

Family and Youth Services Bureau              9/1/2016           3/29/2022

Digital Initiative for Youth (DIY)                               $ 3,749,891 total

An innovative youth-centered initiative to improve the sexual health and socio-economic well-being of youth in Fresno County, California

---

50.                               PI                              Brindis (PI)

Benioff Foundation                            3/1/2017           9/30/2021

The California Preterm Birth Initiative        $ 463,131
                                              direct/yr 1

The overall goal is to use evaluation findings to assess current programs and activities and offer insight into possible modifications that could realign initiative strategies to ensure outcome achievement.

---

51. 18-10026                      Co-PI                           Decker/Brindis (PI)

California Department of Public Health          7/1/2018          6/30/2021

Adolescent Health Evaluations                                   $ 1,800,000 total

The purpose of the Adolescent Health Programs is to utilize effective, evidence-based or evidence-informed approaches and strategies to reduce rates of adolescent birth, repeat adolescent births and sexually transmitted infections among high-need youth populations. In addition, promote protective factors and build resilience strengths, assist program participants in accessing needed services, and build models for successful adolescent health programming to improve the health and well-being of California's adolescents.

---

52. 29-312-0214448-65402          Co-PI                           Gottlieb/Brindis (PI)

RTI International                              09/17/2018         09/30/2019

Accountable Health Communities (AHC) -
Evaluation

The purpose of this project seeks to test the efficacy of Assistance Track and Alignment Track models in reducing per-patient spending and inappropriate utilization and improving health outcomes.

---

53. No grant # (Brindis)          Co-PI                           Brindis/Spetz (PI)

UCSF Strategic Initiatives                    07/01/2019         6/30/2022

Prepared: July 2, 2025

Infrastructure to advance health services research                    $ 1,446,945 total
at UCSF
The goal of this project is to expand the capacity to jumpstart the career of young
investigators interested in building a Health Services Research (HSR) career at UCSF
through increasing the acquisition, visibility and use of needed data sets and analytics that
will lead to increased opportunities and collaborations across UCSF and UC Health, leading
to a greater impact of the UCSF HSR community both here and nationally.

54. Title: Alameda County School Health Centers Evaluation
Major Goals: Evaluation of the Alameda County School Health Services (SHS) Coalition's
school-based health centers and school-based behavioral health services, including
documenting impact on students' access to and utilization of health care, and improvements in
their health status and behaviors.
Project Number: 15388
Name of PD/PI: Brindis, Claire
Source of Support: Alameda County Health Care Services Agency
Project/Proposal Start and End Date: (7/1/2017 - 6/30/2022
Total Award Amount (including Indirect Costs): $1,675,000

55. Title: ACES Aware Provider Engagement Grant
Major Goals: The goal of this project is to develop and disseminate two white papers widely to
adolescent health, family health, and social services providers via email distribution lists,
research sites, web platforms, social media and conference presentations.
Project Number: N/A
Name of PD/PI: Brindis, Claire and Soleimanpour, Samira and Schapiro, Naomi
Source of Support: Aurrera Health Group
Project/Proposal Start and End Date: 6/30/2020 - 12/31/2021
Total Award Amount (including Indirect Costs): $100,000

56. Title: State Adolescent and Young Adult Health Capacity Building Program
Major Goals: To enhance knowledge and inform practices of professionals and policy- and
decision-makers regarding the consequences of public policies on young people, including
analyzing the effects of public policies, regulations and practices at the community, state and
federal levels on the health of young people and formulating policy options and develop model
public policies.
Project Number: 2 U45 MC 27709-07-00
Name of PD/PI: Irwin, Charles
Source of Support: NIH NIDA
Project/Proposal Start and End Date: (MM/YYYY) (if available): 9/1/2014 - 8/31/2023
Total Award Amount (including Indirect Costs): $5,750,000 for Years 5-9 cycle.

57. Title: Promoting Optimal Health for Rural Youth
Major Goals: This project partners with Fresno Economic Opportunities Commission and
Fresno County Superintendent of Schools to promote the optimal health of youth in rural
Fresno County and reduce unintended pregnancies.
Project Number: 1 TP1AH000233-01-00
Name of PD/PI: Decker, Mara

Prepared: July 2, 2025

Source of Support: PHS Office of Population Affairs
Project/Proposal Start and End Date: (MM/YYYY) (if available): 7/1/2020 - 6/30/2023
Total Award Amount (including Indirect Costs): $2,570,554

58. Title: Implementation of Health-E You/Salud iTu to Promote Adolescent-Centered Contraceptive Care
Major Goals: The major goals of this implementation study is 1) to facilitate and understand the adoption of the Health-E you/Salud iTu intervention by providers in a vast network of SBHCs serving adolescents from diverse backgrounds in multiple states across the U.S. and and 2) to assess improvements in contraceptive use associated with our implementation study.
Project Number: DI-2020C2-2037; PD/PI: Tebb, Kathlee; Source of Support: Patient Centered Outcomes Research Institute (PCORI);Project/Proposal Start and End Date: 7/1/2021 - 6/30/2025; Total Award Amount (including Indirect Costs): $1,401,546.


## PEER REVIEWED PUBLICATIONS

1. **Brindis CD**. The nation's changing demographic profile. Family Life Educator. 1(5):4-9. 1986

2. **Brindis CD**. Development and evaluation of a short-term training design for health professionals. Mobius. 1986 Jan; 6(1):33-48. PMID: 10275686. 1986

3. Abbey N, **Brindis CD**, Casas M, Schoonmaker S. Family life education for Hispanics: Practical guidelines for schools. Family Life Educator. 1(6):4-10. 1987

4. **Brindis CD**, Barth D, Loomis A. Continuous counseling: case management with teenage parents. Social Casework: The Journal of Contemporary Social Work. 1987; 3(68):164-172. 1987

5. Mitchell F, **Brindis CD**. Pew Memorial Trust policy synthesis: 3. Adolescent pregnancy: the responsibilities of policymakers. Health Serv Res. Aug; 22(3):399-437. PMID: 3679836. PMCID: PMC1065446 1987

6. Minkler DH, Korenbrot C, **Brindis CD**. Family planning among Southeast Asian refugees. West J Med. Mar; 148(3):349-54. PMID: 3363968. PMCID: PMC1026120 1988

7. Korenbrot C, Showstack J, Loomis A, **Brindis CD**. Birthweight outcomes in a teenage pregnancy case management project. Journal of Adolescent Health Care, 10:97-104. PMID: 2925477. 1989

8. Weeks JR, Rumbaut RG, **Brindis CD**, Korenbrot CC, Minkler D. High fertility among Indochinese refugees. Public Health Rep. 1989 Mar-Apr; 104(2):143-50. PMID: 2495548. PMCID: PMC1580022 1989

9. **Brindis CD**. Reducing adolescent pregnancy: The next steps for program, research, and policy. Family Life Educator, 9(1):3-63 (Special Issue). 1990

10. Korenbrot C, **Brindis CD**, Priddy F. Trends in rates of live births and abortions following state restrictions of public funding of abortion. Public Health Reports, Nov-Dec;105(6):555-62. PMID: 2124355. PMCID: PMC1580169. 1990

11. **Brindis CD**, Lee PR. Public policy issues affecting the health care delivery system of adolescents. J Adolesc Health Care. Sep; 11(5):387-97. PMID: 2211270. 1990

Prepared: July 2, 2025

12. Newacheck PW, McManus MA, **Brindis CD.** Financing health care for adolescents: problems, prospects, and proposals. J Adolesc Health Care. Sep; 11(5):398-403. PMID: 2211271. 1990

13. **Brindis CD**. Adolescent pregnancy prevention for Hispanic youth: The role of schools, families and communities. Journal of School Health, 62(7):345-351. PMID: 1434564. 1992

14. **Brindis CD**. What it will take: Placing adolescents on the American national agenda for the 1990s. Journal of Adolescent Health, Nov; 14(7):527-30. PMID: 8312287. 1993

15. **Brindis CD**. Health policy reform and comprehensive school health education: The need for an effective partnership. Journal of School Health, 63(1):33-37. PMID: 8468971. 1993

16. Garcia Baltazar J, Figueroa-Perea JG, Zapata HR, **Brindis CD**, Perez-Palacios G. Reproductive characteristics of adolescents and youths in the metropolitan area of Mexico City, 1987. Salud Pública de Mexico, Nov-Dec; 35(6):682-91. PMID: 8128309. 1993

17. **Brindis CD**, Starbuck-Morales S, Wolfe A, McCarter V. Characteristics associated with contracep-tive use among adolescent females in school-based family planning programs. Family Planning Per-spectives, Jul-Aug; 26(4):160-4. PMID: 7957817. 1994

18. **Brindis CD**, Kapphahn C, McCarter V, Wolfe A. The impact of health insurance status on adolescents' utilization of school-based clinic services: Implications for health care reform. Journal of Adolescent Health, Jan; 16(1):18-25. PMID: 7742332. 1995

19. Newacheck PW, Hughes DC, **Brindis CD**, Halfon N. Decategorizing health services: interim findings from the Robert Wood Johnson Foundation's Child Health Initiative. Health Aff (Millwood). 14(3):232-42. PMID: 7498895. 1995

20. **Brindis CD**, Pfeffer R, Wolfe A. A case management program for chemically dependent clients with multiple needs. J Case Manag. 4(1):22-8. PMID: 7795539. 1995

21. Rodriguez MA, **Brindis CD**. Violence and Latino youth: prevention and methodological issues. Public Health Rep. May-Jun; 110(3):260-7. PMID: 7610213. PMCID: PMC1382116 1995

22. Clayson Z, Berkowitz G, **Brindis CD**. Themes and variations among seven comprehensive perinatal drug and alcohol abuse treatment models. Health Soc Work. Aug; 20(3):234-8. PMID: 7557729. 1995

23. **Brindis CD**, Wolfe AL, McCarter V, Ball S, Starbuck-Morales S. The associations between immigrant status and risk-behavior patterns in Latino adolescents. J Adolesc Health. Aug; 17(2):99-105. PMID: 7495832. 1995

24. **Brindis CD**. Promising approaches for adolescent reproductive health service delivery. The role of school-based health centers in a managed care environment. West J Med. Sep; 163(3 Suppl):50-6. PMID: 7571604. 1995

25. Gans JE, **Brindis CD**. Choice of research setting in understanding adolescent health problems. J Adolesc Health. Nov; 17(5):306-13. PMID: 8924435. 1995

26. Soman LA, **Brindis CD**, Dunn-Malhotra E. The interplay of national, state, and local policy in financing care for drug-affected women and children in California. J Psychoactive Drugs. Jan-Mar; 28(1):3-15. PMID: 8714330. 1996

Prepared: July 2, 2025

27. Berkowitz G, **Brindis CD**, Clayson Z, Peterson S. Options for recovery: promoting success among women mandated to treatment. J Psychoactive Drugs. Jan-Mar; 28(1):31-8. PMID: 8714332. 1996

28. Hughes DC, Halfon N, **Brindis CD**, Newacheck PW. Improving children's access to health care: the role of decategorization. Bull N Y Acad Med. 73(2):237-54. PMID: 8982519. PMCID: PMC2359302 1996

29. Berkowitz G, **Brindis CD**, Clayson Z. Using a multimethod approach to measure success in perinatal drug treatment. Eval Health Prof. Mar; 19(1):48-67. PMID: 10186903. 1996

30. Dryfoos JG, **Brindis CD**, Kaplan DW. Research and Evaluation in School-Based Health Care. Adolesc Med. Jun; 7(2):207-220. PMID: 10359968. 1996

31. **Brindis CD**, Theidon KS. The role of case management in substance abuse treatment services for women and their children. J Psychoactive Drugs. Jan-Mar; 29(1):79-88. PMID: 9110268. 1997

32. **Brindis CD**, Sanghvi RV. School-based health clinics: remaining viable in a changing health care delivery system. Annu Rev Public Health. 18:567-87. PMID: 9143732. 1997

33. **Brindis CD**, Clayson Z, Berkowitz G. Options for Recovery: California's perinatal projects. J Psychoactive Drugs. Jan-Mar; 29(1):89-99. PMID: 9110269. 1997

34. Hughes D, Halfon N, **Brindis CD**, Newacheck P. Improving children's access to health care: The role of decategorization. Bulletin of the New York Academy of Medicine: A Journal of Urban Health, 73(2):1-18. PMID: 8982519 PMCID: PMC2359302. 1997

35. **Brindis CD**, Berkowitz G, Clayson Z, Lamb B. California's approach to perinatal substance abuse: toward a model of comprehensive care. J Psychoactive Drugs. Jan-Mar; 29(1):113-22. PMID: 9110271. 1997

36. **Brindis CD**, Reyes P. At the crossroads: options for financing college health services in the 21st century. J Am Coll Health. May; 45(6):279-88. PMID: 9164058. 1997

37. Newacheck PW, Hughes DC, Halfon N, **Brindis CD**. Social HMOs and other capitated arrangements for children with special health care needs. Matern Child Health J. Jun; 1(2):111-9. PMID: 10728233. 1997

38. Neumark-Sztainer D, Blum RW, **Brindis CD**, Anglin TM, Irwin CE. The state of adolescent health: looking back and planning ahead. J Adolesc Health. Nov; 21(5):280-6. PMID: 9358290. 1997

39. Hughes DC, **Brindis CD**, Halfon N, Newacheck PW. Integrating children's health services: evaluation of a national demonstration project. Matern Child Health J. Dec; 1(4):243-52. PMID: 10728250. 1997

40. Berkowitz G, **Brindis CD**, Peterson S. Substance use and social outcomes among participants in perinatal alcohol and drug treatment. Womens Health. 4(3):231-54. PMID: 9787650. 1998

41. **Brindis CD**, Philliber S. Room to grow: Improving services for pregnant and parenting teenagers in school settings. Education and Urban Society, 30(2):242-260. 1998

42. Berkowitz G, Peterson S, Smith EM, Taylor T, **Brindis CD**. Community and treatment program challenges for chemically dependent American Indian and Alaska Native women. Contemporary Drug Problems. 25(2):347-371. 1998

Prepared: July 2, 2025

43. Newacheck PW, Halfon N, **Brindis CD**, Hughes DC. Evaluating community efforts to decategorize and integrate financing of children's health services. Milbank Q. 76(2):157-73. PMID: 9614419. PMCID: PMC2751072 1998

44. **Brindis CD**, Hughes DC, Halfon N, Newacheck PW. The use of formative evaluation to assess integrated services for children. The Robert Wood Johnson Foundation Child Health Initiative. Eval Health Prof. Mar; 21(1):66-90. PMID: 10183340. 1998

45. Teagle SE, **Brindis CD**. Substance use among pregnant adolescents: a comparison of self-reported use and provider perception. J Adolesc Health. Mar; 22(3):229-38. PMID: 9502011. 1998

46. Teagle SE, **Brindis CD**. Perceptions of motivators and barriers to public prenatal care among first-time and follow-up adolescent patients and their providers. Matern Child Health J. Mar; 2(1):15-24. PMID: 10728255. 1998

47. **Brindis CD**, Boggess J, Katsuranis F, Mantell M, McCarter V, Wolfe A. A profile of the adolescent male family planning client. Fam Plann Perspect. Mar-Apr; 30(2):63-6, 88. PMID: 9561870. 1998

48. **Brindis CD**, Sanghvi R, Melinkovich P, Kaplan DW, Ahlstrand KR, Phibbs SL. Redesigning a school health workforce for a new health care environment: training school nurses as nurse practitioners. J Sch Health. May; 68(5):179-83. PMID: 9672855. 1998

49. Kaplan DW, **Brindis CD**, Naylor KE, Phibbs SL, Ahlstrand KR, Melinkovich P. Elementary school-based health center use. Pediatrics. Jun; 101(6):E12. PMID: 9606254. 1998

50. Halfon N, Newacheck PW, Hughes D, **Brindis CD**. Community health monitoring: taking the pulse of America's children. Matern Child Health J. Jun; 2(2):95-109. PMID: 10728265. 1998

51. Berkowitz G, Peterson S, **Brindis CD**. Methodological issues and practices in measuring perinatal alcohol and other drug treatment outcomes. Addiction Research, 6(5):435-452. 1998

52. Gould JB, Herrchen B, Pham T, Bera S, **Brindis CD.** Small-area analysis: targeting high-risk areas for adolescent pregnancy prevention programs. Fam Plann Perspect. Jul-Aug; 30(4):173-6. PMID: 9711455. 1998

53. Card JJ, Peterson JL, Niego S, **Brindis CD**. The Prevention Minimum Evaluation Data Set (PMEDS). A tool for evaluating teen pregnancy and STD/HIV/AIDS prevention programs. Eval Health Prof. Sep; 21(3):377-94. PMID: 10350957. 1998

54. Canton G, **Brindis CD**. Prevalencia de Chlamydia en la mujer Embarazada (Prevalence of Chlamydia in Pregnant Women), Revista Centroamericana de Obstetricia y Ginecología (REVCOG) (Central American Journal of Obstetrics and Gynecology), 8(2):33-37. 1998

55. Kahn JG, **Brindis CD**, Glei DA. Pregnancies averted among U.S. teenagers by the use of contraceptives. Fam Plann Perspect. Jan-Feb; 31(1):29-34. PMID: 10029930. 1999

56. **Brindis CD**. Building for the future: adolescent pregnancy prevention. J Am Med Womens Assoc (1972). 54(3):129-32. PMID: 10441918. 1999

57. Kaplan DW, **Brindis CD**, Phibbs SL, Melinkovich P, Naylor K, Ahlstrand K. A comparison study of an elementary school-based health center: effects on health care access and use. Arch Pediatr Adolesc Med. Mar; 153(3):235-43. PMID: 10086399. 1999

Prepared: July 2, 2025

58. Chetkovich C, Mauldon J, **Brindis CD**, Guendelman S. Informed policymaking for the prevention of unwanted pregnancy: Understanding low-income women's experiences with family planning. Evaluation Review, 23(5):527-552. 1999

59. Newacheck PW, **Brindis CD**, Cart CU, Marchi K, Irwin CE. Adolescent health insurance coverage: recent changes and access to care. Pediatrics. Aug; 104(2 Pt 1):195-202. PMID: 10428994. 1999

60. Chirinos JL, **Brindis CD**, Salazar VC, Bardales OT, Reategui LR. Perfil de las estudiantes adolescentes sexualmente activos en colegios secundarios de Lima, Peru (A profile of sexually active male adolescent high school students in Lima, Peru). Rev Med Hered, 10(1):49-61. 1999

61. Chirinos JL, Salazar VC, **Brindis CD**. A profile of sexually active male adolescent high school students in Lima, Peru (Perfil de los adolescentes varones sexualmente activos en colegios secundarios de Lima, Peru). Cadernos de Saude Publica, Rio de Janeiro, Brazil, 16(3):733-746. 2000

62. Clayson Z, Castaneda X, Sanchez E, **Brindis CD**. The intersections of culture, health and systems in California Latino communities. International Quarterly of Community Health Education. 4(19):375-389. 2000

63. Denner J, Kirby D, Coyle K, **Brindis CD**. The Protective Role of Social Capital and Cultural Norms in Latino Communities: A Study of Adolescent Births. Hispanic Journal of Behavioral Sciences. 1(23):3-21. 2001

64. Castañeda X, **Brindis CD**, Castañeda I. Nebulous margins: Sexuality and social constructions of risks in rural areas of Central Mexico. Culture, Health, and Sexuality. 2(3):203-219. 2001

65. Driscoll AK, Biggs MA, **Brindis CD**, Yankah E. Adolescent Latino Reproductive Health: A Review of the Literature. Hispanic Journal of Behavioral Sciences. 3(23):255-326. 2001

66. Chirinos JL, **Brindis CD**, Tye S, McCarter V. Differences and similarities in sexual and contraceptive knowledge, attitudes, and behavior among Latino male adolescent students in California, United States and Lima, Peru. (Diferencias y similitudes en el conocimiento, las actitudes y los comportamientos sexuales y de anticoncepcion entre estudiantes adolescentes varones latinos en California, Estados unidos, y en Lima, Peru).Cad Saude Publica. Rio de Janeiro, Brazil. Jul-Aug; 17(4):833-42. PMID: 11514864. 2001

67. Clayson Z, Castaneda X, Sanchez E, **Brindis CD**. Unequal Power—Changing Landscapes: Negotiations between Evaluation Stakeholders in Latino Communities. American Journal of Evaluation. 1(23):33-44. 2002

68. Chavez Alvarado S, **Brindis CD**, Yon C, Goldfarb N. Rural Andean Women's Perspectives on Menopause. Hispanic Health Care International. 3(1):142-152. 2002

69. **Brindis CD**, Ott MA. Adolescents, health policy, and the American political process. J Adolesc Health. Jan; 30(1):9-16. PMID: 11755796. 2002

70. Peterson S, Berkowitz G, Cart CU, **Brindis CD**. Native American women in alcohol and substance abuse treatment. J Health Care Poor Underserved. Aug; 13(3):360-78. PMID: 12152506. 2002

Prepared: July 2, 2025

71. **Brindis CD**, Park MJ, Ozer EM, Irwin CE. Adolescents' access to health services and clinical preventive health care: crossing the great divide. Pediatr Ann. Sep; 31(9):575-81. PMID: 12271742. 2002

72. **Brindis CD**. Advancing the adolescent reproductive health policy agenda: issues for the coming decade. J Adolesc Health. Dec; 31(6 Suppl):296-309. PMID: 12470928. 2002

73. **Brindis CD**, Park MJ, Paul T, Burg S. A Profile of Adolescent Health: The Role of Race, Ethnicity, and Gender. Journal of Ethnic and Cultural Diversity in Social Work, 11(1-2):1-32. 2002

74. **Brindis CD**, Morreale MC, English A. The unique health care needs of adolescents. Future Child. 13(1):117-35. PMID: 14503457. 2003

75. Jessup M, Humphreys J, **Brindis CD**, Lee K. Extrinsic Barriers to Substance Abuse Treatment among Pregnant Drug Dependent Women. Journal of Drug Issues. 2(33):285-304. 2003

76. Pirkis JE, Irwin CE, **Brindis CD**, Sawyer MG, Friestad C, Biehl M, Patton GC. Receipt of psychological or emotional counseling by suicidal adolescents. Pediatrics. Apr; 111(4 Pt 1):e388-93. PMID: 12671157. 2003

77. **Brindis CD**, Klein J, Schlitt J, Santelli J, Juszczak L, Nystrom RJ. School-based health centers: accessibility and accountability. J Adolesc Health. Jun; 32(6 Suppl):98-107. PMID: 12782448. 2003

78. Santelli JS, Nystrom RJ, **Brindis CD**, Juszczak L, Klein JD, Bearss N, Kaplan DW, Hudson M, Schlitt J. Reproductive health in school-based health centers: findings from the 1998-99 census of school-based health centers. J Adolesc Health. Jun; 32(6):443-51. PMID: 12782456. 2003

79. **Brindis CD**, Llewelyn L, Marie K, Blum M, Biggs A, Maternowska C. Meeting the reproductive health care needs of adolescents: California's Family Planning Access, Care, and Treatment Program. J Adolesc Health. Jun; 32(6 Suppl):79-90. PMID: 12782446. 2003

80. McConnell JK, Packel L, Biggs MA, Chow JM, **Brindis CD**. Integrating Chlamydia trachomatis control services for males in female reproductive health programs. Perspect Sex Reprod Health. Sep-Oct; 35(5):226-8. PMID: 14668026. 2003

81. Newacheck PW, Hung YY, Park MJ, **Brindis CD**, Irwin CE. Disparities in adolescent health and health care: does socioeconomic status matter? Health Serv Res. Oct; 38(5):1235-52. PMID: 14596388. PMCID: PMC1360944 2003

82. Pirkis JE, Irwin CE, **Brindis CD**, Patton GC, Sawyer MG. Adolescent substance use: beware of international comparisons. J Adolesc Health. Oct; 33(4):279-86. PMID: 14519570. 2003

83. Salinas-Urbina, AA, Cortes-Sotres JF, **Brindis CD**, Goldfarb N. Factores asociados a la prevencion del cancer cervico uterino en una comunidad urbana en la Ciudad de Mexico. (Factors associated with the prevention of cervical cancer in an urban community in Mexico City.) Hispanic Health International, 2(3)119-127. 2003

84. Newacheck PW, Park MJ, **Brindis CD**, Biehl M, Irwin CE. Trends in private and public health insurance for adolescents. JAMA. Mar 10; 291(10):1231-7. PMID: 15010445. 2004

85. Foster DG, Klaisle CM, Blum M, Bradsberry ME, **Brindis CD**, Stewart FH. Expanded state-funded family planning services: estimating pregnancies averted by the Family PACT

Program in California, 1997-1998. Am J Public Health. Aug; 94(8):1341-6. PMID: 15284041. PMCID: PMC1448453 2004

86. **Brindis CD**, English A. Measuring public costs associated with loss of confidentiality for adolescents seeking confidential reproductive health care: How high the costs? How heavy the burden? Arch Pediatr Adolesc Med. Dec; 158(12):1182-4. PMID: 15583105. 2004

87. **Brindis CD**, Barenbaum M, Sanchez-Flores H, McCarter V, Chand R, Taylan-Arcoleo M. Let's Hear it for the Guys: California's Male Involvement Program. International Journal of Men's Health. 1(4):29-53. 2005

88. Jessup M, **Brindis CD**. Issues in Reproductive Health and Empowerment in Perinatal Women with Substance Use Disorders. Journal of Addictions Nursing. 3(16):97-105. 2005

89. **Brindis CD**, Geierstanger SP, Wilcox N, McCarter V, Hubbard A. Evaluation of a peer provider reproductive health service model for adolescents. Perspect Sex Reprod Health. Jun; 37(2):85-91. PMID: 15961362. 2005

90. **Brindis CD**, Loo VS, Adler NE, Bolan GA, Wasserheit JN. Service integration and teen friendliness in practice: a program assessment of sexual and reproductive health services for adolescents. J Adolesc Health. Aug; 37(2):155-62. PMID: 16026725. 2005

91. Cubbin C, Santelli J, **Brindis CD**, Braveman P. Neighborhood context and sexual behaviors among adolescents: findings from the national longitudinal study of adolescent health. Perspect Sex Reprod Health. Sep; 37(3):125-34. PMID: 16150660. 2005

92. Chervin DD, Philliber S, **Brindis CD**, Chadwick AE, Revels ML, Kamin SL, Wike RS, Kramer JS, Bartelli D, Schmidt CK, Peterson SA, Valderrama LT. Community capacity building in CDC's Community Coalition Partnership Programs for the Prevention of Teen Pregnancy. J Adolesc Health. Sep; 37(3 Suppl):S11-9. PMID: 16115565. 2005

93. Kramer JS, Philliber S, **Brindis CD**, Kamin SL, Chadwick AE, Revels ML, Chervin DD, Driscoll A, Bartelli D, Wike RS, Peterson SA, Schmidt CK, Valderrama LT. Coalition models: lessons learned from the CDC's Community Coalition Partnership Programs for the Prevention of Teen Pregnancy. J Adolesc Health. 2005 Sep; 37(3 Suppl):S20-30. PMID: 16115567. 2005

94. **Brindis CD**. Moving upstream: the role of schools in improving population health. J Adolesc Health. Oct; 37(4):263-5. PMID: 16182135. 2005

95. Reich JA, **Brindis CD**. Conceiving Risk and Responsibility: A Qualitative Examination of Men's Experiences of Unintended Pregnancy and Abortion. International Journal of Men's Health. 2(5):133-152. 2006

96. Ralph L, **Brindis CD**, Shields WC. Mandating parental involvement in adolescents' abortion: implications of a short-sighted policy. Contraception. Feb; 73(2):211-3. PMID: 16413852. 2006

97. **Brindis CD**. A public health success: understanding policy changes related to teen sexual activity and pregnancy. Annu Rev Public Health. 27:277-95. PMID: 16533118. 2006

98. Park MJ, Paul Mulye T, Adams SH, **Brindis CD**, Irwin CE. The health status of young adults in the United States. J Adolesc Health. Sep; 39(3):305-17. PMID: 16919791. 2006

Prepared: July 2, 2025

99. Afable-Munsuz A, **Brindis CD**. Acculturation and the Sexual and Reproductive Health of Latino Youth in the US: A Literature Review. Perspectives on Sexual and Reproductive Health, 38(4):208-219. PMID: 17162313. 2006

100. Foster DG, Biggs MA, Amaral G, **Brindis CD**, Navarro S, Bradsberry M, Stewart F. Estimates of pregnancies averted through California's family planning waiver program in 2002. Perspect Sex Reprod Health. Sep; 38(3):126-31. PMID: 16963385. 2006

101. **Brindis CD**, Hair EC, Cochran S, Cleveland K, Valderrama LT, Park M.J. Increasing Access to Program Information: A Strategy for Improving Adolescent Health. Journal of Maternal and Child Health, 11(1) 27-35. PMID: 17031582. 2007

102. Foster DG, Ralph LJ Arons A, **Brindis CD**, Harper CC. Trends in knowledge of emergency contraception among women in California, 1999-2004. Women's Health Issues. Ja-Feb;17, 22-28. PMID: 17321944. 2007

103. Knopf DK, Jane Park M, **Brindis CD**, Mulye TP, Irwin CE. What gets measured gets done: assessing data availability for adolescent populations. Matern Child Health J. Jul; 11(4):335-45. PMID: 17308967. 2007

104. Adams SH, Newacheck PW, Park MJ, **Brindis CD**, Irwin CE. Health insurance across vulnerable ages: patterns and disparities from adolescence to the early 30s. Pediatrics. May; 119(5):e1033-9. PMID: 17473076. 2007

105. Kreger M, **Brindis CD**, Manuel DM, Sassoubre L. Lessons learned in systems change initiatives: benchmarks and indicators. Am J Community Psychol. Jun; 39(3-4):301-20. PMID: 17510792. 2007

106. Amaral G, Foster DG, Biggs MA, Jasik CB, Judd S, **Brindis CD**. Public savings from the prevention of unintended pregnancy: a cost analysis of family planning services in California. Health Serv Res. Oct; 42(5):1960-80. PMID: 17850528. PMCID: PMC2254565 2007

107. Buckelew SM, Yu J, English A, **Brindis CD**. Innovations in preventive mental health care services for adolescents. J Adolesc Health. May; 42(5):519-25. PMID: 18407048. 2008

108. Park MJ, **Brindis CD**, Chang F, Irwin CE. A midcourse review of the healthy people 2010: 21 critical health objectives for adolescents and young adults. J Adolesc Health. Apr; 42(4):329-34. PMID: 18346657. 2008

109. Yu JW, Adams SH, Burns J, **Brindis CD**, Irwin CE. Use of mental health counseling as adolescents become young adults. J Adolesc Health. Sep; 43(3):268-76. PMID: 18710682. 2008

110. Foster DG, Biggs MA, Ralph LJ, Arons A, **Brindis CD**. Family planning and life planning reproductive intentions among individuals seeking reproductive health care. Womens Health Issues. Sep-Oct; 18(5):351-9. PMID: 18485738. 2008

111. Castro R, Casique I, **Brindis CD**. Empowerment and physical violence throughout women's reproductive life in Mexico. Violence Against Women. Jun; 14(6):655-77. PMID: 18535307. 2008

112. Soleimanpour S, **Brindis CD**, Geierstanger S, Kandawalla S, Kurlaender T. Incorporating youth-led community participatory research into school health center programs and policies. Public Health Rep. Nov-Dec; 123(6):709-16. PMID: 19711652. PMCID: PMC2556716 2008

Prepared: July 2, 2025

113. Foster DG, Rostovtseva DP, **Brindis CD**, Biggs MA, Hulett D, Darney PD. Cost savings from the provision of specific methods of contraception in a publicly funded program. Am J Public Health. Mar; 99(3):446-51. PMID: 18703437. PMCID: PMC2661445 2009

114. Kreger M, **Brindis CD**, Arons A, Sargent K, Robles A., Hendricks A, Jhawar M, Standish M. Turning the Ship: Moving from Clinical Treatment to Environmental Prevention: A Health Disparities Policy Advocacy Initiative. The Foundation Review. 3(1):26-42. 2009

115. **Brindis CD**, Geierstanger SP, Faxio A. The role of policy advocacy in assuring comprehensive family life education in California. Health Educ Behav. Dec; 36(6):1095-108. PMID: 19366884. 2009

116. Mulye TP, Park MJ, Nelson CD, Adams SH, Irwin CE, **Brindis CD**. Trends in adolescent and young adult health in the United States. J Adolesc Health. Jul; 45(1):8-24. PMID: 19541245. 2009

117. Biggs MA, Ralph L, Minnis A, Marchi KS, Lehrer J, Braveman PA, **Brindis CD**. Factors associated with delayed childbearing: from the voices of expectant Latina adults and teens in California Hispanic Journal of Behavioral Sciences. 32(1) 77-103. 2009

118. Maternowska C, Estrada F, Campero L, Herrera C, **Brindis CD**, Vostrejs MM. Gender, culture and reproductive decision-making among recent Mexican migrants in California. Cult Health Sex. Jan; 12(1):29-43. PMID: 19657804. 2010

119. **Brindis CD**. Reflections in honor of the contributions of Harold S. Luft: overview of the occasion. Health Serv Res. Jun; 45(3):848-50. PMID: 20337733. PMCID: PMC2875763 2010

120. **Brindis CD**. Lost opportunities in accessing reproductive health care--can pediatricians still make a difference? J Adolesc Health. Apr; 46(4):305-6. PMID: 20307817. 2010

121. **Brindis CD**. Lost Opportunities in Accessing Reproductive Health Care-Can Pediatricians Still Make a Difference? Journal of Adolescent Health. (46) No. 4, 305-306. 2010

122. Gardner A, Geierstanger S, **Brindis CD**, McConnel C. Clinic consortia media advocacy capacity: partnering with the media and increasing policymaker awareness. J Health Commun. Apr; 15(3):293-306. PMID: 20432109. 2010

123. Cubbin C, **Brindis CD**, Jain S, Santelli J, Braveman P. Neighborhood poverty, aspirations and expectations, and initiation of sex. J Adolesc Health. Oct; 47(4):399-406. PMID: 20864010. 2010

124. Foster DG, Raine TR, **Brindis CD**, Rostovtseva DP, Darney PD. Should providers give women advance provision of emergency contraceptive pills? A cost-effectiveness analysis. Womens Health Issues. Jul-Aug; 20(4):242-7. PMID: 20620913. PMCID: PMC3153435 2010

125. Soleimanpour S, Geierstanger SP, Keller S, McCarter V, **Brindis CD**. The role of school health centers in health care access and client outcomes. Am J Public Health. Sep; 100(9):1597-603. PMID: 20634445. PMCID: PMC2920968 2010

126. Ralph LJ, **Brindis CD**. Access to reproductive healthcare for adolescents: establishing healthy behaviors at a critical juncture in the lifecourse. Curr Opin Obstet Gynecol. Oct; 22(5):369-74. PMID: 20733485. 2010

127. Curtis AC, Waters CM, **Brindis CD**. Rural adolescent health: the importance of prevention services in the rural community. J Rural Health. 27(1):60-71. PMID: 21204973. 2011

Prepared: July 2, 2025

128. Ralph L, Berglas N, Schwartz S, **Brindis CD.** Finding Teens in TheirSpace: Using Social Networking Sites to Connect Youth to Sexual Health Services. Sexuality Research and Social Policy. 1(8):38-49. 2011

129. Gardner A, Geierstanger S, Miller-Nascimento L, **Brindis CD**. Expanding Organizational Advocacy Capacity: Reflections from the Field. The Foundation Review. 1-2(3):23-42. 2011

130. Gilliam M, **Brindis CD**. Virtual Sex Ed: Youth, Race, Sex, and New Media. Sexuality Research and Social Policy. 1(8):1-4. 2011

131. Amaral G, Geierstanger S, Soleimanpour S, **Brindis CD**. Mental health characteristics and health-seeking behaviors of adolescent school-based health center users and nonusers. J Sch Health. Mar; 81(3):138-45. PMID: 21332478. 2011

132. Guendelman S, Fernandez A, Thornton D, **Brindis CD**. Birthplace, language use, and body size among Mexican American women and men: findings from the National Health and Nutrition Examination Survey (NHANES) 2001-2006. J Health Care Poor Underserved. May; 22(2):590-605. PMID: 21551936. 2011

133. Schwartz SL, **Brindis CD**, Ralph LJ, Biggs MA. Latina adolescents' perceptions of their male partners' influences on childbearing: findings from a qualitative study in California. Cult Health Sex. Sep; 13(8):873-86. PMID: 21707264. 2011

134. Foster DG, Biggs MA, Rostovtseva D, de Bocanegra HT, Darney PD, **Brindis CD**. Estimating the fertility effect of expansions of publicly funded family planning services in California. Womens Health Issues. Nov-Dec; 21(6):418-24. PMID: 21802962. 2011

135. Dehlendorf C, Foster DG, de Bocanegra HT, **Brindis CD**, Bradsberry M, Darney P. Race, ethnicity and differences in contraception among low-income women: methods received by Family PACT Clients, California, 2001-2007. Perspect Sex Reprod Health. Sep; 43(3):181-7. PMID: 21884386. PMCID: PMC3412526 2011

136. Jiang N, Kolbe LJ, Seo DC, Kay NS, **Brindis CD**. Health of adolescents and young adults: trends in achieving the 21 Critical National Health Objectives by 2010. J Adolesc Health. Aug; 49(2):124-32. PMID: 21783043. 2011

137. Kreger M, Sargent K, Arons A, Standish M, **Brindis CD**. Creating an environmental justice framework for policy change in childhood asthma: a grassroots to treetops approach. Am J Public Health. Dec; 101 Suppl 1:S208-16. PMID: 21836108. PMCID: PMC3222493 2011

138. Saleeby E, **Brindis CD**. Women, reproductive health, and health reform. JAMA. Sep 21; 306(11):1256-7. PMID: 21934061. 2011

139. Gee RE, **Brindis CD**, Diaz A, Garcia F, Gregory K, Peck MG, Reece EA. Recommendations of the IOM clinical preventive services for women committee: implications for obstetricians and gynecologists. Curr Opin Obstet Gynecol. 2011 Dec; 23(6):471-80. PMID: 22011955. 2011

140. **Brindis CD**, Ralph LJ. Critical junctures: assuring healthy outcomes for adolescents in the new millennium. Adolesc Med State Art Rev. Dec; 22(3):341-66, ix. PMID: 22423455. 2011

141. Foster DG, Higgins JA, Biggs MA, McCain C, Holtby S, **Brindis CD**. Willingness to have unprotected sex. J Sex Res. 2012; 49(1):61-8. PMID: 21516592. 2012

142. Lustig RH, Schmidt LA, **Brindis CD**. Public health: The toxic truth about sugar. Nature. Feb 01; 482(7383):27-9. PMID: 22297952. 2012

Prepared: July 2, 2025

143. Ozer EM, Urquhart JT, **Brindis CD**, Park MJ, Irwin CE. Young adult preventive health care guidelines: there but can't be found. Arch Pediatr Adolesc Med. 2012 Mar; 166(3):240-7. PMID: 22393182. 2012

144. Keeton V, Soleimanpour S, **Brindis CD**. School-based health centers in an era of health care reform: building on history. Curr Probl Pediatr Adolesc Health Care. 2012 Jul; 42(6):132-56; discussion 157-8. PMID: 22677513. PMCID: PMC3770486 2012

145. de Bocanegra HT, Maguire F, Hulett D, Horsley K, Puffer M, **Brindis CD**. Enhancing service delivery through title x funding: findings from California. Perspect Sex Reprod Health. 2012 Dec; 44(4):262-9. PMID: 23231334. 2012

146. Patel AI, Chandran K, Hampton KE, Hecht K, Grumbach JM, Kimura AT, Braff-Guajardo E, **Brindis CD**. Observations of drinking water access in school food service areas before implementation of federal and state school water policy, California, 2011. Prev Chronic Dis. 2012; 9:E121. PMID: 22765930. PMCID: PMC3468310 2012

147. Biggs MA, Combellick S, Arons A, **Brindis CD.** Educational barriers, social isolation, and stable romantic relationships among pregnant immigrant Latina teens. Hisp Health Care Int. 2013; 11(1):38-46. PMID: 24830483. 2013

148. Hughes D, Docto L, Peters J, Lamb AK, **Brindis CD**. Swimming upstream: the challenges and rewards of evaluating efforts to address inequities and reduce health disparities. Eval Program Plann. 2013 Jun; 38:1-12. PMID: 23416287. 2013

149. Adams SH, Newacheck PW, Park MJ, **Brindis CD**, Irwin CE. Medical home for adolescents: low attainment rates for those with mental health problems and other vulnerable groups. Acad Pediatr. 2013 Mar-Apr; 13(2):113-21. PMID: 23375459. 2013

150. Brody CD, Freccero J, **Brindis CD**, Bellows B. Redeeming qualities: exploring factors that affect women's use of reproductive health vouchers in Cambodia. BMC Int Health Hum Rights. 2013 Feb 26; 13:13. PMID: 23442446. PMCID: PMC3599041 2013

151. Schapiro NA, Kools SM, Weiss SJ, **Brindis CD**. Separation and reunification: the experiences of adolescents living in transnational families. Curr Probl Pediatr Adolesc Health Care. 2013 Mar; 43(3):48-68. PMID: 23419833. 2013

152. Thompson KM, Raine TR, Foster DG, Speidel JJ, Darney PD, **Brindis CD**, Harper CC. Access to levonorgestrel emergency contraception: science versus federal politics. Womens Health (Lond). 2013 Mar; 9(2):139-43. PMID: 23477320. 2013

153. Minnis AM, Marchi K, Ralph L, Biggs MA, Combellick S, Arons A, **Brindis CD**, Braveman P. Limited socioeconomic opportunities and Latina teen childbearing: a qualitative study of family and structural factors affecting future expectations. J Immigr Minor Health. 2013 Apr; 15(2):334-40. PMID: 22678305. PMCID: PMC3479330 2013

154. Biggs MA, Arons A, Turner R, **Brindis CD**. Same-day LARC insertion attitudes and practices. Contraception. 2013 Nov; 88(5):629-35. PMID: 23809277. 2013

155. Foster DG, Biggs MA, Malvin J, Bradsberry M, Darney P, **Brindis CD**. Cost-savings from the provision of specific contraceptive methods in 2009. Womens Health Issues. 2013 Jul-Aug; 23(4):e265-71. PMID: 23816157. 2013

156. Ozer EM, Scott JT, **Brindis CD**. Seizing the opportunity: improving young adult preventive health care. Adolesc Med State Art Rev. 2013 Dec; 24(3):507-25. PMID: 24654545. 2013

Prepared: July 2, 2025

157. **Brindis CD**, Moore K. Improving adolescent health policy: incorporating a framework for assessing state-level policies. Annu Rev Public Health, 35:343-61. 2014 PMID: 24387089. 2014

158. Blum A, Giordano A, Park J, Rosenbaum S, **Brindis CD**. Implementing Health Reform in an Era of Semi-Cooperative Federalism, Lessons from the Age 26 Expansion. Journal of Health & Biomedical Law. 2014; (10):327-362. 2014

159. Suleiman, A, **Brindis CD**. Adolescent School-Based Sex Education: Using Developmental Neuroscience to Guide New Directions for Policy and Practice. Theoretical/Conceptual Papers. NY, Sexuality Research and Social Policy June:11(2);137–152. 2014

160. Thiel de Bocanegra H, Cross Riedel J, Menz M, Darney PD, **Brindis CD**. Onsite provision of specialized contraceptive services: does Title X funding enhance access? J Womens Health (Larchmt). May; 23(5):428-33. 2014. PMID: 24405313. PMCID: PMC4011460 2014

161. Okumura MJ, Ong T, Dawson D, Nielson D, Lewis N, Richards M, **Brindis CD**, Kleinhenz ME. Improving transition from paediatric to adult cystic fibrosis care: programme implementation and evaluation. BMJ Qual Saf. Apr; 23 Suppl 1:i64-i72.  2014. PMID: 24415776. PMCID: PMC4449274 2014

162. Biggs MA, Harper CC, Malvin J, **Brindis CD**. Factors influencing the provision of long-acting reversible contraception in California. Obstet Gynecol. Mar; 123(3):593-602. PMID: 24499746. 2014

163. Park MJ, Scott JT, Adams SH, **Brindis CD**, Irwin CE. Adolescent and young adult health in the United States in the past decade: little improvement and young adults remain worse off than adolescents. J Adolesc Health, Jul; 55(1):3-16. 2014. PMID: 24815958. 2014

164. Raymond-Flesch M, Siemons R, Pourat N, Jacobs K, **Brindis CD**. "There Is No Help Out There and If There Is, It's Really Hard to Find": A Qualitative Study of the Health Concerns and Health Care Access of Latino "DREAMers." Journal of Adolescent Health, Sept. 55(3):323–328. PMID: 25151054. 2014

165. Patel AI, Hecht K, Hampton KE, Grumbach JM, Braff-Guajardo E, **Brindis CD**. Tapping into water: key considerations for achieving excellence in school drinking water access. Am J Public Health. Jul; 104(7):1314-9. PMID: 24832141. PMCID: PMC4056210 2014

166. Maternowska MC, Withers M, **Brindis CD**. Gender, masculinity and migration: Mexican men and reproductive health in the Californian context. Cult Health Sex. 2014; 16(8):989-1002. 2014. PMID: 24939475. 2014

167. Schapiro NA, Kools SM, Weiss SJ, **Brindis CD**. Impact of gender on separation-reunification experiences of Latino immigrant adolescents. Field Actions Science Reports [Online], Special Issue 13, Online since 14 April 2015, http://journals.openedition.org/factsreports/3860. 2015

168. Biggs MA, Rocca CH, **Brindis CD**, Hirsch H, Grossman D. Did increasing use of highly effective contraception contribute to declining abortions in Iowa? Contraception. Feb; 91(2):167-73. PMID: 25465890. 2015

169. Pourat N, Hadler MW, Dixon B, **Brindis CD**. One-stop shopping: efforts to integrate physical and behavioral health care in five California community health centers. Policy Brief UCLA Cent Health Policy Res. Jan; (PB2015-1):1-11. PMID: 25924245. 2015

Prepared: July 2, 2025

170. Sedlander E, **Brindis CD**, Bausch SH, Tebb KP. Options for assuring access to confidential care for adolescents and young adults in an explanation of benefits environment. J Adolesc Health. Jan; 56(1):7-9. PMID: 25530602. 2015

171. Lewis C, Deardorff J, Lahiff M, Soleimanpour S, Sakashita K, **Brindis CD**. High school students' experiences of bullying and victimization and the association with school health center use. J Sch Health. May; 85(5):318-26. PMID: 25846311. 2015

172. Biggs MA, Harper CC, **Brindis CD**. California Family Planning Health Care Providers' Challenges to Same-Day Long-Acting Reversible Contraception Provision. Obstet Gynecol. Aug; 126(2):338-45. PMID: 26241424. 2015

173. **Brindis CD**, Irwin CE. Insuring Young Adults in the United States Through the Affordable Care Act. J Adolesc Health. Aug; 57(2):131-2. PMID: 26206433. 2015

174. Tebb KP, Sedlander E, Bausch S, **Brindis CD**. Opportunities and Challenges for Adolescent Health Under the Affordable Care Act. Matern Child Health J. Oct; 19(10):2089-93. PMID: 25724539. 2015

175. Raymond-Flesch M, Siemons R, **Brindis CD**. Research and Engagement Strategies for Young Adult Immigrants Without Documentation: Lessons Learned Through Community Partnership. Prog Community Health Partnership; 10(3):373-382. 2016. PMID: 28230545. 2016

176. Patel AI, **Brindis CD**. Maximizing School Policies to Reduce Youth Consumption of Sugar-Sweetened Beverages. J Adolesc Health. 2016 Jul; 59(1):1-2. PMID: 27338661. 2016

177. Lara D, Decker MJ, **Brindis CD**. Exploring how residential mobility and migration influences teenage pregnancy in five rural communities in California: youth and adult perceptions. Cult Health Sex. Sep; 18(9):980-95. PMID: 27439657. 2016

178. Yamey G, Horváth H, Schmidt L, Myers J, **Brindis CD**. Reducing the global burden of Preterm Birth through knowledge transfer and exchange: a research agenda for engaging effectively with policymakers. Reprod Health. Mar 18; 13:26. PMID: 26987438. PMCID: PMC4797256 2016

179. **Brindis CD**. The "State of the State" of School-Based Health Centers: Achieving Health and Educational Outcomes. American Journal of Preventive Medicine, 51 pp. 139-140 DOI: 10.1016/j.amepre.2016.03.004. 2016. PMID: 27320218. 2016

180. Patel AI, Grummon AH, Hampton KE, Oliva A, McCulloch CE, **Brindis CD**. A Trial of the Efficacy and Cost of Water Delivery Systems in San Francisco Bay Area Middle Schools, 2013. Prev Chronic Dis. 07 07; 13:E88. PMID: 27390074. PMCID: PMC4951080 2016

181. Banspach S, Zaza S, Dittus P, Michael S, **Brindis CD**, Thorpe P. CDC Grand Rounds: Adolescence - Preparing for Lifelong Health and Wellness. MMWR Morb Mortal Wkly Rep. Aug 05; 65(30):759-62. PMID: 27491062. 2016

182. Arons A, Decker M, Yarger J, Malvin J, **Brindis CD**. Implementation in Practice: Adaptations to Sexuality Education Curricula in California. J Sch Health. Sep; 86(9):669-76. PMID: 27492936. 2016

183. Decker, MJ, Gutmann-Gonzalez A, Lara D. and **Brindis CD**. Exploring the Influence of Neighborhood-Level Factors on Adolescent Birth Rates in California: A Social-Ecological Approach, Youth & Society 1–24, 2016. DOI: 10.1177/0044118X16660323

184. Yarger J, Decker MJ, Campa MI, **Brindis CD**. Rural-Urban Differences in Awareness and Use of Family Planning Services Among Adolescent Women in California. J Adolesc Health. Apr; 60(4):395-401. 2017. PMID: 27998703. 2017

185. Grummon AH, Hampton KE, Hecht A, Oliva A, McCulloch CE, **Brindis CD**, Patel AI. Validation of a Brief Questionnaire Against Direct Observation to Assess Adolescents' School Lunchtime Beverage Consumption. J Nutr Educ Behav. 2017 Nov - Dec; 49(10):847-851.e1. PMID: 28743436. PMCID: PMC5682217 2017

186. **Brindis CD**, Twietmeyer L, Park MJ, Adams S, Irwin CE. Improving Receipt and Preventive Care Delivery for Adolescents and Young Adults: Initial Lessons from Top-Performing States. Matern Child Health J. Jan 30. PMID: 28138827. 2017

187. Siemons R, Raymond-Flesch M, Auerswald CL, **Brindis CD**. Erratum to: Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA). J Immigr Minor Health. 2017 08; 19(4):1000. PMID: 27106484. 2017

188. Pottie K, Hui C, Rahman P, Ingleby D, Akl EA, Russell G, Ling L, Wickramage K, Mosca D, **Brindis CD**. Building Responsive Health Systems to Help Communities Affected by Migration: An International Delphi Consensus. Int J Environ Res Public Health. Feb 03; 14(2). 2017. PMID: 28165380. PMCID: PMC5334698 2017

189. Falzone AE, **Brindis CD**, Chren MM, Junn A, Pagoto S, Wehner M, Linos E. Teens, Tweets, and Tanning Beds: Rethinking the Use of Social Media for Skin Cancer Prevention. Am J Prev Med. 2017 Sep; 53(3S1):S86-S94. PMID: 28818251. PMCID: PMC5886032 2017

190. Larson S, Spetz J, **Brindis CD,** Chapman S. Characteristic Differences Between School-Based Health Centers With and Without Mental Health Providers: A Review of National Trends. J Pediatr Health Care. Jul - Aug; 31(4):484-492. PMID: 28189399. 2017

191. Larson S, Chapman S, Spetz J, **Brindis CD**. Chronic Childhood Trauma, Mental Health, Academic Achievement, and School-Based Health Center Mental Health Services. J Sch Health. 2017 Sep; 87(9):675-686. PMID: 28766317. 2017

192. **Brindis CD**. Advancing the Field of Teenage Pregnancy Prevention Through Community-Wide Pregnancy Prevention Initiatives. J Adolesc Health. Mar; 60(3S):S1-S2. PMID: 28235429. 2017

193. **Brindis CD**, Freund KM, Baecher-Lind L, Bairey Merz CN, Carnes M, Gulati M, Joffe H, Klein WS, Mazure CM, Pace LE, Regensteiner JG, Redberg RF, Wenger NK, Younger L. The Risk of Remaining Silent: Addressing the Current Threats to Women's Health. Womens Health Issues. 2017 Nov - Dec; 27(6):621-624. PMID: 29150088. 2017

194. Isquick S, Chang R, Thiel de Bocanegra H, Chabot M, **Brindis CD**. Postpartum Contraception and Interpregnancy Intervals Among Adolescent Mothers Accessing Public Services in California. Matern Child Health J. Apr; 21(4):752-759. PMID: 27475821. 2017

195. Yarger J, Daniel S, Antonia Biggs M, Malvin J, **Brindis CD**. The Role of Publicly Funded Family Planning Sites In Health Insurance Enrollment. Perspect Sex Reprod Health. Jun; 49(2):103-109. PMID: 28445624. 2017

196. **Brindis CD**. Setting the Stage: Advancing a Cancer Prevention Agenda for Young Adults. Am J Prev Med, Sep; 53(3S1):S1-S4. PMID: 28818239. 2017

Prepared: July 2, 2025

197. Siemons R, Raymond-Flesh M, Auerswald CL, **Brindis CD**. Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA). J Immigr Minor Health. Jun; 19(3):543-551. PMID: 26852235. 2017

198. Philliber AE, Hirsch H, **Brindis CD**, Turner R, Philliber S. The Use of ACOG Guidelines: Perceived Contraindications to IUD and Implant Use Among Family Planning Providers. Matern Child Health J. September 21(9):1706–1712. PMID: 28707101. 2017

199. Soleimanpour S, Geierstanger S, **Brindis CD**. Adverse Childhood Experiences and Resilience: Addressing the Unique Needs of Adolescents. Acad Pediatr, Sep - Oct; 17(7S):S108-S114. PMID: 28865641. 2017

200. Holman DM, White MC, Shoemaker ML, Massetti GM, Puckett MC, **Brindis CD**. Cancer Prevention During Early Adulthood: Highlights From a Meeting of Experts. Am J Prev Med, Sep; 53(3S1): S5-S13. PMID: 28818246. PMCID: PMC5890433 2017

201. Horvath H, **Brindis CD**, Reyes EM, Yamey G, Franck L. Preterm birth: the role of knowledge transfer and exchange. Health Res Policy Syst, Sep 06; 15(1):78. PMID: 28874160. PMCID: PMC5586007 2017

202. Hecht AA, Grumbach JM, Hampton KE, Hecht K, Braff-Guajardo E, **Brindis CD**, McCulloch CE, Patel AI. Validation of a survey to examine drinking-water access, practices and policies in schools. Public Health Nutr. Sep 12; 1-7. PMID: 28893341. 2017

203. Larson S, **Brindis CD**, Chapman SA, Spetz J. Rates of Exposure to Victimizing Events and Use of Substances Among California's Middle and High School Students. J Sch Nurs. 2018 Jan 01; 1059840517707242. PMID: 29357730. 2018

204. Tebb KP, Rodriguez F, Price M, Rodriguez F, **Brindis CD**. Improving California's Capacity to Implement a Positive Youth Development Intervention for Expectant and Parenting Adolescents. Journal of Community Medicine and Health Education. 4(8):263. 2018

205. Jacobs LM, **Brindis CD**, Hughes D, Kennedy CE, Schmidt LA. Measuring Consumer Engagement: A Review of Tools and Findings. Journal for Healthcare Quality, May/June; 40(3):139–146. 2018. doi: 10.1097/JHQ.0000000000000085. PMID: 28786845. 2018

206. Ralph LJ, King E, Belusa E, Foster DG, **Brindis CD**, Biggs MA. The Impact of a Parental Notification Requirement on Illinois Minors' Access to and Decision-Making Around Abortion. J Adolesc Health, Mar; 62(3):281-287. PMID: 29248391. 2018

207. Tebb KP, Rodriguez F, Pollack LM, Trieu SL, Hwang L, Puffer M, Adams S, Ozer EM, **Brindis CD**. Assessing the effectiveness of a patient-centred computer-based clinic intervention, Health-E You/Salud iTu, to reduce health disparities in unintended pregnancies among Hispanic adolescents: study protocol for a cluster randomised control trial. BMJ Open, Jan 10; 8(1):e018201. PMID: 29326184. PMCID: PMC5780691 2018

208. **Brindis CD**, Freund KM. The ramifications of recent health policy actions for cardiovascular care of women: Progress, threats, and opportunities. Clin Cardiol. 2018 Feb; 41(2):173-178. PMID: 29485710. 2018

209. Tilley L, Yarger J, **Brindis CD**. Young Adults Changing Insurance Status: Gaps in Health Insurance Literacy. J Community Health. 2018 Feb 17. PMID: 29455314. 2018

210. Mazur A, **Brindis CD**, Decker MJ. Assessing youth-friendly sexual and reproductive health services: a systematic review. BMC Health Serv Res, 03 27; 18(1):216. 2018. PMID: 29587727. PMCID: PMC5870922 2018

211. Adams S, Park MJ, Twietmeyer L, **Brindis CD**, Irwin CE Jr. Association between Adolesce Preventive Care and The Role of the Affordable Care Act. JAMA Pediatr, 172(1):43-48. doi:10.1001/jamapediatrics.2017.3140. PMID: 29114725 PMCID: PMC5833515. 2018

212. Adams S, Park J, Twietmeyer L, **Brindis CD**, Irwin CE Jr. Increasing Delivery of Preventive Services to Adolescents and Young Adults: Does the Preventive Visit Help?. Journal of Adolescent Health. 2018 Jun 19. pii: S1054-139X(18)30137-X. doi: 10.1016/j.jadohealth.2018.03.013. PMID: 29929838. 2018

213. Malekinejad M, Horvath H, Snyder H, **Brindis CD**. The discordance between evidence and health policy in the United States: the science of translational research and the critical role of diverse stakeholders. Health Res Policy Syst. 2018 Aug 16; 16(1):81. PMID: 30115085. 2018

214. **Brindis CD**, Houtrow A Opportunities for improving programs and services for children with disabilities. Journal of Adolescent Health. 2018 11; 63(5):529-530. PMID: 30348277. 2018.

215. Decker MJ, Isquick S, Tilley L, Zhi Q, Gutman A, Luong W, **Brindis CD**.  Neighborhoods matter. A systematic review of neighborhood characteristics and adolescent reproductive health outcomes. Health and Place Oct. 9 54:178-190. PMID: 30312942. 2018

216. Wallace SP, De Trinidad Young ME, Rodriquez MA, **Brindis CD**. A social determinants framework identifying state-level immigrant policies and their influence on health. SSM Population Health, 2019 Apr; 7:016-16. PMID: 30581960. 2018

217. Mendelson T, Mmari K, Blum RW, Catalano RF, **Brindis CD**. Opportunity youth: insights and opportunities for a public health approach to reengage disconnected teenagers and young adults. Public Health Reports. Nov/Dec;133(1):54S-64S. /doi.org/10.1177/0033354918799344. PMID:30426873 PMCID: PMC6243446. 2018

218. Tebb KP, Pica G, Twietmeyer L, Angela Diaz, **Brindis CD**. Innovative Approaches to Address Social Determinants of Health Among Adolescents And Young Adults. Health Equity Nov 2018; 2(1):321-328. PMID: 30450488. 2018

219. Adams S, Park J, Twietmeyer L, **Brindis CD**, Irwin CE. Young Adult Preventive Healthcare: Changes in Receipt of Care Pre- to Post-Affordable Care Act. J Adolesc Health. 2019 Jun;64(6):763-769. PMID:30850314. 2019

220. Raymond-Flesch M, Lucia L, Jacobs K, **Brindis CD**.  Improving Medicaid Access in Times of Health Policy Change: Solutions from Focus Groups with Frontline Enrollment Workers. Journal of Health Care for the Poor and Underserved. 2019, February; 30(1):280-296. PMID:30827983. 2019

221. Schapiro NA, Green EK, Kaller S, **Brindis CD,** Rodriquez A, Alkebulan-Abakah M, Chen JL. Impact on Healthy Behaviors of Group Obesity Management Visits in Middle School Health Centers: A Community-Based Participatory Research Approach. Journal of School Nursing. J Sch Nurs. 2019 Apr 15; 1059840519842226. PMID: 30983480. 2019

222. Grummon A, Cabana M, Hecht A, Alkon A, McCulloch C, **Brindis CD**, Patel A. Effects of a Multi-pronged Beverage Intervention on Young Children's Beverage Intake and Weight: A Cluster Randomized Pilot Study. Public Health Nutr. 2019 10; 22(15):2856-2867. PMID: 31303190. 2019

Prepared: July 2, 2025

223. Dickson E, Parshall M, **Brindis CD**.  Isolated Voices: Perspectives of Teachers, School Nurses, and Administrators Regarding Implementation of Sexual Health Education Policy. Journal of School Health. 2020 Feb; 90(2):88-98. PMID: 31813167. 2019

224. Dickson E, **Brindis CD**. The Double Bind of School Nurses and Policy Implementation: Intersecting the Street Level Bureaucracy Framework and Teaching Sexual Health Education. J Sch Nurs. 2019 Aug 22; 1059840519868764. PMID: 31438767. 2019

225. Laguna MC, Hecht AA, Ponce J, Jue T, **Brindis CD**, Patel, AI. Teachers as Healthy Beverage Role Models: Relationship of Student and Teacher Beverage Choices in Elementary Schools. Journal of Community Health. 2020 Feb; 45(1):121-127. PMID: 31407126. 2019

226. Bonnie RJ, Backes EP, Alegria M, Diaz A, **Brindis CD**.  Fulfilling the Promise of Adolescence: Realizing Opportunity for All Youth.  J Adolesc Health. 2019 Oct; 65(4):440-442. PMID: 31439468. 2019

227. Onono MA, **Brindis CD**, White JS, Goosby E, Okoro DO, Bukusi EA, Rutherford GW. Challenges to Generating Political Prioritization for Adolescent Sexual and Reproductive Health in Kenya: A Qualitative Study.  PLoS One, 2019; 14(12):e0226426. PMID: 31856245. 2019

228. Kreger M, Sargent K, **Brindis CD**. An Underpinning of School Inequities: Asthma Absences and Lost Revenue in California Schools. J Sch Health. 2020 Mar; 90(3):200-211. PMID: 31957039. 2019

229. Soleimanpour S, Schapiro NA, Faxio A, **Brindis CD**.  A Preliminary Study Examining the Validity of Brief Trauma Screening Tools for Young Adolescents in School-Based Health Centers.  Journal of Nursing Measurement. 2020 Dec 17:JNM-D-19-00043. doi: 10.1891/JNM-D-19-00043. Epub ahead of print. PMID: 33334845, printed: Volume 29, Number 1, 2021 pp. 53-.65.

230. Kassabian S, Fewer S, Yamey G, **Brindis CD**. Building a global policy agenda to prioritize preterm birth: A qualitative analysis on factors shaping global health policymaking. Gates Open Research. 2020 Jun 22;4:65. doi: 10.12688/gatesopenres.13098.1. PMID: 33117963; PMCID: PMC7578407.

231. Decker, M, Dandekar, S, Gutmann-Gonzales, A, **Brindis CD**. Bridging the Gap Between Sexual Education and Clinical Services: Adolescent Perspectives and Recommendations. Journal of School Health. J Sch Health. 2021 Nov;91(11):928-935. doi: 10.1111/josh.13084. Epub 2021 Sep 14

232. Barney A., Rodriguez F, Schwarz EB, Reed R, Tancredi D, **Brindis CD,** Dehlendorf C, Tebb KP. Adapting to Changes in Teen Pregnancy Prevention Research: Social Media as an Expedited Recruitment Strategy. Journal of Adolescent Health, 2021. Aug;69(2):349-353. doi: 10.1016/j.jadohealth.2020.12.140. Epub 2021 Feb 23.

233. Tebb, KP, Rodriguez, F, Pollack, LM, Adams, SH Rico, R, Renteria, R, Trieu, SL, Hwang, L, **Brindis**, **CD**, Ozer, E, Puffer, M. Improving Contraceptive Use Among Latina Adolescents: A Cluster-Randomized Controlled Trial Evaluating an mHealth Application, Health-E You/Salud iTu. Contraception. 2021.

234. Yarger J, Schroeder R, Blum M, Cabral MA, **Brindis CD**, Perelli B, Harper CC. Concerns About the Cost of Contraception Among Young Women Attending Community College. Women's Health Issues. 2021 Apr 27. PMID: 33931310.

Prepared: July 2, 2025

235. Decker MJ, Pineda N, Gutmann-Gonzalez A, **Brindis CD**. Youth-centered maternity care: a binational qualitative comparison of the experiences and perspectives of Latina adolescents and healthcare providers. BMC Pregnancy Childbirth. 2021 May 02; 21(1):349.

236. Adams, SH, Schaub JP, Nagata JM, Park MJ, **Brindis CD**, Irwin CE. Young Adult Perspectives on COVID-19 Vaccinations, Journal of Adolescent Health. J Adolesc Health. 2021 Sep; 69(3): 511–514. Published online 2021 Jul 14. doi: 10.1016/j.jadohealth.2021.06.003

237. Tebb, K and **Brindis CD**. Understanding the Psychological Impacts of Teenage Pregnancy through a Socio-ecological Framework and Life Course Approach. Seminars in Reproductive Medicine. *2022*. DOI https://doi.org/ 10.1055/s-0041-1741518. ISSN 1526-8004.

238. Gutman-Gonzalez, A., Dandekar S, Decker MA, **Brindis CD.** Bridging the Gap Between Sexual Health Education and Clinical Services: Adolescent Perspectives and Recommendations. Journal of School Health. J Sch Health. 2021 Nov;91(11):928-935. doi:10.1111/josh.13084. Epub 2021 Sep 14.

239. English, A and **Brindis, CD**, Health, Safety, and Wellbeing of Adolescents and Young Adults in the United States: What Is at Stake Beyond 2021, Journal of Adolescent Health, 70 (2022) 175e185.

240. **Brindis, CD**. Advancing Sexual and Reproductive Health Education: Pursuing the Long Arc of Justice, Journal of Adolescent Health. 70 (2022) 521e522

241. Adams, SH, Schaub JP, Nagata JM, Park MJ, **Brindis CD**, Irwin CE. Young Adult Anxiety or Depressive Symptoms and Mental Health Service Utilization During the COVID-19 Pandemic. Journal of Adolescent Health (2022) 1-4; https://doi.org/10.1016/j.jadohealth.2022.02.023

242. Sudhinaraset M, Choi, H., Nakphong MK, Woofter R, **Brindis CD**., Contraceptive use and consistency and the role of deferred action for childhood arrivals: A cross-sectional survey of undocumented young adults, Sexual & Reproductive Healthcare 32 (2022) (1-6). 100725

243. Gutman-Gonzalez A, Borgen N, Decker M, **Brindis CD**. Youth perceptions and concerns about sexually transmissible infections versus pregnancy: A qualitative comparative study in California. Sexual Health (2022) (A=I) https://doi.org/10.1071/SH22037 .

244. Maya S, Kahn JG, Lin TK, Jacobs LM, Schmidt LA, Burrough WB, Ghasemzadeh R, Mousli L, Allan M, Donovan M, Barker E, Horvath H, Spetz J. **Brindis CD,** Mohsen Malekinejad M. Indirect COVID-19 Health Effects and Potential Mitigating Interventions: Cost-effectiveness framework. PLOS One 17(7): e0271523. https://doi.org/10.1371/ journal.pone.0271523

245. Decker M, Gutman-Gonzalez A, Saphir M, Nyugen NT, Zhi Q, **Brindis, CD.** Integrated Theory-Based Health and Development Interventions for Young People: A Global Scoping Review, Health Education & Behavior, Published Online: 2022-10-31; 1-12. DOI link: https://doi.org/10.1177/10901981221130734

246. Wesevich A, Jiao MG, Santanam TS, Chung RJ, Uchitel J, Zhang Q, **Brindis CD**, Ford CA, Counts NZ, Wong CA. Adolescent and Young Adult Perspectives on Quality and Value in Health Care. Acad Pediatr. 2022 Oct 23.  PMID: 36288750.

247. Decker, MJ. Price M, Harrison S, Spellen S, Hutchings N, Martinez E, Rutman SP, Shaver A, Franck LS, **Brindis CD,** and Fuchs J. Using Collective Impact to advance birth equity: A comparison of two cross-sector efforts in California. (Maternal and Child Health Journal, November, 2022,( **https://doi.org/10.1007/s10995-022-03528-w).**

Prepared: July 2, 2025

248. Barral RL, **Brindis CD,** Hornberger L, Trent M, Sherman AK, Ramirez M, Finocchario-Kessler S, Ramaswamy M. The perfect storm: Perceptions of influencing adults regarding Latino teen pregnancy in rural communities**:** Maternal and Child Health Journal,February 2023. DOI: 10.1007/s10995-023-03627-2

249. Harper CC, Jones E, **Brindis CD**, Watson A, Schroeder R, Boyer CB, Edelman A, Trieu S, Yarger J. Educational Intervention among adolescents and young adults on emergency contraception options. Journal of Adolescent Health 2023 (January1-4).  (

250. Congdon JL, Bardach NS, Franck LS, **Brindis CD**, Boscardin WJ, Carrasco  Z, Cabana MD, Dehlendorf C. Postpartum Family Planning in Pediatrics: A Survey of Parental Contraceptive Needs and Health Services Preferences (Academic Pediatrics, 2023). 1876-2859, https://doi.org/10.1016/j.acap.2023.03.009. (https://www.sciencedirect.com/science/article/pii/S1876285923000967)

251. Lakatos KO, Teherani A, Thottathil SE, Gandhi S, Weiser, SD, **Brindis CD,** A race to net zero—early lessons from healthcare decarbonization marathon. Health Affairs Scholar (2023, 1(1), 1–10 https://doi.org/10.1093/haschl/qxad006.Advance access publication: June 20, 2023.

252. Mitchell A, Gutmann-Gonzalez A, **Brindis, CD,** Decker, MJ. Contraceptive access experiences and perspectives of. Mexican-origin youth: a binational qualitative study. Sexual and Reproductive Health Matters 2023;31(1):1–16, 31:1, 2216527, DOI:10.1080/26410397.2023.221652. To link to this article: https://doi.org/10.1080/26410397.2023.2216527

253. Rudman, SP, Price M, Williams S, Jones L, Williams-Burt H, Decker MJ, Franck LS, Fuchs JD, **Brindis CD**, Pursuing research justice through community academic partnership to address racial disparities in preterm birth,  *Progress in Community Health Partnerships: Research, Education, and Action*, Summer, 2023, Vol. 17.2. Pages 319-327.

254. Rutman SP, Borgen N, Spellen S, King DD, Decker MJ, Rand L, Cobbins A, **Brindis CD**.Addressing anti-black racism in an academic preterm birth initiative: perspectives from a mixed methods case study. BMC Public Health. 2023 10 18; 23(1):2039.  PMID: 37853363; PMCID: PMC10585806.

255. Adams S, Park JM, **Brindis CD,** Irwin JE, Adolescents' Receipt of Care in a Medical Home: Results from a National Survey, *Journal of Adolescent Health,*2023; 1-S

256. Patel AI, Schmidt LA, McCulloch CE, Blacker, L., Cabana MD, **Brindis CD**, Ritchie LD, A Effectiveness of a School Drinking Water Promotion and Access Program for Overweight Prevention. *Pediatrics.* 2023 09 01; 152(3). PMID: 37545466; PMCID: PMC10471511

257. Raney, JH, Weinstein S, Ganson KT, Testa A, Jackson DB, Pantell M, Glidden DV, **Brindis CD**, Nagata JM. Mental Well-Being Among Adversity-Exposed Adolescents During the COVID-19 Pandemic. *JAMA Netw Open*. 2024 Mar 04; 7(3):e242076.

258. Mangurian C, **Brindis CD**.Take these steps to accelerate the path to gender equity in health sciences. *Nature.* 2024 Mar; 627(8003):S21. PMID: 38480972.

259. Potter MB, Mansur S, Rutman SP, **Brindis CD**. Is team science valued in the academic promotions process? A mixed-methods case study. *J Clin Transl Sci*. 2024; 8(1):e28.  PMID: 38384922; PMCID: PMC10880000.

260. **Brindis CD,** Laitner MH, Clayton EW, Scrimshaw SC, Grosz BJ, Simpson LA, Rosenbaum S, Brierley CL, Simon MA, Yvette Roubideaux Y, Calonge BN, Johnson PA, DeStefano L,

Prepared: July 2, 2025

Bear A, Arora KS, Dzau VJ.  Health-care workforce implications of the Dobbs v Jackson Women's Health Organization decision. *Lancet*. May 22, 2024 , Page 1-4. https://doi.org/10.1016/ S0140-6736(24)00581-6.

261. **Brindis CD**, Laitner MH, Clayton EW, Scrimshaw SC, Grosz BJ, Simpson LA, Rosenbaum S, Brierley CL, Simon MA, Yvette Roubideaux Y, Calonge BN, Johnson PA, DeStefano L, Bear A, Arora KS, Dzau VJ. Societal implications of the *Dobbs v Jackson Women's Health Organization* decision. Lancet. May 22, 2024 https://doi.org/10.1016/ S0140-6736(24)00534-8.

262. Barral BR, Fortenberry FJ, Avitia AA, Ramirez RM, Masonbrink MA, **Brindis CD**. "Sex Out of Boredom": Key Stakeholders' Perspectives on Teen Pregnancy Prevention in Emerging Immigrant Latino Rural Communities. *Sexuality Research and Social Policy*. 2024 May 11; 1-13. **https://doi.org/10.1007/s13178-024-00967-8**

263. Fieldhouse J, Nakiire L, Kayiwa J, Brindis C, Mitchell A, Makumbi I, Ario AR, Fair E, Mazet JAK, Lamorde M. How feasible or useful are timeliness metrics as a tool to optimise One Health outbreak responses? *BMJ Glob Health*2024;9:e013615. doi:10.1136/ bmjgh-2023-01361

264. Schapiro N.Soleimanpour S, Brindis CD. Constructing adolescent-friendly settings to facilitate screening for adverse childhood experiences, *The Journal of Nurse Practitioners*, 20 (2024) 105133, https://doi.org/10.1016/j.nurpra.2024.105133.

265. Raney JH, Weinstein S., Testa A,  Testa KT, Memon Z, Glidden, DV, Baker FC, **Brindis CD**, Nagata, JM. Sexual identity is associated with adverse childhood experiences (ACEs) in US early adolescents. *Academic Pediatrics*, Open Access. August 10, 2024 DOI:https://doi.org/10.1016/j.acap.2024.07.022

266. Rutman, S. P., Loey, J., Decker, M. J., de Guzman, N. S., Spitzer, J., & **Brindis, C. D**. (2024). Experiences of Dating Violence and Protective Factors Among Adolescents in Vulnerable Contexts. *Journal of Aggression, Maltreatment & Trauma*, 1–21. https://doi.org/10.1080/10926771.2024.2418546

267. Pedroza-Tobias A, Cradock A,  Salomon J,  Ritchie LD,  Mcculloch, C, Blacker LS, Schmidt L, **Brindis CD**, Cabana M, Patel A, "Water First" School Water Promotion and Access Intervention: A Cost Analysis Study. *J Acad Nutr Diet*. 2024 Nov 06. PMID: 39515643

268. Shapiro NA and **Brindis CD**. Supporting Primary Care Providers to Improve Adolescent Behavioral and Mental health. *Journal of Pediatric Health Care*. 2025; 1(1):1-5.

269. Nagata JM, Diep T, Helmer CK, Domingue SK, Al-Shoaibi AA, Raney JH, Ganson KT, Testa A, He J, **Brindis CD**, Baker FC. Sexual orientation discrimination and eating disorder symptoms in early adolescence: a prospective cohort study. *J Eat Disord*. 2024 Nov 29; 12(1):196.  PMID: 39614397

270. Nagata JM, Shim J, Low P, Ganson KT, Testa A, He J, Santos GM, **Brindis CD**, Baker FC, Shao IY. Prospective association between screen use modalities and substance use experimentation in early adolescents. *Drug Alcohol Dependence*. 2024 Nov 14; 266:112504.  PMID: 39612721.

271. Nagata JM, Memon Z, Talebloo J, Li K, Low P, Shao I, Ganson K, Testa A, He J, **Brindis CD**, & Baker F. Prevalence and Patterns of Social Media Use in Early Adolescents. *Academic Pediatrics.* 2025.

Prepared: July 2, 2025

272. Johnson J, **Brindis CD**, Donelan K., Goodwin M, Harris H., Kozhimannil KB Rosenbaum S, Weitz T. New Directions for Women's Health: Expanding Understanding, Improving Research, Addressing Workforce Limitations. *Health Affairs*, February 2025, 44-2. Pages 1-7. doi: 10.1377/hlthaff.2024.01004.

273. Fieldhouse, J. K., Nakiire, L., Kayiwa, J., Mirzazadeh, A., Brindis, C. D., Mitchell, A., Sepulveda, J., Makumbi, I., Ario, A.R., Fair, E., Gallalee, S., Isabirye, H., Sekamatte, M., Bird, B.H., Smith, W., Desai, A., Mazet, J.A.K., Lamorde, M. (2025). An analysis of One Health timeliness metrics across multisectoral public health emergencies in Uganda. *Communications Medicine, 5*(1), 192. doi:10.1038/s43856-025-00893-9

274. Nathan SF., Chapman SA, **Brindis CD**, Rocca CH. Associations Among Sociodemographic and Contextual Factors and Youth Pregnancy Preferences. *J Adolesc Health*. 2025 May 17.  PMID: 40380966.

275. Raney RJ, Memon MZ, Otmar OC, Testa TA, Ganson GK, **Brindis BC**, Nagata NJ. Lesbian, Gay, and Bisexual Adolescents Faced Disproportionate Mental Challenges During the COVID-19 Pandemic: What Can We Do About It? Findings From the Adolescent Brain Cognitive Development Study. *J Adolescent Health*. 2025 Mar 1; 76(3):s95-s96.

276. Nagata J. Et al Multidimensional Assessment of Gender Diversity in a Large National Sample of US Early Adolescents, (accepted, *JAMA Pediatrics*).

277. Nagata J, Ganson K, Testa A, Jinbo H, Santos GM, **Brindis CD,** Baker FC. "Prospective Association between Screen Use Modalities and Substance Use Experimentation in Early Adolescents." (accepted: *Drug and Alcohol Dependence*).

**Under Review**

Bryson AE, Oberman M, Lehmann LS, Ralph L, **Brindis CD**, Raymond-Flesch M. Navigating a new frontier: Clinicians' confidence in their ability to help adolescents access abortion post-Dobbs. submitted to *J of Adolescent Health.*

Friend J. **Brindis CD,** Upadhyay UD. Abortion AI: Toward an equity-centered research agenda for AI and abortion, *Contraception*

Mangurian C, **Brindis CD,** Bolstering the Pathway to Promote Scientific Workforce Diversity: The UCSF Mid-Career Development Program. *Academic Medicine Innovation Report*.

Marty- Chantan C,, **Brindis CD,** Thattathil S, Weiser S,  Sherman J,Teherani A. "Barriers and Facilitators in Implementing Clinical Decarbonization Strategies in Healthcare Settings: Insights from the University of California Health System. (Submitted to *The Joint Commission Journal on Quality and Patient Safety*).

Raney JH, Memom Z, Otmar CD, Ganson KT, Testa A, Baker FC, **Brindis CD**, Nagata JM.Sexual Minority Adolescents and the COVID-19 Pandemic: Examining School and Coping Factors to Promote Well-being (submitted to *J of Adolescent Health.)*

Prepared: July 2, 2025

**REVIEW ARTICLES**

1. **Brindis CD**.  Book review of Risking the Future: Adolescent Sexuality, Pregnancy, and Childbearing (Volumes 1 and 2), Family Life Educator, 6(1):20-21. 1987

2. **Brindis CD**.  Book review of Adolescents at Risk: Prevalence and Prevention (J Dryfoos, Oxford University Press, 1990), Family Life Educator 9(3):21-22. 1991

3. **Brindis CD**.  Book review of Adolescent Pregnancy in an Urban Environment: Issues, Programs, and Evaluation (J Hardy and L Zabin, Urban Institute Press, Washington, DC and Urban and Schwarzenberg, Baltimore and Munich, 1991) Family Planning Perspectives, 24(5):230-233. 1992

4. **Brindis CD**.  Book review of Losing Generations: Adolescents in High-Risk Settings (Panel on High-Risk Youth, Commission on Behavioral and Social Sciences and Education, National Research Council), Family Life Educator, 12(4) 1994

5. **Brindis CD**.  Book review of The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families (SS Brown & L Eisenberg, National Academy Press, Washington, DC) Family Life Educator. 1996

6. **Brindis CD**.  Book review of Risking the Future: Adolescent Sexuality, Pregnancy, and Childbearing (Volumes 1 and 2), Family Life Educator, 6(1):20-21. 1997

**BOOKS AND CHAPTERS**

1. Peck W, Hatcher R, **Brindis CD**, Brown E, Thompson J.  Case Histories and Family Planning.  Baltimore: Williams Publishing Company. 1976

2. **Brindis CD**, Korenbrot C, Brown P.  Evaluation Guidebook for Family Planning Information and Education Projects.  Guidebook funded by State of California, Department of Health Services, Office of Family Planning, Grant No. 85-86970. 1986

3. Lipton HL, Dixon-Mueller R, **Brindis CD**.  Transactions with clients: Suggestions for re-search, training and action.  In RJ Lapham, GB Simmons (eds.) Organizing for Effective Family Planning Pro-grams. Washington, DC:  National Academy Press. 1987

4. **Brindis CD**, Jeremy R.  Adolescent Pregnancy and Parenting in California: A Strategic Plan for Action.  San Francisco: Center for Reproductive Health Policy Research, Institute for Health Pol-icy Stud-ies, University of California, San Francisco. 1988

5. **Brindis CD**, Reyes P.  Evaluating Your Information and Education Project.  State of California Guidebook, published by Department of Health Services, Office of Family Planning, Grant No. 86-88951. 1988

6. Halfon N, Jameson W, **Brindis CD**, Lee P, Korenbrot C, Newacheck P.  The health of California's children.  In The Conditions of Children in California.  Berkeley, CA: PACE, Uni-versity of Cali-fornia, Berkeley/Stanford University. 1989

7. Eisen M, **Brindis CD**.  Compilation of an adolescent pregnancy prevention minimum evalua-tion data set.  In JJ Card (ed.) Evaluating Programs Aimed at Preventing Teenage Pregnancies.  Palo Alto, CA: Sociometrics Corporation. 1989

8. Abbey N, **Brindis CD**, Casas M.  Family Life Education in Multicultural Classrooms. Santa Cruz, CA: ETR Associate. 1990

Prepared: July 2, 2025

9. **Brindis CD,** Pittman K, Reyes P, Adams S. Adolescent Pregnancy Prevention: A Guidebook for Communities. Stanford, CA. Stanford Health Promotion Center. 1990

10. Millstein SG, Irwin CE, Jr., **Brindis CD**: Sociodemographic trends and projections in the adolescent population.  In: Hendee WR (ed.) The Health of Adolescents. San Francisco, CA: Jossey-Bass, Inc., pp. 1 - 15. 1991

11. **Brindis CD**, Lee PR.  Adolescents' Conceptualization of Illness.  In RM Lerner, AC Pe-tersen, J Brooks-Gunn (eds.) Encyclopedia of Adolescence.  New York: Garland Publishing, Inc. 1991

12. **Brindis CD**, Irwin C, Millstein S.  U.S. Profile of ado-lescent health.  In ER McEnerey, RE Kreipe, DR Orr, GD Comerciz (eds.) Textbook of Adolescent Medicine, pp. 12-27. Philadelphia: W.B. Saunders Co. 1992

13. **Brindis CD**, Irwin CE, Jr., Millstein SG:  The demography of adolescents in the U.S.: A national profile.  In: McAnarney E, Kreipe R, Orr DP, Commerci G (eds.), Textbook of Adolescent Medicine.  Philadelphia, PA: W.B. Saunders, pp. 12 - 27. 1992

14. **Brindis CD**.  Help a child avoid having a child.  In M Brodkin (ed.) Every Kid Counts.  San Francisco:  Harper Collins. 1993

15. **Brindis CD**, Eisen M.  A minimum data set for evaluating programs aimed at preventing ado-lescent pregnancy.  In JJ Card (ed.) Handbook of Adolescent Sexuality and Pregnancy – Re-search and Evaluation Instruments.  Newbury Park, CA:  Sage Publications. 1993

16. **Brindis CD**.  Antecedents and consequences: The need for diverse strategies in adolescent preg-nancy prevention.  In A Lawson, DL Rhode (eds.) The Politics of Pregnancy: Adolescent Sexuality and Public Policy.  New Haven, CT:  Yale University Press. 1993

17. **Brindis CD**.  Conducting a comprehensive community-wide needs assessment. In Guide to Creating Comprehensive School-Linked Services for California Children and Families. Sacramento, CA:  State Partnership for Comprehensive School-Linked Services. 1993

18. **Brindis CD**.  Funding and policy options.  In SE Samuels, MD Smith (eds.) Condoms in the Schools (report from The Kaiser Forums).  Menlo Park, CA: Henry J. Kaiser Family Foundation. 1993

19. **Brindis CD**.  California case study. In J Steinschneider (ed.) A Guide to School-Based and School-Linked Health Centers (Volume III: Potential Sources of Federal Support for School-Based and School-Linked Health Services).  Washington, DC: The Center for Population Options (Support Center for School-Based and School-Linked Health Care). 1993

20. **Brindis CD**.  School-Based health clinics.  In HM Wallace, RP Nelson & PJ Sweeney (eds.) Maternal and Child Health Practices, (Fourth Edition) pp. 602-613.  Oakland, CA: Third Party Publishing. 1993

21. **Brindis CD**.  Adolescent pregnancy prevention and sexuality education.  In J Drolet, K Clark (eds.) The Sexuality Education Challenge.  Santa Cruz, CA: ETR Associates. 1994

22. **Brindis CD**.  Health care reform and adolescent health: The anticipated role and contribution of public health.  In C Irwin, C Brindis, K Holt, K Langlykke (eds.) Health Care Reform: Opportunities for Improving Adolescent Health.  Arlington, VA: National Center for Education in Maternal and Child Health. 1994

Prepared: July 2, 2025

23. **Brindis CD**, Park MJ, Valderrama TL, Lee CM, Margolis R, Kolbe LJ, Achrekar AP, Hannan C, Anglin TM. Improving the Health of Adolescents & Young Adults: A Guide for States and Communities. Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Division of Adolescent and School Health; Health Resources and Services Administration, Maternal and Child Health Bureau, Office of Adolescent Health; National Adolescent Health Information Center, University of California, San Francisco, Atlanta, GA. (http://nahic.ucsf..edu). 1994

24. **Brindis CD** and Laski L.  Evaluaciones de Programas de Salud.  Mexico: McGraw-Hill. 1995

25. **Brindis CD**, Laski L.  El embarazo adolescente en los jovenes Hispanos de los Estados Unidos de America.  In R. Martínez y Martínez (ed.) La Salud del Niño y del Adolescente (3rd edition).  Mexico: Masson-Salvat. 1995

26. **Brindis CD**, Laski L.  El embarazo adolescente en los jovenes Hispanos de los Estados Unidos.  In R. A. Hidalgo San Martín (ed.) Salud, Sexualidad y Reproduccion en la Adolescencia. Mexico: Universidad de Guadalajara, Instituto Mexicano del Seguro Social, Organizacion Panamericana de la Salud. 1996

27. **Brindis CD**, Peterson JL, Card JJ, Eisen M. Prevention Minimum Evaluation Data Set (PMEDS): A Minimum Data Set for Evaluating Programs Aimed at Preventing Adolescent Pregnancy and STD/HIV/AIDS. Second Edition (updated from JJ Card [ed.] Handbook of Adolescent Sexuality and Pregnancy Research and Evaluation Instruments, Sage Publications, Newbury Park, 1993). Los Altos, CA: Sociometrics Corp. 1996

28. **Brindis CD**, Pfeffer R, Wolfe A.  A case management program for chemically dependent clients with multiple needs.  In HA Siegal, RC Rapp (eds.) Case Management and Sub-stance Abuse Treatment: Practice and Experience, pp. 155-176.  New York: Springer Publishing Company, Inc. 1996

29. **Brindis CD**.  Financing adolescent health services.  In SB Friedman, M Fisher, SK Schonberg, EM Al-derman (eds.) Comprehensive Adolescent Health Care (Second Edition), pp. 114-118.  St. Louis, MO: Mosby. 1997

30. **Brindis CD**, Theidon K.  Case management.  In A field Guide to CASAWORKS for Families: A Treatment and Training Program for Substance-Abusing Women on Welfare and Their Families–A Work in Progress (Volume II, Service Delivery), pps. 18-34. New York: Columbia University, National Center on Addiction and Substance Abuse. 1998

31. **Brindis CD**, Kaplan D, Phibbs S. A Guidebook for Evaluating School-based Health Centers. Denver, CO: University of Colorado Health Sci-ences Center and San Francisco: University of California, San Francisco. Available through National Assembly for School-Based Health Centers, Washington, D.C. (http://nahic.ucsf.edu). 1998

32. Card JJ, **Brindis CD**, Peterson J, Niego S.  Evaluating Teen Pregnancy Prevention Programs (sponsored by Centers for Disease Control and Prevention). (http://www.socio.com/index.htm)  Los Altos, CA: Sociometrics Corp. 1999

33. Castañeda X, Castañeda I, **Brindis CD**.  El circulo de lo sagrado y lo profano: Regulacion de la sexualidad en adolescents de areas rurales (The circle of the sacred and the profane: Regulation of adoles-cent sexuality in rural communities).  In C Stern, E Garcia (ed) Sexualidad y Salud Reproductiva de Adolescentes y Jovenes en Mexico Aportaciones para la investigacion y la accion., pp. 73-88. Mexico, DF, Programa Salud Reproductiva y Sociedad. 2001

Prepared: July 2, 2025

34. **Brindis CD**, Park J, Paul T, Burg S. A Profile of Adolescent Health: The Role of Race, Ethnicity and Gender, <u>In</u> Social Work with Multicultural Youth, pp. 1-32. New York: The Haworth Press Inc. 2002

35. Clayson Z, Castaneda X, Sanchez E, **Brindis CD**. The Intersections of Culture, Health and Systems in California Latino Communities, <u>In</u> Sexual and Reproductive Health Promotion in Latino Populations: Parteras, Promotoras y Poetas, Case Studies across the Americas. New York: Baywood Publishing Co. 2003

36. Driscoll A, Biggs M, **Brindis C**D.  The Influence of Acculturation on Latino Adolescent Childbearing.  Cultural Dimensions of Teen Pregnancy Prevention and Parenting, 22(4): 14-15. 2003

37. **Brindis CD**. California at the Forefront: Building on a History of Wise Investments in Teen Pregnancy Prevention, <u>In:</u> Reality Check: Teen Pregnancy Prevention Strategies That Work. Xlibris Corporation. 2004

38. Kreger M, **Brindis CD**, Escamilla H. Cross-Cutting Themes from the CAFA Initiative Evaluation, in Asthma and Environmental Advocacy in California: The Role of Health Coalitions. Community Action to Fight Asthma. 2005

39. **Brindis CD**, Biggs MA, Driscoll A, Faxio AB, Geierstanger S, McCarter V. Evaluation Findings from The California Wellness Foundation's Teen Pregnancy Prevention Initiative (TPPI). The California Wellness Foundation. A Joint Project of Philiber Research Associates, SRI International's Center for Education and Human Services, the University of California, San Francisco's Institute for Health Policy Studies. 2007

40. Biggs, M.A, **Brindis, CD**, Ralph, L, Santelli, J. The Sexual and Reproductive Health of Young Latino Men Living in the US, <u>In</u>: Health Issues in Latino Males: A Social and Structural Approach.. Marilyn Aguirre-Molina, Luisa Borrell, and William Vega, Editors. Rutgers University Press. 2010

41. Soleimanpour S, Geierstanger S, Kaller, S, McCarter V, **Brindis CD**. The Role of School Health Centers in Health Care Access and Client Outcomes, In School-Based Health Care: Advancing Educational Success and Public Health. Terri D. Wright and Jeanita W. Richardson, Editors. American Public Health Association Press, Washington, DC. 2010

42. Park MJ, **Brindis CD**, Mulye T, Fisher M, ed., Aldermanm E, ed., Kreipe R, ed., Rosenfeld W, ed. Health Policy and Financing for Adolescent and Young Adult Health Services. In: Textbook of Adolescent Health Care (AAP). The Donohue Group, Inc. 2011

43. Judd S. **Brindis CD**. El Involucramiento de Los Hombres Jovenes en la Salud Sexual Y Reproductiva: Hacia Una Agenda Binacional de Investigacion, Accion Y Politica Publica. El "problema' del embarazo en la adolescencia: Contribuciones a un debate. Ed. Claudio Stern. El Colegio de Mexico, Centro de Estudios Sociologicos. 2012

44. Schmidt LA, Patel A, **Brindis CD**, Lustig RH. Towards Evidence-Based Policies for Reduction of Dietary Sugars: Lessons from the Alcohol Experience (Chapter 26, pp. 373-386). In Dietary Sugar and Health. Ed. By M. Goran, L. Tappy, KA Le. CRC Press, Taylor & Francis Group. 2014

45. Soleimanpour S, **Brindis CD**, Children's Health and Healthcare Policy (1960s-Today): Part IV Contemporary Health Policy Issues, Chapter 19: Guide to U.S. Health and Health Care Policy. Thomas R. Oliver, Editor. DWJ Books LLC. 2014

46. Institute of Medicine (IOM) and National Research Council (NRC) Empaneled Committee. Investing the Health and Well-Being of Young Adults. **Brindis CD**, Committee Member and Co-author of Chapter 6: "Public Health" and Chapter 7: "The Health Care System." National Academies Press: http://nap.edu/catalog.php?record_id=18869. 2014

47. Lerner RM, **Brindis CD**, Batanova MD, Blum RW. Adolescent Health and Positive Development: A Relational Developmental Systems Perspective. In the Handbook of Life Course Health Development Science. Springer. 2015

48. Decker MJ, Gutmann-Gonzalez A, Lara D, Lira J, Pérez AC, Estrada-Gutierrez E, Muñoz ER, Guzman-Huerta M, Perichart-Perera O, Pantic I, **Brindis CD**. Adolescent Pregnancy in Mexico and California: Policy and Programmatic Implications. Migration and Health. Chapter 3: 39-50. 2016

49. Decker M, Berglas N, **Brindis CD**. A Call to Action: Developing and Strengthening New Strategies to Promote Adolescent Sexual Health. In Adolescent Pregnancy: Past, Present and Future Trends and Issues, Ed. By Naomi Farber. MDPI, Basel, Switzerland (A Special Issue of Societies). 2016.

50. Gardner AL, **Brindis CD**. Advocacy and Policy Change Evaluation: Theory and Practice. Stanford University Press. Palo Alto, CA 2017.

51. Blondell AD, Robertson MJ, Papanastassiou AA, Bradley SJ. Mobile Homeless Youth, Health Disparities, and Access to Care: Using Mobile Phones and Geospatial Technologies to Document Geographies of Risk and Pathways to Care. C. Freeman et al (eds), In Risk, Protection, Provision and Policy, Geographies of Children and Young People, Vol 12. Springer Science+Business Media Singapore. 2017.

52. **Brindis CD**, MacFarlane S. Challenges in Shaping Policy with Data: In Palgrave Handbook of Global Health Data for Policy and Practice, Eds: MacFarlane S, AbouZahr C. chapter 3:45-63, 2019.

53. Park MJ, **Brindis CD,** Irwin CE, Jr. Health care policy for adolescents and young adults. In: Crockett LJ, Carlo G, Schulenburg JE, eds. APA Handbook of Adolescent and Young Adult Development. American Psychological Association; 2022.

54. **Brindis CD**, Gutmann-Gonzalez A, Decker MJ. Teenage pregnancy: Trends, predictors, prevention efforts, and future directions, Encyclopedia of Child and Adolescent Health (First Edition), Elsevier Press, Volume 1. Pages 973-987, 2023. https://www.sciencedirect.com/science/article/pii/B9780128188729000194; ISBN 9780128188736, https://doi.org/10.1016/B978-0-12-818872-9.00019-4. (https://www.sciencedirect.com/science/article/pii/B9780128188729000194


**OTHER PUBLICATIONS**

1. Manley-Forbes A, Hatcher R, **Brindis CD**.  A one-year experience with a family planning pediatric clinic.  Advances in Family Planning. 1974

2. **Brindis CD**.  Parental notification regulations: Issues and outlooks.  Research Highlights, Institute for Health Policy Studies, University of California, San Francisco, 1(2), 1983.

3. **Brindis CD**.  Demographic trends affecting California family planning providers. Reproductive Health Information Center Newsletter. 1985.

Prepared: July 2, 2025

4. Tereszkiewicz L, **Brindis CD**.  School-based clinics offer health care to teens, youth.  Law News, Journal of the National Center for Youth Law, 7(5):1-3. 1986.

5. **Brindis CD**.  School-Based comprehensive health services – an innovative approach to reaching high risk youth.  Reproductive Health Resources, 4(1):4-9. 1986.

6. **Brindis CD**. Evaluating school-based clinic programs.  Clinic News, IV(2):4-8. 1988

7. **Brindis CD**, Korenbrot C.  A study of the cost implications resulting from the elimination of the Cali-fornia Office of Family Planning.  California Policy Seminar Research Report (published by the California Policy Seminar, a joint University of California/State Government Program), University of California, Berkeley. 1989

8. Irwin CE, Jr, **Brindis CD**, Brodt S, Bennett T, Rodriguez R: The Health of America's Youth: Current Trends in Adolescent Health Status and Utilization of Health Services, Maternal and Child Health Bureau, Health Resources and Services Administration, Public Health Service, U.S. Department of Health and Human Services, Rockville, MD. 1991

9. **Brindis CD**, Reyes P, Stanionis M, Uslan B, Powell A.  The impact of the California Of-fice of Family Planning budget cuts: A clinic based study.  California Policy Seminar research report (published by the California Policy Seminar, a joint University of California/ State Government Program), University of California, Berkeley. 1991

10. Bruner C, Bell K, **Brindis CD**, Chang H, Scarbrough W. Charting a course: Assessing a community's strengths and needs. Resource Brief, National Center for Service Integration. New York: Columbia University, NCSI Information Clearinghouse, National Center for Children in Poverty. 1993

11. **Brindis CD**.  Adolescent health and health care reform.  PSAY Network, 2(1). 1994

12. **Brindis CD**, Park MJ, Valderrama TL, Lee CM, Margolis R, Kolbe LJ, Achrekar AP, Hannan C, Anglin TM. Improving the Health of Adolescents & Young Adults: A Guide for States and Communities. Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Division of Adolescent and School Health; Health Resources and Services Administration, Maternal and Child Health Bureau, Office of Adolescent Health; National Adolescent Health Information Center, University of California, San Francisco, Atlanta, GA. (http://nahic.ucsf.edu). 1994

13. Blachman L, **Brindis CD**.  Finding common ground.  The Clearinghouse for Drug Exposed Children Newsletter, published by the Clearinghouse for Drug Exposed Children, Division of Be-havioral and Developmental Pediatrics, University of California, San Francisco. 1994

14. Irwin CE, Jr., **Brindis CD**, Holt KA, Langlykke K (eds.):  Health care reform: Opportunities for improving adolescent health. Washington, DC: National Center for Education in Maternal and Child Health. 1994

15. **Brindis CD**. Promoting Adolescent Health: Policy Recommendations for Health Care Reform. Testimony, Working Seminar on Adolescent Health and Health Care Reform, Washington, DC. 1994

16. Perino JP, **Brindis CD**. Payment for Services Rendered: Expanding the Revenue Base of School-Based Clinics. A Report on Existing and Potential Funding Sources. Center for Reproductive Health Policy Research, Institute for Health Policy Studies, University of California, San Francisco. 1994

Prepared: July 2, 2025

17. **Brindis CD**, Korenbrot CC.  The Cost Effectiveness of Office of Family Planning Expenditures for Contraceptive Services in the State of California.  Center for Reproductive Health Policy Research, Institute for Health Policy Studies, University of California, San Francisco. 1995

18. **Brindis CD**, Card JJ, Niego S, Peterson J. Assessing Your Community's Needs and Assets: A Collaborative Approach to Adolescent Pregnancy Prevention. Los Altos, CA: Sociometrics Corp. 1996

19. **Brindis CD**, Peterson S.  Effective strategies to reduce teenage pregnancy.  Maternal and Child Health Resources, published by Education Programs Associates, Inc., Campbell, CA 2(2). 1996

20. **Brindis CD**, Wunsch B. Finding Common Ground: Developing Linkages between School-Linked and School-Based Health Services with Managed Care. A Report on the Evaluation of the Foundation Consortium Initiative to Integrate School-Linked and School-Based Health Services with Managed Care. Submitted to the Foundation Consortium for School-Linked Services, Sacramento, CA. 1996

21. **Brindis CD**.  Book review of The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families (SS Brown & L Eisenberg, National Academy Press, Washington, DC) Family Life Educator. 1996

22. Kahn J, **Brindis CD**, Glei D.  Pregnancies and pregnancy consequences averted by use of contraceptives.  PSAY Network newsletter, 5(3):1-2. 1997

23. Ozer E, **Brindis CD**, Millstein SG, Knopf DK, Irwin CE, Jr. America's Adolescents: Are They Healthy?  San Francisco, CA: University of California, San Francisco. National Adolescent Health Information Center. (http://nahic.ucsf.edu/). 1997

24. **Brindis CD**. Teen pregnancy and immigrant youth. Paper prepared for National Research Council, Commission on Behavioral and Social Sciences and Education, and the Institute of Medicine, Board on Children, Youth, and Families. 1997

25. **Brindis CD**, Moore G.  Developing an assets-based partnership agenda: Lessons learned in the San Francisco School Volunteers' Allies for Education program.  Evaluation report. Submitted to San Francisco School Volunteers. 1997

26. **Brindis CD**, Peterson SA, Brown S.  Complex terrain: Charting a course of action to pre-vent adolescent pregnancy – an analysis of California's policy landscape.  Report commis-sioned by The California Wellness Foundation, Woodland Hills, California. 1997

27. **Brindis CD**, Berkowitz G, Clayson Z, Peacock E.  Evaluating the effectiveness of the Irvine Founda-tion's women's health collaborative: Baseline evaluation findings.  Submitted to the Irvine Foun-dation, March 1996.  Second year findings. 1997

28. Feldman RL, **Brindis CD**.  Healthy Schools, Healthy Communities National Evaluation Final Report: An Evaluation of the First Full Year of Operations for School-Based Health Centers in Elementary, Middle and High Schools Across the Nation.  Report submitted to the Bureau of Primary Health Care, Health Resources and Services Administration, Contract No. 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, Deliverable No. 17.  The Lewin Group, Inc., and the Institute for Health Policy Studies, UCSF. 1997

29. **Brindis CD**, Harder P, Clayson Z, Kim S.  Serving San Francis-co's communities: The San Francisco Children's Fund evaluation.  Final report to the Mayor's Of-fice of Children, Youth

and Their Families, submitted in conjunction with Harder Company Community Research. 1997

30. **Brindis CD**, Ozer EM, Handley M, Knopf DK, Millstein SG, Irwin CE, Jr.: Improving Adolescent Health: An Analysis and Synthesis of Health Policy Recommendations, Full Report and Report Summary. San Francisco, CA: University of California, San Francisco, National Adolescent Health Information Center. (http://nahic.ucsf.edu/index.php/publications/article/improving_adolescent_health). 1997

31. **Brindis CD**.  Book review of Risking the Future: Adolescent Sexuality, Pregnancy, and Childbearing (Volumes 1 and 2), Family Life Educator, 6(1):20-21. 1997

32. **Brindis CD**, Mamo L, Wilcox N, McCarter V, Peterson S, Sanghvi R.  Peer Providers of Reproductive Health Services Evaluation: Year Two Annual Report, October 1, 1996–September 30, 1997.  Re-port submitted to the California Family Health Council and The California Wellness Foundation. 1997

33. **Brindis CD**.  Managed care and school health.  An interview with Claire D. Brindis, Dr.P.H.  School Health Alert (Supplement).  P.O. Box 150127, Nashville, TN, 37215. 1998

34. **Brindis CD**.  Advancing the adolescent reproductive health policy agenda: Issues for the coming decade.  Paper prepared for Health Futures II Meeting, convened by Maternal and Child Health Bureau, U.S. Department of Health and Human Services. 1998

35. **Brindis CD**, Davis L.  Communities Responding to the Challenge of Adolescent Pregnancy Prevention.  A five-part monograph series: 1. Mobilizing for Action 2. Building Strong Foundations, Ensuring the Future 3. Designing Effective Family Life Education Programs 4. Improving Contraceptive Access for Teens 5. Linking Pregnancy Prevention to Youth Development.  Advocates for Youth.Washington, DC. http://www.advocatesforyouth.org/index.php. 1998

36. Rinehart P, Borowsky I, Stolz A, Latts E, Cart CU, **Brindis CD**.  Youth violence: Lessons from the experts.  Minneapolis, MN: Division of General Pediatrics and Adolescent Health, Department of Pediatrics, University of Minnesota. 1998

37. **Brindis CD**. Adolescent transitions: Risk-taking and health. No. 5 in series of monographs, Growing Up Well: Focus on Prevention, published by California Center for Health Improvement, Sacramento, California. 1998

38. Ozer E, **Brindis CD**, Millstein SG, Knopf DK, Irwin CE, Jr.: America's Adolescents: Are They Healthy? San Francisco, CA: University of California, San Francisco, National Adolescent Health Information Center. (http://nahic.ucsf.edu/). 1998

39. Irwin, CE Jr, **Brindis CD**, Millstein SG, Ozer EM, Knopf D, Park J, Burg S. Assuring the Health of Adolescents in Managed Care. (http://nahic.ucsf.edu). 1998

40. **Brindis CD**. Teaching teens about contraception: An interview with Claire Brindis.  Family Life Matters, No. 37. Published by the Network for Family Life Education, Rutgers, The State University, Piscataway, NJ. 1999

41. **Brindis CD**, Tye S, Weltzien E, Kramer J, Swann D.  The TeenSMART Program Evaluation Final Report.  Submitted to the Office of Family Planning, California Department of Health Services. 1999

42. **Brindis CD**, Cagampang H.  An Evaluation of the California Community Challenge Grants Program.  Submitted to the State Office of Community Challenge Grants. 1999

Prepared: July 2, 2025

43. **Brindis CD**, VanLandeghem K, Kirkpatrick R, Macdonald T, Lee S.  Adolescents and the State Children's Health Insurance Program (CHIP): Healthy options for meeting the needs of adolescents.  Association of Maternal and Child Health Programs, Washington, DC and University of California, San Francisco, Policy Information and Analysis Center for Middle Childhood and Adolescence, and the National Adolescent Health Information Center, San Francisco. (http://nahic.ucsf.edu/). 1999

44. **Brindis CD**, Berkowitz G, Peacock E, Clayson Z.  Expanding the Sphere of Influence of Women Leaders: Summary Report of the Women's Health Initiative.  Submitted to the James Irvine Foundation. 1999

45. **Brindis CD**, Clayson Z.  The San Francisco Foundation Lifeline Initiative: Final Evaluation Summary Report.  Submitted to the San Francisco Foundation. 1999

46. Cagampang H, **Brindis CD**.  Including Youth in the Health Picture: From Volunteering to Careers in Health.  Prepared for the William K. Kellogg Foundation. 2000

47. **Brindis CD**, Cagampang H, Biggs A, McCarter V.  Report of the Evaluation Enhancement: The Community Challenge Grant Program.  Prepared for the U.S. DHHS, Office of the Assistant Secretary for Planning and Evaluation, Grant 98ASPE296A. 2000

48. **Brindis CD**, Pagliaro S, Davis L. Protection as Prevention: Contraception for Sexually Active Teens.  Washington, DC: National Campaign to Prevent Teen Pregnancy. 2000

49. **Brindis CD**, Peterson S, Wilcox N. A Clinic for Teens by Teens: The Peer Provider Model. Los Angeles: California Family Health Council, Inc. 2000

50. **Brindis CD**, Darney P.  An Evaluation of California's Family Planning Access, Care, and Treatment Program.  Submitted to the Office of Family Planning, California Department of Health Services. 2000

51. Schlitt J, Santelli J, Juszczak L, **Brindis CD**, Nystrom R, Klein J, Kaplan D, Seibou MD. Creating access to care: School-based health center census 1998-99.  Washington, DC: National Assembly on School-Based Health Care. 2000

52. Millstein SG, Ozer EJ, Ozer EM, **Brindis CD**, Knopf DK, Irwin CE, Jr.  Research Priorities In Adolescent Health: An Analysis And Synthesis Of Research Recommendations.  San Francisco, CA: University of California, San Francisco, National Adolescent Health Information Center. (http://nahic.ucsf.edu/). 2000

53. Park MJ, Macdonald TM, Ozer EM, Burg SJ, Millstein SG, **Brindis CD**, Irwin CE, Jr. Investing in Clinical Preventative Health Services for Adolescents. San Francisco, CA: University of California, San Francisco, Policy Information and Analysis Center for Middle Childhood and Adolescence & National Adolescent Health Information Center. (http://nahic.ucsf.edu). 2001

54. **Brindis CD**, Oliva G, Cagampang, H. Bridging the Gap: Next Steps in Developing and Using Indicators to Improve Adolescent Health. University of California, San Francisco. (http://nahic.ucsf.edu/index.php/data/article/measuring_the_positives_review_of_positive_indicators_and_guidelines/. 2001

55. Cagampang H, **Brindis CD**, Oliva. Assessing the 'Multiple Processes' of Adolescent Health: Youth Development Approaches. University of California, San Francisco. (http://nahic.ucsf.edu/index.php/data/article/measuring_the_positives_review of_positive_indicators_and_guidelines/. 2001

Prepared: July 2, 2025

56. Oliva G, **Brindis CD**, Cagampang.  Developing a Conceptual Model to Select Indicators for the Assessment of Adolescent Health and Well-Being. University of California, San Francisco. (http://nahic.ucsf.edu/index.php/data/article/measuring_the_positives_review_of_positive_indicators_and_guidelines/). 2001

57. **Brindis CD**, Cagampang H, Oliva G, Beyond Indicators: From Risk Assessment to Practical Strategies for Promoting Adolescent Health and Well-Being. University of California, San Francisco. (http://nahic.ucsf.edu/index.php/data/article/measuring_the_positives_review_of_positive_indicators_and_guidelines/). 2001

58. Clayton SL, **Brindis CD**, Hamor JA, Raiden-Wright H, Fong C.  Investing in Adolescent Health: A Social Imperative for California's Future.  San Francisco: University of California, San Francisco, National Adolescent Health Information Center. (http://nahic.ucsf.edu/index.php/publications/article/investing_in_adolescent_health). 2001

59. **Brindis CD**, Tye S, Barenbaum M, Sanchez-Flores H, Judd S, Chand R. Young Men Moving Forward: California's Male Involvement Program, A Teen Pregnancy Prevention Program for Males.  Report prepared for the California Department of Health Services, Office of Family Planning. 2002

60. Clayton S, Lee C, Buckelew S, **Brindis CD**.  Improving Health Care Access Through Teen Oriented Outreach, San Francisco: University of California, National Adolescent Health Information Center. (http://nahic.ucsf.edu/). 2002

61. **Brindis CD**, Park J, Valderrama T, Lee C, Paul T. 2001 State Adolescent Health Coordinator Survey: Summary of Results. National Adolescent Health Information Center, UCSF, Division of Adolescent Medicine. (http://nahic.ucsf.edu/). 2002

62. Biehl MC, Park MJ, **Brindis CD**, Pantell, RH, Irwin CE, Jr.:  The Health Status of America's Middle Childhood Population.  San Francisco, CA: University of California, San Francisco, Public Policy Analysis and Education Center for Middle Childhood and Adolescent Health. 2002

63. **Brindis CD**, Biehl MC, Park MJ, Pantell RH and Irwin CE Jr. Building a Strong Foundation: Creating a Health Agenda for the Middle Childhood Years.  San Francisco, CA: University of California, San Francisco, Public Policy Analysis and Education Center for Middle Childhood and Adolescent Health. 2002

64. Cagampang H, **Brindis CD**, Geierstanger S, Berglas N, Barenbaum M. Making the Connection: How School-Community Partnerships Address Teenage Pregnancy Prevention. Statewide Evaluation Report of the California Department of Education's Teenage Pregnancy Prevention Grant Program (SB 1170/95). California Department of Education, Sacramento, California. 2002

65. Cagampang H, **Brindis CD**, Berglas N, Barenbaum M, Peterson S.  Evaluation of the State Department of Educator's Teenage Pregnancy Prevention Initiative.  Report Prepared for the Stuart Foundation, University of California, San Francisco. 2003

66. Berglas N, **Brindis CD**, Cohen J.  Adolescent Pregnancy and Childbearing in California. Prepared at the request of Senator Dede Alpert, California Research Bureau, CRB 03-007, Sacramento, California. 2003

Prepared: July 2, 2025

67. Peterson S, Soleimanpour S, **Brindis CD**. Evaluation of the Alameda County School Based Health Centers, Alameda County Health Department. Alameda, CA. 2003

68. Ozer EM, Park MJ, Paul T, **Brindis CD**, Irwin CE, Jr. America's Adolescents Are They Healthy? (Revised Edition) San Francisco, CA: University of California, San Francisco, National Adolescent Health Information Center. (http://nahic.ucsf.edu/). 2003

69. Clayton S, Haas T, Margolis R, Yamada E, **Brindis CD**. Guide to Local Adolescent Health Data Sources in California. (http://nahic.ucsf..edu). 2003

70. **Brindis CD**, Philliber S. Improving Services for Pregnant and Parenting Teens. The Prevention Researcher. Vol. 10, (3), 103-106. 2003

71. Judd, S, **Brindis, CD**, Rodriguez, K, Stern C, Reartes MD, DelCastillo E, Billings DL. The involvement of Young Men in Sexual and Reproductive Health: Towards a binational research, policy, and action agenda. In Spanish, El Involucramiento de los hombres jóvenes en la salud sexual yreproductiva-Hacia Una Agenda Binacional de Investigación, Acción y Política Pública). University of California, San Francisco, Center for Reproductive Health Research and Policy, El Colegio de Mexico, Programa de Salud Reproductiva y Sociedad, IPAS, Mexico (http://crhrp.ucsf.edu/publications/internal.html#Monographs). 2004

72. Cagampang H, **Brindis CD**. California Health Collaborative: Breast and Cervical Cancer Care Coordination and Navigation (CCAN) Program: Report of the Provider Survey. Fresno, California. 2004

73. Driscoll AK, **Brindis CD**, Biggs MA, Valderamma, LT. Priorities, Progress and Promise: A Chartbook on Latino Adolescent Reproductive Health. San Francisco, CA, University of California, San Francisco, Center for Reproductive Health Research and Policy, Department of Obstetrics, Gynecology and Reproductive Sciences. Institute for Health Policy Studies. 2004

74. **Brindis CD**, Ozer E Adams S, Park J, Lordi N, Zahnd E, Holtby S. A Health Profile of California's Adolescents: Findings from the 2001 California Health Interview Survey. (http://www.healthpolicy.ucla.edu). UCLA Center for Health Policy and Public Health Institute, Oakland, California. 2004

75. **Brindis CD**. Pregnancy Prevention Among Latina Adolescents-The Role of Social Capital and Cultural Norms: An Interview. The Prevention Researcher, 11:18-21, Resource Issue. (http://www.TPRonline.org) (Supplement). 2004

76. **Brindis CD**, Sattley D, Mamo L. From Theory to Action: Frameworks for Implementing Community-Wide Adolescent Pregnancy Prevention Strategies. The William and Flora Hewlett Foundation and the California Wellness Foundation. Bixby Center for Reproductive Health Research and Policy, Department of Obstetrics, Gynecology and Reproductive Sciences. Institute for Health Policy Studies. (http://crhrp.ucsf.edu). 2005

77. Darney PD, **Brindis CD**, et al. Final Evaluation Report of Family PACT presented to the California Department of Health Services, Office of Family Planning. 2005

78. Park J, Paul T, Irwin CE Jr, **Brindis CD**. A Health Profile of Adolescent and Young Adult Males. (http://policy.ucsf.edu/index.php/adulthood/article/the_health_status_of_young_adults_in_th e_us/). 2005

79. **Brindis CD**, Mulye TP, Park J, Irwin CE. Jr. Young People's Health Care: A National Imperative.

Prepared: July 2, 2025

(http://policy.ucsf.edu/index.php/policy/article/young_peoples_health_care_a_national_imperative/). 2006

80. **Brindis CD**, Biggs MA, Driscoll A, Faxio AB, Geierstanger S, McCarter V. Evaluation Findings from The California Wellness Foundation's Teen Pregnancy Prevention Initiative (TPPI). The California Wellness Foundation. A Joint Project of Philliber Research Associates, SRI International's Center for Education and Human Services, the University of California, San Francisco's Philip R. Lee Institute for Health Policy Studies. 2007

81. Kreger M, **Brindis CD**. Framework for Systems Change: Community Action to Fight Asthma. (CAFA) Policy Brief Prepared for The California Endowment. Philip R. Lee Institute of Health Policy Studies, University of California, San Francisco. 2007

82. Kreger M, **Brindis CD**. Framework for Systems Change: Working Toward Sustainability. Community Action to Fight Asthma. (CAFA). Issue Brief. An Initiative of The California Endowment. http://www.calasthma.org. 2008

83. Gardner A, Geierstanger S, **Brindis CD**, McConnel C, Newell B, Martin-Mollard M, Funk J. Clinic Consortia Policy and Advocacy Program. Evaluation Executive Summary, 2004-2006. A Program of The California Endowment. Prepared by University of California, San Francisco. 2008

84. Gardner A, Geierstanger S, McConnel C, **Brindis CD**. Issue Brief: Achieving Clinic Financial Stability: Follow the Money. Clinic Consortia Policy and Advocacy Program. Evaluation Executive Summary, 2004-2006. A Program of The California Endowment. Prepared by University of California, San Francisco. 2008

85. Gardner A, Geierstanger S, McConnel C, Newell B, **Brindis CD**. Issue Brief: Media Advocacy Evaluation Findings. Clinic Consortia Policy and Advocacy Program. Evaluation Executive Summary, 2004-2006. A Program of The California Endowment. Prepared by University of California, San Francisco. 2008

86. Gardner A,Geierstanger S, **Brindis CD**. Issue Brief: Policymaker Relationships: From Education to Partnerships. Clinic Consortia Policy and Advocacy Program. Evaluation Executive Summary, 2004-2006. A Program of The California Endowment. Prepared by University of California, San Francisco. 2008

87. Takahashi ER, Florez CJ, Biggs MA, **Brindis CD**. Teen Births in California: A Resource for Planning and Policy. Sacramento, CA: California Department of Public Health, Maternal, Child and Adolescent Health Division and the Office of Family Planning, and The University of California, San Francisco. http://www.cdph.ca.gov/programs/mcah/Documents/MO-TeenBirthsinCalifornia.pdf. 2008

88. Kreger M, Sargent K, Sabherwal S, **Brindis CD**. Issue Brief: Coalition Sustainability.  CAFA (Community Action for Fight Asthma). An Initiative of The California Endowment. Prepared by the Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco. 2009

89. Kreger M, Sargent K, Henderson P, Sabherwal S, **Brindis CD**. Issue Brief: Resident and Community Involvement in Policy Advocacy. CAFA (Community Action for Fight Asthma). An Initiative of The California Endowment. Prepared by the Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco. 2009

90. Kreger M, **Brindis CD**, Sargent K, Sabherwal S, Henderson P. Issue Brief: Developing and Maintaining Coalitions. CAFA (Community Action for Fight Asthma). An Initiative of The

Prepared: July 2, 2025

California Endowment. Prepared by the Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco. 2009

91. "Una Cuestion De Esperanza: Reduciendo los Embarazos en Adolescentes Latinas en California". UCSF Center on Social Disparities in Health and the Bixby Center for Global Reproductive Health. Produced by Ideas in Motion. http://bixbycenter.ucsf.edu/videos/video-lo-1.html. 2009

92. "Adolescent Health Data:  Youth Have It - Now What"? LEAH. Webinar available at: http://leah.mchtraining.net/teleconference.php. 2009

93. "Eliminating health disparities and achieving equity: A framework for advancing the health, safety and well-being of adolescents". Webinar available at: http://www.mchcom.com March 11, 2009.

94. "Eliminating Adolescent Health Disparities and Achieving Equity: Empowering Youth". Webinar available at http://www.mchcom.com. April 29, 2009.

95. "Promoting Health Equity in Adolescent Care: Framing the issues: Background, Research and Overview of Approaches. American Academy of Pediatrics". Webinar. July 30, 2009.

96. Austin G, **Brindis CD**, Kreger M. The Critical Connection between Student Health and Academic Achievement: How Schools and Policymakers can Achieve a Positive Impact. Brief developed jointly by WestEd and the Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco, on behalf of the California Education Supports Project. 2009

97. Lubbock LA, **Brindis CD**, Macfarland SB, Barde R, Casteneda X, Gonzalez-Figeroa E, Guendelman S, Infante-Xibille C, Munoz P, Ojeda G, Vostrejs MM. Creating a Health Research and Policy Agenda for Im/migration Between Mexico and California. The University of California, San Francisco Global Health Sciences and the Philip R. Lee Institute for Health Policy Studies. The University of California, Berkeley, Institute of Business and Economic Research, Health Initiative of the Americas and California Program on Access to Care .http://globalhealthsciences.ucsf.edu/programs/Forum.aspx. 2009

98. Teipel KD, **Brindis CD**. Improving the Health of Youth: A Guide for State-level Strategic Planning and Action. State Adolescent Health Information Center, University of Minnesota and National Adolescent Health Information Center, University of California, San Francisco. 2010. http://nahic.ucsf.edu/index.php/publications/article/improving_the_health_of_youth

99. "Health Care Reform Implementation: Opportunities to Improve Adolescent and Young Adult Health" Webinar on Adolescent and Young Adult Health in the Post Reform Era, National Institute of Health Care Management Foundation (NIHCM) August 17, 2010.

100. "Overview of Adolescent Health". AMCHP Webinar. October 29, 2010.

101. Loo VS, **Brindis CD**, Bolan GA. Providing Integrated and Teen-friendly Reproductive Health Services: How to Assess and Strengthen Your Service Interventions. http://bixbycenter.ucsf.edu/publications/. 2010

102. **Brindis CD**, Sanchez-Flores H. Tipping Point Community 2010 Grantee Perception Report. Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco. 2010

103. Migration and Health. Mexican Immigrant Women in the United States. First Edition. A Collaborative report with contributions by the National Population Council of the

Prepared: July 2, 2025

Government of Mexico (CONAPO), University of California, Berkeley School of Public Health Initiative of the Americas (ISA), University of California, Los Angeles School of Public Health, University of California, Davis and Berkeley Migration and Health Research Center (MAHRC), University of California, San Francisco, (Bixby Center for Global Reproductive Health). 2010

104. Kreger M, Mohre G, Standish M, **Brindis CD**. Strategic Approaches to Asthma in California Schools. California School, Quarterly Publication of the California School Boards Association. Winter. 2010

105. Teipel KD, **Brindis CD**. Improving the Health of Youth: A Guide to state-Level Strategic Planning. State Adolescent Resource Center, University of Minnesota and National Adolescent Health Information and Innovation Center, University of California, San Francisco. https://portfolio.umn.edu/portfolio/262839. 2011

106. Braveman P, **Brindis CD**, Biggs A, Marchi K, Minnis A, Ralph L, Arons A. Latina Voices: Findings from a Study of Latina Teen Childbearing in the Fresno and Los Angeles Areas. Funded by the Maternal, Child and Adolescent Health Program and Office of Family Planning of the California Department of Public Health's Center for Family Health. http://bixbycenter.ucsf.edu/publications/files/Latina_Teen_Childbearing_March_2011 2011

107. Darney P, **Brindis CD**, Thiel de Bocanegra H, Policar MS, et al.  Bixby Center for Global Reproductive Health. University of California, San Francisco. Family PACT Program Report, FY 2009-10. Sacramento, CA. http://bixbycenter.ucsf.edu/publications/files/FPACT_ProgramReport_09-10.pdf. 2011

108. "From HP 2010 to HP 2020: Building a Bridge for Advancing an Adolescent Health Agenda." Framing Adolescent and Young Adult Health through Healthy People 2020. California Adolescent Health Collaborative. Webinar presented December 13, 2011.

109. **Brindis CD**, Combellick S. "California Schools Make Uneven Progress on Improving Sex Education". Bixby Center for Global Reproductive Health, UCSF. Commissioned by the American Civil Liberties Union of Northern California (ACLU) http://www.aclunc.org/docs/reproductiverights/uneven progress full report.pdf . 2011

110. Eds: Austin G, **Brindis CD**. Student Health is Vital to Academic Results. Being Well. Learning Well. California Health Students Research Project.http://www.childrennow.org/index.php/learn/beingwelllearningwell. 2012

111. "A Public Health Success: California's Adolescent Pregnancy Prevention Story". Webinar presented August. 1, 2012. University of California, Davis, in conjunction with CALPACT, a public health training center.

112. Kreger M, Goldstein S, **Brindis CD**. Supporting student health and academic achievement through innovative programs and funding models. Being Well. Learning Well. California Healthy Students Research Project. http://www.childrennow.org/index.php/learn/beingwelllearningwell. 2012

113. Combellick SL, Ralph LJ, **Brindis CD**. Financing Health Care Services at Mount Sinai Adolescent Health Center: Overview of Findings from 2010. San Francisco, CA: Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco; and New York, NY: ICF International, November 2012

114. Tebb K, **Brindis CD**, Giordano A, Combelick S, Bausch S, Diaz A.A Shifting Health Landscape for Adolescents and Young Adults: Planning for the Implementation of Federal

Prepared: July 2, 2025

Health Care Reform in New York. Philip R. Lee Institute for Health Policy Studies and Division of Adolescent Medicine, Department of Pediatrics, University of California, San Francisco. 2012

115. Darney P, **Brindis CD**, Thiel de Bocangera H, Policar MS, et al.  Bixby Center for Global Reproductive Health. University of California, San Francisco. Family PACT Program Report, FY 2011-12. Sacramento, CA. http://bixbycenter.ucsf.edu/publications/files/FPACT_ProgramReport_11-12.pdf. 2013

116. Hughes D, **Brindis CD**. "Athena Breast Health Network: A Model for UC Collaborations." UCSF Philip R. Lee Institute of Health Policy Studies, with assistance from the UC Berkeley School of Public Health, funded by the UC Office of the President. 2013

117. Darney P, Thiel de Bocangera H, **Brindis CD**, Rodrigues, MD, et al.  The Impact of Title X on Publicly Funded Family Planning Services in California: Access and Quality. Bixby Center for Global Reproductive Health. University of California, San Francisco. Sacramento, CA. 2014

118. Tebb KP, Sedlander E, Pica G, Diaz A, Peake K, **Brindis CD**. Protecting Adolescent Confidentiality Under Health Care Reform: The Special Case Regarding Explanation of Benefits (EOBs): Philip R. Lee Institute for Health Policy Studies and Division of Adolescent and Young Adult Medicine, Department of Pediatrics, University of California, San Francisco; June 2014.

119. **Brindis CD**, Hadler MW, Jacobs K, Lucia L, Pouret N, Raymond-Flesch M, Siemons R, Talamantes E. Realizing the Dream for Californians Eligible for Deferred Action for Childhood Arrivals (DACA): Health Needs and Access to Health Care. UC Berkeley Labor Center, UCLA Center for Health Policy Research and UCSF PRL-Institute for Health Policy Studies. March 2014.

120. Daniel S, Malvin J, Jasik CB, **Brindis CD**. Sensitive Health Care Services in the Era of Electronic Health Records: Challenges and Opportunities in Protecting Confidentiality for Adolescents and Young Adults. Philip R. Lee Institute for Health Policy Studies and Division of Adolescent and Young Adult Medicine, Department of Pediatrics, University of California, San Francisco. September 2014. Available at http://bit.ly/ElectronicHealthRecord-Brief. 2014

121. Biggs MA, Daniel S, Lewis S, Chow J, Malvin J, **Brindis CD**. Findings from the 2012 Family PACT Client Exit Interviews. San Francisco, CA: Bixby Center for Global Reproductive Health, University of California, San Francisco, CA. 2014

122. Pourat N, Hadler MW, Dixon B, **Brindis CD**. One-Stop Shopping: Efforts to Integrate Physical and Behavioral Health Care in Five California Community Health Centers. UCLA Center for Health Policy Research, January 25, 2015. http://healthpolicy.ucla.edu/publications/search/pages/detail.aspx?pubID=1364. 2015

123. Malvin J, Daniel S, **Brindis CD**. California's Confidential Health Information Act (SB 138): Implementation Readiness Among Health Insurers and Health Plans. Funded by the CA Wellness Foundation. Feb. 2015. http://bit.ly/PRL-IHPS-SB138Brief. 2015

124. Lefkowitz B, Cacari-Stone L, (**Brindis CD** participant) Social Determinants of Migrant Health. Conference Report. Issued by the Culture of Health Equity Network. http://cultureofhealthequity.org/our-work/social-determinants-of-migrant-health/. 2015

Prepared: July 2, 2025

125. **Brindis CD**, Viruell-Fuentes E, Goldman Rosas L, Sanchez-Vaznaugh, E. Social Determinants of Migrant Health. Call to Action. Issued by the Culture of Health Equity. http://cultureofhealthequity.org/wp-content/uploads/2015/04/Conference-on-Social-Determinants-of-Health-Call-to-Action-Final-0415.pdf. 2015

126. Cortez R, Decker M, **Brindis CD**, Yarger J, Quinlan-Davidson M. Socioeconomic differences in adolescent sexual and reproductive health: sexually transmitted infections. Health, nutrition and population global practice knowledge brief. Washington, DC; World Bank Group. http://documents.worldbank.org/curated/en/2015/01/23916612/socioeconomic-differences-adolescent-sexual-reproductive-health-sexually-transmitted-infections. 2015

127. Cortez R. **Brindis CD**, Decker M, Yarger J. Socioeconomic differences in adolescent sexual and reproductive health: sources of family planning. Health, nutrition and population global practice knowledge brief. Washington, DC; World Bank Group. http://documents.worldbank.org/curated/en/2015/01/23917202/socioeconomic-differences-adolescent-sexual-reproductive-health-sources-family-planning. 2015

128. Yarger J, Decker M, **Brindis CD**, Cortez R, Quinlan-Davidson M. Socioeconomic differences in adolescent sexual and reproductive health: family planning. Health, nutrition, and population global practice knowledge brief. Washington, DC: World Bank Group. http://documents.worldbank.org/curated/en/2015/01/23915740/socioeconomic-differences-adolescent-sexual-reproductive-health-family-planning. 2015

129. Raymond-Flesch M, Lucia L, Jacobs K,  **Brindis CD**. Lessons from the Medi-Cal Expansion Frontlines: Supporting County Eligibility Workers and Certified Enrollment Counselors to Achieve "No Wrong Door." UCSF Philip R. Lee Institute for Health Policy Studies and UC Berkeley Center for Labor Research and Education. October 2015. http://laborcenter.berkeley.edu/medi-cal-frontlines.pdf

130. Yarger J, Daniel S, Biggs MA, Malvin J, **Brindis CD**. Family PACT Providers and Health Care Reform Implementation, San Francisco, CA: Bixby Center for Global Reproductive Health, University of California, San Francisco http://www.familypact.org/Research/reports/10-29-15HealthCareReformImplementationReport.pdf. 2015

131. Twietmeyer, L, **Brindis, CD**, Adams, S, Park, MJ. Assuring Adolescent and Young Adult Access to Health Insurance and Preventive Health Care Visits: A Compendium of State and Local Strategies. University of California, San Francisco. Available at: http://nahic.ucsf.edu/resource_center/compendium/. 2016

132. **Brindis CD**. CDC Grand Rounds: Adolescence: Preparing for Lifelong Health and Wellness. Centers for Disease Control, MMWR, August 17, 2016.

133. **Brindis CD** & Participants. University of Ottawa. The Ottawa Process International Task Force: Building Health Systems and Health Equity for Populations Affected by Migration. "Health Equity Impact Assessment." Ottawa, Canada. May 16-17, 2016.

134. Tebb KP, Pica G, Diaz A, **Brindis CD**. Adolescent and Health Professional Perspectives on the Medical Home: Improving Health Care Access and Utilization Under the Affordable Care Act. Philip R. Lee Institute for Health Policy Studies and Division of Adolescent and Young

Prepared: July 2, 2025

Adult Medicine, Department of Pediatrics, University of California, San Francisco; July 2016. http://nahic.ucsf.edu/wp-content/uploads/2016/07/Adolescent-Medical-Home-Policy-Brief-July-2016.pdf

135. Yarger J, Mazur A, Lara D, **Brindis CD**. Center for Global Surgical Studies SWOT Analysis Report. Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco. April 2016.

136. The Campaign for Better Care: Summary Evaluation Findings: **Brindis CD**, Hughes D. (Philip R. Lee Institute for Health Policy Studies) published by The Atlantic Philanthropies. September 7, 2016

137. Hughes D, **Brindis CD**, Pettis J. "Talking is Teaching Campaign at UCSF Benioff Children's Hospital Oakland. Too Small to Fail." Funded by the Clinton Foundation and The Opportunity Institute. July 2016

138. Tebb KP, Pica G, Twietmeyer L, Diaz K, **Brindis CD**. Addressing Social Determinants of Health Among Adolescents and Young Adults: Strategies from the Field. Philip R. Lee Institute for Health Policy Studies and Division of Adolescent and Young Adult Medicine, Department of Pediatrics, University of California, San Francisco. July, 2017. https://healthpolicy.ucsf.edu/addressing-social-determinants-of-health-strategies

139. Yamamoto K, Lowenstein K, **Brindis CD**. "Federal Policy in 2017: What Faculty Should Know and What They Can Do." University of California, San Francisco Academic Senate Division Meeting, May 11, 2017 https://senate.ucsf.edu/division-meeting;

140. Gardner A, **Brindis CD**. Assessing Your Advocacy and Policy Change Activities - Knowing What Works and What Doesn't. Northwest Regional Primary Care Association Fall Primary Care Conference. Seattle, Washington. October 23, 2017.

141. **Brindis CD**, Gardner A.  Evaluating Activism, Creating a Legacy for Change. Handa Center for Human Rights and International Justice Event. Stanford University. Palo Alto, CA. October 31, 2017. https://www.youtube.com/watch?v=gVPBjZ938mI

142. **Brindis CD**.  More Access to Health Care:  Opportunities for Leadership in Value, Quality and Equity.  Journal of the San Francisco Marin Medical Society. March, 91(2). 2018

143. Schapiro NA, Soleimanpour S, **Brindis CD**.  Reaching Out to Youth about Trauma: Adolescent Rapid Screening Validation Pilot. Platform Abstracts. Journal of Adolescent Health 62:S1–S19. 2018

144. **Brindis CD**, Decker M, Gutman-Gonzalez A, Lanshaw N, Corsack C. Advancing Health Equity and Justice in California: A Landscape Analysis. Submitted to Hispanics in Philanthropy. https://hiponline.org/wp-content/uploads/2018/11/HIP-Taking-a-Pulse_web.pdf. July, 2018

145. Po J, **Brindis CD**, Adams S, Teipel K, Park MJ, & Sieving R. Improving Young Adult Health: State & Local Strategies for Success. San Francisco, CA: National Adolescent and Young

Prepared: July 2, 2025

Adult Health Information Center, University of California, San Francisco; 2020. Available at: https://nahic.ucsf.edu/resource_center/ya-strategies/

146. **Brindis CD**, Mohsen M, Kahn, JG, Schmidt, L, et. al "Rapid Assessment of Pandemic Indirect Impacts and Mitigating Interventions for Decision-making" (RAPID), Final Report Submitted to the Office of the California Surgeon General, Sacramento, Ca. March 17, 2021.

147. University of California, San Francisco; University of Minnesota. Promoting and caring for Young Adult mental health: Challenges and Opportunities for Improvement, University of California, February 2023. https://nahic.ucsf.edu/resource_center/promoting-and-caring-for-young-adult-mental-health-challenges-andopportunities-for-improvement/

148. Adams SA, Park MJ, Brindis CD, Irwin CE, Jr. Sources of Preventive Visit Data for Adolescents and Young Adults. (2023). National Adolescent and Young Adult Health Information Center; San Francisco. Available from: https://nahic.ucsf.edu/sources-of-preventive-visitdatafor-adolescents-and-young-adults

## SIGNIFICANT PUBLICATIONS

1. Amaral G, Foster D, Biggs MA, Jasik C Judd S, **Brindis CD**. Public savings from the prevention of unintended pregnancy: A cost analysis of family planning services in California. Health Services Research. Vol. 42(5) 1960-1980, 2007. http://www.hsr.org/hsr/abstract.jsp?aid=42386172996

   This paper was written collaboratively, building upon methodology that Dr. Brindis had established and developed previously to support the awarding of an 1115 Medicaid Demonstration Waiver to support subsidized family planning services for low income women and men up to 200% of poverty living in California. The analysis has been used successfully to justify federal investments in the state that have reached over a $1.5 billion dollars. Dr. Brindis helped to supervise the writing of the paper, wrote sections of the discussion, and oversaw revisions and resubmission.

2. Kreger M, Sargent K, Arons A, Standish M, **Brindis CD**. Creating an Environmental Justice Framework for Policy Change in Childhood Asthma: A Grassroots to Treetops Approach. American Journal of Public Health. 2011. Vol. 101, S1 208-216. http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2011.300188

   Dr. Brindis was Principal Investigator for the evaluation of The California Endowment's Asthma Initiative, which is the basis for this paper. Dr. Brindis contributed to the conceptual framework of the research, conducted analyses, as well as preparation of the manuscript.

3. Raymond-Flesch M, Siemons R, Pourat N, Jacobs K, **Brindis CD**. "There Is No Help Out There and If There Is, It's Really Hard to Find": A Qualitative Study of the Health Concerns and Health Care Access of Latino "DREAMers." Journal of Adolescent Health, Sept. 2014,55(3):323–328. 2014.

   This paper summarizes the first qualitative study of Deferred Action for Childhood Arrivals in the U.S. Dr. Brindis was co-investigator for this study, conceived the research design, conducted focus groups, directed the analyses, and collaborated in writing the manuscript, including overseeing revisions and resubmission.

Prepared: July 2, 2025

4. **Brindis CD**, Freund KM, Baecher-Lind L, et. al. The Risk of Remaining Silent: Addressing the Current Threats to Women's Health. Women's Health Issues. 2017 Nov - Dec; 27(6):621-624.

   This paper is an analyses of policy issues that have emerged as a threat to women's health and well-being under the Trump Administration. Dr. Brindis wrote the paper, as well as brought together a number of key leaders in women's health to discuss the myriad women's health issues at risk of being upended.

5. Adams S, Park MJ, Twietmeyer L, **Brindis CD**, Irwin CE Jr. Association between Adolesce Preventive Care and The Role of the Affordable Care Act. JAMA Pediatr,. 2018;172(1):43-48. doi:10.1001/jamapediatrics.2017.3140

   This paper is the first nation-wide analysis of the effect of the ACA on improving the content of preventive care services on adolescents over the past four years. I collaborated with my colleagues to conceptualize the hypotheses, assisted in reviewing the overall analyses of the data, and provided input into the final editorial work for submitting this paper.

## CONFERENCE ABSTRACTS   (Representative Sample)

1. Eliminating Health Disparities by Increasing Access to Family Planning Services: California's Family PACT Program. (Presented with A. Biggs, G. Amaral, DG. Foster, H.T. de Bocanegra), AcademyHealth, Orlando, FL.

2. Cost effectiveness of Chlamydia control services among family planning clients. (Presented with M.A. Biggs, D. Greene Foster, J. Chow, G. Amaral), American Public Health Association, Washington, DC.

3. Cost effectiveness of advance provision of emergency contraception. (Presented with D. Greene Foster, T. Raine L. Cao, D.P. Rostovtseva, P. Darney), American Public Health Association, Washington, DC.

4. Cost effectiveness of advance provision of emergency contraception.(Presented with T. Raine, L. Cao, D.P. Rostovtseva, P. Darney), American Public Health Association, Washington, DC.

5. Cost savings from the provision of specific methods of contraception. (Presented with D. Greene Foster, M.A. Biggs, G. Amaral, H. T. de Bocanegra, D.P. Rostovtseva, P. Darney), American Public Health Association, Washington, DC

6. Bringing teens into the family planning clinic: The importance of diverse outreach strategies.(Presented with A. Arons, L. Ralph, N. Berglas, M.A. Biggs), American Public Health Association, Washington, DC.

7. Creating youth friendly clinics: Findings from California Case studies. (Presented with L .Maddock, S. Koenemann, S. Hunter), American Public Health Association, Washington, DC.

8. Teens reaching teens: Use of peer outreach workers in family planning clinics. (Presented with N. Berglas, A. Arons, L. Ralph, M.A. Biggs), American Public Health Association, Washington, DC.

Prepared: July 2, 2025

9. Finding teens in TheirSpace: Using internet social networking sites to increase access to family planning. (Presented with S. Schwartz, L. Ralph, N. Berglas).American Public Health Association, San Diego, CA.

10. Teen Births Up, but We're Not Down: Why Age Matters When It Comes to Contraception. (Presented with S. Koenemann), American Public Health Association, San Diego, CA.

11. Pregnancy intendedness and decision-making among young Latinas: Findings from a qualitative study. (Presented with S. Schwartz, L. Ralph, M .A. Biggs, A. Arons), American Public Health Association, San Diego, CA.

12. Accidents Do Happen: Emergency Contraceptives, Teen Contraceptive Use and Knowledge of Reproductive Health Services. (Presented with L. Maddock, S. Koenemann, J. Malvin), American Public Health Association, San Diego, CA

13. Preventing Latina teen pregnancy: The important role of parents. (Presented with L. Ralph, M.A. Biggs, S. Schwartz, A. Arons, A. Minnis, K. Marchi), American Public Health Association, San Diego, CA.

14. A Coalition of School Based Health Centers and Key Evaluation Findings. (Presented with S. Geierstanger, S. Soleimanpour, A. Faxio), American Public Health Association, San Diego, CA.

15. Burden of Asthma on Schools. (Presented with M. Kreger, D. Hughes, K. Sargent, S. Sabherwal, A. Robles, M. Standish), American Public Health Association, San Diego, CA.

16. Evaluating a Movement: Using Systems Change Outcomes. (Presented with M. Kreger, D. Hughes, S. Sabherwal, K. Sargent, A. Robles, M. Standish), American Public Health Association, San Diego, CA.

17. They'll Use it if it's Free: Contraceptive Choices Among Uninsured low-Income Women. (Presented with D. Rostovtseva, M.A. Biggs, S. Holtby, C. McCain, C. Lewis, H. Thiel de Bocanegra, D.G. Foster, American Public Health Association, Philadelphia, PA.

18. Understanding Teens and the "Digital Divide: Can We Reach Low-Income Youth Online with Health Information? (Poster session with N. Berglas, S. Schwartz, L. Ralph), American Public Health Association, Philadelphia, PA.

19. Improving Attendance and Achievement by Improving Air Quality. (Poster session with M. Kreger, S. Sabherwal, K. Sargent, J. Nielsen, A. Robles, M. Standish), American Public Health Association, Philadelphia, PA.

20. He Was so Happy, So I Was Happy Too: Male Partner Influences on Latina Teen Childbearing Decisions. (Presented with S. Schwartz, L Ralph, M.A. Biggs) American Public Health Association, Philadelphia, PA.

21. Youth Friendliness: How Do Family Planning Clinics Measure Up? (Presented with N. Berglas, M.A. Biggs, S. Navarro), American Public Health Association, Philadelphia, PA.

22. Translating Research to Impact Public Policy: California's Experience with Parental Involvement Legislation for Minor's Abortion in the 2005, 2006, and 2008 Elections. (Presented with L. Ralph), American Public Health Association, Philadelphia, PA

23. Evaluating Policy Advocacy: Employing Systems Change Outcomes. (Presented with M. Kreger, D. Hughes, S. Sabherwal, K. Sargent, A. Robles, M. Standish), American Public Health Association, Philadelphia, PA

Prepared: July 2, 2025

24. Discussing Intrauterine Contraception at the Family Planning Visit: A Missed Opportunity for Client Education. (Presented with S. Schwartz, M.A. Biggs, S. Holtby, C. McCain, D. Rostovtseva), American Public Health Association, Philadelphia, PA.

25. Unplanned Pregnancies Among Young Adult Latinas: The Influence of Partners, Fertility Concerns, and Individual Aspirations. (Presented with L. Ralph, S. Schwartz, M.A. Biggs) American Public Health Association, Philadelphia, PA.

26. Approaches to Evaluating Advocacy and Policy Change: An International Comparison. (Presented with J. Kaye, A. Jackson, M. Billera, A. Gardner, L. Nascimento, S. Geierstanger), American Evaluation Association, Orlando, FL.

27. How Traditional Evaluation Thinking and Frameworks Can Be Adapted for Advocacy/Policy Evaluation. (Presented with J. Kaye, S. Ladd, D. Dunet, E. Chappelle, L. Gase, M. Kreger, S. Sabherwal, K. Sargent, A. Robles, M. Jhawar, M. Standish, American Evaluation Association, Orlando, FL.

28. Clinica Alta Vista: Providing an Integrated Model of Prenatal Care for Latina Adolescents and Their Families. (Poster presented with S. Soleimanpour, S. Ng, V. McCarter.) AFL Annual Conference, Oakland, CA.

29. Does Experience Matter? Quality of Reproductive Health Care Provided to Latino Adolescents (Poster co-authored with: LA Botkin, SA Fishkin, C.D. Brindis, E. Ozer, C. Kapphahn). Society for Adolescent Medicine Annual Meeting. Toronto, CANADA.

30. Traditional versus Centering: Which model of care leads to improved outcomes for Latina pregnant and parenting teens and their infants? (poster co-authored with S. Soleimanpour, S. Ng, V. McCarter) American Public Health Association Annual Meeting. Denver, CO.

31. Burden of Asthma on California Schools: Losses in Student Attendance, Achievement, and Revenue. (presented with M. Kreger, A. Arons, K. O'Brien, M. Standish) American Public Health Association Annual Meeting. Denver, CO.

32. Evaluating Policy Advocacy: Lessons from an Environmental Policy Initiative in California. (presented with M. Kreger, A. Arons, M. Standish) American Public Health Association Annual Meeting. Denver, CO.

33. It takes a community: CBOs and family planning providers collaborate to increase access to reproductive health services for low-income populations. (Poster co-authored with S. Schwartz, N. Berglas) American Public Health Association Annual Meeting. Denver, CO.

34. Can you get pregnant when you're on your period? Negotiating Sex Education: Questions & Misinformation"(presented with E. Villasenor, S. Kaller) American Public Health Association Annual Meeting. Denver, CO.

35. Pushing the Envelope beyond the pill and condoms: Teen Knowledge and attitudes towards long acting, reversible contraceptives. (poster co-authored with L. Maddock, D. Richardson, J. Funk). American Public Health Association Annual Meeting. Denver, CO.

36. Health of young people in the United States, 1991-2008: Trends in critical national health objectives. (Presented with N. Jiang, L. Kolbe, D. Chul Seo, N. Kay) American Public Health Association Annual Meeting. Denver, CO.

37. Assessing Health Policy Change Using an Online Survey Instrument. (Presented with A. Gardner, L. Nascimento, S. Geierstanger). American Evaluation Association Annual Meeting. San Antonio, TX.

Prepared: July 2, 2025

38. Burden of Asthma on California Schools: Statewide and Local Attendance and Financial Losses and academic Achievement Analysis. Presented with M. Kreger, R. Guide, M. Bullen, M. Standish). American Public Health Association Annual Meeting. Washington, DC.

39. Advocating for Healthy Schools: Employing a Systems Change Framework to Assess Health and Education Policy Advocacy in California: Breaking Down Silos." (Presented with M. Kreger). American Public Health Association Annual Meeting. Washington, DC.

40. Client Demographics and Service Characteristics of California Title X and Non-Title X Family Planning Providers. (Presented with H. Thiel de Bocanegra, F. Maguire, M. Puffer, K J Horsley). American Public Health Association Annual Meeting. Washington, DC

41. School Based Behavioral Health Services in a Diverse, Urban Setting: Making a Difference. (Presented with S. Soleimanpour, S. Ng, V. McCarter, S. Geierstanger). American Public Health Association Annual Meeting. Washington, DC.

42. Meeting the Needs of Latino and African American Youth: School Based Behavioral Health Interventions. (Presented with S. Soleimanpour, S. Ng, V. McCarter, S. Geierstanger). American Public Health Association Annual Meeting. Washington, DC

43. Taking the Pulse: Potential for Assessing the Impact of Yoga and Mindfulness Programs on Youth. (Poster Presentation with L. Maddock, S. Geierstanger, E. Hendrick, S. Ng, N. Berdjis). American Public Health Association Annual Meeting. Washington, DC.

44. A Question of Hope ("Una Cuestion de Esperanza"). US Film Festival. (Presented with M. Antonia Biggs, K. Marchi, P. Braveman). American Public Health Association Annual Meeting. Washington, DC

45. Lessons Learned From State Departments of Insurance/> Implementation of the Age 26 Health Reform Provision." (Poster presented with Alexander Blum and Amanda Giordano). AcademyHealth Annual Research Meeting, Washington, DC.

46. One Product, Multiple Health Needs, Saving Lives: A Multidisciplinary Approach for the Prevention of Unintended Pregnancies and Sexually Transmitted Infections. (Poster presented with Bethany Young Holt) California Wellness Foundation Conference on Women's Health. Los Angeles, CA.

47. Improving Reproductive Environmental Health through EPA Policy. (Poster presented with Plumb M, Trowbridge J, Charlesworth A, Woodruff TJ). American Public Health Association Annual Meeting. San Francisco, CA

48. Intervening at a Critical Juncture: Women's Motivation to Use Intrauterine Contraception Immediately Following an Abortion. (Poster presented with Biggs MA, Levy S, Teig E, Arons A) American Public Health Association Annual Meeting. San Francisco, CA.

49. Building on Youth Assets to Improve Reproductive Health: Teen Pregnancy Prevention Programs in California. (Poster presented with Maddock L, McCarter V.) American Public Health Association Annual Meeting. San Francisco, CA

50. Uneven Progress: An Assessment of Sex Education policies and Practices in California Public Schools. (Poster presented with Combellick S.) American Public Health Association Annual Meeting. San Francisco, CA.

51. Teen Pregnancy Prevention Education in California: Adapting Curricula to Fit the Local Context. (Poster presented with Arons A Decker M, Malvin J) American Public Health Association Annual Meeting. San Francisco, CA.

Prepared: July 2, 2025

52. Free Drinking Water Access and Barriers to Improving Water Access and Intake in California Schools." (Poster presented with Patel A, Hecht K, Hampton K, Grumbach J, Chandran K, Braff-Guajardo E.) American Public Health Association Annual Meeting. San Francisco, CA.

53. Writing on the Wall: The effects of Neighborhoods on Teen Reproductive Health. (Poster presented with Isquick S, and Decker M). American Public Health Association Annual Meeting. San Francisco, CA.

54. Making Do with Less: The Impact of State Budget Cuts on California's Teen Pregnancy Prevention Programs." (Invited Panel presentation, with Yarger J and Malvin J). American Public Health Association Annual Meeting. San Francisco, CA.

55. Expanding Universal Coverage: Reproductive Health Vouchers in Cambodia  (Poster presented with Brody C, Freccero J, Bellows B).American Public Health Association Annual Meeting. San Francisco, CA.

56. Stayin' Alive and Thriving: Exploring Multiple Dimensions of SBHC Sustainability. (invited Panel presentation with Kaller S, Geierstanger S, and Brown S). American Public Health Association Annual Meeting. San Francisco, CA.

57. The Last Bottle Standing: Sports Drink and Bottled Water Access in California Public Schools. Patel A, Braff-Guajardo E, Hampton KE, Grummon A, Brindis CD. [3806.113]Annual Pediatric Academic Societies meeting, Institute of Medicine National Academies.

58. Understanding Contraceptive Use in the United States. American Public Health Association Annual Meeting; **Brindis, CD** Moderator.

59. A Qualitative Study of the Healthcare Access and Concerns of Latino Dreamers. With Raymond-Flesch M, Siemons R, Pourat N, Jacobs K, **Brindis CD**. Poster Presentation. 2014 Meeting of the Pediatric Academic Society. Vancouver, Canada. May 2014.

60. Adolescents and Young Adults Under Health Care Reform: Explanation of Benefits (EOBs) and Patient Confidentiality. Keynote Address, **Brindis CD**, AcademyHealth Child Health Services Interest Group, June 7, 2014.

61. Glass Half Full: A Comparison of Water Delivery Options to Improve Students' Water Intake in Schools. Patel A, Braff-Guajardo E, Hampton KE, Grummon A, **Brindis CD**. Poster presentation. 2014 Meeting of the Pediatric Academic Society. Vancouver, Canada. May 5, 2014.

62. Where Have All the Teens Gone? Decline in Adolescent Female Participation in California's Family Planning Program Following Cuts in Outreach Funding. Panel with Yarger J, Daniel S, Biggs MA, Malvin J, **Brindis CD**. American Public Health Association Annual Meeting, New Orleans, LA.

63. Operationalizing Resilience-Building and Life Course Planning with Pregnant and Parenting Adolescents in California. Panel with Kreger M, Tebb K, Truebridge S, **Brindis CD**. American Public Health Association Annual Meeting, New Orleans, LA.

64. Implementation of the Affordable Care Act (ACA): How Are MCH Populations Doing? Panel with Walker DK, Witgert K, **Brindis CD**, Comeau M, Peifer KL. American Public Health Association Annual Meeting, New Orleans, LA

Prepared: July 2, 2025

65. Meeting the Social-Emotional Needs of Students: Creating Alternatives to the School-to-Prison-Pipeline. Panel with Kreger M, Sargent-Cairoli K, Thrasher J, Rucker P, Redmond, C, **Brindis CD**. American Public Health Association Annual Meeting, New Orleans, LA

66. School Health Center Evaluation with a "Twist" of Quality. Panel with Shelly Kaller S, Lutsky M, **Brindis CD**. American Public Health Association Annual Meeting, New Orleans, LA.

67. Sexually Transmitted Infection Services and Adoption of Effective Contraceptive Methods. Poster Presentation with Daniel S, Biggs A, Malvin J, **Brindis CD**, Yarger J. American Public Health Association Annual Meeting, New Orleans, LA.

68. California Family Planning Providers' Challenges to Same Day Long-Acting Reversible Contraception (LARC) Provision. Poster Presentation with Biggs MA, Malvin J, **Brindis CD**, Yarger J. American Public Health Association Annual Meeting, New Orleans, LA. 2014

69. Potential Role of Family Planning in an Era of Health Care Reform: Patient Perspectives on Primary Care Needs and Insurance Eligibility. Poster Presentation with Daniel S, Biggs A, Malvin J, **Brindis CD**, Yarger J. American Public Health Association Annual Meeting, New Orleans, LA. 2014

70. Characteristics of the Undocumented Young Adults Eligible for the Deferred Action for Childhood Arrivals. Poster Presentation with Pourat N, Lucia L, Hadler M, **Brindis CD**, Jacobs K, Siemons R, Talamantes E, Raymond-Flesch M. American Public Health Association Annual Meeting, New Orleans, LA. 2014

71. Meeting Them More Than Halfway: Adolescent Perspectives on Patient-Centered Care. Poster Presentation with Uy-Smith EL, Lofink HE, Padrez R, Trudnak Fowler TE, Koenig KT, Fairbrother G, **Brindis CD**. Society for Adolescent Health and Medicine Annual Meeting, Los Angeles, CA. 2015

72. Measuring Up to the Common Core: What is Known About the Delivery of Primary Care Services in the School-Based Health Centers (SBHC). Uy-Smith EL, Grumbach K, **Brindis CD**. Society for Adolescent Health and Medicine Annual Meeting, Los Angeles, CA. 2015

73. Moving Beyond Health Care Access: Evidence-Based Practices for Young Adults. Irwin CE Jr., Lau J, Ozer E, **Brindis CD**. Workshop Session. Society for Adolescent Health and Medicine Annual Meeting, Los Angeles, CA. 2015

74. Headstand Yoga & Mindfulness School Program. Geierstanger S, Ng S, Maddock L, **Brindis CD**, Gutmann-Gonzalez A. Poster Presentation: California School Health Association Conference, San Diego, CA. 2015

75. Fulfilling the Vision: The Role of Enrollment Workers in Promoting Health Insurance Access." Raymond-Flesch M, **Brindis CD**. American Public Health Association Annual Meeting, Chicago, IL. 2015

76. Risk and Resilience Factors Associated with Frequency of School-Based Health Center Use. Soleimanpour S, **Brindis CD**. American Public Health Association Annual Meeting, Chicago, IL. 2015

77. School-Based Health Centers and Adolescents' Access to Reproductive Health Care. Soleimanpour S, Geierstanger S, Kaller S, Ng S, McCarter V, **Brindis CD**. American Public Health Association Annual Meeting, Chicago, IL. 2015

Prepared: July 2, 2025

78. Lessons from the ACA's Medicaid Expansion Front-Lines: Perspectives of Enrollment Workers. Raymond-Flesch M, **Brindis CD**. American Public Health Association Annual Meeting, Chicago, IL. 2015

79. Transforming Statewide Policy into Community-Wide Practice: School Disciplinary Policy and Health Disparities. Kreger M, Sargent-Cairoli K, **Brindis CD**. American Public Health Association Annual Meeting, Chicago, IL. 2015

80. Evaluating Consumer Engagement in Health Care: Strategies and Tactics as an Evaluation Framework. **Brindis CD**, Hughes D, Schmidt LA, Jacobs L. American Evaluation Association Annual Meeting. Chicago, IL. 2015

81. Video: A Multi-Purpose Evaluation Method? **Brindis CD**, Hughes D, Schmidt LA, Jacobs L. American Evaluation Association Annual Meeting. Chicago, IL. 2015

82. The Political Prioritization of Preterm Birth: A Policy Analysis Using a Prioritization Framework." Poster Presentation. Consortium of Universities for Global Health Annual Conference. San Francisco, CA. 2016

83. Young Adults and the Affordable Care Act. Irwin CEJr, **Brindis CD**, Ozer E, Park J, Hemlin E. Workshop: Society for Adolescent Health and Medicine Annual Meeting, Washington, DC. 2016

84. What, Me Worry? Youth Perceptions of Pregnancy and STIs. **Brindis CD**. Oral Presentation, Abstract. American Public Health Association Annual Meeting, Denver CO. 2016

85. Cultivating Clinical Connections: Opportunities and Barriers to Increasing Youth Access to Clinical Sexual Health Services in California. Decker M, Gutmann-Gonzalez, **Brindis CD**. Poster Presentation. Society for Adolescent Health and Medicine Annual Meeting, New Orleans, LA. 2017

86. Honoring Their Roots: Crating and Cultivating Positive Connections with Latino Adolescents and Young Adults. O'Brien SJ, Mondardez J, Garcia-Huidobro A, **Brindis CD**. Raymond-Flesch M. Workshop Presentation. Society for Adolescent Health and Medicine Annual Meeting, New Orleans, LA. 2017

87. Impacto Perinatal: El Embarazo de Adolescentes en Mexico y en California: Politicas Publicas y Consecuencias Programaticas. **Brindis CD**, Decker MJ, Gutmann-Gonzalez A. Instituto Nacional de Perinatologia, Mexico City, Mexcio. Reunion Anual INPer 2017: Salud Sexual y Reproductiva del Adolescente: April 4, 2017.

88. Barriers and Enablers to Care for Young Adults Churning Between Health Plans. Yarger J, Tilley L, **Brindis CD**. Oral presentation. American Public Health Association Annual Meeting, Atlanta, GA. 2017

89. Health Literacy Challenges for Young Adults Experiencing Churning Health Insurance Coverage. Tilley TL, Yarger J, **Brindis CD**. Oral presentation. American Public Health Association, Atlanta, GA. 2017

90. Use of an mHealth Application, Health-E You/ Salud iTu, to Improve Sexually Active Latina Adolescents' Contraceptive Knowledge, Self-Efficacy and Use. Tebb K, **Brindis CD**. Poster Presentation. Pediatric Academic Society (PAS) Meeting. Toronto, Canada. May 5-8, 2018.

Prepared: July 2, 2025

91. An Opportunity for Intervention: Teen Dating Violence Among California's Adolescents in Out-of-Home Settings. Rutman S, Decker M, **Brindis CD**. Oral Presentation. American Public Health Association, San Diego, CA. November 10-14, 2018.

92. Improving Capacity to Implement an Evidence-Informed Case Management Intervention for Expectant and Parenting Adolescents: Results from a Statewide Training Evaluation. Tebb K, **Brindis CD**, Pressfield L, Campa M. Poster Presentation. American Public Health Association, San Diego, CA. November 11, 2018.

93. Increasing Interest and Uptake of LARCs among Latina Adolescents using a Mobile Health Application, Health-E You/Salud iTu. Tebb K, Pollack L, Wang L, Adams SA, Sang B, Ozer E, **Brindis CD**. Oral Presentation.  Pediatric Academic Society (PAS) Meeting. Baltimore, MA. April 30, 2019.

94. The Promise of Adolescence. Level L, **Brindis CD**.  Roundtable Discussion. Society of Preventions Research Annual Meeting. San Francisco, CA. May 30, 2019.

95. Migration Roles in the Lives of Latina Youth: A Binational Comparison.  American Public Health Association, Philadelphia, PA.  November 2-6, 2019.

96. Redesigning the Ivory Tower to Address Preterm Birth through Community-Academic Partnerships. American Public Health Association, San Francisco, CA. October 24-28, 2020.

97. The Nature and Impact of Trauma on 1.5 Generation Immigrant Youth During Parental Separation and Reunification. Journal of Adolescent Health. 2012 Feb 1; 50(2):s3-s4. Schapiro SN, Kools KS, Weiss WS, **Brindis BC**.

98. Use Of Youth-Centered Mobile Health Application, Health-E You/Salud iTu, To Reduce Disparities In Contraceptive Knowledge, Access And Unintended Pregnancy Among Sexually Active Latina Adolescents. Journal of Adolescent Health. 2019 Feb 1; 64(2):s40-s41. Tebb TK, Trieu TS, Rodriguez RF, Pollack PL, Adams AS, Ricco RR, Renteria RR, Hwang HL, Ozer OE, Sandoval SD, **Brindis CD**

99. Contraceptive Communication Among Adolescents Who Use Long Acting Reversible Contraception. Journal of Adolescent Health. 2020 Feb 1; 66(2):s115-s116. Tebb TK, Schwartz SE, Rodriquez RF, Reed RR, Tancredi TD, **Brindis CD**, Dehlendorf DC.

100.   Adapting to Political Barriers in Conducting Teen Pregnancy Prevention Research: Use of Social Media as an Expedited Recruitment Strategy. Journal of Adolescent Health. 2020 Feb 1; 66(2):s115. Tebb TK, Schwarz SE, Rodriguez RF, Reed RR, Tancredi TD, Brindis CD, Dehlendorf DC.

101.   Development and Pilot Feasibility Trial of a Co-Developed Teen Pregnancy Prevention Community Program in a Midwest Rural Latino Community. Journal of Adolescent Health. 2025 Mar 1; 76(3):s63-s64. Barral BR, Miller MM, Ramirez RM, Lopez LM, Brindis BC, Miller ME, Cramer CE, Ramaswamy RM.

102.   Transcreating an Unintended Teen Pregnancy Prevention Program for Latino Teens Living in Rural Communities. Journal of Adolescent Health. 2024 Mar 1; 74(3):s59-s60. Barral BR, de Miranda dE, Ramirez RM, Miller MM, Miller ME, Ramaswamy RM, Brindis CD.

103.   In the Face of Adversity: Pandemic Mental Health Protective Factors for Adolescents Who Have Experienced Adverse Childhood Experiences. Journal of Adolescent Health.

2024 Mar 1; 74(3):s57. Raney RJ, Weinstein WS, Ganson GK, Testa TA, Jackson JD, Pantell PM, Glidden GD, Brindis CD, Nagata NJ.

## OTHER CREATIVE ACTIVITIES

1. Espinoza I, Anaya E, Ortiz R, Hernandez G, Bazeza B, Hinojosa S, **Brindis CD**, Laski L, Romero M. Manual de Capacitacion para Consejeria en Planificacion Familiar. Training manual for family planning counselors. Grupo Interinstitucional de Trabajo en Salud Reproductiva, Queretaro, Mexico and Center for Reproductive Health Policy Research, Institute for Health Policy Studies, University of California, San Francisco.

2. **Brindis CD**, Philliber S. Evaluating School Linked Services: Methods, Problems and Results. Philliber Research Associates, Accord, NY.

3. Card JJ, **Brindis CD**, Peterson J, Niego S. Evaluating Your Comprehensive Adolescent Pregnancy Pre-vention Program. (sponsored by the Centers for Disease Control and Prevention-http://www.socio.com/index.htm) Los Altos, CA: Sociometrics Corp.

4. Kent H, **Brindis CD**, Margolis R, Teipel K. Adolescent Health: A Community Perspective. Maternal and Child Health Continuing Education on DC-ROM. Rocky Mountain Public Health Education Consortium. University of Utah http://services.tacc.utah.edu/rmphec/http://services.tacc.utah.edu/rmphec/adolescent_health _outline.html

5. **Brindis CD**, Park J, Paul T. The RESOURCE Project- A Curriculum on Adolescent Health http//policy.ucsf.edu/index.php/resources/

6. A Future with Promise: A Chartbook on Latina Reproductive HealthPower Point http//crhrp.ucsf.edu

7. A Question of Hope: Reducing Latina Teen Childbearing in California. UCSF Center on Social Disparities in Health and the Bixby Center for Global Reproductive Health. Produced by Ideas in Motion. Awarded "Telly" Award, Bronze Prize. 2009. http//bixbycenter.ucsf.edu/videos/video-lo-1.html

8. Adolescent Health Data: Youth Have It - Now What? LEAH. Webinar available at:http://leah.mchtraining.net/teleconference.php

9. Eliminating Health Disparities and Achieving Equity: A Framework for Advancing the Health, Safety and Well-Being of Adolescents. Webinar available at: http://www.mchcom.com March 11, 2009

10. Eliminating Adolescent Health Disparities and Achieving Equity: Empowering Youth. Webinar available at http://www.mchcom.com. April 29, 2009.

11. Promoting Health Equity in Adolescent Care: Framing the issues: Background, Research and Overview of Approaches. American Academy of Pediatrics. Webinar. July 30, 2009

12. Health Care Reform Implementation: Opportunities to Improve Adolescent and Young Adult Health. Webinar on Adolescent and Young Adult Health in the Post Reform Era, National Institute of Health Care Management Foundation (NIHCM) August 17, 2010.

13. Overview of Adolescent Health. AMCHP Webinar. October 29, 2010

14. Health Care Reform: What's Next? Interview with Mark McClellan, MD, Brookings Institute. July 7, 2010. http://www.uctv.tv/search-details.aspx?showID=19462

Prepared: July 2, 2025

15. Scorecard on Kid's Health Care Ranks California 44th: A Commonwealth Fund survey compares the states on children's health care access and treatment." http://www.baycitizen.org/health/story/score-card-kids-health-care-ranks-44th/

16. Inside Health Reform presented with Andrew Bindman, Mark Laret and Diane Rittenhouse who look at the passage and implication of health reform. January 3, 2011(panel moderator). http://www.uctv.tv/search-details.aspx?showID=20178

17. Unplanned Pregnancies in State Reach 4 in 10. USA Today, May 19, 2011. http://yourlife.usatoday.com/parenting-family/pregnancy/story/2011

18. UCSF Health Experts Shape Historic Blueprint for Women's Health Care. Interview by Patricia Yollin, July 26, 2011. http://www.ucsf.edu/news/2011/07/10335/ucsf-health-experts-shape-historic-blueprint-womens-health-care

19. Interview regarding the Institute of Medicine Preventive Services for Women press release. KPCC, 89.3, Los Angeles. http://www.scpr.org/programs/patt-morrison/2011/07/20/19960/health-care-panel-recommends-full-coverage-of-cont

20. US Federal Government Institute of Medicine New Rules on Women's Health Coverage. Interview by Ted Goldberg, KCBS Radio, 740 AM, San Francisco, CA. August 1, 2011.

21. US Federal Government Institute of Medicine New Rules on Women's Health Coverage. Interview by Dave Blanchard, KUOW, (NPR affiliate) Seattle, WA. August 2, 2011.

22. US Federal Government Institute of Medicine New Rules on Women's Health Coverage: Claire Brindis' role in development of. Interview by Catherine Traywick for Science Today, Produced by University of California for CBS Radio Network. August 2, 2011.

23. From HP 2010 to HP 2020: Building a Bridge for Advancing an Adolescent Health Agenda. Framing Adolescent and Young Adult Health through Healthy People 2020. California Adolescent Health Collaborative. Webinar presented December 13, 2011.

24. The Toxic Truth about Sugar. UCSF interview with Robert Lustig and Laura Schmidt upon press release of Nature article http://www.youtube.com/watch?v=ffoOeW5wZ9s&feature=youtu.be&utm_source=Feburary+2012+Staff&utm_campaign=Pulse+Feb12+Staff&utm_medium=email

25. Self Magazine interview. The Toxic Truth about Sugar. 2012

26. Interview with Nana Queiroz of Correio Braziliense, February 8, 2012, RE: The Toxic Truth about Sugar: Nature article http://www.correioweb.com.br/

27. A Public Health Success: California's Adolescent Pregnancy Prevention Story. Webinar presented August. 1, 2012. University of California, Davis, in conjunction with CALPACT, a public health training center.

28. Implementing the Affordable Care Act for Adolescents and Young Adults: Practical Considerations. Webinar presented September 6, 2013. Maternal and Child Health Bureau, HRSA, Washington DC:  http://learning.mchb.hrsa.gov/archivedWebcastDetail.asp?id=344

29. Interview with the Canadian Broadcasting Corporation. June 13, 2013: RE: Women's Reproductive Health and the Cost of Providing Services.

30. Virtual Networking Meeting for State Adolescent Health Coordinators. Webinar presented December 2, 2013. Maternal and Child Health Bureau, HRSA, Washington DC. 2013

Prepared: July 2, 2025

31. KQED radio interview, July 10, local NPR affiliate station, San Francisco, CA. In response to release of report protecting Adolescent Confidentiality Under Health Care Reform: The Special Case Regarding Explanation of Benefits (EOBs). 2014

32. Adolescent Health Activities in State Title V Programs:  Data From an Environmental Scan." Webinar presented April 14, 2014. Association of Maternal and Child Health Programs

33. Testimony in Support of the American Public Health Association's Comprehensive Sex Education Policy. Written submission, November 2014

34. Successful Teen Pregnancy Prevention: Connecting Clinical Care and Community Interventions. Webinar presented April 16, 2014.  CAHC Advisory Council and ASHWG Steering Committee.

35. KPCC Southern CA Public Radio. Contribution to radio piece and website story: "Happy-health care birthday it's time to buy insurance" by Rebecca Pleven. June 10, 2015. http://www.scpr.org/blogs/health/2015/06/10/18038/happy-health-care-birthday-it-s-time-to-buy-insura/

36. Huffington Post: Quoted in: "This How Teens Have Sex, According to the CDC. Surprisingly Good News!" Author Anna Almendrala, Healthy Living Editor: July 22, 2015. http://www.huffingtonpost.com/entry/the-state-of-teen-sex_55aec49ae4b0a9b94852e702?1t027qfr

37. KPCC Southern CA Public Radio; Contribution to radio piece/website story: PriceCheck Blog: "Yes, you can give birth for $250" by Rebecca Pleven. August 15, 2015

38. KQED PBS Radio-Forum with Michael Krasny. "Comprehensive Sex Ed Now Mandatory for California's Middle and High School Students." One-hour interview. October 7, 2015.

39. Kaiser Health News (on-line article) "Health law increases coverage rates for women not yet pregnant." By Lisa Gillespie. October 28, 2015

40. Institute of Medicine and National Research Council Report: Investing in the Health and Well-Being of Young Adults. Webinar presented February 3, 2015. Society for Public Health Education (SOPHE). http://www.sophe.org/education.cfm

41. Child and Adolescent Health. AMCHP/MCHB Title V Transformation Action Planning Town Hall Series presented June 2, 2015. Association of Maternal & Child Health Program.

42. Adolescents in the United States: Health Care for Adolescents: How to Improve it. U.S. Centers for Disease Control and Prevention. August 18, 2015. Atlanta, GA. (Invited panel presentation/Webinar.) http://www.cdc.gov/cdcgrandrounds/archives/2015/august2015.htm

43. KCBS San Francisco Radio. Over the Counter Contraception. Interview and commentary; February 14, 2016.

44. KPCC Southern CA Public Radio; Contribution to radio piece/website story: California women waiting longer to have their first child. Rebecca Pleven. January 14, 2016. http://www.scpr.org/news/2016/01/14/56839/calif-women-waiting-longer-to-have-their-first-chi/

45. L.A. School Report. California sprints to the head of the class on sex education, as all students this year will be taught about consent. **Brindis CD** cited. August 8, 2016. http://laschoolreport.com/california-sprints-head-class-sex-education-students-year-will-taught-consent/

Prepared: July 2, 2025

46. Achieving Relevance and Visibility in an Academic Research Career – Opportunities and Potential Pitfalls. June 15, 2017.  BIRCWH* Leadership Webinar. (*Building Interdisciplinary Research Careers in Women's Health)

47. The (Uncertain) Future of Women's Reproductive Health Care. July 19, 2017. Expert Panel Presentation, San Francisco. PRL Institute for Health Policy, BIRCWH* & Bixby Center for Global Reproductive Health. https://youtu.be/2nPD1yeowK

48. La Jornada Maya: https://www.lajornadamaya.mx/2017-04-10/Mexico-duplica-a-EU-en-riesgo-de-embarazos-adolescentes

49. Cronica: http://www.cronica.com.mx/notas/2017/1017950.html

50. Headlines that say GOP bill makes sexual assault a pre-existing condition are misleading. Lauren Carroll. Published on-line: Politifact, May 5, 2017. Claire Brindis, consultant.

51. Evaluating Activism. Stanford University Press Blog. Published June 13, 2017. Gardner A, **Brindis CD**. Article in relation to their book, Advocacy and Policy Change Evaluation. http://stanfordpress.typepad.com/blog/2017/06/evaluating-activism.html

52. Interview with "Take Two" on 89.3 KPCC regarding "Gag Rule" for Abortion Services Information. May 18, 2018.

53. The Economist. Interview: Latin American is Losing Its Battle Against Teen Pregnancy. February 16, 2019. https://www.economist.com/the-americas/2019/02/16/latin-america-is-losing-its-battle-against-teen-pregnancy

54. EdSource. Interview: Plan to cut PE test — and its body-fat measurement — in California sparks debate. March 2, 2020. https://edsource.org/2020/newsoms-plan-to-eliminate-p-e-test-sparks-debate-about-body-fat-measurements/624303.

55. CoinDesk. Interview: Ethereum Community Grapples with Coronavirus as EthCC Cases Tick Upward. March 16, 2020. https://www.coindesk.com/ethereum-community-grapples-with-coronavirus-as-ethcc-cases-tick-upward.

56. Wallethub. Interview: Most Aggressive States Against the Coronavirus. April 7, 2020. https://urldefense.proofpoint.com/v2/url?u=https-3A__wallethub.com_edu_most-2Daggressive-2Dstates-2Dagainst-2Dcoronavirus_72307_-23expert-3Dclaire-2Dbrindis&d=DwMFaQ&c=iORugZls2LIYyCAZRB3XLg&r=4hqeibzHYulQPr3by1T4zkXYaw8ISfFb8uMpzA8k-sE&m=UVbSVtA5LRYmp7P0y2oS4qfqU323Y1Ah9JvUGEFQAf8&s=gkWXD_8Bd-DlNinqvRXANzEEbTncANM7G8fBgLGigiw&e=

57. Tebb TK, Trieu TS, Rodriguez RF, Pollack PL, Adams AS, Ricco RR, Renteria RR, Hwang HL, Ozer OE, Sandoval SD, Brindis CD Use Of Youth-Centered Mobile Health Application, Health-E You/Salud iTu, To Reduce Disparities In Contraceptive Knowledge, Access And Unintended Pregnancy Among Sexually Active Latina Adolescents. Journal of Adolescent Health. 2019 Feb 1; 64(2):s40-s41. . .

58. Tebb TK, Schwartz SE, Rodriquez RF, Reed RR, Tancredi TD, Brindis CD, Dehlendorf DC. .Contraceptive Communication Among Adolescents Who Use Long Acting Reversible Contraception. Journal of Adolescent Health. 2020 Feb 1; 66(2):s115-s116.

59. Tebb TK, Schwarz SE, Rodriguez RF, Reed RR, Tancredi TD, Brindis CD, Dehlendorf DC. Adapting to Political Barriers in Conducting Teen Pregnancy Prevention Research: Use of

Prepared: July 2, 2025

Social Media as an Expedited Recruitment Strategy. Journal of Adolescent Health. 2020 Feb 1; 66(2):s115.

60. Barral BR, Miller MM, Ramirez RM, Lopez LM, Brindis BC, Miller ME, Cramer CE, Ramaswamy RM. Development and Pilot Feasibility Trial of a Co-Developed Teen Pregnancy Prevention Community Program in a Midwest Rural Latino Community. Journal of Adolescent Health. 2025 Mar 1; 76(3):s63-s64.

61. Barral BR, de Miranda dE, Ramirez RM, Miller MM, Miller ME, Ramaswamy RM, Brindis CD. Transcreating an Unintended Teen Pregnancy Prevention Program for Latino Teens Living in Rural Communities. Journal of Adolescent Health. 2024 Mar 1; 74(3):s59-s60.

62. Raney RJ, Weinstein WS, Ganson GK, Testa TA, Jackson JD, Pantell PM, Glidden GD, Brindis CD, Nagata NJ. In the Face of Adversity: Pandemic Mental Health Protective Factors for Adolescents Who Have Experienced Adverse Childhood Experiences. Journal of Adolescent Health. 2024 Mar 1; 74(3):s57.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-11913-IT |

## <u>DECLARATION OF ANNE MARIE COSTELLO</u>

I, Anne Marie Costello, declare as follows:

1.       I am employed by the Department of Health and Human Services (HHS) in the Center for Medicaid and CHIP Services (CMCS) at the Centers for Medicare & Medicaid Services (CMS), located at 7500 Security Boulevard, Baltimore, MD 21244.  I am a Deputy Director for CMCS.  I have held this position since January 2020.  Before that, I served as the Director of the Children and Adults Health Programs Group within CMCS.  I have been employed at CMS since 2010. In my role as a Deputy Director of CMCS, I manage a team of professional and administrative staff with a variety of advanced degrees in fields including economics, law, medicine, public health, public policy, finance, and business operations.  My team is responsible for policy development, management, oversight, budget, and performance issues related to Medicaid, the Children's Health Insurance Program (CHIP), and the Basic Health Program (BHP) on behalf of CMS.  My team and I regularly interact with representatives from states and other stakeholders.

2.      Medicaid is a joint state/federal partnership. States are responsible for providing care to Medicaid beneficiaries and do so through both fee-for-service (FFS) and managed care delivery systems. States design their Medicaid programs including determining which delivery system(s) to utilize for providing care to Medicaid beneficiaries and which benefits are offered in each delivery system.  The federal government outlines Medicaid program requirements and reviews and approves many components of a state's Medicaid program, such as underlying authorities for benefits, eligibility, fee-for-service provider reimbursement rates, managed care, and managed care contracts and rates.

3.      The federal government also contributes federal financial participation (FFP) towards the Medicaid program. Federal law and regulations require that CMS issue advanced funding (through  initial grant awards ) to states at the beginning of each quarter based on CMS-reviewed state expenditure estimates.

4.      Once the advanced funding request is approved, the state can draw down the federal advance for the allotted amount as costs are incurred.  42 C.F.R.   430.30(d)(3). The State draws down federal funds through a subaccount operated through the Payment Management System (PMS) application within HHS' Program Support Center (PSC). Section 430.30(d)(3), 42 C.F.R., provides that the grant award  authorizes the State to draw Federal funds as needed to pay the Federal share of disbursements.   The state's quarterly federal Medicaid award is only to be used to reimburse Medicaid providers for actual payments.  42 C.F.R.   430.30 and 45 C.F.R.   95.13.

5.      Those initial awards are reconciled to actual state expenditures following a finalization process that includes quarterly CMS reviews of state-submitted, actual expenditures and state draw-downs from its PMS subaccount. The Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program (Form CMS-64) is the accounting statement that

each state Medicaid agency submits each quarter to CMS to claim FFP for its Medicaid expenditures.

6.      The Form CMS-64 is a summary of actual expenditures derived from source documents including invoices, payment vouchers, governmental funds transfers, expenditure certifications, cost reports and settlements, and eligibility records. It does not include claim-level information.

7.      Medicaid provider payment occurs at the state level  CMS does not directly pay providers. In the fee-for-service delivery system, the state Medicaid agency must conduct prepayment review for all claims received.[1] Additionally, in both the fee-for-service and managed care delivery systems, the state or the health plan respectively, must generally pay 90 percent of clean claims (i.e., claims that can be processed without obtaining additional information) within 30 days of the date of receipt.[2] Although CMS is not involved in the process, CMS therefore understands that a Medicaid provider in any given state can generally expect to receive payment from the state within 30 days of submitting a claim for service rendered to a Medicaid beneficiary.

8.      Family planning services and supplies are a mandatory Medicaid benefit in accordance with Section 1905(a)(4)(C) of the Social Security Act. Family planning services must also be provided to individuals receiving Medicaid services through an Alternative Benefit Plan, as described in Section 1937(b)(7). This benefit can be provided in both the fee-for-service and managed care delivery systems.

---

[1] 42 CFR 447.45(f)
[2] 42 CFR 447.45(d)(2)  42 CFR 447.46(c). In a managed care delivery system, this requirement applies only to managed care organizations (MCOs), and the MCO and its providers may, by mutual agreement, establish an alternative payment schedule.

**State E  pe  d ture Report     a d C a   s  or FFP**

9.      To claim FFP, each state submits its aggregate expenditures on a quarterly basis to CMS electronically via the Medicaid Budget and Expenditure System (MBES) using the Form CMS-64. The state submits this form electronically to CMS 30 days after the end of each quarter (January 30, April 30, July 30, and October 30).

10.      When submitting its quarterly expenditures, each state certifies that its expenditures are allowable under federal requirements. The Form CMS-64 consists of a series of forms that separate expenditures based on certain categories of services (typically aligned with statutorily defined benefit categories such as inpatient hospital services, nursing facility services, etc.). The Form CMS-64 is CMS's official accounting record of Medicaid expenditures.

11.      CMS must assure that state expenditures claimed for federal matching funds under Medicaid are programmatically reasonable, allowable, and allocable in accordance with existing federal laws, regulations, and policy guidance. To achieve this, CMS relies primarily upon quarterly reviews of the Form CMS-64 performed by CMCS financial management staff across the country. The quarterly expenditure review process is complex, with up to 225 individual reporting lines for each state, which can result in over 1,000 pages of detailed expenditures each quarter. For each quarter, CMS Medicaid financial staff has 60 days to complete their review, including verifying the accuracy of reported expenditures  determining whether the expenditures are properly supported  verifying the authority for FFP in the expenditures  and verifying the federal match rate.

12.      CMS has a standard National CMS-64 Review Guide which is used by staff to ensure consistency of the reviews. The Review Guide targets specific areas on which to focus the review, based on risk, while also providing flexibility for staff and managers to use their

professional discretion to expand or curtail the review based on the complexity of the state's program and issues identified during the review process.

13.    Although review times may vary, it typically takes CMS up to 6 months from the date of submission of Form CMS-64 to pay any additional FFP requested by the state.

14.    Section 1132(a) of the Social Security Act requires states to claim FFP for Medicaid and CHIP expenditures within two years of the date of the expenditure. Implementing regulations at 45 C.F.R. 95 Subpart A specify FFP will be available only if the state files a claim within two years after the calendar quarter in which the expenditures were made. Under certain limited circumstances, the Medicaid statute and regulations provide for exceptions to the two-year time limit. Section 1132(a) of the Act and regulations at 45 C.F.R. 95.19 specify that time limit does not apply for any claims that: (a) are an adjustment to prior year costs (this is limited to interim payments reconciled to actual cost)  (b) result from an audit exception  (c) result from a court-ordered retroactive payment  or (d) for which the Secretary determines there was good cause for the failure by the state to file the claim within the time period.

**Med ca d Fee  or Ser  ce**

15.    In a fee-for-service delivery system, the state directly reimburses providers for each service delivered to Medicaid beneficiaries. States claim FFP for these costs from CMS.

5

16.    The graphic below illustrates the payment relationship in a fee-for-service delivery system at a high level:



**Medicaid Managed Care**

17.    Managed care is the predominant delivery system for most Medicaid beneficiaries. In a managed care delivery system, the state contracts with risk-based health plans[3] to provide services to Medicaid beneficiaries who are enrolled in the plan (known as enrollees). The state executes a contract with one or more health plans, and this contract outlines the contractual responsibilities of the plan. The state pays health plans capitation payments for taking on these contractual obligations.

18.    A capitation payment is a periodic payment (generally monthly), that a state makes to a health plan on behalf of each beneficiary enrolled under a contract, similar to a health insurance

---

[3] 42 CFR 2. There are three types of risk-based health plans (often referred to as managed care plans): (1) MCOs; (2) prepaid inpatient health plans (PIHPs); and prepaid ambulatory health plans (PAHPs). Generally, MCOs are comprehensive health plans while PIHPs and PAHPs are limited benefit plans.

premium paid in employer-sponsored insurance. The state makes this payment regardless of whether the particular beneficiary receives services during the period covered by the payment.

19.    The health plan is responsible for contracting with a provider network, negotiating provider payment rates, and paying providers for covered services. Health plans are responsible for maintaining a sufficient provider network to meet the needs of the anticipated number of enrollees. In managed care, enrollees are generally restricted to only utilize the provider network of a health plan (i.e., network providers) with some exceptions for out-of-network providers. A network provider has a provider agreement with a health plan or subcontractor of that plan.[4] Network and out-of-network providers submit claims to the health plans for payment and health plans pay both network and out-of-network providers.

20.    The graphic below illustrates the Medicaid managed care payment relationship at a high level:



---

[4] Definition of network provider in 42 CFR 438.2.

21.    With respect to family planning specifically, Sections 1902(a)(23)(B) and 1915(b) of the Social Security Act allow Medicaid managed care enrollees to obtain family planning services and supplies from providers of their choice, including those out-of-network. Thus, in practice, when family planning services and supplies are included in managed care, enrollees receive family planning services from network providers and out-of-network providers, and both provider types are paid by the health plans.

*        *        *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Dated: _____July 14, 2025_____

Anne M. Costello -S
Digitally signed by
Anne M. Costello -S
Date: 2025.07.14
15:29:03 -04'00'

_____
ANNE MARIE COSTELLO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-11913-IT |

## DECLARATION OF DREW SNYDER

1.     I, Drew Snyder, declare as follows: I am employed by the Department of Health and Human Services (HHS) as the Director of the Center for Medicaid and CHIP Services (CMCS) and Assistant Director of the Centers for Medicare & Medicaid Services (CMS), located at 7500 Security Boulevard, Baltimore, MD 21244.  I have held this position since January 2025.  In my role as CMCS Director, I oversee a team of professional and administrative staff with a variety of advanced degrees in fields including economics, law, medicine, public health, public policy, finance, and business operations.  My team is responsible for policy development, management, oversight, budget, and performance issues related to Medicaid, the Children's Health Insurance Program (CHIP), and the Basic Health Program (BHP) on behalf of CMS.  My team and I regularly interact with representatives from states and other stakeholders.

2.     Medicaid is a joint state/federal partnership. States are responsible for providing care to Medicaid beneficiaries and do so through both fee-for-service (FFS) and managed care delivery systems. The federal government outlines Medicaid program requirements and reviews

1

and approves many components of a state's Medicaid program, such as underlying authorities for benefits and eligibility and managed care contracts and rates.

3.     The federal government also contributes federal financial participation (FFP) towards the Medicaid program.

4.     Congress recently amended the Medicaid statute as part of the One Bill Beautiful Bill Act, which President Trump signed into law on July 4, 2025. P.L. No. 119-21, 139 Stat. 72 (2025). Specifically, Section 71113 directs that no Medicaid funds "shall be used to make payments to a prohibited entity for items and services furnished during the 1-year period beginning on the date of the enactment of this Act[.]"

5.     Section 71113 defines a prohibited entity as an entity (including its affiliates, subsidiaries, successors, and clinics) that, as of October 1, 2025, is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986; is an essential community provider (described in section 156.235 of title 45, Code of Federal Regulations) that is primarily engaged in family planning services, reproductive health, and related medical care; provides for abortions other than those identified in the Hyde Amendment; and for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

6.     CMCS staff have analyzed data in CMS's Transformed Medicaid Statistical Information System from 2023 and identified at least two non-Planned Parenthood entities, Family Planning Association of Maine, Inc., and Health Imperatives (which is based in Massachusetts),

that received more than $800,000 in Medicaid funding in fiscal year 2023, are 501(c)(3) essential community providers, and have provided for abortions other than those identified in the Hyde Amendment in the past.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Dated:  _____7/14/2025_____            ____/s/ Drew Snyder_____
                                           DREW SNYDER

# EXHIBIT 1

**From:**
**To:**
**Subject:** FW: [External]Notice of Temporary Restraining Order (TRO) in Planned Parenthood v. Kennedy
**Date:** Thursday, July 10, 2025 11:19:01 AM
**Attachments:** TRO.pdf

**From:** Costello, Anne Marie (CMS/CMCS) @cms.hhs.gov>
**Sent:** Thursday, July 10, 2025 5:36 AM
**To:** @medicaid.alabama.gov; @alaska.gov; @azahcccs.gov;
@azahcccs.gov; @dhs.arkansas.gov;
@dhcs.ca.gov>; @state.co.us; @state.co.us;
@ct.gov; @dc.gov; @delaware.gov;
@ahca.myflorida.com; @dch.ga.gov; @dhs.hawaii.gov;
@dhw.idaho.gov; @illinois.gov; @fssa.in.gov;
@hhs.iowa.gov; @ks.gov; @ky.gov;
@LA.GOV; @maine.gov; @maryland.gov;
@mass.gov; @michigan.gov; @state.mn.us;
@medicaid.ms.gov; @dss.mo.gov; @mt.gov;
@nebraska.gov; @dhcfp.nv.gov; @dhcfp.nv.gov;
@dhhs.nh.gov; @dhs.nj.gov; @hsd.nm.gov;
@health.ny.gov; @dhhs.nc.gov; @nd.gov;
@medicaid.ohio.gov; @okhca.org; @oha.oregon.gov;
@pa.gov; @ohhs.ri.gov; @scdhhs.gov;
@state.sd.us; @tn.gov; @hhs.texas.gov;
@utah.gov; @vermont.gov; @dmas.virginia.gov;
@hca.wa.gov; @wv.gov; @dhs.wisconsin.gov;
@wyo.gov; @medicaid.as.gov; @medicaid.as.gov;
@cnmimedicaid.org; @cnmimedicaid.org;
@dphss.guam.gov; @dphss.guam.gov; @salud.pr.gov;
@ases.pr.gov; @salud.pr.gov; @dhs.vi.gov;
@adph.state.al.us; @ct.gov; @dc.gov;
@ahca.myflorida.com; @dch.ga.gov; @dhw.idaho.gov;
@illinois.gov; @fssa.in.gov; @maine.gov;
@maryland.gov; @state.ma.us; @michigan.gov;
@mt.gov; @state.mn.us; @health.ny.gov;
@dhhs.nc.gov; @nd.gov; @dhsoha.state.or.us; @pa.gov;
@tn.gov; @utah.gov; @hca.wa.gov; @wv.gov;
@dhs.wisconsin.gov; @wyo.gov
**Cc:** @cms.hhs.gov>;
@cms.hhs.gov>
**Subject:** [External]Notice of Temporary Restraining Order (TRO) in Planned Parenthood v. Kennedy

Dear State Medicaid and CHIP Directors:

Please review the attached Temporary Restraining Order (TRO) in *Planned Parenthood Federation of America, Inc. v. Kennedy*.  This TRO enjoins the Department and its "agents, employees, appointees, successors, and anyone acting in concert or participation with" the Department from "enforcing, retroactively enforcing, or otherwise applying the provisions of Section 71113 of 'An Act to provide for reconciliation pursuant to title II of H. Con. Res 14,' against Planned Parenthood Federation of America and its members; Planned Parenthood League of Massachusetts; and Planned Parenthood Association of Utah."  It also requires the Department and its "agents, employees, appointees, successors, and anyone acting in concert or participation with" the Department to "take all steps necessary to ensure that Medicaid funding continues to be disbursed in the customary manner and timeframes to" the above entities.

If you have questions, please reach out to me at ▓▓▓▓▓▓▓▓▓▓▓@cms.hhs.gov.

Thank you
Anne Marie


Anne Marie Costello
Deputy Director
Center for Medicaid & CHIP Services
Cell: ▓▓▓▓▓▓▓

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

PLANNED PARENTHOOD FEDERATION OF    )
AMERICA, INC., et al.,              )
                                    )
          Plaintiffs,               )
                                    )    Civil Action No.
     v.                             )    1:25-cv-11913-IT
                                    )
ROBERT F. KENNEDY, JR., et al.,     )
                                    )
          Defendants.               )
                                    )
_____


     BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


                    MOTION HEARING


                Friday, July 18, 2025
                     9:01 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

WILMER CUTLER PICKERING HALE AND DORR LLP
BY:  ALAN E. SCHOENFELD
         CASSANDRA MITCHELL
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com


PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.
BY:  EMILY NESTLER
1110 Vermont Avenue NW
Washington, DC  20005
(202) 973-4800
emily.nestler@ppfa.org


WILMER CUTLER PICKERING HALE AND DORR LLP
BY:  SHARON KELLEHER HOGUE
60 State Street
Boston, MA  02109
(617) 526-6000
sharon.hogue@wilmerhale.com


WILMER CUTLER PICKERING HALE AND DORR LLP
BY:  ALBINAS PRIZGINTAS
2100 Pennsylvania Avenue NW
Washington, DC  20037
(202) 663-6000
albinas.prizgintas@wilmerhale.com


PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.
BY:  C. PEYTON HUMPHREVILLE
123 William Street
New York, NY  10038
(212) 965-7000
catherine.humphreville@ppfa.org

1   On behalf of the Defendants:

2       U.S. DEPARTMENT OF JUSTICE
        BY:  EMILY MARGARET HALL
3            ELIZABETH THEMINS HEDGES
        950 Pennsylvania Avenue NW
4       Washington, DC  20530
        (202) 307-6482
5       emily.hall@usdoj.gov
        elizabeth.t.hedges@usdoj.gov
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2              (In open court at 9:01 a.m.)

3              THE DEPUTY CLERK:  United States District Court is

4     now in session, the Honorable Judge Indira Talwani presiding.

5              This is Case Number 25-cv-11913, Planned Parenthood

6     Federation of America, Inc., et al., v. Kennedy, et al.

7              Will counsel please identify themselves for the

8     record.

9              MR. SCHOENFELD:  Good morning, Your Honor.  Alan

10    Schoenfeld for the plaintiffs, and I'm joined by a number of

11    colleagues.

12             THE COURT:  Good morning.

13             MR. SCHOENFELD:  Thank you.

14             MS. HALL:  Good morning, Your Honor.  My name is

15    Emily Hall for defendants, and I'm joined by Betsy Hedges.

16             THE COURT:  Good morning.

17             So we are here on Planned Parenthood, et al.'s,

18    motion for a preliminary injunction.  And before we get into

19    argument on the motion, I wanted to start with a sense of the

20    parties as to the framework for the overall case.  This isn't

21    a scheduling conference, but I'm curious whether you view

22    this as a case that ultimately will require discovery or

23    disputed facts that would go to trial, summary judgment,

24    motion to dismiss.

25             What are the parties anticipating here?

1          MR. SCHOENFELD:  Thanks, Your Honor.  Do you want
2     me here?
3          THE COURT:  Wherever you're comfortable, but since
4     I go back and forth between people, you're probably better
5     off there.
6          MR. SCHOENFELD:  Okay.  So for plaintiffs, I think
7     it depends on what happens today.  But I think that --
8          THE COURT:  Well, all that can happen today is a
9     preliminary injunction can be granted or denied.
10          MR. SCHOENFELD:  Understood.  But subject to
11     Your Honor's views about the particular claims that might
12     have merit, I think this is a case where limited discovery
13     and summary judgment are likely to resolve the case on the
14     merits for a permanent injunction.  So I think that's our
15     view.
16          THE COURT:  Okay.  Limited discovery and summary
17     judgment?
18          MR. SCHOENFELD:  I think that's probably where we
19     think this is going.
20          THE COURT:  Okay.  I'm not holding anyone to it.
21     I'm just trying to have a sense of it.
22          MR. SCHOENFELD:  Understood.
23          THE COURT:  Counsel?
24          MS. HALL:  Thank you, Your Honor.
25          I think I generally agree with plaintiffs'

1    position.  I think the necessity of a trial would probably

2    depend on what comes out in discovery and whether facts

3    remain contested at that point, but we would expect that some

4    limited discovery at least will be necessary before summary

5    judgment.

6              THE COURT:  Okay.  Thank you.

7              MS. HALL:  Thank you.

8              THE COURT:  So my usual practice here is to start

9    with the moving party.  I go back and forth as I work my way

10   through arguments, and that's how I intend to proceed.

11             So with that --

12             MR. SCHOENFELD:  Yeah.

13             THE COURT:  -- you may start.

14             MR. SCHOENFELD:  Thanks very much, Your Honor.

15             As Your Honor noted, this is an application for a

16   preliminary injunction from Congress's attempt to defund

17   Planned Parenthood by excluding it from the Medicaid program.

18             The statute prohibits certain entities from

19   obtaining Medicaid reimbursement.

20             THE COURT:  I'm going to interrupt you.  There are

21   three plaintiffs here:  Planned Parenthood Federation of

22   America, Inc., which I believe is here on its own behalf and

23   on behalf of its members, and then two other plaintiffs,

24   Planned Parenthood of Massachusetts and Planned Parenthood of

25   Utah.  I may not have their exact names correctly, but those

1    are the three parties in front of me.

2         And it does seem to me that, on both sides, many of

3    the arguments may depend on what we're talking about.  The

4    statute itself doesn't use the word "Planned Parenthood."

5    The defendants' brief uses "Planned Parenthood" as a single

6    term for all of the plaintiffs throughout.

7         It would be helpful here to the extent that you

8    can, that you use the word -- you use words to distinguish

9    what you're talking about.

10        MR. SCHOENFELD:  Certainly.

11        THE COURT:  If you are intending to talk about

12   Planned Parenthood and its members, perhaps use "plaintiffs."

13   If you're talking about Planned Parenthood Federation, maybe

14   it would be helpful to call it "federation," and if you're

15   talking about the members, maybe "members," just so I can

16   understand the arguments that you're making.

17        MR. SCHOENFELD:  Yeah, absolutely.  And that's a

18   helpful direction.

19        Our view, of course, is that what Congress has

20   attempted to do here is exclude Planned Parenthood, the

21   federation, and its members from the Medicaid program.  And I

22   think that that framing guides our discussion of the first

23   three constitutional claims, which are brought on behalf of

24   all of the plaintiffs.  And so those are the bill of

25   attainder, equal protection, and First Amendment retaliation

1   claims brought on behalf of everyone.

2          There's the back end of the complaint claims, which

3   are the claims for the nonqualifying members, including

4   Planned Parenthood of Utah, which I'll address separately.

5          But to frame the statute, Congress's intent here

6   was to exclude Planned Parenthood and all of its members from

7   the Medicaid program.  The statute prohibits certain defined

8   entities from obtaining Medicaid reimbursement, making it

9   impossible for those entities to provide healthcare to

10  Medicare patients, those most in need of high-quality care

11  and those least likely to find care elsewhere.

12         The statute defines the term, quote, "prohibited

13  entity" to include a narrow universe of healthcare providers

14  that meet four gerrymandered, conjunctive statutory criteria,

15  making it certain that Planned Parenthood, and virtually only

16  Planned Parenthood -- and I'll get to that point about the

17  "virtually only" later in connection with the bill of

18  attainder argument -- are defunded.

19         THE COURT:  I'm going to give you time here, so you

20  don't need to rush.

21         MR. SCHOENFELD:  Yeah, I just wanted to -- I

22  understand that that's a point of contention, so I just

23  wanted to make sure that I'm not taking it as common ground.

24         THE COURT:  And I just want to make sure the

25  reporter can keep up.

1      MR. SCHOENFELD:  Yes.  I apologize.  I'll slow
2 down.  This is the peril of being from New York.
3      The starting premise of the government's defense of
4 the defunding statute is that Congress may choose not to
5 subsidize abortion.  That is entirely beside the point.  That
6 is not --
7      THE COURT:  Let me just stop you here.  No
8 disagreement here as I'm proceeding here that Congress may
9 defund abortion?
10      MR. SCHOENFELD:  For purposes of this argument,
11 that's not an argument that we're making.  I think there are
12 limits to that, but that is not --
13      THE COURT:  Okay.
14      MR. SCHOENFELD:  -- at all material to these
15 arguments because that's not what the statute does.
16      What the statute does do is to punish Planned
17 Parenthood and its members for their expressive of
18 association.  They're coming together for support and
19 advocacy for abortion rights.
20      Now, how do we know that?  We know that because the
21 statute doesn't just regulate conduct.  It doesn't simply
22 exclude abortion providers.  It also excludes nonabortion
23 providing affiliates of those entities.
24      And that point is important not just for the
25 nonqualifying members, but for the entire statute, for all of

1    the claims --

2            THE COURT:  Okay.  So let me stop you there.  Just,

3    again, for definitional purposes, the plaintiff has put --

4    plaintiffs have put evidence in the record as to their

5    corporate structure, that each -- and each member is a

6    separate -- that each member is a separate legal entity with

7    its own board of directors and so forth.

8            And am I correct on my reading of the record that

9    the defendants do not challenge those corporate formation --

10   the evidence as to corporate formation?

11           MS. HALL:  Your Honor, I think we do not contest

12   that they are separately registered 501(c)(3) organizations,

13   but the characterization of those relationships we do

14   contest.

15           THE COURT:  Okay.  So let me just pull this apart a

16   little bit.

17           When I consider parties in front of me and the

18   rights and responsibilities of parties in front of me, I have

19   persons, actual people, and I have legal entities.  And

20   sometimes the legal entities' boundaries can be disregarded,

21   their alter ego theories, their disregard of corporate

22   structure theories, et cetera.

23           And sometimes people work together.  You've got

24   conspiracy analysis.  You have, sometimes, liability for

25   people who are unincorporated associations, all of those

1    things.

2          But just so -- again, I want to be very precise

3    here.  Right now, the record in front of me, which could come

4    out differently in discovery, but the record in front of me

5    is that I have 48 distinct legal entities, 47 separately --

6    separate legal entities, which are the members, and then

7    Planned Parenthood Federation, which is a separate legal

8    entity.

9          Any disagreement about that as to the record?

10         MS. HALL:  As to the parties to this case, I -- as

11    I understand Planned Parenthood Federation's theory of

12    standing, they are proceeding on behalf of their 47 members.

13         THE COURT:  And on their own behalf, I think.

14         MS. HALL:  Exactly, and on their own behalf.  So

15    that theory of standing would bring in the 47 members.  But I

16    just want to be clear that the -- all 47 have not sued in

17    their own name.

18         THE COURT:  Fair distinction.  I appreciate that,

19    and I didn't mean to suggest otherwise.  I'm simply trying to

20    understand the legal relationships here.

21         And I think what you said is you would disagree

22    about -- I think the words you used were the characterization

23    of those relationships, but I want to be clear in what way

24    you're disagreeing about the characterization of those.

25         You're not disagreeing that as -- that these are

1    separate legal entities?

2         MS. HALL:  I'm not disagreeing that they are

3    separately incorporated.

4         THE COURT:  Well, what's the difference between the

5    way I phrased it?

6         MS. HALL:  I think "separate legal entities" could

7    potentially have several different meanings.

8         THE COURT:  Okay.  Tell me what the different

9    meanings are of "legal entities."

10        MS. HALL:  So, for example, under certain statutes

11   like this one, the word "entity" is defined to include

12   affiliates.  So it says an entity including its affiliates.

13        THE COURT:  Okay.  But that doesn't make it a legal

14   entity.

15        I'm stepping back.  I'm not saying you can't have

16   multiple legal entities come together for reasons.  That's

17   why we have conspiracy statutes, and we have alter ego

18   piercing, and you could have a statute that says we're going

19   to treat all these people together.  I'm just saying they're

20   separate people legally that you're treating together, and

21   I'm just wondering if you have any disagreement with that.

22        MS. HALL:  I'm hesitant to use the word "entity"

23   because that's the language in the statute.  I --

24        THE COURT:  Okay.  If I use the word "legal

25   entity," which I am using to reference what I understand, you

1  know -- if you sue somebody, for example, the summons goes to
2  a legal entity, which is the LLC, the corporation, whatever,
3  the different form of a legal entity.

4  And we have rules.  For example, practicing here, a
5  legal entity has to have an attorney represent them.  They
6  can't just come in on their own.

7  So in that concept that they're -- not to say that
8  legal entities can't be combined for purposes of things, any
9  disagreement that, on the evidentiary record before me, there
10 are 48 different legal entities?

11 MS. HALL:  On that specific understanding and that
12 granular level of understanding of what "entity" means in
13 this particular context --

14 THE COURT:  And, again, legal entity.  I'm not
15 trying to substitute that for prohibited entity, just a legal
16 entity.  We have these different legal entities.

17 MS. HALL:  Accepting your definition of that term,
18 yes, I agree.

19 THE COURT:  Okay.

20 MS. HALL:  Thank you.

21 THE COURT:  Okay.  Please proceed.

22 MR. SCHOENFELD:  And just to finish up on that
23 point, Your Honor, the evidence before the Court at the
24 preliminary injunction stage is that these are 48 separately
25 incorporated independent, individual healthcare providers, 47

1  affiliates that provide healthcare in the Planned Parenthood

2  Federation of America.

3  THE COURT:  That does not provide healthcare.

4  MR. SCHOENFELD:  That does not provide healthcare,

5  correct.  So it is a membership organization of the 47

6  independent healthcare-providing organizations.

7  THE COURT:  Okay.

8  MR. SCHOENFELD:  The thrust of the government's

9  argument is that it is -- that Congress is permitted to

10  regulate on the basis of abortion.  That's not the issue

11  before the Court today.

12  The issue before the Court today is the fact that

13  this statute, in fact, goes farther; and it regulates the

14  relationship between and among Planned Parenthood members and

15  the federation and in that way singles out the federation and

16  its members for particularly negative treatment, punishment

17  under the bill of attainder clause; and it burdens their

18  First Amendment expressive association rights.

19  As Your Honor recognized in the amended TRO,

20  *Jaycees* is the signal case here.  It is precisely the coming

21  together of these entities for those purposes that is the

22  defining feature of the statute.  It is repeated twice in the

23  definitional provision of "prohibited entity," and therein

24  lies the constitutional problem.

25  If Congress had simply regulated abortion, maybe

some of the government's arguments would have force, but that is not what the statute does. It is doing something more. And that is the substance of all of the constitutional claims, which I'll get into in a moment.

Think of it this way: If of the many hundreds of health centers operated by the 47 independent affiliates, only one provided abortions, every single affiliate would be excluded from the Medicaid program, as would the federation. That structure is manifestly not about regulating abortion. It's not about using abortion as the determinant of eligibility for participation in a nonabortion Medicaid program.

It is the association, the *Jaycees* protected association work, that is the subject of the government's action here.

And -- am I interrupting you?

THE COURT: No, you're not, but I do like to go back and forth.

MR. SCHOENFELD: Yes, please.

THE COURT: I know you want to get through all your arguments, but I actually think I would like to hear from the defendants.

MR. SCHOENFELD: Do you want me to sit?

THE COURT: Yeah, why don't you sit.

I'd like to hear from you on this point. Is the --

1    are the plaintiffs correct that if, as of October 1st, one --

2    let's use Planned Parenthood Massachusetts, that as of

3    October 1st, Planned Parenthood of Massachusetts continues to

4    provide abortions, and every other Planned Parenthood member

5    has stopped providing abortions, are they all defunded for

6    the year nonetheless?

7             MS. HALL:  Your Honor, I don't know the answer to

8    that question because the agency has not yet had an

9    opportunity to engage with the structure of Planned

10   Parenthood.  These are precisely the sorts of factual

11   disputes that we raised in our brief.

12            THE COURT:  Okay.

13            MS. HALL:  I don't know all the details of Planned

14   Parenthood's corporation structure, the level of control

15   that's exercised; and those factual questions are what would

16   determine the answer to your question.

17            THE COURT:  Okay.  So as I understand what I'm

18   supposed to do here, at least on the first few counts,

19   they're facial challenges.  And if there's a plausible

20   construction of the statute that's not unconstitutional, then

21   the statute can't be attacked on a facial challenge, correct?

22            MS. HALL:  If there's a -- if there is a plausible

23   application of the statute that does not violate the

24   Constitution, yes.

25            THE COURT:  Okay.  So what's the plausible

1 application here?

2      MS. HALL:  Your Honor, I think that an

3 application -- certainly, the plaintiffs don't contest that

4 Planned Parenthood League of Massachusetts, one of the named

5 plaintiffs, will, as of October 1st, satisfy all of the

6 conditions of the statute.

7      THE COURT:  No, no.  I'm not asking -- I think the

8 question is what -- well, let me not interrupt you.  Today,

9 what is the plausible -- what is the plausible construction

10 of the statute that is constitutional?

11      So if Planned Parenthood of Massachusetts is

12 providing abortions on October 1st, is there a plausible

13 construction of the statute that would allow depriving other

14 members of Medicaid funds if they are not providing

15 abortions?

16      So, in other words, assuming that the scenario I'm

17 suggesting happens, that -- and it may not be all 46 that

18 stop providing, but we know at least three don't provide

19 abortions, and we know that the others could change providing

20 abortions or not.  Presumably, that's one of the things that

21 Congress wanted to do, is stop abortions.  So between now and

22 October 1st, some of these other entities might stop

23 providing abortions.

24      Is there a construction of the statute that would

25 be constitutional as -- in that -- if that's the scenario?

1    MS. HALL:  Yes, Your Honor.  And I think two points

2    here.  One, on your precise question regarding a construction

3    of the statute, association and affiliation are different

4    concepts.

5    THE COURT:  Okay.

6    MS. HALL:  Affiliation is a concept in corporate

7    law regarding the relationships between particular legal

8    entities, to use Your Honor's definition of that term; and

9    it's common in the law in regulations, in contracts, in

10   statutes, to impose conditions, impose restrictions, impose

11   obligations on an entity and its affiliates.

12   And not all of --

13   THE COURT:  Okay.  So let me just -- let me just

14   stop you for a minute here.  Your permissible construction is

15   that I do use corporate law principles and treat this as an

16   affiliation under corporate law?  Is that -- is that how

17   you're wanting me to proceed?

18   MS. HALL:  Your Honor, at this stage, for the

19   existence of a facial challenge, any permissible application

20   of the statute --

21   THE COURT:  And I'm just trying to understand what

22   the permissible application is that you're urging me.

23   MS. HALL:  Right.  And so I think there are several

24   permissible applications; and so this is my first, but if you

25   don't -- if you may, I'd like to talk about a few.

1      THE COURT:  Sure.

2      MS. HALL:  So, first, yes, a construction of the

3  statute that applies the corporate law understanding of

4  affiliate -- and, specifically, the concept of common control

5  and two entities that are under common control are considered

6  affiliates -- I think that would be a permissible application

7  of the statute.  It would not intrude on association rights

8  because affiliation and association are different concepts,

9  and not every -- association can exist without legal

10  corporate affiliation.

11      Secondly --

12      THE COURT:  Let me just -- I'm just trying to slow

13  down here and understand your arguments here.  So one

14  construction is that if the statute is prohibiting payment of

15  funds under the control of the entity providing abortions,

16  then it's legal?

17      MS. HALL:  Not quite, Your Honor.  Our -- I think

18  the common control doesn't require that -- to use the kind of

19  triggering entity example as Planned Parenthood of

20  Massachusetts, since no one contests that that entity plans

21  to perform abortions as of October 1st and that it received

22  more than $800,000 in fiscal year 2023, Planned Parenthood

23  League of Massachusetts does not need to itself control every

24  affiliate that would fall within the statute, but it can be

25  under common control with other entities.

1        THE COURT:  So your contention is that the statute

2  passes facial challenges under the First Amendment if one

3  affiliate provides abortion and the other affiliates don't if

4  they are both under control of a third organization, not

5  under -- not that the one is under control of the other?

6        MS. HALL:  That's true as well as if one is under

7  the control of the other.  Either would be sufficient to

8  qualify as an affiliate under established principles of

9  corporate law.

10       THE COURT:  And in the event that the affiliates

11  are not under the control as those words are understood in

12  corporate law, would it be unconstitutional then?

13       MS. HALL:  Your Honor, I don't think it would

14  necessarily be unconstitutional then.  I think if we were to

15  set forward a different definition of "affiliate," probably

16  some of those definitions, I think that's --

17       THE COURT:  Okay.

18       MS. HALL:  -- very plausible.

19       THE COURT:  So what's the other definitions of

20  "affiliates" that you would say would make this pass

21  constitutional muster?

22       MS. HALL:  Your Honor, I think that potentially,

23  certainly, a narrower construction of "affiliate" that

24  required, perhaps, an even closer corporate relationship.

25  That could also pass constitutional muster.

1          I don't know what CMS and HHS will determine as to

2     the scope of the facts that would be sufficient to establish

3     affiliate status.

4          THE COURT:  But for a facial challenge, don't --

5     they -- it's a hard standard for them on a facial challenge;

6     but don't you have to give me a facially plausible

7     interpretation, to which I then, on the preliminary

8     injunction standard, say, well, their standard applies and,

9     you know, we move away for today?  They might have a

10    challenge later as applied, but you have a facially plausible

11    explanation for what's going on here.

12         MS. HALL:  Your Honor, that leads into the second

13    point that I was going to raise, which is that as I

14    understand the facial challenge case law, it focuses on

15    whether there is any constitutional application of the

16    statute.  And, certainly, if the complaint is association,

17    that can -- there is no associational reason that Planned

18    Parenthood League of Massachusetts, for example, could fall

19    within the statute if it continues to perform abortions as of

20    October 1st.

21         And so that certainly, on their theory, which is

22    that it's unconstitutional because it restricts their

23    associational rights, Planned Parenthood of Massachusetts is

24    not being brought within the scope of the statute because of

25    any association.  And so that is a permissible application of

1   the statute, and that alone should defeat a facial challenge

2   because a facial --

3        THE COURT:  Okay.  But I also have plaintiff

4   Planned Parenthood of Utah.  Planned Parenthood of Utah

5   doesn't fall within this unless it's an affiliate.

6        MS. HALL:  That's right, Your Honor, and so I think

7   that presents Planned Parenthood of Utah with the opportunity

8   to mount an as-applied challenge.  But the question of a

9   facial challenge is whether it can be permissibly applied at

10  all.  And the statute can certainly be permissibly applied

11  even on their association theory to entities that

12  independently qualify.

13       And so there's no facial challenge that can be

14  based -- that could be premised on this association theory

15  because they do not contest, the plaintiffs do not contest,

16  that some Planned Parenthood members as of October 1st,

17  according to their plans, will fall within the scope of this

18  statute themselves without reference to any affiliates.

19       THE COURT:  Okay.  Back to you.  Your response.

20       MR. SCHOENFELD:  Thanks very much, Your Honor.

21       So I think the -- first off, there is no plausible

22  application of the statute that satisfies the Constitution.

23  I think that standard -- and, of course, in this preliminary

24  junction posture, we just need to show likelihood of success

25  in demonstrating that there's no constitutional application,

1     which we have done --

2         THE COURT:  I think you have to show substantial

3     likelihood of success.

4         MR. SCHOENFELD:  Even so, we do.  I think the

5     question of how that *Salerno* standard applies to something

6     like the bill of attainder is less clear.  If it's a bill of

7     attainder, it's a bill of attainder; and it's a bill of

8     attainder as to Planned Parenthood Federation and all of its

9     members, and I'm happy to explain why.

10        But there is no constitutional application here for

11     the simple reason that, as the government concedes in its

12     brief, in order to escape the prohibition, a member need not

13     only stop providing abortions, but it must, in the

14     government's word, disaffiliate from every other affiliate.

15     It is required to repudiate its association with --

16        THE COURT:  Let's imagine for a moment that the

17     only case in front of me was brought by Planned Parenthood

18     Massachusetts.  All right?  Explain what you just said now as

19     to Planned Parenthood of Massachusetts' rights.

20        MR. SCHOENFELD:  Planned Parenthood of

21     Massachusetts, like the other Planned Parenthood members,

22     cannot be attained by a statute that is meant to particular

23     target it for punishment, and that's irrespective of whether

24     the prohibition on affiliation apply -- or the prohibition on

25     providing abortion applies to it or some of its affiliates.

1    It is punished by this statute for its expressive

2    association.  That addresses bill of attainder.

3          For equal protection, they -- all of the Planned

4    Parenthood affiliates are situated differently from all other

5    abortion providers, not on account of their providing

6    abortion, but on account of their association with Planned

7    Parenthood.  So the provision of abortion is not the

8    determinative of the equal protection claim; it is the

9    something more that is the --

10    THE COURT:  Well, if another healthcare provider --

11    and I think the examples that the defendants give come from

12    Maine.  But if you have a healthcare provider that is not a

13    member of Planned Parenthood, but is -- receives more than

14    $800,000 as a nonprofit, as a community healthcare provider,

15    they're also covered.

16          So why doesn't that undercut your argument?

17    MR. SCHOENFELD:  So every case that has addressed

18    this question in both the bill of attainder and equal

19    protection context has essentially said that if there's

20    collateral damage from Congress's overinclusive definition

21    that doesn't undermine the specification requirement of the

22    bill of attainder, nor does it undermine an equal protection

23    challenge, everyone --

24    THE COURT:  So on the equal protection challenge,

25    you point out that the -- if the game here was to stop

1  abortions, they would have targeted entities that received

2  Medicaid funds that also perform abortions without the other

3  three restrictions of it being a nonprofit, of it being

4  community -- I guess the other two restrictions, being a

5  nonprofit and being a community health provider.

6        So they responded to that to say that there's --

7  it's just a rational basis standard and that it's rational to

8  only target nonprofits rather than for-profit abortion

9  providers and that it is rational to only provide -- target

10 those facilities that provide community family health

11 services rather than other -- other entities.

12       What's your response to that?

13       MR. SCHOENFELD:  So two arguments, Your Honor.  The

14 first is that we're not in rational basis review.  We're in

15 heightened scrutiny because this burdens Planned Parenthood

16 and its members associational rights.  They make no effort to

17 argue that the statute satisfies any type of heightened

18 scrutiny.

19       Second, they try to justify each of the separate

20 conjunctive criteria separately.  They never make an effort

21 to justify the conjunction of those four statutory criteria.

22 And they concede, they acknowledge, as do many members of

23 Congress, that the purpose of this was to single out and

24 defund Planned Parenthood.

25       The DC Circuit's decision in *Foretich*, which is a

1    bill of attainder case, I think is a really good example of

2    this.  The Court goes through, I think, eight different

3    statutory criteria and essentially says, yeah, like, one of

4    these standing alone might have a rational basis, but when

5    you look at all of them together, the inexorable conclusion

6    is that it was meant to single out the plaintiff for

7    attainment.

8            And that's precisely what's happening here.  I

9    don't think the Court is required to sort of blind itself to

10   the reality of what Congress was attempting to and has, but

11   for the Court's TRO, successfully done, which is to defund

12   Planned Parenthood.

13           The fact that there are two other providers among

14   the many hundreds of abortion providers in the United States

15   that are simply collateral damage to Congress's work here I

16   don't think undermines any of the arguments we're making

17   before the Court.

18           THE COURT:  So you do make a factual assertion in

19   your reply, and maybe it was also earlier -- I'm not sure --

20   but I didn't see a cite for it, and I'm wondering if it is in

21   the record.

22           You say that -- first, you say none of the

23   requirements are tied to the number of abortions provided,

24   and that's just by a facial reading of it.  It doesn't say

25   how many abortions provided.  It just says that you fit into

1   these different categories.

2          And then it says the vast majority of abortion

3   providers based on the -- accounting for the majority of

4   abortions provided are not covered by this statute.

5          Do I have that somewhere in the record?  Is that in

6   the expert declaration or not?

7          MR. SCHOENFELD:  I need to look, and I'll get you

8   the cite if it's there.  It looks like -- I want to look at

9   it with my own eyeballs, but let me go back and look at it.

10         So the -- sorry.  Can you just ask your question

11  one more time?

12         THE COURT:  Well, so you're making the assertion

13  that the vast majority of abortion providers accounting for

14  the majority of abortions provided in this country are not

15  covered by the statute.  And I'm wondering if that's in the

16  record.

17         MR. SCHOENFELD:  So the Custer declaration does say

18  that 60 percent of abortions in the United States are

19  provided by non-Planned Parenthood member providers.  We also

20  know -- I don't --

21         THE COURT:  That 60 percent of abortions or --

22  60 percent of abortions -- maybe it doesn't matter -- except

23  I think it does.

24         The relevant universe we're comparing are entities

25  that get Medicaid funds, because if there are things

1    happening in entities that don't get Medicaid funds at all,

2    that's not something that the government is working with.

3         So here the government's made a decision that

4    Medicaid funds can't go to entities that receive over

5    $800,000 in Medicaid funds for nonabortion-related matters

6    that are nonprofits and that are community healthcare

7    providers.

8         And you're saying to me that there's a bigger

9    different group that they're not defunding, but is that a

10   different group that also receives Medicaid, or is that just

11   a different group?

12        MR. SCHOENFELD:  I don't think it's in the record

13   what percentage of abortions either Planned Parenthood or

14   non-Planned Parenthood providers who receive Medicaid for

15   nonabortion services provide.

16        I also don't think it matters, because ultimately,

17   if this -- if this statute's criteria related only to the

18   provision of abortion, and we've separated out the affiliate

19   provision -- right? -- it's the affiliate provision that, I

20   think, makes this rotten to the core.  If it was just about

21   abortion -- and even if you had some size metrics like the

22   amount of revenue or the amount of Medicaid revenue, maybe we

23   would be dealing with an arguably constitutional statute.

24        But that's not what we have here.  The statute does

25   not just disqualify entities that meet those criteria, but it

1     sweeps in affiliates; and the purpose for which it sweeps in

2     those affiliates is to penalize Planned Parenthood, to single

3     out Planned Parenthood and penalize it, not merely for the

4     provision of abortion, but because of the advocacy for which

5     it's known.

6          THE COURT:  Well, so the government offers some

7     different responses there.  They're saying they're singling

8     out nonprofits because nonprofits have the benefit in the tax

9     code of being nonprofits.  And so they shouldn't be

10    singling -- they shouldn't be -- there's no reason to stop

11    Medicaid funds going to for-profit company entities that

12    provide abortion.

13         Any response to that?

14         MR. SCHOENFELD:  That may arguably be a rational

15    basis standing alone for a statute that has that as the

16    determining criterion.  It is hard to imagine a rational

17    basis for those four separate criteria streamed together; and

18    in any event, we're not in rational basis.  It burdens the

19    association of Planned Parenthood Federation and its members,

20    and we know that because of the use twice in the statute of

21    this affiliate language.

22         And because it burdens the associational rights of

23    the federation and its members, this is subject to heightened

24    scrutiny.  They don't argue that that satisfies heightened

25    scrutiny.  They don't argue that that's a rationale that

1  would persuade a court, that Congress is entitled to burden

2  associational exercise.

3          I think it's critical to the analysis here that, as

4  the government concedes, stopping abortion is not enough

5  under the statute.  An entity, in order to be covered, in

6  order to exclude itself from this prohibition, must

7  disaffiliate from the Planned Parenthood Federation and from

8  all other members.  In --

9          THE COURT:  And there's no disagreement about that,

10  right?  An entity can't get out from this prohibition if --

11  an entity that -- an entity can't get out from this

12  prohibition by stopping abortions if it remains affiliated

13  with Planned Parenthood Federation or other Planned

14  Parenthood members?

15          MS. HALL:  If it is legally affiliated within the

16  meaning of the statute, yes.

17          THE COURT:  Okay.

18          MS. HALL:  So that -- that depends on -- and

19  that's -- again, affiliation is different from association.

20          MR. SCHOENFELD:  And, Your Honor, may I on this

21  point?

22          THE COURT:  Yeah.

23          MR. SCHOENFELD:  So I agree that association and

24  affiliation are different.  I don't actually understand the

25  government to dispute that Planned Parenthood Federation and

1    its members are an association for First Amendment purposes.

2            I think they take the view that Congress can

3    regulate abortion, and that's what it's doing.  But we say

4    it's doing something different.  I don't understand them to

5    dispute the premise that it is an association.

6            MS. HALL:  Your Honor, I -- no, the government does

7    not dispute that it is an association; but it is also --

8    again, we don't have the facts to know exactly the nature of

9    the Planned Parenthood network.  And that's something that

10   we, of course, submit in our brief, that we need those facts

11   in order to determine whether they, in fact, have the

12   requisite affiliate relationships, and that's why this -- the

13   last three claims are premature.

14           MR. SCHOENFELD:  Well --

15           MS. HALL:  But --

16           MR. SCHOENFELD:  I apologize.

17           THE COURT:  Hold on one minute, both of you.

18           Maybe we can make this argument slightly more

19   complicated, which is -- it uses the term "affiliates" in two

20   places, but then it also uses the word of "part of a

21   nationwide healthcare provider network."

22           What does that mean?

23           MS. HALL:  Your Honor, again, the agencies have not

24   had an opportunity to analyze the statute, issue guidance.

25   But I will note that in other -- and I don't have the cite,

1  and I apologize for that.  In another, I believe, regulatory

2  provision, but it may be a statutory provision, a "nationwide

3  healthcare provider network" is used to refer to a system of

4  providers that are operating, I believe, typically, under a

5  certain type of health insurance program.

6       So, again, I --

7       THE COURT:  Like Medicaid?

8       MS. HALL:  No, I don't think so, Your Honor.  I --

9  I think it's something more akin to a managed care system.

10  But, again, I -- I don't have definitive interpretation as to

11  that language.  But I --

12       THE COURT:  But with regard to definitive

13  interpretations right now, a healthcare provider right now

14  can accept or not accept Medicaid patients right now for

15  yesterday or tomorrow.

16       And is it the government's position that they have

17  to sort of make their best guess and risk either turning away

18  patients or serving patients but not getting paid for it

19  while they hear, in the first instance, what the government

20  contends this means?

21       MS. HALL:  Your Honor, I think that the potentially

22  covered entities have a few options.  They can choose not to

23  serve patients that -- for which they might not get

24  reimbursement, and that's already true as to certain

25  services.  It may be unclear in certain circumstances whether

1    services will ultimately be covered by Medicaid, and a

2    provider has to make a call ahead of time before submitting a

3    claim for reimbursement as to whether they expect that it

4    will be reimbursed or not.  There's inherently some level of

5    risk in that.

6          THE COURT:  Except this is 55 percent of their

7    customer base, but yes.  Okay.  So they have to -- so one

8    option is they make a decision that they go ahead with it

9    even if they might not get paid.  Okay.

10         MS. HALL:  That's right.

11         They might also choose to forgo providing services

12    in the interim and then wait out the litigation and wait

13    until their claims are resolved and then, at that point,

14    decide to either resume or to cease depending on the outcome

15    of the litigation.

16         That's -- that's a typical course.  That's a

17    typical situation in litigation.  You have -- plaintiffs are

18    not -- plaintiffs cannot typically get a preliminary

19    injunction just to have enhanced legal certainty.  That is

20    not -- you know, uncertainty as to application of a law is

21    not itself grounds for a preliminary injunction.

22         THE COURT:  What's your response -- and I think

23    this came in the reply brief, so you haven't had a chance on

24    the papers.  But the plaintiffs assert that if they submit

25    claims for services provided and then they're later deemed to

1    not -- to be a prohibited entity, that they could be

2    prosecuted under the False Claims Act.

3            MS. HALL:  Well, Your Honor, the False Claims Act

4    has a scienter requirement and a materiality requirement.

5    And so if the claims that are submitted include appropriate

6    disclaimers, I suppose, of their reason that they think

7    they're entitled to reimbursement because they don't think

8    that the law applies to them, then I think that would be

9    substantial evidence against scienter, a substantial evidence

10   against materiality that would preclude that sort of

11   liability, which only attaches when there's a state of mind.

12           THE COURT:  And what if they simply said, "It

13   applies to us on its face, but we think it's

14   unconstitutional," and they write that on their Medicaid

15   claims?

16           MS. HALL:  Your Honor, I certainly am not a false

17   claims expert, and this came in yesterday.  But I believe

18   that that sort of assertion could be grounds for denial of

19   reimbursement, but I don't think that if the entities

20   submitted that and said, you know, by -- "On its face, this

21   statute applies to us, but we're still seeking reimbursement

22   because we think that the statute is unconstitutional," I

23   would be very surprised if the requisite scienter was found

24   there.

25           THE COURT:  And just in terms of the timing, if

1  we're having limited discovery here, presumably this case is

2  not going to be resolved in the next three months, so if

3  plaintiffs submit claims for Medicaid services -- let's make

4  this very simple.

5       If Planned Parenthood Massachusetts submits claims

6  for Medicaid services and marks those claims as submitted

7  because this statute is unconstitutional, when would those

8  claims have to be filed, and when would those claims normally

9  be paid?

10       MS. HALL:  As I understand it, the statute requires

11  providers to submit their reimbursements within two years of

12  providing services, and there's even an exception for

13  later -- later filings when it's pursuant to a court order.

14  So they have a long time to submit those reimbursements.

15       As I understand it, the states typically are

16  responsible for processing claims within 30 to 90 days.  And

17  then at that point, those claims are submitted to the federal

18  government, which for I think the next three months of claims

19  probably would not actually reach any kind of determination

20  by the federal government until around April of 2026.

21       THE COURT:  Okay.  So I understand your

22  on-the-ground argument that you don't agree with the -- or

23  the feasibility of the choice that plaintiff -- defendants'

24  counsel is suggesting.  But as to how Medicaid reimbursement

25  functions, do you disagree?

1    MR. SCHOENFELD: I think, in general, what the

2 government has described is correct. But if I may --

3    THE COURT: Sure.

4    MR. SCHOENFELD: -- I think, number one, the two

5 scenarios that counsel for the government has described are

6 catastrophic, right? Stopping to provide services for

7 Medicaid patients during this period while the legal

8 ambiguity, as they view it, is worked out is catastrophic for

9 the providers and for their patients.

10    And the idea that a categorical exclusion of a

11 provider is similar to figuring out whether one particular

12 blood test is covered by Medicaid or not --

13    THE COURT REPORTER: I'm sorry; if you can say that

14 again slower.

15    MR. SCHOENFELD: Let me try to remember it.

16    There is a significant difference between not

17 knowing whether you as a provider are excluded from the

18 Medicaid program and whether you can see any patients at all

19 versus not knowing whether one particular blood test is

20 provided.

21    If government counsel would like to make a binding

22 representation in court that there will be no False Claims

23 Act or other liability either under federal law or state law

24 as a result of Planned Parenthood members submitting these

25 claims during the period where the constitutionality of the

1  statute is being worked out and can guarantee that there will
2  be immunity for that conduct, both at the state level and the
3  federal level, we might be in a different place.
4      I still think that there is irreparable harm from
5  the disruption in the provision of services.  I don't
6  understand the government to be making that offer.
7      And just to go back to, I think, the first point
8  that government's counsel made, the notion that this is
9  ambiguous and the Court needs to wait for CMS or HHS to
10 effectuate, the very clear congressional directive to defund
11 Planned Parenthood in its entirety I think is not to be
12 credited by this Court.
13     We are at a preliminary injunction stage.  We have
14 demonstrated a likelihood of success on the merits.  We've
15 also demonstrated right now eminent, manifest, critical,
16 existential harm.  And the idea that the government might
17 eventually take a different view, all while this irreversible
18 harm is being done at the provider level, I think does not
19 justify the Court staying its hand.
20     THE COURT:  What if a court, this Court, were to
21 take the view that if "affiliates" means "association" at the
22 end of the day and the corporate structure is disregarded,
23 that that would be unconstitutional; and, therefore, in the
24 interest of constitutional -- avoiding finding the statute
25 unconstitutional, I read the statute to say that only

1 abortion-providing entities and not nonabortion-providing

2 entities -- namely, Planned Parenthood Federation itself and

3 the affiliate members -- could be included in that, where

4 does that get us?

5 MR. SCHOENFELD:  I think what Your Honor is

6 contemplating is something like severing the offending clause

7 from the statute.  That's not a remedy the government has

8 asked for.  And I think, you know, the constitutional

9 avoidance issues are limited here.  But I think you're

10 asking, essentially, to rewrite -- not you -- a Court,

11 hypothetical --

12 THE COURT:  Well, I'm asking you, if I were to do

13 that, and I think it's a fair response to say you're

14 rewriting the statute if that's what you're saying.

15 MR. SCHOENFELD:  Yeah.

16 THE COURT:  But that's my questions to you.

17 MR. SCHOENFELD:  So the government hasn't asked for

18 severance of that, and I would imagine it's because the

19 severance standard is whether a court is confident that

20 Congress would have enacted the statute without the severed

21 provision.  And that is not -- the government can't meet that

22 standard here.

23 I think the upshot is the Court is required to take

24 Congress at its word, and the evidence is in front of the

25 Court in terms of the way the provision is written.

1          Because this is a case about impermissible

2     targeting, the Court is welcome to consider the views of

3     members of Congress describing precisely why this was

4     enacted.  All of the government's case law, *O'Brien* and

5     *Hubbard*, all of those cases make a specific proviso for bill

6     of attainder cases and attainder-like cases where there's

7     evidence in the record that a particular entity was targeted,

8     and they carve out these sorts of cases from considering

9     those views.

10          But even if the Court didn't consider their views,

11    I don't think there's any illusion about what Congress was

12    trying to do here.  And so while that might kind of

13    practically solve some of the problem with the constitutional

14    issues, it's simply not a remedy that I think is available to

15    the Court.

16          MS. HALL:  May I be heard, Your Honor?

17          THE COURT:  Absolutely.

18          MS. HALL:  What plaintiffs' counsel is now

19    describing as a remedy that is unavailable is precisely what

20    Count 4 of their complaint asks for.  Count 4 of their

21    complaint asks for a declaration that the proper

22    interpretation of the statute simply as a matter of statutory

23    interpretation --

24          THE COURT:  And you think that count is not ripe,

25    not properly before me, there's no constitutional grounds,

1    et cetera.  So, presumably, that count, even if they've

2    argued for it, you would agree they don't get that?

3             MS. HALL:  Your Honor, I would agree that they

4    don't get that at a preliminary injunction posture because it

5    would be inappropriate to issue a declaratory judgment in a

6    preliminary injunction posture because it's not ripe, because

7    there's no cause of action.

8             THE COURT:  Just to be clear, a preliminary

9    injunction, you're absolutely right.  I can't give a

10   preliminary declaratory judgment, but they've never asked for

11   that.  They've asked for, at the end of the day, a

12   declaratory judgment; and then they've asked for a

13   preliminary relief because of those concerns.  So there is no

14   preliminary declaratory judgment on the table.

15            MS. HALL:  As I understood their request, they were

16   also asking for a preliminary declaration.

17            THE COURT:  Yeah, I went back and looked at the

18   thing, and I don't see it there.

19            MR. SCHOENFELD:  Your Honor, may I respond on the

20   relationship --

21            THE COURT:  Yeah.

22            MR. SCHOENFELD:  -- between -- so Count 4 and

23   Counts 1 through 3 are entirely independent of each other.

24            THE COURT:  You know what?  Count 4 -- counsel is

25   right.  I'm giving her a hard time about asking for a

1    preliminary declaratory judgment, but counsel is right that
2    Count 4 by itself does nothing one way or another.  But we
3    have --
4            MR. SCHOENFELD:  Sure.
5            THE COURT:  -- the other counts and so forth.  And
6    I do think my point to you about Count 4 was simply to say
7    you're telling me not to reach it.  You're probably right
8    that there's no reason to reach it in and of itself.
9            But what I do need to reach, I think, are the
10   constitutional claims in 1 through 3 and 5 and 6.
11           MR. SCHOENFELD:  Correct.
12           THE COURT:  And in order to understand those
13   claims, don't I have to understand what either -- what the
14   statute says on its face or what you're urging me that the
15   statute says, one or the other or both?  But I don't get to
16   just ignore what the statute says.
17           MS. HALL:  That's right, Your Honor.  And I think,
18   to respond to your point, to your original point to opposing
19   counsel about the sort of remedy that you are suggesting, I
20   do think that this, the remedy that would be appropriate if
21   Your Honor finds a likelihood of success on either Count 5 or
22   Count 6, the associational and vagueness arguments and
23   unconstitutional conditions arguments, the proper remedy
24   would be to enjoin the statute's application as to the
25   non- -- the allegedly nonqualifying members, as Your Honor

1   just suggested would be the proper remedy.

2          THE COURT:  Well, what about the claim that

3   Massachusetts Planned Parenthood and Planned Parenthood

4   Federation are making that it is a First Amendment -- and

5   maybe it's not Planned Parenthood Massachusetts, but maybe it

6   is Planned Parenthood Federation, is making the argument that

7   by penalizing anybody who associates with each other, you're

8   essentially doing the -- it's because of the bill of

9   attainder, it's because of the re- -- First Amendment

10  retaliation, essentially, that these are First Amendment

11  claims I need to worry about or protected constitutional

12  claims I need to worry about?

13         MS. HALL:  Well, Your Honor, I think if Your Honor

14  finds likelihood of success on the bill of attainder

15  argument, and I'm happy to talk about why that claim fails,

16  but if Your Honor were to find likelihood of success on the

17  bill of attainder argument, yes, I do think that would apply

18  equally to all of the federation members as well as

19  Massachusetts and Utah.

20         The same goes for the First Amendment retaliation

21  argument.

22         As for equal protection, plaintiffs seem to suggest

23  that the inclusion of affiliates renders it facially

24  unconstitutional; but because there are 37 members or 36

25  members that the federation asserts would be covered by the

1  law in any event, that precludes a facial challenge on the

2  basis of association because the -- those entities, even if

3  there were no association issue with the statute, which, as

4  we've asserted, there are certainly at least constitution --

5  at the very least, ways to read the statute that don't apply

6  to the members, the other ten members, you can't -- the

7  plaintiffs can't have a facial challenge based on association

8  when 36 of their members would fall within the statute

9  regardless of any association.

10        THE COURT:  Well, Utah can have it.

11        MS. HALL:  Your Honor, Utah -- according to

12  plaintiffs' theory, Utah is a nonqualifying member.  And so

13  Utah has a standalone as-applied association claim and can

14  argue on behalf of itself and, I think, sort of presenting

15  the sorts of arguments that the other allegedly nonqualifying

16  members would make that it cannot be constitutionally applied

17  to them because it's targeting them based on alleged

18  association.

19        Now --

20        THE COURT:  How about Federation?  Do they have an

21  applied challenge?  Because, essentially, what this is saying

22  is that, in order to keep your funding, you have to -- the

23  entities have to disassociate with Federation, and that's

24  kind of what they're saying what the statute says.

25        MS. HALL:  Your Honor, again, this is all dependent

1   on the facts and what the nature of these relationships are.

2   But assuming that that bears -- ends up being true, then I

3   think the federation could only seek that sort of relief as

4   to members whose association rights would be impeded.  I --

5           THE COURT:  Why isn't it its own?  So Federation

6   has 48 members as they're sitting there.  And in between now

7   and October 1st, the members are thinking to themselves, "Can

8   we continue providing healthcare services to our communities?

9   If we didn't get an injunction here, we're faced with this

10  dilemma.  We either have to give up providing services to our

11  communities.  Only 4 percent of" -- whatever -- "some small

12  percentage of our services are abortion anyway.  We'll just

13  give up those, abortion, and try to prevent the pregnancies

14  from happening in the first place so we can decrease the

15  number of abortions by providing contraception and so forth.

16  And we're making these decisions; we're thinking it's more

17  important for women to have access to contraception than it

18  is to have an abortion, and we're making that decision.  So,

19  therefore, we're going to stop providing abortions."  And

20  maybe they'll make that decision over the next three months.

21          But doesn't the statute also say on its face that

22  they need to disaffiliate with everybody else?  And if so,

23  isn't that meaning that, essentially, Planned Parenthood

24  Federation's 48 members are going to fall away?  Because some

25  of these are going to think it's more important to either

prevent abortions by providing contraception or just to
provide contraception.

They may think that providing women's health is
critical, and so they're going to give up the 4 percent of
their work doing abortions so that they can do the rest of
their mission, but they now have to also give up being
members of Planned Parenthood, right?

MS. HALL:  Your Honor --

THE COURT:  Planned Parenthood Federation.  Sorry.

MS. HALL:  Your Honor, if I follow the question
correctly, I think one aspect that I would just note is that,
in a footnote of plaintiffs' opening brief, they assert that,
as of October 1st, their members will continue to provide
abortions.  So I'm not sure that there is a real --

THE COURT:  But that's because they're asking me
for a preliminary injunction.  And if I say no to them for
the preliminary injunction and they're actually faced with
this issue on the ground of, "Do we stop providing healthcare
in large communities" -- I mean, we know that three of their
members have stopped providing abortions because the states
they're in prohibited them from doing it.

So we know that, at some point, there's a real
issue on the ground that people faced with that choice, even
if they think it's unconstitutional, may think their mission
of providing healthcare to poor people matters more and to

1    provide family planning and contraception other than abortion

2    matters more, and maybe they're just interested in lessening

3    the number of abortions -- who knows? -- but maybe they take

4    a different position.

5            You would agree that, under the circumstance,

6    unless they disaffiliate with Planned Parenthood, they run

7    the risk that, having dropped their abortion service, they

8    still won't get their family planning paid for.  And that's

9    chilling speech.

10           So they drop out.  So, I mean, isn't that either

11   penalizing Planned Parenthood Federation or interfering with

12   Planned Parenthood Federation's First Amendment rights or

13   their First Amendment rights of association?

14           MS. HALL:  No, Your Honor, because I don't think

15   that any of that is blocking these different organizations

16   from engaging in speech collectively.  Nothing in the statute

17   precludes them from coordinating for advocacy purposes.

18   Nothing in the statute precludes them from engaging in any

19   First Amendment activity.

20           THE COURT:  Except you're telling me that you don't

21   know if coordinating for speech purposes might be the same as

22   affiliation under the statute because you don't know what

23   affiliation under the statute means.

24           MS. HALL:  Your Honor, I don't think that

25   coordinating merely for speech purposes without corporate

1   control is sufficient to fall within affiliation in the

2   statute.

3          THE COURT:  Okay.  So we have now gotten a sentence

4   here, because this really is kind of the critical thing.

5          In the government's view, as you're representing

6   it, if there isn't corporate control, then banding together

7   and supporting a -- the federation as a membership

8   organization for advocacy would not limit people from

9   participating in Medicaid, if they don't -- if they

10   separately don't provide abortions?

11          MS. HALL:  Simply -- that's correct, Your Honor, if

12   it were simply for advocacy purposes.

13          To use maybe an easier example, if, for example,

14   Planned Parenthood Gulf Coast, which I understand does not

15   provide abortions, engaged in protected speech activity

16   together with Maine Family Planning --

17          THE COURT:  So as you sit -- stand here right now,

18   is Planned Parenthood Gulf Coast covered by this or not?

19          MS. HALL:  Your Honor, I don't know.

20          THE COURT:  But you're telling me -- you're telling

21   me that if they don't engage in speech and they're -- so are

22   you saying that if -- I guess I'm just -- I'm not

23   understanding it.  How -- how is it that Planned Parenthood

24   Gulf Coast, which doesn't provide abortions, has to sit here

25   today and decide whether or not to provide Medicaid services

1  this next few months?  I don't understand.

2          MS. HALL:  Because it depends on the nature of the

3  corporate relationship, which I don't have.

4          THE COURT:  Okay.  Tell me what it is that they

5  need to worry about doing or not doing or what their

6  relationship is or isn't.  Is it their relationship as of

7  October 1st or their relationship last fiscal year?

8          MS. HALL:  Their relationship as of October 1st

9  determines whether they are an entity, including its

10 affiliates.

11         THE COURT:  Okay.  So what is it that they have to

12 be careful of between now and October 1st to be able to

13 continue to provide healthcare services in those states?

14         MS. HALL:  Your Honor, I'm not in a position to set

15 forth the precise contours of what sort of business

16 relationships --

17         THE COURT:  Give me imprecise ones.  Give me

18 anything.

19         MS. HALL:  So, for example, Your Honor, I think

20 that if an entity, if Planned Parenthood Gulf Coast, to use

21 that example, has a contract or another formal agreement with

22 Planned Parenthood Federation or with another member that

23 requires it to take certain actions, that requires it to

24 provide particular services, that requires it to abide by

25 certain rules.

1       THE COURT:  So if Planned Parenthood Federation

2   says to Planned Parenthood Gulf Coast, "You may not turn away

3   patients based on their gender," that would be enough?

4       MS. HALL:  Your Honor, again, that alone, I don't

5   know whether that would be enough.

6       THE COURT:  What if Planned Parenthood Federation

7   says, "You need to make available cancer screenings"?

8       MS. HALL:  Your Honor, if -- if one entity is

9   controlling what types of services another entity offers,

10  then I do think that is a very relevant indicator of control.

11      THE COURT:  So if Planned Parenthood has a -- I'm

12  thinking sort of for franchises right now, right?  So

13  McDonald's says, if you have to have the McDonald logo, you

14  need to have napkins out front and forks and knives.  And if

15  you don't have those kinds of things, you don't meet our

16  standards for being a McDonald's franchise.

17          Is that sufficient type of control if that's what's

18  happening here, if it's not related to abortion, if it's

19  simply providing healthcare?

20      MS. HALL:  If the only -- if the only requirement

21  were you must have forks and napkins, again, I'm not sure

22  that that would be sufficient alone to demonstrate control.

23      THE COURT:  Well, but let's -- I mean, Planned

24  Parenthood is -- they are associated in the sense of the way

25  a trademark is associated, right?  Planned Parenthood

1  Federation says, "A Planned Parenthood clinic, wherever it is

2  across the country, can only use our Planned Parenthood logo

3  if they provide certain minimum healthcare standards," right?

4        MS. HALL:  That is my understanding.  I don't

5  believe that -- I'm not sure how -- what level of detail that

6  is in the record.  But that is my understanding, yes.

7        THE COURT:  Okay.  And you're saying that that,

8  saying to these communities that they provide this level of

9  healthcare that's mandated by Planned Parenthood Federation,

10 would disqualify them from Medicaid funds?

11       MS. HALL:  Your Honor, again, combined with other

12 factors and other considerations, I think that here we have a

13 question because I don't have the bylaws for these

14 organizations.  I don't have --

15       THE COURT:  Right, but --

16       MS. HALL:  -- this information --

17       THE COURT:  Congress could have helped everyone out

18 here and said the statute goes into effect, you know, after

19 October 1st.  And then everyone knows we've got to figure

20 this all out between now and October 1st.  But Congress

21 didn't do that.  Congress said this went into effect on the

22 night of July 4th.  And so between July 4th and

23 September 30th, Gulf Coast and other entities have to figure

24 out what they're doing.

25       MS. HALL:  And, Your Honor, I think one indicator

1    for Gulf Coast is that in all of Planned Parenthood's outward

2    facing materials, it appears to be described as a Planned

3    Parenthood affiliate.  And so I think that is a good

4    indication that it may be covered by the statute.

5         THE COURT:  Okay.  And the reason it's covered by

6    the statute is not because it provides abortion, because we

7    know it doesn't provide abortion, but because it's a Planned

8    Parenthood affiliate, which sort of goes into their argument

9    that what you're targeting is Planned Parenthood, not

10   abortions.

11        MS. HALL:  No, Your Honor, I don't think that

12   that's -- that that provides evidence of that.  I think it's

13   very common for Congress to include within the scope of a

14   statutory restriction affiliates of an entity that engages in

15   a primary behavior.

16        So, for example, there's a statute that governs --

17   excuse me while I find the citation.

18        THE COURT:  Do you -- is there any disagreement

19   here that Planned Parenthood Federation has a First Amendment

20   right to advocate for abortion?

21        MS. HALL:  No, I don't contest that there is a

22   First Amendment right to advocate for abortion.

23        THE COURT:  And are you saying that, because these

24   entities are associated with each other because they say

25   they're a Planned Parenthood affiliate, even though they

1    don't provide abortion, they can't get Medicaid funding, and

2    it's for a reason different than that Medicaid -- that

3    Planned Parenthood advocates for abortion?

4           MS. HALL:  Your Honor, yes.  This law has nothing

5    to do with advocacy for abortion.  It has to do with the

6    provision of abortion.  And, again, it is common for Congress

7    to act on an entity that engages in a particular behavior

8    along with entities that are affiliated with that entity.

9           And so the example that I was looking for was a law

10   that requires organizations that are subject to foreign

11   control to -- that engage in political activity to register

12   with the attorney general.  That's 18 USC Section 2386.

13          And under that law, "subject to foreign control" is

14   defined to include an organization that is affiliated

15   directly or indirectly with a foreign government.  This is

16   just another example of a statute.

17          And I don't -- I don't think that anyone would

18   assert -- and perhaps I'm wrong about that -- that that

19   statute which requires entities that are subject to foreign

20   control, including affiliated, directly or indirectly, with a

21   foreign government to register with the attorney general if

22   they engage in political activity domestically.

23          THE COURT:  Do foreign governments have a

24   First Amendment right in this country?

25          MS. HALL:  Your Honor, certainly not to the same

1  extent that an American citizen would.

2         MR. SCHOENFELD:  Your Honor, if I might, I mean,

3  the rational basis for that statute jumps off the page.  If

4  the concern is about government infiltration and the affairs

5  of the United States, ensuring that a foreign company and its

6  affiliates need to be subject to the same prohibition --

7  because, you know, who knows what the corporate

8  organizational laws of Myanmar are, and if they're subject to

9  some prohibition, certainly all their affiliates are.

10        But just to take a step back here, because I want

11 to make sure that the claims remain clearly distinguished,

12 there's a lot of talk about the Claims 4, 5, and 6; but to

13 bring this back to the equal protection claim, the

14 prohibition is on discrimination.  The fact that the -- that

15 Congress has chosen to discriminate against Planned

16 Parenthood because of its advocacy isn't cured by the

17 happenstance that one or more affiliates may otherwise be

18 excluded from the prohibition.

19        It is no less a facial challenge.  If a statute is

20 adopted with discriminatory intent, the fact that someone

21 might fall outside -- might otherwise be included in the

22 prohibition doesn't do anything to disturb the equal

23 protection showing.

24        If Congress said members of the Boston Bar

25 Association may not serve as federal judges, and some person

1     was a member of the Boston bar -- and they said it because

2     they don't like the position that the Boston Bar Association

3     has taken on a particular issue, and some member of the

4     Boston Bar Association was born outside the United States --

5     well, no, a federal judge can be born outside the

6     United States -- had committed an --

7           THE COURT:  A federal judge can be born outside of

8     the United States, unlike the president.

9           MR. SCHOENFELD:  Understood.  And I caught myself

10    and corrected myself -- had committed an infamous crime but

11    was still a member of the Boston Bar Association, it is no

12    less discriminatory -- I'm trying here with my hypothetical.

13    It may not work.

14          But my point is if there is a member who is

15    otherwise ineligible to be a member of -- a member of the

16    federal judiciary, it doesn't lessen the discrimination

17    against the Boston Bar Association or its members that

18    Congress has chosen to single out the bar association for all

19    of its expressive activity.

20          That's not how equal protection doctrine works.  If

21    it is purposefully discriminatory against an organization,

22    Congress doesn't get the benefit of someone else, you know,

23    one member or two members or however -- members, you know,

24    being otherwise subject to some neutral provision or some,

25    you know, subset of the gerrymandered criteria.

1    So this is a facial challenge because, in our view,

2    it is inarguable that Congress has chosen to single out

3    Planned Parenthood for this statutory prohibition on the

4    basis not simply of its providing abortions, but also because

5    of its association.

6    Congress is not permitted to require organizations,

7    to put organizations to the choice of repudiating their

8    First Amendment-protected association in order to receive

9    government funds regardless of whatever other criteria apply

10   to them.

11   THE COURT:  Let me just dig in a little bit on that

12   last point about their First Amendment rights.  I think the

13   government cites *Rust* a lot.  And you responded in your reply

14   that *Rust* supports you, not them.

15   MR. SCHOENFELD:  Yeah.

16   THE COURT:  Can you both discuss that a little bit?

17   I mean, as I read *Rust*, Congress said you can't use Title X

18   funds, essentially, for abortion-related counseling.  And so

19   it was a First Amendment challenge to that.  And the Supreme

20   Court said, yes, you can limit it that way.

21   But there's a pretty extensive discussion that it's

22   okay -- the regulations, they basically -- they basically go

23   through and say that the grantee -- they govern the project,

24   that there's a project within what the entity's getting it.

25   It limits what the project can do.

1        And the regulations govern the scope of the

2  project's activity, leaves the grantee unfettered in its

3  other activities.  The grantee can continue to engage in

4  abortion advocacy.  It's simply required to conduct these

5  activities through programs that are separate and independent

6  from the project that receives the funds.

7        That's *Rust*, from '91.  Is that not good law

8  anymore?

9        MS. HALL:  Your Honor, I think that that -- *Rust* is

10  good law, and we rely on it, obviously, in our brief as well.

11  But I think that the assertion that -- the suggestion that

12  this case does not permit First Amendment advocacy is just

13  wrong.  This statute does not restrict Planned Parenthood or

14  Planned Parenthood Federation or any of its members from

15  engaging in advocacy.

16        THE COURT:  I'm actually -- I'm actually sort of

17  focusing in a little bit more, and maybe I -- I don't know

18  the case law here at all.  So, please, correct me.

19        What *Rust* seemed to be saying was you could limit

20  the use of the funds the way you want it to be used; but you

21  can't say if you're taking these funds over here, that same

22  entity can't be doing other things over here.

23        So Planned Parenthood Massachusetts is saying, "We

24  are doing -- over here, we're doing -- performing abortions;

25  and we -- here, somewhere else, we are using money to pay

1   dues to" -- I don't know if they pay dues to Planned

2   Parenthood Federation or whatever.  They use it for their own

3   advocacy.

4         "And then over here, we are performing Medicaid

5   reimbursed services; and for that, we're seeking

6   reimbursement."

7         Why isn't *Rust* read to say for whatever you're

8   seeking Medicaid reimbursement, you cannot use those funds

9   for anything; i.e., you cannot use the Medicaid funds for

10   abortion; and, frankly, you can't use the Medicaid funds for

11   abortion advocacy.

12         But you have 50 percent of other funds that are

13   coming into your clinic.  Doesn't *Rust* say you can use those

14   other funds for not only advocacy, but abortion?

15         MS. HALL:  Well, Your Honor, I think that there's a

16   major difference between the situation in *Rust* and now, which

17   is that, at the time, the Supreme Court considered performing

18   abortions to be protected conduct.  And that is not true in

19   the wake of *Dobbs*.  There is no right to perform abortions.

20   There's no right to receive an abortion under the

21   Constitution of the United States of America, and that makes

22   a substantial difference because the conduct that is

23   prohibited is performing abortions.

24         There's no --

25         THE COURT:  But you're not getting Medicaid money

for performing abortions.  But I think what you're saying is
*Rust* is no longer good law to the extent that what it's --
you're saying, I think, that *Dobbs* overrules *Rust* in so far
as *Rust* said, as long as you're not using the federal funds
for abortion or abortion advocacy, you can do other things
here.

And I think what you're saying to me now is that in
the post-*Dobbs* world, we can withhold Medicaid funds from an
organization that performs abortion, period, even if the
funds aren't used -- even if it's not Medicaid funds.

So you're saying that what's happening here
could -- Congress could have done this more broadly, that
Congress could simply say no Medicaid funds goes to any
healthcare provider that performs abortions.

MS. HALL:  Yes, Your Honor.  I don't think that
there's a requirement that entities that receive federal
funding be permitted to engage in activity that is not
protected and that Congress wishes to discourage.

I think that, for example, if an entity had, you
know, two sides of its business and one was providing
Medicaid services and the other was engaging in fraud,
Congress could say we don't want any federal funds going to
an entity, even if the fraud is totally separate, that is
engaged in fraud.

Likewise --

1      THE COURT:  What if the conduct isn't illegal,

2  though?

3      MS. HALL:  Your Honor, I think the same is true.

4  It doesn't have to be illegal, because Congress is not saying

5  you're not allowed to provide abortions.  It's simply saying,

6  if you wish to provide abortions, we don't want to pay you

7  for anything.  We don't want to have a reimbursement

8  relationship.  We don't want to fund an entity that engages

9  in conduct of which we disapprove.

10     THE COURT:  In that same scenario, if the entity

11 didn't engage in abortions but simply engaged in abortion

12 advocacy, that, they couldn't limit the funds?

13     MS. HALL:  Your Honor, I think that's a very

14 different case, and I think we have --

15     THE COURT:  But I'm asking you for the answer to

16 that question.

17     MS. HALL:  Judge Sotomayor's decision in the

18 Mexico City case suggests that federal funds can be

19 conditioned even on advocacy of a position that the

20 government does not take.  And this is -- again, it

21 underscores why this case is not like a typical punitive

22 case.  It is not making it unlawful for Planned Parenthood

23 entities to perform abortions.

24     It is simply saying if you want --

25     THE COURT:  No, but I think what you're saying, to

1    be very clear, is I think what you're saying is it's okay to

2    make it unlawful to advocate for abortions, no?

3              MS. HALL:  No, Your Honor.  That's not what I'm

4    saying.  It -- the -- Congress can say we don't want to give

5    money to an entity that advocates for abortions.

6              THE COURT:  Exactly.  So that what you're talking

7    about here isn't -- because this isn't designed -- this

8    statute doesn't say we're not going to give Medicaid money to

9    entities that perform abortions.  I think if that had been

10   the legislation, I think you might have had some other

11   entities being concerned about what that would mean.  I don't

12   know that the -- I don't know where that goes.

13             But what you're saying is it is okay for Congress

14   to stop entities who advocate -- from receiving funds if they

15   advocate for abortion.  I think that's what you're saying.

16             MS. HALL:  Your Honor, that's not what this statute

17   does, and so there's no need to opine on the --

18             THE COURT:  But it does by the affiliation pieces.

19             MS. HALL:  No, Your Honor.  Again, it does not

20   restrict the Planned Parenthood members from engaging in

21   advocacy together or separately.  It simply prohibits them

22   from legally affiliating.

23             And, again, I think the affiliation point is maybe

24   underscored by the financial relationship between the

25   entities, which, again, I don't have a lot of visibility

1    into.  But as I understand, all members pay some sum into

2    Planned Parenthood Federation, and Planned Parenthood

3    Federation also pays sums out to the entities.

4         So there is some kind of financial relationship

5    between the entities that, again, is different from a simple

6    association relationship.  If the entities were only engaging

7    together by, you know, putting out ad campaigns together that

8    said, you know, "We want to change policies of this state or

9    that state or we want to lobby Congress to change the law,"

10   that's a very, very different case.  And that's not what we

11   have here, based on the limited record.

12        Now, again, there could be a more developed record

13   that demonstrates that, in fact, there are not these

14   financial relationships; that, in fact, there are not these

15   control relationships.  These contracts that preclude the

16   entities from ceasing to perform abortions where it's legal

17   potentially, again, this is -- I'm trying to draw on the

18   materials that I have, which are very limited.

19        But, again, I think that this is not something that

20   is targeting speech advocacy.  This is not something that's

21   targeting that form of association.  It's targeting corporate

22   affiliation, which is a very different concept.  And not

23   every case that --

24        THE COURT:  I am confused here.  Are you really

25   saying -- so you're saying this statute is limited to

1    corporate -- corporate affiliation and not association?

2    That's sort of where we're landing on this?

3         MS. HALL:  Mere First Amendment association would

4    not be sufficient to render -- render an organization an

5    affiliate under the statute.

6         THE COURT:  But anything that is more than

7    speaking, more than getting together on an ad campaign, such

8    as if you want to put a Planned Parenthood sign outside, you

9    have to meet certain standard of care, that would put

10   everyone together?

11        MS. HALL:  Your Honor, again, I think that one

12   small condition for the use of a name or an endorsement is

13   very different from the limited evidence that we have here.

14   And so, again, I think we would need to know more about the

15   nature of what exactly is required, what exactly is

16   prohibited, what sorts of control are actually being

17   exercised because that's -- I mean, Planned Parenthood, the

18   plaintiffs, rather, in their opening brief, they set forth

19   this definition of "affiliate" that they advance, they ask

20   this Court to adopt, that has an understanding of control.

21        And they assert that they simply don't meet that

22   control standard.  But here, what I'm asserting and what the

23   government asserts here is that there is a substantial

24   factual dispute as to the level of control.  And it is -- the

25   application of the statute to any entity that does not itself

1    perform abortions is contingent on the interpretation and

2    application to the facts, not any kind of question of just

3    whether they have engaged in advocacy or speech together.

4            THE COURT:  I come back to you.  Do you understand

5    *Dobbs* to have overruled the portion of *Rust* that --

6            MR. SCHOENFELD:  No.

7            THE COURT:  -- said if an entity performs this over

8    here and what about the Sotomayor opinion, lower court

9    Sotomayor opinion?

10           MR. SCHOENFELD:  So I think that Judge Sotomayor's

11   opinion, I think, is from 2002; and so I think you need to

12   kind of refract it from *AOSI*, which is not an abortion case,

13   which reaffirms the principle from *Rust* that what you do on

14   your own time and dime is not subject to government

15   regulation even if you otherwise accept government funding.

16           So the notion that the government is entitled to

17   regulate at the grantee level, regardless of the program that

18   they're expecting to fund, I think the Supreme Court rejected

19   that in *AOSI*, which we discuss in our brief.

20           I also think that these kind of fine-grained

21   questions about precisely what "affiliate" means and the

22   degree of control do nothing to detract from the fact that

23   what Congress was attempting to do here -- whether they did

24   it successfully or not, I think, is immaterial.

25           What they were attempting to do here was to

1    penalize Planned Parenthood Federation and its members from

2    engaging in their First Amendment protected associational

3    rights and to deter them from doing that.

4            And the fact that they're required to repudiate

5    that relationship, whatever it means, in order to qualify for

6    these benefits, even if they don't provide abortions, is all

7    the evidence the Court needs to find that it's a bill of

8    attainder, find that it violates equal production under any

9    standard of review, and find that it's retaliation in

10   violation of the First Amendment.

11           THE COURT:  Okay.  Let me -- we're going to be

12   running out of time soon here.  Let me change gears for a

13   minute and talk a little bit about irreparable harm.

14           It seems to me that there have been discussions in

15   the papers, and I suppose my temporary restraining order

16   covers one of these, but there's -- as I understand the

17   plaintiffs' argument, you suggested that there was harm to

18   First Amendment rights and then there's harm to the members'

19   relationships, et cetera, with their patients and the closing

20   of the facilities.

21           And then there was reference to the loss of care

22   for patients.  And you probably didn't make the argument, but

23   I did include that loss of care for patients under

24   irreparable harm.  The government points out, I think, that

25   that can properly be considered under the public interest,

1   but not under irreparable harm.

2          So -- any disagreement with you on that, that the

3   harm to the patients is not in front of me today?

4          MR. SCHOENFELD:  I disagree.

5          THE COURT:  Okay.

6          MR. SCHOENFELD:  So we do rely on the, you know,

7   *Elrod* standard that even a minimal --

8          THE COURT:  So let me just get that one off the --

9   or keep it --

10         MR. SCHOENFELD:  Yeah.

11         THE COURT:  We don't need to spend too much time

12  discussing it.  On the First Amendment violation, irreparable

13  harm is -- the issue is whether there's a substantial showing

14  of a First Amendment right violation.  That's where the

15  energy goes.  If there is, then we have irreparable harm by

16  definition under *Elrod*.

17         Any disagreement on that?

18         MS. HALL:  Your Honor, I would just emphasize that,

19  again, nothing in this law restricts advocacy.

20         THE COURT:  But my point is that's a merits

21  argument.  And I may agree with you at the end of the day

22  that they haven't made a substantial showing.

23         But if I disagree and I accept their premise that

24  there is a substantial showing, and the next test done in a

25  preliminary injunction is irreparable harm, harm to

1   First Amendment rights is irreparable harm by definition

2   under *Elrod*, right?

3           MS. HALL:  *Elrod* does hold that harm to First

4   Amendment rights is irreparable.

5           THE COURT:  And that's Justice Alito's decision in

6   the case about -- I don't have the name in front of me, but

7   last month about the children's books.

8           MR. SCHOENFELD:  *Mahmoud v. Taylor*.

9           THE COURT:  That also reiterated the *Elrod* standard

10  for First Amendment rights.

11          So on the First Amendment, I understand the issue

12  to be a merits issue on substantial -- I'm not sure "merits"

13  is the right word -- but on the first prong of the

14  preliminary injunction, whether they've made the necessary

15  substantial likelihood of success or not.  So let's put that

16  aside.  That's the last hour and a half that I still need to

17  figure through.

18          On to the other types of harm, the two harms that

19  are out there are that the clinics might close and that --

20  the patient harm.  And I had cited the patient harm in the

21  temporary restraining order.  You pointed out that harm to

22  third parties, they're not here.  They haven't filed a class

23  action.  I should consider that if I consider it at all under

24  public interests, but not as irreparable harm.

25          Are we on the same page here?  And you're

1  disagreeing with that?

2      MR. SCHOENFELD:  Yeah, so we rely on *Elrod.*  We

3  rely on the harm to the providers, not simply ceasing to

4  provide care, but the disruption in relationships that

5  they've developed over time.  So we rely primarily on that.

6  Sorry.

7      With respect to the patient harm, there is case law

8  from this district in *Mediplex*, which we cite, which says

9  that when the interests of the third parties and the parties

10  before the Court are so inextricably bound up, you can

11  consider it for purposes of irreparable harm.  And I think

12  there's a number of cases in the healthcare context that make

13  clear that you can consider it as a factor.

14      We win even if you ignore it entirely and consider

15  it just on the equities as between the public interest and

16  the government's interest in enforcing the statute.  We win

17  because of the First Amendment interests and the disruption

18  to the provider relationship.  The Court can permissibly

19  consider it.  If you want to not consider it, we still win on

20  a showing of irreparable harm.

21      THE COURT:  Okay.  I haven't read the cases that

22  you just mentioned, but I will go back and look.  But let's

23  look at the harm to the providers.

24      In my prior life, I was -- I did a lot of

25  employment law.  And if an individual has a -- is fired

1  without cause unlawfully, violation of any statute up and

2  down, and now they are about to lose their house and they

3  come in and ask for a preliminary injunction because they're

4  about to lose their house, they don't get it.  And the law is

5  pretty clear that, regardless of the reality of the

6  situation, the law just doesn't recognize it.  It's a

7  mechanical --

8          MR. SCHOENFELD:  Yeah.

9          THE COURT:  It has money.  You can get back money.

10  Even though the money -- even though the clinic is now --

11  well, if the clinic's closed, we might be in a different

12  circumstance.  But even though the clinic has now turned away

13  a lot of patients, you might have lost your house, but tough

14  on you.

15          Why isn't she right?

16          MR. SCHOENFELD:  There is First Amendment case law,

17  there's case law -- sorry -- First Circuit case law -- I

18  apologize -- not a merits issue.  There's First Circuit case

19  law and there's case law elsewhere that says in the context

20  of healthcare, the disruption of the relationship between the

21  provider and the patient is irreparable harm.

22          The loss of continuity of care, the loss of

23  relationships, the loss of the good will, the obliteration of

24  clinics that will not be able to reconstitute themselves if

25  they lay off employees or if they close entirely is manifest

irreparable harm.  No amount of money that the government
would be able to provide to Planned Parenthood members at the
end of this litigation will ever remedy any of those
injuries.

        And it's just different in any case when you're
dealing with back pay and front pay, no matter the amount of
the back pay or front pay, no matter the consequence for an
individual employee.

        THE COURT:  So I think that, first of all, your
client isn't -- clients aren't getting paid in real time,
right?  This is -- someone shows up for services, and they
are submitting a claim to the state.  And some amount of time
later, you get paid that amount of money, right?

        MR. SCHOENFELD:  Correct.  But the -- the
healthcare is provided on the assumption, based on years of
investment in the program, that they will be reimbursed.  And
some of my clients have stopped providing care, certain types
of care to Medicaid patients, have stopped honoring
appointments because of concern that they won't get
reimbursed.

        THE COURT:  I understand that.  But isn't the
standard that I'm -- isn't the issue here, when it's economic
harm that we're talking about, assuming you're right on all
of your legal arguments on the merits and assuming at some
later juncture I -- you prevail, and those claims that you

1  have been submitting as you go are now being paid in full,

2  what you're saying is the clinics are having to bet on

3  whether the courts are going to go one way or another?

4        MR. SCHOENFELD:  Correct.  And they're making

5  decisions in real time on that basis.

6        THE COURT:  And I'm having to guess whether the

7  courts are going to go one way or another above me.

8        And what you're saying is I should make that

9  decision rather than your clients, because if your clients

10  are right, then -- and they get that money, I mean, that's

11  the sort of argument; then they'll have the money.  And what

12  you're saying is but they have to cancel the appointment not

13  because they can't pay tomorrow's mortgage, but because

14  they -- they think they're not going to be able to pay

15  tomorrow's mortgage because they think that they might lose.

16        MR. SCHOENFELD:  Yeah, I mean, there's hundreds of

17  millions of dollars at stake, and my clients do not lightly

18  disrupt their relationship with patients that they've

19  cultivated trust and good will with for decades.

20        The reason they are doing this is because they

21  cannot run the risk of incurring liability for submitting

22  reimbursement claims that they may later be penalized by, and

23  they can't be in the business of providing healthcare

24  services when there's no likelihood or no promise of

25  reimbursement.

1          No -- I mean, the Custer declaration lays this out.

2     No amount of reimbursement for services provided, no amount

3     of interest on top of that will ever allow my patients to

4     restore the status quo.  They will never be put back in the

5     position they were in in terms of the relationship with

6     patients --

7          THE COURT:  But isn't that because they're making

8     the choice right now to not take the risk?

9          MR. SCHOENFELD:  This is not a self-inflicted

10    wound.

11         THE COURT:  I understand that, and I'm not trying

12    to be flippant here.

13         MR. SCHOENFELD:  No, I understand.

14         THE COURT:  But if -- you don't disagree with the

15    government's description of how funding is -- comes down.  So

16    this isn't a question where you're saying to me, if we don't

17    get this check on Friday, we lose the house, right?  There's

18    nothing happening on Friday or Saturday or next week.

19         MR. SCHOENFELD:  I mean, some of this --

20         THE COURT:  The way they've described this, you

21    wouldn't be seeing the money for a while anyway.

22         MR. SCHOENFELD:  I don't think that's true.  Some

23    of this money would be coming in before October 1st.  I think

24    what the government referred to is an outside two-year

25    limitation on submitting reimbursements, but some of this

1   money would be coming through the door on a more regular

2   basis, including before October 1st.

3        THE COURT:  So if you submit the claims and the

4   state pays them, then what happens?

5        MR. SCHOENFELD:  Well, then, number one, we are

6   incurring the possibility of False Claims Act --

7        THE COURT:  No, you submit the claims with the

8   proviso on the top that says, "We're submitting it because we

9   think the statute is unconstitutional."

10       MR. SCHOENFELD:  I wish it were the case that that

11  provided adequate insurance, but it doesn't, I think, under

12  pretty well-settled case law.  I don't think that would

13  provide adequate security here.  And if the government wants

14  to make that representation both as to state and federal

15  False Claims Act liability, that's something we could

16  obviously consider, but it's simply not the case.

17       These are kind of revolving lines.  The money is

18  coming in the door when the services are provided.  The

19  possibility that the government is either going to claw the

20  money back at the end of the day because the services were

21  provided under a time period where we are deemed to be a

22  prohibited entity or that the money is never reimbursed for

23  states that aren't providing it, the only reason states are

24  continuing to provide it now is because CMS provided a letter

25  after the Court entered the TRO.  We have no idea what's

1    going to happen, but the likelihood of harm and the harm

2    being irreparable --

3            THE COURT:  I'm sorry.  Why are you -- you're

4    continuing to get money for services provided through right

5    now, these two weeks.  Is that what you're talking about?

6            MR. SCHOENFELD:  Yeah, as a result of the TRO.  I

7    don't know what the case would be if there were no TRO and it

8    hadn't been distributed by CMS to the state directors of

9    Medicaid.

10           In the absence of some injunction where both the

11   federal government and the state government are free to deny

12   Medicaid payments -- and maybe that would be reversed at some

13   point in the future -- we've described to you in detail

14   exactly what will happen on the ground.

15           And the fact that we are being put to the choice of

16   serving our patients or foregoing that money is not a choice

17   that the -- that the government is constitutionally permitted

18   to put us to.

19           The harm here -- I mean, again, I think the harm in

20   terms of the disruption of services, the disruption of the

21   relationships, that is the natural consequence that is the

22   desired intent of Congress.  And so if the question is

23   whether that harm is irreparable or not, I don't think

24   there's any case that --

25           THE COURT:  So the problem -- the problem with what

1   you're saying, I think, is if it's the desired intent of

2   Congress to take this money away and that's upheld by the

3   courts, you lose the money.  That's the reality.

4           And so the question that I have to figure out is,

5   one, substantial likelihood of success, and so I would be

6   saying and you would be saying we believe as we stand here

7   that this is absolutely going our way or very high percentage

8   chance going our way.

9           If I don't get to that level of very high chance it

10  goes away, then -- I mean, the reason that standard is so

11  high, then in terms of irreparable harm, why aren't we just

12  under this normal rule that, even though the reality on the

13  ground is that all of these services are going to be

14  deprived -- your patients are going to lose out on these

15  services, why isn't the answer, "Oh, well, you do the work if

16  you want to, and then you can get the claim in.  You believe

17  you really are going to win it, so it's not that bad a risk"?

18          MR. SCHOENFELD:  Because the PI standard, the PI

19  doctrine doesn't require us to make that choice.  *Ex parte*

20  *Young* makes very clear that we are entitled to challenge an

21  unconstitutional act without subjecting us, ourselves, to the

22  penalty.

23          And the standard has evolved in such a way to make

24  sure that if we make the requisite showing -- sorry -- if we

25  make the requisite showing that we are substantially likely

1   to succeed on the merits of our claims, we are entitled to

2   ensure that no harm that will be irreparable, that is

3   irreparable, is one that we have to endure rather than

4   vindicate our constitutional rights.

5          If there's money at the end of the day that puts us

6   in exactly the status quo ante, I agree; we do not have a

7   right to a preliminary injunction.  If we are able to

8   demonstrate to the Court's satisfaction that this is not

9   merely about money and no amount of money will ever restore

10  us to the position we were in before this enactment, then we

11  are entitled to a preliminary injunction.

12         THE COURT:  I -- that -- this is -- I don't think

13  that's quite the test, of restoring you in the exact same

14  position or not.  And that's my example about the -- I

15  probably seemed like I was off on a strange tangent, but

16  that's my example about people lose their house; that the

17  courts don't protect you even though that may be the outcome,

18  unless you can show, essentially, corporate death or, you

19  know, that it's not just your services are going to be

20  reduced, it's not just that you're not going to be able to

21  get this product out in a case, it's not just that you are

22  really hamstrung for the long haul.  That's not the test,

23  unfortunately.

24         Isn't the test either that there's some injury that

25  can't be compensated through money or that the entire

1    business goes out?

2          MR. SCHOENFELD:  I don't think it's quite that

3    clear.  I don't think the test is corporate death.  I think

4    the test is irreparable harm.  And in this particular

5    context, courts have repeatedly recognized that this type of

6    injury, the substantial disruption and the provision of care

7    by long-term healthcare providers invested in their

8    communities to these patients -- and there's no dispute in

9    the record that that is actually going to happen and is, in

10   fact, happening right now.

11          I don't think there's any dispute that that has

12   traditionally satisfied the irreparable harm standard.  And I

13   don't think you're required to show that the clinics are

14   going to close down.  But what we have shown you through the

15   record is that employees are going to be laid off and they're

16   never going to be recuperated by the organizations.  These

17   are employees who have known these patients for decades and

18   have provided care.

19          I think those are precisely the types of

20   irreparable harm, particularly in this context, that courts

21   have routinely recognized satisfy the requirements.

22          I also think -- I mean, not to quibble with the

23   hypothetical, I do think there are cases where if someone is

24   going to lose their house, they may get an injunction because

25   of the irreplaceability of real property.  It happens in the

1   mortgage foreclosure context.

2        My only point -- again, we don't need to argue

3   about that. My only point is where there is something unique

4   about the relationship, courts are willing to find

5   irreparable harm. And in the doctor-patient relationship,

6   these providers have a unique, irreplaceable, essentially

7   uninterruptible relationship with their patients.

8        THE COURT: So it seemed like the standard here

9   used to be that I would need to make my evaluation of those

10   harms and substantial risk, substantial likelihood, I would

11   need to make that based on the record. And the appellate

12   courts would review that on an abuse of discretion standard.

13        Do you think that is currently the state of law?

14        MR. SCHOENFELD: That is the way the law is

15   currently written. And I think that the -- there is ample

16   support in the record before this Court for both likelihood

17   of success on the merits and irreparable harm. And if the

18   Court were to reach that conclusion on any or all of our

19   claims and find irreparable harm, I'm very confident that,

20   under the governing law, it would be affirmed by the

21   First Circuit.

22        THE COURT: And then?

23        MR. SCHOENFELD: Your Honor, I think the point is

24   we are right on the law. We have made the requisite factual

25   showing, and we are entitled, certainly, before Your Honor

1   for preliminary injunction.

2          And I think that's true under governing Supreme

3   Court case law as well.  I think if you look at any of the

4   cases governing any of the claims here, we come very squarely

5   within the constitutional provision and very squarely within

6   the requirements for a preliminary injunction.

7          THE COURT:  What is your response to the argument

8   regarding the destruction of the patient relationships?

9          MS. HALL:  Your Honor, I think there are two

10  responses to that.  First is that, as Your Honor asserted,

11  the plaintiffs here are electing --

12         THE COURT:  I'm not asserting anything here.  I'm

13  just pushing both of you.

14         MS. HALL:  Understood, Your Honor.  I'll certainly

15  rephrase that.

16         As was just discussed, there is a -- the plaintiffs

17  here are electing to disrupt the plaintiff -- the patient

18  relationships by ceasing to provide care.  But if they

19  ultimately prevail on the merits, if they are correct about

20  their legal theory, the theory that they are pressing and

21  that they assert is substantially likely to succeed, at the

22  end of the litigation, then they will be able to get all of

23  the reimbursements back for the services that they provide.

24         So any disruption to the patient relationship is

25  something that they are taking on in order to hedge against

1  not prevailing.

2      But what matters for irreparable harm is whether it

3  will not be able to be remedied if they ultimately prevail at

4  the end of the litigation.  And that, itself, is --

5  demonstrates that the reimbursements are sufficient and that

6  any action that the plaintiffs take that foregoes those

7  reimbursements by deciding not to provide care, that is

8  something that they are electing to do.  That is a path that

9  they are choosing to take.

10     And they could, instead, kind of put their money

11 where their mouth is and go ahead and provide the procedures

12 and the services that they assert they are legally entitled

13 to provide.  And if they prevail at the end of the

14 litigation, then they will be able to receive reimbursement

15 for those services.

16     A preliminary injunction is not meant to give them

17 insurance in case they're wrong.  A preliminary injunction is

18 meant to protect them in case they are right.

19     THE COURT:  I want to switch gears for one minute,

20 and then I'm going to let you both wrap it up.

21     You described -- the defendants described this

22 piece of legislation as reallocation of funds.  And I

23 understood the argument to be that the government would

24 prefer to pay healthcare providers that don't perform

25 abortions also instead of supporting healthcare providers

1  that do perform abortion; and so, therefore, these same

2  funds, instead of going there, will go somewhere else.

3            Am I understanding that correctly?

4            MS. HALL:  Broadly, yes, Your Honor.

5            THE COURT:  Okay.  So there's a final provision of

6  this, Section 71113, in which allocates an additional

7  $1 million to implement the section.

8            What's that for?

9            MS. HALL:  Your Honor, as I understand it, that can

10 be spent by the HHS and CMS in order to, for example, put

11 together guidance on how this is implemented, perhaps to

12 police this.  You know, if the law's upheld, there's no

13 injunction, then they're going to need to investigate the

14 sorts of forms that are submitted.

15           As I understand it, and I'll admit this is not

16 incredibly detailed, the current -- the current forms that

17 are submitted to CMS and HHS don't provide all of the

18 information that might be helpful in order to effectuate this

19 provision.  And so there might be need to be new forms

20 developed, that sort of thing.

21           And so there's an allocation so that CMS can take

22 whatever steps are necessary to ensure that it can, in fact,

23 ensure that federal funds are not going to these entities.

24 So that may involve just, you know, reporting requirements,

25 reviewing submissions from states more closely or in a

1 different way than they might otherwise.

2    THE COURT:  Okay.  So it's not a cost-neutral

3 reallocating?  The government is spending an additional

4 million dollars to take the work from these clinics and

5 moving them to other clinics?

6    MS. HALL:  Certainly, I don't know whether CMS will

7 spend that full amount, but Congress is entitled to make a

8 judgment that it wishes to expend money in order to ensure

9 that it's not subsidizing --

10    THE COURT:  I just -- you know, when I'm trying to

11 figure out what the statute is, and you described it as

12 reallocating money, it's reallocating and spending more money

13 to move money from places that some of which provide

14 abortions and some of which are affiliated with Planned

15 Parenthood to other facilities.

16    MS. HALL:  Certainly.  Congress has appropriated

17 funds in order to ensure that the agency tasked with

18 effectuating its --

19    THE COURT:  I'm not saying they can't do it.  I'm

20 just trying to understand what they did.  That's all.

21    MS. HALL:  That's my understanding, yes,

22 Your Honor.

23    THE COURT:  Yes?

24    MR. SCHOENFELD:  I would just look at

25 Professor Brindis's report, which makes quite clear that

1  Congress won't be able to do that, which I think goes to the

2  irreparability of the harm and the public interest.

3       THE COURT:  Won't be able to?

4       MR. SCHOENFELD:  To find providers willing to

5  provide care, capable of providing care to these communities

6  without Planned Parenthood.

7       THE COURT:  Yeah, no, I understand that.  But,

8  then, maybe Congress's intent here was to save money on

9  Medicaid and not pay for family planning.

10       I mean, I'm a little puzzled by this.  I have to

11  tell you this.  This idea that we're going to stop abortions,

12  that we're going to stop abortions for -- essentially, we're

13  going to stop abortions for poor people, we're going to stop

14  abortions when the person is an essential community provider,

15  primarily engaged in family planning services, reproductive

16  health and related care and is a nonprofit, but Congress

17  decided not to stop abortions when the money is going to a

18  for-profit abortion provider or a facility that doesn't

19  primarily provide -- is not an essential community provider,

20  I mean, it just seems essentially what we're saying is --

21  what this is saying is that Congress is -- the reason for

22  these differences is Congress paying for -- doesn't want to

23  have funds go to providers that provide family planning

24  services, reproductive health, and related medical care

25  unrelated to abortions to poor people.

1          MR. SCHOENFELD:  I agree with you, Your Honor.  And

2     the only point that I want to underscore, Your Honor, sort of

3     using "family planning" as, I think, a shorthand here, we're

4     talking about a lot of cancer screenings.  We're talking

5     about a lot of basic healthcare that's provided by Planned

6     Parenthood through the Medicaid program.

7          THE COURT:  And Medicaid, I believe you both --

8     there's no disagreement; Medicaid is required to cover

9     contraception.

10          MS. HALL:  There's no disagreement.

11          THE COURT:  By statute, not by reg.

12          MR. SCHOENFELD:  Correct.

13          THE COURT:  Okay.  We need to wrap this up.  I will

14     give each of you a tiny closing argument and try not to

15     interrupt you.

16          MR. SCHOENFELD:  Sure, Your Honor.

17          I think the argument has been very comprehensive,

18     and I appreciate the Court's, you know, thoughtful engagement

19     here.  I would just underscore two points.

20          The first one is I think what became clear through

21     our colloquy and Your Honor's colloquy with the government is

22     that this is not an abortion regulation.  If it were an

23     abortion regulation, it would be written differently, and we

24     would find ourselves in a different place.

25          The statute is trying to do more, and it's not --

1    you don't have to scratch your head and think about what the

2    statute is trying to do.  It's clear from the face of the

3    statute.  It's clear from the legislative context.  It's

4    clear from the historical context.  It's clear from the

5    legislature's own mouths, all of which the Court can

6    consider, even though it need not, to reach the conclusion

7    that what is happening here is that Planned Parenthood and

8    Planned Parenthood alone, not notwithstanding the presence of

9    two other entities, Planned Parenthood alone is being singled

10    out.

11        And whatever flavor you choose to adopt to figure

12    out why that is constitutionally impermissible, bill of

13    attainder, equal protection, or First Amendment, the

14    government cannot do that.  And that is true with respect to

15    the entire federation and all of its members.

16        The government doesn't get to say I dislike you

17    because you come together to reach a broader audience and

18    stand in solidarity with each other in support of abortion

19    rights and then choose to disqualify you from a program that

20    has nothing to do with abortion.  So that's my sort of

21    summary on the merits.

22        On the irreparable harm, I would encourage

23    Your Honor to look at the -- I'm sure you have, but I just

24    want to bring you back to the cases we cite in our brief, all

25    of which make clear that while it is generally true that as a

1    loss of money is not an irreparable harm, there are

2    circumstances like those present here where the loss of

3    services and the direct immediate impact on the plaintiff

4    constitutes an irreparable harm.

5            And we've cited recent cases from this district,

6    we've cited recent cases from this circuit, and we've cited

7    other cases in the healthcare context, all of which make that

8    point, which I think ought to be obvious.

9            No matter how much money the government ever

10   decides to distribute to Planned Parenthood affiliates, they

11   will never be able to find themselves in the position they

12   found themselves before this statute was enacted.

13           And contrary to what the government says, there is

14   no constitutional requirement and there is no impediment in

15   Rule 65 or the case law to us asserting our constitutional

16   rights and preserving the status quo if we can make the

17   requisite showing.

18           My clients are not required to gamble their

19   livelihoods, their relationships, and their patients' lives

20   in order to vindicate their obvious constitutional rights.

21           Thank you, Your Honor.

22           MS. HALL:  Your Honor, the law at issue in this

23   case is an exercise of Congress's core -- thank you -- core

24   power of the purse.  It's a spending regulation, and it

25   restricts who and what Congress will subsidize.  That's a

1    core authority under Article I, and Congress -- both houses

2    of Congress and the President came together, all three

3    democratically elected bodies in the government, to enact

4    that restriction on federal funds on behalf of the American

5    taxpayer.

6         That should not be displaced lightly.  And

7    plaintiffs have failed to present the level of evidence that

8    would be required to demonstrate that this -- this law was

9    enacted with animus, that it was enacted to target Planned

10   Parenthood.  We did not get a chance to talk about this

11   extensively, but there are other entities other than Planned

12   Parenthood that may be subject to the law as well as we put

13   forth in the Snyder declaration.  And so there's really no

14   evidence that this law was, in fact, designed to target

15   Planned Parenthood.

16        The plaintiffs assert that there's ample

17   legislative evidence that it was, in fact, not only designed

18   to target Planned Parenthood, but, in fact, to target Planned

19   Parenthood's shared advocacy on behalf of abortion and not

20   provision of abortion.  But every legislative statement that

21   they put forth in the record is about providing abortions,

22   which is not protected activity.

23        Evidence that Congress was trying to avoid federal

24   funds, federal taxpayer money from going to entities that

25   provide abortions is not the same as targeting First

1  Amendment activity that is advocating for abortion.

2          And, again, the use of a corporate form, a standard

3  corporate definition of "affiliate," does not render the

4  statute unconstitutional by infringing on freedom of

5  association.

6          As we've discussed, the plaintiffs can continue to

7  advocate.  They continue to put together ad campaigns.  They

8  can lobby -- they can -- there are, obviously, restrictions

9  on lobbying itself, but they can advocate to Congress that

10 Congress pass certain policies.  None of that is restricted

11 by this law, and none of that is restricted by any notion of

12 affiliate.

13         "Affiliate" is not a term that is used to encompass

14 any particular association.  And as I mentioned, you know,

15 Planned Parenthood entities could choose to associate for

16 protected speech purposes with many other entities, including

17 the other entities, Maine Family Planning and Health

18 Imperatives, that might be covered by the statute.  And,

19 again, that's premature.

20         They could associate with those entities for the

21 same expressive purposes that they say is the reason that

22 they're members of Planned Parenthood.  And without any

23 corporate relationship, there's no issue.

24         So, again, I think that plaintiffs are really

25 relying on this idea that affiliation is the same as

association.  That simply is not true.  It has no basis in the law.

Secondly, as to irreparable harm, again, irreparable harm is meant to ensure that if plaintiffs prevail at the end of litigation, they have not suffered irreparable harm.  Their choice not to provide care because they may not prevail at the end of litigation does not cause them irreparable harm.

So for these reasons, Your Honor, the government submits that there is no basis to enter a preliminary injunction enjoining an act of Congress, signed by the President, and has been in effect for less than two weeks without opportunity to apply at all to the members --

THE COURT:  It's actually been restrained for less than two weeks, but --

MS. HALL:  That's right, Your Honor.  It has, in fact, been restrained; and the agencies certainly have been respecting that injunction.

But, again, the law -- the rest of the law has been in effect for less than two weeks.  This is very new. There's been no opportunity for the agency to set forth the definition of "affiliate," to begin that process.  And for that reason, among all the others in our briefing, there's no basis for a preliminary injunction here.

Thank you.

1       THE COURT:  I will take this back and get something
2  out in writing.

3       I would like set a schedule for litigation of this
4  case going forward.  I understand you don't know what you're
5  going to do till you know what I'm going to do.  But let me
6  ask you:  Two weeks after my decision is issued, if you can
7  confer and give me a proposed schedule for how this
8  litigation will unfold?

9       MR. SCHOENFELD:  Absolutely, Your Honor.

10      MS. HALL:  Certainly, Your Honor.

11      MR. SCHOENFELD:  I know Your Honor doesn't need to
12 be reminded of this, but the TRO expires on Monday.

13      THE COURT:  I am aware.

14      MR. SCHOENFELD:  Okay.  I felt obligated to say it.
15 I'm sure Your Honor is on top of it.

16      THE COURT:  If the government was amenable to
17 extending the time and I could spend my weekend with my
18 family, I would appreciate that.  I don't imagine that I have
19 too much leeway there, but --

20      MS. HALL:  Your Honor, the government does not
21 consent to an extension of the TRO.

22      THE COURT:  That's where we are.

23      MR. SCHOENFELD:  Thank you, Your Honor.

24      THE COURT:  I will look forward to your statement
25 in two weeks, and you'll have my decision on Monday.

1          MR. SCHOENFELD:  So just to be clear, like an

2     ordinary kind of Rule 16, Rule 26 statement?

3          THE COURT:  Yes.  I realize I'm early in the

4     process, and I also realize this is an issue where the

5     plaintiffs are asserting First Amendment rights and,

6     et cetera.  And if I do end up issuing a preliminary

7     injunction, the government will be fighting that.

8          So see what I've put out, but then give me the

9     schedule based on what I -- what I've done of how you think,

10    regardless of how I go on that decision, what happens.

11    That's not the decision on the merits and the schedule for

12    how we proceed.  I would appreciate it.

13         I do recognize that I'm early in the game.  I just

14    think there's some urgency as evidenced by this filing.  And

15    I would imagine -- I mean, frankly, whichever way I go, I can

16    imagine that there will be an appeal on either side.  So that

17    doesn't stop the underlying litigation.

18         Thank you.

19         MR. SCHOENFELD:  Thank you, Your Honor.

20         MS. HALL:  Thank you, Your Honor.

21         THE DEPUTY CLERK:  We are in recess.

22         (Court in recess at 11:03 a.m.)

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

       I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

                Dated this 28th day of July, 2025.

                /s/ Robert W. Paschal
                _____

                ROBERT W. PASCHAL, RMR, CRR
                Official Court Reporter

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

PLANNED PARENTHOOD
FEDERATION OF AMERICA, *et al.*,

     *Plaintiffs,*

      *v.*

ROBERT F. KENNEDY, JR., in his
official capacity as SECRETARY OF
THE DEPARTMENT OF HEALTH
AND HUMAN SERVICES, *et al.*,

     *Defendants.*

Case No. 1:25-cv-11913

## <u>NOTICE OF APPEAL OF PRELIMINARY INJUNCTION</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the First Circuit from the Court's July 21, 2025, Memorandum & Order, *see* ECF No. 62.

Dated: July 22, 2025                           Respectfully submitted,


                                               BRETT A. SHUMATE
                                               Assistant Attorney General

                                               YAAKOV M. ROTH
                                               Principal Deputy Assistant Attorney General

                                               ERIC J. HAMILTON
                                               Deputy Assistant Attorney General
                                               Civil Division

                                               ELIZABETH HEDGES
                                               TIBERIUS DAVIS
                                               Counsel to the Assistant Attorney General
                                               Civil Division

                                               MICHELLE R. BENNETT
                                               Assistant Director
                                               Federal Programs Branch

                                               BRADLEY P. HUMPHREYS
                                               JACOB S. SILER
                                               ELISABETH J. NEYLAN
                                               Trial Attorneys
                                               Federal Programs Branch

                                               /s/ Emily M. Hall
                                               EMILY M. HALL
                                               Counsel to the Assistant Attorney General
                                               U.S. Department of Justice
                                               950 Pennsylvania Ave NW
                                               Washington, DC 20530
                                               Telephone: (202) 307-6482
                                               Email: emily.hall@usdoj.gov

                                               *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: July 22, 2025

/s/ *Emily M. Hall*
Emily M. Hall

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | No. 1:25-cv-11913-IT |

## <u>NOTICE OF APPEAL</u>

Please take notice that Defendants hereby appeal to the United States Court of Appeals for the First Circuit from this Court's July 28, 2025 memorandum opinion and order, Dkt. No. 69.

Dated: August 5, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Director
Federal Programs Branch

<u>/s/ Elisabeth J. Neylan</u>
Elisabeth J. Neylan
Trial Attorney (N.Y. Bar Reg. No. 6125736)
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-3519; Fax: (202) 616-8460
E-mail: Elisabeth.J.Neylan@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, and PLANNED PARENTHOOD ASSOCIATION OF UTAH,<br><br>        Plaintiffs,<br><br>        v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, and CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>        Defendants. | Civil Action No. 1:25-cv-11913-IT |

MEMORANDUM & ORDER

August 29, 2025

TALWANI, D.J.

Pending before the court is Defendants' Motion to Stay Preliminary Injunctions Pending Appeal [Doc. No. 84]. Plaintiffs Planned Parenthood Federation of America, Inc. ("Planned Parenthood Federation"), Planned Parenthood League of Massachusetts ("Planned Parenthood Massachusetts"), and Planned Parenthood Association of Utah ("Planned Parenthood Utah") assert that Defendants have not carried their burden to show that a stay is warranted. See generally Opp'n [Doc. No. 92]. For the reasons set forth below, Defendants' Motion [Doc. No. 84] is DENIED.

## I.    Background

The court incorporates by reference the factual findings set forth in its <u>Memorandum & Order</u> [Doc. No. 69].

To summarize, on July 4, 2025, the President signed into law An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 ("the 2025 Reconciliation Act"), Pub. L. No. 119-21, 139 Stat. 72 (2025). Mem. & Order 23 [Doc. No. 69]. Section 71113(a) of the 2025 Reconciliation Act directs that certain "prohibited entities" may not receive federal Medicaid reimbursements for a one-year period beginning on the law's effective date. Pub. L. No. 119-21, § 71113(a), 139 Stat. 72, 300 (July 4, 2025). Section 71113(b)(1) defines a "prohibited entity" as:

> an entity, including its affiliates, subsidiaries, successors, and clinics—
>
> (A) that, as of the first day of the first quarter beginning after the date of enactment of this Act—
>
>> (i) is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;
>>
>> (ii) is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations (as in effect on the date of enactment of this Act), that is primarily engaged in family planning services, reproductive health, and related medical care; and
>>
>> (iii) provides for abortions, other than an abortion-
>>
>>> (I) if the pregnancy is the result of an act of rape or incest; or
>>>
>>> (II) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed; and
>
> (B) for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered  organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

Id. § 71113(b)(1). The definition of "prohibited entity" captures all Planned Parenthood Federation Members, including some that do not perform abortion and/or did not receive more than $800,000 in Medicaid reimbursements during fiscal year 2023. Mem. & Order 13–14 [Doc. No. 69]; Custer Decl. ¶ 47 [Doc. No. 5-1]; Lee Decl. ¶ 29 [Doc. No. 5-2]. The definition also covers two entities that are not Planned Parenthood Federation Members. See Mem. & Order 14; Snyder Decl. ¶ 6 [Doc. No. 53-2].

Plaintiffs filed this action on July 7, 2025, alleging that Section 71113 violates the United States Constitution by subjecting Planned Parenthood Federation and its Members to a bill of attainder, by retaliating against them in violation of the First Amendment, and by denying them equal protection of the law. See Compl. ¶¶ 130–53 [Doc. No. 1]. Plaintiffs also alleged that where Planned Parenthood Members that do not perform abortion and/or did not receive more than $800,000 in Medicaid reimbursements during fiscal year 2023 would be covered based on their affiliation with other Members, Section 71113 imposes an unconstitutional condition on their First Amendment rights and is unconstitutionally vague in violation of the Fifth Amendment. Id. ¶¶ 164–75.

Plaintiffs also filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. No. 4]. In opposing Plaintiffs' Motion [Doc. No. 4], Defendants requested that the court stay any injunctive relief pending appeal. Defs.' Mem. 44 [Doc. No. 53]. On July 21, 2025, the court granted Plaintiffs' request for a Preliminary Injunction in part and enjoined Defendants from enforcing or otherwise applying Section 71113 against Planned Parenthood Federation Members, including Planned Parenthood Utah, who will not provide abortion services as of October 1, 2025, or for whom the total amount of Federal and State expenditures under the Medicaid program furnished in fiscal year 2023 made directly to them did

not exceed $800,000. Mem. & Order 35 [Doc. No. 62]. The court denied Defendants' request to stay this injunction pending appeal. Id. 33–35. Defendants appealed this ruling the following day, Notice of Appeal [Doc. No. 63], but did not seek a stay from the First Circuit at that time.

On July 28, the court granted the remainder of Plaintiffs' request for injunctive relief. The court enjoined Defendants from enforcing or applying Section 71113 against Planned Parenthood Utah, Planned Parenthood Massachusetts, and all other Planned Parenthood Federation Members. Mem. & Order 58 [Doc. No. 69]. The court again denied Defendants' request for a stay pending appeal, finding that Defendants did not carry their burden to show that a stay was warranted. Id. at 57. Defendants appealed that ruling on August 5, 2025. Notice of Appeal [Doc. No. 75]. Again, Defendants did not seek a stay from the First Circuit at that time.

On August 7, 2025, Defendants filed the pending standalone Motion to Stay Preliminary Injunctions Pending Appeal [Doc. No. 84], which requested a stay of the court's July 21, 2025 Memorandum & Order [Doc. No. 62] and July 28, 2025 Memorandum & Order [Doc. No. 69] pending appeal to the United States Court of Appeals for the First Circuit. Mot. 1 [Doc. No. 84]. On August 11, 2025, the court ordered Plaintiffs to respond to Defendants' Motion [Doc. No. 84] no later than August 21, 2025, in accordance with Local Rule 7.1(b)(2). See Elec. Order [Doc. No. 87].

That evening, Defendants sought a stay in the First Circuit. See Appellants' Mot. for Stay Pending Appeal, Planned Parenthood Federation of America, Inc., v. Robert F. Kennedy, Jr., No. 25-1698 (1st Cir., Aug. 11, 2025). Defendants did not withdraw the Motion [Doc. No. 84] pending before this court, however, and on August 19, 2025, the First Circuit denied Defendants' stay request without prejudice. See Order 1 [Doc. No. 89].

On Thursday, August 20, 2025, Defendants notified the court that they would not seek leave to file a Reply in support of the pending Motion [Doc. No. 84]. Defs.' Notice Regarding Stay Mot. [Doc. No. 91]. Defendants requested that the court rule on their motion no later than Monday, August 25, 2025, "so that, if needed, Defendants may seek relief from the First Circuit and, if further relief is necessary, from the Supreme Court in advance of October 1, 2025[.]" Id. at 3. Although Defendants initiated appellate proceedings on July 22, 2025, see Notice of Appeal [Doc. No. 63], and now seek a stay, to date they have not sought expedited review from the First Circuit of the preliminary injunction orders.

## II.    Standard of Review

A district court may stay injunctive relief while an appeal is pending. Fed. R. Civ. P. 62(d). However, "[a] stay is an intrusion into the ordinary processes of administration and judicial review." Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotations and citation omitted); accord New York v. Trump, 133 F.4th 51, 65 (1st Cir. 2025). Accordingly, "[a] stay is not a matter of right, even if irreparable injury might otherwise result." Nken, 556 U.S. at 433 (citation omitted).

"[T]he party seeking a stay—here, the Government—bears the burden of proving that the circumstances justify one." New Jersey v. Trump, 131 F.4th 27, 34 (1st Cir. 2025). In determining whether the circumstances warrant a stay, courts consider

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Nken, 556 U.S. at 426.

"The first two factors . . . are the most critical. It is not enough that the [applicant's] chance of success on the merits be better than negligible." Id. at 434 (internal quotations and

citation omitted). Similarly, "simply showing some possibility of irreparable injury fails to satisfy the second factor." Id. at 434–35 (internal quotations and citation omitted). Courts assess the harm to other interested parties and weigh the public interest "[o]nce an applicant satisfies the first two factors." Id. at 435.

### III.    Discussion

#### A.    *Defendants' Likelihood of Success on the Merits*

In the orders on appeal, the court concluded that Plaintiffs demonstrated a substantial likelihood of success on their claims that Section 71113 unconstitutionally conditions Medicaid funding on Planned Parenthood Members foregoing associational rights, violates Planned Parenthood Members' right to equal protection, and subjects Planned Parenthood Federation and its Members to a bill of attainder. Mem. & Order 23–49 [Doc. No. 69]; see also Mem. & Order 16–28 [Doc. No. 62] (concluding Section 71113 unconstitutionally conditions Medicaid funding on Planned Parenthood Members foregoing associational rights and violates Planned Parenthood Members' right to equal protection). Defendants argue that they are likely to succeed on the merits on appeal, focusing primarily on their contention that Section 71113 is not a bill of attainder. See Mem. ISO Mot. to Stay 3–9 [Doc. No. 85]. As explained below, Defendants have not "made a strong showing" that their challenges are likely to prevail on appeal as to any of the grounds on which Plaintiffs have thus far shown a likelihood of success, let alone all three.

##### 1.    The First Amendment and Equal Protection Claims

###### a.    The Court's Original Findings

Defendants argue that Section 71113's "reference to an entity's 'affiliates' . . . in defining a 'prohibited entity' does not transform the entire provision into an intrusion on the First Amendment's protection of expressive association." Mem. ISO Mot. to Stay 9 [Doc. No. 85]. In their construct, "Section 71113 does not require Medicaid recipients (i.e. providers) to refrain

from any form of expressive activity." Mem. ISO Mot. to Stay 12 [Doc. No. 85]. But Defendants
ignore that Section 71113 does exactly that where it requires Members to disassociate from each
other to continue receiving Medicaid reimbursement. See Mem. & Order 26, 28, 45 [Doc. No.
69].

As the court explained, "[m]embership in Planned Parenthood Federation—and
corresponding affiliation with other Members—is . . . part and parcel with Planned Parenthood
Members' associational expression." Mem. & Order 27 [Doc. No. 69]. Defendants have asserted
that "HHS and CMS could permissibly conclude . . . that [Planned Parenthood Federation]
members are all 'affiliates' within the meaning of the statute." Defs.' Mem. 29 [Doc. No. 53].
Consequently, Planned Parenthood Members who do not perform abortions must relinquish their
affiliation with other Planned Parenthood Members, and thus with Planned Parenthood
Federation, to avoid Section 71113's coverage. Where the law discourages membership in
Planned Parenthood Federation, it diminishes Members' associational expression. See NAACP
v. Claiborne Hardware Co., 458 U.S. 886, 908 (1982) ("Effective advocacy of both public and
private points of view, particularly controversial ones, is undeniably enhanced by group
association.") (quoting NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958)). And
expressive association itself is protected by the First Amendment. Roberts v. U.S. Jaycees, 468
U.S. 609, 622 (1984) (explaining Supreme Court has "long understood as implicit in the right to
engage in activities protected by the First Amendment a corresponding right to associate with
others in pursuit of a wide variety of political, social, economic, educational, religious, and
cultural ends."). Where Section 71113 discourages Planned Parenthood Members from
"affiliating" with each other via Membership in Planned Parenthood Federation, it is irrelevant
that Section 71113 does not prevent Members from "collaborat[ing] for the purpose of advocacy,

prais[ing] or endors[ing] each other publicly, participat[ing] in events, or issu[ing] joint press releases." Mem. ISO Mot. to Stay 12 [Doc. No. 85].

Defendants suggest that Section 71113 at most creates a First Amendment concern only regarding its application "to a handful of unusual Planned Parenthood members." Mem. ISO Mot. to Stay 13 [Doc. No. 85]. But the court has explained that Section 71113 also impinges Planned Parenthood Federation's associational right. See Mem. & Order 37, 45, 52 [Doc. No. 69]. As Defendants have pointed out, "[a]ny [Planned Parenthood Federation] member can . . . remove itself from the provision's scope by . . . ceasing to provide for abortions and disaffiliating with entities that do." Defs.' Mem. 11 [Doc. No. 53]; see also Mem. & Order 34, 39, 45 [Doc. No. 69] (discussing disaffiliation requirement). But because disaffiliating from other Members requires disassociating from Planned Parenthood Federation, Section 71113's application on the basis of affiliation inhibits Planned Parenthood Federation's ability to engage in collective advocacy. The law thus "impinges on Planned Parenthood Federation's . . . right of association." Mem. & Order 45 [Doc. No. 69]; see also Mem. & Order 30 [Doc. No. 62] ("[W]here Section 71113 burdens Non-qualifying Members' affiliation with other Planned Parenthood Members, it diminishes Planned Parenthood Federation's and those Members' associational expression and causes First Amendment injury.").

Because Section 71113 burdens Planned Parenthood Federation and its Members' associational expression, the court concluded that Section 71113 is subject to strict scrutiny. Mem. & Order 45 [Doc. No. 69]. Laws that impinge on fundamental rights, including First Amendment rights, "will only be upheld if 'precisely tailored to serve a compelling governmental interest.'" Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 9 n.6 (1st Cir. 2013) (quoting Plyler v. Doe, 457 U.S. 202, 217(1982)); Mem. & Order 45–47 [Doc. No. 69].

Although Defendants contest the court's alternative conclusion that Section 71113 is unlikely to survive rational basis review, see Mem. ISO Mot. to Stay 14 [Doc. No. 85], they do not contend that "halting funding to certain large abortion providers" constitutes a compelling government interest, see Mem. ISO Mot. to Stay 16 [Doc. No. 85], or that Section 71113 is "precisely tailored" to any compelling interest such that it can survive strict scrutiny.

The court concluded that Plaintiffs are also likely to succeed in establishing that Section 71113 fails rational basis review because Section 71113's conjunctive criteria "affect[] only a small number of abortion providers," "leave[] every other conceivable category [of abortion provider] unaffected," and include Planned Parenthood Members who do not provide abortion. Mem. & Order 47–49 [Doc. No. 69]. Defendants continue to argue that the law's criteria are rational in isolation, suggesting that because essential community providers—which primarily serve low-income, medically underserved individuals—are most likely to have many Medicaid patients, depriving Medicaid funding from only this category of healthcare providers "justif[ies] the administrative burdens associated with identifying prohibited entities." Mem ISO Mot. to Stay 15 [Doc. No. 85]. But it is the criteria in conjunction that single out Planned Parenthood Federation Members (and only two other known entities) for unequal treatment. Mem. & Order 44–45 [Doc. No. 69]. Therefore, Section 71113's conjunctive definition undermines the conceived rational bases for the law notwithstanding justifications for any of the individual criterion. See Mem. & Order 47–49 [Doc. No. 69].

Defendants assert that "halting federal subsidies to one category of abortion providers plainly serves" the goal of reducing abortion. See Mem. ISO Mot. to Stay 14 [Doc. No. 85]. "But discriminatory exclusion . . . is [not] a permissible legislative end." Mem. & Order 48 [Doc. No. 69] (citing Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.,

UAW, 485 U.S. 360, 373 (1988) and Romer v. Evans, 517 U.S. 620, 632 (1996)). And as the court detailed, Section 71113 excludes a category of Medicaid programs that is both over and underinclusive such that it likely violates Plaintiffs and Planned Parenthood Members' constitutional right to equal protection under both strict scrutiny and rational basis review. See id. at 44–49.

           b.     Defendants' New Arguments

Defendants' Memorandum in Support of Motion to Stay [Doc. No. 85] also seeks to justify the law's coverage of "affiliates" as no more than "an incidental burden" on protected expression. Mem. ISO Mot. to Stay 11 [Doc. No. 85] (citing United States v. O'Brien, 391 U.S. 367, 377 (1968) and Arcara v. Cloud Books, Inc., 478 U.S. 697, 705 (1986)). However, Defendants previously asserted only that "the law does not restrict speech or burden association." Defs.' Mem. 34 [Doc. No. 53]; see also id. at 7 ("providing abortions is conduct, not speech); id. at 35 ("Section 71113 . . . does not condition government funding on speech at all."). To the extent Defendants seek to justify the law's burden on protected expression for the first time through their Motion to Stay [Doc. No. 84], their argument is not properly before the court. See Iverson v. City Of Bos., 452 F.3d 94, 103 (1st Cir. 2006) (concluding plaintiff waived argument not presented in opposition to defendant's dispositive motion); cf. Disaster Sols., LLC v. City of Santa Isabel, Puerto Rico, 21 F.4th 1 (1st Cir. 2021) (holding argument waived where not presented prior to post-judgment motion).

The court nonetheless addresses Defendants' new argument in light of the important First Amendment issues at stake. In the cases on which Defendants rely, the Court "has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." O'Brien, 391 U.S. at 376. Instead of regulating one

course of conduct, Section 71113 requires Planned Parenthood Members to refrain from specific activities—including affiliating with Planned Parenthood Federation and Members that provide abortion—to continue engaging in a separate activity—participating in Medicaid programs. Defendants have not articulated why their argument under the O'Brien test will prevail where Plaintiffs' First Amendment claim turns on application of the unconstitutional conditions framework. See Mem. & Order 23–30 [Doc. No. 69].

As the court explained, the Supreme Court has emphasized in unconstitutional conditions cases that permitting regulated entities to use distinct (albeit closely-related) corporate entities to separate federally funded activities from protected expression that Congress chooses not to fund "allows Congress to set conditions with its spending powers without unconstitutionally leveraging the funding." Mem. & Order 28 [Doc. No. 69] (discussing Regan v. Taxation With Representation of Wash., 461 U.S. 540 (1983) and FCC v. League of Women Voters of Cal., 468 U.S. 364 (1984)). But the "affiliates" provision does the opposite; it leverages funding to coerce disaffiliation among Members and from Planned Parenthood Federation.

Defendants acknowledge that in the cases on which the court relied, "the Supreme Court recognized that the resulting First Amendment concerns would be alleviated if the government permitted the regulated entities" to engage in protected expression "through their affiliates." Mem. ISO Mot. to Stay 10 [Doc. No. 85] (citing Regan, 461 U.S. at 543, and FCC, 468 U.S. at 400-01). Defendants argue "[t]hat principle has no bearing here, where Section 71113 does not require Medicaid recipients (i.e. providers) to refrain from any expressive activity." Id. But Section 71113 does exactly that: The law requires Planned Parenthood Members to refrain from affiliating with Members that provide abortions, and that affiliation is for expressive activity. See Mem. & Order 26–27 [Doc. No. 69] (explaining "the record demonstrates that Members'

affiliation via their membership in Planned Parenthood Federation is expressive"). And as this court previously explained, "Section 71113 prohibits the type of dual structure that would have insulated the abortion restriction from an unconstitutional conditions challenge." Mem. & Order 29 [Doc. No. 69].

Even assuming that O'Brien applies, Defendants have not made the requisite showing that the burden on First Amendment rights is permissible here. A government regulation is sufficiently justified if, inter alia, "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377 (footnotes omitted) (emphasis added). Defendants make no such showing.

Defendants argue only that the "affiliates" provision is necessary because without it, "a prohibited entity could create subsidiaries or affiliates and then use them to obtain federal Medicaid funds, frustrating Congress' objective of withholding taxpayer dollars from certain large abortion providers." Mem. ISO Mot. to Stay 10 [Doc. No. 85]. But while Defendants focus on evasion of the law through new "subsidiaries" or other entities under a prohibited entity's control, the provision has no such limitation. Instead, it encompasses existing affiliates that do not provide abortion. And there is no indication in the record that Planned Parenthood Members share revenues from Medicaid reimbursements. The result is a restriction on associational freedom that is in no way "essential to the furtherance of [Defendants'] interest" in withholding funds from certain abortion providers, Arcara, 478 U.S. at 703 (quoting O'Brien, 391 U.S. at 377 (footnotes omitted)), and instead imposes a wholly unwarranted burden.

Further, Section 71113 differs in significant respects from the list of statutory provisions Defendants offer to suggest that the term "affiliates" raises no First Amendment concern. See Mem. ISO Mot. to Stay 10–11 [Doc. No. 85]. First, the statutes Defendants identify illustrate that

where Congress seeks to prevent evasion of regulation through related entities, it has done so by carefully defining the relationships at issue to ensure that the statute only applies to organizations related to the regulated entities via "control."[1] In contrast here, Section 71113 does not define or limit the term "affiliates." And while Defendants contend that the term "affiliates" necessarily has the same meaning in Section 71113 as it does in those statutes, Section 71113 does not contain the same limitation. Consistent with the absence of any express limit on the term "affiliates," Defendants have argued that "Planned Parenthood Federations' 'membership

---

[1] See e.g. 12 U.S.C. § 1841(k) ("For purposes of this chapter [relating to banking regulation], the term 'affiliate' means any company that controls, is controlled by, or is under common control with another company."); 21 U.S.C. § 350g(l)(4)(A) (defining, for purposes of section regarding monitoring and recordkeeping at facilities engaged in food manufacturing and processing, "[t]he term 'affiliate'" as "any facility that controls, is controlled by, or is under common control with another facility"); 26 U.S.C. § 414(b) (treating, for purposes of certain sections of the Internal Revenue Code, "all employees of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a) . . . as employed by a single employer")) and id. § 1563(a) (defining a "controlled group of corporations" based on stock ownership); 29 U.S.C. § 1301(14) (defining, for purposes of determining the employer for certain plans under ERISA, a "controlled group" to mean a group "under common control" of a person); 15 U.S.C. § 1693o-2(c)(1) (defining, for the purpose of exemption from regulations on interchange fees for electronic debit transactions, "[t]he term 'affiliate'" as "any company that controls, is controlled by, or is under common control with another company"); 7 U.S.C. § 136a-1(i)(E)(ii)(II)(bb) (explaining, for purposes of setting fees for registrants of pesticides, "persons are affiliates of each other if, directly or indirectly, either person controls or has the power to control the other person, or a third person controls or has the power to control both persons"); 16 U.S.C. § 620e(5) (defining, for purposes of statute restricting exports of unprocessed timber from federal lands, "person" subject to restrictions to include "business affiliates where 1 affiliate controls or has the power to control the other or when both are controlled directly or indirectly by a third person"); 42 U.S.C. § 16451(1) (defining, for purposes of statute concerning records costs incurred by a public utility or natural gas company, "[t]he term 'affiliate' of a company" as "any company, 5 percent or more of the outstanding voting securities of which are owned, controlled, or held with power to vote, directly or indirectly, by such company"); cf. 50 U.S.C. § 4611 (explaining, where the President has found a violation of multilateral export control violations by a foreign person, sanctions may be imposed on "any parent, affiliate, subsidiary, and successor entity of the foreign person," except where the President determines that "the parent, affiliate, subsidiary, or successor entity . . . has not knowingly violated the export control regulation violated by the foreign person" and other requirements are met).

standards,' 'accreditation standards,' and 'shared medical standards and guidelines,' would be sufficient to show common control such that Planned Parenthood Members who do not provide abortion could be 'affiliates' of the Planned Parenthood Members who do," Mem. & Order 26 [Doc. 69] (quoting Defs.' Mem. 28 [Doc. No. 53]), even though the record before the court demonstrates that each Planned Parenthood Member is an independent organization that is incorporated and governed separately from other Members, and that each has its own CEO and governance structure. See id. at 8 (citing Custer Decl. ¶ 9 [Doc. No. 5-1]; Lee Decl. ¶ 10 [Doc. No. 5-2]; Ghorbani Decl. ¶¶ 1, 8–9 [Doc. No. 5-3]).

Second, none of the statutes cited by Defendants impact First Amendment protected activity or circumstances in which the affiliation at issue is "part and parcel with . . . associational expression." See Mem. & Order 27 [Doc. No. 69]. Plaintiffs have demonstrated that Planned Parenthood Members' affiliation with each other is expressive. Id. at 26–27. That Congress has used the term "affiliates" in contexts that do not implicate collective advocacy has no bearing on the First Amendment issue here.

### 2. Defendants' Renewed Bill of Attainder Arguments

Defendants argue that they are likely to prevail on the merits because Section 71113 is not a bill of attainder. Mem. ISO Mot. to Stay 3 [Doc. No. 85]. First, Defendants argue that Section 71113 does not impose punishment, and instead "advances Congress's 'nonpunitive legislative purpose[]' of ending Medicaid funding for certain abortion providers." Id. (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 475–76 (1977)). Second, Defendants argue that Section 71113 is not a bill of attainder because it does not single out identifiable individuals. Id. at 6.

The Bill of Attainder Clause prohibits Congress from enacting a law that "legislatively determines guilt and inflicts punishment" on an identifiable party without a judicial trial. Nixon

14

v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977). "The deprivation of any rights, civil or political, previously enjoyed, may be punishment[.]" Cummings v. Missouri, 71 U.S. 277, 320 (1866). The Supreme Court has recognized three necessary inquiries in determining whether a statute imposes punishment: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" Selective Serv. Sys., 468 U.S. 841, 852 (1984) (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977)). The determination is ultimately circumstantial, and none of these inquiries are dispositive. See Selective Serv. Sys., 468 U.S. at 852–54.

Defendants contend that "[h]alting the flow of federal Medicaid funds . . . bears no resemblance to the forms of punishment that implicate the Bill of Attainder Clause." Mem. ISO Mot. to Stay 4 [Doc. No. 85]. But in determining that Section 71113 imposes punishment, the court considered not only the deprivation of Medicaid funding, but also the "occupational[] and constitutional harms that the law imposes." Mem. & Order 37 [Doc. No. 69]. The court concluded that "[w]here Section 71113 conditions a specified group's continued participation in Medicaid on Planned Parenthood Members surrendering certain activities" by October 1, 2025, namely ending abortion services and disaffiliating from other Planned Parenthood Members, the law "fits within a historical category of bills of attainder" that required particular parties to "do a given act by a named day" to escape the law's burden. Id. at 38 (collecting sources); see also Gaines v. Buford, 31 Ky. 481, 510 (1833). And because Section 71113 requires Planned Parenthood Members to either stop participating in Medicaid programs or end both legal abortion services and affiliation with other Planned Parenthood Members and Planned

15

Parenthood Federation, it bars Planned Parenthood Members from participation in Medicaid programs if they continue to affiliate for collective advocacy. See Mem. & Order 38–39 [Doc. No. 69]. It thus bears resemblance to a historical category of bills of attainder that "barr[ed] designated . . . groups from participation in specified employments or vocations." Nixon, 433 U.S. at 474.

Defendants correctly point out that abortion access is no longer constitutionally protected, Mem. ISO Mot. to Stay 7 [Doc. No. 85] (citing Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 232 (2022)), but nothing in the decisions Defendants have appealed turned on an elevated status for abortion rights. That there is no constitutionally protected right to abortion does not leave Planned Parenthood Federation and its Members unprotected by other provisions of the Constitution. Singling out Planned Parenthood Members for exclusion from Medicaid programs so long as they—or any affiliate—continue to provide legal abortion, while allowing other entities that provide legal abortions to receive Medicaid reimbursements for other services, constitutes punishment within the meaning of the Bill of Attainder Clause regardless of whether abortion itself is constitutionally protected.

Defendants next assert that Section 71113 furthers a non-punitive end where "Congress could reasonably conclude that withholding Medicaid funding from entities that perform abortions will discourage at least some . . . abortions." Mem. ISO Mot. to Stay 5–6 [Doc. No. 85]. But Defendants acknowledgement that Section 71113 ends Medicaid funding only "for certain abortion providers," Mem. ISO Mot. to Stay 3 [Doc. No. 85], undercuts their contention that the law is nonpunitive. Indeed, the court determined that "there is a poor fit between Section 71113" and the goal of reducing abortion where the law "excludes few abortion providers from participating in Medicaid programs and bars Planned Parenthood Members that do not provide

abortion from receiving Medicaid funds." Mem. & Order 38–39 [Doc. No. 69]; cf. id. at 47 (explaining "Plaintiffs are likely to show that there is no rational relationship between the class burdened by Section 71113 . . . and the goal of reducing abortion" where "Section 71113 affects only a small number of abortion providers and leaves every other conceivable category unaffected.").

Further, the law's inclusion of only "certain abortion providers" supports the conclusion that Congress acted with an intent to punish. "Courts conduct [the] inquiry" into legislative intent "by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." Foretich v. U.S., 351 F.3d 1198, 1225 (D.C. Cir. 2003) (citing Selective Serv. Sys., 468 U.S. at 855 n.15). Here, Section 71113's text and structure, namely the conjunctive criteria that capture "every Planned Parenthood Member and exclude all but two other Medicaid providers[,]" substantiate the conclusion that Congress intended to punish Planned Parenthood Federation and its Members. Mem. & Order 40 [Doc. No. 69].

Additionally, although "statements by individual legislators rank among the least illuminating forms of legislative history" when determining what Congress intended a statute to mean, NLRB v. SW Gen., Inc., 580 U.S. 288, 307 (2017), statements by individual legislators in bill-of-attainder cases are relevant "where the very nature of the constitutional question requires an inquiry into legislative purpose[,]" i.e. whether Congress intended to single out a particular group for punishment. See United States v. O'Brien, 391 U.S. 367, 384 n.30 (1968). And here, where Section 71113's text does, in fact, single out Planned Parenthood Members, the legislative backdrop and statements in the record only corroborate that this was Congress's intent. See Mem. & Order 40–41 [Doc. No. 69].

Relatedly, Section 71113 satisfies the specification prong. A bill of attainder must name the affected parties or apply "to easily ascertainable members of a group[.]" United States v. Lovett, 328 U.S. 303, 315 (1946). A law satisfies the specification prong where it defines the affected class "entirely by irreversible acts committed by them" in the past. See Selective Serv. Sys., 468 U.S. at 848. Courts "have established [four] guideposts to aid in determining whether legislation singles out a person or class within the meaning of the Bill of Attainder Clause." SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 669 (9th Cir. 2002) (citing Selective Serv. Sys., 468 U.S. at 847, United States v. Brown, 381 U.S. 437, 448–49 (1965), and circuit court decisions). Here, the court determined that Plaintiffs were likely to succeed in establishing that Planned Parenthood Federation and its Members were the easily ascertainable target of Section 71113 based on three of these guideposts—whether the identity of the affected class was easily ascertainable when the law was passed, whether the class was defined by "past conduct [that] operates only as a designation of particular persons," and whether "the past conduct defining the affected individual or group consists of 'irrevocable acts committed by them." Mem. & Order 32–36 [Doc. No. 69].

Defendants cite Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1 (1961), to argue that "because Section 71113 turns on whether an entity meets various requirements 'as of' [October 1, 2025]" and "plaintiffs 'can escape regulation' by altering their activities," Section 71113 does not define prohibited entities based on "'past conduct,' and instead focuses on future activity." Mem. ISO Mot to Stay 7 [Doc. No. 85]. But Defendants ignore that Section 71113 singles out Planned Parenthood Members by defining the class subject to the regulation based on immutable facts: Only entities that are "essential community provider[s] . . . primarily engaged in family planning services, reproductive health,

and related medical care" who, during fiscal year 2023 received more than $800,000 in Medicaid reimbursements or were affiliated with such an entity, are subject to the restriction that the entity not provide abortions as of October 1, 2025. Pub. L. No. 119-21, § 71113(b)(1) 139 Stat. 72 (2025).

For this reason, Section 71113 is distinct from the law at issue in Communist Party. There, any organization could be subject to the law's burden if they engaged in activities triggering the requirement, and each such organization could then shed that burden, if it "should at any time choose to abandon these activities." 367 U.S. at 87. Here, Section 71113 uses retrospective characteristics—including that, in 2023, the entity received at least $800,000 in Medicaid reimbursements or affiliated with an entity that received that amount—to identify the limited set of entities (Planned Parenthood Members and two others) who are burdened with the regulation in the first place. Further, Planned Parenthood Members cannot avoid Section 71113 by abandoning activities at any time; so long as a Member provides elective abortion as of October 1 or affiliates with an entity that does so, it is barred by Section 71113 from receiving Medicaid reimbursements for any services rendered during the entire period that the law is effective. Therefore, the law's burden does not "endure only so long as[] an organization presently conducts operations of a described character." Id.

In any event, Defendants do not dispute that historically, "some [bills of attainder] left the designated parties a way of escaping the penalty." United States v. Brown, 381 U.S. 437, 442 (1965). Consequently, Defendants' reliance on Communist Party is insufficient to make the requisite showing that they are likely to prevail on the merits of Plaintiffs' bill of attainder claim.

B.    *The Remaining Stay Factors*

Defendants have not carried their burden to establish that the remaining factors support

staying preliminary relief.

Defendants assert that preliminary injunctive relief threatens significant irreparable harm

to the government by interfering with Congress's power over federal spending and the

"Executive Branch's authority and ability to enforce the law[.]" Mem. ISO Mot to Stay 15 [Doc.

No. 85]. But Defendants do not dispute the court's conclusion that Section 71113 has a

negligible impact on the federal budget or on Medicaid spending. See Mem. & Order 53 [Doc.

No. 69]. Instead, Defendants point out that "Congress adjusts federal spending for many reasons

other than reducing the overall budget deficit[,]" and assert that Congress has determined that

"halting funding to certain large abortion providers serves the public interest." Mem. ISO Mot. to

Stay 16 [Doc. No. 85].

But "Congress exercises its conferred powers subject to the limitations contained in

the Constitution." New York v. United States, 505 U.S. 144, 156 (1992). Therefore, "other

constitutional provisions may provide an independent bar" to Congress's exercise of its spending

power. South Dakota v. Dole, 483 U.S. 203, 208 (1987). Here, Defendants suffer no irreparable

harm where Plaintiffs are substantially likely to succeed in establishing that Section 71113

violates several constitutional provisions. As explained above and in the court's previous orders,

it is precisely because Congress targeted only a "certain" group of entities for exclusion from

Medicaid programs—all but two of which are Planned Parenthood Federation Members—that

Plaintiffs are likely to succeed in establishing that Section 71113 is unconstitutional. See

generally Mem. & Order 30–49 [Doc. No. 69]. Although Congress has significant latitude in

allocating funds "from a finite pool of resources," Congress cannot pursue fiscal objectives "by

discriminating against individuals or groups." See Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 485 U.S. 360, 373 (1988). Where Plaintiffs have shown that Congress has likely exercised its power in violation of Plaintiffs and Planned Parenthood Federation Members' constitutional rights, Defendants do not suffer irreparable harm from preliminary relief pending a final determination of Plaintiffs' claims. Cf. Somerville Pub. Sch. v. McMahon, 139 F.4th 63, 74–75 (1st Cir. 2025) (concluding preliminary injunction "undermining implementation" of federal policy would not cause government irreparable injury where government conceded that policy would be unlawful).

Moreover, Defendants have not established that a stay should issue where Plaintiffs and Planned Parenthood Federation Members face irreparable harm in the absence of preliminary injunctive relief. Although Defendants disagree with the court's conclusions regarding Plaintiffs' constitutional claims, see Mem. ISO Mot for Stay 16 [Doc. No. 85], they do not dispute the principle that constitutional harms, and impingement on First Amendment Freedoms in particular, is an irreparable injury. See Mahmoud v. Taylor, 606 U.S. __, 145 S. Ct. 2332, 2364 (2025). And staying relief that preliminarily enjoins Section 71113's enforcement is counter to the public interest where Plaintiffs are likely to succeed in establishing that Section 71113 is unconstitutional. See Somerville Pub. Sch. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025); New Hampshire Indonesian Cmty. Support v. Trump, 765 F. Supp. 3d 102, 112 (D.N.H. 2025) (explaining government has "no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution[]") (citation omitted) (alteration in original); see also Mem. & Order 54 [Doc. No. 69] (citing Roman Cath. Diocese of Brooklyn, 592 U.S. 14, 19–20 (2020)).

Moreover, Plaintiffs have shown via declaration that Planned Parenthood Member clinics will be forced to reduce or eliminate healthcare services and turn away Medicaid patients, that some Member clinics are likely to temporarily or permanently close, and that all Planned Parenthood Member patients are likely to face increased wait times and disrupted or reduced access to care. See Custer Decl. ¶¶ 4, 51, 54–57, 78 [Doc. No. 5-1]; Lee Decl. ¶¶ 40–42 [Doc. No. 5-2]; Ghorbani Decl. ¶¶ 6, 24 [Doc. No. 5-3]; Tosh Decl. ¶¶ 45–48 [Doc. No. 5-4]. In light of this showing, Defendants' unsupported suggestions that Plaintiffs could continue providing the same level of service with other funding sources and that Medicaid patients could obtain the same care from other healthcare providers, see Mem. ISO Mot. to Stay 16 [Doc. No. 85], do not establish that a stay is otherwise in the public interest.

Defendants ultimately contend that because Acts of Congress are presumptively constitutional, they "'should remain in effect pending a final decision on the merits' by the Supreme Court." Mem. ISO Mot. to Stay 2, 15 [Doc. No. 85] (quoting Turner Broadcasting System, Inc. v. FCC, 507 U.S. 1301, 1302 (1993) (Rehnquist, C.J., in chambers)). But here, the court has determined that Plaintiffs have rebutted the presumption of constitutionality that attaches to Acts of Congress for the purpose of seeking preliminary relief. See, e.g., Mem. & Order 54 [Doc. No. 69] (explaining preliminary injunction is in public interest "[w]here Plaintiffs have demonstrated a substantial likelihood of success on constitutional claims premised on impingement of First Amendment associational rights, singling out Planned Parenthood Federation and its Members for legislative punishment, and denial of equal protection").

Courts "may not resolve a conflict between considered review and effective relief" by granting a stay "reflexively." See Nken v. Holder, 556 U.S. 418, 427 (2009). Although the

issuance of a stay is left to the court's discretion, that "does not mean that no legal standard governs that discretion . . . . [A] motion to [a court's] discretion is a motion . . . to its judgment; and its judgment is to be guided by sound legal principles." Id. at 434 (internal citation and quotations omitted). Those legal principles have been distilled into the four stay factors. Id. And for the reasons explained above, Defendants have not established that any of those factors weigh in favor of a stay.

## IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Stay Preliminary Injunctions Pending Appeal [Doc. No. 84] is DENIED.

IT IS SO ORDERED.

August 29, 2025                                    /s/Indira Talwani
                                                   United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.


*s/ Steven H. Hazel*
Steven H. Hazel