Nos. 25-1698, 25-1755

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; PLANNED PARENTHOOD ASSOCIATION OF UTAH
*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the U.S. Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in the official capacity as Administrator of the Centers for Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES,
*Defendants-Appellants,*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————

## BRIEF OF *AMICI CURIAE* THE CENTER FOR MEDICAL PROGRESS AND DAVID DALEIDEN IN SUPPORT OF APPELLANTS AND REVERSAL

———————

MARK P. MEUSER
JESSE FRANKLIN-MURDOCK
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700
mmeuser@dhillonlaw.com
jfm@dhillonlaw.com

*Counsel for Amici Curiae*

1

## CORPORATE DISCLOSURE STATEMENT

The Center for Medical Progress ("CMP") is a non-profit dedicated to investigative journalism on bioethical issues. CMP has no parent corporation and issues no stock.

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................7

SUMMARY OF ARGUMENT .............................................................8

ARGUMENT .......................................................................................10

    I.    *AMICI*'S ACCOUNT OF THE DEFUNDING DEBATE.................10

    II.    the district court's ruling.................................................19

    III.    A *Bruen* Style Text and History Analysis of the Bill of Attainder

Clause………......................................................................19

        A.    Founding-Era Understanding of Bill of Attainder Laws.............20

        B.    Limited Debate at Constitutional Convention.............................21

        C.    Early Judicial Definitions of Bills of Attainder ..........................22

    IV.    The Lower Court's Order Violates the Historical Understanding of

the Framers of the Constitution.........................................................24

CONCLUSION ...................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Cincinnati Soap Co. v. U.S.*,

   301 U.S. 308, 317 (1937)........................................................................24

*Cummings v. Missouri*,

   71 U.S. (4 Wall.) 277, 323 (1866) ........................................... 9, 21, 23

*District of Columbia v. Heller*,

   554 U.S. 570, 634 (2008)........................................................................19

*Dobbs v. Jackson Women's Health Org.*,

   597 U.S. 215 (2022)................................................................................27

*Fam. Plan. Ass'n of Me. v. U.S. Dep't of Health & Human Servs.*,

   No. 1:25-cv-00364 (D. Me. filed July 16, 2025) ..................................18

*Fletcher v. Peck*,

   10 U.S. (6 Cranch) 87, 138 (1810) .......................................................22

*Gonzales v. Carhart*,

   550 U.S. 124, 160 (2007)............................................................... 10, 13

*Medina v. Planned Parenthood South Atl.*,

   606 U.S.___, 145 S. Ct. 2219, 2229 (2025)........................................ 9, 26

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

   597 U.S. 1, 4 (2022)................................................................................19

*Nixon v. Administrator of General Services*,

    433 U.S. 425, 474 (1977) ....................................................................24

*Regan v. Taxation With Representation of Washington*,

    461 U.S. 540 (1983) .................................................................... 10, 25

*Rust v. Sullivan*,

    500 U.S. 173 (1991) ...................................................................... 9, 25

*U.S. v. Realty Co.*,

    163 U.S. 427, 444 (1896) ....................................................................24

*United States v. Brown*,

    381 U.S. 437, 441 (1965) ....................................................................20

**Statutes**

42 U.S.C. §§ 1396–1396w-6 ....................................................................17

**Other Authorities**

157 Cong. Rec. H2047 (2011) ..................................................................11

Commentaries on the Constitution of the United States § 1338 (1833) ........... 21, 22

*Commentaries on the Laws of England* 381 (1769) ..............................................21

H.R. 1, 119th Cong. § 71113 (2025) ......................................................17

H.R. 4133, 110th Cong. (2007)...............................................................11

The Federalist No. 44, at 282 ..................................................................20

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 3 ................................................................... 9, 20

### INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are The Center for Medical Progress, Inc. ("CMP"), a 501(c)(3) non-profit dedicated to investigative journalism on bioethical issues, and David Daleiden, its founder and president. In 2015, CMP and Daleiden released undercover videos exposing illegal fetal organ tissue trafficking from late-term abortions by Planned Parenthood and its partners, prompting congressional investigations, a $7.8 million settlement against related companies, and nationwide debate regarding the practices surrounding the harvesting and sale of aborted fetal body parts at abortion clinics across the country.

