# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; PLANNED PARENTHOOD ASSOCIATION OF UTAH,

*Plaintiffs-Appellees*,

*v.*

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts in Case No. 1:25-cv-11913

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

EMILY NESTLER
PLANNED PARENTHOOD
   FEDERATION OF AMERICA, INC.
110 Vermont Avenue, NW
Washington, DC 20005
(202) 973-4800
emily.nestler@ppfa.org

ALAN SCHOENFELD
CASSANDRA A. MITCHELL
ALEX W. MILLER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 937-7294
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com

*Attorneys for Plaintiffs-Appellees*

October 13, 2025      *ADDITIONAL COUNSEL LISTED ON INSIDE COVER*

C. Peyton Humphreville
Kyla Eastling
Planned Parenthood
    Federation Of America, Inc.
123 William Street
New York, NY 10038
(212) 441-4363
peyton.humphreville@ppfa.org
kyla.eastling@ppfa.org

Albinas Prizgintas
Wilmer Cutler Pickering
    Hale and Dorr llp
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6700
albinas.prizgintas@wilmerhale.com

Sharon K. Hogue
Wilmer Cutler Pickering
    Hale and Dorr llp
60 State Street
Boston, MA 02109
(617) 526-6000
sharon.hogue@wilmerhale.com

*Attorneys for Plaintiffs-Appellees*

# CORPORATE DISCLOSURE STATEMENT

Planned Parenthood Federation of America, Inc. is a private, non-profit corporation, is not a subsidiary of any other corporation, and no public company owns 10% or more of its stock.

Planned Parenthood League of Massachusetts is a private, non-profit corporation, is not a subsidiary of any other corporation, and no public company owns 10% or more of its stock.

Planned Parenthood Association of Utah is a private, non-profit corporation, is not a subsidiary of any other corporation, and no public company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page(s)

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...........................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ..................................................x

INTRODUCTION ......................................................................................1

STATEMENT OF THE ISSUES.....................................................................3

STATEMENT OF THE CASE........................................................................4

    A.    Planned Parenthood's Service To The Community...............................4

        1.    Planned Parenthood's mission, structure, and advocacy work ....................................................................4

        2.    Planned Parenthood Members provide sexual and reproductive healthcare throughout the Nation .........................7

        3.    Service and reimbursement under the Medicaid program ..........................................................................8

    B.    The Sweeping Purpose And Effect Of The Defund Provision: To Target And Punish Planned Parenthood ......................10

        1.    Legislative history of the Defund Provision............................10

        2.    The Defund Provision: text and purpose .................................13

        3.    The devastating impact of the Defund Provision .....................17

    C.    Procedural History.................................................................22

STANDARD OF REVIEW ..........................................................................22

SUMMARY OF THE ARGUMENT .................................................................23

ARGUMENT ..........................................................................................25

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ..................................25

    A.    The Defund Provision Is An Unconstitutional Bill Of
          Attainder ...........................................................................................25

          1.    Specification...............................................................26

          2.    Punishment..................................................................29

    B.    The Defund Provision Violates Equal Protection ..............................35

    C.    The Defund Provision Violates The First Amendment .....................41

          1.    The Defund Provision violates Planned
                Parenthood's First Amendment associational rights ...............41

          2.    The Defund Provision unconstitutionally retaliates
                against Planned Parenthood's exercise of First
                Amendment rights.....................................................48

II.    THE REMAINING FACTORS WEIGH HEAVILY IN PLAINTIFFS'
    FAVOR ........................................................................................................51

    A.    Plaintiffs Have Demonstrated Irreparable Injury...............................51

    B.    The Preliminary Injunction Serves The Public Interest .....................54

CONCLUSION ....................................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACORN v. United States*,
618 F.3d 125 (2d Cir. 2010) ................................................................32

*Agency for International Development v. Alliance for Open Society International, Inc.* (*AOSI*),
570 U.S. 205 (2013)..................................................31, 41, 42, 43

*Alexander v. Choate*,
469 U.S. 287 (1985)..........................................................................8

*Barton v. Clancy*,
632 F.3d 9 (1st Cir. 2011)............................................................48, 49

*Bates v. City of Little Rock*,
361 U.S. 516 (1960).........................................................................47

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011).........................................................................40

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985).........................................................................35

*Communist Party of the United States v. Subversive Activities Control Board*,
367 U.S. 1 (1961).............................................................................27

*Consolidated Edison Co. of New York v. Pataki*,
292 F.3d 338 (2d Cir. 2002) ............................................................34

*Cummings v. Missouri*,
71 U.S. 277 (1866).....................................................................28, 30

*Dawson Chemical Co. v. Rohm & Haas Co.*,
448 U.S. 176 (1980).........................................................................35

*Eisenstadt v. Baird*,
405 U.S. 438 (1972).........................................................................38

*Falmouth School Department v. Doe ex rel. Doe,*
44 F.4th 23 (1st Cir. 2022).................................................................48

*Family Planning Association of Maine v. United States Department of
Health & Human Services,*
2025 WL 2439209 (D. Me. Aug. 25, 2025), *appeal filed*, No. 25-
1829 (1st Cir. Aug. 29, 2025) ...................................................38, 39

*Florida Youth Conservation Corps v. Stutler,*
2006 WL 1835967 (N.D. Fla. June 30, 2006) ....................................30

*Fowler Packing Co. v. Lanier,*
844 F.3d 809 (9th Cir. 2016) ............................................................35

*Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart,*
864 F.2d 551 (7th Cir. 1988) ............................................................51

*Gaines v. Buford,*
31 Ky. 481 (1833)..............................................................................28

*Gately v. Massachusetts,*
2 F.3d 1221 (1st Cir. 1993)...............................................................52

*Gattineri v. Town of Lynnfield,*
58 F.4th 512 (1st Cir. 2023).......................................................48, 49

*Harris v. McRae,*
448 U.S. 297 (1980)...........................................................................10

*Hartman v. Moore,*
547 U.S. 250 (2006)...........................................................................51

*Healy v. James,*
408 U.S. 169 (1972)...............................................................36, 46, 47

*League of Women Voters of the United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016)...............................................................53

*Lozman v. City of Riviera Beach,*
585 U.S. 87 (2018).............................................................................48

*Mahmoud v. Taylor,*
145 S. Ct. 2332 (2025).......................................................................52

*Massachusetts Association of Older Americans v. Sharp,*
  700 F.2d 749 (1st Cir. 1983) .............................................................55

*Massachusetts ex rel. Department of Public Welfare v. Secretary of*
  *Health & Human Services,*
  749 F.2d 89 (1st Cir. 1984) ............................................................10

*McCue v. Bradstreet,*
  807 F.3d 334 (1st Cir. 2015).............................................................49

*National Association for the Advancement of Colored People v. Alabama,*
  357 U.S. 449 (1958).................................................................46, 47

*Nieves v. Bartlett,*
  587 U.S. 391 (2019).........................................................................51

*Nixon v. Administrator of General Services,*
  433 U.S. 425 (1977).................................................................30, 33

*Perry v. Sindermann,*
  408 U.S. 593 (1972).........................................................................49

*Planned Parenthood of Central North Carolina. v. Cansler,*
  877 F. Supp. 2d 310 (M.D.N.C. 2012) .............................................31

*Planned Parenthood of Kansas, Inc. v. City of Wichita,*
  729 F. Supp. 1282 (D. Kan. 1990).....................................................50

*Planned Parenthood of Minnesota v. Minnesota,*
  612 F.2d 359 (8th Cir. 1980) .....................................................40, 50

*Plyler v. Doe,*
  457 U.S. 202 (1982).........................................................................38

*Rio Grande Community Health Center, Inc. v. Rullan,*
  397 F.3d 56 (1st Cir. 2005)..........................................................54-55

*Roberts v. United States Jaycees,*
  468 U.S. 609 (1984).............................................................36, 38, 46

*Rocket Learning, Inc. v. Rivera-Sanchez,*
  715 F.3d 1 (1st Cir. 2013)...............................................................38

*Romer v. Evans*,
    517 U.S. 620 (1996).........................................................................41

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996)...............................................22, 52, 54

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000).................................................................53

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)............................................................................41

*Rust v. Sullivan*,
    500 U.S. 173 (1991)...................................................................43, 44

*SeaRiver Maritime Financial Holdings, Inc. v. Mineta*,
    309 F.3d 662 (9th Cir. 2002) .....................................................26, 27

*Securities & Exchange Commission v. Fife*,
    311 F.3d 1 (1st Cir. 2002).................................................................48

*Selective Service System v. Minnesota Public Interest Research Group*,
    468 U.S. 841 (1984)..........................................................26, 29, 32

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012).................................................................52

*Somerville Public Schools v. McMahon*,
    139 F.4th 63 (1st Cir. 2025)..............................................................55

*TikTok Inc. v. Garland*,
    122 F.4th 930 (D.C. Cir. 2025).........................................................31

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)..........................................................................47

*Ullmann v. United States*,
    350 U.S. 422 (1956)..........................................................................33

*United States Department of Agriculture v. Moreno*,
    413 U.S. 528 (1973)..........................................................................41

*United States v. Brown*,
    381 U.S. 437 (1965).........................................................25, 28, 30, 32

*United States v. Enmons*,
    410 U.S. 396 (1973)...................................................................35

*United States v. Lovett*,
    328 U.S. 303 (1946).........................................................27, 30, 32

*United States v. O'Brien*,
    391 U.S. 367 (1968)...................................................................51

*Waldron v. George Weston Bakeries, Inc.*,
    570 F.3d 5 (1st Cir. 2009)............................................................23

*Wieman v. Updegraff*,
    344 U.S. 183 (1952)...................................................................30

## STATUTES AND REGULATIONS

42 U.S.C.
    § 1320a-7 ..............................................................................8
    § 1320a-7a.............................................................................8
    § 1396a(a)(23).........................................................................9

Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025)...............................1, 14

45 C.F.R. § 156.235 ........................................................................14

## LEGISLATIVE MATERIAL

American Health Care Act, H.R. 1628, 115th Cong. (2017)............................10, 11

Defund Planned Parenthood Act of 2025, H.R. 271, 119th Cong. (2025)..............12

Defund Planned Parenthood Act, S. 203, 119th Cong. (2025)................................12

