Nos. 25-1698, 25-1755

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

———————————

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED
PARENTHOOD LEAGUE OF MASSACHUSETTS; PLANNED PARENTHOOD
ASSOCIATION OF UTAH,

*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the U.S.
Department of Health and Human Services; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; MEHMET OZ, in the official capacity as
Administrator of the Centers for Medicare & Medicaid Services; CENTERS FOR
MEDICARE & MEDICAID SERVICES,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

**REPLY BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*
LEAH B. FOLEY
  *United States Attorney*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
DANIEL TENNY
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.H.Hazel@usdoj.gov*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ............................................................................. 1

ARGUMENT ............................................................................................................... 3

I.    The Government Is Overwhelmingly Likely To Succeed On The Merits ......... 3

      A.    Section 71113 Is Not A Bill Of Attainder ...................................................... 3

      B.    Plaintiffs' Other Claims Are Meritless ...................................................... 12

II.   The Remaining Factors Counsel Against Injunctive Relief ............................... 22

CONCLUSION ........................................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**          **Page(s)**

*ACORN v. United States,*
618 F.3d 125 (2d Cir. 2010) ........................................................................ 6, 8

*Arcara v. Cloud Books, Inc.,*
478 U.S. 697 (1986) .......................................................................................... 18

*BellSouth Corp. v. FCC,*
162 F.3d 678 (D.C. Cir. 1998) ........................................................................ 8

*Brown v. Entertainment Merchs. Ass'n,*
564 U.S. 786 (2011).......................................................................................... 21

*Communist Party of the U.S. v. Subversive Activities Control Bd.,*
367 U.S. 1 (1961) ................................................................................ 10, 11, 12

*Cummings v. Missouri,*
71 U.S. 277 (1866)............................................................................................ 7

*District 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*
*Loc. Lodge 207 v. Raimondo,*
18 F.4th 38 (1st Cir. 2021) .......................................................................... 23

*Elgin v. U.S. Dep't of the Treasury,*
641 F.3d 6 (1st Cir. 2011) ........................................................................... 11

*Family Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs.,*
No. 1:25-cv-00364, 2025 WL 2439209 (D. Me. Aug. 25, 2025) ........................ 20, 26

*FCC v. Beach Commc'ns,*
508 U.S. 307 (1993) ........................................................................................ 21

*Flemming v. Nestor,*
363 U.S. 604 (1960) ........................................................................ 6, 9, 10, 22

*Florida Youth Conservation Corps., Inc. v. Stutler,*
No. 4:06-cv-275, 2006 WL 1835967 (N.D. Fla. June 30, 2006) ................................. 8

*González-Droz v. González-Colón,*
660 F.3d 1 (1st Cir. 2011) ........................................................................ 20, 21

*Healy v. James,*
408 U.S. 169 (1972) ........................................................................................ 18

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ................................................................... 4-5

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018)........................................................2, 14, 15

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.,*
    909 F.3d 446 (D.C. Cir. 2018) ............................................... 7

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)...................................................... 23

*Maryland v. King,*
    567 U.S. 1301 (2012)................................................................ 23

*Massachusetts Ass'n of Older Ams. v. Sharp,*
    700 F.2d 749 (1st Cir. 1983) ................................................ 24

*NAACP v. Alabama,*
    357 U.S. 449 (1958) ................................................................ 18

*Nixon v. Administrator of Gen. Servs.,*
    433 U.S. 425 (1977) ................................................................ 11

*Planned Parenthood of Cent. N.C. v. Cansler,*
    877 F. Supp. 2d 310 (M.D.N.C. 2012).................................... 8

*Romer v. Evans,*
    517 U.S. 620 (1996)................................................................ 20

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ............................................................ 5, 19

*Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.,*
    468 U.S. 841 (1984) ............................................................ 6, 13

*Somerville Pub. Sch. v. McMahon,*
    139 F.4th 63 (1st Cir. 2025) ................................................ 23

*Turner Broad. Sys., Inc. v. FCC,*
    507 U.S. 1301 (1993) ........................................................ 2, 23

*United States v. Brown,*
    381 U.S. 437 (1965)................................................................ 11

iii

*United States v. Hansen,*
  599 U.S. 762 (2023) ............................................................ 2, 14, 15

*United States v. Lovett,*
  328 U.S. 303, 311 (1946) ........................................................ 6, 7

*United States v. O'Brien,*
  391 U.S. 367 (1968) .................................................................. 22

*Wieman v. Updegraff,*
  344 U.S. 183 (1952) .................................................................... 9

*Williamson v. Lee Optical of Okla. Inc.,*
  348 U.S. 483 (1955) ............................................................. 21-22

## Other Authorities:

*Affiliate*, Black's Law Dictionary (12th ed. 2024), Westlaw ........................................... 7-8

Order, *Family Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs.,*
  No. 25-1829 (1st Cir. Oct. 16, 2025) ................................................ 8

