# United States Court of Appeals
## For the First Circuit

---

Nos. 25-1698, 25-1755

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED
PARENTHOOD LEAGUE OF MASSACHUSETTS; PLANNED PARENTHOOD
ASSOCIATION OF UTAH,

Plaintiffs, Appellees,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of
the U.S. Department of Health and Human Services; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his
official capacity as Administrator of the Centers for
Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID
SERVICES,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

---

Before

Gelpí, Montecalvo, and Aframe, Circuit Judges.

---

Eric D. McArthur, Deputy Assistant Attorney General, with
whom Brett A. Shumate, Assistant Attorney General, Leah B. Foley,
United States Attorney, and Daniel Tenny and Steven H. Hazel,
Attorneys, Appellate Staff Civil Division, U.S. Department of
Justice, were on brief, for appellants.

Alan Schoenfeld, with whom Cassandra A. Mitchell, Alex W.
Miller, Albinas Prizgintas, Sharon K. Hogue, Wilmer Cutler
Pickering Hale and Dorr LLP, Emily Nester, C. Peyton Humphreville,

Kyla Eastling, and Planned Parenthood Federation of America, Inc., were on brief, for appellees.

Jordan A. Sekulow, Olivia F. Summers, Nathan J. Moelker, and American Center for Law & Justice, on brief for American Center for Law & Justice, amicus curiae.

John J. Bursch, Erin M. Hawley, Lincoln Davis Wilson, James A. Campbell, J. Caleb Dalton, Allison H. Pope, Alliance Defending Freedom, Elizabeth Murrill, Attorney General, Benjamin J. Aguiñaga, Solicitor General, and Kelsey L. Smith, Deputy Solicitor General, on brief for State of Louisiana, amicus curiae.

Ronald D. Coleman, Coleman Law Firm, PC, Michael J. O'Neill, Matthew C. Forys, Richard P. Hutchison, and Landmark Legal Foundation, on brief for Landmark Legal Foundation, amicus curiae.

Mark P. Meuser, Jesse Franklin-Murdock, and Dhillon Law Group Inc., on brief for Center for Medical Progress and David Daleiden, amici curiae.

J. Marc Wheat, Timothy Harper, and Advancing American Freedom, Inc., on brief for Advancing American Freedom; Alabama Policy Institute; America's Women; American Values; Anglicans for Life; Fran Bevan, Phyllis Schlafly's Pennsylvania Eagle Forum; Christian Medical & Dental Associations; Concerned Women for America; Democrats for Life; Eagle Forum; Frontiers of Freedom; Charlie Gerow; International Conference of Evangelical Chaplain Endorsers; JCCWatch.org; Lutheran Center for Religious Liberty; National Apostolic Christian Leadership Conference; New York State Conservative Party; North Carolina Values Coalition; Melissa Ortiz, Principal & Founder, Capability Consulting; Pro-Life Wisconsin; Ann Schockett, Past President, National Federation of Republican Women, Treasurer, Save the Persecuted Christians; Gregory P. Seltz, Executive Director, LCRL, Speaker Emeritus, The Lutheran Hour; Paul Stam, Former Speaker Pro Tem, NC House of Representatives; Stand for Georgia Values Action; Students for Life of America; The Family Foundation of Virginia; Richard Viguerie, Chairman, Conservative HQ.com; Suzi Voyles, President, Eagle Forum of Georgia; Wisconsin Family Action, Inc.; and Young America's Foundation, amici curiae.

William J. Olson, Jeremiah L. Morgan, William J. Olson, P.C., Patrick M. McSweeney, James N. Clymer, Clymer Musser & Sarno, P.C., J. Mark Brewer, Rick Boyer, and Integrity Law Firm, on brief for America's Future, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, and Conservative Legal Defense and Education Fund, amici curiae.

Shannon Eddy, Jenny Ma, Aisha Rich, Public Rights Project, Donna R. Ziegler, County Counsel, County of Alameda, California, Lauren Keefe, City Attorney, City of Albuquerque, New Mexico, Rosalyn Guy-McCorkle, Allegheny County Solicitor, Allegheny County, Pennsylvania, Ebony M. Thompson, City Solicitor, Baltimore City Department of Law, City of Baltimore, Maryland, Sarah W. Chaplin and Amy B. Kraham, Senior Assistant City Attorneys, City of Bellingham, Washington, Zachary M. Klein, Columbus City Attorney, City of Columbus, Ohio, Carlos Pabellon, Corporation Counsel, County of Dane, Wisconsin, David R. Gault, Deputy Corporation Counsel, County of Dane, Wisconsin, Miko Brown, City Attorney, City and County of Denver, Colorado, Christian D. Menefee, Harris County Attorney, Harris County Attorney's Office, Harris County, Texas, Hydee Feldstein Soto, City Attorney, City of Los Angeles, California, Brian E. Washington, County Counsel, County of Marin, California, Kristyn Anderson, City Attorney, City of Minneapolis, Minnesota, John P. Markovs, Montgomery County Attorney, Montgomery County, Maryland, Muriel Goode-Trufant, Corporation Counsel, City of New York, New York, Ryan Richardson, City Attorney, City of Oakland, California, Laura Conover, County Attorney, Pima County Attorney's Office, Pima County, Arizona, Robert Taylor, City Attorney, City of Portland, Oregon, David Chiu, City Attorney, City and County of San Francisco, California, Nora Frimann, City Attorney, City of San José, California, and Tony Lopresti, County Counsel, County of Santa Clara, California, on brief for County of Alameda, California; City of Albuquerque, New Mexico; Allegheny County, Pennsylvania; City of Baltimore, Maryland; City of Bellingham, Washington; City of Columbus, Ohio; Dane County, Wisconsin; City and County of Denver, Colorado; City of Evanston, Illinois; Harris County, Texas; City of Hoboken, New Jersey; City of Los Angeles, California; City of Madison, Wisconsin; Marin County, California; City of Minneapolis, Minnesota; Montgomery County, Maryland; City of New York, New York; City of Oakland, California; Pima County, Arizona; City of Portland, Oregon; City of Rochester, New York; City and County of San Francisco, California; City of San José, California; County of Santa Clara, California; Chelsea Byers, Mayor, City of West Hollywood, California; Chris Canales, Councilmember, City of El Paso, Texas; John Clark, Mayor, Town of Ridgway, Colorado; Christine Corrado, Councilmember, Township of Brighton, New York; Olgy Diaz, Councilmember, City of Tacoma, Washington; Diane Ellis-Marseglia, Commissioner, Bucks County, Pennsylvania; Vanessa Fuentes, Mayor Pro Tem, City of Austin, Texas; Jamie Gauthier, Councilmember, City of Philadelphia, Pennsylvania; Susan Hughes-Smith, Legislator, County of Monroe, New York; Lisa Kaplan, Councilmember, City of Sacramento, California; Jessie Lopez, Councilmember, City of Santa Ana, California; Quinton D. Lucas,

Mayor, City of Kansas City, Missouri; Delishia Porterfield, Councilmember, Metropolitan Nashville and Davidson County, Tennessee; Kim Roney, Councilmember, City of Asheville, North Carolina; Seema Singh, Councilmember, City of Knoxville, Tennessee; David Stout, Commissioner, El Paso County, Texas; Ginny Welsch, Councilmember, Metropolitan Nashville and Davidson County, Tennessee; and Robin Wilt, Councilmember, Township of Brighton, New York, amici curiae.