*Amici*'s undercover investigation of Planned Parenthood and Big Abortion leadership exposed the criminal companies DaVinci Biosciences and DV Biologics, who admitted guilt for illegally selling human fetal tissue for valuable consideration from abortions at Planned Parenthood in southern California and were shut down after a $7.8 million settlement with the Orange County District Attorney. The OCDA credited *amici*'s reporting with prompting the successful prosecution. *Amici*'s reporting also established violations of medical ethics and standards at Planned Parenthood Gulf Coast in Texas, which the U.S. Court of Appeals for the Fifth

---

[1] No counsel for any party authored any part of this brief, and no person or entity other than *amici* funded its preparation or submission. All parties consented to the filing of this brief.

Circuit described as a willingness to use illegal partial birth abortions to sell fetal body parts.

*Amici*'s reporting is also responsible for new regulatory reforms and increased public scrutiny of government-funded experimental research projects on aborted human fetuses.

*Amici* are uniquely positioned to assist the Court because their reporting uncovered facts demonstrating compelling reasons why Congress properly exercised its Constitutional power of the purse to decide which organizations receive billions in taxpayer dollars.

## SUMMARY OF ARGUMENT

Section 71113 of the Reconciliation Act represents Congress's policy choice to withhold Medicaid funds from certain family-planning organizations that perform elective abortions, a decision rooted in decades of defunding debates and amplified by *amici*'s 2015 undercover investigation exposing Planned Parenthood's and other abortion providers' illegal fetal-tissue trafficking. Far from "singling out" Planned Parenthood with punitive intent, as the district court erroneously concluded, the provision applies broadly to any qualifying 501(c)(3) entity exceeding $800,000 in fiscal year 2023 Medicaid reimbursements, capturing numerous providers like Maine Family Planning and reflecting that a majority of U.S. elective abortions (59%) are performed outside Planned Parenthood affiliates. This categorical funding

condition defeats any bill of attainder claim, as it burdens a general class of organizations rather than targeting a specific entity.

Applying a *Bruen* style text and history analysis, the Bill of Attainder Clause, U.S. Const. art. I, § 9, cl. 3, prohibits only legislative acts inflicting criminal punishment such as death, banishment, property forfeiture, or corruption of blood, without judicial trial, as understood at the Founding. Historical attainders, decried by the Framers as abuses of parliamentary power against political foes, involved no fixed rules, no adversarial process, and irreversible deprivations of life, liberty, or property. Early authorities like Blackstone, Story, and the Supreme Court's 1866 decisions in *Cummings v. Missouri* and *Ex parte Garland* confirm this narrow scope: the Clause guards against *ad hoc* legislative convictions, not routine spending decisions. Debate at the Constitutional Convention underscored the provision's focus on criminal sanctions, rejecting expansions beyond that domain.

The district court's ruling flouts this original meaning by equating a one-year funding bar with "historical notions of punishment," such as barring communists from employment. But Section 71113 imposes no such deprivation: Medicaid reimbursements are mere benefits, not vested rights, as reaffirmed in *Medina v. Planned Parenthood S. Atl.*, 606 U.S. ___, 145 S. Ct. 2219 (2025), and Congress enjoys plenary discretion over appropriations without subsidizing elective abortions, per *Rust v. Sullivan*, 500 U.S. 173 (1991), and *Regan v. Taxation With*

*Representation of Washington*, 461 U.S. 540 (1983). Withholding taxpayer dollars from providers engaged in elective abortions is policy, not penalty, let alone one akin to attainder. *Amici*'s revelations of Big Abortion providers' ethical violations and criminal partnerships only bolster Congress's constitutional authority via the power of the purse to enforce accountability.

This Court should reverse.