Protecting Funding for Women's Health Care Act, H.R. 599, 119th
    Cong. (2025) ......................................................................12

Protecting Funding for Women's Health Care Act, S. 177, 119th
    Cong. (2025) ......................................................................12

S. Amend. 267, 115th Cong. (July 25, 2017) .........................................11

Senate Committee on the Budget, 115th Cong., Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff (July 21, 2017), https://www.budget.senate.gov/imo/media/doc/Background%20on%20Byrd%20Rule%20decisions_7.21[1].pdf........................................................................................................11

## OTHER AUTHORITIES

Benner, Katie, *Most Planned Parenthood Clinics Are Ineligible for Medicaid Money After Court Ruling*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/us/politics/trump-planned-parenthood.html ...................................................................................17, 40

Brown, Elisha, *Medicaid patients lose quick access to basic care after Planned Parenthood cuts and closures*, News from the States (Sept. 30, 2025), https://www.newsfromthestates.com/article/medicaid-patients-lose-quick-access-basic-care-after-planned-parenthood-cuts-and-closures ............................................................18

Brief for Respondents, *Medina v. Planned Parenthood of South Atlantic*, 145 S. Ct. 2219 (2025) (No. 23-1275) ...................................34

Joseph, Jamie, *Defund 'Big Abortion' Industry That Thrived Under Biden, 150 Pro-life Groups Urge Congress*, Fox News (Mar. 26, 2025), https://www.foxnews.com/politics/defund-big-abortion-industry-thrived-under-biden-150-pro-life-groups-urge-congress ....................13

SBA Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*, YouTube (Apr. 29, 2025), https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794 .......................13

Speaker Mike Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*, YouTube (Dec. 4, 2024), https://www.youtube.com/watch?v=VOM5wRs1WFc....................................................................12

Wilkie, Jordan, *Planned Parenthood Keystone operating without Medicaid funds*, WITF (Sept. 30, 2025), https://www.witf.org/2025/09/30/planned-parenthood-keystone-operating-without-medicaid-funds/ ...............................................................................................18

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs agree that oral argument is warranted, and it has been scheduled for November 12, 2025.

# INTRODUCTION

Section 71113 of the "One Big Beautiful Bill" (the "Defund Provision"), Pub. L. No. 119-21, 139 Stat. 72 (2025), is the culmination of a decade-long effort to unlawfully target and punish Planned Parenthood Federation of America ("PPFA") and its Members (collectively, "Planned Parenthood"). Because the Provision violates the Constitution and devastates vulnerable Americans' access to lifesaving healthcare, the district court properly issued a preliminary injunction. This Court should affirm.

The Defund Provision uses a gerrymandered definition of "prohibited entity" to categorically bar Planned Parenthood Members from receiving federal Medicaid reimbursements. These reimbursements are for vital services that have nothing to do with abortion, which federal funds cannot reimburse under the Hyde Amendment except in extremely limited circumstances. Instead, the Defund Provision seeks to prohibit Planned Parenthood Members—and effectively only Planned Parenthood Members, whether or not they provide abortions—from offering more than one million patients a year birth control visits, cancer screenings, testing and treatment for sexually transmitted infections ("STIs"), and other Medicaid-covered care.

These statutory contortions and Congress's professed intent demonstrate that the law was driven by animus toward Planned Parenthood and its record as the nation's most prominent advocate for sexual and reproductive rights. The goal of

the Defund Provision is no secret—a government spokesperson conceded it sought to punish "political advocacy." And because singling out Planned Parenthood for punishment in this manner violates the Constitution, the district court properly issued a preliminary injunction barring the Defund Provision's enforcement against Planned Parenthood Members.

Three independent constitutional bases support the district court's order, and the government's arguments on appeal do nothing to undermine them. First, the Defund Provision is an unconstitutional bill of attainder because it specifies and punishes Planned Parenthood without trial. Second, the Defund Provision violates the Fifth Amendment's equal protection guarantee because it treats Planned Parenthood Members worse than similarly situated healthcare providers, including other abortion providers, without sufficient justification—whether under heightened scrutiny or otherwise. Finally, the Defund Provision unconstitutionally punishes PPFA and its Members for exercising their First Amendment rights to freely associate with each other and PPFA to further their goals of advocating for and providing sexual and reproductive healthcare to all who need it.

The remaining preliminary injunction factors all favor affirmance. The district court correctly found that the Defund Provision will significantly harm the health and well-being of millions of Planned Parenthood Members' patients. Medicaid recipients who rely on Planned Parenthood Member health centers are

already losing access to critical services. In many areas, no comparable Medicaid providers can take on these patients. As a result, many patients are already being left without any viable healthcare options and may be forced to go without necessary medical care. Planned Parenthood Members have scaled back services, laid off staff, and closed clinics—impacting not only Medicaid patients but also others who depend on these centers for care. This is especially devastating in the many underserved communities where Planned Parenthood is the sole provider of sexual and reproductive health services. By contrast, the government has no legitimate interest in perpetuating unlawful government action and will not be harmed by a requirement to continue reimbursing Planned Parenthood Members for healthcare services authorized and provided to patients under the Medicaid program, as it has for decades. This Court should affirm.

## STATEMENT OF THE ISSUES

This case involves the federal government's appeals from preliminary injunctions barring enforcement of the Defund Provision, which excludes Planned Parenthood Members from receiving Medicaid reimbursements. As the district court correctly held, that Provision is unconstitutional and should be preliminarily enjoined. The questions presented are:

1.     Whether the district court correctly held that the Defund Provision's targeting of Planned Parenthood for punishment makes the law an unconstitutional bill of attainder.

2.     Whether the district court correctly held that by singling out Planned Parenthood Members for differential treatment and targeting Planned Parenthood's associational activity, the Defund Provision violates Planned Parenthood's rights to equal protection under the Fifth Amendment.

3.     Whether the district court correctly held that the Defund Provision's punishment of Planned Parenthood Members that provide abortions and their "affiliates" violates Planned Parenthood's First Amendment rights.

4.     Whether the district court correctly held that the remaining preliminary injunction factors favor relief because the Defund Provision will prevent patients from accessing life-saving healthcare and cause irreparable harm to Planned Parenthood, including by violating its constitutional rights, and enforcing the unlawful Defund Provision serves no public interest.

## STATEMENT OF THE CASE

**A.     Planned Parenthood's Service To The Community**

### 1.     Planned Parenthood's mission, structure, and advocacy work

PPFA is a national membership organization whose mission is to support the provision of comprehensive, high-quality sexual and reproductive healthcare, to

educate the public about sexual and reproductive health, and to advocate for access to sexual and reproductive healthcare. A171-172(¶¶7, 12). PPFA has 47 independently incorporated and operated Members including Plaintiff-Members Planned Parenthood League of Massachusetts ("PPLM") and Planned Parenthood Association of Utah ("PPAU"). A120(¶19), A122(¶25), A125(¶35). At the time this litigation was filed, Members collectively operated nearly 600 health centers across the Nation. A174(¶21). Although each Member focuses on the distinct needs of its own community, Members share the mission of providing comprehensive reproductive healthcare to all patients, regardless of ability to pay. A171-172(¶12).

Each Member is an independent, autonomous non-profit organization that is separately incorporated and governed. A171(¶9), A202(¶10), A216(¶1), A218(¶9). Each Member has its own CEO and board of directors, and manages its own finances, legal responsibilities, and operations. A171-173(¶¶9, 16), A202(¶10); A218(¶9). This structural independence means that PPFA does not control the operations or decision-making of its Members, and Members similarly do not control each other. A173(¶18). The actions or policies of one Planned Parenthood Member do not legally or operationally bind the others. The Planned Parenthood name, however, "sends a powerful message to the community that the Member stands for certain values and provides high-quality health care and educational services." A172(¶15).

PPFA and its Members, along with national, state, and local Planned Parenthood 501(c)(4) social welfare organizations, have long been at the forefront of the movement for reproductive rights, advocating at the federal, state, and local levels to protect and expand abortion access. This includes pushing to codify the rights to abortion and contraception, block abortion bans, repeal the Hyde Amendment, and ensure access to emergency contraception and medication abortion. A171-173(¶¶12, 19). Planned Parenthood Action Fund, a related 501(c)(4) organization, seeks to hold members of Congress politically accountable through its congressional scorecard, communicating with and activating constituents to educate their lawmakers about the importance of sexual and reproductive healthcare. Planned Parenthood Members and their related 501(c)(4) organizations play a similar role in state legislatures across the Nation. Since the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, Planned Parenthood Action Fund and Members' related 501(c)(4) organizations have successfully campaigned for reproductive freedom ballot initiatives. Separately, Planned Parenthood Action Fund and other national, state and local Planned Parenthood advocacy and political organizations work to elect federal, state, and local officials who will support abortion access. A173(¶19), A191-192(¶75).

### 2. Planned Parenthood Members provide sexual and reproductive healthcare throughout the Nation

Planned Parenthood Members play a pivotal role in the delivery of sexual and reproductive healthcare to millions of people in the United States each year. A174(¶21). An estimated one out of every three women and one in ten men nationally has received care from a Planned Parenthood Member. *Id.* In federal fiscal year 2023, Members served more than two million patients and provided approximately 9.4 million services, including cancer examinations, contraceptives, testing and treatment for STIs, as well as abortion where it is legal. A175(¶23). Those services are often life-affirming or life-saving for patients and prevent serious adverse consequences for the broader public health of the Member's community. *See* A175-176(¶¶23-26); A179(¶36). In fiscal year 2023, Members provided more than 5.1 million STI tests and treatments, 426,000 cancer screenings and prevention services, and 2.2 million birth control services. A175(¶23). During that same period, Members also lawfully provided over 400,000 abortions—approximately 4% of their services nationwide. *Id.*

Planned Parenthood Members play a special role in providing care in low-income and historically underserved communities. *See* A175-176(¶¶24, 25-26); *see* A259-260(¶¶21-22). Sixty-five percent of Members' patients have incomes at or below 150 percent of the federal poverty level. A176(¶25). In many communities, a Planned Parenthood Member health center is the only place to which a patient can

turn for sexual and reproductive healthcare. A175(¶24); *see also* A263-264(¶26); *infra* p.9. Planned Parenthood Member health centers are also often more convenient and accessible than other providers and offer a comprehensive range of services unavailable from many other providers. A178(¶33); *see, e.g.,* A206(¶22); A219(¶11); A262-263(¶¶23-25); A270-271(¶34); A287-288(¶70); A178(¶¶30-32); A184(¶53).