## INTRODUCTION AND SUMMARY

Plaintiffs' brief confirms that there is no basis for enjoining the enforcement of an Act of Congress that limits federal Medicaid spending. On the merits, plaintiffs largely rehash their unsuccessful stay-stage arguments. Plaintiffs' claim that Section 71113 qualifies as a bill of attainder under the Supreme Court's stringent test rests on the premise that Congress enacted the statute to punish them for their expressive advocacy. But no evidence supports that claim. Plaintiffs' own brief describes them as, collectively, "the only nationwide abortion provider," which explains the legitimate reason why the statute applies largely but not exclusively to them. Br. 23. Plaintiffs also have no answer to the Supreme Court cases recognizing that withdrawing federal financial benefits does not constitute punishment under the Bill of Attainder Clause. In any event, plaintiffs acknowledge (Br. 26) that a bill of attainder must "defin[e] the class subject to the regulation based on immutable facts," yet fail to explain why the statute—which turns largely on whether an entity engages in certain activities several months after the statute's enactment—satisfies that standard.

Plaintiffs' alternative claims are likewise meritless. Plaintiffs primarily urge that Section 71113's reference to an entity's "affiliates," "subsidiaries," and "successors" transforms the statute into an intrusion on First Amendment association. As we previously explained, Congress often treats an entity and its affiliates as a single enterprise in order to ensure that regulations are effective, and such provisions have never been understood as raising First Amendment concerns. Without addressing

those realities, plaintiffs accuse (Br. 44) the government of adopting "shifting" interpretations of the affiliate provision.  That is incorrect.  In each filing in this litigation that has addressed the issue, the government has articulated a control-based understanding of the term "affiliate" that applies without regard to expression.  Under the constitutional-avoidance doctrine, it is plaintiffs' burden to show that the government's construction is not "fairly possible," and plaintiffs make no attempt to meet that burden.  *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)).  Nor, in any event, do plaintiffs address how any concerns regarding the statute's affiliate provision could justify the district court's injunctions, which sweep far beyond the entities that may be affected by that provision.  And plaintiffs' fallback argument that Section 71113 fails rational-basis review cannot be reconciled with the highly deferential nature of such review.

On the equities, plaintiffs fail to explain why this case should be an exception to the traditional rule that "all Acts of Congress . . . 'should remain in effect pending a final decision on the merits by [the Supreme] Court.'"  *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers).  Plaintiffs never grapple with the substantial harms imposed by the injunctions here, which countermand the elected Branches' resolution of a significant and contested public policy question and compel the government to fund major abortion providers.  By contrast, plaintiffs' asserted injuries rely mainly on the premise that if the government supplies them with federal Medicaid funds, they can retain more staff and operate more clinics.  Plaintiffs'

desire to engage in those activities does not give them a cognizable interest in obtaining taxpayer dollars that Congress withheld. This Court should vacate the preliminary injunctions.

## ARGUMENT

## I. The Government Is Overwhelmingly Likely To Succeed On The Merits

### A. Section 71113 Is Not A Bill Of Attainder

Plaintiffs' lead argument is that the Medicaid funding restriction qualifies as a bill of attainder. To support that claim under the Supreme Court's stringent test, plaintiffs would need to show that Section 71113: (1) imposes punishment (2) on specified individuals. Plaintiffs satisfy neither requirement.

**1.** Plaintiffs do not dispute that on its face, Section 71113 does not single them out for punishment but instead establishes a limit on future eligibility for federal Medicaid funds for entities that meet generally applicable criteria (including the criteria that they either provide abortions or are affiliates of entities that do). Nor do plaintiffs suggest that the Bill of Attainder Clause prevents Congress from defining the Medicaid program to exclude entities that engage in conduct it disapproves or that it otherwise does not wish to subsidize, including the provision of abortion.

Instead, plaintiffs claim that, despite its text, Section 71113 is actually an effort to "punish[]" them for "advocat[ing] for sexual and reproductive rights." Br. 25. But their own brief illustrates the absence of any evidence supporting that claim—much

less evidence strong enough to overcome the statute's text—and in fact reinforces Congress's legitimate purposes.

As plaintiffs themselves emphasize, Planned Parenthood members play a "pivotal role" in providing services such as abortion to "millions of people," and they collectively form "the only nationwide abortion provider." Br. 7, 23. It is unsurprising that in seeking to reduce taxpayer funding for abortion providers, Congress would establish a limitation that applies to "the only nationwide abortion provider," Br. 23, in addition to—as plaintiffs concede, Br. 13—a few other entities with similar characteristics. That looks nothing like a bill of attainder, and everything like a restriction on the provision of federal funds to entities engaged in conduct that Congress does not wish to subsidize. By contrast, plaintiffs are not the only nationwide abortion advocate, and like all other such advocates, they can continue to participate in Medicaid so long as they do not perform abortions (or qualify as affiliates or subsidiaries of entities that do).