Martha Jane Perkins and National Health Law Program on brief for National Health Law Program and National Women's Law Center, amici curiae.

Jamila Johnson, Ronelle Tshiela, Stephanie Toti, and Lawyering Project on brief for The Lawyering Project, amicus curiae.

William Tong, Attorney General of Connecticut, Alma Rose Nunley, Special Counsel for Reproductive Rights, Janelle Medeiros, Special Counsel for Civil Rights, Rob Bonta, Attorney General, State of California, Neli N. Palma, Senior Assistant Attorney General, State of California, Karli Eisenberg, Supervising Deputy Attorney General, State of California, Erica Connolly, Deputy Attorney General, State of California, Gillian Hannahs, Deputy Attorney General, State of California, Philip J. Weiser, Attorney General, State of Colorado, Anne E. Lopez, Attorney General, State of Hawai'i, Aaron M. Frey, Attorney General, State of Maine, Letitia James, Attorney General, State of New York, Barbara D. Underwood, Solicitor General, State of New York, Judith N. Vale, Deputy Solicitor General, State of New York, Blair J. Greenwald, Assistant Solicitor General, State of New York, Galen Sherwin, Special Counsel for Reproductive Justice, State of New York, Kathleen Jennings, Attorney General, State of Delaware, Kwame Raoul, Attorney General, State of Illinois, Anthony G. Brown, Attorney General, State of Maryland, Andrea Joy Campbell, Attorney General, Commonwealth of Massachusetts, Keith Ellison, Attorney General, State of Minnesota, Matthew J. Platkin, Attorney General, State of New Jersey, Jeff Jackson, Attorney General, State of North Carolina, Peter F. Neronha, Attorney General, State of Rhode Island, Dana Nessel, Attorney General, State of Michigan, Aaron D. Ford, Attorney General, State of Nevada, Raúl Torrez, Attorney General, State of New Mexico, New Mexico Department of Justice, Dan Rayfield, Attorney General, State of Oregon, Charity R. Clark, Attorney General, State of Vermont, Nicholas W. Brown, Attorney General, State of Washington, Brian L. Schwalb, Attorney General, District of Columbia, on brief for State of Connecticut, State of California, State of New York, State of Colorado, State of Delaware, State of Hawai'i, State of Illinois, State of Maine,

State of Maryland, Commonwealth of Massachusetts, State of
Michigan, State of Minnesota, State of Nevada, State of New Jersey,
State of New Mexico, State of North Carolina, State of Oregon,
State of Rhode Island, State of Vermont, State of Washington, and
the District of Columbia, amici curiae.

Molly A. Meegan, Francisco M. Negrón, Jr., Meaghan Hannan
Davant, American College of Obstetricians and Gynecologists,
Nicole A. Saharsky, Leif Overvold, Zachary Krislov, and Mayer Brown
LLP on brief for American College of Obstetricians and
Gynecologists, American Academy of Family Physicians, American
Academy of Nursing, American College of Nurse-Midwives, American
Medical Women's Association, North American Society for Pediatric
and Adolescent Gynecology, Society for Adolescent Health and
Medicine, Society of Family Planning, and Society of OB/GYN
Hospitalists, amici curiae.

————————————

December 12, 2025

————————————

**GELPÍ**, **Circuit Judge**.  In 2025, Congress enacted a law that withholds Medicaid funding for one year from certain abortion providers that meet four criteria: they must (1) be non-profit organizations, (2) operate as essential community providers primarily engaged in family planning services, (3) provide certain abortion services, and (4) have received more than $800,000 in Medicaid funding in fiscal year 2023.  An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119-21, § 71113, 139 Stat. 72, 300-01 (July 4, 2025) ("Section 71113").  In practice, along with two other unrelated providers, this combination of criteria covers only Planned Parenthood members.[1]  The statute also withholds Medicaid funding from the subsidiaries, successors, clinics, and "affiliates" -- a term the statute does not define -- of any entity that meets the four criteria above, even if that entity does not itself meet the criteria.

When enacted, most Planned Parenthood members independently satisfied the statute's requirements for defunding ("Qualifying Members").  Some, however, did not independently qualify because they either did not provide abortion services or did not, in 2023, receive more than $800,000 in Medicaid funding

---

[1] As discussed in Section I.A., infra, the group of entities commonly referred to as "Planned Parenthood," is actually comprised of a national membership organization and its forty-seven individual members.

("Non-Qualifying Members").  These Non-Qualifying Members still potentially risked losing Medicaid funding alongside the Qualifying Members because of the law's application to "affiliates."

Concerned about their ability to continue providing services to their patients, Planned Parenthood Federation of America, Planned Parenthood League of Massachusetts, a Qualifying Member, and Planned Parenthood of Utah, a Non-Qualifying Member (collectively, "Appellees"), sued to enjoin enforcement of Section 71113.  They alleged that the law constitutes an unconstitutional bill of attainder because it singles them out for punishment; an unconstitutional condition on their right of association because it coerces them to choose between remaining associated with Planned Parenthood's national organization and its Members or disaffiliating and remaining eligible for Medicaid funds; and a violation of their equal protection rights because it treats them differently from other providers of abortion services based on a fundamental right: their association with Planned Parenthood's national organization and their fellow Members.  Alternatively, Appellees alleged that Section 71113 also fails rational basis review.  The district court held that Appellees were likely to succeed on the merits of each claim and granted preliminary injunctions.  We disagree and accordingly vacate the district court's orders.

## I. BACKGROUND

### A. Planned Parenthood and Medicaid

Plaintiff-Appellee Planned Parenthood Federation of America, Inc., ("PPFA") is a not-for-profit corporation and national membership organization with forty-seven Members, including Plaintiffs-Appellees Planned Parenthood League of Massachusetts and Planned Parenthood Association of Utah. PPFA administers accreditation standards, promulgates medical standards, and leads policy and program initiatives. Each Member is an independently incorporated non-profit organization with its own CEO, governance structure, staff, and operations. The Members set PPFA's membership standards, approve PPFA's long-range goals and changes to PPFA's bylaws and membership standards, elect PPFA's board of directors, and determine the dues that Members must pay PPFA annually.