## ARGUMENT

## I. *AMICI*'S ACCOUNT OF THE DEFUNDING DEBATE

Every year, over a million elective abortions are performed in the United States, each terminating the life of a healthy developing infant in the womb, "a child assuming the human form" *Gonzales v. Carhart*, 550 U.S. 124, 160 (2007). Nearly 75% of abortions are sought due to financial or socio-economic pressures on the mother,[2] with recent studies showing nearly 70% of patients describe their abortions as unwanted, coerced, or inconsistent with their preferences.[3]

---

[2] Lawrence B. Finer, *Reasons U.S. Women Have Abortions: Quantitative and Qualitative perspectives*, available at Guttmacher Institute, available at: https://www.guttmacher.org/journals/psrh/2005/reasons-us-women-have-abortions-quantitative-and-qualitative-perspectives#:~:text=The%20reasons%20most%20frequently%20cited,was%20the%20most%20important%20reason.

[3] David C. Reardon, *Hidden Epidemic: Nearly 70% of Abortions Are Coerced, Unwanted or Inconsistent With Women's Preferences*, Charlotte Lozier Institute, available at: https://lozierinstitute.org/hidden-epidemic-nearly-70-of-abortions-are-coerced-unwanted-or-inconsistent-with-womens-preferences/.

Public concern about the government funding of Big Abortion businesses and subsidizing of their access to the most vulnerable populations and their children has been increasing since at least 2007, when then-Representative Mike Pence sponsored a bill to defund major abortion providers. *See* H.R. 4133, 110th Cong. (2007) (Title X Abortion Provider Prohibition Act) (introduced by Rep. Mike Pence). Representative Pence introduced similar bills throughout his time in the House of Representatives, with one passing the House in 2011. 157 Cong. Rec. H2047 (2011) (Pence amendment ending taxpayer funding for Planned Parenthood).[4]

In 2015, *amici*'s undercover journalism revealed that Planned Parenthood executives and affiliates were involved in the sale of fetal body parts in violation of federal law. The trafficking spanned across the Planned Parenthood Federation of America's ("PPFA") national network, with oversight, approval, and even direct involvement by national leadership at PPFA. Over wine and salad at an undercover business lunch in Los Angeles, PPFA's then Senior Director of Medical Services described the organ harvesting and sales in the late-term abortions she personally performed in Los Angeles: "We've been very good at getting heart, lung, liver,

---

[4] *See also* Michael Muskal, *House Votes to Strip Planned Parenthood of All Federal Funding*, L.A. Times (Feb. 18, 2011), available at: https://www.latimes.com/politics/la-xpm-2011-feb-18-la-pn-planned-parenthood-20110219-story.html.

because we know that, so I'm not gonna crush that part, I'm going to basically crush below, I'm gonna crush above, and I'm gonna see if I can get it all intact."[5] PPFA's Senior Director of Medical Services described the steps she would take to supply the baby whole for organ harvesting, mirroring the definitions of a criminal partial-birth abortion in federal law:

> With the calvarium [head], in general, some people will actually try to change the presentation so that it's not vertex [head-first], because when it's vertex presentation, you never have enough dilation at the beginning of the case, unless you have real, huge amount of dilation to deliver an intact calvarium. So if you do it starting from the breech presentation [feet-first], there's dilation that happens as the case goes on, and often, the last, you can evacuate an intact calvarium [head] at the end.[6]

*Amici*'s undercover reporting, and the surrounding public discussion and scrutiny from policymakers, was not limited to PPFA. Some of Big Abortion businesses' most incriminating and outrageous admissions were recorded by *amici* at trade shows for the National Abortion Federation, an elite Big Abortion trade group that includes both Planned Parenthood and independent abortion businesses. Both the non-Planned Parenthood abortion businesses in NAF and the PPFA Plaintiffs here were so embarrassed by the admissions on the NAF tapes, and

---

[5] Center for Medical Progress, available at https://www.centerformedicalprogress.org/2015/07/planned-parenthoods-top-doctor-praised-by-ceo-uses-partial-birth-abortions-to-sell-baby-parts/.