### 3. Service and reimbursement under the Medicaid program

Medicaid is a joint federal-state program under which the federal government provides financial assistance to States to help them finance healthcare for eligible families and individuals with low incomes. *See Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985). Although the program is administered at the state level, the majority of Medicaid funding is provided by the federal government. *See* A180-181(¶41); A257(¶15). The Secretary of Health and Human Services has the power to enforce Medicaid provider requirements. 42 U.S.C. §§ 1320a-7, 1320a-7a.

As relevant here, Medicaid works by reimbursement. A258(¶19). For example, a patient enrolled in Medicaid may visit a healthcare provider for birth control, an STI test, a cervical cancer examination, or other covered care. The provider will then submit a reimbursement claim to a State Medicaid agency for the specific services provided. Federal law requires that Medicaid beneficiaries be able to access any qualified provider, which has been interpreted to mean that providers

cannot be arbitrarily excluded from participating in Medicaid. *See* 42 U.S.C. § 1396a(a)(23).

As part of their commitment to low-income and underserved communities, Planned Parenthood Members have participated in Medicaid programs for decades in every State where they are able—today, 46 of 47 Members across 43 States. A115(¶7); A181(¶43). Unlike many Medicaid providers, no Member limits the number of Medicaid patients that it will see. *Id*. In many communities, a Planned Parenthood Member health center is the only place where individuals can receive sexual and reproductive healthcare services through the Medicaid program. A175-176(¶¶24, 26); A182-183(¶46).

Planned Parenthood Members serve over one million Medicaid patients each year. A170(¶5); A181(¶43). Historically, over half of the patients who received care at Planned Parenthood Member health centers relied on Medicaid for their healthcare, and half of visits to Planned Parenthood Member health centers were covered by Medicaid. A181(¶43). Serving Medicaid patients has been a critical way in which Planned Parenthood Members carry out their missions of providing comprehensive reproductive healthcare to all patients, regardless of their ability to pay. In the 2023 federal fiscal year, Medicaid reimbursements for services provided to Medicaid patients constituted more than one-third of Planned Parenthood Members' aggregate revenue. A181(¶44).

With extremely narrow exceptions, federal law has long prohibited the use of federal funds, including Medicaid funds, for abortions. *See Massachusetts ex rel. Dep't of Pub. Welfare v. Secretary of Health & Human Servs.*, 749 F.2d 89, 94-95 (1st Cir. 1984) (discussing *Harris v. McRae*, 448 U.S. 297, 308-309 (1980)). As a result, no federal funds, including Medicaid funds, are used to reimburse Planned Parenthood Members for abortions, except under the very narrow circumstances authorized by federal law. A182(¶45); A208(¶26).

## B. The Sweeping Purpose And Effect Of The Defund Provision: To Target And Punish Planned Parenthood

### 1. Legislative history of the Defund Provision

The Defund Provision represents the culmination of a decade-long effort to coerce and punish Planned Parenthood for being the face of the movement to protect access to sexual and reproductive healthcare, including abortion. Members of Congress and the Executive Branch have repeatedly and expressly made clear their intent to coerce Planned Parenthood Members into abandoning the lawful provision of abortion and to punish Planned Parenthood for its nationwide abortion-rights advocacy.

During President Trump's first term in office, Congress frequently attempted to defund Planned Parenthood Members. *See* A137(¶¶86-87). Most notably, in 2017, Congress considered, but ultimately rejected, a bill that included language nearly identical to the Defund Provision. *See* American Health Care Act of 2017,

H.R. 1628, 115th Cong. (July 25, 2017); S. Amend. 267, 115th Cong. (July 25, 2017). It was clear then that that language was intended to target Planned Parenthood, and it is still clear now. Like the Defund Provision challenged here, H.R. 1628 did not use the words "Planned Parenthood." Instead, it applied only to entities that provided abortions and received more than $350 million in Medicaid funds in fiscal year 2014. A138(¶88). That number was no accident, but rather yet more proof of the intended target of the bill: Planned Parenthood Members collectively received over $350 million in Medicaid funds that year. A183(¶48). No other organization or group came close. But the Senate parliamentarian determined that "prohibit[ing]" only "Planned Parenthood from receiving Medicaid funds for one year" violated the Senate's Byrd Rule,[1] which prohibits extraneous (*i.e.*, nonbudgetary) matters from being included in reconciliation legislation. Thus, in the Senate version of the bill, the threshold for qualification was reduced from $350 million to $1 million, *see* S. Amend. 267 to H.R. 1628, apparently to bring one other unidentified entity within its scope. But there was no question that the bill was designed to target Planned Parenthood, as the bill's supporters expressly acknowledged. A137(¶86). H.R. 1628 passed the House but failed in the Senate.

---

[1] S. Comm. on the Budget, 115th Cong., Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff (July 21, 2017).

Undeterred by the failed 2017 legislation, congressional efforts to defund Planned Parenthood continued. Several House members subsequently introduced bills that sought to defund Planned Parenthood unless it certified that it would not provide abortions. A138-139(¶90). Those bills specifically named Planned Parenthood, would have prohibited any federal funds from being paid to Planned Parenthood, and specifically targeted Planned Parenthood based on its association with abortion. *Id.* Similar bills have been introduced by members of the Senate and the House this term.[2]

These efforts to defund Planned Parenthood culminated with the enactment of the Defund Provision. *See* A140-141(¶93). Before the current congressional term began, Speaker Johnson stated that "defunding" Planned Parenthood continued to be at the top of House Republicans' agenda; later, while discussing budget cuts, he confirmed that he was planning to "axe" funding for Planned Parenthood.[3] On April 29, 2025, during a keynote address at a fundraising event for an anti-abortion group, Speaker Johnson reiterated, "In the weeks ahead, the House is going to be working

---

[2] *See, e.g.*, Defund Planned Parenthood Act, S. 203, 119th Cong. (2025) (introduced by Sen. Paul (Kentucky)); H.R. 271, 119th Cong. (2025) (introduced by Rep. Fischbach (Minnesota)); Protecting Funding for Women's Health Care Act, S. 177, 119th Cong. (2025) (introduced by Sen. Ernst (Iowa)); H.R. 599, 119th Cong. (2025) (introduced by Rep. Aderholt (Alabama)).

[3] Speaker Mike Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*, YouTube (Dec. 4, 2024).

on the One, Big, Beautiful Bill … . And we're absolutely making it clear to everybody that this bill is going to redirect funds away from Big Abortion,"[4] a long-used pejorative for Planned Parenthood among anti-abortion groups.[5]

Now, Congress has chosen to attempt to defund Planned Parenthood in the same way that failed in 2017. The Defund Provision initially started where the 2017 bill left off with the $1 million eligibility threshold but was again scaled down—this time to $800,000—to overcome the Byrd Rule. A141-142(¶95). According to the government, this lower eligibility threshold means only that "at least two" additional entities have been swept into the statute's coverage. A467. But the intent remains to defund Planned Parenthood Members, and any additional entities captured within the language are merely collateral damage.

### 2. The Defund Provision: text and purpose

Through a contrived formulation designed to target Planned Parenthood without expressly naming it, the Defund Provision prohibits federal funds from being made available under Medicaid to a "prohibited entity" for "services furnished during the 1-year period beginning on the date of the enactment of this Act." The

---

[4] SBA Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*, YouTube (Apr. 29, 2025).

[5] *See, e.g.*, Joseph, *Defund 'Big Abortion' Industry That Thrived Under Biden, 150 Pro-life Groups Urge Congress*, Fox News (Mar. 26, 2025) (letter from anti-abortion groups encouraging Congress to "cut[] funding for Big Abortion, including Planned Parenthood," and then only citing statistics and claims about Planned Parenthood).

Defund Provision bars Planned Parenthood Members from being reimbursed for providing services to patients under the Medicaid program.[6]

The statute defines a "prohibited entity" as "an entity"—"including its affiliates, subsidiaries, successors, and clinics," which are undefined terms in the statute—that meets four criteria:

> (1) it "provides for abortions," other than abortions in the case of rape or incest or where the pregnant patient's life is in danger;
>
> (2) it is a 501(c)(3) not-for-profit, tax-exempt organization;
>
> (3) it "is an essential community provider described in" 45 C.F.R. § 156.235 "that is primarily engaged in family planning services, reproductive health, and related medical care"; and
>
> (4) "for which the total amount of Federal and State expenditures under the Medicaid program … in fiscal year 2023 made directly … to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000."

Section 7113(b).

Some Planned Parenthood Members, including PPLM, independently satisfy the requirements of the Defund Provision, and therefore qualify as "prohibited entit[ies]" under the statute. *See* A183(¶47); A209(¶29). Others, including PPAU,

---

[6] The Defund Provision defines a "prohibited entity" as one that meets certain criteria "as of the first day of the first quarter beginning after the date of enactment of this Act" (*i.e.*, October 1, 2025), but prohibits federal funds from being disbursed "for items and services furnished during the 1-year period beginning on the date of the enactment of this Act," July 4, 2025. Section 71113(a), (b)(1)(A) (emphasis added).

do not meet one or more criterion, for example because they do not provide abortion services or did not receive over $800,000 in Medicaid funds during fiscal year 2023, and therefore do not independently meet this definition (the "Non-Qualifying Members"). *See* A221(¶20); A187(¶63). The statute, however, also prohibits federal funding from going to any entity that is an "affiliate" of a prohibited entity. The statute does not define "affiliate," and the government has provided no guidance at all as to how it is interpreting the term. As a result, Non-Qualifying Members are left guessing as to the position of the Department of Health and Human Services ("HHS") on whether they are entitled to receive federal Medicaid reimbursements.