Plaintiffs fail to explain why it would be illegitimate for Congress to withhold federal Medicaid funds on account of their status as "the only nationwide abortion provider." Plaintiffs urge (Br. 33) that such a purpose would be "nonsensical" because federal law already bars federal funding of abortion. But as we previously explained, "[m]oney is fungible," and Congress was entitled to conclude that it does not want to contribute to abortion indirectly by allowing entities to allocate federal funds for other expenditures and use the savings to fund abortions. *Holder v.*

4

*Humanitarian L. Project*, 561 U.S. 1, 31 (2010). Similarly irrelevant is plaintiffs'

contention that Medicaid sometimes operates as a "fee-for-service reimbursement

program in which providers are reimbursed set rates for medical services actually

provided." Br. 34. That is not the only way federal Medicaid reimbursements are

structured, *see* A460, and in any event the relevant point is that when prohibited

entities obtain such reimbursements, nothing stops them from using the proceeds to

fund abortions. Plaintiffs' claim (Br. 3) that the loss of federal Medicaid

reimbursements will prompt them to "scale[] back services, la[y] off staff, and close[]

clinics" demonstrates that those reimbursements subsidize all of their operations.

And plaintiffs have no response at all to the government's argument that, no matter

whether Medicaid reimbursements subsidize abortion, Congress was entitled to

conclude that it does not wish to support abortion providers with taxpayer funds. *See*

*Rust v. Sullivan*, 500 U.S. 173, 192-93 (1991) ("[T]he government may 'make a value

judgment favoring childbirth over abortion, and . . . implement that judgment by the

allocation of public funds.'" (second alteration in original)).

    Plaintiffs likewise struggle to explain why halting Medicaid funding to certain

entities resembles the severe punishments the Supreme Court has understood as

implicating the Bill of Attainder Clause. Like the district court, plaintiffs equate

Section 71113 with historical laws "[b]arring designated . . . groups from participation

in specified employments." Br. 30 (second alteration in original) (quotation marks

omitted). But a law that defines the requirements for future participation in a

government benefit program is nothing like a prohibition on working in a particular profession. Receiving Medicaid reimbursements is not a profession. And prohibited entities may continue to provide healthcare services, including to Medicaid-eligible patients; they just may not receive federal reimbursements for doing so. *See ACORN v. United States*, 618 F.3d 125, 137 (2d Cir. 2010) ("Plaintiffs are not prohibited from any activities; they are only prohibited from receiving federal funds to continue their activities."). Losing access to a federal subsidy is not an "affirmative disability or restraint," and is "certainly nothing approaching" the kinds of historical punishments associated with bills of attainder. *Flemming v. Nestor*, 363 U.S. 604, 617 (1960)

Plaintiffs' inability to reconcile their position with Supreme Court precedent is highlighted by their comparison (Br. 31) of Section 71113 to "a crushing fine." The Supreme Court has repeatedly recognized that the withdrawal of federal financial support is not equivalent to a fine or any other traditional form of punishment. *See* Opening Br. 13-14 (discussing *Flemming*, 363 U.S. at 617; *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 853 (1984)). Without addressing those cases, plaintiffs invoke (Br. 32) *United States v. Lovett*, which concerned a statute forbidding the use of appropriated funds to pay the salaries of named government employees that Congress deemed "subversive." 328 U.S. 303, 311 (1946). But *Lovett* reinforces the distinction on which the government relies here. In classifying the law challenged in *Lovett* as an attainder, the Supreme Court explained that the law was no "mere appropriation measure" but instead "permanently . . . bar[red]" the named individuals

"from ever engaging in any government work." *Id.* at 313-14. That reasoning forecloses plaintiffs' argument here, where Section 71113 does not prevent them from practicing any profession. Plaintiffs' related suggestion that "[t]he deprivation of any rights, civil or political, previously enjoyed, may be punishment" is unavailing because obtaining federal Medicaid reimbursements is not a civil or political right. Br. 30 (quoting *Cummings v. Missouri*, 71 U.S. 277, 320 (1866)).

In addition to disregarding Supreme Court precedent, plaintiffs' position is also at odds with the decisions of other circuits. Plaintiffs appear to accept "that the Bill of Attainder Clause tolerates statutes that . . . prevent companies from engaging in particular kinds of business or particular combinations of business endeavors." *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 463 (D.C. Cir. 2018). Plaintiffs claim, however, that this principle does not apply here because serving Medicaid patients is "central to Planned Parenthood's mission." Br. 31. But, again, nothing in Section 71113 precludes prohibited entities from serving Medicaid-eligible patients; they just may not receive federal reimbursements for doing so. The Bill of Attainder Clause does not enshrine a right to a business model that depends on government subsidies. And, regardless, courts have rejected bill-of-attainder challenges to other line-of-business restrictions that affected core activities. *See, e.g.*, *BellSouth Corp. v. FCC*, 162 F.3d 678, 680 (D.C. Cir. 1998).