PPFA and its Members share the same mission: "to ensure that people receive high-quality, inclusive, and comprehensive sexual and reproductive healthcare," regardless of circumstance; "to provide related educational services; to promote research on sexual and reproductive health; and to advocate for public policies that guarantee access to such services." Members administer medical treatment at approximately 600 health centers in forty-seven states and the District of Columbia. Collectively, they provide sexual and reproductive healthcare to more people in

the United States than any other provider -- they served over two million patients in fiscal year 2023. The Members strive to meet the needs of the communities in which they operate and offer various services, including the provision of contraception and contraceptive counseling, cancer screenings, tests for sexually transmitted infections, pregnancy tests, vasectomies, colposcopies, and abortions, where they are legal. PPFA and its Members also advocate for access to sexual and reproductive healthcare at the local, state, and federal levels.

Medicaid is a joint state-federal program that provides the largest source of health coverage in the United States. "Congress created Medicaid in 1965 to subsidize state efforts to provide healthcare to families and individuals whose 'income and resources are insufficient to meet the costs of necessary medical services.'" Medina v. Planned Parenthood S. Atlantic, 606 U.S. 357, 363 (2025) (quoting Armstrong v. Exceptional Child Ctr., Inc., 570 U.S. 320, 323 (2015)). All states and the District of Columbia currently participate in Medicaid, although they are not required to do so.[2]

---

[2] The five U.S. territories -- Puerto Rico, the U.S. Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa -- also participate in Medicaid under different funding rules. Unlike the states and D.C., their federal Medicaid funding is capped.

Each state submits a plan to the Secretary of the U.S. Department of Health and Human Services ("HHS") for approval. HHS administers the Medicaid program through the Centers for Medicare and Medicaid Services ("CMS"). Once a state's plan is approved, the state receives federal reimbursements for a percentage of its spending on covered medical care provided to eligible individuals. CMS does not pay Medicaid providers directly. Instead, state Medicaid programs reimburse healthcare providers for covered services they have delivered. Abortion is not a covered service because a federal statute known as the Hyde Amendment prohibits the use of federal Medicaid funds to reimburse for abortion care, with limited exceptions. Pub. L. No. 118-42, § 202, 138 Stat. 25, 153 (2024). But family planning services are a mandatory Medicaid benefit.

PPFA is not itself a healthcare provider that participates in Medicaid, but it supports Members that provide healthcare and receive Medicaid funding in forty-three states. Medicaid covers half of patient visits to Member health centers, and over half of Members' patients rely on Medicaid for healthcare.

### B. Legislative History

Because Appellees' claims turn in part on Congress's intent in enacting Section 71113, we briefly recount the

legislative history of that provision and the attempts that preceded it.

Over the last several legislative sessions, members of Congress introduced bills to defund Planned Parenthood Members.[3] For example, in 2017, a reconciliation bill similarly sought to bar "prohibited entit[ies]" from Medicaid funding for one year. See H.R. 1628, 115th Cong. § 103 (2017). That bill defined "prohibited entit[ies]" based, in part, on the receipt of more than $350 million in Medicaid reimbursements during fiscal year 2014. Id. § 103(b)(1)(B). Collectively, Members received over $350 million in Medicaid reimbursements that year, and the law would not have excluded any other abortion providers from Medicaid funding.

In later sessions, different representatives introduced several bills with similar terms. Multiple members of Congress made remarks about PPFA and its Members while debating these bills. One representative said a bill "represent[ed] . . . defunding

---

[3] See Defund Planned Parenthood Act of 2023, H.R. 128, 118th Cong. § 3 (2023) (providing for a "moratorium on Federal funding" to PPFA); Defund Planned Parenthood Act of 2023, H.R. 371, 118th Cong. § 3 (2023) (same); Defund Planned Parenthood Act of 2025, H.R. 271, 119th Cong. § 3 (2025) (same); Protect Funding for Women's Health Care Act, H.R. 6176, 118th Cong. § 3 (2023) (requiring "no Federal funds may be made available" to PPFA); Protect Funding for Women's Health Care Act, H.R. 599, 119th Cong. § 3 (2025) (same); Protect Funding for Women's Health Care Act, S. 177, 119th Cong. § 3 (2025) (same); Defund Planned Parenthood Act, S. 203, 119th Cong. § 2 (2025)(same).

Planned Parenthood," and asked rhetorically, "How long have we been fighting to defund Planned Parenthood?" 163 Cong. Rec. H2393, H2409 (Mar. 24, 2017) (Statement of Rep. Matt Gaetz (Fla.)). Other representatives described a bill as "eliminat[ing] funding for Planned Parenthood," id. at H2414 (Statement of Rep. Roger Marshall (Kan.)), and that "[they were] proud to defund Planned Parenthood once and for all," id. at H2433 (Statement of Rep. Kevin Brady (Tex.)). None of those bills became law.

The law at issue, Section 71113, was first reported out of the House of Representatives Committee on the Budget in May 2025 as part of the Reconciliation Act. See H.R. Rep. No. 119-106, pt. 2, at 2203-04 (2025). According to Representative Christopher Smith, "[r]econciliation legislation offer[ed] an important opportunity to stop funding abortion purveyors like Planned Parenthood." 171 Cong. Rec. E255 (daily ed. Mar. 27, 2025) (statement of Rep. Christopher Smith (N.J.)). Representative Smith specifically "call[ed] for the defunding of Planned Parenthood -- Child Abuse, Incorporated . . . ." Speaker Mike Johnson, a co-sponsor of the Defund Planned Parenthood Act of 2023, H.R. 371, 118th Cong. (2023), announced that "the House . . . [was] absolutely making it clear to everybody that [the Reconciliation Act] is going to redirect funds away from Big Abortion."

As enacted, Section 71113 states:

No Federal funds that are considered direct
spending and provided to carry out a State
plan under title XIX of the Social Security
Act or a waiver of such a plan shall be used
to make payments to a prohibited entity for
items and services furnished during the 1-year
period beginning on the date of the enactment
of this Act . . . .

An Act to Provide for Reconciliation Pursuant to Title II of H.

Con. Res. 14, Pub. L. No. 119-21, § 71113(a), 139 Stat. 72, 300

(July 4, 2025).