[6] *Id.*

concerned about the government scrutiny and sanctions they could demerit, that they pursued a federal nationwide injunction for nearly ten years to prevent their release to the public. Recent Congressional investigative action liberated key footage from that censorship.[7]

For example, *amici*'s undercover reporting caught the leadership of Cedar River Clinics, a large non-profit abortion business in Washington State that supports itself with significant Medicaid revenue,[8] boasting about increasing revenues through selling aborted fetal body parts: "I just went into this, and it was very good. And now we've gone through our first year, I mean, I was looking at numbers of $250,000 a year."[9] At the same National Abortion Federation meeting, the abortion services director for Planned Parenthood New York City was recorded admitting, "We certainly do intact D&Es" (the clinical term for procedures the U.S. Supreme Court identified as prohibited under the federal partial-birth abortion ban act). *See Gonzales* at 168. This response was made enthusiastically to an offer to sell fetal

---

[7] Marjorie Taylor Green, *WRAP UP: Hearing Investigating the Black Market of Baby Organ Harvesting* (July 30, 2024), available at: https://greene.house.gov/news/documentsingle.aspx?DocumentID=801.

[8] Taylor Riley, *Abortion Provision and Delays to Care in a Clinic Network in Washington State After Dobbs*, JAMA Network Open, Vol. 7, No. 5, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC11137636/#H1-2-ZOI240473.

[9] Center for Medical Progress, available at: https://www.centerformedicalprogress.org/2024/03/new-videos-planned-parenthood-seeks-1500-per-fetal-liver-financial-incentive-docs-can-pull-off-a-leg-or-two-to-hide-partial-birth-abortions/.

livers for $1,500 each, saying, "I think a financial incentive from you guys, to the people we have to get this approved from, will be very happy about it."[10] Also during the same National Abortion Federation meeting, Planned Parenthood Gulf Coast leadership told amici that living fetuses were sometimes delivered whole or with "only like an arm that's disarticulated" and described using "a second set of forceps to hold the body at the cervix and pull off a leg, or two" to mutilate the fetal body to cover up violations of the partial-birth abortion law in order to sell more body parts.[11] Both government-funded Planned Parenthood and government-funded non-Planned Parenthood abortion businesses have engaged in barbaric and illegal late-term abortion practices, including partial-birth abortions and selling fetal body parts, and conspired to cover up the evidence to maintain their industry-wide access to millions of dollars in government subsidies. The public and policymakers recognized that getting taxpayer money out of Big Abortion was long overdue.

In recent years, *amici*'s investigative reporting has obtained documents from PPFA's fetal harvesting programs through state public records requests. These

---

[10] Center for Medical Progress, available at: https://www.centerformedicalprogress.org/2024/07/planned-parenthood-headquarters-seeks-1500-financial-incentive-per-aborted-fetal-liver-in-new-full-undercover-video/.

[11] Center for Medical Progress, available at: https://www.centerformedicalprogress.org/2024/08/texas-planned-parenthood-can-pull-off-a-leg-or-two-to-hide-partial-birth-abortions-to-sell-fetal-body-parts/.

primary-source materials corroborate the wrongdoing documented in *amici*'s undercover reporting. PPFA members in southern California, for example, contracted with the University of California to give the UC labs "access" to Planned Parenthood's "proprietary" aborted fetal organs, in exchange for the "valuable consideration" of Planned Parenthood owning "all right, title, and interest in patents and patent applications and other intellectual property rights relating to the Material." One UC San Diego lab wrote in its "Research Plan" that it would harvest organs from fetuses up to 23 weeks gestational age "from subjects undergoing elective surgical pregnancy termination at Planned Parenthood in San Diego" and that patients with "viable nonanomalous" fetuses would be enrolled. The majority of healthy infants born at 23 weeks can survive with modern medical care. The lab stated that clinical data collected from each subject would include "evidence of fetal heart activity by ultrasound immediately prior to the dilation and evacuation procedure" and sought to harvest fetuses from up to 2,500 patients. Emails obtained from the same program note that these patients were given the chemical abortion drug Misoprostol, which acts to induce labor contractions, for several hours prior to the elective abortion procedures, which the Research Plan stated were done on healthy, viable, preemie-age infants with clinically documented heartbeats.[12] As a