The government's briefing confuses things further. It sometimes suggests that the Defund Provision allows any Member "to avoid the law's application … solely … by ceasing to provide abortions, among other possibilities." Br.14. Elsewhere, the government argues that whether a Non-Qualifying Member is an "affiliate" of a prohibited entity turns on ownership or control, rather than merely stopping providing abortions. Br.23. At still other points, the government appears to suggest that *all* Members of PPFA are banned from receiving federal Medicaid funds simply by virtue of that membership. Br.24 (contending that Planned Parenthood Members should be "understood as a single enterprise" because "PPFA collects dues from its members and then subsidizes those members in various ways" so "Federal funds provided to one PPFA member can thus benefit other members").

What is clear, however, is that the statute's criteria for exclusion were specifically drafted to target Planned Parenthood Members. When taken together, nearly all of the entities that satisfy these four conjunctive statutory criteria—*i.e.*, that provide abortions, are 501(c)(3) organizations, are essential community providers primarily engaged in family planning services, reproductive health, and related medical care, and received more than $800,000 in Medicaid funds in fiscal year 2023—are Planned Parenthood Members. Meanwhile, the Defund Provision excludes from its scope virtually all other abortion providers, including those providers that are for-profit organizations, that are not essential community providers, that are not primarily engaged in family planning and reproductive health services, or that did not receive more than $800,000 in Medicaid funds in fiscal year 2023. As the plain text of the Defund Provision alone makes clear, it was intended to prevent Planned Parenthood Members, and only Planned Parenthood Members, from receiving Medicaid funds.

That is reaffirmed by statements from President Trump and members of Congress about earlier (and functionally identical) versions of this statutory language that failed to pass in 2017. A137(¶86). And were there any doubt that the Defund Provision targets Planned Parenthood for its political advocacy, in response to the district court's preliminary injunction ruling an HHS spokesperson declared:

"States should not be forced to fund organizations that have chosen political advocacy over patient care."[7]

### 3. The devastating impact of the Defund Provision

Despite the extraordinary efforts Planned Parenthood Members have taken to protect Medicaid patients after the Defund Provision was allowed to take effect, the statute is having devastating effects on Members, their patients, and PPFA. The Defund Provision creates an immediate health crisis for—at a minimum—over a million Medicaid patients who may no longer be able to obtain services at Planned Parenthood Member health centers. A271-272(¶35). Indeed, since the Defund Provision was allowed to take effect, it has been widely reported that across the country patients are being forced to either attempt to find another provider if they can—despite the lack of equivalent providers accepting new Medicaid patients—or attempt to self-pay for care if they can afford to do so. Some Members have continued to see Medicaid patients and are shouldering the cost. While some may be able to do so for a short time in the hope of renewed preliminary injunctive relief, many will be unable to do so for the full year that the current Defund Provision will be in effect in the absence of preliminary injunctive relief. And as Planned Parenthood predicted in its district court filings, some Member health centers have

---

[7] Benner, *Most Planned Parenthood Clinics Are Ineligible for Medicaid Money After Court Ruling*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/us/politics/trump-planned-parenthood.html.

already closed as a direct result of the Defund Provision. If the Defund Provision continues to be enforceable, this dire situation will only worsen.[8]

The Defund Provision is threatening Planned Parenthood Members' ability to provide necessary and often life-saving care to their patients, especially their most vulnerable patients. A185(¶54). Most immediately, the Defund Provision is jeopardizing care for the more than one million Planned Parenthood Member patients who are enrolled in Medicaid by putting their health care providers in a dire scenario in which providing services to their patients is financially impossible. A170(¶¶4-5); A183-185(¶¶49-55); A210(¶35); A221-222(¶¶20-21); A239-241(¶¶44, 45-46, 47). Many of those patients, particularly those in areas designated by the federal government as medically underserved (*i.e.*, lacking access to primary care services), will not be able to find alternative providers, and thus will lose access

---

[8] *See, e.g.*, Brown, *Medicaid patients lose quick access to basic care after Planned Parenthood cuts and closures*, News from the States (Sept. 30, 2025), https://www.newsfromthestates.com/article/medicaid-patients-lose-quick-access-basic-care-after-planned-parenthood-cuts-and-closures (discussing Planned Parenthood Gulf Coast Medicaid patient who was informed the day after this Court stayed the preliminary injunction that she would need to pay out of pocket or cancel her appointment and further describing challenges faced by Planned Parenthood Members, including health center closures); Wilkie, *Planned Parenthood Keystone operating without Medicaid funds*, WITF (Sept. 30, 2025), https://www.witf.org/2025/09/30/planned-parenthood-keystone-operating-without-medicaid-funds/ (noting that while Planned Parenthood Keystone is currently providing care at no cost to Medicaid patients, it may need to "transition patients to self-pay" depends on success of the instant lawsuit).

to care altogether. A170(¶¶4-5); A184-185(¶¶52-53, 54-56); A211(¶¶36-38); A222(¶¶22-23); A243-244(¶¶52-54); *see infra* pp.52-56. And even for patients who live in areas with other providers, there is no way such providers will be able to fill the gaps left by the reduced capacity and/or closures of Planned Parenthood Member health centers in those areas. A183-185(¶¶49, 50-56); A271-281(¶¶35-59).

Other publicly funded healthcare providers, already stretched to capacity, do not provide the same services and are unable to make up the shortfall in coverage. *See* A271-281(¶¶35-59). Due to the immense role Planned Parenthood Members play in providing services, clinics in some states would have to more than double their caseloads to meet the needs of patients served by Planned Parenthood Members. A273-274(¶¶40-41). And even if those patients are eventually able to find care elsewhere, they face disruptions in care to the serious detriment of their health—for example, undetected STIs and cancers, or unintended pregnancies. A185(¶56). All in all, the Defund Provision's impact is not simply a matter of redirecting patients from Planned Parenthood Members' clinics to other providers; it will without doubt mean that many patients do not receive the care they need at all.

That loss in access to reproductive healthcare will, in turn, lead to a broader public health crisis. *See* A282(¶¶60-62). For example, when States have cut funding for Planned Parenthood Members, patients have been unable to access critical

healthcare leading to negative health outcomes. A295-306(¶¶87-107). Among other things, the Defund Provision will lead to higher rates of STIs, A290-293(¶¶74-81), and likely result in an increased number of abortions due to the decreased access to contraceptives and the corresponding increase in the number of unintended pregnancies, A288-289(¶71). These harms will be costly not only mentally and physically for patients, including mothers and children, but also fiscally for society. A285-290(¶¶67-73).

The Defund Provision is already resulting in drastic revenue shortfalls for many Planned Parenthood Members. *See* A186-188(¶¶60-64). In the aggregate, more than one-third of Members' total revenue is from Medicaid reimbursements for services provided; some members receive the vast majority of their health services revenue from Medicaid reimbursement. A181(¶44). Without Medicaid reimbursements, Members will be forced—and in some cases are already being forced—to terminate employees, curtail services, and close health centers, with grave consequences for patients served at those centers. A183(¶47); A185(¶¶54-55); A240-242(¶¶46-48); Brown, *supra* note 8. For example, PPAU anticipates that it will likely have to lay off full-time staff, limit the services it provides, and potentially close health centers in areas with few options for Medicaid patients. A222-223(¶¶22-24). And even if funding is later restored, these harms will have

lasting, long-term effects, as it is extremely difficult, time-consuming, and expensive to reopen health centers once closed—often prohibitively so.  A240-241(¶46).

Other Planned Parenthood Members and their patients will be harmed in similar—and sometimes more sweeping—ways.  A147-149(¶¶114-122); *see* A186-188(¶¶60-64).   California presents a particularly devastating example.   Seven Planned Parenthood Members operate 114 health centers in California, collectively providing care to over 700,000 patients each year.  A231-232(¶16, 19).  Over 80% of Planned Parenthood Member patients in California rely on California's Medicaid (Medi-Cal) program for their healthcare coverage.  A227(¶4).  California Planned Parenthood Member health centers collectively provide approximately $425 million of services annually to patients covered by Medi-Cal and related programs, and 77%, or $328 million worth of services, is reimbursed using federal funds.  A238(¶38).  If the Defund Provision is not enjoined, Planned Parenthood California Members face reductions in services, layoffs for many of their 3,000 employees, and clinic closures.  A240-242(¶¶45, 48).  Such closures would in turn significantly reduce access to healthcare across the State, with no hope that other publicly funded providers would be able to fill the gap.  A241-243(¶¶47-52).

The harms to Planned Parenthood Members across the country will also injure PPFA itself—including by striking at the heart of PPFA and the Members' core

mission of ensuring access to vital sexual and reproductive healthcare for all. A186(¶59); A193-194(¶¶78-79).

## C. Procedural History

On July 7, 2025, Plaintiffs sued to enjoin the Defund Provision's enforcement. The district court entered a temporary restraining order the same day, followed by an amended order on July 11. A569. The court granted Plaintiffs' motion for a preliminary injunction in part, A569, which the government appealed, A563-565. The district court then granted the motion for preliminary injunction in full, A570, and the government filed another notice of appeal, A566.

The government filed a motion to stay the July 21 and July 28 preliminary injunctions pending appeal, which the Court granted. Plaintiffs filed an emergency motion for reconsideration of the stay order and requested expedited briefing. The Court denied the motion for reconsideration but expedited the schedule for briefing and oral argument.

## STANDARD OF REVIEW

"An appellate court affords considerable deference to the district court's evaluative judgment" of the preliminary injunction factors. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). Absent an abuse of discretion, this Court must affirm a district court's grant of a preliminary injunction. *Id.* While the district court's "handling of abstract legal questions" is evaluated de

novo, its findings of fact are reviewed only for clear error. *Waldron v. George Weston Bakeries, Inc.*, 570 F.3d 5, 8 (1st Cir. 2009).

## SUMMARY OF THE ARGUMENT

The Defund Provision is an unconstitutional exercise of congressional power. It was specifically crafted to punish Planned Parenthood for being the Nation's most prominent advocate for abortion rights, and if its Members are treated collectively, the only nationwide abortion provider. As the district court correctly held, the Defund Provision violates the Constitution in several ways, and the equities clearly favor a preliminary injunction.

**I.** The Defund Provision is an unconstitutional bill of attainder. It intentionally targets Planned Parenthood: the legislative history and statutory structure demonstrate that its criteria were gerrymandered to describe Planned Parenthood Members while excluding nearly all other abortion providers from its coverage. And it punishes Planned Parenthood by preventing Members from receiving Medicaid reimbursements, thereby preventing them from serving many of their patients and carrying out a core part of their mission.