Plaintiffs fare no better in highlighting (Br. 32) that the law upheld by the Second Circuit in *ACORN* was passed in part because Congress was concerned about

7

the plaintiff organization's "mismanagement and fraud."  Plaintiffs' emphasis on that

aspect of *ACORN* is surprising because the Second Circuit described Congress's

focus on fraud as "point[ing] in the direction of a traditional form of punishment."

*ACORN*, 618 F.3d at 137.  Because that feature of *ACORN* is absent here, Section

71113 is even less like a bill-of attainder than the law the Second Circuit upheld.[1]

Plaintiffs' alternative contention that Section 71113 imposes punishment

because it stamps them with "a badge of infamy" is difficult to comprehend.  Br. 30

(quotation marks omitted).  The quoted language comes from a case that the Supreme

Court decided on a due-process theory and that involved a law excluding named

individuals "from public employment on disloyalty grounds." *Wieman v. Updegraff*, 344

U.S. 183, 190-91 (1952).  The Supreme Court's concern about damage to the relevant

individuals' reputations has no application to Section 71113's prospective withholding

of federal Medicaid funds from entities that are not named in the statute.  And to the

extent plaintiffs complain (Br. 33) that their inability to obtain federal funds in the

---

[1] The absence of support for plaintiffs' position is highlighted by their reliance on two out-of-circuit district court cases.  Br. 30-31 (first citing *Florida Youth Conservation Corps., Inc. v. Stutler*, No. 4:06-cv-275, 2006 WL 1835967, at *1 (N.D. Fla. June 30, 2006); and then citing *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 324 (M.D.N.C. 2012)).  Both cases are distinguishable:  the first involved a bar on contracting with a specifically named corporation whose primary business was contracting with the government, and the second concerned a limit on state funding specifically naming Planned Parenthood and a legislative record reflecting objections to the organization's ideology.  In any event, neither case discusses the Supreme Court precedents recognizing that appropriations laws generally do not constitute punishment.  *See infra* pp. 5-7.

future may lead them to turn away Medicaid patients, that is a normal consequence of Congress's appropriations choices—not a punishment implicating the Bill of Attainder Clause.

The lack of support for plaintiffs' argument is apparent in their assertion (Br. 25) that Section 71113 reflects a Congressional intent to "punish[] Planned Parenthood for being the Nation's foremost advocate for sexual and reproductive rights." Only "unmistakable evidence of punitive intent" could justify such a claim. *Flemming*, 363 U.S. at 619. Yet plaintiffs primarily depend on statements by a few individual legislators that express concern about distributing federal Medicaid funds to major abortion providers such as plaintiffs—"Big Abortion." Br. 13 (quotation marks omitted). If those statements have any relevance here, it is to reinforce that Congress's objective was to reduce federal funding of entities that perform abortions and not to punish political advocacy. The statements of a few individual legislators would not, in any event, amount to "unmistakable evidence" of the intent of a 535-member body. *Flemming*, 363 U.S. at 619; *accord Selective Service*, 468 U.S. at 855 n.15.

Equally unavailing is plaintiffs' continued reliance (Br. 17, 40) on a statement by a Department of Health and Human Services employee in response to the district court's first order. An Executive Branch employee may approve of the statute for reasons different from those that motivated the legislature, and a statement that did

not purport to address legislative intent and that was made after Section 71113's enactment is irrelevant to discerning Congress's motivation.

Plaintiffs likewise err in canvassing (Br. 11-12) various bills that were proposed but not enacted in the years before Section 71113's passage. This aspect of plaintiffs' argument "ignores the crucial constitutional significance of what Congress did when it rejected the approach of outlawing [particular entities] by name and accepted instead a statutory program regulating not enumerated organizations but designated activities." *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 84-85 (1961). In any event, the bills plaintiffs cite are fully consistent with Congress's legitimate non-punitive objective of reducing the flow of federal funds to entities that "provide[] abortions." Br. 11.

For similar reasons, plaintiffs do not support their position by asserting (Br. 34) that Section 71113 "does not prevent the vast majority of abortion providers from receiving Medicaid reimbursements." As discussed, there are legitimate, nonpunitive reasons why Congress focused on the abortion providers it did. *See supra* pp. 3-5. And, regardless, the Bill of Attainder Clause "was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 471 (1977).

**2.** Plaintiffs' bill-of-attainder claim is also meritless for the independent reason that the statute refrains from designating "identifiable individual[s]" for punishment.