Section 71113 defines a "prohibited entity" as:

an entity, including its affiliates,
subsidiaries, successors, and clinics --

(A) that, as of [October 1, 2025] --

(i) is an organization described in
section 501(c)(3) of the Internal Revenue
Code of 1986 and exempt from tax under
section 501(a) of such Code;

(ii) is an essential community provider
described in section 156.235 of title 45,
Code of Federal Regulations . . . that
is primarily engaged in family planning
services, reproductive health, and
related medical care; and

(iii) provides for abortions, other than
an abortion [exempt under
§ 71113(b)(1)(A)(iii)(I),(II)] . . . and

(B) for which the total amount of Federal and
State expenditures under the Medicaid program
under title XIX of the Social Security Act for
medical assistance furnished in fiscal year
2023 made directly, or by a covered
organization, to the entity or to any
affiliates, subsidiaries, successors, or

> clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

Id. § 71113(b)(1).

Thirty-seven Members, including Planned Parenthood League of Massachusetts and two non-Planned Parenthood entities,[4] satisfy the criteria in Section 71113(b)(1) and are thus "prohibited entit[ies]." As stated above, we refer to them as "Qualifying Members." The remaining ten Members, including Planned Parenthood Association of Utah, either do not provide abortion services or did not receive $800,000 in Medicaid reimbursements during fiscal year 2023. Again, we refer to them as "Non-Qualifying Members." CMS has not yet applied Section 71113 to any of the Members.

---

[4] The two non-Planned Parenthood Members covered by Section 71113's definition of "prohibited entit[ies]" are Family Planning Association of Maine and Health Imperatives, which is based in Massachusetts.

Family Planning Association of Maine independently sued to enjoin Section 71113 in the United States District Court for the District of Maine, alleging the law "arbitrarily and irrationally removes [it] from the Medicare funding stream" in violation of the Fifth Amendment's Equal Protection Clause. See Fam. Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs., 2025 WL 2439209, at *8 (D. Me. Aug. 25, 2025). The district court denied its request to enjoin the law. That order has been appealed. See No. 25-1829 (1st Cir. Aug. 29, 2025).

### C. Procedural Background

Appellees brought suit on July 7, 2025, seeking a declaratory judgment that Section 71113 is an unconstitutional bill of attainder, an unconstitutional condition on their right to associate under the First Amendment, and denies them equal protection of the law. Appellees also requested a declaration that Section 71113 did not apply to Non-Qualifying Members or, alternatively, if it did apply, that it violated the Non-Qualifying Members' constitutional rights. Appellees requested an injunction prohibiting Section 71113's enforcement. Immediately after filing suit, Appellees moved for a temporary restraining order ("TRO") and preliminary injunction to enjoin enforcement of Section 71113. The district court granted Appellees' request for a TRO the same day and entered an amended TRO four days later.

On July 21, 2025, the district court granted Appellees' motion for a preliminary injunction in part and enjoined the government from enforcing Section 71113 against Non-Qualifying Members, including Planned Parenthood Association of Utah. The government appealed to this Court. Meanwhile, on July 28, 2025, the district court granted Appellees' motion for a preliminary injunction in full and enjoined the government from enforcing

Section 71113 against all Members.[5]  Again, the government appealed to this Court.

In early August 2025, the government moved in the district court to stay both preliminary injunction orders pending appeal, and it also sought a stay of the same in this Court.  This Court denied the government's stay motion without prejudice as premature.  See Order, Aug. 19, 2025.  Ten days later, the district court also denied the government's motion.  This Court then stayed both preliminary injunction orders pending appeal.  See Order, Sep. 11, 2025.  Appellees filed an emergency motion for reconsideration of this Court's stay order and requested an expedited briefing schedule.  See Emergency Mot. for Recons. of Stay Order and for Expedited Briefing, Sep. 16, 2025.  Two days later, we denied Appellees' request for reconsideration of the stay but entered an expedited briefing schedule.  See Order, Sep. 18, 2025.  We heard oral arguments on November 12, 2025.

## II. Discussion

### A.  Standard of Review

A plaintiff requesting a preliminary injunction "must establish" that: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips

---

[5] The district court incorporated the findings first made in its July 21 Order into its July 28 Order.

in [its] favor"; and (4) "an injunction is in the public interest."
Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).
That said, "the four factors are not entitled to equal weight in
the decisional calculus; rather, likelihood of success is the main
bearing wall of the four-factor framework." Corp. Techs., Inc. v.
Harnett, 731 F.3d 6, 9-10 (1st Cir. 2013) (citation modified); see
also Doe v. Noem, 152 F.4th 272, 285 (1st Cir. 2025).

We review a district court's grant of a preliminary
injunction under a discretionary lens. OfficeMax, Inc. v.
Levesque, 658 F.3d 94, 97 (1st Cir. 2011); see also Doe, 152 F.4th
at 284 (quoting González-Fuentes v. Molina, 607 F.3d 864, 875 (1st
Cir. 2010)). But "an incorrect finding of law in determining the
likelihood of success on the merits is not within the district
court's discretion." OfficeMax,Inc., 658 at 97 (quoting Paris v.
Dep't of Hous. & Urb. Dev., 843 F.2d 561, 574 (1st Cir. 1988)).

### B. Likelihood of Success on the Merits

The district court held that Appellees were likely to
succeed on their bill of attainder, unconstitutional conditions,
and equal protection claims. First, as to the bill of attainder
claim, the district court reasoned that Appellees are likely to
establish that they are the "easily ascertainable" target of
Section 71113 based on the law's text and structure, and that the
threat of losing funding is punishment because Section 71113
imposes severe burdens on them without furthering a nonpunitive

- 17 -

purpose.  Second, the district court concluded that Appellees are likely to succeed in showing that Section 71113 unconstitutionally conditions Medicaid reimbursements for Non-Qualifying Members -- who do not provide abortions -- on forfeiting their right to associate with Members who do provide abortions.  Third, the district court held that Appellees are likely to succeed on their equal protection claim because Section 71113 infringes their fundamental First Amendment right of association and thus does not survive strict scrutiny.[6]  We review each claim in turn.

### 1.  Bill of Attainder

Article I, section 9, clause 3 of the Constitution provides that "[n]o Bill of Attainder . . . shall be passed."[7] This Bill of Attainder Clause prohibits congressional acts that determine guilt and "inflict[] punishment without a judicial trial."  Cummings v. Missouri, 71 U.S. 277, 323 (1867).  "The Supreme Court has struck down statutes on bill of attainder grounds only five times in the nation's history."  Elgin v. U.S. Dep't of Treasury, 641 F.3d 6, 19 (1st Cir. 2011) (Stahl, J., concurring) (collecting cases); see Cummings, 71 U.S. 277 (1867) (striking

---

[6] Appellees also brought a First Amendment retaliation claim. The district court did not resolve that claim in granting the preliminary injunctions.