---

[12] Center for Medical Progress, available at: https://www.centerformedicalprogress.org/2024/11/breaking-viable-

final element of cruelty in Plaintiffs' "proprietary" organ harvesting scheme, while the English-language consent forms stated there might be "commercial value" in the aborted organs harvested, the official Spanish-language translations of Planned Parenthood's forms omitted this disclosure entirely.[13]

As a result of these revelations, national calls to defund Big Abortion businesses have only grown more forceful and become a higher policy priority over the years. Due to the particularly egregious behavior of PPFA and its brand recognition as the largest abortion provider in the country, public figures often mentioned PPFA specifically in calls to defund the abortion industry.

In 2017, the 115th Congress considered H.R. 1628 (the American Health Care Act) which included a similar defunding provision but was narrowly rejected by the Senate. In 2023, the 118th Congress considered H.R. 128 and H.R. 371, whose sponsors emphasized that "the nation's largest abortion provider[s]" should not continue to receive "millions of hard-earned taxpayer dollars every year." Various pro-life organizations have advocated to stop the millions of dollars that flow to abortion providers through Medicaid. Planned Parenthood points to Students for Life

---

nonanomalous-6-month-old-fetuses-sold-from-planned-parenthood-abortions-to-university-of-california-new-documents-show/.

[13] Dana Kennedy, *Planned Parenthood's stomach-churning emails 'negotiating' for fetus donations exposed*, NY Post (Nov. 21, 2024), available at: https://nypost.com/2024/11/21/us-news/planned-parenthoods-emails-negotiating-for-fetuses-exposed/.

Action's mobilization campaign "to DEFUND planned Parenthood & Big Abortion" as supposed proof it is being unfairly singled out, but such examples only underscore the breadth of nationwide concern.

Similar to its predecessors, Section 71113 bars "Federal funds … under title XIX of the Social Security Act (42 U.S.C. §§ 1396–1396w-6.) or a waiver of such a plan"—i.e., Medicaid funds—from being used "to make payments" to "an entity, including its affiliates, subsidiaries, successors, and clinics," which is, (1) a tax-exempt 501(c)(3) organization, (2) "primarily engaged in family planning services, reproductive health, and related medical care," (3) provides abortions other than those resulting from rape or incest or necessary to save the woman's life, and (4) "for which … expenditures … in fiscal year 2023 … exceeded $800,000." H.R. 1, 119th Cong. § 71113 (2025).

Here, the defund provision does not single out Planned Parenthood; instead, it sweeps in a larger class of 501(c)(3) providers primarily engaged in family-planning and reproductive health that provide abortions and exceeded $800,000 in FY2023 Medicaid reimbursements. For example, Maine Family Planning, a 501(c)(3) that provides abortion care, alleges in its federal complaint that Medicaid reimbursements make up "approximately 20–25%, or roughly $1.9 million" of its budget and, that in FY2023, it received more than $800,000 in Medicaid reimbursements, squarely meeting the statute's threshold. Complaint ¶ 33, *Fam.*

17

*Plan. Ass'n of Me. v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00364 (D. Me. filed July 16, 2025). Other Big Abortion providers like Cedar River Clinics will likely meet the statute's threshold. This threshold will prevent them and others like them from using millions of dollars in government funding to subsidize expanding their elective abortion businesses, and will thus protect taxpayers.

The fact that another entity with no affiliation with Planned Parenthood, has filed suit over this same issue confirms that the law is not aimed solely at Planned Parenthood. The law applies broadly to any organization using taxpayer dollars to subsidize elective abortion, and it sets a brightline to avoid creating further government-sponsored Big Abortion centers. These examples, together with sector-wide data showing most abortions are provided outside PPFA, demonstrates that the statute defines and burdens a general class of organizations, not a single entity, defeating any bill of attainder claim premised on PPFA-specific targeting.