**II.** The Defund Provision denies PPFA and its Members Equal Protection of the law. By design, the Defund Provision treats Planned Parenthood Members differently than nearly all other medical providers—indeed, nearly all other abortion providers. And although the Defund Provision fails under any level of scrutiny,

heightened scrutiny applies because the Defund Provision specifically targets the associative conduct of PPFA and its Members by targeting both Members that independently satisfy the Defund Provision's requirements, and those that merely "affiliate" with other Members that do.

**III.** The Defund Provision violates the First Amendment in two ways. First, it bars an "affiliate" of a prohibited entity from participating in Medicaid but does not define the term. That uncertainty itself burdens Members' First Amendment rights, and the government's inconsistent positions have exacerbated the harm—it has variously claimed that only complete disassociation from Planned Parenthood suffices to escape the Defund Provision, that the question turns on ownership or control, or even that Members do not qualify as prohibited entities if they stop providing abortions. These are unconstitutional conditions that burden PPFA and its Members' expressive association. Second, and regardless, the Defund Provision unconstitutionally retaliates against Planned Parenthood because of its advocacy and expression.

**IV.** Finally, the Defund Provision is causing and will cause Planned Parenthood irreparable harm, and a preliminary injunction is in the public interest. The infringement of Planned Parenthood's constitutional rights alone constitutes irreparable injury, but the grave harms to Planned Parenthood's operations, mission, and reputation also constitute irreparable harm. The Defund Provision also is

significantly harming Medicaid patients, including by forcing them to pay out of pocket, find other healthcare providers, or forgo medical care altogether.

## ARGUMENT

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The district court correctly held that the Defund Provision is likely unconstitutional.  Specifically, the court was correct to find that the law violates the Bill of Attainder Clause and the Fifth Amendment's equal protection guarantee as to all Members, and that it violates the First Amendment rights of the Non-Qualifying Members.  The government fails to show that the district court erred on any of those claims, let alone all three.  Further, the preliminary injunction is proper because the Defund Provision constitutes unlawful retaliation against all Members' protected speech and association.

### A.  The Defund Provision Is An Unconstitutional Bill Of Attainder

The Defund Provision punishes Planned Parenthood for being the Nation's foremost advocate for sexual and reproductive rights, using a gerrymandered set of criteria specifically designed to capture the providers in Planned Parenthood's uniquely visible membership association.  The Bill of Attainder Clause prohibits "trial by legislature" and requires legislatures to accomplish their objectives "by rules of general applicability," not by "specify[ing] [those] upon whom the sanction it prescribes is to be levied." *United States v. Brown*, 381 U.S. 437, 442, 461 (1965).

The district court correctly held that the Defund Provision likely satisfies all three elements of a bill of attainder: "[1] specification of the affected persons, [2] punishment, and [3] lack of a judicial trial," the last of which is not disputed. *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 847 (1984).

### 1. Specification

The Defund Provision "singles out Planned Parenthood Members by defining the class subject to the regulation based on immutable facts" even without explicitly naming them. A584-585. The definition of "prohibited entity" in the Defund Provision was designed for Planned Parenthood alone—deploying, as the district court found, a set of "conjunctive criteria [that] create a narrow class of entities consisting almost entirely of Planned Parenthood Members." A71. The legislative history and context confirm that intent. *Supra* pp.10-13. Indeed, this gerrymandered provision allows virtually all abortion providers other than Planned Parenthood Members to remain in the Medicaid program. Statutes gerrymandered to target one group meet the specification requirement; a "statute need not identify an individual or group by name to incur suspicion." *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 669-670 (9th Cir. 2002). Because the Defund Provision specifies Planned Parenthood in all but name, this element of the test is satisfied.

The government's arguments are wrong and misstate the law. Contrary to the government's assertion, Br.18-19, Planned Parenthood need not show that the statute

singles out Planned Parenthood by name or by past conduct; instead, specification exists if the challenged legislation applies "to easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315 (1946); *see also SeaRiver*, 309 F.3d at 669-670. And it is immaterial that the law incidentally captures two non-Planned Parenthood entities. Br.19. The government has never disputed that these entities were afterthoughts swept into the bill during reconciliation to get the Defund Provision past issues with the Senate Parliamentarian under the Byrd Rule. Dkt. 5 at 10, 20 n.15.

For similar reasons, the government's reliance (*e.g.*, Br.17, 19) on *Communist Party of the U.S. v. Subversive Activities Control Board*, 367 U.S. 1 (1961), is misplaced. The Defund Provision's surgical targeting of Planned Parenthood and its Members in no way resembles the eight-part balancing inquiry at issue in *Communist Party*, which turned on the details of ongoing conduct in a way that left the statute's eventual reach unclear, and was to be made "after full administrative hearing, subject to judicial review which opens the record for the reviewing court's determination whether the administrative findings as to fact are supported by the preponderance of the evidence." *Id.* at 87; *see id.* at 13-14 (describing factors like "the extent to which [an entity's] views and policies do not deviate from those of such foreign government or foreign organization" and "the extent to which it sends members or representatives to any foreign country for instruction or training in the

principles, policies, strategy, or tactics of such world Communist movement"). The Defund Provision contains none of these protections or uncertainties, and was not merely drafted "with a particular example in mind," Br.22; *supra* pp.13-16.

Nor does it matter whether Planned Parenthood Members theoretically could have escaped punishment by stopping providing abortions and, potentially, disaffiliating with abortion-providing entities before October 1. Br.14.[9] The government is wrong that a law must cover only past conduct in order to be a bill of attainder. The Supreme Court has recognized that some traditional bills of attainder left "the designated parties a way of escaping the penalty." *Brown*, 381 U.S. at 442; *accord Cummings v. Missouri*, 71 U.S. 277, 324 (1866) ("'A British act of parliament … might declare that if certain individuals or a class of individuals, failed to do a given act by a named day, they should be deemed to be, and treated, as convicted felons or traitors. Such an act comes precisely within the definition of a bill of attainder'" (quoting *Gaines v. Buford*, 31 Ky. 481, 510 (1833))).

In any event, the idea that all Planned Parenthood Members could just stop providing lawful abortions by October 1 is a false choice. Planned Parenthood's shared mission is to ensure access to sexual and reproductive healthcare, including

---

[9] October 1 has now passed, but the government has yet to provide any guidance as to how it is interpreting the term "affiliates," leaving Non-Qualifying Members—as well as state officials—to guess whether the federal government believes they are covered by the statute.

abortion, for all people. Dkt. 1 at 3. It is also a false choice to suggest that every Planned Parenthood Member could "disaffiliat[e]" (Dkt. 53 at 11)—that is, apparently, withdraw from PPFA membership—by October 1. In structuring the statute this way—with a last-minute amendment that moved the operative date from the date of enactment to October 1—Congress may have intended to create the illusion that Planned Parenthood Members could choose to come into compliance with the statute, when doing so would run contrary to their core mission and itself be an infringement of their First Amendment rights.

### 2. Punishment

Three factors determine whether legislation punishes: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852. The district court correctly held that those factors show the Defund Provision imposes punishment. A75-80; A581-582.

*First*, the Defund Provision falls within the historical meaning of legislative punishment. The Supreme Court has explained that the Bill of Attainder Clause is "not to be given a narrow historical reading," and must "be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of

specifically designated persons or groups." *Brown*, 381 U.S. at 447. As early as 1866, the Supreme Court recognized that "[t]he deprivation of *any* rights, civil or political, previously enjoyed, may be punishment." *Cummings*, 71 U.S. at 320 (emphasis added). "'[B]arring designated … groups from participation in specified employments or vocations' is [also] a historical form of punishment characteristic of bills of attain[d]er." A76 (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 474 (1977)). So is Congressional action that seeks to (1) "stigmatize[] … reputation," *Lovett*, 328 U.S. at 314, or (2) impose "a badge of infamy" aimed at "stifl[ing] the flow of democratic expression and controversy." *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952).[10]

The Defund Provision prohibits Planned Parenthood Members from continuing to participate in the Medicaid program and serve Medicaid patients, "put[ting] plaintiff[s] out of business, or at least … out of the business in which [they have] been engaged to date." *Florida Youth Conservation Corps v. Stutler*, 2006 WL 1835967, at *1 (N.D. Fla. June 30, 2006). The wholesale exclusion of Planned Parenthood Members from their longstanding participation in Medicaid is "analogous to legislation that prohibits a person or entity from engaging in certain

_____

[10] Whether the bar in *Cummings* could be complied with (Br.15) does nothing to undermine the Supreme Court's holding that "deprivation of any rights" may be punishment, 71 U.S. at 320.

- 30 -

employment, which courts have historically found to be associated with punishment." *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 324 (M.D.N.C. 2012) (state law prohibiting Planned Parenthood organizations from receiving government funds was an unconstitutional bill of attainder).

Moreover, prohibiting Planned Parenthood Members from participating in Medicaid is not simply a "line-of-business restriction." Br.15 (quoting *TikTok Inc. v. Garland*, 122 F.4th 930, 945 (D.C. Cir. 2025)). Serving patients of limited means is central to Planned Parenthood's mission, and Medicaid recipients are a significant proportion of Members' patients, *supra* pp.9-10, 17-21, making that aspect of Planned Parenthood Members' care more than a "particular kind[] of business," Br.15. The government's contrary argument that "[h]alting the flow of federal Medicaid funds bears no resemblance to the severe punishments—including death, banishment, and imprisonment—previously understood as implicating the Clause" is contrary to the law. Br.8-9. Under this logic, the government's imposition of a crushing fine would not constitute punishment. That cannot be the case.