10

*Nixon*, 433 U.S. at 468.  Plaintiffs demonstrate as much by quoting the district court's statement that Congress "defin[ed] the class subject to the regulation based on immutable facts," Br. 26 (quotation marks omitted), without explaining how choosing to provide abortions (or affiliating with entities that do) several months after the Act's passage could plausibly be described as an immutable characteristic.  Plaintiffs also miss the point in contending that even laws leaving "the *designated* parties a way of escaping the penalty" may qualify as bills of attainder.  Br. 28 (emphasis added) (quoting *United States v. Brown*, 381 U.S. 437, 442 (1965)).  As the Supreme Court has explained, a law such as Section 71113 that neither names particular individuals nor "attach[es] to [their] past and ineradicable actions" does not operate as a designation of persons.  *Communist Party*, 367 U.S. at 87-88; *see Elgin v. U.S. Dep't of the Treasury*, 641 F.3d 6, 19-20 (1st Cir. 2011) (Stahl, J., concurring) (explaining that even bills of attainder that provided "individuals with a means to escape punishment" "met the specificity requirement because they . . . identified specific individuals or groups based on prior acts").  The only past action relevant to the application of Section 71113 is the receipt of a specified amount of Medicaid funds in 2023, and plaintiffs do not suggest that Congress intended to punish anyone for that.

Plaintiffs' attempt to distinguish *Communist Party* only highlights that the decision precludes their bill-of-attainder claim here.  Plaintiffs depict the statute in *Communist Party* as involving an "eight-part balancing inquiry . . . that left the statute's eventual reach unclear."  Br. 27.  But as the Supreme Court noted in upholding the

11

statute, "legislators who voted for the Act in its final form expected that the Communist Party, if it continued to engage in the activities which had been reported to Congress as characterizing its past conduct, would be" covered. *Communist Party*, 367 U.S. at 84. Here, likewise, plaintiffs' theory is that even though Section 71113 does not impose restrictions based on entities' "ineradicable [past] actions," Congress may have expected that the prohibited-entity definition would encompass plaintiffs if they continued to provide abortions. *Communist Party* makes clear that such a theory does not support a bill-of-attainder claim.

Nor can plaintiffs evade *Communist Party* on the theory that the regulated individuals there could avoid the law's burdens by changing their conduct on an "ongoing" basis. Br. 27. What matters under the Supreme Court's cases is whether a group is specified based on past irreversible acts, not whether the opportunity to escape the law's effect is time-limited. In *Selective Service*, for instance, the Court concluded that the specification requirement did not apply even though regulated individuals only had a limited time—30 days after receiving a notice of ineligibility for federal financial aid—in which to register for the Selective Service and thus escape consequences. 468 U.S. at 849-51. In this case, similarly, Congress gave providers a nearly three-month period to avoid the law's effects by changing their conduct.

## B.     Plaintiffs' Other Claims Are Meritless

**1.** Plaintiffs' remaining claims rest primarily on the theory that Section 71113's reference to an entity's "affiliates," "subsidiaries," and "successors" transforms the

entire provision into an intrusion on First Amendment association. That theory confuses a regulation of corporate affiliates with a restriction on expressive association and would not in any event justify the expansive relief entered by the district court.

Plaintiffs do not contest the central elements of the government's argument. They do not dispute that Section 71113's text reflects that the affiliate provision refers to corporate affiliates, not associates engaged in joint expression. Nor do plaintiffs dispute that Congress often prevents the evasion of regulatory requirements by promulgating similar provisions that treat an entity and its affiliates as a single enterprise. Plaintiffs do not contend that such provisions have ever been understood as raising First Amendment concerns.

Instead, plaintiffs complain (Br. 37-38) that the government has "fail[ed] to issue any guidance on the meaning of" the term "affiliates." As an initial matter, this case involves a pre-enforcement challenge in which the district court entered preliminary injunctions before October 1, 2025, the first date on which prohibited entities could begin to be identified. Thus, the question on appeal is whether the district court's decision to enter those injunctions was error. Although plaintiffs' complaint requests a declaration that PPFA members that refrain from providing abortions do not qualify as affiliates, A161, the district court's preliminary-injunction orders do not resolve that issue, and it is therefore not before this Court. And if the Department of Health and Human Services ultimately construes Section 71113 in a

13

way that plaintiffs regard as unlawful, they could raise a statutory-interpretation claim or an as-applied constitutional claim at that time.

To the extent that plaintiffs believe that Section 71113 is susceptible to multiple interpretations, that would be a problem for plaintiffs, not the government. Under constitutional-avoidance principles, a court must adopt any "fairly possible" statutory construction that avoids constitutional concerns. *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). As the government has explained in each filing in this case that addressed the issue, the ordinary tools of statutory interpretation establish that the term "affiliate" refers to an entity subject to another by "means of control." Opening Br. 23; Renewed Stay Mot. 14; Initial Stay Mot. 14; Dkt. No. 53, at 28 (Government's Opposition to Plaintiffs' Preliminary Injunction Motion). This understanding of an affiliate turns on indicia of control and applies without regard to expression.