[7] This provision limits Congress. A parallel provision in Article I, section 10, clause 1 provides that "[n]o State shall . . . pass any Bill of Attainder."

down a law targeting Confederate sympathizers); Ex parte Garland, 71 U.S. 333 (1867) (same); Pierce v. Carskadon, 83 U.S. 234 (1872) (same); United States v. Lovett, 328 U.S. 303 (1946) (striking down an appropriations statute forbidding the payment of salaries to named government employees deemed subversive); United States v. Brown, 381 U.S. 437 (1965) (striking down a statute targeting Communist Party members).

To succeed on their bill of attainder claim, Appellees must show that Section 71113 (1) inflicts punishment, (2) upon an identifiable individual, (3) without a judicial trial. Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp., 468 U.S. 841, 846-47 (1984).[8]  Because we conclude that Section 71113 does not inflict punishment, we confine our analysis to this requirement and do not address the remaining elements of a viable bill of attainder claim.

To determine whether a statute inflicts "punishment" for bill of attainder purposes, courts consider: "(1) whether the challenged statute falls within the historical meaning of

---

[8] The government does not dispute that the constitutional prohibition on bills of attainder applies to corporations such as Appellees.  The Second Circuit has held that it applies, Consol. Edison Co. of N.Y., Inc. v. Pataki, 292 F.3d 338, 346-49 (2d Cir. 2002); the D.C. Circuit has assumed, without deciding, that it applies while noting that differences between commercial entities and persons must be considered. Tiktok, Inc. & ByteDance Ltd. v. Garland, 122 F.4th 930, 967 (D.C. Cir. 2024).  We follow the D.C. Circuit's lead and assume for purposes of our analysis that the Clause protects corporations while recognizing that differences between corporations and persons may well be germane to a bill of attainder analysis.

legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" Id. at 852 (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 473, 475-76, 478 (1977)).  The latter two factors are interrelated.  See id. at 853-56 (analyzing the latter two factors together).  A perceived presence of a nonpunitive legislative purpose, and the judicial obligation to exercise restraint in adjudicating claims that Congress acted with an unconstitutional purpose, see id. at 850 ("The judicial function is . . . to construe [a federal statute], if consistent with the will of Congress, so as to comport with constitutional limitations") (citation and internal quotation marks omitted), combine to make it quite difficult to find a legislative intent to punish.  But see Consol. Edison Co. of N.Y., Inc., 292 F.3d at 351-55 (finding that legislation constituted a bill of attainder where there was evidence of a legislative intent to punish and no "wholly non-punitive purpose to justify" the law) (emphasis added).  Conversely, a perceived absence of a nonpunitive legislative purpose can be powerful circumstantial evidence that the legislature acted with an intent to punish.

The district court concluded that Appellees are likely to succeed on their bill of attainder claim because all three

factors point towards Section 71113 being punishment. As to the
first criterion, the district court recognized that, historically,
bills of attainder typically involved imposition of the death
penalty, and that bills of pains and penalties (which fall within
the constitutional proscription on bills of attainder) typically
involved punishments such as imprisonment, banishment, and the
punitive confiscation of property by the sovereign. See Nixon,
433 U.S. at 473-74. But the district court took note that "[o]ur
country's own experience with bills of attainder resulted in the
addition of another sanction to the list of impermissible
legislative punishments: a legislative enactment barring
designated individuals or groups from participation in specified
employments or vocations, a mode of punishment commonly employed
against those legislatively branded as disloyal." Id. at 474.
The district court likened Section 71113 to this latter form of
enactment because, in its view, the law compels Appellees to
discontinue the provision of mission-critical services: either
abortion services (where legal) or sexual and reproductive
healthcare services to persons funded by Medicaid. In this way,
the district court concluded, "Section 71113 is consistent with
historical notions of punishment."

As to the second and third factors, the district court
determined that there was a poor fit between Section 71113 and any
nonpunitive legislative purpose because the statute excludes few

abortion providers other than Appellees from participating in the Medicaid program and because federal law already bars federal funding for elective abortions.   Therefore, the district court determined, the statute does relatively little to further Congress's nonpunitive purpose, which the government describes as "halting federal Medicaid funding for abortion providers," while concomitantly imposing a severe burden on Appellees' ability to carry out their mission of providing all types of reproductive health care services.   Moreover, as described above, the record contains several examples of statements by legislators articulating a desire to defund Appellees, which the district court regarded as evidence of punitive intent.   These facts and record evidence led the district court to conclude that Section 71113 cannot reasonably be viewed as furthering any nonpunitive legislative purpose and that it evinces a congressional intent to punish Appellees.[9]

We do not question the district court's findings that Section 71113 will likely have deleterious effects on Appellees'

_____

[9] As part of its assessment of whether Section 71113 imposes punishment, the district court also expressed concern that Section 71113's prohibition might burden the associational rights of affiliates that do not perform abortions by barring them from receiving Medicaid reimbursements unless they disassociate from the PPFA.  As we explain in Section II.B.2., Section 71113 likely imposes no burden on Appellees' associational rights.  Thus, associational burdens play no role in our bill of attainder analysis.

ability to carry out all aspects of their mission. Nor do we doubt that several members of the Congress that enacted Section 71113 wanted to defund Appellees or that Section 71113 could be drafted to better advance the law's purpose of halting federal Medicaid funding for abortion providers. But we disagree with the district court's categorization of these findings as sufficient indicia of punishment.

When Congress employs its constitutional power to tax and spend for the "general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, it has "broad discretion" to place "limits on the use of such funds to ensure they are used in the manner [it] intends." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. ("AOSI"), 570 U.S. 205, 213 (2013) (citation omitted). For this reason, judicial "review of distinctions that Congress draws in order to make allocations from a finite pool of resources must be deferential, for the discretion about how best to spend money to improve the general welfare is lodged in Congress rather than the courts." Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 485 U.S. 360, 373 (1988) (citation omitted).

True, Taxing and Spending Clause legislation can violate the Constitution by running afoul of another of its provisions. See, e.g., AOSI, 570 U.S. at 213-21 (spending condition violates the First Amendment by compelling affirmation of a belief that by

its nature could not be confined within the scope of the relevant federal program); Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 575-88 (2012) (spending conditions that coerce States to make regulatory changes that Congress could not impose directly violate federalism principles that protect States as independent sovereigns within our federal system). But "Congress has broad power to tax and spend for the general welfare so long as it does not violate other constitutional provisions." Erwin Chemerinsky, Constitutional Law: Principles and Policies 300 (7th ed. 2023). Thus, where Congress uses its traditional taxing and spending authority, a court should not conclude that a federal statute violates the Constitution because it was enacted with an improper punitive purpose unless the record compels such a finding. See Selective Serv. Sys., 468 U.S. at 850.