Many clinics meet the definition of a Medicaid-barred entity under Section 71113. Approximately 59% of abortions in the United States occur at a non-PPFA center.[14]

---

[14] *See* Abortion Care Network, *Communities Need Clinics: Press Kit*, available at: https://abortioncarenetwork.org/communities-need-clinics-press-kit/.

## II.  THE DISTRICT COURT'S RULING

Despite the breadth of this statutory framework, the district court nevertheless concluded that the law impermissibly singled out Planned Parenthood. In its July 28, 2025, Order, the district court held that Section 71113 of the Reconciliation Act is likely unconstitutional. Section 71113 bars certain entities that provide abortions and received more than $800,000 in Medicaid reimbursements in fiscal year 2023 from receiving federal Medicaid funds for one year. The district court concluded that Section 71113 "singled [Planned Parenthood] out with punitive intent." July 28, 2025, Order, at 41 (Gov't Add. at 80). Thus, the district court ruled that Section 71113 was an unconstitutional bill of attainder. The district court also found that it violated the First Amendment and the Equal Protection Clause. *Id.* at 1 (Gov't Add. at 40).

That conclusion cannot be squared with the original meaning of the Bill of Attainder Clause, as demonstrated by its text and history.

## III. A *BRUEN* STYLE TEXT AND HISTORY ANALYSIS OF THE BILL OF ATTAINDER CLAUSE

The Supreme Court recently reaffirmed that constitutional rights "are enshrined with the scope they were understood to have when the people adopted them." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 4 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008)). The Constitution's text forbids Congress from passing a bill of attainder. U.S. Const. art.

I, § 9, cl. 3. A straightforward historical analysis confirms that Section 71113 is not a bill of attainder.

The concept of bills of attainders was so abhorrent to the Framers that they prohibited them three times in the Constitution: Congress was forbidden to pass them, the states were forbidden to pass them, and the federal courts were forbidden to impose them. *See* U.S. Const., art. 1, §§ 9-10; art. 3, §3. Madison stressed that "Bills of attainder … are contrary to the first principles of the social compact, and to every principle of sound legislation." *See* The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961).

### A. Founding-Era Understanding of Bill of Attainder Laws

Historically, a "bill of attainder, a parliamentary act sentencing to death one or more specific persons, was a device often resorted to in sixteenth, seventeenth and eighteenth century England for dealing with persons who had attempted, or threatened to attempt, to overthrow the government." *United States v. Brown*, 381 U.S. 437, 441 (1965). Traditionally, these laws were used by Parliament to single out and punish, often, by death, the political enemies of the crown. A bill of attainder also generally resulted in forfeiture of the target's property, including the right of the person's heirs to inherit it. *Id.* Blackstone stated that an "immediate consequence of attainder is the corruption of blood, both upwards and downwards." 4 William

Blackstone, *Commentaries on the Laws of England* 381 (1769). Blackstone traced attainders to "antient Saxon laws, [where] the land is forfeited to the king." *Id*.

It is a well-established principle that a "bill of attainder is a legislative act which inflicts punishment without a judicial trial." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

### B. Limited Debate at Constitutional Convention

The Framers were acutely aware of this abuse, which is why bills of attainder were addressed at the Constitutional Convention. Joseph Story stated that during "the revolutionary war, bills of attainder, and ex post facto acts of confiscation, were passed to a wide extent; and the evils resulting therefrom were supposed, in times of more cool reflection, to have far outweighed any imagined good." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1367 (1833).

During the Constitutional Convention, there was limited debate on bill of attainders and *ex post facto* laws. On August 22, 1787, Elbridge Gerry of Massachusetts moved to include in the Constitution "The Legislature shall pass no bill of attainder, nor any *ex post facto* law." After a brief debate, the question was split and "the first part of the motion relating to bills of attainder was agreed to, *nem. con.*" 3 James, Madison, *The Madison Papers* 1400, (1840, Washington ed.). The *ex post facto* law clause was inserted into the Constitution by a vote of 7 states to 3 with North Carolina divided. *Id.* at 1401.