Congress's broad spending powers (Br.12-13) are irrelevant because it cannot exercise those powers in a way that is irrational and unconstitutional, as is the case here. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.* ("*AOSI*"), 570 U.S. 205, 213-214, 217 (2013) (holding spending statute unconstitutional). Just as *Lovett* held that a statute barring the appropriation of federal funds for the salaries

of specific government employees was a bill of attainder, so too is the Defund Provision not "a mere appropriation measure," but rather a "proscription from any opportunity to serve" the public. *Lovett*, 328 U.S. at 305 n.1, 313, 316. The government does not even acknowledge this holding in *Lovett*, much less distinguish it. And the government's reliance on *ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010), is misplaced. That case involved extreme facts—where Congress passed appropriation laws temporarily barring funds from going to ACORN while investigations of mismanagement and fraud were ongoing—that do not map onto this case. While Congress has an interest in ensuring that public funds are well-managed, the government has not invoked that interest here, and it could not. And Congress, of course, does not have any valid interest in punishing Planned Parenthood for being the face of the abortion rights movement and offering lawful health services.

Further, the government is wrong that the Defund Provision is "even less like punishment than some funding restrictions" because "its application depends not on past acts but on future conduct." Br.14. To start, punishment for bill of attainder purposes "is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct." *Selective Serv. Sys.*, 468 U.S. at 851-852 (citing *Brown*, 381 U.S. at 458-459). Even through the purportedly forward-looking aspects of the Defund Provision, Congress sought to deter Planned

Parenthood—specifically—from engaging in lawful conduct with the punishment of prohibition. And in any event, the evidence demonstrates that the Defund Provision was intended to target and punish Planned Parenthood Members for past conduct— decades of providing and advocating for access to lawful abortion care. *Supra* pp.9, 30.

Beyond barring Planned Parenthood Members from serving a significant proportion of their patients, the government's effort to prevent Planned Parenthood Members from receiving Medicaid reimbursement will materially damage the organization's reputation. Planned Parenthood Members have already been forced to ask Medicaid patients to self-pay if they are able or to attempt to obtain care elsewhere, cut down hours of operations, lay off staff, or close down clinics altogether. These actions risk severing Planned Parenthood Members' hard-earned trust within the communities in which they operate, an "imposition of infamy" from which the organization may never recover. *Ullmann v. United States*, 350 U.S. 422, 451 n.5 (1956) (Douglas, J., dissenting).

*Second*, the Defund Provision does not advance any nonpunitive legislative purpose. *See Nixon*, 433 U.S. at 475-476. The government's justifications—not subsidizing abortion and favoring childbirth over abortion, *see* Br.16—are nonsensical. The Defund Provision does not prevent the use of federal funds for abortions—the Hyde Amendment has long prohibited Medicaid funding for

abortions.  Rather, the Defund Provision categorically prohibits federal Medicaid funds from being used to reimburse for all *non*-abortion medical services provided by the "prohibited entit[ies]."  Nor does it prevent the vast majority of abortion providers from receiving Medicaid reimbursements, focusing instead on punishing Planned Parenthood providers.  A77-78.  And Medicaid is traditionally a fee-for-service reimbursement program in which providers are reimbursed set rates for medical services actually provided—often at rates that do not cover the cost of providing that care—so any government concern that Medicaid funds will effectively subsidize abortion is also misplaced.  *See* Brief for Respondents at 49-50, *Medina v. Planned Parenthood of S. Atl.*, 145 S. Ct. 2219 (2025) (No. 23-1275) (noting that, for example, "South Carolina's Medicaid reimbursement rates are so low that they 'do not even fully cover the cost of the Medicaid services [Respondent] provides'" so it "is wrong to say … that the money that [Respondent] receives from Medicaid 'frees up other funds to provide more abortions'").  There is thus no nonpunitive purpose for the Defund Provision.

*Third*, the legislative record confirms the government's intent to punish Planned Parenthood.  Members of Congress have repeatedly said they intended to defund Planned Parenthood.  *See supra* pp.10-13; *see also Consolidated Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 355 (2d Cir. 2002) ("[T]he stated intent of at least some legislators—most notably one of the floor managers of the legislation—to

punish [the plaintiff] reinforces [the] conclusion that a substantial part of the legislation cannot be justified by any legislative purpose but punishment."). And since this litigation was filed, the statute's supporters have reaffirmed that intent. *Supra* pp.4-5; *see Fowler Packing Co. v. Lanier*, 844 F.3d 809, 818-819 (9th Cir. 2016) (considering post-enactment statements in a bill of attainder analysis to assess legislature's intent to punish). Further, the Defund Provision's "inclusion of only 'certain abortion providers' supports the conclusion that Congress acted with an intent to punish." A583.[11]

## B. The Defund Provision Violates Equal Protection

Equal protection directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). By design, the Defund Provision prohibits Planned Parenthood Members from receiving Medicaid reimbursements while leaving untouched almost all others who provide the same care—even abortions. *See supra* Argument I.A.1. The statute defines

---

[11] While the government argues that evidence of intent from previous bills is not relevant, Br.17, Planned Parenthood identified evidence going to congressional intent for the Defund Provision itself. And in any event, when Congress uses the same language across bills, it is presumed they mean the same thing. *See United States v. Enmons*, 410 U.S. 396, 404-405 (1973) (considering legislative history of earlier bill as relevant to interpretation of later bill that contained the same operative language); *see also Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 204-213 (1980) (considering legislative history of several predecessor bills to interpret scope of later statute). *Communist Party* is not to the contrary, Br.17, because the enacted language there was meaningfully changed from prior bills and fundamentally differs from the Defund Provision's targeting of Planned Parenthood, *supra* pp.12-13.

"prohibited entity" using a web of conjunctive criteria that rule out nearly all providers participating in Medicaid except Planned Parenthood, and that was the intent of the statute. *See id.* No matter how many abortions they perform, and no matter how many federal Medicaid dollars they received in fiscal year 2023, providers may still receive federal Medicaid dollars if they operate for a profit. So too may non-profit abortion providers who do not predominantly serve low-income individuals or engage primarily in family planning services. As the district court held, this targeting fails any level of review. *See* A86-88; A575-576.

To start, heightened scrutiny applies because the Defund Provision infringes on Planned Parenthood's fundamental First Amendment right of association. The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "Government actions that may unconstitutionally infringe upon this freedom can take a number of forms." *Id.* The government violates this freedom of association when it "seek[s] to impose penalties or withhold benefits from individuals because of their membership in a disfavored group." *Id.* (citing *Healy v. James*, 408 U.S. 169, 180-184 (1972)).

Associating with PPFA is expressive. The district court found as a matter of fact that PPFA "advocates before Congress, provides education and information about sexual and reproductive health, and through Planned Parenthood Action Fund,

communicates with the public regarding lawmakers' voting records, supports campaigns for ballot initiatives, and supports candidates for federal, state, and local officials who will support reproductive freedom in furtherance of its mission." A65-66; *see also* A179-180(¶¶36-40); A191-192(¶¶74-75). And by using the licensed Planned Parenthood name, Members express that they "stand[] for particular values." A66; *see also* A172(¶15). Since "Members engage in those activities with [PPFA] and each other," "Membership in [PPFA]—and corresponding affiliation with other Members—is … part and parcel with Planned Parenthood Members' associational expression." A66. This factual finding was not clear error.

The Defund Provision treats Planned Parenthood Members differently from other healthcare providers because they associate with PPFA and each other. The Defund Provision defines a "prohibited entity" to include its "affiliates," but then fails to define the latter, creating uncertainty that itself burdens protected association. The government's briefing exacerbates the harm through its inconsistent approach to what constitutes affiliation. In some places, the government suggests that *all* PPFA Members may be banned from receiving federal Medicaid funds simply by virtue of their membership. Br.24 (arguing Planned Parenthood Members are "affiliates" and should be "understood as a single enterprise"). It is not clear whether that is the government's actual position—elsewhere, the government has asserted that being an "affiliate" turns on corporate ownership and control. Br.23. And HHS

has left Non-Qualified Members guessing by failing to issue any guidance on the meaning of "affiliates." As a result, the Defund Provision unconstitutionally burdens Members' association with each other and PPFA by conditioning Medicaid reimbursements on changes to their expressive association, a core First Amendment activity. *See Jaycees*, 468 U.S. at 622. And on the strongest version of the government's interpretation, the violation is even clearer—as the district court held, "no Member can escape the law's burden simply by ending its own abortion services. Instead, a Member must also disaffiliate from any Member that continues to provide abortion, which requires disassociating from [PPFA]." A84.

"Classifications that impinge on 'fundamental rights,'" including First Amendment rights, "are subject to strict scrutiny and will only be upheld if 'precisely tailored to serve a compelling governmental interest.'" *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 9 n.6 (1st Cir. 2013) (quoting *Plyler v. Doe*, 457 U.S. 202, 217 (1982)); *Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7 (1972). The government does not dispute this established standard and does not dispute that, if heightened scrutiny applies, the Defund Provision fails. *See* Br.32. As the district court correctly concluded, the Defund Provision comes nowhere close to surviving strict scrutiny and fails even rational basis review. A83-88; A575-576.[12]

---

[12] The government refers to *Family Planning Association of Maine v. United States Department of Health & Human Services*, 2025 WL 2439209 (D. Me. Aug. 25,

The statute does not serve the government's asserted purpose of ensuring that federal dollars do not "subsidize abortion." Br.32. Federal law already prohibits the use of federal funds for abortions, s*ee supra* pp.9-10, so all the Defund Provision does is prevent *Planned Parenthood Members* from receiving reimbursement for the critical *non*-abortion care they provide to Medicaid patients. Moreover, the Defund Provision also punishes providers that do not even provide abortions, so long as they merely "affiliate" with a "prohibited entity." There is no logical link between such association and "subsidizing abortion." As the district court found, "each Planned Parenthood Member is an independent organization." A171-172. Medicaid largely operates through reimbursement—a clinic is reimbursed for a specific service already provided; not for general operating funds that it can allocate as it wants.

The statute deploys several more conditions that have nothing to do with abortion, individually or in tandem. As the district court observed, "it is unclear how including only entities that are non-profits and provide medical services in

_____

2025), *appeal filed*, No. 25-1829 (1st Cir. Aug. 29, 2025) ("*MFP*"), a separate lawsuit brought by one of the two non-Planned Parenthood providers swept up by the Defund Provision as collateral damage. The *MFP* court did not confront the record of animus presented in Planned Parenthood's case. What is more, *MFP* involves only a freestanding equal protection claim that does not implicate the First Amendment, and so the District of Maine applied rational basis review. The court expressly recognized that Planned Parenthood's case "raises distinct legal questions and a less deferential standard of review" than MFP's case. *Id.* at *2 n.4. With an appeal underway, this Court has yet to weigh in on the District of Maine's decision.

underserved communities is in any way related to reducing abortion."  A87.  Even

if the government could connect the Defund Provision's requirements to its asserted

interest in disfavoring the provision of abortion services—which it cannot—the

combined conditions single out Planned Parenthood Members, leaving virtually all

other abortion providers untouched.  A84 (citing A467).  The Defund Provision thus

does not halt Medicaid funds for one category of abortion providers, Br.13, but rather

deploys layered criteria that are designed to work together to specifically target

Planned Parenthood for unequal treatment.  A86; A575.