Plaintiffs' depiction (Br. 44) of the government's position as "shifting" is incorrect and underscores that the affiliate provision's best reading raises no First Amendment concern. In seeking to portray the government's construction as inconsistent, plaintiffs juxtapose (Br. 15) parts of our brief that discuss the affiliate provision with parts of our brief that have nothing to do with that provision. The government made clear that it was not purporting to resolve any question about which specific entities would qualify as affiliates, and each reference to avoiding the statute's reach by ceasing to provide abortions was either discussing the whole

14

corporate enterprise (including members who are affiliates) or the hypothetical scenario in which only the affiliate provision was invalidated. This sort of selective quotation cannot undermine the clear thrust of the statute and the government's brief.

Plaintiffs similarly attack a straw man in suggesting (Br. 45-46) that we argued that any provision of "practical support" by one entity to another would necessarily be "sufficient" to demonstrate that the entities are affiliates. The cited passage instead reflects the commonsense recognition that such support may be relevant to determining control, and that when entities are affiliates, they are likely to pool resources such that a subsidy given to one affiliate may be used to benefit the entire enterprise. And even if there were multiple ways of interpreting the affiliate provision, the availability of even one "fairly possible" construction that avoids constitutional concerns would be fatal to plaintiffs' First Amendment claim. *See Hansen*, 599 U.S. at 781 (quoting *Jennings*, 583 U.S. at 296). Plaintiffs nowhere explain why they regard the government's control-based understanding of the relevant language as impermissible.

Other parts of plaintiffs' brief rehash arguments the government refuted at the stay stage. Plaintiffs claim, for instance, that there is no "logical link" between the affiliate provision and "subsidizing abortion." Br. 39. In the absence of the affiliate provision, however, a prohibited entity could create affiliates and use them to obtain federal Medicaid funds, frustrating Congress's objective of withholding taxpayer dollars from certain large abortion providers. And in practice, affiliated entities often

act as single enterprises with interconnected finances, exacerbating Congress's concern regarding subsidizing abortion. Plaintiffs retort that each PPFA member is "independent," *id.*, but that argument would be better directed at a determination that particular members qualify as affiliates—to the extent that the agency makes such a determination—and in any event plaintiffs do not identify anything that prevents one member from obtaining federal Medicaid funds and then transferring those funds through PPFA to another member that provides abortions. Concerns about similar conduct explain why Congress frequently extends statutory requirements to regulated entities' affiliates. *See* Opening Br. 14-16.

It is likewise error for plaintiffs to suggest (Br. 37, 42) that the district court made "factual finding[s]" that somehow constrain this Court's consideration of the First Amendment issue here. The relevant question is whether Section 71113's affiliate provision can be construed in a way that accords with the First Amendment, and, in particular, whether the government's control-based definition avoids First Amendment concerns. That is a question of law subject to de novo review. Plaintiffs cannot sidestep that question by emphasizing (Br. 36-37) that PPFA "advocates before Congress," "communicates with the public," "supports campaigns," and "supports candidates for [elected office]." Those activities are irrelevant because Section 71113's affiliate provision turns on control, not on whether entities voluntarily

engage in joint advocacy.[2]  Under the statute, an organization's members can maintain their membership (and their joint advocacy) so long as the requisite control is absent.

The extent of plaintiffs' error is illustrated by their focus on the district court's ostensible "finding" that "[m]embership in [PPFA] . . . and corresponding affiliation with other [m]embers" is "part and parcel with Planned Parenthood [m]embers' associational expression," Br. 37 (quoting A66), and that such membership "is expressive," Br. 46 (quoting A65-66).  Those are legal conclusions, not factual findings, and they are incorrect.  Corporate affiliation is not expressive.  If PPFA members are affiliates, it is because of the control PPFA asserts (for example, over the services they must provide or the standards of care they must meet), and that control is not expressive activity.  That would be true even if PPFA members' expression is in some way facilitated by PPFA's control.  If that was enough to raise constitutional concerns, the numerous state and federal laws referring to corporate affiliates would

---

[2] Plaintiffs similarly err by contending, in a footnote, that the district court made a "finding" that PPFA "does not control its members."  Br. 45 n.13 (citing Dkt. No. 69, at 11).  The cited page reflects no such finding, which is unsurprising given that the record before the district court included only limited information regarding PPFA's control of its members.  Plaintiffs' related citation to the district court's statement that PPFA members are "separate legal entities" does nothing to advance their argument.  Br. 45 (citing A87).  By definition, all affiliates are distinct legal entities.  *See Affiliate*, Black's Law Dictionary (12th ed. 2024), Westlaw.

be susceptible to as-applied First Amendment challenges whenever an entity's affiliate status happens to facilitate its expression.  *See* Op. Br. 24-25 (collecting examples).