In our view, the preliminary injunction record does not compel such a conclusion. First, we disagree with the district court's determination that Section 71113 is consistent with historical notions of punishment. Leave aside that Appellees are corporations, and not individuals. See ACORN v. United States, 618 F.3d 125, 137 (2d Cir. 2010) (observing, in a context where Congress withheld a future appropriation from a corporation, that "[t]here may well be actions that would be considered punitive if taken against an individual, but not if taken against a corporation" (alteration in original) (citation and internal

- 24 -

quotation marks omitted)).  Section 71113 is fundamentally different from the statutes at issue where the Supreme Court found congressional legislation to impose punishments and thus to constitute bills of attainder.  These cases -- Cummings, 71 U.S. 277, Ex parte Garland, 71 U.S. 333, Lovett, 328 U.S. 303, and Brown, 381 U.S. 437 -- all involved statutes imposing on individuals or groups of individuals severe, non-contingent disabilities from and restraints on participating in certain employments or professions because of past associations or conduct.  See Selective Serv. Sys., 468 U.S. at 852 & n.9.

In contrast, Section 71113 looks ahead.  It imposes no fine or other penalty for past conduct.  Instead, it establishes new conditions on the receipt of appropriated funds in service of a new policy goal favored by Congress.  And it does so by imposing conditions that Appellees can satisfy by halting abortion services.  Thus, whatever else might be said about Section 71113, it simply does not impose "punishment" as the term has been historically understood.  See id. at 853 (concluding that a federal statute barring those who failed to register for the draft from obtaining federal higher education financial assistance unless or until they register was not "punishment" because "the sanction is the mere denial of a noncontractual governmental benefit," the statute imposed "no affirmative disability or restraint," and "a statute that leaves open perpetually the possibility of qualifying

for aid does not fall within the historical meaning of forbidden
legislative punishment" (citation modified)); see also, e.g.,
TikTok, Inc., 122 F.4th at 968 (upholding as non-punitive a statute
containing a line-of-business restriction that perpetually leaves
open the possibility of overcoming its prohibitions by voluntarily
discontinuing engagement in the disfavored line of business);
ACORN, 618 F.3d at 137 ("The withholding of appropriations [from
a corporation] does not constitute a traditional form of punishment
that is considered to be punitive per se." (citation modified)).

Second, we also disagree with the district court's
determination that Section 71113 likely imposes punishment under
the remaining factors for determining whether a measure is
punishment for bill of attainder purposes. Again, the district
court reasonably concluded that there is an imperfect fit between
Section 71113 and its purpose, that Section 71113 imposes a severe
burden on Appellees' ability to carry out all aspects of their
mission, and that some members of the Congress that enacted Section
71113 desired to defund Appellees. But these determinations do
not compel the conclusion that Section 71113 inflicts punishment.

That Section 71113 regulates only certain abortion
providers does not mean that it punishes those that it does
regulate. An act imposing future burdens on only some who are
similarly situated does not impose punishment for bill of attainder
purposes by virtue of being underinclusive. See Nixon, 433 U.S.

at 469-70; see also Kaspersky Lab, Inc. v. U.S. Dep't of Homeland
Sec., 909 F.3d 446, 456 (D.C. Cir. 2018) ("[T]he Bill of Attainder
Clause does not require narrow tailoring."). Moreover, for reasons
explained above, the calls by individual legislators to defund
Appellees should not be mistaken for calls to punish. Unless
linked to some prior act, a call to defund, even if it uses
disparaging language about aspects of Appellees' mission, is a
call for a prospective change in action. But prospective changes
in action, even when burdensome, differ fundamentally from
punishments, which are retrospective.[10] At bottom, the preliminary
injunction record does not cause us to doubt the sincerity of what
the government tells us is the nonpunitive purpose behind Section
71113: halting federal Medicaid funding for abortion providers,
presumably as a means of inducing them to stop performing abortions
and/or diminishing their capacity for performing abortions.[11]

---

[10] Insofar as Appellees rely on statements made by legislators
during the consideration of earlier bills that never were enacted,
these would lack probative value for the additional reason that
"unsuccessful attempts at legislation are not the best of guides
to legislative intent." Red Lion Broad. Co. v. FCC, 395 U.S. 367,
382 n.11 (1969) (citing Fogarty v. United States, 340 U.S. 8, 13-14
(1950)).

[11] With respect to this last point, we think Congress
rationally could have concluded that, notwithstanding the Hyde
Amendment's ban on federal funds being expended on most abortions,
the prohibitions in Section 71113 could have the effect of further
diminishing Appellees' capacity for performing abortions. As the
Supreme Court explained in Sabri v. United States, "[m]oney is
fungible . . . . Liquidity is not a financial term for nothing;

For all these reasons, Section 71113 does not impose punishment on Appellees. It instead uses Congress's taxing and spending power to put Appellees to a difficult choice: give up federal Medicaid funds and continue to provide abortion services or continue receiving such funds by abandoning the provision of abortion services. That the law imposes a difficult choice on the recipient of federal funds does not demonstrate that Congress is punishing the recipient for past action -- an intrinsic element of a bill of attainder. Appellees therefore likely will not prevail on the merits of their bill of attainder claim.

### 2. Unconstitutional Conditions

In addition to finding that Section 71113 was likely a bill of attainder, the district court concluded that Appellees were likely to succeed in showing that Section 71113 unconstitutionally conditioned federal funds on the relinquishment of their First Amendment associational rights. In the district court's view, Section 71113 did not merely withhold funding based on whether an entity provided abortion services, but also on whether "its affiliates" did. The district court acknowledged the government's position that "affiliates" carried its ordinary dictionary meaning: "two entities' existence under common control," and that PPFA's "membership standards," "accreditation

---

money can be drained off here because a federal grant is pouring in there." 541 U.S. 600, 606 (2004).

standards," and "shared medical standards and guidelines" could be sufficient to show the requisite common control.

The district court concluded that, under the government's position, whether a Member was an "affiliate" was likely to be informed by its participation in expressive association. Thus, Non-Qualifying Members could not "escape the law's burden except by disassociating from Members that [provide abortions]" and PPFA altogether.

Because we instead find that the statute allows a definition of "affiliates" that is unlikely to turn on any First Amendment protected activity, we conclude, as a matter of constitutional avoidance, that Appellees are not likely to succeed on the merits of their unconstitutional conditions claim. See Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 59 (2006) (noting that in some circumstances a funding condition may result in an unconstitutional burden on First Amendment rights).

There are several reasons to think that the best reading of Section 71113 favors a narrow construction of "affiliates" based on corporate control. We begin with the text of the statute. IRS v. Murphy, 892 F.3d 29, 35 (1st Cir. 2018). Section 71113 defines "[p]rohibited entity" as "an entity, including its affiliates, subsidiaries, successors, and clinics . . . ." Pub. L. No. 119-21, 139 Stat. 72 (2025) (emphasis added). Congress did not

expressly define the term "affiliates," so we apply the ordinary presumption -- absent contrary evidence -- that Congress knows and adopts "the widely accepted legal definitions of meanings associated with the specific words enshrined in the statute." United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001) (citing Morissette v. United States, 342 U.S. 246, 263 (1952)). We therefore "turn to Black's Law Dictionary to glean the most widely accepted legal meaning" of the term. Id.