Several weeks later, Colonel Mason moved to strike both bill of attainder and *ex post facto* laws from the Constitution. *Madison Papers* 1578-79 (Sept. 14). Mason argued that he "thought it not sufficiently clear that the prohibition meant by this phrase was limited to cases of a criminal nature; and no Legislature ever did or can altogether avoid them in civil cases." *Id.* at 1579. Mr. Gerry seconded the motion, but he did so because he wanted this prohibition to include civil cases. *Id*. Nonetheless, Mason's motion was defeated with all states voting against it. *Id*.

While there may not have been much debate recorded during the Constitutional Convention over bills of attainder, at least one Framer made it clear that this provision only applied to criminal laws. The rejection of Mason's motion shows the other Framers understood the text as already limited to criminal punishment, with no need to alter it further.

### C. Early Judicial Definitions of Bills of Attainder

Joseph Story taught that Bills of attainder "are special acts of the legislature, as inflict capital punishments upon persons supposed to be guilty of high offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1338 (1833). Early on, the Supreme Court ruled that a "bill of attainder may affect the life of an individual, or may confiscate his property, or may do both." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138 (1810).

The first attempt by the federal judiciary to define bills of attainder was in 1866 by Justice Miller in a dissenting opinion. *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 386 (1866) ("I am not aware of any judicial decision by a court of Federal jurisdiction which undertakes to give a definition of [bills of attainder].") Justice Miller defined bills of attainder as:

> Laws which declared certain persons attainted, and their blood corrupted so that it had lost all heritable quality. Whether it declared other punishment or not, it was an act of attainder if it declared this.

*Id.* at 387. He stated that this "seems to have been the main feature at which the authors of the Constitution were directing their prohibition." *Id.* Upon examining of the history of bills of attainder, he "found that the following comprise those essential elements of bills of attainder":

1. They were convictions and sentences pronounced by the legislative department of the government, instead of the judicial.
2. The sentence pronounced and the punishment inflicted were determined by no previous law or fixed rule.
3. The investigation into the guilt of the accused, if any such were made, was not necessarily or generally conducted in his presence, or that of his counsel, and no recognized rule of evidence governed the inquiry.

*Id.* at 388.

In *Cummings v. State of Missouri*, the Supreme Court found:

> A bill of attainder is a legislative act which inflicts punishment without a judicial trial. If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the Constitution, bills of attainder include bills of pain and penalties.

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

23

A reading of *Cummings* reveals that the Supreme Court took a more expansive view of the Bill of Attainder Clause than Colonel Mason. The *Cummings* Court determined that the bill of attainder protected against all deprivations of life, liberty, or property, but also any deprivation of political or civil rights. *Id*. at 321–322. Understanding this history makes clear why the district court's ruling departs from the Framers' design.

### IV. THE LOWER COURT'S ORDER VIOLATES THE HISTORICAL UNDERSTANDING OF THE FRAMERS OF THE CONSTITUTION.

It is a well-established principle that the "determination of Congress to recognize the moral obligation of the nation to make an appropriation as a requirement of justice and honor is obviously a matter of policy and discretion not open to judicial review unless in circumstances which here are not able to find." *Cincinnati Soap Co. v. U.S.*, 301 U.S. 308, 317 (1937) (citing *U.S. v. Realty Co.*, 163 U.S. 427, 444 (1896)).

The district court ruled that Section 71113 fit within the "historical notions of punishment." (Doc. 69, p. 37.) The court found that "barring designated groups from participation in specified employments or vocations is a historical form of punishment characteristic of bills of attainder." *Id.* (quoting *Nixon v. Administrator of General Services*, 433 U.S. 425, 474 (1977) (cleaned up)). The court determined that "providing elective abortions where legal … is a core part of their operations.

24

July 28, 2025, Order at 38 (Gov't Add. at 77). The court found that "Planned Parenthood Members stand to lose over a third of their aggregate revenue because they are barred from receiving Medicaid reimbursements." *Id.* at 39 (Gov't Add. at 78). The court determined that Congress was trying to punish Planned Parenthood without a trial and therefore held that Section 71113 was an unconstitutional bill of attainder.