The underinclusiveness of the Defund Provision reaffirms that the real

intention of the statute is to punish Planned Parenthood, not to disfavor abortion.  *Cf.*

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011)

("Underinclusiveness raises serious doubts about whether the government is in fact

pursuing the interest it invokes, rather than disfavoring a particular speaker or

viewpoint.").  HHS has confirmed that the Provision's true design is to punish

Planned Parenthood for its advocacy and Members for their provision of abortion.

Benner, *supra* n.7.  Yet, while Planned Parenthood's "abortion stance has made it[]

unpopular among some segments of the population," "Planned Parenthood's

unpopularity in and of itself and without reference to some independent

considerations in the public interest cannot justify" the Defund Provision.  *Planned*

*Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 361 (8th Cir. 1980).  At its core

and in context, the law is "inexplicable by anything but animus." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Such a "bare … desire to harm" a group is not a legitimate, much less compelling, reason for singling them out. *Id.* at 634 ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a 'bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." (alterations and emphasis in original) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *accord* A87 ("[D]iscriminatory exclusion … is [not] a permissible legislative end.").

### C. The Defund Provision Violates The First Amendment

#### 1. The Defund Provision violates Planned Parenthood's First Amendment associational rights

The Supreme Court has long held that "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit.'" *AOSI*, 570 U.S. at 214 (cleaned up) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006)). As a result, "a funding condition" may constitute "an unconstitutional burden on First Amendment rights." *Id.* And while "conditions that define the limits of the government spending program" are permissible, those "that seek to leverage funding to regulate speech outside the contours of the program itself" are not. *Id.* at 214-215.

Here, the Defund Provision unconstitutionally coerces the expressive association (and thus the speech) of Planned Parenthood Members. The statute extends the status of prohibited entities to their affiliates without defining the latter, which itself directly infringes their associational rights by forcing them to guess whether their relationship with other Members suffices. *Supra* pp.14-15. Worse, the government appears to argue that membership in PPFA alone suffices to constitute "affiliation" within the meaning of the Defund Provision. Br.12. On that reading of the law, the Defund Provision violates the First Amendment by unconstitutionally conditioning federal Medicaid funds on Members disassociating with PPFA and each other—and as the district court properly found, "the record demonstrates that Members' affiliation via their membership in [PPFA] is expressive." A22. Nothing in the factual record refutes this, and the district court's factual finding was not clear error.

The only legal question then is whether the conditions imposed by the Defund Provision occur "'outside the contours' of the Medicaid program." A23 (quoting *AOSI*, 570 U.S. at 214-215). They do. Congress may and has imposed restrictions on what services can be provided throughout the Medicaid program. Indeed, that is what the Hyde Amendment does: it bars providers from being reimbursed for almost all abortion services through the federal Medicaid program. But the Defund Provision goes much further. It "does not merely 'withhold[] funding based on

whether entities provide abortion services,' but also based on whether 'an entity, *including its affiliates*,' provides abortion services." A64 (alteration in original). This association occurs outside the context of the Medicaid program, as activities like advocating before Congress are not within the purview of a program that provides reimbursement for the provision of healthcare. *See* A66 (recognizing that the Defund Provision imposes no "limit on the services that Medicaid funds may reimburse," but instead restricts with whom "a Medicaid provider may … affiliate"). It thus unconstitutionally "place[s] a condition on the *recipient* of the subsidy rather than on the program or service" being provided. A67 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). And while PPFA does not receive Medicaid funding, the Defund Provision also strikes at the core of PPFA's First Amendment association rights; it too has a right to associate and advocate together with its Members.

Comparing *AOSI* and *Rust* is instructive. In *AOSI*, the Supreme Court held that a federal law that denied HIV/AIDS funding to any organization that did not have a policy opposing prostitution and sex trafficking imposed an unconstitutional condition on that funding. 570 U.S. at 208, 221. The Court ruled that recipients of government funding are free to engage in First Amendment protected activity, like the expressive association at issue here, "on [their] own time and their own dime." *Id.* at 218. In *Rust*, by contrast, the Supreme Court upheld a restriction on family planning funding that barred grantees from providing counseling or referrals for

abortion as a method of family planning *within* government-subsidized family planning projects. 500 U.S. at 179, 196. It emphasized, however, that grantees "remained unfettered" in activities *outside* of those projects. *Id.* at 196. Here, the Defund Provision targets services provided and the association among PPFA and its Members wholly *outside* of the Medicaid program. As the district court properly held, "conditioning Medicaid funding on affiliation is not a limit on the services that Medicaid funds may reimburse." A23.

The government's shifting definitions of what constitutes affiliation cannot save the law. To the contrary, the government's failure to provide guidance or even adopt a clear and consistent position in this litigation only underscores how this undefined category is being used to coerce Members into relinquishing their Planned Parenthood membership—and dare them not to. The Defund Provision is now operative, yet the government has *never* provided a definitive position on how it is interpreting the statute. At times, it has suggested that HHS needs to issue guidance before it can determine which Planned Parenthood Members are prohibited entities, or that it otherwise cannot yet make that determination. A487; A559; Dkt. 53 at 27-28. But the government has also argued that it "could permissibly conclude (again, depending on the facts as of October 1) that PPFA members are all 'affiliates' within the meaning of the statute." Dkt. 53 at 29. This suggestion that PPFA and its independently incorporated and operated Members operate "a single enterprise"

Br.24, and that the only way Members can escape the Defund Provision is to stop "affiliating" with PPFA and each other, *see, e.g.*, A65; Dkt. 53 at 11; A501(30:10-14), would plainly violate the Constitution.

In other places, however, the government says that the use of the term "affiliates" is an "anodyne reference" to ownership and control, and merely aims to stop prohibited entities from "using the corporate form to evade the funding restriction." Br.22, 23. This interpretation would shield the Non-Qualifying Members from the Defund Provision; as the district court found, the Members "are separate legal entities." A87.[13] But again, the failure of the government to actually commit to this interpretation itself causes harm, burdening Members' First Amendment rights as they guess at the operative reading of the law.

Indeed, at other times, the government's reading of "affiliates" has even wider ramifications for expressive association. For instance, it suggests that PPFA's provision of "practical support" and its "collect[ion] [of] dues from its members" are sufficient to constitute affiliation. Br.24. To stretch the meaning of "affiliates" to

---

[13] Unable to demonstrate that this factual finding is clear error, the government mischaracterizes statements cherry-picked from other litigation brought by PPFA. Br.28. The declaration cited by the government is consistent with the factual record that was before the district court: Planned Parenthood Members have a shared mission to provide sexual and reproductive health services and agree to meet certain standards as a condition of their membership. A171-172(¶¶11-12). The district court considered this in finding that PPFA does not control its Members and that Members do not control one another. Dkt. 69 at 11.

encompass Planned Parenthood, the government says it is enough that one Member can use funds in a way that "benefit[s] other members" or "the entire enterprise." Br.24. Besides being hopelessly vague, such a broad understanding of the act of affiliation encompasses expressive association, which by definition involves members undertaking "collective effort on behalf of shared goals." *Jaycees*, 468 U.S. at 622. Whether advocating before Congress or educating the public about reproductive health, Planned Parenthood Members associate to express themselves in a shared mission, and so "membership in Planned Parenthood Federation is expressive," as the district court found. A65-66. And if the government were allowed to punish any individual or entity that provided grants or donations to Planned Parenthood, that too would raise grave First Amendment problems.

In any event, a condition need not directly regulate expressive association to unconstitutionally burden it. It does not matter whether the Defund Provision expressly regulates membership by directly "requir[ing] recipients of federal Medicaid funds to refrain from any expressive activity." Br.27. Rather, as the Supreme Court has repeatedly ruled, "the Constitution's protection is not limited to direct interference" with the right to freely associate. *Healy v. James*, 408 U.S. 169, 183 (1972); *see also NAACP v. Alabama*, 357 U.S. 449, 461-462 (1958) (requiring the NAACP to disclose its membership infringed members' associational rights even though there was "no direct action … to restrict the right of petitioner's members to

associate freely"). "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Healy*, 408 U.S. at 183 (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960)). "In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *NAACP*, 357 U.S. at 461. And withholding a benefit burdens association. *See, e.g., Healy*, 408 U.S. at 181-183 (state college's withholding of official recognition from a student group burdened the group members' First Amendment rights).

*      *      *

Because the Defund Provision does not define the degree of association that would result in prohibition, it violates the First Amendment rights of all Members and PPFA. The government's refusal to commit to a consistent definition bears out these harms, and various of its interpretations plainly violate the Constitution by conditioning *all* Planned Parenthood Members' federal Medicaid eligibility on disassociating from Planned Parenthood. Therefore, an injunction against the provision as to all Members is "no more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." Br.31 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025)).

## 2. The Defund Provision unconstitutionally retaliates against Planned Parenthood's exercise of First Amendment rights

Planned Parenthood is also likely to prevail on its distinct claim that the Defund Provision retaliates against it in violation of the First Amendment. And while the district court did not reach Planned Parenthood's retaliation claim, this Court "may affirm the district court's grant of a preliminary injunction … on any grounds supported by the record." *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002).

"[T]he government may not deprive an individual of a 'valuable government benefit[]' in retaliation for [the] exercise of First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 23 (1st Cir. 2011); *see also Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Yet that is precisely what the Defund Provision seeks to do. Because PPFA and its Members (1) "engaged in constitutionally protected conduct," (2) were "subjected to an adverse [government] action," and (3) "the protected conduct was a substantial or motivating factor in the adverse action," they have demonstrated all elements necessary to prevail on a retaliation claim. *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe ex rel. Doe*, 44 F.4th 23, 47 (1st Cir. 2022)).