As the Supreme Court explained in a case that the government previously highlighted, laws that incidentally burden expression raise no First Amendment concern where, as here, their application is not triggered by expressive conduct and they do not inevitably single out those engaged in protected expression.  *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986).  Plaintiffs fail to discuss *Arcara* and instead invoke inapposite cases.  Br. 46-47 (citing *NAACP v. Alabama*, 357 U.S. 449, 461-62 (1958); *Healy v. James*, 408 U.S. 169, 181-83 (1972)).  Compelling the NAACP to disclose its members' identities (and thereby coercing them to discontinue their joint political activities) is hardly an incidental burden on expression.  *See NAACP*, 357 U.S. at 462.  The same is true of a state college's decision to bar a student political club from using "campus facilities," "bulletin boards," and even the "school newspaper."  *Healy*, 408 U.S. at 181-82.  *Arcara* recognizes that these and other government actions that "singl[e] out those engaged in expressive activity" implicate the First Amendment, 478 U.S. at 707, but plaintiffs do not argue that Section 71113 falls into the same category.  Nor could they, given that the statute applies regardless of whether a prohibited entity engages in expressive activity and has no application to many entities that conduct abortion-related advocacy.

At a minimum, plaintiffs' arguments regarding the affiliate provision do not justify the district court's second injunction, which sweeps far beyond the small

number of Planned Parenthood members that may qualify only as affiliates. For entities who themselves provide abortions (and meet the other statutory criteria), Section 71113 applies for that reason and plaintiffs' contention that the affiliate provision somehow affects those entities' expression is inapplicable even on its own terms. The government emphasized this problem with plaintiffs' First Amendment theory in its opening brief (at 18), yet plaintiffs do not address it. Indeed, plaintiffs' own complaint requests relief on this claim only for the members who do not independently qualify as prohibited entities. A156-59. Plaintiffs have thus forfeited any argument that their First Amendment claim supports injunctive relief covering all PPFA members.

**2.** In addition to relying in large part on plaintiffs' flawed attack on the affiliate provision, plaintiffs' equal-protection and unconstitutional-conditions claims reflect other errors. As to the unconstitutional-conditions claim, plaintiffs characterize Section 71113 as placing "a condition on the *recipient* of the subsidy rather than on the [federal] program." Br. 43 (quoting *Rust*, 500 U.S. at 197). But as we have already explained, Congress was making funding decisions—which are indisputably within the challenged program—based on a complete understanding of how federal funds might directly or indirectly contribute to abortions given the fungibility of money, and without regard to any expressive activity.

Plaintiff's equal-protection claim is largely derivative of their erroneous First Amendment claim, and to the extent plaintiffs raise an independent claim it also lacks

merit. Although plaintiffs cursorily assert that Section 71113 "fails even rational basis review," Br. 38, they make no attempt to apply the highly deferential standard governing such claims, *see González-Droz v. González-Colón*, 660 F.3d 1, 9-10 (1st Cir. 2011). Under that standard, it is plaintiffs' burden to "negate any and all conceivable bases upon which the challenged [law] might appropriately rest." *Id.* at 9. Applying that standard, a district court in this Circuit recently recognized that Section 71113 readily withstands rational-basis review. *See Family Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-cv-00364, 2025 WL 2439209, at *1 (D. Me. Aug. 25, 2025) (denying a motion to preliminarily enjoin Section 71113 on equal protection grounds). This Court declined to grant an injunction pending the plaintiff's appeal of that decision, emphasizing the "difficulty of establishing that legislation fails under rational basis review." Order at 2, *Family Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-1829 (1st Cir. Oct. 16, 2025).

Without acknowledging the governing standard, plaintiffs insist that Section 71113 "is 'inexplicable by anything but animus.'" Br. 41 (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)). Plaintiffs believe (Br. 40) that because Section 71113 only applies to them and a few similarly situated entities, Congress's "real intention" must have been "to punish Planned Parenthood." That is just a rehash of their flawed bill-of-attainder claim, and it ignores the legitimate reasons that Congress could rationally prevent prohibited entities from obtaining future Medicaid reimbursements. Those reasons are evident from plaintiffs' own filings: Congress could rationally conclude

20

that it did not wish to support the "only nationwide abortion provider," Br. 23, or that halting the flow of Medicaid funds to plaintiffs and similarly situated entities— who claim that in the absence of those funds they will need to "scale[] back services, la[y] off staff, and close[] clinics"—would reduce the number of abortions. Br. 3. Plaintiffs do nothing to "negate" those conceivable legitimate bases for the law. *González-Droz*, 660 F.3d at 9.

For similar reasons, plaintiffs do not advance their argument by portraying (Br. 40) Section 71113 as "underinclusiv[e]." Plaintiffs invoke a decision that considered an underinclusivity argument in the context of heightened scrutiny, *see* Br. 40 (citing *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 802 (2011)), without addressing precedent establishing that such arguments have no purchase when rational-basis review applies, *see FCC v. Beach Commc'ns*, 508 U.S. 307, 316 (1993). There is nothing irrational about Congress's focus on a subset of abortion providers that operate on a large scale, are most likely to be dependent on federal Medicaid funds, and provide many abortions to Medicaid patients. Congress could rationally conclude that those are the providers that present the most acute problem in terms of government subsidization of abortion, and also the ones most likely to reduce the availability of abortion in response to this enactment. *See Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955) (recognizing that Congress "may take one step at a time,

21

addressing itself to the phase of the problem which seems most acute to the legislative mind").