Black's Law Dictionary defines an "affiliate" as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Affiliate, Black's Law Dictionary (12th ed. 2024). Black's also defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee." Control, Black's Law Dictionary (12th ed. 2024). These definitions suggest a consistent theme: affiliation depends on concrete organizational power, not merely shared values, professional standards, or membership in the same umbrella organization. And that makes sense in the context of Section 71113: without this provision, a prohibited entity could use the corporate form to evade the funding restriction.

Here, we see nothing in the statutory structure to suggest that Congress meant the term "affiliates" to bear a novel definition. To the contrary, Congress placed "affiliates" alongside familiar corporate terms like "subsidiaries," "successors," and "clinics," which strengthens the inference that it was using a corporate-control cluster of terms. Because statutory words are often known by the company they keep, we give related meaning to those terms. See City of Providence v. Barr, 954 F.3d 23, 34 (1st Cir. 2020); S. D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 378 (2006) ("[A] string of statutory terms raises the implication that the 'words grouped in a list should be given related meaning.'" (quoting Dole v. United Steelworkers of Am., 494 U.S. 26, 36 (1990)).

Reading "affiliates" according to its settled corporate meaning also aligns with how the term is used across federal law. Multiple statutes and regulations -- ranging from commerce to communications to banking -- define affiliation in terms of ownership, control, or the power to direct another entity's decisions. See, e.g., 15 U.S.C. § 8206(2) (insurance) ("any entity that controls, is controlled by, or is under common control with . . . ."); 47 U.S.C. § 274(i)(1) (telecommunication common carriers) ("any entity that, directly or indirectly, owns or controls, is owned or controlled by, or is under common ownership or control with . . . ."); 17 C.F.R. § 230.405 (similar in

securities regulation); 12 U.S.C. § 1841(k) (similar in banking law).  While these provisions arise in different substantive contexts, they reflect a consistent background norm: affiliation is a matter of who controls whom, not who agrees with whom.

Appellees argued -- and the district court agreed -- that the government's positions on what constitutes an affiliate were unclear and inconsistent.  At times, the government cited Black's control-based definition, but it also asserted that PPFA's "membership standards," "accreditation standards," and "shared medical standards and guidelines," could suffice to constitute "affiliation."  Appellees contend that the latter position's breadth, and the government's inconsistent articulation of the definition, unconstitutionally "coerce[d]" disaffiliation. They explain: Non-Qualifying Members are "left guessing" whether their relationship with other Members suffices.  In their appellate briefing, Appellees characterize the government as going even further, now suggesting that "practical support," "collect[ion] [of] dues from its [M]embers," and Members' use of funds in a way that "benefits other [M]embers" or "the entire enterprise" (PPFA) suffices to constitute "affiliation."

But even if there are arguments that could support a broader definition of affiliates than we have described, adopting such a construction would raise serious constitutional concerns. After all, such a definition would stretch the term beyond its

usual -- indeed anodyne -- legal meaning and risk unconstitutionally conditioning federal funds on protected expressive activity. See NAACP v. Alabama, 357 U.S. 449, 462-63 (1958) (government action that "may induce members to withdraw from the Association" burdens the freedom of association); see also AOSI, 570 U.S. at 214 ("[T]he Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" (quoting Rumsfeld, 547 U.S. at 59)).

We should not credit a definition that would introduce constitutional difficulties. "It is a cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality," this Court will assess "whether a construction of the statute is fairly possible by which the question may be avoided." Kong v. United States, 62 F.4th 608, 615 (1st Cir. 2023) (quoting Zadvydas v. Davis, 533 U.S. 678, 689 (2001)). So even if we were to find likely that there is "serious doubt" about the constitutionality of the "affiliates" clause, our answer would be clear: it is "fairly possible," indeed it is the best reading, to interpret the statute as adopting the narrower, control-based definition that we described above. Id.

These considerations support applying the corporate-control definition as we have described it. Congress chose a term -- "affiliates" -- that is deeply rooted in the

language of corporate control and our adopting this definition
avoids the potential constitutional problem identified by
Appellees.  Section 71113 is therefore best read to apply only to
affiliate relationships that display traditional hallmarks of
direction or oversight: the power to manage, supervise, or govern
another entity's operations.[12]

With that understanding, we conclude that Appellees are
unlikely to succeed on the merits of their unconstitutional
conditions claim.  Whether Non-Qualifying Members fall within the
definition of "prohibited entit[ies]" is unlikely to turn on
expressive activity but instead on whether they and Qualifying
Members exist under common control.  Appellees' remaining
arguments on the application of Section 71113 are more
appropriately addressed through its Declaratory Judgment claim,
which has yet to be litigated.  If requested, the district court
should conduct further fact-finding to determine whether
Non-Qualifying Members satisfy the control-based definition of
"affiliates."

---

[12] Indeed, after oral arguments, the government submitted a
Rule 28(j) letter notifying us that CMS had emailed State Medicaid
Directors concerning the implementation of Section 71113.  The
email stated that "State Medicaid agencies are responsible for
identifying the prohibited entities enrolled in their Medicaid
program for purposes of ensuring compliance with Section 71113."
And that, to aid states in that task, CMS interprets Section
71113's term "affiliate," and the term "control" within that
definition, in the same manner as the Black's Law Dictionary
definition we cite above.

### C. Equal Protection Claim

The district court held that Appellees were likely to succeed on the merits of their equal protection claim. In the district court's view, Section 71113 treated Planned Parenthood Members differently from other providers <u>because</u> of their association with PPFA and its Members.

The district court explained that Section 71113 combines several criteria in a way that effectively "bar[s] Planned Parenthood Members from receiving Medicaid reimbursements while leaving virtually all other abortion providers outside its scope." (quotation marks omitted). <u>See</u> Pub. L. No. 119-21, 139 Stat. 72, 300 (July 4, 2025). The district court further reasoned that Section 71113 "classifies on the basis of affiliation" because it "applies to affiliates of an entity that provide[s] abortion[s]." As the district court read the statute, "no Member [could] escape the law's burden simply by ending its own abortion services." Instead, a Member would also need to sever all ties with other Planned Parenthood Members that continued to provide abortion services, "which requires disassociating from [PPFA]." That feature of the statute showed that Section 71113 classifies providers not only on the basis of what they do, but also on the basis of their associations. The district court thus held that Section 71113 likely impinged upon Appellees' fundamental right of association and required strict scrutiny. Applying such scrutiny,

the district court concluded that the statute was not "precisely tailored to serve a compelling governmental interest," and that Appellees demonstrated a substantial likelihood of success on their equal protection claim.