While the district court concluded that the legislature could not prohibit a member of the Communist Party from union employment, (*Id*. at 31 (Gov't Add. at 70)) there is no effort by the district court to explain how Planned Parenthood is being denied employment. Instead, Congress has made a decision not to fund Planned Parenthood or other Big Abortion businesses for a year. Just as Congress did not infringe constitutional rights when it declined to subsidize nonprofit lobbying, Congress is not violating any constitutional rights by deciding not to subsidize medical providers that perform elective abortions. *See, e.g., Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983).

Contrary to the wishes of Planned Parenthood or the district court judge, "Government has no constitutional duty to subsidize an activity merely because it is constitutionally protected . . . ." *Rust v. Sullivan*, 500 U.S. 173, 175 (1991).

Just this year, the Supreme Court ruled on a case involving a state's ability to prohibit abortion providers from receiving Medicaid funds. The Court ruled that

"federal legislation seeks to benefit one group or another. (Why pass legislation otherwise?) But § 1983 provides a cause of action only for the deprivation of rights, privileges, or immunities, not benefits or interests." *Medina v. Planned Parenthood South Atl.*, 606 U.S.\_\_\_\_, 145 S. Ct. 2219, 2229 (2025) (cleaned up). The Court determined that Planned Parenthood had the duty to show that the Medicaid statute "does not just seek to benefit them or serve their interests but clearly and unambiguously gives them individual federal rights." *Id.* at 2224.

The district court made no attempt to go back to the Medicaid Statute and show how the prior acts of Congress ever created an individual federal right entitling Planned Parenthood to demand Medicaid funds. Absent such a finding of fact, the Supreme Court has made clear that Medicaid reimbursement is just a benefit. The deprivation of a benefit is clearly outside the historic understanding of both Mason's narrow view of the clause and the more expansive view by the *Cummings* Court. The Bill of Attainder Clause was never intended to restrict Congress' ordinary discretion in deciding how to allocate a finite pool of public funds.

The Founders of this nation did not design the Bill of Attainder Clause to tie future Congress' hands when it came to federal subsidies. Stretching a prohibition on death sentences into a ban on programmatic spending conditions would be unprecedented. The historical tradition does not support that leap.

Even if there were a fundamental right to abortion, which there is not, *see Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the claim that cessation of federal funding constitutes a "punishment" on par with death or banishment without trial should not survive scrutiny.

And if any fundamental rights are implicated here, it is one of the original principles the Founders actually honored: life, liberty, and the pursuit of happiness, not a claim to perpetual subsidy for practices that extinguish the first of those goods.

## CONCLUSION

From its origins in English law through the Founding era and into early American jurisprudence, a bill of attainder was universally understood as an act of legislative punishment: death, banishment, or forfeiture of property without trial. Section 71113 does not resemble those historic examples. It is simply a spending decision in which Congress chose not to underwrite elective abortion providers with Medicaid dollars. That may be controversial policy, but it is not punishment within the meaning of the Bill of Attainder Clause.

The district court's contrary ruling ignores both the text and history of the Constitution. This Court should reverse.

Respectfully Submitted,

October 3, 2025

_/s/Mark P. Meuser_____

MARK P. MEUSER
JESSE FRANKLIN-MURDOCK
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700
mmeuser@dhillonlaw.com
jfm@dhillonlaw.com

*Counsel for Amici Curiae*

**CERTIFICATION**

I hereby certify that a copy of this pleading was this day forwarded to opposing counsel via the court's electronic service system.


October 3, 2025                    _/s/Mark P. Meuser_____
                                        Mark P. Meuser

## CERTIFICATE OF COMPLAINCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that This brief complies with the length limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and First Circuit Rule 32(g)(1) because this brief contains 4,652 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font.

October 3, 2025                    _/s/Mark P. Meuser_____
                                   Mark P. Meuser