*First*, as previously explained, PPFA and its Members engage in First Amendment-protected activity by associating with one another and by engaging in advocacy. *See supra* pp.36-37.

*Second*, terminating Planned Parenthood Members' Medicaid eligibility is an adverse action. The Defund Provision punishes Members for associating with each other and PPFA by stopping the flow of hundreds of millions of dollars in Medicaid reimbursements—denying a "valuable government benefit." *Barton*, 632 F.3d at 23 (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). With that much at stake, disqualification would "deter a reasonably hardy individual" from associating with Planned Parenthood or advocating for access to sexual and reproductive healthcare, including abortion. *McCue v. Bradstreet*, 807 F.3d 334, 339 (1st Cir. 2015) (quoting *Barton*, 632 F.3d at 29).

The government protests that the Defund Provision "applies without regard to expression." Br.33. But that assertion is incorrect and irrelevant. Under the government's interpretation of the statute, the Defund Provision may reach providers by virtue of their association, even when for expressive purposes. *See supra* pp.44-47. And even if the Defund Provision did not regulate expressive activity, that is beside the point. What matters is that speech and association motivated the adverse action, not that the adverse action regulates speech.

*Finally*, Planned Parenthood's protected political speech "was a substantial or motivating factor in the adverse action." *Gattineri*, 58 F.4th at 514 (citation omitted). Planned Parenthood has long been a prominent voice in the national discourse on sexual reproductive health issues, and this is not the first time it has

been targeted for that reason. *See, e.g.*, *Planned Parenthood of Kan., Inc. v. City of Wichita*, 729 F. Supp. 1282, 1287-1288 (D. Kan. 1990) (finding 35 years ago, that a local resolution "singles out Planned Parenthood on the basis of its advocacy of certain unpopular ideals"); *Planned Parenthood of Minn.*, 612 F.2d at 361 (determining 45 years ago that "Planned Parenthood of Minnesota in its abortion stance has made itself unpopular among some segments of the population," and that "Planned Parenthood's unpopularity played a large role in" the passage of a statute excluding it from a grant program).

In recent years, some in Congress have also sought specifically to "defund Planned Parenthood." *See supra* pp.10-13. Despite this record, the government insists that the Defund Provision targets "major abortion providers." Br.1. But as explained (*see supra* Section I.), the Provision targets non-profit sexual healthcare providers that receive substantial Medicaid reimbursements. Its coverage does not turn on the number of abortions provided; in fact, some Planned Parenthood Members perform few abortions, and others none at all. Instead, the statute deploys layered qualifications designed to capture all Planned Parenthood Members, some just by association. These contorted conditions and the long train of attempts to punish Planned Parenthood for its advocacy demonstrate that the Defund Provision unconstitutionally retaliates against Planned Parenthood based on its protected First Amendment activity.

Unable to overcome the First Amendment retaliation test, the government tries to sidestep it. It argues that this Court ought not strike down "an otherwise constitutional statute on the basis of an alleged illicit legislative motive." Br.33 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). But *O'Brien* did not say legislative motives do not matter. To the contrary, it expressly approved of "inquir[ing] into legislative purpose" in a "class of cases where the very nature of the constitutional question requires" such an examination—most notably, "those in which statutes have been challenged as bills of attainder." *O'Brien*, 391 U.S. at 383 & n.30; *see also Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 556 (7th Cir. 1988) ("[W]here a statute or ordinance does not have the generality characteristic of legislation … a more beady-eyed examination of motive is appropriate."). Like their bill of attainder claim, Plaintiffs' First Amendment retaliation claim requires an inquiry into legislative purpose, making such an assessment not only proper but necessary. *See, e.g., Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (requiring "retaliatory animus" (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006))).

## II.  THE REMAINING FACTORS WEIGH HEAVILY IN PLAINTIFFS' FAVOR

### A.  Plaintiffs Have Demonstrated Irreparable Injury

The government does not and cannot come close to clearing the high bar necessary for reversal of the district court's findings on irreparable harm. The

district court is afforded "broad discretion … in weighing irreparable harm." *Gately v. Massachusetts*, 2 F.3d 1221, 1234 (1st Cir. 1993). Irreparable harm is demonstrated where the injury "is not easily measured or fully compensable in damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19-20 (1st Cir. 1996). Here, Planned Parenthood demonstrated that it would suffer irreparable injury absent injunctive relief with unrebutted evidence of harm.

Given the likely First Amendment violations, "[t]here is no need for an extensive analysis" to identify an injury to Planned Parenthood. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012). The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2364 (2025). At the district court, and again here, Planned Parenthood demonstrated its likelihood of success on its First Amendment argument, and that alone is sufficient to justify a finding of irreparable injury.

Planned Parenthood Members also face existential threats to their ability to keep operating and to their mission. Disqualifying Planned Parenthood from Medicaid is forcing its health centers to cancel appointments with patients, cut back on services, lay off staff, and perhaps close. *See* A170(¶4); A181-182(¶44); A185-186(¶¶54-57); A193(¶¶78); A212-213(¶¶40-42); A217-218(¶6); A222-223(¶24); A240-242(¶¶45-48). These cancellations and cuts are harming Planned Parenthood

Members' and PPFA's shared "mission of ensuring access to sexual and reproductive health care services" to people no matter their means. A169(¶1); *see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (irreparable harm where "new obstacles unquestionably make it more difficult for the [plaintiffs] to accomplish their primary mission").

These harms are also impairing the provider-patient relationship and undermining Planned Parenthood health centers' goodwill and reputation. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000). The Defund Provision will sever Planned Parenthoods providers' relationships with their patients, damaging trust and goodwill that these providers hold in their communities. This interference in the provider-patient relationship is "not easily quantifiable," and "courts often find this type of harm irreparable." *Id*. at 13.

The government does not credibly respond. Instead, it states with no support that Planned Parenthood Members could "continue providing these services with other funding sources," that patients can "obtain care from healthcare providers that are not prohibited entities," or that Planned Parenthood Members could "simply cease providing abortions." Br.36-37. Even if Members are able to obtain some supplemental funding, that funding will not come close to making Members whole. The government's statements that patients can go to other providers belies the unrebutted record that, in many communities, no provider will be able to fill the

enormous gap left when Planned Parenthood Members can no longer see Medicaid patients. A147(¶114); A148-149(¶¶121-124); A170(¶5); A184(¶¶52-53); A271-273(¶¶35-39). Even if some patients are able to find alternative sources of care, that is precisely the kind of injury to Planned Parenthood that "several courts have recognized": the irreparable injury that occurs when a company's "customers (or prospective customers) will turn to competitors." *Baccarat*, 102 F.3d at 20. And while the government claims that Members could cease providing lawful abortions, as discussed above, it refuses to make clear its position on whether they would still be prohibited entities due to their association with other Planned Parenthood Members.

## B. The Preliminary Injunction Serves The Public Interest

Finally, the public interest is served by an injunction, not through enforcement of the Defund Provision. If the Defund Provision remains enforceable, it will compel Members to curtail care for patients, cut services, and potentially close health centers, jeopardizing the health of all Planned Parenthood patients. *See* A271-272(¶35); A280(¶57); A282-283(¶¶60-64); A293-294(¶82); A188-190(¶¶65-73). Put simply, the Defund Provision has and will substantially decrease access to reproductive healthcare across the Nation. A280(¶57); A282-283(¶¶60-63); A293-294(¶82); *see Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 77 (1st Cir.

2005) (affirming preliminary injunction where "any shut down" of health center "would adversely affect hundreds of Medicaid patients").

By comparison, there is no public interest in enforcing the Defund Provision. Planned Parenthood Members have provided care under the Medicaid program for decades. *See supra* p.9. The government cannot credibly claim that it will suffer injury by preserving that status quo. Instead, the government leans almost entirely on a supposed policy interest "against allocating federal taxpayer dollars to providers of abortion." Br.35. But of course, the Defund Provision does not just disqualify abortion providers from Medicaid—it specifically punishes Planned Parenthood while leaving many other providers free to stay in the program. The government has never explained what legitimate public interest that serves. While the government fleetingly invokes the public's interest in the implementation of duly enacted statutes, Br.34, there is no public interest in perpetuating unconstitutional action. *See Somerville Public Schools v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025).

The government cannot contend that the public interest outweighs the harms to PPFA and its Members here. *See Massachusetts Ass'n of Older Ams. v. Sharp*, 700 F.2d 749, 750, 753-754 (1st Cir. 1983) (discussing Medicaid program's purpose of providing assistance to the most needy, and holding that "[t]ermination of [Medicaid] benefits that causes individuals to forgo such necessary medical care … far outweighs" the government's mere "loss of public funds" in the form of Medicaid

payments).  Planned Parenthood Members provide greatly needed medical care to over one million Medicaid patients each year.  Ensuring those patients remain with their provider of choice during this litigation would alone be enough to satisfy the public interest prong.

## CONCLUSION

The district court's grant of a preliminary injunction should be affirmed.

Respectfully submitted,

_/s/ Alan Schoenfeld_

EMILY NESTLER
PLANNED PARENTHOOD
   FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW
Washington, DC  20005
202) 973-4800
emily.nestler@ppfa.org

C. PEYTON HUMPHREVILLE
KYLA EASTLING
PLANNED PARENTHOOD
   FEDERATION OF AMERICA, INC.
123 William Street
New York, NY  10038
(212) 441-4363
peyton.humphreville@ppfa.org
kyla.eastling@ppfa.org

ALAN SCHOENFELD
CASSANDRA A. MITCHELL
ALEX W. MILLER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 937-7294
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com

ALBINAS PRIZGINTAS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC  20037
(202) 663-6700
albinas.prizgintas@wilmerhale.com

SHARON K. HOGUE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
sharon.hogue@wilmerhale.com

October 13, 2025

_Attorneys for Plaintiffs-Appellees_

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,587 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Alan Schoenfeld*
Alan Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com

October 13, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Plaintiffs-Appellees with the Clerk of the United States Court of Appeals for the First Circuit via the CM/ECF system this 13th day of October, 2025 to be served on all counsel of record via ECF.

/s/ Alan Schoenfeld
Alan Schoenfeld
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com

October 13, 2025