**3.** Even the district court was unwilling to endorse plaintiffs' fallback argument that Congress enacted Section 71113 in retaliation for their political advocacy. *See* A88 (declining to reach this claim). Plaintiffs do not identify any case to ever conclude that Congress has, by engaging in the legislative process, committed First Amendment retaliation. That is unsurprising, as a general "principle of constitutional law" bars courts from "strik[ing] down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Plaintiffs seize on an exception to that rule for bill-of-attainder claims, for which it is in theory possible to attribute an "illicit legislative motive" to Congress. *Id.* at 383 & n.30. Even assuming that this exception extends to plaintiffs' First Amendment retaliation claim, the exception would only be available if plaintiffs presented "unmistakable evidence" of legislative intent—a standard that the Supreme Court has never found to be satisfied. *Flemming*, 363 U.S. at 619. As discussed above, plaintiffs come nowhere near meeting that standard. *See supra* pp. 9-10.

## II. The Remaining Factors Counsel Against Injunctive Relief

Because plaintiffs' claims fail on the merits, the injunctions must be vacated. The equitable factors confirm that conclusion.

Plaintiffs' claim (Br. 55) that "there is no public interest" in enforcing Section 71113 contradicts binding precedent. Plaintiffs have no response to decisions

recognizing that the government "suffers a form of irreparable injury" whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *District 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).  Nor do plaintiffs explain why this case should be an exception to the Supreme Court's traditional rule that "all Acts of Congress . . . 'should remain in effect pending a final decision on the merits by [the Supreme] Court.'" *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers).  All that plaintiffs offer (Br. 55) is a citation to a case noting that "there is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  That statement does not support plaintiffs' request for an injunction barring enforcement of an Act of Congress.

In addition to disregarding these precedents, plaintiffs also fail to account for Section 71113's particulars.  Plaintiffs request an injunction countermanding Congress's resolution of a significant and contested question of public policy and instead compelling the government to distribute taxpayer dollars to entities engaged in conduct that many Americans disapprove.  Plaintiffs cannot justify this intrusion on Congress's spending authority by claiming (Br. 55) that because Section 71113 prevents funding of prohibited entities but not all abortion providers, it serves no "legitimate public interest."  The fact that Congress acted in a tailored way, by

terminating federal Medicaid funding for major abortion providers rather than for every entity that performs abortions, is not a basis for preventing Congress from acting at all. *Cf. supra* pp. 21-22.

Plaintiffs' failure to grapple with the harms to the government is exemplified by their reliance (Br. 55) on *Massachusetts Association of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir. 1983). That case involved a request for an injunction directing an agency to "follow[] the requisite regulations," not an injunction barring the enforcement of an Act of Congress. *Id.* at 753. And in determining that the requested injunction should issue, this Court emphasized that it would prevent the termination of "needy" individuals' Medicaid benefits while creating only "a remote possibility" of "the loss of public funds." *Id.* at 753-54. No similar circumstances are present here.

At the same time that plaintiffs gloss over the government's injuries, they substantially overstate their own asserted harms. Plaintiffs principally rely (Br. 52) on an alleged First Amendment injury, but that meritless claim provides no basis for irreparable harm, *see supra* pp. 12-19. Plaintiffs also err in asserting (Br. 55) that an injunction would preserve the "status quo." The status quo includes Section 71113, a duly enacted Act of Congress that is currently in effect in light of this Court's stay order.

Plaintiffs' remaining arguments rest (Br. 52-53) on the premise that compelling the government to supply them with federal Medicaid funds would enable them to hire more staff and operate more clinics. Missing from plaintiffs' brief is any

24

explanation why their desire to engage in more of those activities would entitle them to obtain taxpayer dollars that Congress withheld.  And to the extent plaintiffs invoke Medicaid patients' own interest in receiving care, plaintiffs appear to admit (Br. 53) that they can secure "some supplemental funding," and they do not address why that funding could not be used to support the limited number of patients who may be unable to obtain care from other providers.  In any event, the enactment of Section 71113 reflects a determination by our elected representatives that the benefits of the statute outweigh any adverse impact on access to care.  "It would be a special kind of judicial hubris to declare that the public interest has been undermined by the public." *Family Plan. Ass'n of Me.*, 2025 WL 2439209, at *8.

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunctions.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
LEAH B. FOLEY
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY

  */s/ Steven H. Hazel*
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.H.Hazel@usdoj.gov*

November 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 32(a)(7)(B) because it contains 6,232 words.  This brief also complies with

the typeface and type-style requirements of Federal Rule of Appellate Procedure

32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-

point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Steven H. Hazel*
Steven H. Hazel