We conclude that rational basis is the appropriate standard of review for the equal protection claim. Under that standard, Appellees are not likely to succeed on the merits of their equal protection claim.

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Implicit in this clause is an equal protection guarantee, see Bolling v. Sharpe, 347 U.S. 497, 499 (1954), which requires that "all persons similarly" situated be "treated alike." Pyler v. Doe, 457 U.S. 202, 216 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)). We analyze Fifth Amendment equal protection claims in "precisely the same" manner as we do Fourteenth Amendment equal protection claims. United States v. Blewitt, 920 F.3d 118, 123 (1st Cir. 2019) (quoting Carrasco v. Sec'y of Health, Educ. & Welfare, 628 F.2d 624, 628 n.5 (1st Cir. 1980)).

We review de novo the district court's choice of the proper level of scrutiny. See Doe, 152 F.4th at 284 (quoting Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs., 144 F.4th 9, 19 (1st Cir. 2025)). Accordingly, we must

determine whether Section 71113 discriminates with respect to a fundamental right, as the district court concluded. Having already determined that Appellees failed to show a likelihood of success on their claim that the "affiliates" clause burdens First Amendment-protected activity, we conclude that no fundamental right is likely implicated based on our construction of the statute. Section 71113 therefore warrants only rational basis review. See D'Angelo v. N.H. Sup. Ct., 740 F.3d 802, 806 (1st Cir. 2014).

A classification survives rational basis review so long as it is rationally related to a legitimate governmental interest and "is neither arbitrary, unreasonable nor irrational." D'Angelo, 740 F.3d at 806 (quoting LCM Enters., Inc. v. Town of Dartmouth, 14 F.3d 675, 679 (1st Cir. 1994)); see also Heller v. Doe, 509 U.S. 312, 324 (1993) (a statutory classification that "rests on grounds wholly irrelevant to the achievement" of the government's objective fails rational basis review (quoting Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 71 (1978)). Under this standard, a statutory classification is presumed valid and those attacking its rationality "have the burden 'to negative every conceivable basis which might support it.'" FCC v. Beach Commc'ns, 508 U.S. 307, 315 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)).

The rational basis standard is "a paradigm of judicial restraint." Beach Commc'ns, 508 U.S. at 314. Under this form of review, courts may not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations . . . ." New Orleans v. Dukes, 427 U.S. 297, 303 (1976). Moreover, legislative judgment "may be based on rational speculation unsupported by evidence or empirical data." Heller, 509 U.S. at 320 (quoting Beach Commc'ns, 508 U.S. at 315). As such, our inquiry ends if there are "plausible reasons" for legislative action. United States R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980). Under this highly deferential standard, we conclude that Appellees are unlikely to show that the government's classification is irrational.

At oral argument, Appellees claimed that Section 71113 is irrationally underinclusive because it only covers Planned Parenthood Members, and "two other entities [that] got caught up collaterally." Had the government actually intended to reduce the provision of abortion services, they reasoned, Section 71113 would have covered a wider group of abortion providers. Next, Appellees argued that criterion (B) in Section 71113, which requires a prohibited entity to have received more than $800,000 in Medicaid funds in fiscal year 2023, is not a reasonable proxy for abortion providers participating in the Medicaid program. Lastly, Appellees stated that withholding Medicaid funds from "prohibited

entit[ies]" to discourage abortions has no "footing in reality," because data shows that "the number of abortions goes up" when Planned Parenthood centers close. For these reasons, Appellees urge that Section 71113's classification does not bear a rational relationship to the government's interest in reducing abortion.

The government, on the other hand, argued that the criteria set forth in Section 71113 reasonably define a subset of abortion providers participating in the Medicaid program. Section 71113, in the government's view, covers entities that (1) receive a significant amount of Medicaid funding; (2) are likely to be dependent on such funding; and (3) practice specialties where they are likely to provide a "disproportionate number" of abortions. Section 71113, therefore, aims to withhold Medicaid funds from those abortion providers that are "most likely" to serve many Medicaid patients. As such, Congress could reasonably take the view that entities that meet the prohibited entity criteria represent the "most acute aspect of the problem" it seeks to address, which is the "subsidization of abortion," and that these entities will most likely be susceptible to changing their practices based on the substantial impact that would arise from the loss of federal funds.

Here, Appellees likely fail to negate any conceivable basis for upholding Section 71113. Accepting Appellees' argument that, to be valid under rational basis review, Section 71113 must

have covered a wider range of abortion providers would require us to disregard longstanding precedent allowing Congress to legislate incrementally. Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1995) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (citing Semler v. Or. State Bd. of Dental Exam'rs, 294 U.S. 608 (1935)). Further, Appellees' argument that the $800,000 criterion is a poor proxy for abortion providers participating in the Medicaid program fails to negate the argument that the criterion permits Congress to allocate a significant amount of Medicaid funds elsewhere, under its "authority to impose limits on the use of [government] funds to ensure they are used in the manner Congress intends." See AOSI, 570 U.S. at 213 (citing Rust v. Sullivan, 500 U.S. 205, 195 n.4 (1990)). Lastly, we are bound by Supreme Court precedent establishing that congressional action may have a rational basis even when not supported by specific data or evidence, or even when conflicting evidence may be available. See Heller, 509 U.S. at 320 (quoting Beach Commc'ns, 508 U.S. at 315). Questions on the "wisdom and utility" of legislation are left exclusively to Congress, so long as these questions are "at least debatable." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 469 (1981) (first quoting Ferguson v. Skrupa, 372 U.S. 726, 729 (1963); and then quoting United States v. Carolene Products Co., 304 U.S. 144, 154 (1938)).

The "Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."  Beach Commc'ns, 508 U.S. at 314 (quoting Vance v. Bradley, 440 U.S. 93, 97 (1979)).  Guided by this presumption and given the highly deferential nature of our review, Section 71113 likely survives rational basis review.  There are plausible reasons for treating "prohibited entit[ies]" differently from other abortion providers, particularly where Congress viewed these entities as the most significant recipients of Medicaid funds.  Preventing these entities from receiving funds if they continue providing abortion services furthers Congress's interest in reducing abortions.  Plaintiffs, therefore, are unlikely to succeed in showing that Section 71113 violates equal protection.

### III. CONCLUSION

Because Appellees are unlikely to succeed on the merits of their claims, we **vacate** the district court's July 21 and July 28, 2025, orders granting the preliminary injunctions and **remand** for further proceedings consistent with this opinion.